_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

Bidi Vapor LLC,

*Petitioner,*

v.

U.S. Food and Drug Administration; Robert M. Califf, M.D., Commissioner; U.S. Department of Health and Human Services; Xavier Becerra, Secretary,

*Respondents.*

_____

On Review Of FDA Marketing Denial Order (STN PM0003460.PD2) Issued Under The Federal Tobacco Control Act

==================================

## PETITIONER'S TIME SENSITIVE MOTION
## (FEBRUARY 19, 2024) FOR A STAY PENDING REVIEW

Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, Petitioner hereby certifies that the following have an interest in the outcome of this petition for review:

1. Becerra, Xavier (Secretary, Department of Health and Human Services)

2. Bidi Vapor LLC (Petitioner)

3. Butler, Samuel (counsel for Petitioner)

4. Chowdhury, Azim (counsel for Petitioner)

5. Farrelly, Matthew, Ph.D. (Director, Office of Science, Center for Tobacco Control, Food and Drug Administration)

6. Garland, Merrick B. (Attorney General of the United States)

7. Gill, Neelam (counsel for Petitioner)

8. Gotting, Eric (counsel for Petitioner)

9. Keller & Heckman LLP (counsel for Petitioner)

10. King, Brian (Director, Center for Tobacco Control, Food and Drug Administration)

11. Patel, Nirajkumar (member of Petitioner)

12. Sabnis, Rohit (counsel for Petitioner)

13. United States Attorney's Office, Middle District of Florida

14. United States Department of Health & Human Services (Respondent)

15. United States Department of Justice

16.    United States Food & Drug Administration (Respondent)

17.    Van-Tull, LiAnn (counsel for Petitioner)

18.    Vicente, Wendy (FDA Office of Chief Counsel)

19.    Zeimer, Sara (counsel for Petitioner)

<u>FRAP 26.1 Disclosure Statement</u>: No parent corporation or publicly held corporation owns 10% or more of any stock in Bidi Vapor LLC.

<u>11th Cir. R. 26.1-3 Certification</u>: No publicly traded company or corporation has an interest in the outcome of this appeal.

<u>11th Cir. R. 26.1-2 Certification</u>: The undersigned certifies that this CIP is complete at the time of filing.


Dated: February 2, 2024.


                              Respectfully submitted,


                              /s Eric P. Gotting
                              Eric P. Gotting
                              KELLER AND HECKMAN LLP
                              1001 G Street, NW
                              Suite 500 West
                              Washington, DC 20001
                              Telephone: (202) 434-4100
                              Facsimile: (202) 434-4646
                              gotting@khlaw.com
                              *Counsel for Petitioner*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITES ................................................................................ ii

INTRODUCTION ..............................................................................................1

BACKGROUND ................................................................................................2
    I.     Tobacco Control Act And The Deeming Rule ......................................2
    II.    PMTA Deadlines And FDA Enforcement Discretion...........................3
    III.   APPH Standard For PMTAs Requires A Multi-Factor, Multi-
          Disciplinary Analysis .........................................................................3
       A.   Statutory Language ....................................................................3
       B.   FDA Regulations, Guidance, and Public Statements ........................4
    IV.   Bidi's PMTA and Amendments ...........................................................6
    V.    FDA's Deficiency Letter and Marketing Denial Order ........................7

LEGAL STANDARD..........................................................................................9

ARGUMENT .....................................................................................................9
    I.     Bidi Is Likely To Succeed On The Merits ...........................................9
       A.   FDA Failed To Comply With The TCA When It Did Not Engage
           In A Holistic Review Of Bidi's PMTA ............................................9
       B.   FDA's Alleged Deficiencies Are Arbitrary and Capricious.............14
         1. Deficiency One................................................................15
         2. Deficiency Two……………………………………….....................17
         3. Deficiency Three…………………………………………...……18
    II.    Bidi Faces Irreparable Harm Without A Stay .....................................20
    III.   A Stay Does Not Harm FDA And Serves The Public Interest.............22

CONCLUSION.................................................................................................23

CERTIFICATE OF COMPLIANCE..................................................................25

CERTIFICATE OF SERVICE ..........................................................................26

# TABLE OF AUTHORITES

Page(s)

## **Cases**

*Bidi Vapor LLC v. FDA*,
  47 F.4th 1191 (11th Cir. 2022) ............................................................ 8, 13, 14, 15

*Burlington Northern and Santa Fe Railway Co. v. Surface Trans. Bd.*,
  403 F.3d 771 (D.C. Cir. 2005) ..............................................................15

*City of Arlington, Tex. v. FCC*,
  569 U.S. 290 (2013) ................................................................................9

*Clarke v. Commodity Futures Trading Comm'n*,
  74 F.4th 627 (5th Cir. 2023) ................................................................22

*Fontem US, LLC v. FDA*,
  82 F.4th 1207 (D.C. Cir. 2023) ................................. 10, 11, 12, 13, 20

*Genuine Parts Co. v. EPA*,
  890 F.3d 304 (D.C. Cir. 2018) ..............................................................14

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022) .................................................... 20, 21

*Jysk Bed'N Linen v. Dutta-Roy*,
  810 F.3d 767 (11th Cir. 2015) ..............................................................22

*LabMD, Inc. v. Fed. Trade Comm'n*,
  678 Fed. App'x 816 (11th Cir. 2016) .....................................................9

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................................4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................15

*Oderbrecht Constr. Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ............................................................20

*Physicians for Social Responsibility v. Wheeler*,
  956 F.3d 634 (D.C. Cir. 2020) ..............................................................15

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)......................................................................................20

*Wages and White Lion Inv., LLC v. FDA*,
   90 F.4th 357 (5th Cir. 2024) ......................................................................13

**Statutes**

5 U.S.C. §705...............................................................................................9
5 U.S.C. §§706(2)(A), (2)(B), (2)(C) ...........................................................9
21 U.S.C. §387 *et seq.*.................................................................................2
21 U.S.C. §387a(b).......................................................................................2
21 U.S.C. §387g..........................................................................................20
21 U.S.C. §387j............................................................................................2
21 U.S.C. §387j(b)(1)...................................................................................4
21 U.S.C. §387j(c)(1)(B) ..............................................................................4
21 U.S.C. §387j(c)(2)....................................................................................3
21 U.S.C. §387j(c)(2)(A)...............................................................................8
21 U.S.C. §387j(c)(4)....................................................................................3
21 U.S.C. §387*l*(b) .....................................................................................9

 **Regulations**

15 C.F.R. §10.35 ..........................................................................................2
21 C.F.R. §1114.9 .........................................................................................7
21 C.F.R. §1114.25 .......................................................................................7
21 C.F.R. §1114.33 .......................................................................................8
81 Fed. Reg. 28974 (May 10, 2016) .............................................................2
86 Fed. Reg. 55300 (Oct. 5, 2021)...........................................................4, 5

# INTRODUCTION

Over three years ago, Petitioner Bidi Vapor LLC ("Bidi") timely filed with Respondent U.S. Food and Drug Administration ("FDA" or "Agency") a pre-market tobacco product application ("PMTA") to continue manufacturing and selling its tobacco-flavored Electronic Nicotine Delivery Systems ("ENDS") or "e-cigarette" product (known as the BIDI® Stick Classic). Bidi spent over $8.2 million compiling the PMTA and amendments containing extensive scientific and technical data showing its product meets the statutory "appropriate for the protection of the public health" ("APPH") standard, including that it helps adult smokers transition away from more dangerous cigarettes.

Less than two weeks ago, FDA issued to Bidi a Marketing Denial Order ("MDO"), forcing the product off the market. The MDO, however, was not based on a full scientific review, as required by statute, of all the information and data in the PMTA related to an APPH determination. Rather, FDA rested its MDO on a mere three, discrete deficiencies, without any explanation as to how they outweighed the extensive materials submitted by Bidi demonstrating the BIDI® Stick Classic is APPH. And that is not all. The deficiencies themselves are largely conclusory and ignore significant evidence and comments advanced by Bidi. Accordingly, the MDO violates the Administrative Procedure Act ("APA") as it is arbitrary and capricious and otherwise unlawful.

1

Bidi files this time sensitive motion (February 19, 2024) seeking a stay pending appeal of the MDO. At a minimum, without a stay, Bidi will lose 95% of its business within three weeks and cease operations, as its four main distributers are already reducing orders and indicated they will terminate business with Bidi if a stay is not entered during the third week of February. And it would be impracticable to first seek an administrative stay from FDA. Under 15 C.F.R. §10.35, FDA has no response deadline. Bidi cannot wait.

## BACKGROUND

### I.     Tobacco Control Act And The Deeming Rule

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"), giving FDA authority over the marketing and sale of "tobacco products." 21 U.S.C. §387, *et seq.* In August 2016, FDA's "Deeming Rule" took effect, which applied the TCA to ENDS. 21 U.S.C. §387a(b); 81 Fed. Reg. 28974 (May 10, 2016).

Consequently, ENDS were immediately subject to numerous TCA provisions, including a requirement that manufacturers obtain premarket authorization from FDA to sell product. 21 U.S.C. §387j. Manufacturers had to submit PMTAs, which entail a time-consuming and costly process of compiling extensive scientific, technical, and marketing data FDA must review when deciding whether to grant marketing authorization.

## II.  PMTA Deadlines And FDA Enforcement Discretion

FDA changed the PMTA deadline several times over the years, finally

landing on August 8, 2021, A0041-45, which was then shortened by the federal

district court in Maryland to September 9, 2020.  *Am. Academy of Pediatrics, et al.*

*v. FDA*, 8:18-cv-00883-PWG (D. Md.) (Dkt. Nos. 127 & 182).  Any ENDS for a

timely filed PMTA could remain on the market until September 9, 2021, after

which the product would be subject to enforcement discretion.  *Id.*

To date, Petitioner is not aware that FDA has ever issued a warning letter or

initiated an enforcement action against a product on the market that has a pending

PMTA before the Agency.  A0198.

## III.  APPH Standard For PMTAs Requires A Multi-Factor, Multi-Disciplinary Analysis

### A.  Statutory Language

The TCA requires FDA to conduct a complex, science-based evaluation

based on all contents in a PMTA to determine whether a product is APPH.  The

TCA's plain language provides a PMTA shall be denied if "upon the basis of

information submitted to [FDA]…and any other information before [FDA]" the

applicant has not demonstrated APPH.  21 U.S.C. §387j(c)(2).

The statute defines APPH in broad terms with respect to "risks and benefits

to the population as a whole," including "users and nonusers of tobacco products."

21 U.S.C. §387j(c)(4).  In this context, FDA must determine whether the ENDS

3

product will lead people to start using tobacco products (*i.e.*, initiation) or to stop using such products (*i.e.*, cessation).  *Id.*

Moreover, the statute lists numerous forms of other evidence that must be in any PMTA, including data on health risks, ingredient and additive information, manufacturing practices, product samples, labeling specimens, and any other information required by FDA.  21 U.S.C. §387j(b)(1).  The TCA also envisions that FDA consider the positive impact manufacturer-implemented restrictions on the sale and distribution of a product to minors could have on the APPH determination.  21 U.S.C. §387j(c)(1)(B).

All of this is consistent with Congress's choice of words in adopting the APPH standard.  Congress did not employ any words or terms of limitation.  Rather, it used the word "appropriate"—"the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted).

### B.    FDA Regulations, Guidance, and Public Statements

FDA has repeatedly described APPH as a multi-factored and multi-disciplinary standard.  For instance, in October 2021, FDA issued the PMTA Final Rule.  86 Fed. Reg. 55300 (Oct. 5, 2021).  FDA noted APPH involves a "complex determination," *id.* at 55335, that FDA "considers many factors," *id.* at 55314, and that APPH "requires a balancing" of risks and benefits, *id.* at 55384.  FDA also

stated an APPH "determination would involve consideration of many factors," and noted it "will be made with respect to…the population as a whole, rather than whether a product meets each item in a series of specific criteria." *Id.* at 55386. Indeed, FDA stated it would determine APPH on an "individualized" basis, according to the "risks and benefits" of the specific product, and "based on *all* of the contents of the application." *Id.* at 55320, 55390 (emphasis added).

Similarly, in June 2019, FDA issued final PMTA Guidance, totaling over 50 pages, which also discussed APPH. A0046-51. Specifically, FDA said it "weighs all of the potential benefits and risks from information contained in the PMTA" to make an APPH determination. A0048. This would include information and data in health risk studies, toxicological and pharmacological testing, public literature reviews, pharmacokinetic evaluations, and consumer perception and intention studies. A0047-51. It also highlights specific restrictions on the sale and distribution of a product that would decrease the likelihood of underage use. A0048; A0054 (noting "complexity" of applications).

Furthermore, during several public workshops in 2018-19, FDA described reviewing a PMTA as a "[m]ulti-disciplinary approach," and cited numerous factors that must be considered. A0059-61; A0056-57. The following FDA-created diagram depicts the many APPH factors it must consider:



## IV.   Bidi's PMTA and Amendments

On September 8, 2020, Bidi submitted comprehensive and scientifically rigorous PMTAs for the BIDI® Stick Classic, as well as ten other non-tobacco flavored ENDS products.  A0198.[1]  The applications included, among other things, *in vitro* toxicity testing, e-liquid and aerosol analysis of harmful and potentially harmful chemicals, comprehensive literature reviews, comparisons to other tobacco products, hardware safety and battery certification information, manufacturing and quality control details, independent and validated consumer insight surveys, environmental assessments and stability data, as well as details

---

[1] The BIDI® Stick Classic is a disposable ENDS, which is a self-contained device in which the e-liquid is pre-filled into a sealed reservoir by the manufacturer.  The product is discarded after the e-liquid is consumed.

about the company's stringent youth-access prevention measures, adult-focused marketing practices, post-market surveillance strategies and unique recycling program. A0198.

Between October 2020 and January 2024, Bidi continued to update the applications with amendments. 21 C.F.R. §1114.9 (allowing amendments). To date, the company has submitted twenty amendments covering the BIDI® Stick Classic, including a consumer insight survey, product pattern of use and likelihood of use studies, updated scientific literature reviews, abuse liability assessments, product stability studies, a consumer perception and behavioral intentions study, aerosol testing results, a toxicological assessment, a nicotine pharmacokinetics and effects study, and most recently, an update on an ongoing adult smoker switching study. A0008-11; A0152-53; A0200.

The PMTA and amendments cost Bidi $8.2 million, with the PMTA alone totaling 285,000 pages. A0199; A0203.

## V. FDA's Deficiency Letter and Marketing Denial Order

On March 20, 2023, FDA sent Bidi a deficiency letter, which identified thirty-two items for the company to address regarding the BIDI® Stick Classic. A0012-38. 21 C.F.R. §1114.25 (allowing deficiency letters). Bidi filed a comprehensive response on June 18, 2023. A0039-40 (cover letter).

On January 22, 2024, FDA issued a marketing denial order ("MDO") for the BIDI® Stick Classic, A0001-11, concluding the BIDI® Stick Classic is not APPH. 21 U.S.C. §387j(c)(2)(A); 21 C.F.R. §1114.33. The MDO, however, was based on just three, discrete grounds (or alleged deficiencies):

- Bidi relied on test data from published literature for aerosol levels of Harmful and Potentially Harmful Constituents ("HPHCs") in similar tobacco-flavored ENDS products that were insufficient or inappropriate for a comparison against HPHC aerosol levels detected in the BIDI® Stick Classic. ("Deficiency One"). A0002-03.

- Bidi tested for substances (*e.g.*, nickel) that might have leached from the BIDI® Stick Classic device and its hardware components into the enclosed, pre-filled e-liquid by testing the product's aerosol rather than conducting a leachability test on the e-liquid. ("Deficiency Two"). A0004.

- The BIDI® Stick Classic's nicotine levels may lead to continued abuse liability (*i.e.*, risk of addiction) in adult tobacco product users (*e.g.*, smokers) and pose an addiction risk in nonusers (*e.g.*, youth) ("Deficiency Three"). A0004-05.

Moreover, nowhere in the MDO did FDA balance these deficiencies against all of the extensive data and information submitted by Bidi in the PMTA and amendments demonstrating the BIDI® Stick Classic is APPH and should have been granted marketing authorization.[2]

---

[2] FDA had previously issued, on September 7, 2021, MDOs for Bidi's ten non-tobacco flavored ENDS products. Bidi filed a Petition for Review and this Court eventually vacated the MDOs because FDA failed to consider relevant evidence contained in the PMTAs, namely the extensive efforts Bidi had taken to guard against underage use and access. *Bidi Vapor LLC v. FDA*, 47 F.4th 1191 (11th Cir. 2022). Those PMTAs are now pending before FDA on remand.

## LEGAL STANDARD

This Court has discretion to enter a stay of FDA's MDO pending judicial review. 5 U.S.C. §705; 21 U.S.C. §387*l*(b). The factors considered are: (1) whether petitioner has made a strong showing it is likely to succeed on the merits; (2) whether petitioner will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *LabMD, Inc. v. Fed. Trade Comm'n*, 678 Fed. App'x 816, 819 (11th Cir. 2016).

## ARGUMENT

### I. Bidi Is Likely To Succeed On The Merits

#### A. FDA Failed To Comply With The TCA When It Did Not Engage In A Holistic Review Of Bidi's PMTA

FDA based the MDO on a mere three alleged deficiencies without ever engaging in a multi-factored and multi-disciplinary analysis that weighed and balanced all of the potential risks and benefits of the BIDI® Stick Classic when making its APPH determination. As discussed above, the TCA and various FDA regulations, guidance, and public statements make clear FDA must engage in a holistic approach that considers all data and information in a PMTA when deciding whether to grant marketing authority. Where FDA blatantly ignores this obligation, as it did here, it violates the APA and otherwise acts in an arbitrary and capricious manner. 5 U.S.C. §§706(2)(A), (2)(B), (2)(C); *City of Arlington, Tex. v.*

*FCC*, 569 U.S. 290, 297 (2013) (when agency exceeds power delegated by Congress it acts *ultra vires*).

Indeed, the D.C. Circuit recently held as much when vacating an MDO issued against another tobacco-flavored ENDS product. In *Fontem US, LLC v. FDA*, 82 F.4th 1207 (D.C. Cir. 2023), the Court considered an MDO that, similar to the one issued to Bidi, relied on six discrete deficiencies to find that Fontem's tobacco-flavored ENDS product was not APPH. *Id.* at 1213. Significantly, in describing FDA's burden under the TCA, the D.C. Circuit held FDA must: (i) "engage in [a] holistic public health analysis"; (ii) "account [for] the potential benefits of unflavored [*i.e.*, tobacco-flavored] products or weigh those benefits against risks to the public health"; (iii) "make a single predictive judgment whether a given tobacco product, on balance, will benefit the public as a whole"; "consider *both* the 'risks and benefits' of the product" and the "overall effect of a product for the 'population as a whole'"; and (iv) "make an all-things-considered judgment" as to whether a produce is APPH. *Id.* at 1211, 1215, 1218.

Moreover, the D.C. Circuit held FDA must pay careful attention to "balance[ing] the benefits of transitioning existing smokers to the product against the costs of inducing non-smokers to take up smoking." *Id.* at 1215. This is so as "[w]eighing the relative risks of new tobacco products will often be central to the public health analysis given the reality that there are both many smokers who wish

10

to stop smoking and many individuals who do not presently consume tobacco products at all." *Id.* In other words, FDA cannot ignore evidence relevant to one side of the equation, such as benefits to addicted smokers.

The D.C. Circuit vacated the MDO as to Fontem's tobacco-flavored ENDS product because FDA, while identifying multiple deficiencies, "failed to analyze the tradeoffs necessary to make a public health finding." *Id.* at 1217. For example, one purported deficiency included a failure to provide sufficient information regarding the safety of the product, particularly the need for aerosol testing. *Id.* at 1213. Although Fontem had produced evidence showing its aerosol concentrations were much lower than combustible cigarettes, FDA wanted more data on the potential emissions of harmful chemicals. *Id.* at 1213, 1220. But FDA "did not explain why this deficiency was sufficiently serious to outweigh any benefits associated with Fontem's products across the population as a whole." *Id.* at 1220.

Another alleged deficiency criticized the lack of information regarding "puffing regimens" and "toxicant yields" under certain conditions (coil temperature). *Id.* at 1213. Although Fontem had provided evidence of the conservative approach it had taken when measuring aerosol concentrations, FDA was worried users could still operate the device in ways that increased exposures to harmful constituents. *Id.* at 1213, 1220. But FDA failed to explain how "negative

consequences associated with toxicant yields or aerosol temperature were so serious as to outweigh the asserted benefits of Fontem's products." *Id.* at 1220.

The same holds true for Bidi's MDO. There was a wholesale failure on FDA's part to weigh the purported deficiencies against extensive evidence in the PMTA favoring a marketing granted order. For instance, in summary fashion, FDA concluded in Deficiency Three that the nicotine levels in the BIDI® Stick Classic could lead nonusers of tobacco products (including youth) who start using the product to develop a nicotine addiction. A0005. There is no discussion, however, of the extensive evidence submitted by Bidi demonstrating that such risk is extremely low. As summarized in Dr. Willie McKinney's declaration, at least three studies specific to the BIDI® Stick Classic demonstrate minors are not using the product and/or nonusers and youth do not, in fact, intend to start using BIDI® Sticks. A0165-66. Further, two additional studies show current smokers are using BIDI® Sticks to transition away from combustible cigarettes and quit their smoking habits. A0166-67. Yet the MDO neither weighed this evidence on the cessation side of the equation (*i.e.*, addicted smokers), nor offered any product-specific evidence indicating there is a significant risk to nonusers and youth.

Similarly, FDA maintained in Deficiencies One and Two that aerosol testing submitted by Bidi, showing not only that HPHC constituent levels in the BIDI® Stick Classic are comparable to those seen in other tobacco-flavored ENDS but

also that such levels in the BIDI® Stick Classic are a fraction of those found in combustible cigarettes, should nevertheless be completely discounted for various reasons. A0155-61. But this analysis, focusing on technical shortcomings in just two tests, is precisely what the D.C. Circuit held in *Fontem* violates the TCA. Even if the MDO raises "legitimate concerns," standing alone they do not "reflect the required statutory balancing for denying an application on public health grounds. The agency did not balance its concerns against the potential benefits of [Bidi's] products. Nor did it explain why these deficiencies were so serious as to justify" a no APPH determination. *Id.* at 1220-21.[3]

Finally, perhaps most surprising is FDA's disregard for controlling precedent in this Circuit. As noted above, this Court vacated MDOs for Bidi's non-tobacco flavored products because FDA failed to consider all relevant evidence in the PMTAs, and in particular Bidi's comprehensive underage access and marketing restrictions. *Bidi Vapor*, 47 F.4th at 1202-08; *Wages and White Lion Inv., LLC v. FDA*, 90 F.4th 357, 373 (5th Cir. 2024) (following *Bidi Vapor*). This Court summarized FDA's regulations and repeated representations in

---

[3] *See id.* at 1219 (FDA "faults Fontem for failing to provide very specific information about the physical properties of Fontem's products, but fails to explain how the identified problems relate to the 'risks and benefits to the population as a whole, including users and nonusers of the tobacco product.'"); *id.* at 1222 (FDA "identified highly granular deficiencies but failed to evaluate the potential effects of such deficiencies on the public health or to weigh these deficiencies against the potential benefit of Fontem's products.").

guidance and public statements that such restrictions are "critical" to an APPH determination and relevant as to whether a product should be granted marketing authorization. *Bidi Vapor*, 47 F.4th at 1202-03. Indeed, Bidi's PMTA contained numerous examples of marketing and access restrictions that the company has implemented. *Id.* at 1200; A0188-96. But in maintaining there is a potential risk to underage users, there is not a single mention in the MDO of these efforts and their potential benefits.

In the final analysis, there is nothing in the MDO that even remotely resembles a full-blown weighing or balancing of all the information and data, covering over 285,000 pages, that Bidi spent millions of dollars to generate in support of an APPH finding. As such, FDA has fallen well short of meeting its statutory duty under the TCA to conduct a holistic review of Bidi's PMTA, and this Court should therefore vacate the MDO on these grounds alone.

## B. FDA's Alleged Deficiencies Are Arbitrary and Capricious

Agency action is arbitrary and capricious where it failed to rely on factors Congress intended to be evaluated or consider an important aspect of the problem. *Bidi Vapor*, 47 F.4th at 1202 (citation omitted). An "agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). Indeed, agency action must be "reasonable and reasonably

explained." *Bidi Vapor*, 47 F.4th at 1202; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must examine relevant evidence and articulate a satisfactory explanation).

Moreover, it is arbitrary and capricious to apply different standards to similarly situated entities without a reasoned explanation. *Burlington Northern and Santa Fe Railway Co. v. Surface Trans. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) (citation omitted). Finally, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (internal quotations marks and citation omitted).

As detailed in Dr. McKinney's declaration, FDA's alleged deficiencies fail under the APA on multiple grounds.

### 1. Deficiency One

As part of the APPH determination, FDA wants to know whether the subject product poses a relatively greater or lower risk than similar ENDS products and other tobacco products. A0154. In the MDO, FDA maintained that published HPHC aerosol data from comparator tobacco-flavored ENDS products which were used by Bidi to compare to HPHC aerosol testing results from the BIDI® Stick Classic were insufficient or inappropriate. A0002.

To begin, the Agency generally argued the testing methods used to gather data appearing in the published data were different from those used on the BIDI® Stick Classic, and thus any comparisons could not be reliably made. A0002. However, FDA never explained why the unidentified differences in protocols prevented such comparisons. A0156-57. Indeed, Bidi presented evidence to FDA that the testing methods used on the comparator products and the BIDI® Stick Classic were similar. A0157. Accordingly, neither Bidi nor this Court know why the comparisons, which showed similar HPHC levels among the ENDS products and the BIDI® Stick Classic, were entirely discounted by FDA. A0155.

Moreover, as to the tobacco-flavored JUUL comparator product, FDA claimed some HPHCs may have gone undetected because the product was subjected to a limited puff count during testing, while aerosol data on the BIDI® Stick Classic were collected using a higher puff count. A0002. However, as Bidi noted to the Agency, that means the published data on JUUL aerosol could have only underestimated its HPHC levels. A0156. If the JUUL and the BIDI® Stick Classic had been subjected to the same testing regimes, and additional HPHCs were detected in the JUUL, that fact would have only bolstered Bidi's conclusion that its own product does not pose greater risk. A0156. Yet the Agency never addressed Bidi's comments in the MDO or explained how the JUUL data could have materially changed Bidi's analysis. A0156.

Finally, FDA treated Bidi differently than other manufacturers. For instance, in granting marketing approval for an NJOY tobacco-flavored ENDS, FDA accepted aerosol data from ENDS comparator products reported in published literature. But FDA never explained why it took a disparate approach as to Bidi. A0159-60. In fact, FDA acted inconsistently even within its review of the BIDI® Stick Classic. The Agency allowed Bidi to rely on publicly available data for a combustible cigarette when comparing aerosol levels against the BIDI® Stick Classic, even though the published data were collected using different testing parameters. But without explanation, FDA did not allow Bidi to employ a similar approach as to comparator ENDS. A0159.[4]

## 2. Deficiency Two

FDA also requests that manufacturers test their products for potentially hazardous substances (*e.g.*, nickel) that may have leached from the device and its

---

[4] FDA also argued Bidi did not provide certain information about testing done on comparator products (*e.g.*, analytical method validation, testing laboratories and accreditations). A0002-03. FDA did not respond, however, to Bidi's comments that demanding this information as a condition for accepting published data essentially eliminates the use of publicly available data, as many of the requested items do not typically appear in published studies. Indeed, full validation reports would be considered proprietary information. A0157-58. This contrasts with FDA guidance encouraging applicants to use published literature in lieu of, in this case, spending potentially one million dollars to conduct comparison tests on various products (which FDA suggested in the MDO Bidi should have done). A0158-59. And even if Bidi had conducted its own tests on comparator products, FDA further demanded certain information, like the length of time between dates of manufacture and testing, that would never be available to Bidi. A0159.

hardware components into the enclosed, pre-filled liquid, as users could eventually inhale any leachable substances.  A0004.  While FDA asked in the deficiency letter that Bidi perform a leachability study of the e-liquid itself, Bidi conducted an aerosol study for any leachable compounds.  A0160.  As Bidi noted to the Agency, consumers are exposed to the aerosol and its constituents, not the self-contained e-liquid.  If substances that leached from the device into the e-liquid do not transfer to the aerosol, then there is no risk from those constituents.  A0160-61.

And all indications are that relatively small amounts are finding their way into the aerosol.  Bidi's testing demonstrated the number and concentrations of HPHC's and other constituents in the BIDI® Stick Classic aerosol are much lower than those found in combustible cigarette smoke.  A0161.  As such, there are likely significant reductions in relative exposures and associated cancer and non-cancer risks from the BIDI® Stick Classic.  A0161.  However, in the MDO, FDA never indicated Bidi's testing methodology for evaluating aerosols was inappropriate (FDA only stated it could not be used to analyze the e-liquid) or any less informative than leachability studies, or otherwise addressed Bidi's comments that aerosol testing is better suited to assessing potential risk.  A0161.

### 3.    Deficiency Three

FDA argued nicotine levels in the BIDI® Stick Classic may result in comparable or higher abuse liability than a combustible cigarette, thus potentially

resulting in tobacco users maintaining their nicotine dependence and posing addiction risks to nonusers (including youth).  A0004-05.  As to current smokers, this appears to be a wholesale shift in FDA's approach to APPH determinations and abuse liability.  A0164.  As Bidi commented to FDA, compelling cigarette smokers to transition to a harm reduction product like the BIDI® Stick Classic means the ENDS must have a similar nicotine delivery as a cigarette.  Otherwise, the user will inevitably find the nicotine level unsatisfactory and continue smoking.  A0163-64.  Indeed, when granting marketing approval to NJOY's tobacco-flavored ENDS product and the IQOS (a heat-not-burn tobacco product), FDA made clear that comparable nicotine levels supported an APPH finding because that facilitates the smoker's move away from more dangerous cigarettes.  A0164.

But in the MDO, FDA took a completely contrary position.  The Agency now believes the possibility of continued nicotine dependence means that a harm reduction product cannot be APPH.  A0164.  At least in Bidi's case, it will only have a chance at marketing approval if the BIDI® Stick Classic has lower nicotine levels.  This stands harm reduction, one of the TCA's underlying goals, completely on its head.  A0150.  And for purposes of this motion, it is arbitrary and capricious.  As Dr. McKinney notes, this appears to be the first time in a PMTA review the Agency has adopted this stance.  Yet nowhere does FDA in the MDO explain this

shift in policy (or even acknowledge it) or address Bidi's comments regarding the role of comparable nicotine levels in harm reduction.[5]  A0164.

Finally, in conclusory fashion, FDA expressed concerns that nonusers will develop a nicotine dependence if they use the BIDI® Stick Classic.  The Agency did not submit any empirical evidence supporting this claim.  But Bidi submitted evidence from studies demonstrating that only low proportions of non-smokers and never-smokers, including young consumers and youth, had any intention to use a BIDI® Stick Classic.  A0165-66.  The MDO never mentions these studies.

## II.     Bidi Faces Irreparable Harm Without A Stay

Agency orders that impose crippling and unrecoverable financial burdens on regulated parties present a paradigmatic irreparable harm.  Indeed, complying with regulatory action "later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in judgment).  This is so because sovereign immunity precludes the injured party from recovering damages from the offending agency.  *Oderbrecht Constr. Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022).

---

[5] Moreover, if FDA regulates "nicotine yields" as APPH, it must go through notice and comment rulemaking.  21 U.S.C. §387g.  *Fontem*, 82 F.4th at 1218-19.

Bidi faces immense and immediate financial losses because of the MDO. Its four (4) major existing distributor customers, with whom it has developed relationships with over several years, have ceased or slowed placing new orders for all of Bidi's products (not just the BIDI® Stick Classic), have informed Bidi that they will not replenish their current inventories of Bidi's products, and/or have informed Bidi that their retail customers will not continue to stock Bidi's products on their shelves if the MDO remains in place. A0201-03.

Bidi estimates that it will lose revenues of approximately $1.5 million per month from its four (4) distributor customers, constituting ninety-five percent (95%) of its business, while an MDO remains in place. Due to the drastic reduction in new sales, Bidi's cash flow is plummeting, forcing it to significantly downsize its workforce and making certain that, should the MDO not be stayed, it will be forced to cease operations within three (3) weeks. A0201-03. Bidi's financial losses, for which there will be "no adequate remedy at law to recover damages for the harm suffered" are irreparable harm. *Georgia*, 46 F.4th at 1302 (citation omitted). Such harm independently warrants a stay.

Moreover, the MDO, along with FDA's press release touting the alleged lack of scientific evidence supporting Bidi's PMTAs, will continue to damage Bidi's goodwill, cause it to lose customers, and preclude it from any market presence in some jurisdictions, A0203-04, which this Court has acknowledged as a

standalone irreparable injury warranting preliminary injunctive relief. *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015). Finally, if the MDO remains in place, Bidi will ultimately lose its substantial financial investments made over the years in the PMTA and its business, and Bidi's existing customers will suffer without access to their preferred harm reduction product. A0203-04.

Only an immediate judicial stay of the unlawful MDO will convince Bidi's business partners to continue working with Bidi.

## III. A Stay Does Not Harm FDA And Serves The Public Interest

Issuing a stay pending judicial review will harm neither the FDA nor the public interest. To begin, the public interest is always served when agencies comply with their statutory and regulatory obligations, including under the APA. *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643-44 (5th Cir. 2023) (citation omitted). FDA cannot plausibly argue it would be harmed by a temporary stay of a potentially unlawful MDO. Moreover, FDA previously saw fit to defer resolution of the BIDI® Stick Classic PMTA for over three years. It cannot convincingly maintain the MDO must now take effect immediately.

Indeed, a stay benefits the public interest. As noted above, studies involving the BIDI® Stick Classic show current addicted smokers are likely to use the product to transition away from more dangerous combustible cigarettes and quit their smoking habits. A stay would preserve adult access to this harm reduction

product.[6]  Further, also discussed above are studies demonstrating there is little risk that nonusers, young adults, or minors will initiate use of the BIDI® Stick Classic. And this is not surprising.  FDA has repeatedly stated that tobacco-flavored ENDS pose a lower risk of uptake than non-tobacco flavored ENDS.[7]  FDA never even mentioned concerns about underage use in the deficiency letter.

## CONCLUSION

In the prior Bidi matter, this Court saw fit to issue a stay pending appeal under similar circumstances involving Bidi's non-tobacco flavored ENDS.  Order, No. 21-13340 (Feb. 1, 2022).  It should do the same here and grant a stay.

---

[6] Dr. McKinney also cited various nonclinical (*i.e.*, *in vitro*) studies indicating BIDI® Stick Classic aerosols have substantially reduced levels of various compounds when compared to combustible cigarettes and thus present less cancer and non-cancer risk.  A0167.

[7] *See*, *e.g.*, FDA News Release – *FDA Denies Marketing of Two Vuse Solo Menthol E-Cigarette Products* (Mar. 17, 2023) ("[d]ata indicate tobacco-flavored e-cigarettes do not have the same appeal to youth [as non-tobacco flavored ENDS] and therefore do not pose the same degree of risk"), http://tinyurl.com/mr2c5nv4; FDA, NJOY Daily Rich Tobacco 4.5% MGO Decision Summary (June 10, 2022) ("Existing evidence consistently indicates that use of tobacco flavored ENDS is less common than use of flavored ENDS among youth"), http://tinyurl.com/3e6fmhra.

Dated: February 2, 2024

Respectfully submitted,

/s Eric P. Gotting
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

**CERTIFICATE OF COMPLIANCE**

I hereby certify the foregoing complies with the length limitations of Federal Rule of Appellate Procedure ("Rule") 27(d)(2)(A) because it is 5198 words, excluding the parts that are exempted under Rule 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Times New Roman font.

/s Eric P. Gotting
Eric P. Gotting

# CERTIFICATE OF SERVICE

I hereby certify that on February 2, 2024, a true and correct copy of the

foregoing was filed via the Court's CM/ECF system and served via Federal

Express (and email where indicated) on the following counsel:

Hon. Merrick B. Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530-0001

Attorney General for Administration
Justice Management Division
United States Department of Justice
950 Pennsylvania Ave., N.W.
Room 1111
Washington, D.C. 20530

Civil Process Clerk
United States Attorney's Office
Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602

Xavier Becerra, Secretary
U.S. Department of Health and Human Services
200 Independence Ave., S.W.
Washington, D.C. 20201-0004
[Xavier.Becerra@hhs.gov](mailto:Xavier.Becerra@hhs.gov)

Office of the General Counsel
U.S. Department of Health and Human Services
200 Independence Ave., S.W.
Washington, D.C. 20201

Robert M. Califf, M.D., Commissioner
U.S. Food and Drug Administration
10903 New Hampshire Ave.
Silver Spring, MD 20993-0002
commissioner@fda.hhs.gov

Chief Counsel, Food and Drug Administration
ATTENTION: LITIGATION
White Oak Building 31 Rm 4544
10903 New Hampshire Ave.
Silver Spring, MD 20993-0002
OC-OCC-FDA-Litigation-Mailbox@fda.hhs.gov

Wendy S. Vicente
Senior Counsel
Office of the Chief Counsel
White Oak 31, Rm. 4562
10903 New Hampshire Ave.
Silver Spring, MD 20993-0002
Wendy.Vicente@fda.hhs.gov

/s Eric P. Gotting
Eric P. Gotting

# ADDENDUM

## Table of Contents

January 22, 2024 FDA Marketing Denial Order ...............................................A0001

March 20, 2023 FDA Deficiency Letter (PM0003460.PD2) ..........................A0012

June 18, 2023 Bidi Vapor LLC Deficiency Letter Response
(PM0003460.PD2) ...............................................................................................A0039

July 27, 2017 FDA Press Release (FDA announces comprehensive
regulatory plan to shift trajectory of tobacco-related disease, death)...............A0041

FDA Draft Guidance for Industry: Modifications to Compliance Policy for
Certain Deemed Tobacco Products (March 2019) ...........................................A0043

FDA Guidance for Industry: Premarket Tobacco Product Applications for
Electronic Nicotine Delivery Systems (June 2019)..........................................A0046

Mitchell Zeller Declaration (*American Academy of Pediatrics, et al. v. U.S.
FDA, et al.*)..........................................................................................................A0052

October 22, 2018 Transcript: US FDA CTP Tobacco Product Application
Review Public Meeting........................................................................................A0055

October 28, 2019 Transcript: US FDA Deemed Tobacco Product
Applications: A Public Meeting..........................................................................A0058

Bidi Vapor LLC Excerpt from Response to Deficiency Letter Question 13
(June 18, 2023)....................................................................................................A0063

Bidi Vapor LLC Excerpt from Response to Deficiency Letter Question 12
(June 18, 2023)....................................................................................................A0068

FDA FOIA Copy of TPL Review of PMTAs PM000630-PM0000631
(Excerpt)...............................................................................................................A0071

Bidi Vapor LLC Excerpt from Response to Deficiency Letter Question 15
(June 18, 2023)....................................................................................................A0072

Bidi Vapor LLC Excerpt from Response to Deficiency Letter Question 12
(June 18, 2023)....................................................................................................A0074

Bidi Vapor LLC Excerpt from Response to Deficiency Letter Question 23 (June 18, 2023) ................................................................................... A0075

Study Manuscript: Likelihood of Use of Multiple Flavor Varieties of a Disposable Electronic Nicotine Delivery System Among Adults in the United States ..................................................................................... A0078

Bidi Vapor LLC Ninth Amendment regarding POU Study (December 3, 2021) ........................................................................................... A0107

Bidi Vapor LLC PMTA Submission Excerpt .................................... A0114

Bidi Vapor LLC Excerpt from Response to Deficiency Letter Question 22 (June 18, 2023) ................................................................................... A0116

Bidi Vapor LLC Tenth Amendment regarding LOU Study, Aerosol Assessment, and Stability Reports (December 17, 2021) ................................. A0117

Bidi Vapor LLC Twelfth Amendment regarding LOU Study, Aerosol Assessment, and Stability Reports (May 19, 2022) ........................................... A0123

Bidi Vapor LLC Fifteenth Amendment regarding Population Prevalence Study (September 9, 2022) .............................................................. A0131

Bidi Vapor LLC Eighteenth Amendment regarding Ambient Stability Study (February 16, 2023) ....................................................................... A0145

Dr. Willie J. McKinney Declaration ................................................ A0148

Nirajkumar Patel Declaration .......................................................... A0179




January 22, 2024

**DENIAL**

Bidi Vapor LLC
Attention: Nirajkumar Patel, CEO
4460 Old Dixie Highway
Grant Valkaria, FL 32949

**FDA Submission Tracking Number (STN):** PM0003460.PD2, see Appendix A

Dear Nirajkumar Patel:

We completed substantive scientific review of your PMTA[1] and are denying issuance of a marketing granted order for the tobacco product identified in Appendix A. Refer to Appendix B for a list of amendments received in support of your application.

**The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health" (APPH). Section 910(c)(2)(A). Based on our review of your PMTA, we determined that the application for the new tobacco product, as described in your application and specified in Appendix A, lacks sufficient evidence to demonstrate that permitting the marketing of the product subject to this application is APPH. You cannot introduce or deliver for introduction this product into interstate commerce in the United States. Doing so is a prohibited act under section 301(a) of the FD&C Act, the violation of which could result in enforcement action by FDA.**

You may submit a new application or a resubmission for the product that is subject to this marketing denial order. A resubmission to address the deficiencies set out below would be appropriate and facilitate an efficient review. Note that a resubmission is subject to all the requirements set forth in § 1114.17 of the "Premarket Tobacco Product Applications and Recordkeeping Requirements" rule ("PMTA rule"). If you choose to submit a resubmission for this product, you must fulfill all requirements set forth in section 910(b) of the FD&C Act and 21 CFR Part 1114. To do so, you may cross-reference information submitted in:

- The new tobacco product application, PM0003460.PD2 subject to this Denial (see 21 CFR 1114.17)
- A Tobacco Product Master File submission (see 21 CFR 1114.7(b)(2) or 1114.17(c)(2); and guidelines at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/tobacco-product-master-files)

---

[1] Premarket Tobacco Product Application (PMTA) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act)

A resubmission should be clearly identified as such and include all information necessary to respond to all deficiencies identified in this letter (see 21 CFR 1114.17(c) and (d)). If you decide to resubmit and cross-reference this PMTA, in addition to evaluating your response to the listed deficiencies, FDA will assess your resubmission to determine whether it meets the requirements of the PMTA rule and whether the application as a whole supports a finding that the marketing of your product(s) is appropriate for the protection of the public health.

We provide the following basis for our determination:

1. Your PMTA provided comparison aerosol yield data from published literature for products in the same category and flavor (Virginia Tobacco or Tobacco Classic) as the new product: JUUL Virginia Tobacco 5% and Virginia Tobacco 3% (prefilled, closed, cartridge-based ENDS); Apollo Classic Tobacco (3 products: disposable, prefilled closed, and tank ENDS); BLU Classic Tobacco (2 products: disposable and prefilled closed pod ENDS); Ever Smoke Classic Tobacco (prefilled closed pod ENDS); and South Beach Smoke Classic Tobacco (2 products: pre-filled closed pod and tank ENDS). You also provided comparison aerosol yield data from a standardized research electronic cigarette (SREC) product, developed in collaboration between NJOY LLC and National Institute on Drug Abuse. However, the published aerosol data you provided for the comparison ENDS either lacked certain evidence or used different aerosol testing parameters and thus the published aerosol data was insufficient or inappropriate for comparison to the new product. The comparison aerosol data you submitted should have come from studies utilizing comparable puffing life cycle, puffing regimens, and puffing machine as the studies for the new product, and such studies should use methods that have been appropriately validated and conducted in accredited laboratories.

   In the case of JUUL Virginia Tobacco 5% and Virginia Tobacco 3%, the published aerosol yield data were collected using 50 puffs aerosol collection rather than the entire puffing life cycle or the same puffing life cycle (i.e., 90% end of life or product consumption) as the new product. Because of the differences in ENDS aerosol collection between the new product and these comparison products, JUUL Virginia Tobacco 5% and Virginia Tobacco 3%, you were only able to provide quantified aerosol yield for formaldehyde, glycerol, nicotine, and propylene glycol for comparison to the new product, while the aerosol yields for acetaldehyde, acrolein, cadmium, chromium, copper, diacetyl, diethylene glycol, ethylene glycol, glycidol, lead, nickel, and propylene oxide were provided as below the limit of detection (BLOD) or below the limit of quantitation (BLOQ). Since the JUUL aerosol data were collected not from the entire puffing life cycle or 90% EOL, it is unclear for those constituents reported as BLOD and BLOQ if they would have been measurable above the LOD and LOQ had the JUUL aerosol data been collected from the entire puffing life cycle or 90% EOL. In addition, the names of the testing laboratory and methods were provided for JUUL comparison data but lacked method description or protocols. For Apollo Classic Tobacco, BLU Classic Tobacco, Ever Smoke Classic Tobacco, and South Beach Smoke Classic Tobacco, a brief description of each test methods and the name of the testing laboratory were provided. However, the aerosol constituents were collected using different puffing regimens, puffing life cycle, and puffing machine than the new product aerosol study, and thus cannot be reliably and consistently compared to the aerosol yield data for the new product. In the case of the SREC product, the tobacco report brochure you provided does not include the standard deviation of the aerosol yield measurements and number of replicates; puffing regimen information; analytical method protocols; testing laboratory name and accreditation; and puff counts per aerosol collection to determine that the test data are

accurate and reliable as comparative data to the new product. For all comparison ENDS data, you did not provide analytical method validation information. Without this information, FDA cannot determine whether the comparison ENDS data are suitable and reliable to compare to the new product, in terms of precision, accuracy, selectivity, sensitivity, linearity, and range.

Comparison ENDS data is necessary for FDA to determine whether the overall levels of HPHC in the aerosol of the new product pose greater or lower risk when a current ENDS user switches from other similar ENDS to the new product or uses them interchangeably. Thus, for FDA to characterize the comparative health risks of the new product to the same category ENDS, you could have submitted comparison aerosol data from ENDS with comparable puffing life cycle, puffing regimens, and puffing machine as the new product and used methods that have been appropriately validated and conducted in accredited laboratories. If such datasets cannot be extracted from published literatures, you could have provided measured data using the same standard puffing regimens and fully validated analytical methods by the accredited analytical laboratory as the new product. You should have provided the aerosol constituent yields in mass (e.g., mg, μg, ng) per device and per puff for the following constituents for the ENDS comparison products:

a) Acetaldehyde
b) Acrolein
c) Cadmium
d) Chromium
e) Copper
f) Diacetyl
g) Diethylene glycol
h) Ethylene glycol
i) Formaldehyde
j) Glycerol
k) Glycidol
l) Lead
m) Nickel
n) Nicotine
o) Propylene glycol
p) Propylene oxide

In addition, you should have provided all of the following information about HPHC testing so that we could have evaluated the HPHC quantities in the ENDS comparison products and thus the risk and benefit of the new product:

q) Complete description of all puff regimens used to generate aerosol yield data, quantitative test protocols and analytical methods used, and full validation reports for each analytical method
r) Testing laboratories and their accreditation(s)
s) Length of time between date(s) of manufacture and date(s) of testing
t) Complete raw aerosol HPHC yield datasets, with units of measure
u) Standard deviation(s)
v) Number of replicates
w) A summary of the results for all testing performed
x) Storage conditions prior to initiating testing
y) Whole stick or pod puff counts

2. Your PMTA provided data on non-targeted analysis (NTA) of aerosol yields collected from the new product stored for four and 17 months for your leachable study. You stated that your NTA study was performed by Enthalpy Analytical, LLC using gas chromatography mass spectrometry (GC-MS) technique. However, GC-MS NTA methodology is typically used to identify volatile organic compounds (VOCs) and some semi-volatile organic compounds (SVOCs) in the leachable study (ISO 10993-18:2020 ). This is because gas chromatography (GC) methodology vaporizes analytes via thermal heating into the gas-phase and separates analytes (leachables) in a complex mixture into individual components based on the adsorption affinity of analytes with stationary and mobile phases. Additionally, GC-MS is scientifically known to employ hard ionization techniques such as electron impact ionization that causes fragmentation of the molecular structure of analyte ions such that the mass-to-charge ratio ($m/z$) and exact mass of the intact leachable compounds cannot be determined. Therefore, GC-MS analysis is limited to chemical compounds that have high vapor pressure (volatile) and are thermally stable.

   You did not conduct a complete leachable study to identify other possible leachables from the container closure system of the new product such as additional SVOCs, non-volatile organic compounds (NVOCs), and thermally labile leachable compounds (ISO 10993-18:2020). Furthermore, because different analytes have different propensity to be ionized and detected in positive or negative ion mode of mass spectrometry methodology, a comprehensive leachable study should have also included mass spectrometry analysis in both positive and negative ion modes to unbiasedly identify all possible leachables that can leach out of the ENDS components. As additional SVOCs, NVOCs, and thermally labile leachable compounds can pose health risks to users, FDA cannot fully evaluate the health risks of all leachable chemical constituents that can leach from the container closure systems or product components of the new product without leachable results from additional leachable analysis of the components of the new product. To fully characterize the health risks of the new product, your leachable study could have also been conducted using other MS-based techniques other than GC-MS to identify other possible leachables (e.g., SVOCs, NVOCs, thermally labile leachable compounds) that could be leached from the components of the new product.

3. Your PMTA includes a clinical study that measured nicotine exposure, including nicotine pharmacokinetic (PK) endpoints, following use of the new product. In the clinical study, you provided data which demonstrated higher nicotine exposure following use of the new product than following use of usual brand (UB) combusted cigarettes. In your response to FDA's Deficiency letter signed March 20, 2023, you clarified that maximum nicotine concentration ($C_{max}$) is not higher following controlled use of the new product than use of UB cigarettes based on statistical findings in your study report. You also stated the new product has an abuse liability similar to that of combusted cigarettes (CC), and therefore, adults who use CC are likely to switch to the new product. Additionally, your response includes a survey study which demonstrates that nicotine dependence in adults who exclusively use any of eleven flavors of Bidi Stick ENDS (including the new product) is similar to nicotine dependence in adults who exclusively use CC. Some evidence in your PMTA suggests the new product has an abuse liability similar to that of CC (i.e., data from nicotine exposure following controlled use of the new product and the survey study), but given the higher nicotine exposure following ad libitum use as well as subjective experiences and product characteristics, the totality of evidence demonstrates that the abuse liability of the new product is similar to or higher than CC. Clinical studies estimating nicotine exposure from ad libitum use provide a better assessment of

nicotine exposure from ENDS because they represent more natural use behaviors. Furthermore, your data show that nicotine exposure is higher (than UB cigarettes) following ad libitum use of the new product, specifically in adults who use CC and mostly have no ENDS experience. Nicotine exposure among experienced ENDS users may be even greater than among inexperienced ENDS users as published studies show that experienced ENDS users take longer/larger puffs from ENDS and obtain more nicotine from the same ENDS compared to adults who use CC and are inexperienced with ENDS.

Due to the high abuse liability of the new product, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product; and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence. For these reasons, FDA cannot find that the marketing of the new product is APPH.

Because you have not met your burden of "showing" that permitting the marketing of the new product would be APPH as required by section 910(c)(2)(A), we must deny authorization for your application.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[2,3] using eSubmitter.[4] Alternatively, submissions may be mailed to:

>  Food and Drug Administration
>  Center for Tobacco Products
>  Document Control Center (DCC)
>  Building 71, Room G335
>  10903 New Hampshire Avenue
>  Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[5]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

---

[2] For more information about CTP Portal, see
https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[3] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[4] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter
[5] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

If you have any questions, please contact Wendy Guan, Regulatory Health Project Manager, at (240) 402-6937 or Wendy.Guan@fda.hhs.gov.

Sincerely,

Matthew C.
Farrelly -S

Digitally signed by Matthew
C. Farrelly -S
Date: 2024.01.22 08:04:29
-05'00'

Matthew Farrelly, Ph.D.
Director
Office of Science
Center for Tobacco Products

Enclosures:
        Appendix A – New Tobacco Product Subject of This Letter
        Appendix B – Amendments Received for This Application

**Appendix A**
New Tobacco Product Subject of This Letter

| Common Attributes[6,7] | |
|---|---|
| Submit date | September 8, 2020 |
| Receipt date | September 8, 2020 |
| Applicant | Bidi Vapor LLC |
| Product manufacturer | Bidi Vapor LLC |
| Product category | ENDS (VAPES) |
| Product subcategory | Closed E-Cigarette |
| **Attributes** | **New Tobacco Product** |
| **STN** | **PM0003460.PD2** |
| Product name | Bidi Stick - Classic |
| Package type | Plastic Box |
| Product quantity | 1 E-Cigarette |
| Characterizing flavor (CF) | Tobacco |
| Nicotine source | Tobacco |
| Length | 112.5 mm |
| Diameter | 0.12 mm[8] |
| Wattage | 5.4 watt (W) |
| Battery capacity | 280 milliampere hours (mAh) |
| E-liquid volume | 1.4 mL |
| Nicotine concentration | 60 mg/mL |
| PG/VG ratio | 48.67/51.33 |
| Additional property | Width: 15.5 mm, Thickness: 7 mm |

[6] We interpret package type to mean container closure system and package quantity to mean product quantity within the container closure system, unless otherwise identified.
[7] Product name is brand/sub-brand or other commercial name used in commercial distribution.
[8] The heating element diameter and length range limits are calculated by the FDA reviewer based on the tolerances provided by the applicant (e.g., length: 3 ± .05).

**Appendix B**
Amendments Received for This Application

| Submission Date | Receipt Date | Applications Being Amended | Reviewed | Brief Description |
|---|---|---|---|---|
| October 13, 2020 | October 13, 2020 | All | Yes | Submission of Consumer Insight Survey Summary |
| November 24, 2020 | November 24, 2020 | All | Yes | Response to November 21, 2020, FDA Request for Classic Bidi Stick |
| January 6, 2021 | January 6, 2021 | All | Yes | Request for application review status; notification of forthcoming submissions |
| March 23, 2021 | March 23, 2021 | All | Yes | Additional study results; updated Marketing Plan; final report for Disposable Vape User Insights Study; notification of forthcoming submissions; battery certification and updated product packaging; updates on quality management system, quantitative flavor analysis, and ambient stability testing; updated EA information |
| April 20, 2021 | April 20, 2021 | All | Yes | Additional information on Tobacco Product Perception and Intention (TPPI) studies and Abuse Liability Assessment |
| September 8, 2021 | September 8, 2021 | All | Yes | Actual Use (AU) and TPPI study updates; ongoing studies and literature review updates; copy of applicant's request for enforcement discretion dated June 25, 2021 |

A0008

| Submission Date | Receipt Date | Applications Being Amended | Reviewed | Brief Description |
|---|---|---|---|---|
| October 24, 2021 | October 24, 2021 | All | Yes | Updates to storage and stability information, and literature review |
| October 29, 2021 | October 29, 2021 | All | Yes | Updates on PK/Abuse Liability Assessment |
| November 4, 2021 | November 4, 2021 | All | Yes | Submission of a randomized crossover clinical study |
| November 5, 2021 | November 5, 2021 | All | Yes | Status updates on the TPPI studies |
| December 3, 2021 | December 3, 2021 | All | Yes | Updates on TPPI and behavioral studies and PK/Abuse Liability Assessment; final TPPI study report for Bidi Stick Patterns of Use (POU) study report; preprint journal article for PK/Abuse Liability Assessment; notification of forthcoming ambient stability testing results; and updated Marketing Plan |
| December 17, 2021 | December 17, 2021 | All | Yes | Final TPPI study report for Bidi Stick Likelihood of Use (LOU) study; ambient stability testing reports; summary and report of toxicological human health risk assessment study |
| December 23, 2021 | December 23, 2021 | All | Yes | Final study report and data files for Bidi Stick PK/Abuse Liability Assessment; PBI study update; updates on quality management system and draft Quality Agreement with contract manufacturer |
| December 23, 2021 | December 23, 2021 | All | Yes | Duplicate of previous December 23, 2021, amendment |

| Submission Date | Receipt Date | Applications Being Amended | Reviewed | Brief Description |
|---|---|---|---|---|
| December 23, 2021 | December 23, 2021 | All | Yes | Duplicate of previous December 23, 2021, amendment |
| May 20, 2022 | May 20, 2022 | All | Yes | Toxicological Ingredient Risk Assessment; final TPPI study report and data files for PBI Study; and update on Population Prevalence Study |
| July 5, 2022 | July 5, 2022 | All | Yes | Updates to quality and manufacturing control information |
| July 11, 2022 | July 11, 2022 | All | Yes | Copy of July 5, 2022, cover letter and submission report; copy of email correspondence with RHPM |
| July 28, 2022 | July 28, 2022 | All | Yes | Updates to the legal business name of the contract manufacturer to SMISS TECHNOLOGY CO., LTD |
| September 9, 2022 | September 9, 2022 | All | Yes | Final study report and data files for Bidi Stick Population Prevalence Study; preprint article for the BIDI Stick LOU study |
| September 15, 2022 | September 15, 2022 | All | Yes | Request to include (12) 4057a forms with the previously submitted corresponding PM0003460 amendments and OCE correspondence in the Agency's files |
| February 6, 2023 | February 6, 2023 | All | Yes | Technical update of EAs for PM0003460.PD1 – PD11 |
| February 13, 2023 | February 13, 2023 | All | Yes | Updated Integrated Summary, LOA, and translation certification |

| Submission Date | Receipt Date | Applications Being Amended | Reviewed | Brief Description |
|---|---|---|---|---|
| February 16, 2023 | February 16, 2023 | All | Yes | Technical update of Ambient Stability Study for Classic BIDI Stick, PM0003460.PD2 |
| April 21, 2023 | April 21, 2023 | All | Yes | Request for extension of time to respond to FDA's March 20, 2023, Deficiency letter |
| June 18, 2023 | June 18, 2023 | All | Yes | Response to FDA's March 20, 2023, Deficiency letter |
| June 18, 2023 | June 18, 2023 | All | Yes | Additional information in response to FDA's March 20, 2023, Deficiency letter |
| January 18, 2024 | January 18, 2024 | All | Yes | Update to inform FDA of an additional adult smoker switching study independently being conducted by Rose Research Center, LLC |




March 20, 2023

**DEFICIENCY**

Bidi Vapor LLC
Attention: Nirajkumar Patel, CEO
4460 Old Dixie Highway
Grant Valkaria, FL 32949

**FDA Submission Tracking Number (STN):** PM0003460.PD2

Dear Nirajkumar Patel:

**We request that you submit all the information identified below within 90 calendar days from the date of this letter.** In general, to maximize review efficiency of applications, we do not intend to provide an extension of time for response to deficiency letters. This deficiency letter identifies information that FDA needs to complete its scientific review.  It should not be understood to communicate a list of all substantive concerns that may be observed during the review of your application and other information. Providing information to address deficiencies identified in your submission does not guarantee that you will receive a positive marketing order. A final decision regarding marketing of the products will be made at the end of our scientific review based on the totality of all the information included in your original submission, your timely responses to this letter, and any other information before the Secretary with respect to the tobacco product(s) in question. As stated in 21 CFR § 1114.9 (c), if you do not submit this requested amendment to your application within the time period specified in this letter, we may consider you to have submitted a request to voluntarily withdraw the pending PMTA under § 1114.11 and issue an acknowledgement letter notifying you of the withdrawal.

We have preliminarily determined that this application does <u>not</u> in its present form support a positive scientific determination. To maximize review efficiency, we do not intend to issue additional Deficiency letters for this application.

The following information is necessary for FDA to make a scientific determination:

1.  Your PMTA provides some of the design parameter information for the new product. You do not include all of the design parameters needed to fully characterize the product to allow for evaluation of the health impacts of the new product and for determining if the new product meets the requirements of section 910(b)(1) of the FD&C Act for a premarket product. To determine that the new product in your PMTA meets the requirements of section 910(b)(1) of the FD&C Act, FDA must evaluate all the design parameters. Provide the manufacturing data sheet specification (MDSS) or target specification and upper and lower range limits for the design parameters listed below for the new product, unless otherwise noted:

---

[1] Premarket Tobacco Product Applications (PMTAs) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and received on September 8, 2020.

A0012

    a.   Draw resistance (Pa) −Target and lower range limit
    b.   Inhaled aerosol temperature (°C)
    c.   Battery charging temperature limits (°C) − Range limits
    d.   Battery discharging temperature limits (°C) − Range limits
    e.   Power delivery unit (PDU) wattage operating range (W) − Lower range limit
    f.   PDU temperature cut-off (°C) (if applicable)
    g.   PDU current cut-off (mA) (if applicable)

In addition to being needed for characterization purposes, these design parameters are also needed to evaluate the product itself. Draw resistance can affect the heating element temperature which can impact toxicant exposure. Inhaled aerosol temperature may affect nicotine delivery and the risk of thermal inhalation injury. Battery charging and discharging temperature limits and other parameters (i.e., PDU wattage operating range, PDU temperature cut-off, PDU current cut-off) directly associated with the battery and PDU are needed to ensure that the batteries will charge and discharge within the normal operating region. If the batteries and PDU operate outside the normal operating region, the battery could be damaged, which could lead to overheating, fire, or explosion and may cause harm to the user.

For each of the above parameters, provide the necessary data on a per unit of measurement of product basis (e.g. report draw resistance in paper electronic nicotine delivery system [ENDS]). If a design parameter is not applicable (e.g., temperature cut-off, temperature deviation if the device does not use temperature control), state as such and provide a scientific rationale as to why it is not necessary.

2.   Your PMTA provides some of the design parameter information for the new product but does not include test data confirming that the target specifications and range limits are met during and after manufacturing for some design parameters. To allow FDA to evaluate the risk of injury from using the new product and confirm that product specifications are met, provide test data (i.e., measured values of design parameters) including test protocols, applicable acceptance criteria, complete data sets, and a summary of results, for the design parameters listed below for the new product:

    a.   Draw resistance (Pa)
    b.   E-liquid volume (mL)
    c.   Inhaled aerosol temperature (°C)
    d.   Heating element temperature range (°C)
    e.   Battery charging temperature limits (°C)
    f.   Battery discharging temperature limits (°C)
    g.   PDU voltage operating range (V)
    h.   PDU current operating range (mA)
    i.   PDU wattage operating range (W)
    j.   PDU temperature cut-off (°C) (if applicable)
    k.   PDU current cut-off (mA) (if applicable)

For each of the above parameters, provide the necessary data on a per unit of measurement of tobacco product basis (e.g. draw resistance in Pa per ENDS). If a design parameter is not

applicable (e.g., temperature cut-off, temperature deviation if the device does not use temperature control), state as such and provide a scientific rationale.

Certificates of analysis (COA) from the material supplier may satisfy this deficiency. If you choose to address this deficiency by providing COA for any of the parameters listed above, the COA must include target specification; quantitative acceptance criteria; parameter units; test data average value; and either the standard deviation of the test data or the minimum and maximum values of the test data. Provide a complete, unaltered COA from the material supplier.

For the design parameters listed above that were tested according to national or international standards, identify the standards, provide the associated standards report and state what deviations, if any, from the standards occurred. Provide a justification for the sampling protocol used to obtain the test data and explain why the data is representative of the finished product.

3. Your PMTA includes a controller subcomponent that has several functions associated with the battery, heating element, and overall usability. Many of the functions could be associated with risk mitigation; for example, you state that the controller monitors the heating element temperature to ensure it is between 190-220 °C, which could mitigate the risk of extreme heating element temperatures that could affect harmful and potentially harmful constituent (HPHC) exposure. The list below summarizes controller functions that are identified in your application and considered as risk mitigation methods:

   a. Does not activate when the inhalation pressure is more than negative 400 Pa
   b. Stops activation when the product is inhaled for more than 10 seconds
   c. Ensures the battery voltage is above 3.3 V; otherwise, current is not sent to the heating element
   d. Monitors the PDU discharge current to ensure it is always above 1.3 A
   e. Monitors the product internal temperature to ensure it is always within an intended range
   f. Monitors the resistance of the heating element to make sure it is above 0.4 ohms when in use
   g. Monitors the heating element temperature to ensure it is between 190 – 220 °C

However, you did not provide a test report demonstrating the effectiveness of each function listed above. To verify that these controller functions work as intended, provide test reports that demonstrate the performance of each control function mentioned above. The test report for each function should include the test protocol, test results, raw data sets, and test sample size. If the new product has any other functions that are not identified in the list above that are associated with risk mitigation, include these functions in the test reports. In addition, if any of the functions listed above do not apply to the product, state as such and provide a scientific rationale.

4. Your PMTA provides battery test reports (e.g., IEC 62133-2:2017 – Secondary cells and batteries containing alkaline or other non-acid electrolytes, safety requirements for portable sealed secondary cells, and for batteries made from them, for use in portable applications), demonstrating that each of the four batteries (manufactured by BIWO New Energy, ZHUHAI HANGE BATTERY TECH Co. Ltd, INTELLECT BATTERY Co. Ltd, and Shida Battery Technology Co.

Ltd) is manufactured to specifications and functions as intended and is qualified to be used in the new product. FDA not only evaluates the safety of the battery alone, but also evaluates the battery and product safety when the battery is used in the new product. You did not provide test reports or other evidence to demonstrate that the battery can still function within specified ranges and used safely in the new product. This is necessary for evaluating the total product safety because if the assembled product and PDU do not function within the battery's normal operating region, then hazardous conditions (e.g., overheating, explosions) could occur and injure a user.

You state that the new product is certified to UL 8139:2020 – Electrical Systems of Electronic Cigarettes and Vaping Devices, but you did not provide the UL 8139 test reports for the new product with each battery. Provide test data for the following tests conducted for the new product with each of the four batteries: normal discharge test, short circuit test, forced-discharge test, temperature cycling or thermal abuse test, and continuous operation. One way to satisfy this deficiency is to provide the full UL 8139 test reports that demonstrate testing of the new product with each of the four batteries or other test reports for testing done to national or international standards.

5. Your PMTA provides a design failure mode and effect analysis report (DFMEA) that summarizes five failure modes associated with parts (i.e., bottom cap, mouthpiece, internal fixation not connecting securely (when dropped or negative pressure is applied)) or the battery not functioning properly. You state that these failures are mitigated and verified with drop testing, negative pressure testing, and voltage and capacity testing of the batteries to prevent leakage and battery failure. However, you did not provide the tests reports that are mentioned in the DFMEA report demonstrating the mitigation methods used to prevent failures. These test reports are necessary in order for FDA to evaluate the effectiveness of the mitigation methods and ensure risks associated with insecure connection of parts and improper battery function failures are minimized as low as reasonably possible. Provide the test reports that are listed in the DFMEA report.

FDA evaluates all failure modes that are associated with potential hazards to determine if they are considered in the design and adequately mitigated to determine if the finished product functions as intended under foreseeable conditions. The DFMEA analysis you provided only considers failure of functions (associated with an e-liquid leaking risk or general battery failure due to an unqualified battery being assembled into the product) but does not consider design related failures. Provide an updated DFMEA or other report that evaluates failure of all parts, functions, or design features that are associated with design hazards such as dry puffing, extreme coil temperature, inaccurate e-liquid volume, or battery overheating, fire, or explosions. For each design failure mode identified, describe how it is mitigated and support the mitigation technique with design justification and/or test reports.

6. Your PMTA provides a "Risk Management Report" document that analyzes risks of potential harm when the new product is used according to the product's intended purpose. You also provided a "State of the Science report" and an "Adverse Events report," however, those reports were not specific to your new product. The risk analysis document you provided only evaluates risks to the consumer associated with disassembling the finished product and does not include any other foreseeable consumer risks associated with improper and unintended use (e.g., dry puffing due to e-liquid not saturating the wick because of the orientation may cause

new or more HPHC) of the product. Improper and unintended use of the product can cause unintended harms to users. Additionally, since there is not a minimum activation pressure specified, it is possible that the new product could be activated unintentionally due to movement of the product. In order for FDA to assess consumer safety and ensure unintended harms have been considered and mitigated, identify all possible consumer risks associated with the use of your new product and provide a risk analysis report that outlines mitigation methods used to reduce such risks including, but not limited to, improperly holding the product other than as recommended in the labeling (e.g., horizontal, invert), storing the product in temperatures outside the range identified in labeling (e.g., above 113 °F [45 °C]), and unintentional activation due to movement (e.g., a child playing with the new product ). The risk analysis should evaluate each risk and demonstrate how each is mitigated. Mitigation may include an engineering analysis based on the design or testing. If testing is completed to support mitigation, then a test report demonstrating that the mitigation methods reduce the level of risks should be included.

7.  Your PMTA provides certificates of analysis COAs for the quality check (QC) analysis of incoming raw materials conducted by Shenzhen TCT Testing Technology Co., Ltd.: propylene glycol, vegetable glycerin, nicotine, benzoic acid, and tobacco flavor ingredient. However, you did not provide the analytical method information, validation reports, and reference datasets for these QC analyses. Without this information, FDA cannot determine whether the specifications of these raw materials are properly verified before they are used to manufacture the bulk e-liquid. In order for FDA to ensure that the incoming raw materials used to manufacture the new product are of good quality, provide the analytical method information, validation reports, and reference datasets for the QC analysis of propylene glycol, vegetable glycerin, nicotine, benzoic acid, and tobacco flavor ingredient.

8.  Your PMTA provides discrepant and incomplete information about the ingredient composition for the e-liquid and tobacco complex flavoring ingredients throughout the submission and relevant amendments. For example, you stated that the e-liquid composition of the new product contains nicotine, benzoic acid, propylene glycol, glycerol, and a tobacco complex flavoring ingredient. However, you submitted a material safety data sheet (MSDS) report in both your PMTA submission (MSDS_E-Liquid.pdf; report no. TCT200819W045) and amendment dated May 20, 2022 (MSDS_E-Liquid.pdf; report no. TCT200819W045) identifying the e-liquid ingredients to contain acetic acid instead of the tobacco complex flavoring ingredient and all individual ingredients present at different percent quantities. Moreover, Table 3.2-2, Table 4.2-3, and Table 4.2-5 of your submission indicate that your tobacco complex flavoring ingredient includes propylene glycol, glycerol, nicotine, acetol, devoton, and butyrolactone. However, your submitted reports (Tobacco Leaf.pdf [report no. TCT200714C031] and MSDS TOBACCO.pdf [report no. TCT200819W031]) identify the presence of 2-cyclopentenone, 2-methyl-2-cyclopentenone, acetic acid, 2-acetylfuran, furfuryl alcohol, and d-limonene instead of acetol, devoton, and butyrolactone. Furthermore, the ingredient screening risk assessment in your amendment dated May 20, 2022, indicates that the e-liquid additionally contains menthol. However, menthol is not identified as an ingredient in any other PMTA documents. Therefore, it is unclear if menthol is present in the new product. In order for us to fully characterize the composition of the new product and conduct a complete health risk evaluation, you need to provide a complete and consistent ingredient composition of the e-liquid and complex flavoring ingredient for the new product. In addition, you also need to provide each of the ingredient

quantities in the units of quantity or provide information clearly specifying how we can convert the quantities in percentage to the appropriate units of quantity.

9. Your PMTA indicates that the finished bulk e-liquid is decanted into a storage drum and stored under 25 °C and 55% relative humidity. However, you did not specify the structural materials of the drum. Furthermore, you did not specify how the drum is sealed to isolate its content from the ambient atmosphere. This information is needed because the drum is in direct contact with the bulk e-liquid during storage and its chemical composition and the mean in which the drum seals the bulk e-liquid may affect or alter the performance, composition, constituents or characteristic of the bulk e-liquid (e.g., leaching substances that are then incorporated into the product). Provide the supplier, ingredient composition and quantities, and any other pertinent information (e.g., MSDS, COA) needed to characterize the drum. Additionally, provide detailed standard operating procedure (SOP) or work instruction on how you seal the storage drum.

10. Your PMTA provides batch release specifications and quality check results for the bulk e-liquid (Table 3.2-4 of the PMTA) and the e-liquid filled in the finished new product (Table 3.3-3 of the PMTA). However, the release specifications contain inconsistent information across provided documents, an ingredient (vinyl glycol) that was not previously identified in the bulk e-liquid, and quantities that are not in units of measurement. The release specifications also did not provide scientific evidence or justification for the specification ranges and why it would be appropriate for the new product. For example, the release specification for viscosity (47.76 to 71.64 mPa·s) in Table 3.2-4 of the PMTA is different from the viscosity reported in the certificate of analysis (88.6 to 132.9 mPa·s; see CoA_RM6_ CT_ 001.pdf in the PMTA). You did not provide an explanation for these different specifications for viscosity. For bulk e-liquid, the certification of analysis and Table 3.2-4 and 3.3-3 of the PMTA list release specifications for vinyl glycol as 30.29 %w/v ± 20 %. However, vinyl glycol is not a known compound and not previously identify ingredient in the application for the bulk e-liquid or finished new product. Additionally, you provided the following release specifications:

Bulk e-liquid in Table 3.2-4 of the PMTA
- Propylene glycol 28.72 %w/v ± 20 %
- Vinyl glycol (vegetable glycerin) 30.29 %w/v ± 20 %
- Nicotine 6 % ± 15 %w/v
- Benzoic acid 7.2 % ± 10 %w/v

E-liquid of the finished new product in Table 3.3-3 of the PMTA
- Propylene glycol 28.72 %w/v ± 20 %w/v
- Vegetable glycerin 30.29 %w/v ± 20 %w/v
- Nicotine 75.6 to 92.4 mg/Stick
- Benzoic acid 70.0 to 110.0 mg/Stick

However, you did not provide the definitions of the numerator and denominator of the percentages. For example, it is unclear what are the units of bulk e-liquid nicotine (6%), benzoic acid (7.2 %), and the tolerances of bulk e-liquid propylene glycol and vegetable glycerin (±20%). Without additional information about the units of the target quantities and acceptance ranges, we cannot determine whether the new product can be manufactured consistently. Additionally, you did not specify how you determined the acceptance ranges for propylene glycol (± 20

%w/v), glycerol (± 20 %w/v), nicotine (± 15 %w/v), and benzoic acid (± 10 %w/v), nor did you provide a scientific justification on how these acceptance ranges would be appropriate for the new product. In order for FDA to evaluate the release specification test data and determine whether your new product can be manufactured consistently and conform to specifications, provide the following information in detail:

    a. Provide the correct release specification for bulk e-liquid viscosity and justification for the different specifications in the certification of analysis and Table 3.2-4 and 3.3-3 of the PMTA

    b. Identify what vinyl glycol is and why it would be an appropriate ingredient for the bulk e-liquid

    c. For each release specification, provide the target quantities and tolerances as mass per gram of product (mg/g) or mass per volume of product (mg/ml) for propylene glycol, vegetable glycerin, nicotine, and benzoic acid

    d. Provide scientific evidence or justification for each of your acceptance ranges for propylene glycol (± 20 %w/v), glycerol (± 20 %w/v), nicotine (± 15 %w/v), and benzoic acid (± 10 %w/v), and why it would be appropriate for the bulk e-liquid and finished new product.

11. Your PMTA provides targeted quantitative chemical analysis of mainstream smoke (MSS) yields of 18 harmful and potentially harmful constituents (HPHCs), water, tar, and total particulate matter from combusted cigarettes such as Marlboro Red, Newport Menthol, and University of Kentucky 1R6F reference cigarettes. The MSS yields from these combusted cigarettes were measured using both ISO and Health Canada intense (HCI) smoking regimens by Global Laboratory Services Inc. However, you did not provide quantitative test protocols and full validation reports for all analytical methods used to obtain the MSS yield data from Global Laboratory Service Inc. Without this information, FDA cannot determine whether the MSS yield data from Global Laboratory Service Inc. are reliable. In order for FDA to fully evaluate the health risk of the new product, provide laboratory accreditation, analytical method protocols, and full validation reports for all analytical methods used to obtain the MSS yield data for combusted cigarettes. If you do not have access to this information, one way to provide this information is through a tobacco product master file (TPMF). If you reference a TPMF, also provide an appropriate signed letter of authorization on the TPMF owner's letterhead that would allow FDA to reference the master file. Alternatively, the TPMF owner can provide FDA with a current list of each person authorized to reference the TPMF that identifies any limitation on each authorization (e.g., if the TPMF owner is authorizing use of only certain sections and, if so, identification of those sections).

12. Your PMTA provides targeted quantitative chemical analysis of the following aerosol yields generated using the new product: 32 HPHCs, single chemical constituents (propylene glycol, glycerol, and nicotine), pH value, and menthol. However, your aerosol yield measurements were obtained from 100 puffs of the new product and you did not specify in which stage of the lifetime (beginning, middle, end) of the new product these puffs were collected. You provided quantified aerosol yields for propylene glycol, glycerol, nicotine, formaldehyde, and acetaldehyde for the new product, but HPHC yields for the remaining 30 aerosol yields were listed as below limit of detection (BLOD). Because your HPHC aerosol yields were obtained from 100 puffs of the new product and doesn't account for the entire usage, it is not clear whether the data are representative of the overall aerosol emission of the new product. Because aerosol constituent quantities do not stay consistent throughout the puffing cycle of the entire lifetime

of the ENDS product, the aerosol yields collected from a portion (100 puffs) of the new product (375 puffs on average based on your measured data under ISO puffing regimen) does not provide sufficient information to evaluate the total HPHC exposure of the entire new product. In order for FDA to evaluate the full HPHC exposure of the new product, you need to measure the aerosol constituent yields of the entire lifetime of the new product, and provide aerosol data in mass (e.g., mg, µg, ng) per device and per puff for the following constituents:

  a. Acetaldehyde
  b. Acrolein
  c. Cadmium
  d. Chromium
  e. Copper
  f. Diacetyl
  g. Diethylene glycol
  h. Ethylene glycol
  i. Formaldehyde
  j. Glycerol
  k. Glycidol
  l. Lead
  m. Nickel
  n. Nicotine
  o. Propylene glycol
  p. Propylene oxide

Provide all of the following information about HPHC testing so that we can evaluate the HPHC quantities in the new product:

  q. Complete description of all puff regimens used to generate aerosol yield data, quantitative test protocols and analytical methods used, and full validation reports for each analytical method
  r. Testing laboratories and their accreditation(s)
  s. Length of time between date(s) of manufacture and date(s) of testing
  t. Complete raw aerosol HPHC yield datasets, with units of measure
  u. Standard deviation(s)
  v. Number of replicates
  w. A summary of the results for all testing performed
  x. Storage conditions prior to initiating testing
  y. Whole stick puff counts

If your test methods are national or international test standards, identify the standards and any deviations from those standards. Alternatively, provide scientific evidence or justification for why HPHC aerosol yields collected from 100 puffs are appropriate and does not raise public health concerns.

13. Your PMTA provides HPHC aerosol data for the following comparison ENDS products: ePen 3 BT 18, ePen 3 MB 18, Brand N Liquid AB Disposable, Brand O Liquid AC Disposable, and Brand P Liquid AD Disposable. However, the aerosol data provided are in exposure concentration (µg/m³) and consumption per day (weight/day), which are not appropriate and do not include

standard deviations and number of replicates needed for chemistry to perform two one-sided t-test (TOST) analysis. You also did not provide the aerosol testing methods used to obtain and complete raw datasets of the comparative aerosol yield data. Additionally, you did not fully identify your comparator ENDS products (Brand N Liquid AB Disposable, Brand O Liquid AC Disposable, and Brand P Liquid AD Disposable) by their actual names or include their manufacturers information. This information and complete testing methods information and dataset are needed to evaluate the comparative health risks of the new product to the same category ENDS products. Provide identity and manufacturers information for each of the ENDS comparison products and a rationale for selecting them for comparison to the new product. In addition, provide the aerosol constituent yields of the entire lifetime of the ENDS comparison products, and provide aerosol data in mass (e.g., mg, µg, ng) per device and per puff for the following constituents:

   a. Acetaldehyde
   b. Acrolein
   c. Cadmium
   d. Chromium
   e. Copper
   f. Diacetyl
   g. Diethylene glycol
   h. Ethylene glycol
   i. Formaldehyde
   j. Glycerol
   k. Glycidol
   l. Lead
   m. Nickel
   n. Nicotine
   o. Propylene glycol
   p. Propylene oxide

Provide all of the following information about HPHC testing so that we can evaluate the HPHC quantities in the comparison products:

   q. Complete description of all puff regimens used to generate aerosol yield data, quantitative test protocols and analytical methods used, and full validation reports for each analytical method
   r. Testing laboratories and their accreditation(s)
   s. Length of time between date(s) of manufacture and date(s) of testing
   t. Complete raw aerosol HPHC yield datasets, with units of measure
   u. Standard deviation(s)
   v. Number of replicates
   w. A summary of the results for all testing performed
   x. Storage conditions prior to initiating testing
   y. Whole stick or pod puff counts

If your test methods are national or international test standards, identify the standards and any deviations from those standards. Alternatively, provide scientific evidence or justification for why HPHC aerosol yields collected from 100 puffs are appropriate and does not raise public

health concerns.

14. Your PMTA provides stability data for 33 HPHCs analyzed from three batches of bulk e-liquid (RM6-CT-001, RM6-CT-002, and RM6-CT-003) and three batches of the new product (BS6-CT-001, BS6-CT-002, and BS6-CT-003). Your stability data include results obtained under both accelerated and ambient long term (LT) stability storage conditions. For the accelerated stability study, you provided data for the initial (T0), 3-month (T3), and 6-month (T6) timepoints. For the ambient long term stability study, you provided T0, T6, and T12 (12-month) timepoints. You stated in the PMTA that you planned a total duration of 24 months for the ambient long term stability study. However, you did not specify the shelf life of the new product or provide data for up to 24-months for ambient LT stability data. Furthermore, you stated that the length of time between the production date and T0 testing date is 11 months, 8 months, and 7 months for bulk e-liquid batch 1 (RM6-CT-001), batch 2 (RM6-CT-002), and batch 3 (RM6-CT-003), respectively. The length of time between the production date and T0 testing date is 11 months, 8 months, and 7 months for the new product batch 1 (BS6-CT-001), batch 2 (BS6-CT-001), and batch 3 (BS6-CT-001), respectively. Thus, the T0 of your new product is 7 months or greater and you did not provide justification why measuring your bulk and new product batches at a time point greater than when the e-liquid was produced (T0) would be appropriate as a baseline for the stability evaluation of the new product. Stability testing is to determine changes over time and a T0 timepoint at the time the product is produced is important in establishing an accurate baseline for determining changes with your product that occur over storage time. In addition, you did not provide acceptance criteria for each of your stability constituents. In order for FDA to fully evaluate the stability and health impact of the new product throughout its shelf life, provide the proposed shelf-life of your new product as well as acceptance criteria for each measured constituent and physicochemical property of the new product and why the acceptance criteria would be appropriate. In addition, provide appropriate stability timepoint data for the new product under ambient long term storage condition or alternatively provide scientific evidence or justification for why the previously submitted data is appropriate for stability evaluation of the new product. If you choose to provide additional stability data, ensure that the same batch of test samples and testing laboratory is used for the full duration of the stability studies. Additionally, provide the following information along with your stability data:

    a. Complete description of *all* quantitative test protocols and analytical methods used, and full validation reports for *each* analytical method
    b. Testing laboratory name and accreditation(s)
    c. Length of time between date(s) of manufacture and date(s) of testing
    d. Complete raw HPHC quantity datasets, with units of measurement
    e. Number of replicates
    f. Standard deviation(s)
    g. A summary of the results for all testing performed
    h. Storage conditions prior to testing
    i. Quantitative acceptance criteria
    j. Footnotes or legends to define all abbreviations used in the data table. If you reported not applicable (NA) or not determined (ND) in the data table, you need to provide scientific justification why they are NA or ND

15. Your PMTA provides results of an accelerated stability study across six months that include targeted quantitative chemical analysis of 32 HPHCs, single chemical constituents (propylene

glycol, glycerol, nicotine, and benzoic acid), nicotine related impurities A - G (i.e., anatabine, β-nicotyrine, cotinine, myosmine, nicotine-N-oxide, nornicotine, and anabasine), pH value, menthol, and 24 metals. You reported the accelerated stability study data as the leachables data for the new product. However, the accelerated stability study data are not an appropriate replacement of the leachable data, because leaching of chemical constituents from the ENDS components to the e-liquid in the new product is unpredictable by nature. The leachables need to be identified in a study using non-targeted semi-quantitative chemical analysis to identify *all* possible chemical compounds that may leach out of ENDS components during normal product use. The leachable study needs to cover the shelf life of the new product under ambient long term storage condition, and you did not establish a shelf-life period for the new product. It could be acceptable to conduct the leachable study under accelerated conditions and in a time period shorter than the proposed shelf-life of the product. However, a scientific justification and proper references are needed to demonstrate that the result of the accelerated leachable study is equivalent to the long-term leachable study. In order for FDA to fully evaluate the health risk of the new product, you need to conduct a study using non-targeted semi-quantitative chemical analysis to identify *all* possible leachables from the ENDS components of the new product. Provide all of the following information about your leachable analysis:

    a. Reference product datasets if a reference e-liquid is used
    b. Analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020 and detailed information on how it is derived
    c. Complete description of *all* test protocols and analytical methods used, full validation reports for *each* analyticalmethod, and scientific rationale for conditions (e.g., physical properties and compositions of solvents used, temperatures, time) chosen in your leachable study
    d. Testing laboratory name and associated accreditation certificates
    e. Length of time between date(s) of manufacture and testing, and storage conditions prior to testing
    f. Complete raw data sets with units and a summary of the results for all leachables testing performed
    g. Number of replicates performed and standard deviation(s)
    h. Storage conditions of leachable study samples
    i. Database search: name, type, algorithm, parameters used
    j. Data analysis and conclusion

If you provide accelerated leachable study data in lieu of ambient long-term leachable study data across the shelf life of the new product, you need to specify the shelf life of the new product, and provide a scientific justification and proper references to demonstrate that the accelerated leachable study is equivalent to the ambient long-term leachable study.

16. Your PMTA provides information about extractables identified from extracted media (n-hexane, isopropyl alcohol (IPA), and water) of the ENDS components of the new product that have been submerged in the media for 72 hours at 37 °C. However, your extractable study was conducted in a targeted manner and non-targeted analysis was not evaluated to account for all possible extractables from undesirable and unpredictable chemical extraction and reaction. In addition, the four different analytical techniques you used to analyze the extractables are not appropriate and lack information for FDA evaluation. Each of the method limitations and concerns are outlined below:

- Headspace gas-chromatography flame ionization detector (HS-GC-FID) technique typically analyzes volatile organic compounds that have been released as gas or vapor directly (dry) from the test materials in a heated sealed container (e.g., vial). However, you used HS-GC-FID to analyze the n-hexane, IPA, and water extracts rather than directly analyze the ENDS components without extraction solvent. The extraction media may react with or hinder the volatile organic compounds from the ENDS components, which would then affect the sensitivity of HS-GC-FID analysis.
- Fourier-transform infrared spectroscopy (FT-IR) data report that the IR spectra of the sample solution (extracts) correspond to the IR spectra of blank solution, but you did not provide raw data to support this statement. Furthermore, FT-IR is not an appropriate analytical technique for the identification and characterization of extractable chemical constituents because FT-IR lacks chemical specificity and sensitivity.
- You used inductive coupled plasma optical emission spectroscopy (ICP-OES) technique and n-hexane, IPA, and water as extraction media for the elemental (metal) analysis of extractables from the ENDS components of the new product. These extraction media are not sufficient to extract elemental impurities from the samples. An acid extraction is needed. Additionally, ICP-OES is suitable for determination of medium with high concentrations of elements (>10 ppb) but for low level analytes, a more sensitive inductively coupled plasma mass spectrometry (ICP-MS) analysis is needed.
- Liquid chromatography mass spectrometry (LC-MS) and gas chromatography mass spectrometry (GC-MS) techniques are used to analyze non-volatile and semi-volatile extractables of the new product, respectively. You stated in the GC-MS and LC-MS analysis reports that no peaks were detected in the chromatograms of n-hexane, IPA, and water extracts of the investigated materials, but you did not provide complete raw datasets to support the findings. Furthermore, you did not provide any information on the instrument parameters (chromatography, mass spectrometry, column brand and type), database search type and parameters, sample preparation procedure, internal and external standards for chemical constituent quantitation, standard solution preparation procedure, solvents used, and sample run sequence for GC-MS and LC-MS analyses.

For all extractable analyses, it is unclear if you submerged the whole assembly or separate components of the new product into the extraction media in sample preparation. In a typical extractables study, each component is extracted separately in an extraction medium so that one can readily identify the source of extractables. A clarification is needed to fully understand your extraction process. Additionally, because the new product is intended to be puffed by mouth, any ENDS components in direct contact with user's mouth and saliva need to be analyzed for potential extractables. Artificial saliva is recommended to be used in the sample preparation process of the study to identify chemical compounds that may leach from the new product to users. Additionally, you did not establish an analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020. Without appropriate and sufficient extractable study data, FDA cannot fully evaluate the health impacts of the new product. Provide the following information about the extractable study for the new product:

    a. Non-targeted HS-GC-MS analysis of volatile organic compounds released from gas or vapor of the structural components of the new product

    b. Non-targeted ICP-MS analysis of extractables from the structural components of the new product using an acid digestion solution

    c. Non-targeted GC-MS and LC-MS analyses of extractables from the structural components of the new product using artificial saliva, polar, semi-polar, and non-polar extraction solutions

    d. Names of the extraction solutions and rationale for selection of these solutions for all the techniques used in extractable study

    e. Analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020 and detailed information on how it is derived

    f. Complete description of all quantitative test protocols and analytical methods used, and full validation reports for each analytical method

    g. Testing laboratory name and associated accreditation certificates

    h. Length of time between date(s) of manufacture and testing, and storage conditions prior to testing

    i. Complete raw data sets with units and a summary of the results for all extractables testing performed

    j. Sample chromatograms

    k. Number of replicates performed and standard deviation(s)

    l. Extractables identified for each component of the ENDS components

    m. Storage and extraction condition of extractables study samples

    n. Database search used including the name, type, and parameters

    o. Data analysis and conclusion

17. Your PMTA provides information about the ENDS aerosol testing methods and validation reports for the new product that were drafted by Shenzhen TCT Testing Technology Co., Ltd, (TCT). However, upon review, we identified several issues in the standard operating procedure (SOP) and validation reports for all your ENDS aerosol testing methods. For example, TCT did not provide intermediate precision in their validation reports. Intermediate precision refers to precision or repeatability study carried out over multiple days by different analysts and on different instruments. Intermediate precision provides information about variations that may exist in an analytical method. Without this information, FDA cannot determine whether the established method can perform consistently on different days, by different analysts, and on different instruments in the same laboratory setting. TCT did not provide acceptance criteria and how they are determined for the following validation parameters: precision (repeatability and intermediate precision), accuracy, limit of detection (LOD), and limit of quantitation (LOQ). Without this information, FDA cannot determine whether these validation parameters were evaluated consistently and adhere to national or international test standards. The limits of detection for many harmful and potentially harmful constituents (HPHCs) were calculated or reported incorrectly. For example, the LODs provided by you through TCT for nicotine, methyl acetate, ethyl acetate, isobutyl acetate, isoamyl acetate, ethyl acetoacetate, and benzyl acetate are different than the LODs FDA calculated based on Equation 1 provided by TCT/applicant.

    Equation 1. $\qquad LOD = t_{(n-1,0.99)} * S * 20$

S is the standard deviation of the replicate measurements, 2.9064 mg/L, 20 and 40 are the volume (in mL) of extraction solvent used on the Cambridge filter pad, and $t_{(n-1,0.99)}$ is 3.143 from Student's $t$ table for one-tailed test at a 99% confidence level. Differences in TCT's LODs and FDA's calculated LODs are summarized below:

- Nicotine: 0.18 mg/100 puffs (TCT) vs 182.70 mg/ 100 puffs (FDA; Equation 1)
- Methyl acetate: 40.6 µg/100 puffs (TCT) vs 46.2 µg/100 puffs (FDA; Equation 1)
- Ethyl acetate: 22.9 µg/100 puffs (TCT) vs 26.1 µg/100 puffs (FDA; Equation 1)
- Isobutyl acetate: 22.0 µg/100 puffs (TCT) vs 25.0 µg/100 puffs (FDA; Equation 1)
- Isoamyl acetate: 19.8 µg/100 puffs (TCT) vs 22.5 µg/100 puffs (FDA; Equation 1)
- Ethyl acetoacetate: 19.2 µg/100 puffs (TCT) vs 21.8 µg/100 puffs (FDA; Equation 1)
- Benzyl acetate: 42.6 µg/100 puffs (TCT) vs 48.4 µg/100 puffs (FDA; Equation 1)

The LODs provided by TCT/applicant for propylene glycol and vegetable glycerin are different than the LODs FDA calculated based on Equation 2 provided by TCT/applicant.

Equation 2. $$LOD = t_{(n-1,0.99)} * S * 20 / 1000$$

Differences in TCT's LODs and FDA's calculated LODs are summarized below:

- Propylene glycol: 7.5 mg/100 puffs (TCT) vs 0.0075 mg/100 puffs (FDA; Equation 2)
- Vegetable glycerin: 16.4 mg/100 puffs (TCT) vs 0.0164 mg/100 puffs (FDA; Equation 2)

The LODs provided by TCT/applicant for formaldehyde, acetaldehyde, acrolein, crotonaldehyde, and butyraldehyde are different than the LODs FDA calculated based on Equation 3 provided by TCT/applicant.

Equation 3. $$LOD = t_{(n-1,0.99)} * S * 40$$

Differences in TCT's LODs and FDA's calculated LODs are summarized below:

- Formaldehyde: 0.06 µg/100 puffs (TCT) vs 126.50 µg/100 puffs (FDA; Equation 3)
- Acetaldehyde: 0.04 µg/100 puffs (TCT) vs 83.08 µg/100 puffs (FDA; Equation 3)
- Acrolein: 0.10 µg/100 puffs (TCT) vs 185.30 µg/100 puffs (FDA; Equation 3)
- Crotonaldehyde: 0.09 µg/100 puffs (TCT) vs 177.52 µg/100 puffs (FDA; Equation 3)
- Butyraldehyde: 0.09 µg/100 puffs (TCT) vs 181.00 µg/100 puffs (FDA; Equation 3)

Because you reported aerosol levels below limit of detection (BLOD) and quantitation (BLOQ) for many HPHCs emitted from the new product, FDA needs accurate LOD to fully evaluate the potential health impact of the new product. In order for FDA to fully evaluate the aerosol HPHC data for the new product, provide the following information about the aerosol testing methods and method validations:

a. Intermediate precision in the validation of TCT's ENDS aerosol testing methods
b. Acceptance criteria and how they are determined for the following validation parameters: repeatability, intermediate precision, accuracy, LOD, and LOQ
c. Provide the correct equation to determine the limit of detection for nicotine aerosol yield method

    d. Provide the correct limits of detection for methyl acetate, ethyl acetate, isobutyl acetate, isoamyl acetate, ethyl acetoacetate, and benzyl acetate aerosol yield methods or provide the correct equation for calculating the limits of detection for these ester compounds

    e. Clarify the unit in mass per 100 puffs for the limits of detection of propylene glycol and glycerol or provide a correct equation for calculating the limits of detection for propylene glycol and glycerol

    f. Provide the correct limits of detection for formaldehyde, acetaldehyde, acrolein, crotonaldehyde, and butyraldehyde aerosol yield methods, and correct corresponding equation for calculating their limits of detection.

If you do not have access to this information, one way to provide this information is through a tobacco master file (TPMF). If you reference a TPMF, also provide an appropriate signed letter of authorization on the TPMF owner's letterhead that would allow FDA to reference the master file. Alternatively, the TPMF owner can provide FDA with a current list of each person authorized to reference the TPMF that identifies any limitation on each authorization (e.g., if the TPMF owner is authorizing use of only certain sections and, if so, identification of those sections).

18. Your PMTA provides information about the e-liquid water activity testing method for the new product that were drafted by Accuprec Research Labs Pvt., Ltd. (ARL). However, upon review, we identified two issues in the SOP and validation report for the e-liquid water activity testing method. For example, ARL provided intraday precision based on six water activity measurements of the Mint Freeze e-liquid sample, which is 8.22% relative standard deviation (RSD). However, ARL did not provide an acceptance criterion for the intraday precision result. Without this information, FDA cannot determine whether the intraday precision is within acceptance limit of the established method and adhere to national or international test standards. ARL did not provide intermediate precision in their water activity validation report. Intermediate precision refers to precision or repeatability studies carried out over multiple days by different analysts on different instruments. Intermediate precision provides information about variations that may exist in an analytical method. Without this information, FDA cannot determine whether the established method can be performed consistently on different days, by different analysts, and on different instruments in the same laboratory setting. In order for FDA to fully evaluate the water activity data for the new product, you need to provide the following information about the e-liquid water activity testing method validation:

    a. Acceptance criterion for intraday precision and how it is determined

    b. Intermediate precision

If you do not have access to this information, one way to provide this information is through a TPMF. If you reference a TPMF, also provide an appropriate signed letter of authorization on the TPMF owner's letterhead that would allow FDA to reference the master file. Alternatively, the TPMF owner can provide FDA with a current list of each person authorized to reference the TPMF that identifies any limitation on each authorization (e.g., if the TPMF owner is authorizing use of only certain sections and, if so, identification of those sections).

19. Your PMTA provides acceptable microbial stability data for bulk e-liquid (labeled as raw material in the PMTA) and finished new product (i.e., packaged in the final container closure system) measured up to 23 months post manufacturing. However, you did not clearly identify the shelf

life of the bulk e-liquid or the finished new product. Shelf life is the time period established by the manufacturer during which the bulk e-liquid and the finished new product is expected to remain stable. This information is needed for FDA to assess the stability data over complete shelf life of the product. Specify your product shelf life from the date of manufacture (e.g., 24 months) for the bulk e-liquid and the finished new product. If the shelf life of the either the bulk e-liquid (i.e., liquid stored in the drum prior to filling) or the finished new product is beyond 23 months, additional microbial stability test data are needed to evaluate how the container closure systems and product composition of the finished new product affect product stability over the defined shelf life. If your proposed shelf life is over 23 months, provide measurements for the following parameters and constituents, beyond 23 months, for the bulk e-liquid or finished new product under standard storage conditions (e.g., 25°C and 60% relative humidity):

    a. Water activity ($a_w$)
    b. Microbial counts (total aerobic microbial counts [TAMC] and total yeast and mold counts [TYMC]
    c. Tobacco-specific nitrosamines (i.e., N-nitrosonornicotine [NNN] and 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone [NNK])

For each parameter and constituent, provide full test data including test protocols, validation data for the test methods (including accuracy, sensitivity, specificity, and reproducibility of the test methods), product storage conditions (prior to and during testing), product manufacture and test dates, quantitative acceptance criteria (if applicable), raw data sets, and a summary of the results for all additional testing performed.

20. Your PMTA and the amendment dated December 17, 2021, provide an elemental impurities analysis as a component of a six-month accelerated stability study that indicate the presence of numerous detectable levels of metals (i.e., arsenic, gold, barium, cadmium, copper, iridium, lead, palladium, rhodium, antimony, selenium, and tin) in your new product e-liquid. Several of these metals, including arsenic, cadmium, lead, and selenium, are known harmful and potentially harmful constituent (HPHCs). Your provided study report states that the detected levels of these metals are within permitted daily exposure levels for elemental impurities in oral drug formulations determined by ICH guideline Q3D (R1). Your provided study report also includes an unidentified specification limit for each elemental impurity that does not align with the referenced ICH guideline Q3D (R1). However, you did not provide information (e.g., an exposure calculation) to relate the detected levels of metal in the e-liquid to potential exposures for consumers of the new product. Additionally, you did not provide justification for why the referenced guidelines for oral drug products are relevant to the evaluation of your new product (an inhaled electronic nicotine delivery system [ENDS] product). Provide scientific evidence and justification to demonstrate that the detectable levels of metals in the e-liquid of the new product are not of toxicological concern.

21. Your PMTA lacks complete ingredient information, including whether ingredients have inherent toxicities (including cytotoxicity, genotoxicity, and mutagenicity), enter the aerosol unchanged, or undergo thermal degradation changes that impact potential or associated toxicities, such as increasing HPHC levels in the primary route of user exposure (i.e., aerosol inhalation). For example, the main ingredients (e.g., PG and VG) could thermally degrade to form HPHCs (e.g., acetaldehyde and formaldehyde) that are carcinogens and respiratory toxicants. You also did not provide toxicological information on other constituents (i.e., leachables from e-liquid). This

information is needed for FDA to evaluate toxicological concerns with your new product. Provide information regarding toxicities and adverse health outcomes associated with ingredients and identified leachables to cover health risks to users and non-users (i.e., non-cancer and cancer effects), including genotoxicity and mutagenicity. In addition, provide scientific evidence or rationale as to why your provided toxicity information or studies support the presence of these ingredients and leachables in your new product at their current levels.

If you choose to use previously conducted toxicology studies that tested aerosols to support that specific ingredients and leachables are not of toxicological concern in your new product, provide a rationale to demonstrate that the aerosolization process in ENDS devices does not create, through thermal degradation, confounding genotoxic constituents, including HPHCs. For putative negative results in assays with e-liquids or aerosols, within your interpretation of those results take into account the presence of potentially genotoxic HPHCs and nicotine as a dose-limiting factor, as the toxicity of nicotine can limit the concentrations of potentially toxic ingredients and leachables in nonclinical assays below those required to produce positive results. Additionally, provide the data and information demonstrating how you took into account and evaluated the dose-limiting effects of nicotine in the studies you submit or reference.

If you choose to reference studies with relevant toxicity endpoints, provide scientific rationale to bridge the information found in such studies to your new product and explain the appropriateness of the experimental methods, deviations from established or referenced protocols, and the conclusions and limitations of the studies in supporting the new product evaluation.

Alternatively, toxicity concerns regarding ingredients or leachables for your new product could be addressed by providing scientific evidence or data from targeted analyses of the e-liquid showing that the ingredients and leachables of concern do not transfer to the aerosol of the new product. If you choose this alternative, provide evidence that the analytical methods you used are capable of quantitating the ingredients and leachables of concern and showing that they are controlled to an acceptable level as part of your overall risk assessment.

22. Your PMTA contains nonclinical study reports (i.e., in vitro bacterial reverse mutation test, in vitro micronucleus test, in vitro chromosomal aberration test, and two in vitro cytotoxicity studies) to support a toxicological evaluation of the new product. However, the in vitro studies provided do not contain sufficient information for a complete toxicological evaluation. Specifically,

- The in vitro bacterial reverse mutation test, in vitro micronucleus test, in vitro chromosomal aberration test, and one of the in vitro cytotoxicity tests were performed with a flavored (i.e., Jungle Juice) e-liquid product that is not under review. You state that all nonclinical studies conducted for Jungle Juice can be directly correlated to assess the safety of your new product. However, bridging of results from these studies to the new product e-liquid is not scientifically supported due to unclear ingredient differences between the e-liquids.
- All in vitro nonclinical assays were performed using only e-liquid and not an aerosol condensate generated with the new product device under intense and non-intense puffing regimens.

- All nonclinical studies lack comparator product data and no comparison to other tobacco products was made. Therefore, the potential cytotoxicity, genotoxicity, and mutagenicity of the new product for users who switch from a same category ENDS or combusted cigarette is not addressed in these assays.
- All the in vitro study reports contain deviations from referenced Organisation for Economic Cooperation and Development (OECD) test guidelines without any provided justification or lack clarity in the test methods utilized. For the in vitro cytotoxicity studies, these issues include testing for and the absence of mycoplasma contamination in 3T3 test system cells was not indicated, laboratory historical positive control data were not provided or referenced, the test article concentrations and dilutions utilized in the assay were unclear, and experimental data were fit with a linear function, rather than a Hill function as described in the study protocol, to calculate $IC_{50}$ values.

Provide data or other scientific evidence to evaluate the genotoxicity, cytotoxicity, and mutagenicity of e-liquids and aerosols generated from your new product in comparison to other tobacco products (e.g., combusted cigarettes, closed ENDS product). If you choose to use your submitted nonclinical studies as evidence for aerosols, provide a clear explanation for why an e-liquid is an appropriate test article since the chemical composition of e-liquids and ENDS aerosols can be different, and the composition of aerosols derived under intense and non-intense conditions can also be different, which may affect assay results. For all studies (i.e., previously submitted nonclinical or new), provide a clear description of all test methods, including test article preparation and dilution, reagent source and quality control, test result evaluation criteria, and historical negative and positive control data, as well as justification for any deviation from OECD test guidelines. If you choose to bridge information from different products or from the literature, provide information, including clear ingredient and constituent information for both the new and the test product, to explain specifically why these data are relevant to your new product under review.

Alternatively, if you do not have access to this information, one way to provide this information is through a tobacco product master file (TPMF). If you reference a TPMF, also provide an appropriate signed letter of authorization on the TPMF owner's letterhead that would allow FDA to reference the master file. Alternatively, the TPMF owner can provide FDA with a current list of each person authorized to reference the TPMF that identifies any limitation on each authorization (e.g., if the TPMF owner is authorizing use of only certain sections and, if so, identification of those sections).

23. Your PMTA includes two clinical studies that measured nicotine exposure, including nicotine pharmacokinetic (PK) endpoints, following use of the new product. In both clinical studies, maximum nicotine exposure ($C_{max}$) and total nicotine exposure (AUC) were higher following the use (i.e., *ad libitum* and controlled use) of the new product than following smoking usual brand (UB) cigarettes. This higher nicotine exposure may contribute to a higher abuse liability, subsequent increased nicotine dependence, and addiction associated with the new product, compared to UB cigarettes. Abuse liability refers to the ability of the product to promote continued use, and the development of addiction and dependence. Provide adequate scientific evidence demonstrating that the higher nicotine exposure with use of the new product does not cause higher abuse liability, nicotine dependence, and addiction. This evidence may include, but is not limited to nicotine BOE resulting from extended actual use of the new product with

appropriate comparisons to cigarettes. These data may come from published literature or from an original clinical study.

24. Your PMTA states that the new product's packaging is child-proof, but you do not provide adequate information to support these claims. Child-resistant packaging and container closure system (CCS) and safety features make it significantly difficult for children five years of age and under to open, use, or obtain toxic, potentially addicting, or otherwise harmful amounts of the tobacco product or any of its constituents within a reasonable time and are not unreasonably difficult for a majority of adults to use properly.

Additionally, you do not identify any specific controls or corrective and preventative actions (CAPA) for nonconforming packaging and CCS and do not provide batch records or results for the finished product in-process checks related to child-proof packaging and CCS demonstrating proper function. Evidence supporting proper function of claimed product packaging and CCS attributes and controls and CAPA for damaged and leaking packaging and CCS is needed to fully evaluate product risks of accidental exposure for the new product.

Therefore, for PM0003460.PD2, provide the following information for child-resistant packaging and CCS for FDA to fully evaluate product risks of accidental exposure for the new product:

   a. Detailed schematics and description of all components of the CCS and packaging including all child-resistant mechanisms.
   b. For each step in the packaging process, a description, test data for finished product in-process checks--including any in-process specifications and acceptance criteria--and corrective and preventative actions (CAPA) for nonconforming packaging.
   c. Provide all documentation and testing data related to child-resistant packaging, such as testing procedure reports, test data, and certifications. This may include data and documentation of testing as described at 16 CFR 1700.20 or data and documentation underlying a General Certificate of Conformity (GCC), as described at section 14(a)(1) of the Consumer Product Safety Act (15 U.S.C. 2063(a)(1)), that the new product meets the applicable packaging requirements under the Child Nicotine Poisoning Prevention Act of 2015 (CNPPA) and 16 CFR 1700.15.

25. Your PMTA provides package labeling for Bidi Stick – Classic 10-pack display box (BIDI STICK PACKAGING- Classic Tobacco_Classic.dox.pdf, Pages 14, 16, 17, and 34) that did not include the required nicotine warning statement on the two principal display panels of the package. Under section 21 CFR 1143.3(a), the package label of e-cigarettes must bear the statement "WARNING: This product contains nicotine. Nicotine is an addictive chemical." directly on the package and the warning statement must "[b]e located in a conspicuous and prominent place on the two principal display panels of the package and the warning area must comprise at least 30 percent of each of the principal display panels". Furthermore, the required warning must comply with the font, text, size, and formatting, as described under section 1143.3(a). Provide an updated proposed package labeling for Bidi Stick – Classic 10-pack display box that includes the required warning statements under CFR 1143.3(a) for PM0003460.PD2. This information is necessary to ensure compliance with the required warning statement as required by 21 CFR 1143.3(a) and with other applicable requirements under the federal Food, Drug, and Cosmetic Act (FD&C Act) and its implementing regulations.

26. Your PMTA includes a marketing plan that describes a recycling program that states, "users can receive one (1) free BIDI™ Stick on their next purchase, provided that the used BIDI™ Stick sent to the BIDI VAPOR LLC facility are all verified." You also state, "the customer will receive a coupon code via email with instructions on how to redeem the FREE Bidi Stick." Per 21 CFR 1140.16(d), "no manufacturer, distributor, or retailer may distribute or cause to be distributed any free samples of cigarettes, smokeless tobacco, or other tobacco products (as such term is defined in section 201 of the Federal Food, Drug, and Cosmetic Act)." To determine if the Bidi Cares Program as intended to be implemented would be in potential violation of 21 CFR § 1140.16(d), FDA requires clarification and additional information regarding your marketing plan. Specifically, provide the following information:

    a. Provide the conditions for receiving this coupon code.
    b. Describe your verification process for the customer receiving the benefits (i.e., the free Bidi Stick) of the Bidi Cares Program is the actual member or the original age-verified purchaser.
    c. Provide a copy of the language of the email that will accompany the coupon code with the instructions on how to redeem the free Bidi Stick.

27. Your PMTA references TPMFs MF0000494 and MF0000498. However, upon review, FDA has identified issues in the TPMFs for which additional information or clarification will be needed by FDA to perform a complete review. The issues include, but are not limited to, lack of information on certain methods, their data, and validation as well as deviations from testing guidelines, and manufacturing process for your e-liquid. These deficiencies are being conveyed separately to the TPMF owners. If you have questions related to the TPMFs, we encourage you to contact the TPMF owners. The TPMF owners' complete and timely response or lack thereof may impact FDA's review of your PMTA.

In addition to the deficiencies listed above, we request the following information to determine whether to prepare an Environmental Impact Statement (EIS) or Finding of No Significant Impact (FONSI). The information requested is <u>not</u> required for a scientific determination to receive marketing authorization; however, we are precluded from issuing an order until the below items are resolved. Information requested in this section is not necessary for a complete response to this letter:

28. Your PMTA includes an environmental assessment (EA) that lacks the complete or correct address for the manufacturing facility for the new product. The manufacturing facility could not be located with the address provided in the EA. This information is used to assess the environmental impact of manufacturing the new product. In your revised EA, provide a full and accurate address, and a map showing the location, for the manufacturing facility where the new product is manufactured.

29. Your PMTA includes an EA that lacks information on the environmental effects of use of the new product on indoor air quality and bystanders. This information is used to assess the environmental impact of marketing the new product as exposure to secondhand and thirdhand ENDS aerosol may have short- and long-term adverse effects on human and environmental health. In your revised EA, provide an evaluation of potential environmental effects of use of the new product on indoor air quality and effects on bystanders. Support may include local indoor smoking laws and studies of ENDS.

A0031

30. Your PMTA includes an EA that lacks information on the environmental justice effects associated with manufacturing, use, and disposal of the new product. This information is a required component of the EA used to assess whether the marketing of the new product is likely to have a disproportionately high and adverse human health or environmental effect on low-income, minority including native/indigenous tribes, or vulnerable populations. In your revised EA, provide any relevant data, analysis, or scientific literature on demographic patterns of use of the new product to demonstrate that environmental justice populations will not be disproportionately affected by the manufacture, use, or disposal of the new product. Provide mitigation strategies if impacts are found in environmental justice populations. For guidance on environmental justice considerations see: https://www.epa.gov/environmentaljustice/environmental-justice-and-national-environmental-policy-act

31. Your PMTA includes an EA that states the new product is composed of materials used in currently marketed ENDS and lists the chemical constituents of the new product components, including the battery, heating element, plastic components and e-liquid. However, your PMTA lacks information on the environmental effects of disposal after use of the new product, including the components and associated chemical constituents, on land, air, and water quality. This information is used to assess the environmental impacts of marketing the new product. In your revised EA, provide the environmental impacts assessment of disposal, both proper and improper (littering), of the new product, including the components and associated chemical constituents, on land, air, and water quality.

32. Your PMTA includes an EA that lacks information on the current market volume of the new product. Marketing information is used to quantitatively assess the environmental impacts of manufacturing, use, and disposal of the new product. In your revised EA, provide the current market volume for your new product. In order to comply with 21 CFR 25.51(a) regarding confidentiality, the projected market volume information is protected from disclosure. According to 21 CFR 25.51(a), "[D]ata and information that are protected from disclosure by 18 U.S.C. 1905 or 21 U.S.C. 331(j) or 360j(c) shall not be included in the portion of environmental documents that is made public. When such data and information are pertinent to the environmental review of a proposed action, an applicant or petitioner shall submit such data and information separately in a confidential section and shall summarize the confidential data and information in the EA to the extent possible."

When responding to this letter, you should utilize FDA Form 4057a Premarket Tobacco Product Application Amendment and General Correspondence Submission. Within FDA Form 4057a, ensure that you correctly populate Section I, Section III, and Section VI. For Section III you should identify this as an amendment with a response type of Deficiency Letter and provide the STN that you are amending, PM0003460.PD2. For Section VI you should have your designated authorized representative sign the certification statement. Refer to Appendix C for best practices in submitting a response to a Deficiency letter.

*If you intend to respond to these deficiencies, clearly state (by STN) that you have responded to each numerated deficiency above. Please be advised that an inadequate resolution of the deficiencies described above will likely result in a marketing denial order.*

Amendments, which contain a substantial amount of new information (e.g., detailed new analyses of previously submitted data, new manufacturing information), may extend the time required for review. FDA generally does not intend to review amendments received after the date stated in this letter because the scientific review of the tobacco will have begun and the evaluation of additional amendments would require significant review time by the agency and would likely delay the completion of the determination of market action. In the circumstance the time required for review is extended, FDA will notify you by letter.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[2,3] using eSubmitter.[4] Alternatively, submissions may be mailed to:

> Food and Drug Administration
> Center for Tobacco Products
> Document Control Center (DCC)
> Building 71, Room G335
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[5]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

If you have any questions, please contact Rida Tariq, Regulatory Health Project Manager, at (301) 348-1830 or Rida.Tariq@fda.hhs.gov.

Sincerely,

Digitally signed by Lida Oum -S
Date: 2023.03.20 17:55:03 -04'00'

Lida Oum, Ph.D.
Chemist, Division of Product Science
Office of Science
Center for Tobacco Products

**Enclosures:**

Appendix A – New Tobacco Product Subject of This Letter

---

[2] For more information about CTP Portal, see
https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[3] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[4] For more information about eSubmitter, see http://www.fda.gov/ForIndustry/FDAeSubmitter
[5] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

Appendix B – Amendments Received for This Application
Appendix C – Best Practices for Submitting a Response to a Deficiency Letter

A0034

**Appendix A**
New Tobacco Product Subject of This Letter

- PM0003460.PD2: Bidi Stick - Classic

**Appendix B**
Amendments Received for This Application

| Submission Date | Receipt Date | Reviewed | Brief Description |
|---|---|---|---|
| October 13, 2020 | October 13, 2020 | Yes | Submission of Consumer Insight Summary |
| November 24, 2020 | November 24, 2020 | Yes | Response to November 21, 2020, FDA Request for Classic Bidi Stick |
| January 6, 2021 | January 6, 2021 | Yes | Request for application review status; notification of forthcoming amendments |
| March 23, 2021 | March 23, 2021 | Yes | Additional study results; Bidi's effort to combat underage use and ensure availability of quality, consistent products to adult consumers |
| April 20, 2021 | April 20, 2021 | Yes | Additional information on Tobacco Product Perception and Intention (TPPI) studies and Abuse Liability Assessment |
| September 8, 2021 | September 8, 2021 | Yes | Actual Use (AU) and TPPI study updates; ongoing studies and literature review updates |
| October 24, 2021 | October 24, 2021 | Yes | Updates to storage and stability, product description, ingredient listing and manufacturing, and literature review |
| October 29, 2021 | October 29, 2021 | Yes | Updates on abuse liability study |
| November 3, 2021 | November 4, 2021 | Yes | Submission of a randomized crossover clinical study |
| November 5, 2021 | November 5, 2021 | Yes | Status updates on the TPPI studies |
| December 3, 2021 | December 3, 2021 | Yes | Updates on TPPI and BSI studies, and PBI study status |
| December 17, 2021 | December 17, 2021 | Yes | Final TPPI study report; Bidi Stick Likelihood of Use (LOU) study; toxicological human health risk assessment study |
| December 23, 2021 | December 23, 2021 | Yes | Final study report and data files for Bidi Stick pk/Abuse Liability Assessment; PBI study update; draft of Quality Agreement with contract manufacturer |
| December 23, 2021 | December 23, 2021 | Yes | Duplicate of previous December 23, 2021 amendment |
| December 23, 2021 | December 23, 2021 | Yes | Duplicate of previous December 23, 2021 amendment |
| May 20, 2022 | May 20, 2022 | Yes | Toxicological Ingredient Risk Assessment; Perceptions and Behavioral Intentions Study; and Population Prevalence Study |
| July 5, 2022 | July 5, 2022 | No | Updates to quality and manufacturing control information |

| July 11, 2022 | July 11, 2022 | No | Copy of July 5, 2022 cover letter and submission report; copy of email correspondence with RHPM |
| July 28, 2022 | July 28, 2022 | No | Updates to the legal business name of the BIDI Stick contract manufacturer to SMISS TECHNOLOGY CO., LTD |
| September 9, 2022 | September 9, 2022 | No | Final study report and data files for Bidi Vapor's Youth Prevalence Study; preprint article for the BIDI® Stick Likelihood of Use Study |
| September 15, 2022 | September 15, 2022 | No | Request to include (12) 4057a forms with the previously submitted corresponding first (11) PM0003460 amendments and the (6/25/2021) letter to CTP/OCE, in the Agency's files. |
| January 26, 2023 | January 26, 2023 | No | Technical update to MF0000498 |
| February 6, 2023 | February 6, 2023 | No | Technical update of EAs for PM0003460.PD1-PD11 |
| February 13, 2023 | February 13, 2023 | No | Technical update of EAs for PM0003460.PD1-PD11 |
| February 16, 2023 | February 16, 2023 | No | Technical update of Ambient Stability Study for Classic BIDI® Stick, PM0003460.PD2 |

A0037

**Appendix C**
Best Practices for Submitting a Response to a Deficiency Letter

We recommend that your submission include consecutively numbered pages and be organized as follows:

- List each number and full deficiency text as stated in this letter, and provide your response immediately following the deficiency.
  - Your response should address all STNs identified in a deficiency; if different information/data is being submitted for different STNs in your response to a given deficiency, the response should clearly correlate information/data to the applicable STNs.
  - If your response applies to a subset of STNs (e.g., 5 out of 10) and you would like us to start scientific review upon receipt of your response, provide a statement to that effect in your cover letter.
  - Submit data as an appendix or appendices and reference the appropriate appendix/appendices in your response.
  - Submit publications as an appendix or appendices and reference the appropriate appendix/appendices in your response.
- If resubmitting information (e.g., tables) to correct earlier omissions/errors, clearly identify what information has been revised. FDA will consider that new information to supersede the information provided in the original submission, except for measured values (e.g., test data, HPHC data). For measured values, applicants should provide rationale for why the updated data are appropriate for consideration. If rationale is not provided, measured values will be combined with previous measured values for evaluation.
- If you have already submitted any of the information requested in the deficiency, identify the date of the prior submission, page numbers, and line numbers where the requested information is located.

To facilitate review, your submission must comply with the PMTA format requirements per 21 CFR 1114.7(b)(1) and be submitted using FDA form as required by 21 CFR 1114.9. Additionally, an amendment must specify the STN assigned to the original submission and must also include the certification statement set forth in 21 CFR 1114.7(m), with the appropriate information inserted, and signed by an authorized representative of the applicant (as designated in the required FDA forms).



Niraj Patel, CEO
(321) 223-3101
raj@bidivapor.com

<u>**Deficiency Letter Response: PM0003460 PD2**</u>                <u>**Via CTP Portal**</u>

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products                <span style="color:red">**CONTAINS CONFIDENTIAL**</span>
Office of Science                          <span style="color:red">**BUSINESS INFORMATION**</span>
Document Control Center Building 71,
Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**RE: Bidi Vapor LLC; Deficiency Letter Response; FDA Submission Tracking Number (STN): PM0003460.PD2**

Dear Dr. Lida Oum

Bidi Vapor, LLC., seeks to respond to the Deficiency Letter issued by the U.S. Food and Drug Administration (FDA) on March 20, 2023, for the BIDI® Stick Classic product (PM0003460.PD2). This response amends the Premarket Tobacco Product Application (PMTA) originally submitted on September 8th, 2020.

In response to FDA's Deficiency Letter dated March 20, 2023, Bidi Vapor LLC., provides requested information, data, and scientific justification to adequately resolve each of the 32 deficiencies identified for the BIDI® Stick Classic product PMTA (STN: PM0003460.PD2). For convivence, we attach the aforementioned letter that outlines the 32 deficiencies we have resolved.

Overall, the information, data and scientific justification provided in the response to this Deficiency Letter demonstrates that the BIDI® Stick Classic product PMTA as amended meets the requirements of section 910(b)(l) of the FD&C Act.

*        *        *        *

        This submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA



§§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

We appreciate FDA's careful consideration of this deficiency letter response and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH determination for our BIDI® Stick products.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor LLC

**CC:**

Rida Tariq, Regulatory Health Project Manager

**Enclosures:**

- Appendix A: FDA correspondence to Bidi Vapor LLC, March 20, 2023, Deficiency Letter (Submission Tracking Number (STN): PM0003460.PD2)

**FDA NEWS RELEASE**

# FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death

**For Immediate Release:**

July 27, 2017

Español (/news-events/comunicados-de-prensa/la-fda-anuncia-un-plan-de-control-integral-para-cambiar-la-trayectoria-de-las-enfermedades-y-muertes)

The U.S. Food and Drug Administration today announced a new comprehensive plan for tobacco and nicotine regulation that will serve as a multi-year roadmap to better protect kids and significantly reduce tobacco-related disease and death. The approach places nicotine, and the issue of addiction, at the center of the agency's tobacco regulation efforts. The goal is to ensure that the FDA has the proper scientific and regulatory foundation to efficiently and effectively implement the Family Smoking Prevention and Tobacco Control Act. To make certain that the FDA is striking an appropriate balance between regulation and encouraging development of innovative tobacco products that may be less dangerous than cigarettes, the agency is also providing targeted relief on some timelines described in the May 2016 final rule that extended the FDA's authority to additional tobacco products. The agency will also seek input on critical public health issues such as the role of flavors in tobacco products.

Tobacco use remains the leading cause of preventable disease and death in the United States, causing more than 480,000 deaths every single year. In addition to the devastating human toll caused mainly by cigarette smoking, tobacco also causes substantial financial costs to society, with direct health care and lost productivity costs totaling nearly $300 billion a year. A key piece of the FDA's approach is demonstrating a greater awareness that nicotine – while highly addictive – is delivered through products that represent a continuum of risk and is most harmful when delivered through smoke particles in combustible cigarettes.

"The overwhelming amount of death and disease attributable to tobacco is caused by addiction to cigarettes –  the only legal consumer product that, when used as intended, will kill half of all long-term users," said FDA Commissioner Scott Gottlieb, M.D. "Unless we change course, 5.6 million young people alive today will die prematurely later in life from tobacco use. Envisioning a world where cigarettes would no longer create or sustain addiction, and where adults who still need or want nicotine could get it from alternative and less harmful sources, needs to be the cornerstone of our efforts – and we believe it's vital that we pursue this common ground."

The FDA plans to begin a public dialogue about lowering nicotine levels in combustible cigarettes to non-addictive levels through achievable product standards. The agency intends to issue an Advance Notice of Proposed Rulemaking (ANPRM) to seek input on the potential public health benefits and any possible adverse effects of lowering nicotine in cigarettes. Because almost 90 percent of adult smokers started smoking before the age of 18 and nearly 2,500 youth smoke their first cigarette every day in the U.S., lowering nicotine levels could decrease the likelihood that future generations become addicted to cigarettes and allow more currently addicted smokers to quit.

"Because nicotine lives at the core of both the problem and the solution to the question of addiction, addressing the addictive levels of nicotine in combustible cigarettes must be part of the FDA's strategy for addressing the devastating, addiction crisis that is threatening American families," said Commissioner Gottlieb. "Our approach to nicotine must be accompanied by a firm foundation of rules and standards for newly-regulated products. To be successful all of these steps must be done in concert and not in isolation."

A0041

The FDA is committed to encouraging innovations that have the potential to make a notable public health difference and inform policies and efforts that will best protect kids and help smokers quit cigarettes. To make this effort successful, the agency intends to extend timelines to submit tobacco product review applications for newly regulated tobacco products that were on the market as of Aug. 8, 2016. This action will afford the agency time to explore clear and meaningful measures to make tobacco products less toxic, appealing and addictive. For example, the FDA intends to develop product standards to protect against known public health risks such as electronic nicotine delivery systems (ENDS) battery issues and concerns about children's exposure to liquid nicotine. It also will provide manufacturers additional time to develop higher quality, more complete applications informed by additional guidance from the agency.

The agency plans to issue this guidance describing a new enforcement policy shortly. Under expected revised timelines, applications for newly-regulated combustible products, such as cigars, pipe tobacco and hookah tobacco, would be submitted by Aug. 8, 2021, and applications for non-combustible products such as ENDS or e-cigarettes would be submitted by Aug. 8, 2022. Additionally, the FDA expects that manufacturers would continue to market products while the agency reviews product applications.

Importantly, the anticipated new enforcement policy will not affect any current requirements for cigarettes and smokeless tobacco, only the newly-regulated tobacco products such as cigars and e-cigarettes. This approach also will not apply to provisions of the final rule for which compliance deadlines already have passed, such as mandatory age and photo-ID checks to prevent illegal sales to minors. It also will not affect future deadlines for other provisions of the rule, including, but not limited to, required warning statements, ingredient listing, health document submissions, harmful and potentially harmful constituent reports, and the removal of modified risk claims, i.e., "light," "low," or "mild," or similar descriptors.

In order to further explore how best to protect public health in the evolving tobacco marketplace, the agency also will seek input from the public on a variety of significant topics, including approaches to regulating kid-appealing flavors in e-cigarettes and cigars. In particular, the FDA intends to issue ANPRMs to: 1) seek public comment on the role that flavors (including menthol) in tobacco products play in attracting youth and may play in helping some smokers switch to potentially less harmful forms of nicotine delivery; and 2) solicit additional comments and scientific data related to the patterns of use and resulting public health impacts from premium cigars, which were included in the FDA's 2016 rule. Additionally, the agency plans to examine actions to increase access and use of FDA-approved medicinal nicotine products, and work with sponsors to consider what steps can be taken under the safety and efficacy standard for products intended to help smokers quit.

"This comprehensive plan and sweeping approach to tobacco and nicotine allows the FDA to apply the powerful tools given by Congress to achieve the most significant public health impact," said Mitch Zeller, J.D., director of the FDA's Center for Tobacco Products. "Public input on these complex issues will help ensure the agency has the proper science-based policies in place to meaningfully reduce the harms caused by tobacco use."

To complement these larger policy considerations, the FDA plans to issue foundational rules to make the product review process more efficient, predictable, and transparent for manufacturers, while upholding the agency's public health mission. Among other things, the FDA intends to issue regulations outlining what information the agency expects to be included in Premarket Tobacco Applications (PMTAs), Modified Risk Tobacco Product (MRTP) applications and reports to demonstrate Substantial Equivalence (SE). The FDA also plans to finalize guidance on how it intends to review PMTAs for ENDS. The agency also will continue efforts to assist industry in complying with federal tobacco regulations through online information, meetings, webinars and guidance documents.

The FDA, an agency within the U.S. Department of Health and Human Services, promotes and protects the public health by, among other things, assuring the safety, effectiveness, and security of human and veterinary drugs, vaccines and other biological products for human use, and medical devices. The agency also is responsible for the

A0042

# Modifications to Compliance Policy for Certain Deemed Tobacco Products

## Guidance for Industry

### *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments regarding this draft guidance may be submitted within 30 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Electronic comments may be submitted to http://www.regulations.gov. Alternatively, submit written comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Room 1061, Rockville, MD 20852. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft guidance, contact the Center for Tobacco Products at (Tel) 1-877-CTP-1373 (1-877-287-1373) Monday-Friday, 9 a.m. – 4 p.m. ET.

Additional copies are available online at http://www.fda.gov/TobaccoProducts/Labeling/RulesRegulationsGuidance/default.htm. You may send an e-mail request to SmallBiz.Tobacco@fda.hhs.gov to receive an electronic copy of this guidance. You may send a request for hard copies to U.S. Food and Drug Administration, Center for Tobacco Products, Attn: Office of Small Business Assistance, Document Control Center, Bldg. 71, Rm. G335, 10903 New Hampshire Ave., Silver Spring, MD 20993-2000.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Tobacco Products**

**March 2019**

In May 2017, FDA published a guidance document, *Three-Month Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule*, under which the Agency, as a matter of enforcement discretion, stated its intention not to begin enforcement for an additional three months for all future compliance dates for requirements under the final deeming rule.

In July 2017, FDA announced a new comprehensive plan for tobacco and nicotine regulation that would serve as a multi-year roadmap. In an effort to strike an appropriate balance between regulation and encouraging development of innovative tobacco products that may be less dangerous than cigarettes, the Agency announced that it would be providing targeted relief on some timelines described in the preamble to the final deeming rule. The comprehensive plan was announced, in part, to afford the Agency time to explore clear and meaningful measures outside of premarket review to make tobacco products less toxic, appealing, and addictive.

The Agency's July 2017 announcement also indicated that extended compliance periods would allow time for FDA to set out additional rules and guidances and for industry to develop higher quality applications. We are continuing to pursue such regulations and guidances; however, the recent surge in youth use of ENDS products has caused us to reevaluate our priorities and modify the compliance policy for certain products, as set forth in this guidance. With respect to flavored cigars affected by this revised compliance policy, we note that any tobacco product, including cigars, may utilize the appropriate pathway to market, including the SE pathway or an exemption from SE. Manufacturers may obtain information about the application process from the detailed statutory criteria, as well as published guidances, webinars, and the marketing orders and their accompanying documentation provided by FDA.

In accordance with this comprehensive plan, in August 2017, FDA announced an extension of the period during which it did not intend to initiate enforcement action for premarket review requirements under the final deeming rule ("August 2017 Compliance Policy"). This revised policy stated that the compliance dates for submitting EX REQs, SE Reports, and PMTAs for newly regulated combustible tobacco products (such as most cigars) would be extended to August 8, 2021, and the compliance dates for submitting EX REQs, SE Reports, and PMTAs for newly regulated noncombustible tobacco products (such as most ENDS products) would be extended to August 8, 2022. In addition, FDA revised the compliance policy relating to the period after FDA receipt of EX REQs, SE Reports, and PMTAs for deemed tobacco products that were on the market on August 8, 2016. Under this revised compliance policy, FDA established a continued compliance period pending review of those applications. FDA stated that, under this policy, it intended to continue deferring enforcement until the Agency rendered a decision on an application (i.e., issuance of: a Marketing Order; a No Marketing Order; a Refuse to File; or Refuse to Accept) or the application was withdrawn.

However, in late 2017, FDA started to see a marked increase in complaints about ENDS products. FDA initiated an investigation of these complaints, the majority of which pertained to minors' access to and use of these products. This new information suggested an alarming increase in the use of ENDS products by middle and high school students. In April 2018, FDA

A0044

- Flavored ENDS products (other than tobacco-flavored, mint-flavored, and menthol-flavored ENDS products) that are offered for sale in the United States after August 8, 2021, without the manufacturer submitting (and FDA receiving) a premarket application (or after action by FDA on that application, as described below); and/or

- All ENDS products that are targeted to minors or likely to promote use of ENDS by minors.

This guidance does not in any way alter the fact that no tobacco product, including those with tobacco, mint, or menthol flavors, may be legally sold to minors. FDA will continue to take legal action regarding sales of tobacco products to minors and will closely monitor all sales of ENDS products. If current trends regarding minors' use of ENDS products persist, the Agency will consider adjusting the approach announced in this guidance.

1. Flavored ENDS products (other than tobacco-flavored, mint-flavored, and menthol-flavored ENDS products) that are offered for sale in ways that pose a greater risk for minors to access such products

FDA intends to prioritize enforcement for lack of a marketing authorization against flavored ENDS products (other than tobacco-flavored, mint-flavored, and menthol-flavored ENDS products) that are offered for sale in the United States in ways that pose a greater risk for minors to access such products. For example:

- Products sold in locations that minors are able to enter at any time (e.g., the entire establishment or an area within the establishment);

- Products sold through retail establishments and online retail locations that have sold to minors after issuance of the guidance [insert guidance date here]; information about sales to minors identified by FDA is publicly available on FDA's searchable retailer inspection database, located here: https://www.accessdata.fda.gov/scripts/oce/inspections/oce_insp_searching.cfm;

- Products sold online with no limit on the quantity that a customer may purchase within a given period of time; or

- Products sold online without independent, third-party age- and identity-verification services that compare customer information against third-party data sources, such as public records.

FDA requests comments on other examples of products that are offered for sale in ways that pose greater risk for minors to access such products. In addition, FDA solicits comments on whether there are any technologies or other measures that would also be well tailored to address youth access to ENDS products, as well as any additional data that would be relevant to FDA's formulation of its enforcement priorities.

A0045

# Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems

## Guidance for Industry

Comments may be submitted at any time for Agency consideration. Electronic comments may be submitted to https://www.regulations.gov. Alternatively, submit written comments to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Room 1061, Rockville, MD 20852. All comments should be identified with Docket No. FDA-2015-D-2496.

For questions regarding this guidance, contact the Center for Tobacco Products at 1-877-CTP-1373 (1-877-287-1373) Monday - Friday, 9 a.m. – 4 p.m. ET.

Additional copies are available online at https://www.fda.gov/tobacco-products/compliance-enforcement-training/small-business-assistance-tobacco-product-industry. You may send an e-mail request to SmallBiz.Tobacco@fda.hhs.gov to receive an electronic copy of this guidance. You may send a request for hard copies to U.S. Food and Drug Administration, Center for Tobacco Products, Attn: Office of Small Business Assistance, Document Control Center, Bldg. 71, Rm. G335, 10903 New Hampshire Ave., Silver Spring, MD 20993-2000.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Tobacco Products**

**June 2019**

nonclinical information, confirm whether the tobacco product meets applicable product standards under section 907 of the FD&C Act (if any), and confirm that the product can be manufactured according to defined standards outlined in the PMTA. Inspections will also provide important information regarding whether the manufacturing, processing, or packing of the tobacco product conform to tobacco product manufacturing practices, which will be set forth in a future rulemaking.[18]

Under section 910(b)(2) of the FD&C Act, FDA has the discretion, upon your request or on its own initiative, to refer your PMTA to the Tobacco Product Scientific Advisory Committee (TPSAC). FDA Advisory committees are used to obtain independent, expert advice on scientific, technical, and policy matters. TPSAC reviews and evaluates safety, dependence, and health issues relating to tobacco products and provides appropriate advice, information, and recommendations to the Commissioner of Food and Drugs.[19] If you wish to request that FDA refer your PMTA to TPSAC, you should include the request in the cover letter of your initial PMTA submission. If you would like to request that FDA refer your PMTA to TPSAC after your PMTA has been submitted, please contact CTP to discuss this option.

### D.  Public Health Considerations for ENDS Products

#### 1.  *Section 910(c)(2)(A) Standard: A Showing That the New Tobacco Product Is Appropriate for the Protection of the Public Health*

Section 910(c)(2)(A) of the FD&C Act requires that FDA deny a PMTA where it finds "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health."[20] FDA's finding of whether there is a showing that permitting a product to be marketed would be appropriate for the protection of the public health (APPH) must be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account:

(A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

(B) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

---

[18] FDA intends to issue regulations under section 906(e) of the FD&C Act that will contain the requirements for tobacco product manufacturing practices. At that time, each new PMTA will also be expected to demonstrate that the methods, facilities, or controls used conform to these regulations (section 910(c)(2)(B)).

[19] For more information, please visit the TPSAC website:
https://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/TobaccoProductsScientificAdvisoryCommittee/default.htm

[20] In addition, the statute provides that FDA shall deny PMTAs under section 910(c)(2) of the FD&C Act where:
(B) the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of section 906(e);
(C) based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or
(D) such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under section 907, and there is a lack of adequate information to justify the deviation from such standard.

A0047

(Section 910(c)(4) of the FD&C Act.) We provide information in this section to assist applicants in submitting an ENDS PMTA that could support a showing that the marketing of a new tobacco product would be APPH.

Throughout this guidance document, we recommend providing specific information pertaining to different topic areas and scientific disciplines to enable FDA to make a determination of whether your PMTA supports a showing that permitting the marketing of your new tobacco product would be APPH. For example, knowing the full assessment of the toxicological effects of your ENDS (e.g., ingredients, components, use of the product) is important to assess the health effects on users and nonusers under Section 910(b). As such, FDA assesses the toxicology of the product to determine whether product use would have a detrimental effect on users' and nonusers' health. FDA weighs all of the potential benefits and risks from the information contained in the PMTA to make an overall determination of whether the product should be authorized for marketing.

You may propose specific restrictions on sale and distribution that can help support a showing that permitting the marketing of the product would be APPH (e.g., a restriction that decreases the likelihood that those who do not use tobacco products will start using tobacco products). FDA may consider your product in that context and may include your proposed restrictions as mandatory conditions in your marketing order. These restrictions would be in addition to any other restrictions that FDA may require on the sale and distribution of the tobacco product, or any postmarket records and reports FDA may find necessary.

The following sections highlight several broad categories of issues that applicants should consider to help demonstrate that permitting the marketing of their products would be APPH and, consequently, should be authorized for marketing.

## 2. Valid scientific evidence

The FD&C Act states that the finding of whether permitting the marketing of a product would be APPH will be determined, when appropriate, on the basis of well-controlled investigations[21] (section 910(c)(5)(A)). However, section 910(c)(5)(B) of the FD&C Act also allows the Agency to consider other "valid scientific evidence" if found sufficient to evaluate the tobacco product. Given the relatively new entrance of ENDS on the U.S. market, FDA understands that limited data may exist from scientific studies and analyses.[22] If an application includes, for example, information on other products (e.g., published literature, marketing information) with appropriate bridging studies, FDA intends to review that information to determine whether it is valid scientific evidence sufficient to demonstrate that the marketing of a product would be APPH. Nonclinical studies alone are generally not sufficient to support a determination that permitting the marketing of a tobacco product would be appropriate for the protection of the public health.

---

[21] Well-controlled investigations are generally those that are designed and conducted in such a way that minimizes or controls for bias, confounding variables, and other factors that may render the results unreliable.

[22] As discussed in section VI.H.2., due to the limited nonclinical or clinical research conducted on specific ENDS products, it is likely that applicants will conduct certain investigations themselves and submit their own research findings as a part of their PMTA.

A0048

Nonetheless, in general, FDA does not expect that applicants will need to conduct long-term studies to support an application.[23] As an example for nonclinical assessments, long-term studies such as carcinogenicity bioassays are not expected to be included in an application. For clinical assessments, instead of conducting clinical studies that span months or years to evaluate potential clinical impact, applicants could demonstrate possible long-term health impact by including existing longer duration studies in the public literature with the appropriate bridging information (i.e., why the data used are applicable to the new tobacco product) and extrapolating from short-term studies.[24] In addition, nonclinical in vitro assays that assess the toxicities that are seen following long-term use of tobacco products may be supportive of these clinical assessments. These studies, used as a basis to support a PMTA, should be relevant to the new tobacco product and address, with robust rationale, acute toxicological endpoints or other clinical endpoints that may relate to long-term health impacts. In this context, FDA considers long-term studies to be those studies that are conducted over six months or longer.

FDA recommends that you provide a detailed explanation of how the data and information provided in your PMTA (including the information required by section 910(b)(1) of the FD&C Act) constitute valid scientific information that would support a finding by FDA that marketing your new tobacco product is APPH.

If an applicant has questions about investigations, including alternatives to well-controlled investigations it would like to utilize, we recommend that the applicant meet with FDA to discuss the approach prior to preparing and submitting an application.[25]For additional information regarding alternatives to well-controlled investigations please see section X of this guidance.

### 3. Comparison Products

As part of FDA's consideration under 910(c)(4) of the FD&C Act of the risks and benefits of the marketing of the new tobacco product to the population as a whole, including users and nonusers of tobacco products, FDA reviews the health risks associated with changes in tobacco product use behavior (e.g., initiation, switching, dual use, cessation) that are likely to occur with the marketing of the new tobacco product. We recommend an applicant compare the health risks of its product to both products within the same category and subcategory, as well as products in different categories as appropriate. It is helpful for FDA to understand applicant's rationale and justification for comparators chosen within the same category or different categories of tobacco products. This comparative health risk data is an important part of the evaluation of the health effects of product switching.

Information about tobacco products in the same category or subcategory is important to FDA's evaluation of a tobacco product's potential effect on public health because current users may switch to other products within the same category. For tobacco products that are within the same category and subcategory, we recommend applicants consider products that consumers are most likely to considered interchangeable between your proposed product and other similar products.

---

[23] See section X for additional discussion.
[24] See section X of the guidance for more information about alternatives to conducting long-term studies.
[25] See the R&D meetings guidance.

A0049

- Managerial oversight and employee training;
- Manufacturing processes and controls for product design, including a hazard analysis that details the correlation of the product design attributes with public health risk, and any mitigations for identified hazards that have been implemented;
- Activities related to identifying and monitoring suppliers and the products supplied (including, for example, purchase controls and materials acceptance activities);
- Validation and verification activities used to ensure that the new tobacco product matches specifications, including any voluntary standards with which your product complies;
- Test methods and procedures conducted before the new tobacco product is released for sale and distribution in the United States, including information on test parameters, such as the concentration of the standard solution, as well as a description of acceptance activities with protocol and acceptance criteria. If the product is manufactured without a solution, you should describe its performance characteristics (e.g., particle size, heating temperature); and
- Handling of complaints, nonconforming products and processes, and corrective and preventive actions.

FDA may request that you submit copies of selected SOPs if needed to enable FDA to more fully understand the methods used in, and the facilities and controls used for, the manufacturing and processing of the new tobacco product.

## 2. Nonclinical and Human Subject Studies

Section 910(b)(1)(A) of the FD&C Act requires that a PMTA contain "full reports of all information, published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products." FDA interprets the information required under this provision to include not only investigations that support the PMTA, but also any investigations that do not support, or are adverse to, the PMTA. Information on both nonclinical and clinical investigations that must be provided, including, but not limited to, any studies assessing constituents of tobacco, aerosol, toxicology, consumer exposure, consumer use profiles, and consumer risk perception. Furthermore, information on investigations concerning products with novel components, ingredients, additives, or design features that are similar or related to those of the new tobacco product and investigations concerning products that share novel components, ingredients, additives, or design features with the new tobacco product should also be provided so that FDA may adequately assess the product's health risks. To the extent the information is available, you should indicate the source of funding for all studies and provide a statement regarding any potential financial or other conflicts of interest on the part of the investigator(s). Due to the emerging nature of ENDS products within the general tobacco market, FDA acknowledges that there may be limited nonclinical or clinical research conducted on specific ENDS products. Thus, it is likely that applicants will conduct certain investigations themselves and submit their own research findings as a part of their PMTA. However, in general, FDA does not expect that applicants will have to conduct long-term studies to support an application.

A0050

       i.      Consumer perceptions and intentions

Consumer perception evaluations should address how consumers perceive product harms and include consideration of packaging and labeling. These evaluations should also address interest in and intentions to use the product, including among populations of non-users of tobacco products (e.g., vulnerable populations such as youth and young adults). Examples of information that may be considered in this analysis include published reports and data on consumer perceptions of the new tobacco product and its packaging and consumer intentions to use the product, and data you collect on consumer perceptions of the harms of the new tobacco product and of its proposed labeling or advertising and intentions to use the product, including among populations of non-users of tobacco products. If you are collecting data on consumer perceptions or intentions, we recommend evaluating perceptions of the product, both absolute and in comparison to other categories of tobacco products and to quitting all tobacco use. This evaluation should include the use intentions among current ENDS users, nonusers, and other tobacco product users, as well as reasons for use (e.g., complete substitution, use in environments where smoking is not allowed, fun and enjoyment).

       ii.      Likelihood of initiation and cessation by both users and nonusers of tobacco products

Evaluations of the likelihood of initiation among never-users and former users of tobacco products and cessation among current tobacco users should cover a range of tobacco use behaviors related to your new tobacco product. Examples of information that FDA recommends considering in these evaluations include:

- Published literature or applicant-initiated studies evaluating the effects of the ENDS on users, including effects on initiation, switching behavior, cessation, and dual use; and on nonusers' initiation of the product. Published literature or studies should be of the same or similar ENDS product. Where the ENDS product studied is similar to the new tobacco product, the applicant should explain why making such a comparison is appropriate; and
- Scientific information (e.g., information collected from peer-reviewed literature or data you collect on your product) on the likelihood of tobacco product use by nonusers, specifically youth and young adults, pregnant women, and other vulnerable populations.

Although randomized clinical trials could address cessation behavior of users of tobacco products, FDA believes this would also be true for observational studies (perception, actual use, or both) examining cessation behaviors.[43]

       iii.      Product use patterns

Evaluation of product use patterns should consider the topography of how individual users consume the product (e.g., the number of puffs, puff duration, puff intensity, duration of use), the

---

[43] FDA recognizes that some clinical investigations examining cessation may require an investigational new drug application (IND). FDA encourages applicants to contact FDA with questions about whether the IND requirements apply to a particular clinical investigation.

A0051

AMERICAN ACADEMY OF
PEDIATRICS, *et al.*,

        Plaintiffs,

      v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.*,

        Defendants.

Civil Action No. 8:18-cv-883-PWG

## DECLARATION OF MITCHELL ZELLER

I, Mitchell Zeller, declare as follows:

1.      I am the Director of the Center for Tobacco Products ("CTP"), United States Food and Drug Administration ("FDA"), a position I have held since March 2013. In this role, I direct the development and implementation of programs and policies for regulating the manufacture, marketing, and distribution of tobacco products. In my capacity as Director of CTP, I am fully familiar with the instant matter and the facts stated herein.

2.      I have dedicated my career to working on FDA issues (nearly 37 years), including the last 25 years focused on tobacco regulation. I am a graduate of Dartmouth College and the American University Washington College of Law. I began my career as a public interest attorney in 1982 at the Center for Science in the Public Interest working on FDA food safety and nutrition issues. In 1988, I served as counsel to the Human Resources and Intergovernmental Relations Subcommittee of the House of Representatives Government Operations Committee, where I conducted oversight of enforcement of federal health and safety laws, including human and animal drugs, dietary supplements, and food policies at FDA. In 1993, I joined the staff of

the last several days leading up to a March 22, 2011 deadline.[19]  While FDA has put many more systems in place since then, and has created a robust application review process within CTP's Office of Science, there is no doubt that the agency will be flooded with applications in the final days leading up to any court-ordered submission deadline.  I expect that FDA will receive roughly 5,424 to 6,764 applications for three different authorization pathways.  This will undoubtedly put a strain on the agency.  Additional time to file applications would provide more planning time for FDA and applicants, more time to build out operational systems, and more time to issue guidance and rules to reduce the volume of low-quality applications.

20.    Most ENDS products are relatively novel and are unlikely to be substantially equivalent to a valid predicate and so will need to be authorized through the PMTA pathway.  Among other things, a PMTA application must include:

a.    Full reports of all information concerning investigations which have been made to show the health risks of the new tobacco product and whether such product presents less risk than other tobacco products;

b.    Full statement of the components, ingredients, additives, and properties, and of the principle(s) of operation of the new tobacco product; and

c.    Full description of the methods used in, and the facilities and controls used for, the manufacture, processing, packing and installation of the new tobacco product.

21.    In addition, some applications may need new nonclinical and clinical studies if the product's potential impact on the public health has not yet been sufficiently reviewed, though in some cases it may be possible to support a marketing order for an ENDS product without

---

[19] *See* FDA Update on Provisional Substantial Equivalence (SE) Review Process (Apr. 5, 2018), *available at* https://www.fda.gov/tobacco-products/ctp-newsroom/fda-update-provisional-substantial-equivalence-se-review-process.

A0053

conducting new nonclinical or clinical studies.  For example, if there is an established body of evidence regarding the health impact (individual or population) of a product or a similar product that can be adequately bridged to product that is the subject of the application, such as data from the published literature or government-sponsored databases, these data may be sufficient to support a PMTA.

22.     Plaintiffs' proposed 120-day deadline for the submission of premarket applications does not account for the sheer number of expected applications, the complexity of those applications and the scientific review process, or the public health and operational concerns I have described.  I believe that a submission deadline at least 10 months away would reflect a much better balancing of the competing concerns and, though still accelerated, would at least reduce the potential for administrative disruption and the risk of a mass market exit that could adversely affect the public health.


        I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

        Dated:  Silver Spring, Maryland
                June 12, 2019


                                        _____
                                        Mitchell Zeller
                                        Director, Center for Tobacco Products
                                        United States Food and Drug Administration

A0054

FOOD AND DRUG ADMINISTRATION

+ + + + +

CENTER FOR TOBACCO PRODUCTS

+ + + + +

TOBACCO PRODUCT APPLICATION REVIEW
PUBLIC MEETING

+ + + + +

MONDAY
OCTOBER 22, 2018

+ + + + +

The Public Meeting convened at the Hilton Washington DC/Rockville Hotel and Executive Meeting Center, 1750 Rockville Pike, Rockville, Maryland, at 8:30 a.m.

This transcript has not been edited or

corrected but appears as received from the

commercial transcribing service.

1    submit a new application once, again, they're

2    able to provide all the required statutory and

3    regulatory elements.

4            If the application is accepted by CTP,

5    it moves to Phase 3, which deals with substantive

6    review and an action by CTP.  The substantive

7    review phase is a multidisciplinary approach to

8    review the data submitted by the applicant to

9    determine if such data is sufficient to

10   demonstrate -- sorry -- to demonstrate that

11   authorizing the marketing of the product would be

12   appropriate for the protection of public health

13   as previously described.

14           During this review phase, CTP may

15   conduct inspections such as of clinical or

16   manufacturing facilities in conjunction with

17   CTP's Office of Compliance and Enforcement.  Also

18   of note, an application may be referred to the

19   Tobacco Product Scientific Advisory Committee,

20   otherwise known as TPSAC.  If the applicant would

21   like TPSAC -- excuse me -- if the applicant would

22   like CTP to consider referral to TPSAC, they

1     move into that filing stage. So the end result

2     is the filing letter or the RTF letter. This is

3     a multidisciplinary approach, so you can have

4     anywhere up to 13 disciplines taking a look at

5     various parts of the application for what's

6     required for filing.

7           Looking through all your documents.

8     Are your studies there? Do you actually have

9     some of the source data? Is there anything

10     missing? So anything that's laid out in filing

11     criteria in 910(b) for your PMTAs and under 911

12     for your MRTPs is what they're looking at for

13     that RTF. If those items are missing, it would

14     be listed in that letter. If you passed that and

15     received filing, then you're in that substandard

16     review phase.

17           MS. BELTRE: Great. I would add to

18     that, clearly identify these sections in your

19     application. When we're talking about large

20     submissions such as the MRTPs and PMTAs that we

21     have received, it would help everyone involved in

22     this process if you can clearly identify what

UNITED STATES FOOD AND DRUG ADMINISTRATION

+ + + + +

DEEMED TOBACCO PRODUCT APPLICATIONS:
A PUBLIC MEETING

+ + + + +

MONDAY
OCTOBER 28, 2019

+ + + + +

The public meeting met at the FDA
White Oak Campus, Great Room, Room 1503, 10903
New Hampshire Avenue, Silver Spring, Maryland, at
8:30 a.m., Anne Radway, Moderator, presiding.

THIS TRANSCRIPT HAS NOT BEEN EDITED OR

CORRECTED BUT APPEARS AS RECEIVED FROM THE

COMMERCIAL TRANSCRIBING SERVICE.

1    information relevant to the subject matter of the

2    application.  Other information may be identified

3    during the pre-submission meeting if held, that

4    is specific to the tobacco product.

5         At the end of the filing phase,

6    similar to the acceptance phase, CTP will issue

7    one of two types of correspondence.  If the

8    submitted information is inadequate to continue

9    with substantive review, the applicant will

10   receive a refusal to file letter.  In this

11   letter, FDA will include the reasons for the

12   refusal.  If refused, the applicant has the

13   option to submit a new application once they are

14   able to meet the filing requirements for a PMTA.

15        If the application meets the filing

16   requirements for a PMTA seeking a marketing

17   order, CTP will issue a letter to notify the

18   applicant that the application has been filed.

19   If filed by CTP, the PMTA moves into Phase 3,

20   which deals with substantive review and results

21   in an action by CTP.

22        The substantive review phase is a

1    multi-disciplinary approach to review the data

2    submitted by the applicant and determine if such

3    data is sufficient to demonstrate that

4    authorizing the marketing of the new product

5    would be appropriate for the protection of public

6    health.

7            During the substantive review phase,

8    CTP's Office of Science, in conjunction with the

9    Office of Compliance and Enforcement, may conduct

10   inspections of clinical or manufacturing

11   facilities.  You will hear more about inspections

12   in a later presentation.

13           Additionally, CTP may conduct testing

14   of the new product.  At this phase, CTP should

15   have received the samples requested in the sample

16   request letter.  An application may be referred

17   to the Tobacco Products Scientific Advisory

18   Committee, also known as TPSAC.  If the applicant

19   would like CTP to consider referral to TPSAC,

20   they should include this request in the cover

21   letter of their initial submission.  Along this

22   request, it would be helpful for the applicant to

1    useful.

2         Going back to thinking about the

3    proposed product itself, human factors are

4    important to consider when designing a product.

5    Human factor considerations assess if users will

6    be able to operate their product appropriately by

7    focusing on the interactions between the people

8    and products.  Importantly, when considering a

9    new proposed product, FDA seeks to understand the

10   likely impact on human health.

11        To evaluate the acute and chronic

12   health effects associated with the product or

13   polytobacco product use, the proposed rule out

14   for public comment states that the applicant

15   include studies, other scientific evidence or

16   both that identify biomarkers and health outcome

17   measurements or end points, and provide data to

18   support the impact of the new tobacco product on

19   the health of users and non-users.

20        This may include health effects

21   associated or related to specific constituents.

22   When designing studies, it is helpful if the

1   and have changes that are clinically relevant are

2   the most useful.  There is not an agreed upon

3   panel of biomarkers established to understand

4   ENDS impact on human health at this time.

5           Applicants have also asked what

6   studies are required to support a PMTA?  It may

7   be possible to support a marketing order for a

8   ENDS product without conducting new, non-clinical

9   or clinical studies given other data sources can

10  support this PMTA.  In most situations, it is

11  likely that at least some analytical testing

12  specific to the product would be conducted to

13  support your PMTA.

14          If conducting studies, alternatives to

15  the traditional randomized, controlled clinical

16  trials, which are typically used for drug

17  development, may be appropriate to support a

18  PMTA.  Again, the most useful studies are those

19  that are generalizable to the U.S. population.

20          If you have a product currently

21  available on the market, it is possible that

22  research has been done on that product or your

comparator products through literature review. In this deficiency, however, FDA has foreclosed Bidi Vapor's opportunity from choosing to use scientific literature in lieu of conducting additional and costly studies to satisfy this deficiency, which reverses its long-standing guidance to industry. For example, FDA's request for information on *"Testing laboratories and their accreditation(s)"* and *"... full validation reports for each analytical method"* prohibits use of published scientific literature as a resource for industry to identify comparator data and products. Additionally, even if an ENDS manufacture were to test retail products, they would not be able to address the FDA request for information on *"Length of time between date(s) of manufacture and date(s) of testing."*

Finally, the FDA has stated that guidance documents do not establish legally enforceable rights or responsibilities; however, the guidance documents are published to provide industry with FDA thinking and insights on a particular issue and/or regulation. If FDA were to reverse its position and prohibit use of published scientific literature to satisfy this deficiency, industry cannot truly rely on the FDA's published guidance documents.

The target consumer population for the BIDI® Stick Classic product are adult smokers (over the age of 21) who cannot, or do not want to quit, and therefore cigarettes are the primary comparator product for the health risk evaluation of the BIDI® Stick Classic product. However, to inform the FDA's evaluation of BIDI® Stick Classic product and address deficiency 13, Bidi Vapor identified published scientific information and data on a diverse category (e.g., disposable, pre-filled closed-pod systems, and tank devices) of ENDS comparator products that is sufficient for meaningful comparisons with BIDI® Stick Classic (Chen et al., 2021; El-Hellani et al., 2018; National Institute of Drug Abuse [NIDA], 2023).  Although, there is still uncertainty with respect to which of the ENDS products will remain on the market after FDA completes all PMTA reviews, data on the National Institute of Drug Abuse (NIDA) Standardized Research Electronic Cigarette (SREC), and data available in peer reviewed scientific literature on ENDS purchased on the U.S. market are viable options as comparator products. Lastly, the BIDI® Stick Classic is an ENDS product, and therefore comparison to tobacco products in this category is also appropriate.

## 13.1  Comparison to ENDS, Secondary Comparator Products

Bidi Vapor identified several scientific publications that contain information about comparator products that is sufficient for meaningful comparisons with BIDI® Stick Classic (Chen et al., 2021; El-Hellani et al., 2018; National Institute of Drug Abuse [NIDA], 2023).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

The 2021 PMTA Final Rule (FDA, 2021) states that "[a]pplicants must compare the health risks of its product to both products within the same category and subcategory, as well as products in different categories as appropriate."

To inform the evaluation of potential exposures associated relative health risks for smokers switching to BIDI® Stick Classic as compared to potentially switching to other ENDS products, a comparison between BIDI® Stick Classic aerosols relative to published data on the NIDA SREC and peer-reviewed literature available for ENDS products on the US market across the spectrum of the ENDS product category (e.g., disposable, pre-filled closed-pod systems, and tank devices) was also considered. BIDI® Stick Classic is a prefilled (closed) disposable ENDS product, with a tobacco flavored e-liquid and therefore comparison to ENDS tobacco products in this flavor profile is considered most informative. This approach allows for a comparison of the BIDI® Stick Classic and a variety of ENDS products, as representative market ENDS that may potentially be considered as alternatives to the BIDI® Stick Classic product (Table 1).

**Table 1 Representative ENDS Products from Published Literature**

| Product Type | Brand | Flavor | PG/VG ratio (vol/vol) | Total Nicotine concentration (mg/mL) |
|---|---|---|---|---|
| **Disposable** | Apollo[a] | Classic Tobacco | 58/42 | 7.11 ± 0.09 |
| | Blu[a] | Classic Tobacco | 0/100 | 9.83 ± 0.09 |
| **Pre-filled (closed pod)** | NIDA SREC[b] | Rich Tobacco (5%) | 40/60 | ~54* |
| | JUUL[c] | Virginia Tobacco 3% (VT 3%) | 30/70 | 35 |
| | JUUL[c] | Virginia Tobacco 5% (VT 5%) | 30/70 | 59 |
| | Apollo[a] | Classic Tobacco | 76/24 | 7.57 ± 0.74 |
| | Blu[a] | Classic Tobacco | 0/100 | 8.79 ± 0.46 |
| | Eversmoke | Classic Tobacco | 77/23 | 12.62 ± 0.64 |
| | South Beach smoke[a] | Classic Tobacco | 78/22 | 13.07 ± 0.16 |
| **Tank** | Apollo[a] | Tobacco | 51/49 | 8.11 ± 0.64 |
| | South Beach smoke[a] | Classic Tobacco | 61/39 | 14.54 ± 1.08 |

[a] El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. Nicotine Tob Res, 20(2), 215-223. doi:10.1093/ntr/ntw280

[b] NIDA Standardized Research Electronic Cigarette [SREC]) reported by https://srecproduct.com/

[c] Chen X, Bailey PC, Yang C, Hiraki B, Oldham MJ, Gillman IG. Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. *Separations*. 2021; 8(10):168. https://doi.org/10.3390/separations8100168

*Nicotine value was calc

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

As stated by the National Institute of Drug Abuse (NIDA) (NIDA, 2023) (Accessed June 9 2013; https://srecproduct.com/), the Standardized Research Electronic Cigarette [SREC] product was developed as a collaboration between NIDA and NJOY LLC part of the National Institutes of Health to facilitate clinical research into the impact of e-cigarettes on public health (NIDA). Similar to the Kentucky reference cigarettes, the SREC was designed to be a standardized device that produces a consistent, well-characterized aerosol (see "Standardized Research Electronic Cigarette.pdf" in folder titled "Q13_Attachments" for additional information on the NIDA SREC standard e-cigarette). Also, the analytical data on the levels of HPHCs in aerosols from the SREC device was collected using the same standardized non-intense puffing conditions (55ml/3sec/30sec), used for the BIDI® Stick Classic aerosols, and thus it is informative for the comparison (see "Standardized Research Electronic Cigarette.pdf" in folder titled "Q13_Attachments" for additional information on the NIDA SREC standard e-cigarette). Although the aerosol chemistry data for the SREC e-cigarette is not published in peer-reviewed literature, the data is published by NIDA, one of the National Institutes of Health (US Department of Health and Human Services), and therefore the data is considered reliable, and thus appropriate to inform the evaluation of the BIDI® Stick Classic aerosols. Taken together, the available data on aerosol constituent levels published by NIDA for the SREC device is informative for the overall evaluation of potential exposures and associated health hazards from use of the BIDI® Stick Classic compared to other products in the ENDS tobacco product category.

To further inform the comparison of HPHC yields in aerosol of the BIDI® Stick Classic product relative to comparator ENDS products, the levels of HPHCs reported in the studies by Chen et al. (2021) and El-Hellani et al. (2018) for U.S. market ENDS products is also provided. Chen et al. (2021) measured constituent yields in aerosols from the JUUL systems currently on the US market (Virginia Tobacco e-liquids in both 5.0% [VT5%] and 3.0% [VT3%] nicotine concentration by weight). The study by El-Hellani et al. (2018) assessed nicotine and carbonyl yields in several e-cigarette brands the authors identified as "popular brands in the U.S. market." This study was funded by NIH/NIDA and FDA CTP[1] and included disposable, prefilled cartridge, and tank-based ENDS products, and thus cover a wide spectrum of US market products. Applicability of the

---

[1] Funding information reported by El-Hellani et al., 2018: "Research reported in this publication was supported by the National Institute on Drug Abuse of the National Institutes of Health under Award Number P50DA036105 and the Center for Tobacco Products of the U.S. Food and Drug Administration."

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

aerosol data published in these studies to inform the overall evaluation of the BIDI® Stick Classic comparison to US market ENDS products is discussed below.

The aerosol collection methods in the study by Chen et al. (2021) included the same standardized non-intense puffing conditions (55ml/3sec/30sec) used for the BIDI® Stick Classic aerosols (and the NIDA SREC device). The HPHC analysis was conducted in aerosol collected over 50 puff blocks from the beginning, middle and end of the pod (to ~85-90% pod life), and these were used to estimate the HPHC aerosol levels for the whole pod (see "Chen_2021_with Supplemental.pdf" in the "Q13_Attachments" folder for detailed information on aerosol collection and analytical methods). Because the HPHC aerosol yields for the JUUL product aerosols in Chen et al. (2021) were estimated based on the levels measured in 50-puff blocks, there is some uncertainty with respect to differences in method sensitivity compared to the evaluation conducted for the BIDI® Stick Classic aerosols which used the whole pod aerosol for the analytical chemistry evaluation. Specifically, based on the 50 puff block approach used by Chen et al. (2021) it is unclear how many of the constituents reported as below the analytical methods' limits of detection (LOD) or quantitation (LOQ) would be present at measurable levels had the authors conducted the measurements in aerosols collected from the whole pod, rather than only from 50-puff blocks. For this reason, the study by Chen et al. (2021) may underestimate the HPHC yields in the JUUL VT 5% and VT 3% product aerosols. However, in the specific context of conducting a comparison between the BIDI® Stick Classic aerosols to US market ENDS products, use of the aerosol chemistry data reported by Chen et al. (2021) for the JUUL VT 5% and VT 3% products provides a conservative approach, and thus the publication by Chen et al. (2021) is informative for the evaluation of BIDI® Stick Classic aerosols to US market ENDS products.

Aerosol collection in the study by El-Hellani et al. (2018) was conducted using a slightly modified non-intense puffing regimen (1.5 L/min puff velocity, 4s puff duration and 10s duration), and the HPHC yields were measured from a 15-puff session (see "El-Hellani et al 2018 with Supplemental.pdf" in folder "Q13_Attachments" for additional information). Since the difference in the puff duration between the study by El-Hellani et al. (2018) (4 sec puff) and the standard ISO non-intense puffing (3 sec puff) is minimal (1s), the difference in puffing topography is not likely to have a measurable impact on the aerosol chemistry, and thus does not preclude the use of this study to inform the comparison of HPHC yields measured in the BIDI® Stick Classic relative to the ENDS products in the study by El-Hellani et al. (2018). Because the HPHC aerosol yields for the product aerosols evaluated by El-Hellani et al. (2018) were measured using aerosols from a 15-puff session, these don't fully account for the whole pod usage, and thus could underestimate the HPHC levels for the ENDS products tested by El-Hellani et al. (2018). However, in the specific

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

context of conducting a comparison between the BIDI® Stick Classic aerosols to US market ENDS products, use of the aerosol chemistry data reported by El-Hellani et al. (2018) provides a conservative approach, and thus this study is informative for the evaluation of BIDI® Stick Classic aerosols to US market ENDS products.

Due to puff limitations of the comparator ENDS, only the non-intense puffing regimen was used for the comparison of the BIDI® Stick Classic to other U.S. market ENDS products. Because there are product differences in nicotine concentrations and aerosol mass, the average nicotine-adjusted aerosol concentration data was used for the comparisons with the data available for the NIDA SREC representative ENDS product, and studies by Chen et al. (2021) and El-Hellani et al. (2018).

Although there is uncertainty with respect to which of the ENDS products will remain on the market after FDA completes all PMTA reviews, the aerosol chemistry data on the NIDA Standardized Research Electronic Cigarette (SREC) and data available in peer reviewed literature on U.S market ENDS provide adequate insight for the HPHC comparison of the BIDI® Stick Classic to other US market ENDS products, and allows for the consideration of possible HPHC exposures for non-users who may initiate use of the new products compared to other ENDS products. Overall, the comparisons of HPHCs from the BIDI® Stick Classic and other ENDS products indicate the levels of measured constituents in aerosols of the BIDI® Stick Classic (Table 2) are within those reported for the ENDS product category (tobacco flavored e-liquids).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

| Analyte | Units | LOD/LOQ | Per Puff Mean (SD) | Per Device Mean* |
|---|---|---|---|---|
| Nicotine | mg | 0.000536/ 0.00536 | 0.476 (0.009) | 53.3 |
| NNK | ng | 0.000543/ 0.00429 | 0.048 (0.012) | 5.38 |
| NNN | ng | 0.00145/ 0.00429 | 0.165 (0.040) | 18.5 |
| Propylene Glycol | mg | 0.00143/ 0.0143 | 4.53 (0.11) | 507 |
| Propylene Oxide | µg | 0.0248/ 0.234 | 2.56 (0.72) | 287 |

BLOQ = below level of quantitation, ND = not detected/ no different than background, SD = standard deviation
* The "Per Device Mean" was calculated by multiplying the "Per Puff Mean" by the total number of puffs. (112)

Bidi Vapor conducted a comprehensive evaluation of the non-cancer hazard and cancer risk from potential exposures to these constituents in aerosols from the BIDI® Stick Classic products and as compared to cigarette smoke using a quantitative risk assessment (QRA) approach (see "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C). However, given the overall substantial reductions in the numbers and levels of HPHCs (established and proposed) in the BIDI® Stick Classic aerosol, compared to cigarette smoke, the potential for substantial reductions in user exposures and associated health hazards from use from the BIDI® Stick does not require a QRA approach for the comparison to cigarette smoke exposures.

The potential reductions in exposures and associated cancer risks and noncancer hazards from the BIDI® Stick Classic product compared to cigarette smoking can also be evaluated by focusing on the aerosol yields of the HPHCs, their respective toxicities, and magnitude of decrease between the levels measured in the BIDI® Stick Classic aerosol compared to cigarette smoke. Taken together, the chemical characterization data for the BIDI® Stick Classic product aerosols demonstrate that although some thermal degradation products are present, these are fewer in number and overall are present in the BIDI® Stick Classic aerosols at lower relative levels.

### 12.3.1 Comparison to Combusted Cigarettes

During smoking, nicotine is delivered via the smoke generated from burning of the cigarette (made of wrapping paper, tobacco filler, humectants, flavor ingredients, etc.,), and burning of the cigarette rod (tobacco plant components and non-tobacco ingredients). This results in a highly complex mixture of >5000 constituents (Rodgman et al., 2008), 93 of which have been established by the FDA as harmful and potentially harmful constituents (HPHCs) (FDA, 2012). Unlike

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

smoking, nicotine delivery during use of the BIDI® Stick Classic product occurs via an aerosolized nicotine-containing liquid.

The levels of aerosol constituents measured in the BIDI® Stick Classic aerosol using the targeted analysis (under non-intense and intense puffing) were compared to constituent levels in cigarette smoke (Table 5 and Table 6). The levels of HPHCs (established and proposed) in mainstream smoke for the Kentucky Reference 1R6F cigarette (1R6F) (Jaccard et al., 2019). The 1R6F reference cigarette was chosen as a representative CC, because several studies comparing Kentucky reference cigarettes (e.g., 1R4F, 1R5F and 3R4F) to commercially marketed cigarettes have shown that reference cigarettes have similar HPHC profiles (Patskan et al., 2008; Roemer et al., 2004; Vu et al., 2015).

**Table 5 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick Using Non-intense Puffing, to Smoke from Combusted Cigarettes Using the ISO Puffing Regimen**

| HPHC or Chemical Analyte (associated health hazard#) | Aerosol or Smoke Yields Normalized by Nicotine (mg/mg) | | % Difference |
|---|---|---|---|
| | **BIDI® Stick Classic** | **1R6F[a]** | **vs_1R6F** |
| Acetaldehyde (CA, RT) | 1.49E-04 | 6.84E-01 | ↓ ≥99.9 |
| Acrolein (RT, CT) | 6.14E-05 | 6.66E-02 | ↓ ≥99.9 |
| Cadmium (CA, RT, RDT) | ND | 3.35E-05 | ↓ ≥99.9* |
| Chromium (CA, RT, RDT) | ND | BLOD | NC |
| Copper | ND | NT | N/A |
| Diacetyl (RT) | 1.75E-04 | NT | N/A |
| Diethylene Glycol (RT) | ND | NT | N/A |
| Ethylene Glycol (RT) | ND | NT | N/A |
| Formaldehyde (CA, RT) | 1.49E-04 | 4.31E-02 | ↓ ≥99.7 |
| Glycerol (RT) | 5.48E+00 | | ↑ ≥128 |
| Glycidol (CA) | 7.46E-05 | NT | N/A |
| Lead (CA, CT, RDT) | BLOQ | BLOD | NC |
| Nickel (CA, RT) | 1.49E-06 | BLOD | NC** |
| Nicotine (RDT, AD) | 1.00E+00 | 1 | N/A |
| NNK (CA) | 8.33E-08 | 1.29E-04 | ↓ ≥99.7 |
| NNN (CA) | 4.25E-07 | 1.09E-04 | ↓ ≥99.9 |
| Propylene Glycol (RT) | 9.65E+00 | NT | N/A |
| Propylene Oxide (CA, RDT) | 4.14E-04 | 8.44E-01 | ↓ ≥99.9 |

AD = addictive; BLOD = below level of detection; CA=carcinogen; CT=Cardiovascular toxicant; ND = not detected/ no different than background; NT = not tested; RDT= reproductive or developmental toxicant; RT=respiratory toxicant; SD = standard deviation

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

NC = Not Calculated; the % Difference could not be calculated because the values were BLOD/BLOQ (or ND) in both the BIDI® Stick Classic and comparator product

N/A = Not Applicable; the % Difference could not be calculated because a value was not reported for the constituent yield in the comparator product.

#Note: Corresponding health hazards as noted in the FDA 2021 HPHC established list., or the FDA 2019 HPHC proposed list.

*Note: The analyte in the BIDI® Stick Classic aerosol was reported as below the method LOD; the % difference was estimated based on ½ the method LOD (LOD/2) as the numeric value for cadmium in the BIDI® Stick Classic aerosol

**Note: The % Difference for nickel could not be calculated because the value for the method LOD was not reported in Jaccard et al., 2019.

a Jaccard, G., et al. (2019). "Mainstream smoke constituents and in vitro toxicity comparative analysis of 3R4F and 1R6F reference cigarettes." Toxicology Reports 6: 222-231

*Analyte was reported as below the method LOQ; the numeric value was estimated based on the average of the LOD and LOQ ([LOQ+LOD]/2)


**Table 6 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick Using Intense Puffing (110mL/6s/30s), to Smoke from Combusted Cigarettes Using the Intense Puffing Regimen (ISO Intense)**

| HPHC or Chemical Analyte (associated health hazard#) | Aerosol or Smoke Yields Normalized by Nicotine (mg/mg) | | % Difference |
|---|---|---|---|
| | **BIDI® Stick Classic** | **1R6Fa** | **vs_1R6F** |
| Acetaldehyde (CA, RT) | 5.38E-03 | 8.43E-01 | ↓ ≥99.4 |
| Acrolein (RT, CT) | 2.37E-03 | 9.11E-02 | ↓ ≥97.4 |
| Cadmium (CA, RT, RDT) | ND | 4.01E-05 | ↓ ≥99.9* |
| Chromium (CA, RT, RDT) | BLOQ | BLOQ | NC |
| Copper | BLOQ | NT | N/A |
| Diacetyl (RT) | 3.00E-04 | NT | N/A |
| Diethylene Glycol (RT) | ND | NT | N/A |
| Ethylene Glycol (RT) | ND | NT | N/A |
| Formaldehyde (CA, RT) | 1.02E-02 | 5.47E-02 | ↓ ≥ 81.4 |
| Glycerol (RT) | 5.38E+00 | NT | N/A |
| Glycidol (CA) | 8.30E-05 | NT | N/A |
| Lead (CA, CT, RDT) | BLOQ | BLOD | NC |
| Nickel (CA, RT) | 1.33E-06 | BLOD | N/A ** |
| Nicotine (RDT, AD) | 1 | 1 | N/A |
| NNK (CA) | 1.01E-07 | 1.01E-04 | ↓ ≥ 99.9 |
| NNN (CA) | 3.47E-07 | 1.21E-04 | ↓ ≥ 99.7 |
| Propylene Glycol (RT) | 9.52E+00 | NT | N/A |
| Propylene Oxide (CA, RDT) | 5.38E-03 | 9.00E-01 | ↓ ≥ 99.4 |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Tobacco 5% nicotine salt, the HPHCs are comparable. In addition, all the nicotine-adjusted HPHC yields (i.e., HPHC:nicotine ratios) were similar or decreased in the aerosols of the new products compared to average HPHC:nicotine ratios for other ENDS products (i.e., cig-a-like, pod, and tank systems). Overall, these comparisons showing similar or reduced exposures to HPHCs from the new products do not raise toxicology concerns.

### 3.5.1.2. Biomarkers of exposure (BOE)

- BOE data submitted from a survey study conducted by the applicant found that participants who had recently used only the new products had lower levels of the measured BOE (i.e., CO, cotinine, CEMA, 3-HPMA, and NNAL) relative to recent users of the new products and combusted cigarettes (i.e., dual users).
- The published literature suggests combusted cigarette smokers will likely experience significant reductions in volatile organic compound (VOC) exposure upon complete switching to ENDS (Goniewicz et al., 2017; Oliveri et al., 2020; Round et al., 2019). The applicant did provide yields of some VOC HPHCs (e.g., acrylonitrile, benzene, propylene oxide, toluene) using mainstream smoke (MSS) concentration data derived from peer-reviewed scientific literature to represent the combusted cigarette category and the levels of these VOCs from the new products. Overall, the differences show lower levels of these VOC yields from the new products compared to the combusted cigarette MSS data.
- Heavy metal exposure is likely to stay the same or decrease upon complete switching to ENDS (Goniewicz et al., 2018; Jain, 2019; Prokopowicz et al., 2019). Dual users who do not significantly reduce combusted cigarette use will likely have comparable tobacco-specific nitrosamine (TSNA) and VOC BOE as combusted cigarette smokers, or if cigarette use is reduced, they may experience low to modest reductions in these BOE (Pulvers et al., 2018).
- Changes in BOE and the associated health risks of dual use of cigarettes and the new products in the PMTAs have not been evaluated in longitudinal studies or under extended exposure conditions, thus conclusions on such long-term health risks cannot be made at this point

### 3.5.2. Synthesis

The toxicology review concludes that the majority of HPHC yields measured in the aerosols of the new products were decreased compared to literature-reported yields from combusted cigarettes, ENDS products of the same category (disposable ENDS) and subcategory (closed e-cigarette), and other ENDS products from different categories (i.e., cig-a-like, pod, and tank systems). NNK and NNN as well as volatile organic chemicals (acrylonitrile, benzene, propylene oxide, and toluene) were reported for the average combusted cigarette comparison product, however, these HPHCs were below the limit of detection or not quantifiable in the aerosol of the new products. Other HPHCs and toxicants such as acetaldehyde, diacetyl, acetyl propionyl, acrolein, (b)(4) formaldehyde, (b)(4) , and ethylene glycol yields in the aerosols of the new products were 65.3-100% lower than average combusted cigarette smoke under both intense and non-intense puffing regimens. (b)(4) and therefore, it is unknown as to why it was detected in the aerosol of PM0000631. Diacetyl was not quantifiable but detected in PM0000630. The applicant provided supporting literature and

g.  *Number of replicates performed and standard deviation(s)*

h.  *Storage conditions of leachable study samples*

i.  *Database search: name, type, algorithm, parameters used*

j.  *Data analysis and conclusion*

*If you provide accelerated leachable study data in lieu of ambient long-term leachable study data across the shelf life of the new product, you need to specify the shelf life of the new product, and provide a scientific justification and proper references to demonstrate that the accelerated leachable study is equivalent to the ambient long-term leachable study.*

## Bidi Vapor's Response to Deficiency Letter Question 15

### 15.1 Response Summary

Question 15 outlines deficiencies regarding previously provided accelerated stability study data that was used as a substitute for leachables data for the new product. Bidi Vapor has addressed these deficiencies by generating the following new data:

In response to this deficiency, we conducted non-targeted analysis (NTA) on the aerosol from 4- and 17-month-old BIDI® Stick Classic products. We conducted this analysis to identify all possible chemical compounds that may have leached into the e-liquid from a fresh and aged BIDI® Stick Classic product. Most importantly our analysis approach will identify compounds that may transfer to the aerosol during normal product use and be inhaled by the consumer. The data generated by non-targeted analysis supersedes the accelerated stability study data that was used as a substitute for leachables data. Additionally, Bidi Vapor conducted an extractables study on the BIDI® Stick mouthpiece and device in order to identify potential chemicals to which the user may be exposed. We are not including the extractables information in our response to this question. For more detailed information on the extractables study methods and results, see question 16 (Bidi Vapor Deficiency Letter Q16 Response.pdf).

Below, Bidi Vapor provides information requested in question 15.

### 15.1.1 Reference product datasets if a reference e-liquid is used (15a)

We did not use a reference e-liquid in the BIDI® Stick non targeted aerosol analysis study (NTA 0423-024 Final Report v0.0 [see "0423-024 Final Report v0.0.pdf" in the "Q15_Attachments" folder).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

A0072

**15.4 Conclusion**

Bidi Vapor characterized the BIDI® Stick Classic device and aerosols using quantitative targeted analysis for a semi-quantitative non-targeted analysis. BIDI® Stick Classic aged (17 months) and fresh (4 months) aerosols were collected under CORESTA and intense puffing regimens throughout the life of the device. The study outcomes show that:

1) the number and concentration of aerosol HPHCs were fewer and lower in BIDI® Stick Classic aerosols than in combustible cigarette smoke,

2) the chemical complexity of the aerosol – based on the non-targeted analysis – was 96% reduced versus combustible cigarette smoke,

3) the product is stable for the proposed shelf life of 12 months.

Taken as a whole, the chemistry, and stability study data, along with the risk assessment, support the conclusion that the BIDI® Stick Classic is less toxic than combustible cigarettes and appropriate for the protection of public health.

**15.5 Deficiency Letter Question 15 Attachment Files**

The following files can be found in the "Q1_Attachments" folder.

| Folder Name | Files Contained Within |
|---|---|
| Q15_Attachments | • 0423-024 Final Report v0.0<br>• Enthalpy_Attachments.pdf |
| 0423-024 (Q23092) Final Report v0.0_NTA Results v0.0 | • CORESTA Regime v0.0 A1001.xlsx<br>• CORESTA Regime v0.0 A1002.xlsx<br>• CORESTA Regime v0.0 A1003.xlsx<br>• CORESTA Regime v0.0 B1001.xlsx<br>• CORESTA Regime v0.0 B1002.xlsx<br>• CORESTA Regime v0.0 B1003.xlsx<br>• INTENSE Regime v0.0 A2001.xlsx<br>• INTENSE Regime v0.0 A2002.xlsx<br>• INTENSE Regime v0.0 A2003.xlsx<br>• INTENSE Regime v0.0 B2001.xlsx<br>• INTENSE Regime v0.0 B2002.xlsx<br>• INTENSE Regime v0.0 B2003.xlsx |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Taken together, the aerosol chemistry data show substantial reductions in the numbers and levels of constituents, including HPHCs in the aerosols generated by the BIDI® Stick Classic product relative to cigarettes. The result is likely significant reductions in exposures and associated cancer risks and non-cancer hazards from the BIDI® Stick Classic product compared to smoking combusted cigarettes. The data and available information also show that potential exposures and overall health risks from the BIDI® Stick Classic product are within those associated with other tobacco-flavored comparator ENDS products on the market in the US.

## 12.9 Deficiency Letter Question 12 Attachments

The following files can be found in the "Q12_Attachments" folder.

**Table 12 Question 12 Attachments**

| Folder Name | Files Contained Within |
|---|---|
| Q12_Attachments | • 0423-025_0423-505 Final Report v0.0.pdf <br> • Chen_2021_with Supplemental.pdf <br> • El-Hellani et al 2018 with Supplemental.pdf <br> • Enthalpy_Attachments.pdf <br> • Standardized Research Electronic Cigarette.pdf |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

to the weight of evidence that the potential of the BIDI® Stick Classic to cause dependence is likely to be similar to that of both other BIDI® Stick flavors and combustible cigarettes.

It is important to consider the concurrent findings of both Study BIDI-PK-01 (see "BIDI-PK-01 Final Study Report.pdf" in "Q23_Attachments" folder) and the BIDI® Stick dependence survey study (see "BIDI Stick Dependence Survey Report FINAL.pdf" in "Q23_Attachments" folder) in the context of tobacco harm reduction (THR) and in the context of the ability of BIDI® Stick Classic to be an alternative to combustible cigarettes and promote complete switching among cigarette smokers. THR relies on the fundamental principle that the harms associated with cigarette smoking, at both the individual and population levels, can be reduced by providing adult smokers with alternatives to cigarettes which deliver a satisfying nicotine level but with lower levels of the harmful chemicals found in cigarette smoke. Acceptability of novel tobacco and nicotine products to adult smokers is an important driver of the likelihood that a given product will support smokers in transitioning away from cigarette smoking. Acceptability itself is driven by two main factors; the first factor is nicotine delivery, and it is generally considered that more cigarette-like nicotine delivery is important to the uptake of novel tobacco products such as ENDS, their continued use, and prevention of relapse back to cigarette smoking. The second factor is the elicitation of subjective effects such as satisfaction, reward, and reductions in withdrawal symptoms/smoking urges. These factors combined may contribute to an assessment of the 'abuse liability' of a tobacco product, also known as its dependence potential (Fearon et al., 2022; Vansickel et al., 2022). It is becoming increasingly accepted that the tobacco harm reduction potential of novel tobacco products is maximized when dependence potential is high and toxicity/harmfulness are low (Abrams et al., 2018), and that high nicotine delivery (and therefore high dependence potential) might facilitate complete substitution of cigarettes for potentially reduced harm novel tobacco products (Gades et al., 2022). Therefore, the comparable dependence of cigarettes and the BIDI® Stick Classic supports the notion that this product can assist smokers' switching and contribute to reductions in the individual- and population-level harms associated with cigarette smoking.

The FDA has also acknowledged the potential for comparable nicotine delivery and abuse liability/dependence potential of novel tobacco products to assist in reducing smoking-related harms with the findings made during FDA PMTA Technical Project Lead reviews of both the IQOS (THS2.2) heated tobacco product (STNs PM0000424, PM0000425, PM0000426, and PM 0000479)(FDA, 2019) and the NJOY ACE ENDS (STNs PM0000630 - PM0000631)(FDA, 2022). Regarding IQOS, in the figure shown below are exemplar nicotine pharmacokinetic data from a human clinical study conducted among cigarette smokers (Brossard et al., 2017) in which plasma

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

nicotine levels during a single use of IQOS/THS2.2 (blue line) or smoking of a single cigarette (red line) are presented.

**Figure 1 from Brossard et al. (2017)**



Based on these and other data, FDA concluded that:

*"PK studies show Marlboro, Smooth Menthol, and Fresh Menthol Heatsticks have nicotine delivery, addiction potential, and abuse liability similar to CC. This is potentially beneficial for smokers trying to switch to IQOS as they are more likely to have satisfactory results and not resume CC smoking. The nicotine levels do pose an addiction risk for non-tobacco users who initiate use of these products; however, the risk is no higher than for other, currently available, tobacco products and initiation is expected to be low generally".*

The findings for IQOS/THS2.2 are strikingly similar to those for BIDI® Stick Classic in Study BIDI-PK-01 (see "BIDI-PK-01 Final Study Report.pdf" in "Q23_Attachments" folder), in that both candidate products delivered nicotine to a similar degree as a combustible cigarette and produced similar subjective effects. For IQOS/THS2.2, this novel tobacco product was deemed to be Appropriate for the Protection of Public Health (APPH) due to its abuse liability being likely

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

to impart a strong switching benefit. While there is the potential for some detrimental impact on initiation among non-users of nicotine, analysis of data from a BIDI® Stick tobacco product perceptions and intentions (TPPI) survey study (see "RB-BV-01-01 Final Study Report.pdf" in "Q23_Attachments" folder) conducted on behalf of Bidi Vapor which was previously submitted to FDA during a PMTA amendment concluded that:

> "For each of the 11 flavors of BIDI® Stick ENDS, levels of positive intention to try (i.e., try at least once), purchase, and regularly use a BIDI® Stick ENDS were always highest among subjects who were Current Smokers and/or EC [e-cigarette] Current Users.

> Among Current Smokers, positive intention to trial a BIDI® Stick ENDS ranged from 22.8% (BIDI® Stick Arctic) to 28.1% (BIDI® Stick Tropic), while positive intention to use a BIDI® Stick ENDS on a regular, ongoing basis ranged from 15.7% (BIDI® Stick Arctic) to 21.9% (BIDI® Stick Tropic).

> Separate weighted logistic regression models estimated Current Smokers and EC Current Users to have significantly higher covariate-adjusted odds of trialling, purchasing, and regularly using each flavor of BIDI® Stick ENDS compared to Non-Smokers and EC Non-Users, respectively.

> In contrast, a positive intention to trial each BIDI® Stick ENDS flavor was reported by low proportions of Former Smokers (6.0% to 9.7%) and Non-Smokers (3.4% to 5.2%), and by very low proportions of Never-Smokers (1.0% to 2.4%). Within each CSG [cigarette smoking group], the level of positive intention to trial each presented BIDI® Stick flavor was always highest among EC Current Users and typically lowest among EC Never-Users."

These data clearly demonstrate that BIDI® Stick Classic will not pose a relevant degree of initiation risk among non-users of nicotine.

Regarding NJOY ACE, the PMTA TPL review (FDA, 2022) stated that:

> "In addition, given that the submitted clinical evidence on the new product Extra Rich Tobacco 6%, which was bridged to Rich Tobacco 4.5%, which collectively shows an abuse liability approaching that of combusted cigarettes, there is support for a potential benefit of smokers trying to switch to the new products.

> Taken together, the inherent risk of addiction of the new products appear to be no higher than other currently available tobacco products. As TPL, I agree with the behavioral and clinical pharmacology conclusions that, based on data from the applicant's studies and published literature, the abuse liability of the new products is likely sufficient to sustain dependence in already nicotine-dependent populations".

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

# Likelihood of Use of Multiple Flavor Varieties of a Disposable Electronic Nicotine Delivery System among Adults in the United States

*Elliott H. McDowell, MS[a], Leiyu Yue, MS[a], Jennifer T. Lyden, MPH[a], William R. Bagwell, RPh[b], and Michael Feehan, PhD[c]

**Author Affiliations**

[a] Oracle Life Sciences, Oracle Corporation; 2300 Oracle Way, Austin, TX 78741 USA

[b] Retired employee of Oracle Life Sciences, Oracle Corporation; 2300 Oracle Way, Austin, TX 78741 USA

[c] Department of Ophthalmology, Ross Eye Institute, Jacobs School of Medicine and Biomedical Sciences, State University of New York at Buffalo; 955 Main Street, Buffalo, NY, 14203, USA

**Author Information**

Elliott H. McDowell – elliott.mcdowell@cernerenviza.com; ORCID: 0000-0002-0472-1441

Leiyu Yue – austin.yue@cernerenviza.com; ORCID: 0000-0003-2903-4194

Jennifer T. Lyden – jennifer.lyden@cernerenviza.com; ORCID: 0000-0002-6282-0691

William R. Bagwell – bill.bagwell@outlook.com; ORCID: 0000-0002-7228-2081

Michael Feehan – mfeehan2@buffalo.edu; ORCID: 0000-0002-3921-1089

**Corresponding Author**

Elliott H. McDowell, MS

Oracle Life Sciences, Oracle Corporation

2300 Oracle Way, Austin, TX 78741 USA

elliott.mcdowell@cernerenviza.com

**Abstract**

Flavored, disposable ENDS are used more than other tobacco products among youth, according to the 2022 National Youth Tobacco Survey. Use of these products is also increasing among young adult tobacco users. This study assessed appeal, likelihood of use, and intended use of multiple flavor varieties of a market share-leading disposable ENDS to understand perceptions and intended use of the product among tobacco users and non-users. There were 1,484 current, 568 former, and 768 never tobacco users who participated. All participants rated appeal and likelihood to use each flavor; cigarette smokers reported intended use of the product. Current tobacco users versus non-users found the product more appealing. Likelihood of use was nearly zero for all flavors among tobacco non-users. Tobacco non-users versus current users reported significantly lower likelihood to use the product, regardless of flavor. Likelihood to try any flavor was not significantly different between young versus older adult tobacco non-users. Most cigarette smokers intending to quit reported they would use the products to reduce or quit cigarette smoking. This research fills a gap in knowledge regarding behavioral intentions for flavored, disposable ENDS products and provides an understanding of potential use of these products among tobacco users and non-users.

**Keywords**

E-cigarettes, ENDS, disposable, flavored tobacco, tobacco use

## 1.	Introduction

Results of the 2020 National Health Interview Survey estimate that 12.5% (30.8 million) of adults in the United States (U.S.) smoke cigarettes (Cornelius et al., 2022). Cigarette smoke contains many harmful and potentially harmful constituents (HPHCs), and chronic exposure to some HPHCs via smoking contributes to increased health risks ("How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General," 2010). Though prevalence is declining, smoking remains a public health concern as smoking-related diseases are the leading causes of preventable death in the U.S. ("The health consequences of smoking—50 years of progress: a report of the Surgeon General," 2014).

Electronic nicotine delivery systems (ENDS) are the second most commonly used tobacco products in the U.S. and are estimated to be used by 3.7% (9.1 million) of adults (Cornelius et al., 2022). ENDS produce an aerosol containing lower or no levels of the HPHCs found in cigarette smoke ("How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General," 2010). Though not without risks to health, ENDS use may confer reduced risks versus smoking but increased risks versus not using tobacco (Polosa et al., 2019).

Adopting ENDS use has been shown to aid smoking reduction and cessation, demonstrating the potential for ENDS to benefit individual and population health (Glasser et al., 2017). However, the net public health benefit of ENDS requires an understanding of which populations are likely to use them, whether they are used by smokers to help reduce or quit cigarettes, and the likelihood they will be initiated by tobacco non-users.

Scientific evidence shows that ENDS, and specifically flavored, disposable ENDS, may be appealing to (Kong et al., 2019; Krüsemann et al., 2021; Leventhal et al., 2020) or likely to be initiated by vulnerable populations, including tobacco non-users, youth, and young adults (Stanton et al., 2020). According to results of the 2022 National Youth Tobacco Survey (NYTS), flavored, disposable ENDS are used more than other tobacco products among youth (Gentzke et al., 2022). Use of these products has also increased among adults and young adults in the U.S. following restrictions on the sale of flavored, cartridge-based ENDS (Hammond et al., 2022).

69  The purpose of this study was to assess perceptions of and behavioral intentions for multiple
70  flavor varieties of a market share-leading (in the U.S.), disposable ENDS product among adults
71  (ages ≥ 21) and young adults (ages 21 – 24) with different tobacco use histories. Primary
72  objectives were to understand potential differences in product appeal, likelihood to try and
73  likelihood to regularly use (together, likelihood of use), and intended use of the product among
74  adult and young adult current, former, and never tobacco users. Secondary objectives were to
75  assess likelihood of use among young adults (ages 21 – 24) versus older adults (age ≥ 25) and to
76  understand how likelihood of use may differ for tobacco flavored, menthol flavored, and non-
77  tobacco/non-menthol flavored ENDS.

78  Results of this study fill a gap in knowledge regarding perceptions and behavioral intentions for
79  multiple flavors of a disposable ENDS product, demonstrate the potential impact that availability
80  of the product may have on tobacco use in the U.S., and help understand likelihood of use of
81  flavored, disposable ENDS among adult and young adult tobacco users and non-users.

82  ## 2.    Materials & Methods

83  ### 2.1    Study Design

84  This study used robust and accepted methods to assess behavioral intentions for the "BIDI®
85  Stick" (Study IP) – a disposable ENDS product commercially available in U.S. markets. Data
86  were collected via an online survey that posed questions to adult current, former, and never
87  tobacco users regarding their perceptions of and likelihood to use eleven flavor varieties of the
88  Study IP. The Sterling Institutional Review Board (Atlanta, GA, USA) approved the study and
89  all materials prior to data collection. The study was conducted in accordance with the
90  Declaration of Helsinki. All study procedures were conducted by Cerner Enviza (now Oracle
91  Life Sciences, Oracle Corporation; Austin, TX, USA).

92  ### 2.2    Survey Procedures

93  #### 2.2.1    Survey Content

94  Survey items were taken from validated measures found in scientific literature or from federal
95  surveys, such as the Population Assessment of Tobacco and Health (PATH) Study (Hyland et al.,
96  2017). Following questions assessing demographic characteristics and tobacco use histories, *all*

*participants* were shown a product description, including product labeling materials for each of eleven flavor varieties of Study IP. Labeling materials for each flavor variety contained a description of the package contents, the nicotine concentration, the product brand name, a flavor descriptor, and all required nicotine addiction and product warning statements. *All participants* then rated how appealing they found the Study IP overall and the likelihood they would try and regularly use each flavor variety. *Current cigarette users* and *current dual users* (see definitions in Section 2.4.1) were asked how they intend to use the flavor variety they would most likely regularly use, if at all.

### 2.2.2 Soft Launch

A soft launch was conducted prior to fielding the study to confirm the data collection process and survey instrument functioned properly. Participants were presented three of eleven flavor varieties of Study IP during the soft launch. One tobacco flavored, one menthol flavored, and one non-tobacco/non-menthol flavored variety served as exemplars. No issues with data collection or the survey instrument were identified.

There were 352 participants who participated in the soft launch. Though these participants were presented with only three of eleven flavor varieties of Study IP, their data was included in subsequent analyses, where applicable, resulting in missing data for the remaining eight flavor varieties of Study IP. Handling of missing data is described in Section 2.6.

### 2.3 Participant Sample

Participants were recruited from the Kantar Profiles consumer panel – a nationally representative database of over 21 million U.S. residents who voluntarily enrolled to participate in online surveys. The study began 13 May 2021 and ended 13 August 2021.

Quota sampling was used to recruit a representative sample of U.S. adults within 10% of that reported by the U.S. Census Bureau for age, sex, geographic region, and race. Young adults (ages 21 – 24) were oversampled to ensure a sufficient sample of this age group was recruited. Recruitment also ensured that the final sample contained an adequate number of current, former, and never tobacco users (Table 1).

124     Participants were required to be $\geq$ 21 years old, to be able to read and understand English, to

125     reside in the U.S., and to provide responses to survey items assessing demographic

126     characteristics (age, gender, race, and geographic region) and tobacco use histories. Participants

127     were excluded if they were pregnant, breastfeeding, or employed in market research, media, or

128     journalism; as an attorney; as a healthcare provider; or by a tobacco product manufacturer.

129     **2.4     Definitions of Tobacco User Groups and Subgroups**

130     **Table 1: Definitions of Tobacco User Groups and Subgroups**

| Tobacco User Group or Subgroup | Definition |
|---|---|
| **All Participants** | All participants in the study, including all Current Tobacco Users and Tobacco Non-Users. |
| **Current Tobacco Users** | Combined subgroups of Current Cigarette Users, including those Intending and Not Intending to Quit Smoking, and Current ENDS Users, including Current Dual Users. |
| Current Cigarette Users | Participants who reported they had smoked > 100 cigarettes in their lifetime; AND had smoked cigarettes in the P30D; AND had not used ENDS in the past 30 days. |
| *Intending to Quit Smoking*[1] | Met definition of Current Cigarette User; AND endorsed a rating of $\geq$ 5 on the Motivation to Stop Scale. |
| *Not Intending to Quit Smoking*[2] | Met definition of Current Cigarette User; AND endorsed a rating of $\leq$ 4 on the Motivation to Stop Scale. |
| Current ENDS Users | Participants who reported they had ever used ENDS "fairly regularly" in their lifetime; AND had used ENDS in the past 30 days. |
| *Exclusive ENDS Users* | Met definition of Current ENDS User; AND had not used any other tobacco product in the past 30 days. |
| *Current Dual Users (Cigarettes and ENDS)*[3] | Met definition of Current ENDS User; AND had smoked cigarettes in the past 30 days. |
| **Tobacco Non-Users** | Combined subgroups of Former and Never Tobacco Users. Subgroups of Young Adult (ages 21-24) and Older Adult Tobacco Non-Users (ages $\geq$ 25) were subset from the group of tobacco non-users and used in select analyses. |
| Former Tobacco Users | Participants who reported they had ever smoked > 100 cigarettes; OR had ever used at least one of the following tobacco products "fairly regularly" in their lifetime: ENDS, smokeless tobacco, nicotine pouches, nicotine replacement therapy, cigars/cigarillos, pipe tobacco, hookah/waterpipe tobacco; AND had not used any tobacco product in the past 3 months. |
| Never Tobacco Users | Participants who reported they had never used any tobacco product; OR had never smoked > 100 cigarettes; AND had never used any of the following tobacco products "fairly regularly" in their lifetime: ENDS, smokeless tobacco, nicotine pouches, nicotine replacement therapy, cigars/cigarillos, pipe tobacco, hookah/waterpipe tobacco; AND had not used any tobacco product in the past 30 days. |

131

132     **2.5     Measures**

133     **2.5.1    Demographic Characteristics**

134     Demographic characteristics were assessed for all participants and were stratified by current,

135     former, and never tobacco use (Table 3). Survey items assessing demographic characteristics

136     were taken from the PATH Study and included many response options per survey item; thus,

137  demographic results were collapsed into the following categories: age (21-24, 25-34, 35-44, 45-
138  54, 55+ years); gender (male, female, other); geographic region (Northeast, Midwest, South,
139  West); race (White, Black, other); education level (less than a Bachelor's, Bachelor's degree or
140  higher); annual household income (less than $50,000, $50,000 or more); and marital status
141  (currently married, not currently married). Expanded demographic results are found in
142  Supplementary Table A.

### 2.5.2  Product Appeal

144  Appeal of the Study IP overall and specific product attributes (disposability, nicotine
145  concentration, availability of a variety of flavors) was assessed among all participants using a
146  scale ranging from 1 ("Not at all appealing") to 5 ("Extremely appealing").

### 2.5.3  Likelihood of Use

148  Likelihood to try and likelihood to regularly use each of eleven flavor varieties of Study IP was
149  assessed among all participants using an 11-point Juster scale ranging from 0 ("No chance or
150  almost none") to 10 ("Certain or practically certain"); the other Juster scale response options
151  (ratings 1-9) also had a semantic label. The Juster scale is a probability-based scale that has been
152  shown to predict likelihood of purchase and use for many consumer products (Singh &
153  Dall'Olmo Riley, 2022), including tobacco (Hoek et al., 2019; Hoek et al., 2011).

### 2.5.4  Intended Use

155  Intended use of the Study IP was assessed among *current cigarette users* and *current dual users*
156  (cigarettes and ENDS). These participants reported their intended use of the Study IP they would
157  most likely regularly use. Response options included the following: (1) use to quit or help quit
158  cigarettes completely; (2) use to cut back use of cigarettes; (3) use and use the same amount of
159  cigarettes; or (4) use and use more cigarettes.

160　**2.6　Study Objectives and Analyses**

161　**Table 2: Study Objectives and Analyses**

| | Study Objective | Statistical Test of Objective |
|---|---|---|
| 1 | Assess appeal of the Study IP overall and for specific product attributes among Current Tobacco Users and Tobacco Non-Users. | Count and percentage for number of participants endorsing each appeal rating. |
| 2 | Determine whether the likelihood to try any variety of Study IP differed between Current Tobacco Users and Tobacco Non-Users. | Mean, SD, 95% CI for likelihood to try ratings; *and* two-sample t-test for difference in mean likelihood to try among Current Tobacco Users vs. Tobacco Non-Users. |
| 3 | Determine whether the likelihood to regularly use any variety of Study IP differed between Current Tobacco Users and Tobacco Non-Users. | Mean, SD, 95% CI for likelihood to regularly use ratings; *and* two-sample t-test for difference in mean likelihood to regularly use among Current Tobacco Users vs. Tobacco Non-Users. |
| 4 | Determine whether the likelihood to try any variety of Study IP differed between Young Adult and Older Adult Tobacco Non-Users. | Mean, SD, 95% CI for likelihood to try ratings; *and* two-sample t-test for difference in mean likelihood to try among Young Adult vs. Older Adult Tobacco Non-Users. |
| 5 | Determine whether the likelihood to try the Study IP differed between Young Adult and Older Adult Tobacco Non-Users, by flavor category. | Mean, SD, 95% CI for likelihood to try ratings for each flavor category (tobacco, menthol, non-tobacco flavor) by age group; *and* two-way repeated measures ANOVA (with flavor category x age group interaction) for difference in mean likelihood to try, by flavor category, among Young Adult vs. Older Adult Tobacco Non-Users. |
| 6 | Determine whether the likelihood to try the Study IP flavor categories differed among Tobacco Non-Users. | Mean, SD, 95% CI for likelihood to try ratings for each flavor category (tobacco, menthol, non-tobacco flavor); *and* one-way repeated measures ANOVA for differences in mean likelihood to try ratings for each flavor category among Tobacco Non-Users. |
| 7 | Determine whether the likelihood to try any variety of Study IP differed between Current Cigarette Smokers Intending and Not Intending to Quit Smoking. | Mean, SD, 95% CI for likelihood to try and regularly use ratings; *and* two-sample t-test for difference in mean likelihood to try among Current Cigarette Smokers Intending vs. Not Intending to Quit Smoking. |
| 8 | Assess intended use of the Study IP among current cigarette users and current dual users | Count and percentage for number of participants endorsing each intended use. |

162

163　Table 2 presents study objectives and corresponding statistical analyses. P-values $\leq 0.05$ were

164　considered statistically significant. All analyses were conducted using R Software Version 4.2.0

165　(R Foundation for Statistical Computing; Vienna, Austria).

166　Participants in the soft launch were only presented with three of eleven varieties of Study IP; no

167　results were collected for the remaining eight varieties. Responses from these participants were

168　included in descriptive analyses for the three varieties included in the soft launch and associated

169　missing data were excluded in descriptive analyses for the remaining eight varieties.

## 3.    Results

### 3.1    Final Sample

There were 2,820 participants in the study and included in analyses. Each participant was assigned to one of four overall tobacco user groups: (a) current cigarette users (n=756) – including those intending (n=357) and not intending (n=399) to quit smoking; (b) current ENDS users (n=728); (c) former tobacco users (n=568); and (d) never tobacco users (n=768).

### 3.2    Demographic Characteristics

Demographic characteristics are presented in Table 3 and are stratified by current, former, and never tobacco users. The sample contained roughly equal numbers of males and females. About half of the sample represented adults $\leq$ ages 34 years old. Participants were similarly distributed across geographic regions. Participants in the total sample were predominantly White. Expanded results for demographic characteristics can be found in Supplementary Table A.

A0086

182 **Table 3: Demographic Characteristics of Study Participants by Tobacco Use History**

| | Current Tobacco Users[1] | Former Tobacco Users | Never Tobacco Users |
|---|---|---|---|
| | n=1484 | n=568 | n=768 |
| | n (%) | n (%) | n (%) |
| **Age in Years[2]** | | | |
| 21-24 (%) | 255 (17.1%) | 32 (5.6%) | 424 (55.2%) |
| 25-34 (%) | 382 (25.7%) | 158 (27.8%) | 86 (11.2%) |
| 35-44 (%) | 267 (17.9%) | 113 (19.9%) | 65 (8.5%) |
| 45-54 (%) | 256 (17.2%) | 84 (14.8%) | 58 (7.6%) |
| 55+ (%) | 324 (21.8%) | 181 (31.9%) | 135 (17.6%) |
| **Gender** | | | |
| Male (%) | 752 (50.6%) | 366 (64.4%) | 299 (38.9%) |
| Female (%) | 716 (48.2%) | 201 (35.4%) | 457 (59.5%) |
| Another gender (%) | 16 (1.0%) | 1 (0.2%) | 12 (1.6%) |
| **Geographic Region[3]** | | | |
| Northeast (%) | 222 (15.0%) | 97 (17.1%) | 128 (16.7%) |
| Midwest (%) | 350 (23.5%) | 134 (23.6%) | 166 (21.6%) |
| South (%) | 633 (42.6%) | 214 (37.7%) | 271 (35.3%) |
| West (%) | 279 (18.8%) | 123 (21.7%) | 203 (26.4%) |
| **Race** | | | |
| White (%) | 1129 (76.0%) | 452 (79.6%) | 501 (65.2%) |
| Black (%) | 211 (14.2%) | 55 (9.7%) | 134 (17.4%) |
| Another race (%) | 144 (9.8%) | 61 (10.7%) | 133 (17.3%) |
| **Education Level** | | | |
| Less than a Bachelor's degree (%) | 1123 (75.7%) | 380 (66.9%) | 504 (65.6%) |
| Bachelor's degree or higher (%) | 361 (24.3%) | 188 (33.1%) | 264 (34.4%) |
| Don't know (%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Decline to answer (%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| **Annual Household Income** | | | |
| Less than $50,000 (%) | 848 (57.2%) | 249 (43.8%) | 412 (53.6%) |
| $50,000 or more (%) | 594 (40.0%) | 297 (52.3%) | 287 (37.4%) |
| Don't know (%) | 24 (1.6%) | 5 (0.9%) | 25 (3.3%) |
| Decline to answer (%) | 18 (1.2%) | 17 (3.0%) | 44 (5.7%) |
| **Marital Status** | | | |
| Currently married (%) | 615 (41.4%) | 303 (53.3%) | 264 (34.4%) |
| Not currently married (%) | 859 (57.9%) | 262 (46.1%) | 498 (64.8%) |
| Don't know (%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Decline to answer (%) | 10 (0.6%) | 3 (0.5%) | 6 (0.8%) |

183

## 3.2 Product Appeal

185 *Tobacco non-users* found the Study IP, overall, less appealing than *current tobacco users*. Most
186 *former* (n=516; 67.2%) and *never tobacco users* (n=365; 64.1%) found the Study IP "not at all
187 appealing," while only 19.5% (n=111) and 14.2% (n=109), respectively, found the Study IP
188 between "moderately appealing" and "extremely appealing." Comparatively, 40.0% (n=143) of
189 *current cigarette smokers intending to quit*, 33.6% (n=134) of *current cigarette smokers not*

190   *intending to quit,* and 72.2% (n=526) of *current ENDS users* found the Study IP between

191   "moderately appealing" to "extremely appealing."

192   Results for appeal of specific product attributes – disposability and availability of one nicotine

193   strength, specifically – were similar to overall product appeal among current tobacco users and

194   tobacco non-users. More than half of tobacco non-users, including 56.6% (n=435) of *never*

195   *tobacco users* and 54.2% (n=308) of *former tobacco users* considered the fact that the Study IP

196   was available in a variety of flavors to be "not at all appealing." Appeal of a variety of flavors

197   was highest among *current ENDS users* and *current cigarette smokers intending to quit smoking*,

198   as 79.2% (n=546) and 52.9% (n=189) of these groups, respectively, rated the total offering of

199   eleven available flavors (versus specific flavors) between "moderately appealing" to "extremely

200   appealing." Results for product appeal are found in Table 4.

**Table 4: Product Appeal of Study IP Overall and for Specific Product Attributes by Tobacco User Group**

| | Current Cigarette Users Intending to Quit | Current Cigarette Users Not Intending to Quit | Current ENDS Users | Former Tobacco Users | Never Tobacco Users |
|---|---|---|---|---|---|
| | n (%) (95% CI) | n (%) (95% CI) | n (%) (95% CI) | n (%) (95% CI) | n (%) (95% CI) |
| **Appeal of Study IP Overall** | | | | | |
| N* | 357 | 399 | 728 | 568 | 768 |
| Not at all appealing (%) | 146 (40.9%) (35.8% - 46.2%) | 172 (43.1%) (38.2% - 48.1%) | 69 (9.5%) (7.4% - 11.8%) | 364 (64.1%) (60.0% - 68.0%) | 516 (67.2%) (63.7% - 70.5%) |
| Slightly appealing (%) | 66 (18.5%) (14.6% - 22.9%) | 80 (20.1%) (16.2% - 24.3%) | 119 (16.3%) (13.7% - 19.2%) | 76 (13.4%) (10.7% - 16.5%) | 94 (12.2%) (10.0% - 14.8%) |
| Moderately appealing (%) | 70 (19.6%) (15.6% - 24.1%) | 67 (16.8%) (13.3% - 20.8%) | 204 (28.0%) (24.8% - 31.4%) | 70 (12.3%) (9.7% - 15.3%) | 65 (8.5%) (6.6% - 10.7%) |
| Very appealing (%) | 53 (14.8%) (11.3% - 19.0%) | 47 (11.8%) (8.8% - 15.4%) | 163 (22.4%) (19.4% - 25.6%) | 34 (6.0%) (4.2% - 8.3%) | 37 (4.8%) (3.4% - 6.6%) |
| Extremely appealing (%) | 20 (5.6%) (3.5% - 8.5%) | 20 (5.0%) (3.1% - 7.6%) | 159 (21.8%) (18.9% - 25.0%) | 7 (1.2%) (0.5% - 2.5%) | 7 (0.9%) (0.4% - 1.9%) |
| **Appeal of Study IP Being a Disposable, Non-Refillable Product** | | | | | |
| N* | 357 | 399 | 728 | 568 | 768 |
| Not at all appealing (%) | 150 (42.0%) (36.8% - 47.3%) | 174 (43.6%) (38.7% - 48.6%) | 132 (18.1%) (15.4% - 21.1%) | 358 (63.0%) (58.9% - 67.0%) | 537 (69.9%) (66.5% - 73.1%) |
| Slightly appealing (%) | 72 (20.2%) (16.1% - 24.7%) | 72 (18.0%) (14.4% - 22.2%) | 126 (17.3%) (14.6% - 20.3%) | 80 (14.1%) (11.3% - 17.2%) | 78 (10.2%) (8.1% - 12.5%) |
| Moderately appealing (%) | 60 (16.8%) (13.1% - 21.1%) | 67 (16.8%) (13.3% - 20.8%) | 175 (24.0%) (21.0% - 27.3%) | 63 (11.1%) (8.6% - 14.0%) | 62 (8.1%) (6.2% - 10.2%) |
| Very appealing (%) | 43 (12.0%) (8.9% - 15.9%) | 45 (11.3%) (8.3% - 14.8%) | 145 (19.9%) (17.1% - 23.0%) | 33 (5.8%) (4.0% - 08.1%) | 24 (3.1%) (2.0% - 04.6%) |
| Extremely appealing (%) | 26 (7.3%) (4.8% - 10.5%) | 21 (5.3%) (3.3% - 07.9%) | 136 (18.7%) (15.9% - 21.7%) | 9 (1.6%) (0.7% - 03.0%) | 14 (1.8%) (1.0% - 03.0%) |
| **Appeal of Study IP Being Available in One Nicotine Concentration (6.0%)** | | | | | |
| N* | 357 | 399 | 728 | 568 | 768 |
| Not at all appealing (%) | 117 (32.8%) (27.9% - 37.9%) | 137 (34.3%) (29.7% - 39.2%) | 77 (10.6%) (8.4% - 13.0%) | 354 (62.3%) (58.2% - 66.3%) | 554 (72.1%) (68.8% - 75.3%) |
| Slightly appealing (%) | 66 (18.5%) (14.6% - 22.9%) | 78 (19.5%) (15.8% - 23.8%) | 113 (15.5%) (13.0% - 18.4%) | 79 (13.9%) (11.2% - 17.0%) | 67 (8.7%) (6.8% - 10.9%) |
| Moderately appealing (%) | 83 (23.2%) (19.0% - 28.0%) | 91 (22.8%) (18.8% - 27.2%) | 197 (27.1%) (23.9% - 30.4%) | 67 (11.8%) (9.3% - 14.7%) | 49 (6.4%) (4.8% - 8.3%) |
| Very appealing (%) | 57 (16.0%) (12.3% - 20.2%) | 46 (11.5%) (8.6% - 15.1%) | 179 (24.6%) (21.5% - 27.9%) | 31 (5.5%) (3.7% - 7.7%) | 27 (3.5%) (2.3% - 5.1%) |
| Extremely appealing (%) | 23 (6.4%) (4.1% - 9.5%) | 28 (7.0%) (4.7% - 10.0%) | 151 (20.7%) (17.9% - 23.9%) | 8 (1.4%) (0.6% - 2.8%) | 21 (2.7%) (1.7% - 4.1%) |
| **Appeal of Study IP Being Available in a Variety of Flavors (11 Flavors)** | | | | | |
| N* | 357 | 399 | 728 | 568 | 768 |
| Not at all appealing (%) | 119 (33.3%) (28.5% - 38.5%) | 143 (35.8%) (31.1% - 40.8%) | 57 (7.8%) (6.0% - 10.0%) | 308 (54.2%) (50.0% - 58.4%) | 435 (56.6%) (53.1% - 60.2%) |
| Slightly appealing (%) | 47 (13.2%) (9.8% - 17.1%) | 68 (17.0%) (13.5% - 21.1%) | 87 (12.0%) (9.7% - 14.5%) | 68 (12.0%) (9.4% - 14.9%) | 122 (15.9%) (13.4% - 18.7%) |
| Moderately appealing (%) | 64 (17.9%) (14.1% - 22.3%) | 65 (16.3%) (12.8% - 20.3%) | 144 (19.8%) (16.9% - 22.9%) | 86 (15.1%) (12.3% - 18.4%) | 74 (9.6%) (7.6% - 11.9%) |
| Very appealing (%) | 66 (18.5%) (14.6% - 22.9%) | 78 (19.5%) (15.8% - 23.8%) | 203 (27.9%) (24.7% - 31.3%) | 59 (10.4%) (8.0% - 13.2%) | 64 (8.3%) (6.5% - 10.5%) |
| Extremely appealing (%) | 59 (16.5%) (12.8% - 20.8%) | 36 (9.0%) (6.4% - 12.3%) | 229 (31.5%) (28.1% - 35.0%) | 30 (5.3%) (3.6% - 7.5%) | 36 (4.7%) (3.3% - 6.4%) |

## 3.3 Likelihood of Use

### 3.3.1 Likelihood to Try

*Current tobacco users* reported higher likelihood to try each flavor variety of Study IP (mean range: 1.42 to 4.77) than *tobacco non-users* (mean range: 0.31 to 0.85). Mean likelihood to try for each flavor variety of Study IP was less than 1.0 among all *tobacco non-users*, including *former tobacco users* (mean range: 0.44 to 0.85) and *never tobacco users* (mean range: 0.31 to 0.58). This indicates virtually no interest in trying any variety of Study IP among surveyed *tobacco non-users* (Supplementary Table B).

*Current tobacco users* also reported significantly higher (p<0.001) likelihood to try the Study IP (mean=3.02) than *tobacco non-users* (mean=0.55). When comparing likelihood to try Study IP among *tobacco non-users* specifically, there was an overall significant difference by flavor category (p<0.001). Again, however, mean ratings by flavor category were less than 1.0 among *tobacco non-users*, indicating virtually no interest in using the Study IP (mean range: 0.36 [tobacco flavored] to 0.62 [non-tobacco/non-menthol flavored]). Though statistically significant, this finding is likely not behaviorally significant (Table 5b).

*Current ENDS users*, of which 65.5% (n=477) were *current dual users,* reported the highest mean likelihood to try each variety of Study IP than all other tobacco user groups. The tobacco flavored Study IP had the lowest mean likelihood to try rating among this group (mean=3.60), while a non-tobacco/non-menthol flavored Study IP had the highest mean rating (mean=4.77) (Supplementary Table B).

**Table 5a: Likelihood to Try Study IP among Current Tobacco Users and Tobacco Non-Users**

| | | Tobacco Non-Users[1] | p-value (F-Statistic) |
|---|---|---|---|
| **Likelihood to Try Study IP by Flavor Category[2]** | | | |
| Non-tobacco/non-menthol flavored | N* | 1336 | |
| | Mean ± Std Dev | 0.61 ± 1.54 | |
| | (95% CI) | (0.53 - 0.69) | |
| Menthol flavored | N* | 1336 | p < 0.001 (F = 186.032) |
| | Mean ± Std Dev | 0.49 ± 1.40 | |
| | (95% CI) | (0.42 - 0.57) | |
| Tobacco flavored | N* | 1336 | |
| | Mean ± Std Dev | 0.36 ± 1.32 | |
| | (95% CI) | (0.29 - 0.43) | |

**Table 5b: Likelihood to Try Study IP by Flavor Category among Tobacco Non-Users**

| | Current Tobacco Users[1] | Tobacco Non-Users[2] | p-value (t-Statistic) |
|---|---|---|---|
| **Likelihood to Try Study IP[3]** | | | |
| N* | 1484 | 1336 | p < 0.001 (t = -30.417) |
| Mean ± Std Dev | 3.02 ± 2.77 | 0.55 ± 1.40 | |
| (95% CI) | (2.88 - 3.16) | (0.47 - 0.62) | |
| **Likelihood to Regularly Use Study IP[4]** | | | |
| N* | 1,484 | 1,336 | p < 0.001 (t = -29.816) |
| Mean ± Std Dev | 2.93 ± 2.80 | 0.49 ± 1.37 | |
| (95% CI) | (2.79 - 3.08) | (0.42 - 0.57) | |
| | Current Cigarette Users Intending to Quit[5] | Current Cigarette Users Not Intending to Quit[5] | p-value (t-Statistic) |
| **Likelihood to Try Study IP[3]** | | | |
| N* | 357 | 399 | p = 0.132 (t = 1.503) |
| Mean ± Std Dev | 1.94 ± 2.37 | 1.69 ± 2.23 | |
| (95% CI) | (1.69 - 2.19) | (1.47 - 1.91) | |

There were no significant differences (p=0.148) in likelihood to try any variety of Study IP between *young adult tobacco non-users* (mean=0.62) and *older adult tobacco non-users* (mean=0.51). When accounting for flavor category (tobacco flavored vs. menthol flavored, vs. non-tobacco/non-menthol), there was a significant interaction (p<0.001) between *young adult tobacco non-users* and *older adult tobacco non-users* for the likelihood to try the Study IP. Again, all mean likelihood to try ratings were below a value of 1.0 for each flavor category among *young adult tobacco non-users* (mean range: 0.32 for tobacco flavored varieties to 0.69

for non-tobacco flavored varieties) and *older adult tobacco non-users* (mean range: 0.39 for

tobacco flavored varieties to 0.56 for non-tobacco/non-menthol flavored varieties), indicating

virtually no likelihood to try any Study IP, regardless of flavor. Though statistically significant,

this finding is likely not behaviorally significant given that mean likelihood to try ratings were

nearly zero on an 11-point scale (Table 5c). Additionally, *current cigarette users intending to*

*quit smoking* and *current cigarette users not intending to quit smoking* did not report

significantly different likelihood to try the Study IP (p=0.132).

**Table 5c: Likelihood to Try Study IP among Young Adult versus Older Adult Tobacco**

**Non-Users**

| | | Young Adult (21 – 24) Tobacco Non-Users[1] | Older Adult ($\geq$ 25) Tobacco Non-Users[2] | *p*-value for interaction *(t or F-Statistic)* |
|---|---|---|---|---|
| **Likelihood to Try Study IP[3]** | | | | |
| Any flavor | N* | 456 | 880 | $p = 0.148$ ($t = 1.446$) |
| | Mean ± Std Dev | 0.62 ± 1.40 | 0.51 ± 1.40 | |
| | (95% CI) | (0.49 - 0.75) | (0.41 - 0.60) | |
| **Likelihood to Try Study IP by Flavor Category[4]** | | | | |
| Non-tobacco/non-menthol flavored | N* | 456 | 880 | $p < 0.001$ ($F = 7.984$) |
| | Mean ± Std Dev | 0.69 ± 1.56 | 0.56 ± 1.53 | |
| | (95% CI) | (0.55 - 0.84) | (0.46 - 0.66) | |
| Menthol flavored | N* | 456 | 880 | |
| | Mean ± Std Dev | 0.57 ± 1.44 | 0.45 ± 1.37 | |
| | (95% CI) | (0.44 - 0.71) | (0.36 - 0.54) | |
| Tobacco flavored | N* | 456 | 880 | |
| | Mean ± Std Dev | 0.32 ± 1.16 | 0.39 ± 1.39 | |
| | (95% CI) | (0.22 - 0.43) | (0.29 - 0.48) | |

### 3.3.2   Likelihood to Regularly Use

Results for likelihood to regularly use the Study IP followed the same pattern across tobacco user

groups as did results for likelihood to try the Study IP. However, mean likelihood to regularly

use ratings for all flavored varieties of Study IP were lower in magnitude among all tobacco user

groups than for mean ratings for likelihood to try (Supplementary Table C). The likelihood to

regularly use any Study IP was significantly different (p<0.001) between *current tobacco users*

(mean=2.93) *and tobacco non-users* (mean=0.49). *Tobacco non-users* also reported virtually no

likelihood to regularly use any Study IP, regardless of flavor (Table 5a).

### 3.4   Intended Future Use

262 *Current cigarette users intending to quit smoking*, *current cigarette users not intending to quit*
263 *smoking*, and *current dual users* were asked how they would use the Study IP that they reported
264 being most likely to regularly use with respect to their current level of cigarette use. A large
265 majority of *current cigarette users intending to quit smoking* reported that they would use the
266 Study IP to reduce cigarette consumption (n=249; 69.7%), with 21.3% (n=76) reporting that they
267 would use them to quit cigarettes completely. Fewer *current cigarette users not intending to quit*
268 *smoking* reported they would use the Study IP to reduce cigarette consumption (n=128; 32.1%).
269 Over half of *current dual users* reported they would use the Study IP to reduce cigarette
270 consumption (n=262; 54.9%), with 15.9% (n=76) reporting they would use them to quit
271 cigarettes completely. Only 3.4% (n=12) of *current cigarette users intending to quit smoking* and
272 3.5% (n=14) of *current cigarette users not intending to quit smoking* reported they would adopt
273 use of the Study IP and use more cigarettes (Table 6).

274 **Table 6: Intended Future Use of Study IP among Current Cigarette Users and Current**
275 **Dual Users (Cigarettes and ENDS)**

|  | Current Cigarette Users Intending to Quit[1] | Current Cigarette Users Not Intending to Quit[2] | Current Dual Users (Cigarettes and ENDS)[3] |
|---|---|---|---|
|  | n (%) | n (%) | n (%) |
|  | (95% CI) | (95% CI) | (95% CI) |
| **Intended Future Use of Study IP[4]** | | | |
| N* | 357 | 399 | 477 |
| Quit cigarettes completely (%) | 76 (21.3%) | 12 (3.0%) | 76 (15.9%) |
|  | (17.2% - 25.9%) | (1.6% - 5.2%) | (12.8% - 19.5%) |
| Cut back (reduce) cigarette use (%) | 173 (48.5%) | 116 (29.1%) | 186 (39.0%) |
|  | (43.2% - 53.8%) | (24.7% - 33.8%) | (34.6% - 43.5%) |
| Use the same amount of cigarettes (%) | 77 (21.6%) | 235 (58.9%) | 162 (34.0%) |
|  | (17.4% - 26.2%) | (53.9% - 63.8%) | (29.7% - 38.4%) |
| Use more cigarettes (%) | 12 (3.4%) | 14 (3.5%) | 41 (8.6%) |
|  | (1.7% - 5.8%) | (1.9% - 5.8%) | (6.2% - 11.5%) |

276

# 4.    Discussion

277

278 The Tobacco Control Act (TCA) directs FDA to consider (1) the increased or decreased
279 likelihood that existing users of tobacco products will stop using such products and (2) the
280 increased or decreased likelihood that those who do not use tobacco products will start using

such products (2021) when assessing whether authorization the product would be appropriate for
the protection of the public health (APPH).

The study described here was designed to address both of FDA's criteria by evaluating appeal,
likelihood to try, likelihood to regularly use, and intended use of the flavored ENDS products
among *existing users of tobacco products* and *those who do not use tobacco products*. Results of
this study provide evidence that can help understand the impact that availability of disposable,
flavored ENDS may have on tobacco use behaviors among current tobacco users and tobacco
non-users.

Use of ENDS has been associated with significantly increased rates of smoking reduction,
cessation, and plans to quit smoking among adult current cigarette smokers, including those
intending and not intending to quit smoking upon initiating ENDS (Kasza et al., 2022; Kasza et
al., 2023). The general conclusions of numerous reports analyzing data from the PATH Study
show that initiation of ENDS by current cigarette smokers results in reductions in the quantity of
cigarettes smoked per day, reductions in the number of days cigarettes are smoked per month,
increased frequency of trying to quit smoking and smoking cessation (Abi Nehme et al., 2022;
Benmarhnia et al., 2018; Berry et al., 2019; Brouwer et al., 2022; Buu et al., 2018; Coleman et
al., 2019; Glasser et al., 2021; Han et al., 2022; Kalkhoran et al., 2020; Kaplan et al., 2021;
Kasza et al., 2020; Persoskie et al., 2019).

Cigarette smokers who completely switch to ENDS are exposed to far lower levels of inhaled
toxicants (Morris et al., 2022) and report positive changes in their health (Lehmann et al., 2017).
Estimates from population health modeling suggest that switching current smokers in the U.S. to
exclusive use of ENDS could save 1.6 – 6.6 million lives over a 10-year period. The
demonstrated ability for ENDS to aid in reducing or eliminating cigarette use is beneficial to
population health if a sufficient number of smokers switch to ENDS (Levy et al., 2018).

Scientific literature suggests that cigarette smokers who successfully switch to ENDS cite
availability of appealing flavors as a reason for initial or continued use to reduce, quit, or prevent
relapse to smoking (Berg, 2016; Jones et al., 2019; Li et al., 2021; Rest et al., 2022). Specific
flavors used upon initiation of ENDS by cigarette users have been shown to differ from flavors
used after switching (Bansal-Travers et al., 2022; Lindson et al., 2022), progressing from initial
use of tobacco flavored, menthol flavored, and non-tobacco/non-menthol flavored ENDS to

continued use of predominantly non-tobacco/non-menthol flavored ENDS (Du et al., 2020; Etter, 2016; Harrell et al., 2017; McQueen et al., 2011). The PATH Study and other longitudinal studies have also shown that use of non-tobacco/non-menthol flavored ENDS is more associated with smoking cessation among adult cigarette smokers than tobacco flavored ENDS (Friedman & Xu, 2020; Rest et al., 2022). Availability of ENDS products in flavors that are appealing to adult cigarette smokers may be more likely to be used and may therefore help accelerate reported reductions in cigarette smoking.

Findings of this study demonstrate that current tobacco users, and specifically current cigarette users and current ENDS users, are more likely to try and regularly use the non-tobacco/non-menthol Study IP than tobacco non-users, including former and never tobacco users, regardless of whether the Study IP is tobacco flavored, menthol flavored, or non-tobacco flavored. Thus, current tobacco use may moderate likelihood to use the Study IP, which has also been demonstrated in published literature for other ENDS products (Sharma et al., 2022). Appeal, likelihood to try, and likelihood to regularly use any flavor of Study IP was significantly higher among current tobacco users than tobacco non-users, congruent with evidence from scientific literature on ENDS (Leventhal et al., 2019; Li et al., 2021; Pang et al., 2020). Tobacco non-users reported virtually no likelihood to try or regularly use any flavor of the Study IP. Similar results were also found for young adults when compared to older adults, for which there were no significant differences in likelihood to try any flavor of the Study IP. The results of this study were consistent with other published research on the Study IP where intention to try any flavor variety was highest among current smokers and lowest among never smokers, ENDS non-users, and ENDS never users (Russell et al., 2023).

As this study was conducted using an online survey, participants with different tobacco use histories were recruited so that perceptions and intentions of the Study IP could be assessed among both current tobacco users and tobacco non-users. Recruitment using an online panel allowed an adequate sample of young adults to be enrolled, ensuring representation of this population. Nearly all survey items used in the study were taken from validated measures in literature or from federal surveys assessing tobacco use, specifically the PATH Study (Hyland et al., 2017), providing support that the study was conducted using scientifically accepted methods.

340 Results may have been subject to recall bias as the measures used relied on self-reported

341 behavioral intentions. Results for likelihood to try and likelihood to regularly use served as

342 proxies for actual use behaviors. Additional data from actual use studies would be helpful to

343 complement and support these findings.

## 5.    Conclusions

345 Findings demonstrate that current tobacco users may be more likely to adopt use of any flavor of

346 the disposable ENDS product assessed than tobacco non-users, including young adult tobacco

347 non-users. This was evidenced by significantly higher appeal, likelihood to try, and likelihood to

348 regularly use any flavor of the product among current tobacco users than tobacco non-users.

349 Tobacco non-users also reported virtually no interest in using any flavor of the product, as

350 likelihood of use ratings were nearly zero for all flavors. Current cigarette users reported they

351 would use the product to reduce or quit smoking, providing additional evidence that current

352 cigarette users intend to use the products to transition away from smoking.

353 Results suggest that any of the disposable ENDS product assessed, regardless of flavor, are not

354 likely to be initiated by tobacco non-users, including young adults. As this study assessed

355 intended behaviors, future research should investigate patterns of real-world use, including

356 tobacco use histories and current tobacco use behaviors among those who are current or former

357 users of these specific ENDS products.

**Data Availability**

359 The data that support the findings of this study are available from Oracle Life Sciences, but

360 restrictions apply to the availability of these data and so are not publicly available. Data are

361 however available from the corresponding author upon reasonable request and per the express

362 approval and permission of Oracle Life Sciences.

## 6.    References

364 Abi Nehme, A. M., Lou, X., Yan, X., Lee, J.-H., & Salloum, R. G. (2022). Transition to smoking

365        cessation among dual cigarette and e-cigarette users in the population assessment of

366        tobacco and health study, Waves 3 and 4 (2015–2017). *Addictive Behaviors*, *129*,

367        107284. https://doi.org/https://doi.org/10.1016/j.addbeh.2022.107284

368 Bansal-Travers, M., Rivard, C., Silveira, M. L., Kimmel, H., Poonai, K., Bernat, J. K., Jackson,
369         K., Rudy, S., Johnson, A., Cullen, K. A., Goniewicz, M., Travers, M., Hyland, A.,
370         Villanti, A., Hrywna, M., Abrams, D., Fong, G., Elton-Marshall, T., Stanton, C., &
371         Sharma, E. (2022). Factors associated with changes in flavored tobacco products used:
372         Findings from wave 2 and wave 3 (2014-2016) of the population assessment of tobacco
373         and health (PATH) study. *Addict Behav*, *130*, 107290.
374         https://doi.org/10.1016/j.addbeh.2022.107290
375 Benmarhnia, T., Pierce, J. P., Leas, E., White, M. M., Strong, D. R., Noble, M. L., & Trinidad,
376         D. R. (2018). Can E-Cigarettes and Pharmaceutical Aids Increase Smoking Cessation and
377         Reduce Cigarette Consumption? Findings From a Nationally Representative Cohort of
378         American Smokers. *American Journal of Epidemiology*, *187*(11), 2397-2404.
379         https://doi.org/10.1093/aje/kwy129
380 Berg, C. J. (2016). Preferred flavors and reasons for e-cigarette use and discontinued use among
381         never, current, and former smokers. *Int J Public Health*, *61*(2), 225-236.
382         https://doi.org/10.1007/s00038-015-0764-x
383 Berry, K. M., Reynolds, L. M., Collins, J. M., Siegel, M. B., Fetterman, J. L., Hamburg, N. M.,
384         Bhatnagar, A., Benjamin, E. J., & Stokes, A. (2019). E-cigarette initiation and associated
385         changes in smoking cessation and reduction: the Population Assessment of Tobacco and
386         Health Study, 2013–2015. *Tobacco Control*, *28*(1), 42.
387         https://doi.org/10.1136/tobaccocontrol-2017-054108
388 Brouwer, A. F., Jeon, J., Hirschtick, J. L., Jimenez-Mendoza, E., Mistry, R., Bondarenko, I. V.,
389         Land, S. R., Holford, T. R., Levy, D. T., Taylor, J. M. G., Fleischer, N. L., & Meza, R.
390         (2022). Transitions between cigarette, ENDS and dual use in adults in the PATH study
391         (waves 1–4): multistate transition modelling accounting for complex survey design.
392         *Tobacco Control*, *31*(3), 424. https://doi.org/10.1136/tobaccocontrol-2020-055967
393 Buu, A., Hu, Y. H., Piper, M. E., & Lin, H. C. (2018). The association between e-cigarette use
394         characteristics and combustible cigarette consumption and dependence symptoms:
395         Results from a national longitudinal study. *Addict Behav*, *84*, 69-74.
396         https://doi.org/10.1016/j.addbeh.2018.03.035
397 Coleman, B., Rostron, B., Johnson, S. E., Persoskie, A., Pearson, J., Stanton, C., Choi, K., Anic,
398         G., Goniewicz, M. L., Cummings, K. M., Kasza, K. A., Silveira, M. L., Delnevo, C.,

A0097

399    Niaura, R., Abrams, D. B., Kimmel, H. L., Borek, N., Compton, W. M., & Hyland, A.
400        (2019). Transitions in electronic cigarette use among adults in the Population Assessment
401        of Tobacco and Health (PATH) Study, Waves 1 and 2 (2013-2015). *Tob Control*, *28*(1),
402        50-59. https://doi.org/10.1136/tobaccocontrol-2017-054174
403    Cornelius, M. E., Loretan, C. G., Wang, T. W., Jamal, A., & Homa, D. M. (2022). Tobacco
404        product use among adults—United States, 2020. *Morbidity and Mortality Weekly Report*,
405        *71*(11), 397.
406    Du, P., Bascom, R., Fan, T., Sinharoy, A., Yingst, J., Mondal, P., & Foulds, J. (2020). Changes
407        in Flavor Preference in a Cohort of Long-Term Electronic Cigarette Users. *Ann Am*
408        *Thorac Soc*, *17*(5), 573-581. https://doi.org/10.1513/AnnalsATS.201906-472OC
409    Etter, J. F. (2016). Characteristics of users and usage of different types of electronic cigarettes:
410        findings from an online survey. *Addiction*, *111*(4), 724-733.
411    FDA. (2021). *FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette*
412        *Products for Failing to Provide Evidence They Appropriately Protect Public Health*.
413    Friedman, A. S., & Xu, S. (2020). Associations of Flavored e-Cigarette Uptake With Subsequent
414        Smoking Initiation and Cessation. *JAMA Netw Open*, *3*(6), e203826.
415        https://doi.org/10.1001/jamanetworkopen.2020.3826
416    Gentzke, A. S., Wang, T. W., Cornelius, M., Park-Lee, E., Ren, C., Sawdey, M. D., Cullen, K.
417        A., Loretan, C., Jamal, A., & Homa, D. M. (2022). Tobacco Product Use and Associated
418        Factors Among Middle and High School Students—National Youth Tobacco Survey,
419        United States, 2021. *MMWR Surveillance Summaries*, *71*(5), 1.
420    Glasser, A. M., Collins, L., Pearson, J. L., Abudayyeh, H., Niaura, R. S., Abrams, D. B., &
421        Villanti, A. C. (2017). Overview of Electronic Nicotine Delivery Systems: A Systematic
422        Review. *American Journal of Preventive Medicine*, *52*(2), e33-e66.
423        https://doi.org/10.1016/j.amepre.2016.10.036
424    Glasser, A. M., Vojjala, M., Cantrell, J., Levy, D. T., Giovenco, D. P., Abrams, D., & Niaura, R.
425        (2021). Patterns of E-cigarette Use and Subsequent Cigarette Smoking Cessation Over 2
426        Years (2013/2014-2015/2016) in the Population Assessment of Tobacco and Health
427        Study. *Nicotine Tob Res*, *23*(4), 669-677. https://doi.org/10.1093/ntr/ntaa182
428    Hammond, D., Reid, J. L., Burkhalter, R., Bansal Travers, M., Gravely, S., Hyland, A., Kasza,
429        K., & McNeill, A. (2022). E-Cigarette Flavors, Devices, and Brands Used by Youths

430    Before and After Partial Flavor Restrictions in the United States: Canada, England, and
431        the United States, 2017–2020. *American Journal of Public Health*, *112*(7), 1014-1024.

432 Han, D. H., Lee, S. H., & Seo, D. C. (2022). Within-Person Longitudinal Associations Between
433        Electronic Nicotine Delivery Systems Use and Smoking Cessation Efforts Among US
434        Continuing Adult Cigarette Smokers. *Nicotine Tob Res*, *24*(4), 590-597.
435        https://doi.org/10.1093/ntr/ntab232

436 Harrell, M. B., Weaver, S. R., Loukas, A., Creamer, M., Marti, C. N., Jackson, C. D., Heath, J.
437        W., Nayak, P., Perry, C. L., Pechacek, T. F., & Eriksen, M. P. (2017). Flavored e-
438        cigarette use: Characterizing youth, young adult, and adult users. *Preventive Medicine
439        Reports*, *5*, 33-40. https://doi.org/https://doi.org/10.1016/j.pmedr.2016.11.001

440 The health consequences of smoking—50 years of progress: a report of the Surgeon General.
441        (2014). In: Atlanta, GA: Department of Health and Human Services, Centers for Disease
442        Control and Prevention.

443 Hoek, J., Gendall, P., Eckert, C., Louviere, J., Blank, M.-L., & Thrasher, J. F. (2019). Young
444        adult susceptible non-smokers' and smokers' responses to capsule cigarettes. *Tobacco
445        Control*, *28*(5), 498-505.

446 Hoek, J., Wong, C., Gendall, P., Louviere, J., & Cong, K. (2011). Effects of dissuasive
447        packaging on young adult smokers. *Tob Control*, *20*(3), 183-188.
448        https://doi.org/10.1136/tc.2010.037861

449 How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-
450        Attributable Disease: A Report of the Surgeon General. (2010). In: National Center for
451        Chronic Disease Prevention and Health Promotion.

452 Hyland, A., Ambrose, B. K., Conway, K. P., Borek, N., Lambert, E., Carusi, C., Taylor, K.,
453        Crosse, S., Fong, G. T., & Cummings, K. M. (2017). Design and methods of the
454        Population Assessment of Tobacco and Health (PATH) Study. *Tobacco Control*, *26*(4),
455        371-378.

456 Jones, D. M., Ashley, D. L., Weaver, S. R., & Eriksen, M. P. (2019). Flavored ENDS Use among
457        Adults Who Have Used Cigarettes and ENDS, 2016-2017. *Tob Regul Sci*, *5*(6), 518-531.
458        https://doi.org/10.18001/trs.5.6.4

459  Kalkhoran, S., Chang, Y., & Rigotti, N. A. (2020). Electronic cigarette use and cigarette
460        abstinence over 2 years among US smokers in the population assessment of tobacco and
461        health study. *Nicotine & Tobacco Research*, *22*(5), 728-733.

462  Kaplan, B., Galiatsatos, P., Breland, A., Eissenberg, T., & Cohen, J. E. (2021). Effectiveness of
463        ENDS, NRT and medication for smoking cessation among cigarette-only users: a
464        longitudinal analysis of PATH Study wave 3 (2015–2016) and 4 (2016–2017), adult data.
465        *Tobacco Control*, tobaccocontrol-2020-056448. https://doi.org/10.1136/tobaccocontrol-
466        2020-056448

467  Kasza, K. A., Edwards, K. C., Anesetti-Rothermel, A., Creamer, M. R., Cummings, K. M.,
468        Niaura, R. S., Sharma, A., Pitts, S. R., Head, S. K., & Everard, C. D. (2022). E-cigarette
469        use and change in plans to quit cigarette smoking among adult smokers in the United
470        States: Longitudinal findings from the PATH Study 2014–2019. *Addictive Behaviors*,
471        *124*, 107124.

472  Kasza, K. A., Edwards, K. C., Tang, Z., Stanton, C. A., Sharma, E., Halenar, M. J., Taylor, K.
473        A., Donaldson, E. A., Hull, L. C., Bansal-Travers, M., Limpert, J., Zandberg, I., Gardner,
474        L. D., Hammad, H. T., Borek, N., Kimmel, H. L., Compton, W. M., & Hyland, A.
475        (2020). Correlates of tobacco product cessation among youth and adults in the USA:
476        findings from the PATH Study Waves 1-3 (2013-2016). *Tob Control*, *29*(Suppl 3), s203-
477        s215. https://doi.org/10.1136/tobaccocontrol-2019-055255

478  Kasza, K. A., Hammond, D., Gravely, S., O'Connor, R. J., Meng, G., East, K., Borland, R.,
479        Cummings, K. M., Fong, G. T., & Hyland, A. (2023). Associations between nicotine
480        vaping uptake and cigarette smoking cessation vary by smokers' plans to quit:
481        longitudinal findings from the International Tobacco Control Four Country Smoking and
482        Vaping Surveys. *Addiction*, *118*(2), 340-352.

483  Kong, G., Bold, K. W., Morean, M. E., Bhatti, H., Camenga, D. R., Jackson, A., & Krishnan-
484        Sarin, S. (2019). Appeal of JUUL among adolescents. *Drug Alcohol Depend*, *205*,
485        107691. https://doi.org/10.1016/j.drugalcdep.2019.107691

486  Krüsemann, E. J. Z., van Tiel, L., Pennings, J. L. A., Vaessen, W., de Graaf, K., Talhout, R., &
487        Boesveldt, S. (2021). Both Nonsmoking Youth and Smoking Adults Like Sweet and
488        Minty E-liquid Flavors More Than Tobacco Flavor. *Chem Senses*, *46*.
489        https://doi.org/10.1093/chemse/bjab009

490 Lehmann, K., Kuhn, S., & Reimer, J. (2017). Electronic Cigarettes in Germany: Patterns of Use
491   and Perceived Health Improvement. *Eur Addict Res*, *23*(3), 136-147.
492   https://doi.org/10.1159/000475986

493 Leventhal, A. M., Goldenson, N. I., Barrington-Trimis, J. L., Pang, R. D., & Kirkpatrick, M. G.
494   (2019). Effects of non-tobacco flavors and nicotine on e-cigarette product appeal among
495   young adult never, former, and current smokers. *Drug Alcohol Depend*, *203*, 99-106.
496   https://doi.org/10.1016/j.drugalcdep.2019.05.020

497 Leventhal, A. M., Mason, T. B., Cwalina, S. N., Whitted, L., Anderson, M., & Callahan, C.
498   (2020). Flavor and Nicotine Effects on E-cigarette Appeal in Young Adults: Moderation
499   by Reason for Vaping. *Am J Health Behav*, *44*(5), 732-743.
500   https://doi.org/10.5993/ajhb.44.5.15

501 Levy, D. T., Borland, R., Lindblom, E. N., Goniewicz, M. L., Meza, R., Holford, T. R., Yuan, Z.,
502   Luo, Y., O'Connor, R. J., Niaura, R., & Abrams, D. B. (2018). Potential deaths averted in
503   USA by replacing cigarettes with e-cigarettes. *Tobacco Control*, *27*(1), 18.
504   https://doi.org/10.1136/tobaccocontrol-2017-053759

505 Li, L., Borland, R., Cummings, K. M., Fong, G. T., Gravely, S., Smith, D. M., Goniewicz, M. L.,
506   O'Connor, R. J., Thompson, M. E., & McNeill, A. (2021). How Does the Use of Flavored
507   Nicotine Vaping Products Relate to Progression Toward Quitting Smoking? Findings
508   From the 2016 and 2018 ITC 4CV Surveys. *Nicotine Tob Res*, *23*(9), 1490-1497.
509   https://doi.org/10.1093/ntr/ntab033

510 Lindson, N., Butler, A. R., Liber, A., Levy, D. T., Barnett, P., Theodoulou, A., Notley, C.,
511   Rigotti, N. A., & Hartmann-Boyce, J. (2022). An exploration of flavours in studies of e-
512   cigarettes for smoking cessation: secondary analyses of a systematic review with meta-
513   analyses. *Addiction*.

514 McQueen, A., Tower, S., & Sumner, W. (2011). Interviews with "vapers": implications for
515   future research with electronic cigarettes. *Nicotine & Tobacco Research*, *13*(9), 860-867.

516 Morris, P., McDermott, S., Chapman, F., Verron, T., Cahours, X., Stevenson, M., Thompson, J.,
517   Chaudhary, N., & O'Connell, G. (2022). Reductions in biomarkers of exposure to
518   selected harmful and potentially harmful constituents following exclusive and partial
519   switching from combustible cigarettes to myblu(™) electronic nicotine delivery systems

520    (ENDS). *Intern Emerg Med*, *17*(2), 397-410. https://doi.org/10.1007/s11739-021-02813-
521       w

522    Pang, R. D., Goldenson, N. I., Kirkpatrick, M., Barrington-Trimis, J. L., Cho, J., & Leventhal, A.
523       M. (2020). Sex differences in the appeal of flavored e-cigarettes among young adult e-
524       cigarette users. *Psychol Addict Behav*, *34*(2), 303-307.
525       https://doi.org/10.1037/adb0000548

526    Persoskie, A., O'Brien, E. K., & Poonai, K. (2019). Perceived relative harm of using e-cigarettes
527       predicts future product switching among US adult cigarette and e-cigarette dual users.
528       *Addiction*, *114*(12), 2197-2205. https://doi.org/10.1111/add.14730

529    Polosa, R., O'Leary, R., Tashkin, D., Emma, R., & Caruso, M. (2019). The effect of e-cigarette
530       aerosol emissions on respiratory health: a narrative review. *Expert review of respiratory*
531       *medicine*, *13*(9), 899-915.

532    Rest, E. C., Brikmanis, K. N., & Mermelstein, R. J. (2022). Preferred flavors and tobacco use
533       patterns in adult dual users of cigarettes and ENDS. *Addictive Behaviors*, *125*, 107168.
534       https://doi.org/https://doi.org/10.1016/j.addbeh.2021.107168

535    Russell, C., McKinney, W. J., & Fearon, I. M. (2023). Behavioral intentions assessment of a
536       disposable e-cigarette among adult current, former, and non-smokers in the United States.
537       *Drug Testing and Analysis*.

538    Sharma, A., June, K. M., Norton, K. J., Fix, B., Bansal-Travers, M., Rees, V. W., & R, J. O. C.
539       (2022). Intention to purchase alternative tobacco products as a function of smoking status
540       and responses to advertising, packaging, and sensory experiences. *Addict Behav*, *130*,
541       107291. https://doi.org/10.1016/j.addbeh.2022.107291

542    Singh, J., & Dall'Olmo Riley, F. (2022). Consumer perceptions and behaviour towards branded
543       commodities. *Journal of Consumer Behaviour*, *21*(1), 19-32.
544       https://doi.org/https://doi.org/10.1002/cb.1982

545    Stanton, C. A., Sharma, E., Seaman, E. L., Kasza, K. A., Edwards, K. C., Halenar, M. J., Taylor,
546       K. A., Day, H., Anic, G., Hull, L. C., Bansal-Travers, M., Limpert, J., Gardner, L. D.,
547       Hammad, H. T., Borek, N., Kimmel, H. L., Compton, W. M., & Hyland, A. (2020).
548       Initiation of any tobacco and five tobacco products across 3 years among youth, young
549       adults and adults in the USA: findings from the PATH Study Waves 1–3 (2013–2016).
550       *Tobacco Control*, *29*(Suppl 3), s178. https://doi.org/10.1136/tobaccocontrol-2019-055573

A0102

**Table Legends**

*Table 1*

[1] Intention to quit smoking was based on ratings from the 7-point Motivation to Stop Scale (MTSS). Current cigarette smokers intending to quit smoking were defined as those who endorsed a rating of 5 ("I want to stop smoking and hope to soon") or higher on the MTSS.

[2] Intention to quit smoking was based on ratings from the 7-point Motivation to Stop Scale (MTSS). Current cigarette smokers not intending to quit smoking were defined as those who endorsed a rating of 4 ("I REALLY want to stop smoking, but I don't know when I will") or lower on the MTSS.

[3] Dual users of ENDS and cigarettes could use other tobacco products.

*Table 2*

SD: Standard deviation.

CI: Confidence interval.

*Table 3*

[1] Current tobacco users includes the combined groups of current cigarette smokers and currents ENDS users.

[2] Age category was derived from self-reported age.

[3] Geographic region was derived from the state of residence reported by each participant. United States Census regions were used to determine geographic region.

*Table 4*

Participants were first asked to rate how appealing they found the Study IP overall and were then asked to rate appeal of each product attribute.

*Table 5a*

[1] Current tobacco users includes the combined groups of current cigarette smokers and currents ENDS users.

577    [2] Tobacco non-users includes the combined group of former and never tobacco users.

578    [3] Calculation based on the flavor variety each participant reported they were most likely to try.

579    [4] Calculation based on the flavor variety each participant reported they were most likely to

580    regularly use.

581    [5] Intention to quit smoking was based on ratings from the 7-point Motivation to Stop Scale

582    (MTSS). Current cigarette smokers intending to quit smoking were defined as those who

583    endorsed a rating of 5 ("I want to stop smoking and hope to soon") or higher on the MTSS.

584    [6] Intention to quit smoking was based on ratings from the 7-point Motivation to Stop Scale

585    (MTSS). Current cigarette smokers not intending to quit smoking were defined as those who

586    endorsed a rating of 4 ("I REALLY want to stop smoking, but I don't know when I will") or

587    lower on the MTSS.

588    *Table 5b*

589    [1] Tobacco non-users includes the combined group of former and never tobacco users.

590    [2] Calculation based on the flavor variety each participant reported they were most likely to try

591    within each flavor category.

592    *Table 5c*

593    [1] Young adult tobacco non-users includes all participants ages 21-24 years old within the overall

594    group of tobacco non-users (combined subgroups of former and never tobacco users).

595    [2] Older adult tobacco non-users includes all participants ages 25 years or older within the overall

596    group of tobacco non-users (combined subgroups of former and never tobacco users).

597    [3] Calculation based on the flavor variety each participant reported they were most likely to try,

598    regardless of flavor category.

599    [4] Calculation based on the flavor variety each participant reported they were most likely to try

600    within each flavor category.

601    *Table 6*

[1] Intention to quit smoking was based on ratings from the 7-point Motivation to Stop Scale (MTSS). Current cigarette smokers intending to quit smoking were defined as those who endorsed a rating of 5 ("I want to stop smoking and hope to soon") or higher on the MTSS.

[2] Intention to quit smoking was based on ratings from the 7-point Motivation to Stop Scale (MTSS). Current cigarette smokers not intending to quit smoking were defined as those who endorsed a rating of 4 ("I REALLY want to stop smoking, but I don't know when I will") or lower on the MTSS.

[3] Dual users of ENDS and cigarettes were subset from the overall group of current ENDS users.

[4] Intended use of the Study IP was asked only among participants who reported they had smoked cigarettes in the past 30 days, including current cigarette smokers, both intending and not intending to quit smoking, and current dual users of ENDS and cigarettes.

**Author Contributions**

EHM informed and reviewed data analyses, finalized results tables, interpreted results, and drafted the manuscript per suggested guidelines described in the STROBE Statement and Good Publication Practice Guidelines for Pharmaceutical Companies (GPP3). LY informed, conducted, and reviewed data analyses and produced initial results tables. JTL informed study design, managed execution of the study, and helped draft and edit the manuscript. WRB informed study design and helped manage execution of the study. MF reviewed data analyses, interpreted results, and edited the manuscript. All authors (EM, LY, JTL, WRB, MF) approved the manuscript prior to submission.

**Institutional Review Board Statement**

The study was conducted according to the guidelines of the Declaration of Helsinki and was approved by the Sterling Institutional Review Board (Protocol Number: BV 2021-01; Identification Number: 8829; Date of Approval: 06 July 2021).

**Informed Consent Statement**

Informed consent was obtained from all participants involved in the study.

**Additional Information**

***Funding and Sponsor***

630 This research was funded by Bidi Vapor LLC (the Sponsor). The Sponsor was not involved in

631 the design or execution of the study, except for providing product images and package labels for

632 use in the survey. Further, the Sponsor was not involved in the analysis or reporting of study

633 findings. The Sponsor provided funding to Cerner Enviza (now Oracle Life Sciences, Oracle

634 Corporation) to cover publication costs, but the Sponsor was not involved in writing,

635 interpreting, or reviewing this manuscript.

636 ***Conflicts of Interest***

637 All authors (EM, LY, JTL, WRB, MF) were employed by Cerner Enviza (now Oracle Life

638 Sciences, Oracle Corporation) while conducting this research and drafting this manuscript.

639 Cerner Enviza received funding from the Sponsor to conduct the research described in this

640 manuscript. No author (EM, LY, JTL, WRB, MF) received any form of compensation from the

641 Sponsor. No authors (EM, LY, JTL, WRB, MF) have a financial conflict of interest related to

642 their work with the Sponsor other than employment by Cerner Enviza. No author (EM, LY, JTL,

643 WRB, MF) owns stock in any company that is involved in designing, manufacturing,

644 distributing, marketing, or promoting e-cigarettes, including that of the Sponsor. Otherwise, all

645 authors (EM, LY, JTL, WRB, MF) declare they have no additional conflicts of interests.



December 3, 2021

**Niraj Patel, CEO**
**(321) 223-3101**
**raj@bidivapor.com**

<u>**Via CTP Portal**</u>                                   <u>**PMTA Ninth Amendment: PM0003460**</u>

U.S. Department of Health and Human Services
Food and Drug Administration                   **CONTAINS CONFIDENTIAL**
Center for Tobacco Products                     **BUSINESS INFORMATION**
Office of Science
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**RE**: **Bidi Vapor LLC; Ninth Amendment to Premarket Tobacco Product Applications for BIDI® Stick ENDS; FDA Submission Tracking Number (STN): PM0003460**

## I. Background

On September 8, 2020, Bidi Vapor LLC ("Bidi Vapor" or the "Company") timely submitted to the U.S. Food and Drug Administration ("FDA" or the "Agency") Premarket Tobacco Product Applications ("PMTAs") for eleven (11) BIDI® Stick electronic nicotine delivery system ("ENDS") products. The PMTAs are identified by Submission Tracking Number ("STN") PM0003460.

As described in detail in the company's PMTA amendments (STN PM0003460) submitted on October 13, 2020, March 23, 2021, April 20, 2021, September 8, 2021, September 16, 2021, October 24, 2021, October 29, 2021, and November 5, 2021, while no deficiency letters have been received for any of the BIDI® Stick PMTAs to date, Bidi Vapor has continued to make substantial progress on its applications despite continuing to face on-going COVID-19 related business and logistical challenges. In addition to the significant data provided in the original September 8, 2020 submissions, Bidi Vapor has continued to develop product-specific scientific evidence to support that its flavored ENDS are appropriate for the protection of the public health (APPH). Specifically, Bidi Vapor is continuing to develop robust and reliable evidence intended to demonstrate that the potential benefits of the BIDI® Stick ENDS products for adult combusted cigarette smokers outweigh any risks to youth posed by flavored ENDS. This includes several behavioral studies designed to measure product perception and intention (*e.g.*, likelihood of use, behavioral intentions, and patterns of use of the BIDI® Sticks), as well as a clinical pharmacokinetic ("PK") study designed to measure the abuse liability/dependence potential of the BIDI® Sticks and the exposure to nicotine during product use (compared to combusted cigarettes and JUUL). As noted



in previous PMTA amendments, these product-specific studies will allow for additional bridging to the published literature included in PMTA PM0003460 and its amendments.

The purpose of this **Ninth PMTA Amendment** is to: (1) update FDA on the status of Bidi Vapor's first two completed tobacco product perception and intention ("TPPI") and behavioral studies, the BIDI® Stick Likelihood of Use ("LOU") and Patterns of Use ("POU") studies, and provide FDA with the final BIDI® Stick POU study report; (2) update FDA on the status of the BIDI® Stick PK/Abuse Liability Assessment and provide FDA with a recently published preprint journal article covering this study; (3) inform FDA of the status of its third behavioral survey study, the Perceptions and Behavioral Intentions Study of the BIDI® Stick E-Cigarette ("PBI Study"); (4) notify FDA of forthcoming 12-month ambient stability testing results; and (5) provide FDA with Bidi Vapor's updated Marketing Plan summarizing Bidi Vapor's recently implemented youth access restriction measures and six-month messaging strategy.

## II. Update on Cerner Enviza TPPI and Behavioral Studies on BIDI® Stick: Likelihood of Use and Patterns of Use Studies (Amend PMTA Module 6 Section 6.2.1 and Module 5 Section 5.3)

As described in prior PMTA amendments, Bidi Vapor engaged Kantar Health, LLC, now Cerner Enviza[1], to conduct two quantitative TPPI and behavioral studies for the BIDI® Stick ENDS product: Likelihood of Use ("LOU") and Patterns of Use ("POU") studies. Bidi Vapor initiated these studies following release of FDA's draft TPPI guidance[2] to address, among other things, perceptions and intentions, likelihood of use, label comprehension and product use patterns, including dual use.

**Likelihood of Use Study**

The BIDI® Stick LOU study was administered between May and August 2021 to participants age 21 years and older using a web-based survey to assess tobacco use behavior, perceptions, and intentions. The data for the LOU is currently being compiled into final reports for submission to the Agency. **Bidi Vapor is expecting the final reports for this study to be**

---

[1] On April 1, 2021 Cerner Corporation completed the acquisition of Kantar's Health Division, which is has now rebranded as "Cerner Enviza" Cerner Corporation announced the launch of the new Cerner Enviza operating unit in late October 2021 (*see* Cerner Corporation, News Release: "Cerner Enviza Aims to Accelerate Therapies and Improve Patient Outcomes" (October 26, 2021) https://www.cerner.com/newsroom/cerner-enviza-aims-to-accelerate-therapies-and-improve-patient-outcomes).

[2] U.S. Food & Drug Admin., Draft Guidance for Industry, Tobacco Products: Principles for Designing and Conducting Tobacco Product Perception and Intention Studies (October 2020) (available at https://www.fda.gov/media/143322/download).



completed by the end of this month (December 2021), at which point it will be provided to
FDA via a PMTA Amendment.

<u>**Patterns of Use Study**</u>

The BIDI® Stick POU study surveyed BIDI® Stick users, specifically those who had used
BIDI® Sticks every day or some days within the 30 days prior to taking the survey. The study
utilized a retrospective, self-reported, cross-sectional design to measure recalled BIDI® Stick and
Tobacco/Nicotine Product (TNP) usage and perceived TNP health risks among current users of
BIDI® Stick. Data collection occurred between April and August 2021. In addition to questions
on flavor, both studies included a series of questions regarding past use and current use of other
TNPs to assess whether use of the BIDI® Stick impacts adult current smokers' quitting or reducing
use of combustible cigarettes, including exploring how use of tobacco products may have changed
from the period prior to starting BIDI® Stick use to the most recent 30 days. The study also
evaluated perceptions of absolute and relative health risks of BIDI® Stick versus other TNPs for
several conditions. **Data from the POU study is has been compiled into a final report
(Attachment 1) and summarized below.**

Study findings support the conclusion that users of BIDI® Stick may be using the product
in substitution for their other TNP such as combustible cigarettes. Respondents view BIDI® Stick
to have a lower health risk than combustible cigarettes, the same health risk as other ENDS, and a
greater health risk than not using any TNP. Current use of BIDI® Stick was driven largely by: (1)
availability of flavors and (2) perceived to be less harmful to their health than combustible
cigarettes.

**III. Update on PK/Abuse Liability Assessment (Amend PMTA Module 5 Section 5.2)**

As Bidi Vapor noted in prior PMTA amendments submitted to FDA in March, April,
September, and again in October 2021, Bidi Vapor has been diligently working with McKinney
Regulatory Science Advisors, LLC and whatIF? Consulting Ltd (Dr. Ian M. Fearon) on an abuse
liability, kinetics of nicotine absorption, and puffing topography assessment of its BIDI® Stick
product. As FDA is aware, abuse liability – or the ability of the product to promote continued
use, and the development of addiction and dependence – can be relevant to determining the
likelihood that addicted users of one nicotine product would switch to another. Specifically, Bidi
Vapor executed an assessment of abuse liability (incorporating nicotine pharmacokinetic and
subjective effects measures) and puffing topography in users of BIDI® Stick in comparison to
another ENDS product (JUUL) and combusted cigarettes. As noted in previous PMTA
amendments, this product specific clinical study, as well as Bidi Vapor's perception and
intention behavioral studies that are also nearing completion, will allow for additional bridging to



the published literature included in PMTA PM0003460 and its amendments. Bidi Vapor asserts that the PK and subjective effects data will facilitate a robust examination of the abuse liability of BIDI® Stick relative to combusted cigarettes and the comparator ENDS product (JUUL). In this Ninth PMTA Amendment, **Bidi Vapor seeks to update FDA on the progress of the now completed abuse liability study as the final study report and raw data are being prepared and expected to be submitted to the Agency by the end of December 2021.**

      **Bidi Vapor has published a preprint journal article[3] describing the study that will be subject to peer review**. The research paper, entitled "A Randomized, Crossover Clinical Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI® Stick ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers," describes the findings from the study in adult smokers aged 21 to 65 who smoked at least 10 factory-manufactured cigarettes a day. Researchers completed the clinical pharmacokinetic or "PK" study in August of this year to assess both the kinetics of nicotine uptake and the subjective experiences in smokers when they used the BIDI® Stick. The authors found that the BIDI® Stick ENDS may be a satisfying alternative to cigarettes among current adult smokers, including those who find it difficult to quit or who are not interested in quitting smoking. Accordingly, we hereby amend Module 5 Section 5.2 of the Company's PMTAs with this updated study information and the enclosed preprint manuscript as published (see **Attachment 2** hereto). The study has also been registered on ClinicalTrials.gov[4]. Bidi Vapor will provide the final study report and raw data to FDA in a future PMTA amendment as soon as these are available.

### IV.   Update on PBI Study Status (Amend PMTA Module 6 Section 6.2.1)

      In prior PMTA Amendments (*see, e.g.,* Fourth PMTA Amendment submitted on September 8, 2021) and correspondence to FDA dated August 27, 2021, Bidi Vapor informed FDA that Bidi Vapor has also engaged McKinney Regulatory Science Advisors, LLC and Russell Burnett Research and Consultancy Ltd ("RBRC") to conduct additional quantitative research studies, including the PBI Study. The PBI Study is a cross-sectional, internet-based survey study of risk perceptions and behavioral intentions in relation to the BIDI® Stick ENDS in

---

[3] Fearon, I.M. et al. A Randomised, Crossover, Clinical Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI Stick ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers; November 24th, 2021 (DOI: https://doi.org/10.21203/rs.3.rs-1106788/v1) (available at https://assets.researchsquare.com/files/rs-1106788/v1/1c4725d1-7a50-4790-aa9c-e3b1492f9ac1.pdf?c=1637787276).

[4] "BIDI Stick ENDS Abuse Liability and Puffing Topography Assessment; ClinicalTrials.gov Identifier: NCT05072925 (available at https://clinicaltrials.gov/ct2/show/NCT05072925).



11 flavor profiles among large, U.S. nationally representative samples of adult current combusted cigarette smokers, former smokers, and non-smokers of combusted cigarettes.

We previously informed FDA that the current expected timeline for reporting of these studies is Q1 of 2022 for end of data collection and preliminary data analysis, and Q2 of 2022 for submission of the final report to FDA. We now seek to update FDA on these timelines as the study progresses. **The PBI study is proceeding as planned, and the study has qualified for an Institutional Review Board (IRB) exemption by Advarra, Inc. on November 24, 2021. Study recruitment has begun and data collection should be completed by end of December 2021.** Preliminary results are expected in January 2022. The final report is expected to be submitted to FDA by the end of February 2022. Bidi Vapor has provided PBI Study Documents, including the PBI Study protocol, example data tables, questionnaire, and informed consent form, to FDA in a prior Amendment.

## V.  Status of Stability Testing (Update Module 3 PMTA Section 3.3.3.2)

As provided in Section 3.3.3.2 of its PMTAs, Bidi conducted real time stability testing for pH, boiling point, specific gravity, viscosity, water activity at condition of 25±2 ℃ and 60%±5% RH for total duration of 24 months. The study consisted of four time points: 0 time, 6 months, 12 months and 24 months for both the e-liquid and the finished BIDI® Stick product. The 12-month stability testing has been completed and the report is being finalized, and results will be provided to FDA as soon as they are available via another PMTA amendment.

## VI.  Marketing Plan Update (Update Module 2 PMTA Section 2.4.2)

Bidi would like to amend Section 2.4.2 of its PMTAs with the marketing information and restrictions noted in the attached, updated Bidi Vapor Marketing Plan (**Attachment 3**). Specifically, Bidi Vapor seeks to provide FDA with Bidi Vapor's updated Marketing Plan summarizing Bidi Vapor's youth access restriction measures and six-month messaging strategy.

## VII.    Conclusion

Bidi Vapor would like to amend PMTA Module 2 Section 2.4.2, Module 3 Section 3.3.3.2, Module 5 Section 5.2, Module 5 Section 5.3, and Module 6 Section 6.2.1 of its PMTAs with the information contained herein. Our expectation is that Bidi Vapor's continued efforts to improve its timely-submitted PMTAs during the pandemic demonstrate substantial progress on its applications as detailed in this amendment (and as will be described further in our future amendments). Furthermore, it is our expectation that Bidi Vapor's PMTA will be given due consideration by FDA during the scientific review process. As we complete our ongoing clinical,



behavioral and analytical studies, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

*     *     *     *

This PMTA amendment submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

We appreciate FDA's careful consideration of this ninth PMTA amendment to PM0003460 and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH determination for our BIDI® Stick products.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor LLC

A0112



**Enclosures:**

**Attachment 1** – BIDI® Stick POU Final Report
- **Attachment 1a** – BIDI® Stick POU Final Survey
- **Attachment 1b** – BIDI® Stick POU Final Statistical Analysis Plan
- **Attachment 1c** – BIDI® Stick POU Final Dataset
- **Attachment 1d** – BIDI® Stick POU Final Dataset with Value Labels
- **Attachment 1e** – BIDI® Stick POU Final Protocol

**Attachment 2** – PK/Abuse Liability Assessment Preprint Article
**Attachment 3** – Updated Bidi Vapor Marketing Plan

participants has an average age of 46 years old with a median age of 45 years old. People who smoke nicotine less than 6%, still smoke cigarettes or use it together with vape products.

Total sixth questions,which asked to the 211 respondents if they still smoke cigarettes until now resulted in the following: 112 (53.08%) participants claimed that they no longer smoke; 35 (16.59%) participants said they never tried cigarette smoking; 19 (9.00%) participants answered that they still smoke once a day; 23 (10.90%) participants mentioned that they smoke a few times a week; 10 (4.74%) participants answered that they still smoke a few times a month; and 12 (5.69%) participants stated that they smoke cigarettes less than a few times a month.See Module 5.3.

## 1.2.9.2 SURVEY ON BIDI™ STICK USAGE AND POTENTIAL IMPACT

The second survey conducted internally by Bidi Vapor to its customer base yielded a total of 205 respondents (non-duplicates), which was determined through the number of responses gathered through the survey. Most adult vape users prefer flavors in their use of vape products.

When asked about the reason behind their use of electronic nicotine products, around 58.6% answered that it was because of flavors; 50.3% said it was because the product has no smell; and around 47.6% said it was because some areas allow the use of these products compared to traditional cigarettes.

Vaping helped them use less cigarettes. About 11% of the respondents said they were a dual user (using both electric nicotine products and cigarette sticks) for less than 3 months. About 8% said they were dual users for more than 1 year, and 7% said they were dual users for about 3-6 months. See Module 5.3.

## 1.2.9.3 SURVEY FOR BIDI™ CONSUMER INSIGHTS

The third survey, facilitated by Technomics, Inc. 2020, deployed a 15-minute online survey of consumers ages 21+ who use electronic/vape products. The survey comprising of data collected from 1,001 consumers. It has 4 types of respondents: Convert, Dual user, new singular user, and the Past users which were recognized in the survey.

QuikfillRx LLC is engaged as a strategic market search agency appointed by Bidi Vapor LLC. To best support Bidi Vapor as it prepares to file its Premarket Tobacco Filing Application (PMTA) and to position Bidi as an informed and responsible product marketer, QuikfillRx is seeking to obtain current, relevant insights developed by credible third-party research providers.

The third survey from Technomics Inc., also found out that use of flavored products (47%) and vape products being less harmful than traditional cigarettes (46%) are primary drivers for

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of BIDI VAPOR LLC.*

17 participants (9.95%) use it a few times a month; 6 participants (2.84%) use vape less than ten times a month; and 151 participants (71.56%) use the Bidi™ Stick once a day.

These Bidi™Stick users were asked if they still smoke cigarettes, and the results are as follows: 112 participants (53.08%) claimed that they no longer smoke; 35 participants (16.59%) said they never tried cigarette smoking; 19 participants (9.00%) answered that they still smoke once a day; 23 participants (10.90%) mentioned that they smoke a few times a week; 10 participants (4.74%) answered that they still smoke a few times a month; and 12 participants (5.69%) stated that they smoke cigarettes less than a few times a month.

When asked how likely they are to use cigarettes again, 45 participants (21.33%) said that they are unlikely to smoke again; 43 participants (20.38%) answered that they are neutral to the question; 3 participants (1.42%) responded that they are still likely to smoke cigarettes; 6 participants (2.84%) said that they are highly likely to smoke; and 114 participants (54.03%) answered that they are highly unlikely to use cigarettes again for smoking.

In terms of the respondents' health after using the Bidi™ Stick,  8 participants (3.79%) noticed that they feel worse than before vaping; 100 participants (47.39%) answered that there is no difference at all; 34 participants (16.11%) said that they notice massive improvements in their general health; and 69 participants (32.70%) responded that there are slight improvements in their general health.

They were also asked to share the impact of using the Bidi™ Stick on their smoking behavior. This question is an open-ended field, and only 122 participants (57.8%) answered, and 89 participants (42.2%) did not share their answers. The results are as follows: 10 participants (4.7%) said that the Bidi**™** Stick improved/eliminated the smell of smoke; 11 participants (5.2%) answered that it reduced their cigarette use; 13 participants (6.3%) responded that it has helped them quit/replace cigarette use; 5 participants (2.4%) mentioned that the Bidi™Stick is calming; 14 participants (6.6%) said that it improved their health or energy; 3 participants (1.4%) find the Bidi™Stick convenient; 33 participants (15.6%) answered that the Bidi™Stick has no impact to them at all; and 41 participants (19.4%) said that they use it for different reasons.

The overall survey results from all participating Coalition members further supports that the marketing of BID™ STICK is APPH (the "Coalition Survey").  Over 9,000 participants provided responses in the combined analysis.  The results were largely consistent with the BIDI VAPOR survey.

When asked about the reason why they use electronic nicotine products, out of 9,439 respondents (96%), there are 64.79% who claimed that such products are less harmful than other forms of tobacco, like traditional cigarettes. Meanwhile, there are 55.87% who said that electronic nicotine products are less harmful to other people around them, 56.28%

_**Confidentiality Statement:** Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of BIDI VAPOR LLC._

     o **MN assay**-BIDI® Stick Classic aerosol condensate generated under intense puffing conditions (110/6/30) was positive for genotoxicity.


**Conclusion**

In response to this deficiency, Bidi Vapor conducted *in vitro* cytotoxicity (NRU) studies and a battery of nonclinical *in vitro* genotoxicity studies [Ames and micronucleus assay] using aerosols generated from the BIDI® Stick Classic product using non-intense (55ml over 3s, every 30s) and intense (110ml over 6s, every 30s) puffing conditions. In addition, published data and information on cigarette and ENDS comparator products are included for hazard identification comparison. Bidi Stick *in vitro* study results show…

- Less cytotoxicity when compared to smoke from combusted cigarettes and comparable to ENDS comparator products

- Negative Ames mutagenicity, which is opposite a cigarette smoke (positive mutagenicity) and similar to ENDS comparators

- Equivocal MN genotoxicity under non-intense puffing and positive genotoxicity under intense puffing, which is similar to cigarette smoke and ENDS comparators

Although in vitro screening assays can provide supplemental information for hazard identification, the determination of potential exposures and associated cancer risks and non-cancer hazards from the BIDI® Stick Classic product relative to use of combusted cigarettes and other comparator products is conducted based on the aerosol chemistry characterization. The overall substantial reductions observed in the levels of HPHCs in BIDI® Stick Classic aerosols compared to cigarette smoke support likely reductions in user exposures and associated health hazards from use of the BIDI® Stick Classic product.

**22.5  Deficiency Letter Question 22 Attachment Files**

The following files are available in the "Q22_Attachment" folder.

1. 0423-023-24-TobaccoReport.xlsx

2. 0423-023-25-TobaccoReport.xlsx

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

CONFIDENTIAL



December 17, 2021

**Niraj Patel, CEO**
**(321) 223-3101**
**raj@bidivapor.com**

**Via CTP Portal**                    **PMTA Tenth Amendment: PM0003460**

U.S. Department of Health and Human Services
Food and Drug Administration                    **CONTAINS CONFIDENTIAL**
Center for Tobacco Products                    **BUSINESS INFORMATION**
Office of Science
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**RE**: Bidi Vapor LLC; Tenth Amendment to Premarket Tobacco Product Applications
for BIDI® Stick ENDS; FDA Submission Tracking Number (STN): PM0003460

**I.   Background**

On September 8, 2020, Bidi Vapor LLC ("Bidi Vapor" or the "Company") timely
submitted to the U.S. Food and Drug Administration ("FDA" or the "Agency") Premarket Tobacco
Product Applications ("PMTAs") for eleven (11) BIDI® Stick electronic nicotine delivery system
("ENDS") products. The PMTAs are identified by Submission Tracking Number ("STN")
PM0003460.

As described in detail in the company's PMTA amendments (STN PM0003460) submitted
on October 13, 2020, March 23, 2021, April 20, 2021, September 8, 2021, September 16, 2021,
October 24, 2021, October 29, 2021, November 5, 2021, and December 3, 2021, while no
deficiency letters have been received for any of the BIDI® Stick PMTAs to date, Bidi Vapor has
continued to make substantial progress on its applications despite continuing to face on-going
COVID-19 related business and logistical challenges. In addition to the significant data provided
in the original September 8, 2020 submissions, Bidi Vapor has continued to develop product-
specific scientific evidence to support that its flavored ENDS are appropriate for the protection of
the public health (APPH). Specifically, Bidi Vapor is continuing to develop robust and reliable
evidence intended to demonstrate that the potential benefits of the BIDI® Stick ENDS products for
adult combusted cigarette smokers outweigh any risks to youth posed by flavored ENDS. This
includes several behavioral studies designed to measure product perception and intention (*e.g.*,
likelihood of use, behavioral intentions, and patterns of use of the BIDI® Sticks), as well as a
clinical pharmacokinetic ("PK") study designed to measure the abuse liability/dependence



potential of the BIDI® Sticks and the exposure to nicotine during product use (compared to combusted cigarettes and JUUL). As noted in previous PMTA amendments, these product-specific studies will allow for additional bridging to the published literature included in PMTA PM0003460 and its amendments.

The purpose of this **Tenth PMTA Amendment** is to: (1) provide FDA with the final study report for one of its tobacco product perception and intention ("TPPI") studies, the BIDI® Stick likelihood of use ("LOU") study; (2) provide FDA with completed 12-month ambient stability testing reports for all eleven flavors of BIDI® Stick; and (4) submit summary and report of a toxicological human health risk assessment study of aerosol HPHCs and other compounds.

## II. Kantar Health LLC/Cerner Enviza TPPI Study on BIDI® Stick: Likelihood of Use and Patterns of Use Studies (Amend PMTA Module 6 Section 6.2.1)

As described in prior PMTA amendments, Bidi Vapor engaged Kantar Health, LLC, now Cerner Enviza[1], to conduct a quantitative tobacco product perception and intention ("TPPI") study for the BIDI® Stick ENDS product: the Likelihood of Use ("LOU") study. Bidi Vapor initiated this study following release of FDA's draft TPPI guidance[2] to address, among other things, perceptions and intentions, likelihood of use, including dual use, and label comprehension.

### Likelihood of Use Study

The BIDI® Stick LOU study was administered between May and August 2021 to participants age 21 years and older using a web-based survey to assess tobacco use behavior, perceptions, and intentions. **Data from the LOU study has been compiled into a final report (Attachment 1) and summarized below.** Key Study findings for each BIDI® Stick include the following observations:

- Tobacco/nicotine products (TNP) non-users, both former and never users, reported no interest in using BIDI® Stick based on average Juster scale ratings below 1.0 on the 11-

---

[1] On April 1, 2021 Cerner Corporation completed the acquisition of Kantar's Health Division, which is has now rebranded as "Cerner Enviza" Cerner Corporation announced the launch of the new Cerner Enviza operating unit in late October 2021 (*see* Cerner Corporation, News Release: "Cerner Enviza Aims to Accelerate Therapies and Improve Patient Outcomes" (October 26, 2021) https://www.cerner.com/newsroom/cerner-enviza-aims-to-accelerate-therapies-and-improve-patient-outcomes)

[2] U.S. Food & Drug Admin., Draft Guidance for Industry, Tobacco Products: Principles for Designing and Conducting Tobacco Product Perception and Intention Studies (October 2020) (available at https://www.fda.gov/media/143322/download).



point scale, representing "no chance" of using the product. This finding was the same regardless of the BIDI® Stick flavor being assessed.

- Young adult TNP non-users. reported no interest in using BIDI® Stick as based on average Juster scale ratings below 1.0 on the 11-point Juster scale, representing "no chance" of using the product. This finding was the same regardless of the BIDI® Stick flavor being assessed. FDA has stated that young adults' behavior may serve as a surrogate for youth behavior.

- Current cigarette smokers indicated a statistically significant greater intention to try and use BIDI® Stick regularly compared to TNP non-users. Nevertheless, Juster scale ratings measuring intentions to try were overall low for all cohorts.

- Greater than 50% of all current cigarette smokers with or without intention to quit smoking, and indicating an interest in trying BIDI® Stick, reported that they would use the BIDI® Stick to reduce *and* completely quit cigarette smoking.

- Current ENDS users reported lower intentions to use BIDI® Stick Classic, a tobacco-flavored product, but reported higher intentions to use flavored or menthol-flavored BIDI® Stick products.

Although the Patterns of Use study (*see* Ninth PMTA Amendment submitted on December 3, 2021) indicated that respondents view BIDI® Stick to have a lower health risk than combustible cigarettes, the same health risk as other ENDS, and a greater health risk than not using any TNP, the much larger LOU study found that all respondents, regardless of TNP use history, associated daily use of BIDI® Stick to carry the same level of risk as using combustible cigarettes. Respondents' perception that ENDS and BIDI® Stick have the same health risk as cigarettes in the LOU study may be the primary driver of the low average likelihood to use based on Juster scale values for cigarette smokers. Nevertheless, both studies clearly revealed that all consumers understand that use of BIDI® Stick is not safe or without risks to health.

## III. Toxicological Human Health Risk Assessment of Aerosol HPHC's (Update Module 4 PMTA Section 4.2.2)

A human health risk assessment was conducted to evaluate the potential health effects (noncancer and cancer) of exposure to aerosol from BIDI® Stick Classic (60 mg/ml) and Arctic (60 mg/ml) products. Approximately 33 compounds listed as harmful or potentially harmful constituents (HPHCs) or otherwise proposed by FDA for evaluation were analyzed, including carbonyls, metals, tobacco-specific nitrosamines (TSNAs), volatile organic compounds (VOCs), esters, humectants and impurities, and other ingredients (**Attachment 2a-2h**). A wide range of



potential consumer exposure scenarios were estimated using two puffing regimens (intense and non-intense) that represent human consumption scenarios (typical and heavy consumption). The health risk estimates determined from exposure to aerosol of Bidi Vapor products were compared with risk estimates of exposure to smoke yields from combustible cigarettes; aerosol yields of heat-not-burn (HnB) products (e.g., IQOS and tobacco heating product); and aerosol yields of other disposable closed-system ENDS.

Overall, the study found an estimated reduction in potential risk for key health hazards of cancer, respiratory toxicity, cardiovascular toxicity, and reproductive and developmental toxicity in the population of adult users, even under heavy consumption scenarios, compared with the estimated potential health risks from lifetime combustible cigarette use and comparator HnB and ENDS products. Absolute risk estimates are low and below levels of toxicological concern or within acceptable risk ranges for inhaled compounds. Bidi Vapor will include ingredient risk assessment reports with the next amendment.

### IV. Status of Stability Testing (Update Module 3 PMTA Section 3.3.3.2)

As provided in Section 3.3.3.2 of its PMTAs, Bidi conducted real time stability testing for pH, boiling point, specific gravity, viscosity, water activity at condition of 25±2 ºC and 60%±5% RH for total duration of 24 months. The study consisted of four time points: 0 time, 6 months, 12 months and 24 months for both the e-liquid and the finished BIDI® Stick product. The 12-month stability testing has been completed and the reports are provided herein **(Attachment 3a – 3k)**. Key Study findings for each BIDI® Stick include the following observations:

- BIDI® Stick is consistently manufactured and stable for up to 24 months when stored at ambient temperatures.

- BIDI® Stick aerosol HPHCs are below or similar to HPHC levels in FDA authorized products (e.g., combustible cigarettes, IQOS).

- BIDI® Stick nicotine levels were within the product release specifications and in line with packaging labels (60 mg/mL).

- BIDI® Stick e-liquid does not support microbial growth.

CONFIDENTIAL



## V. Conclusion

Bidi Vapor would like to amend PMTA Module 3 Section 3.3.3.2, Module 4 Section 4.2.2, and Module 6 Section 6.2.1 of its PMTAs with the information contained herein. Our expectation is that Bidi Vapor's continued efforts to improve its timely-submitted PMTAs during the pandemic demonstrate substantial progress on its applications as detailed in this amendment (and as will be described further in our future amendments). Furthermore, it is our expectation that Bidi Vapor's PMTA will be given due consideration by FDA during the scientific review process. As we complete our ongoing clinical, behavioral, and analytical studies, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

\*       \*       \*       \*

This PMTA amendment submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

We appreciate FDA's careful consideration of this tenth PMTA amendment to PM0003460 and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH determination for our BIDI® Stick products.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.



Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor LLC


**Enclosures:**

**Attachment 1** – BIDI® Stick LOU Final Report
- **Attachment 1a** – BIDI® Stick LOU Final Survey Questionnaire
- **Attachment 1b** – BIDI® Stick LOU Final Statistical Analysis Plan
- **Attachment 1c** – BIDI® Stick LOU Final Dataset
- **Attachment 1d** – BIDI® Stick LOU Final Dataset with Value Labels
- **Attachment 1e** – BIDI® Stick LOU Final Protocol
- **Attachment 1f** – BIDI® Stick LOU Final Cognitive Interview Report

**Attachment 2** – Human Health Risk Assessment of Aerosol HPHCs and Other Compounds in Aerosol of Bidi® Stick Classic and Arctic Products
- **Attachment 2a** – Human Health Risk Assessment of Aerosol HPHCs and Other Compounds in Aerosol of Bidi® Stick Classic and Arctic Products Report
- **Attachment 2b** – Human Health Risk Assessment of Aerosol HPHCs and Other Compounds in Aerosol of Bidi® Stick Classic and Arctic Products Summary Presentation
- **Attachment 2c** – HPHC and Target Constituent Guidance Value Selection
- **Attachment 2d** –TCT Aerosol Testing Data (TCT200629C060 Aerosol Report-BS6-CT-001)
- **Attachment 2e** – TCT Aerosol Testing Data (0421-018 QA Final Report)
- **Attachment 2f** – Device Puff Data (TCT210910C001-Artic BS6-MF)
- **Attachment 2g** – Device Nicotine Yield Data (TCT210910C002-Artic BS6-MF)
- **Attachment 2h**– Device Nicotine Yield Data (TCT210910C042-Classic BS6-CT)

**Attachment 3a –3k** – Stability Reports for 11 BIDI® Stick ENDS



**Niraj Patel, CEO**
**(321) 223-3101**
**raj@bidivapor.com**

<u>**Via CTP Portal**</u>                    <u>**PMTA Twelfth Amendment: PM0003460**</u>

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products            **CONTAINS CONFIDENTIAL**
Office of Science                      **BUSINESS INFORMATION**
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002


**RE**: **Bidi Vapor, LLC; Twelfth (12th) Amendment to Premarket Tobacco Product Applications for BIDI® Stick ENDS; FDA Submission Tracking Number (STN): PM0003460**

**I. Background**

On September 8, 2020, Bidi Vapor LLC ("Bidi Vapor" or the "Company") timely submitted to the U.S. Food and Drug Administration ("FDA" or the "Agency") Premarket Tobacco Product Applications ("PMTAs") for eleven (11) BIDI® Stick electronic nicotine delivery system ("ENDS") products. The PMTAs are identified by Submission Tracking Number ("STN") PM0003460. PMTA PM0003460 has not been the subject of any deficiency letters, and the marketing denial order (MDO) issued with respect to the non-tobacco flavored products on September 7, 2021 was stayed by the Eleventh Circuit Court of Appeals on February 1, 2022.[1]

Despite receiving the MDO and continuing to deal with on-going COVID-19 related business and logistical challenges, Bidi Vapor has continued to supplement its original, comprehensive PMTA submission with product-specific scientific evidence to support that its products are appropriate for the protection of the public health ("APPH"), as described in the company's previous PMTA amendments submitted on October 13, 2020, March 23, 2021, April 20, 2021, September 8, 2021, September 16, 2021, October 24, 2021, October 29, 2021, November 5, 2021, December 3, 2021, December 17, 2021, and December 23, 2021.

---

[1]     *See* Bidi Vapor, LLC v. U.S. Food and Drug Administration, et al., Case No. 21-13340 (11th Circ. 2022).



Specifically, as described in this and previous amendments, Bidi Vapor has developed (and continues to develop) additional robust and reliable evidence intended to demonstrate that the benefits of the BIDI® Stick ENDS products for adult combustible cigarette smokers outweigh any potential risks to youth posed by non-tobacco flavored ENDS. As FDA knows, this includes several product-specific behavioral studies designed to measure product perception and intention (*e.g.*, likelihood of use, behavioral intentions, and patterns of use of the BIDI® Sticks), as well as a randomized, clinical pharmacokinetic ("PK") study designed to measure the abuse liability and dependence potential of the BIDI® Sticks and the exposure to nicotine during product use (compared to combustible cigarettes and tobacco-flavored JUUL comparator products). As noted in previous PMTA amendments, these product-specific studies will allow for additional bridging to the published literature included in PMTA PM0003460 and its amendments.

The purpose of this **Twelfth PMTA Amendment** is to provide FDA with: (1) the completed toxicological ingredient risk assessment of the BIDI® Stick Arctic (menthol) and Classic (tobacco) products; (2) the final study report and data files for Bidi Vapor's third product-specific behavioral study, the Perceptions and Behavioral Intentions ("PBI") Study; and (3) a status update of the Company's fourth (on-going) product-specific behavioral study, a third-party online survey study of the prevalence and patterns of use of cigarettes and e-cigarettes among nationally representative samples of youth, young adults, and older adults in the United States ("Population Prevalence Study").

## II. Completed Toxicological Ingredient Risk Assessment of BIDI® Stick Arctic and Classic (Amend Module 4 PMTA PM0003460 Section 4.2.2)

In Bidi Vapor's Tenth Amendment submitted to FDA on December 17, 2021, the company provided FDA the results of a toxicological human health risk assessment of harmful and potentially harmful constituents ("HPHCs") in the aerosol of the BIDI® Stick. This study found an estimated reduction in potential risk for key health hazards of cancer, respiratory toxicity, cardiovascular toxicity, and reproductive and developmental toxicity in the population of adult users, even under heavy consumption scenarios, compared with the estimated potential health risks from lifetime combustible cigarette use and comparator heat-not-burn ("HnB") and ENDS products. Absolute risk estimates are below levels of toxicological concern or within acceptable risk ranges for inhaled compounds. In the Tenth Amendment, Bidi Vapor informed FDA that it would submit ingredient risk assessment reports in a forthcoming amendment.

Bidi Vapor now seeks to provide this ingredient risk assessment information. More specifically, an ingredient screening risk assessment was conducted to characterize the potential individual health risk of ingredients of certain BIDI® Stick products (i.e., the BIDI® Stick Arctic (menthol) and the BIDI® Stick Classic (tobacco)) from inhalation exposure, with a focus on the flavoring and primary carrier ingredients (which are common to all BIDI® Stick products). Potential human health risk was characterized for each ingredient by determining the margin of exposure ("MOE") risk estimate based on estimated inhalation exposure levels, or by



determining Hazard Quotients ("HQs") for the primary carrier ingredients of propylene glycol and glycerol measured in the aerosol. Both risk quotients present the ratio between the anticipated consumer exposure and the daily exposure at which toxicological effects are not anticipated to occur. The results of this screening risk assessment provide support that the Bidi Vapor products are APPH. Specifically, the ingredient risk assessment resulted in the following findings:

- The e-liquids used in the BIDI® Stick do not contain flavor ingredients or primary humectants that are classified as carcinogens (from an exposure route relevant to inhalation); reproductive/developmental toxicants (from an exposure route relevant to inhalation); genotoxicants or mutagens; respiratory sensitizers; or repeated exposure toxicants.

- The primary carrier ingredients, propylene glycol and glycerol, are at levels in the aerosol resulting in low toxicological concern as defined as a target risk ratio (H.Q) of ≤ 1.0 as set forth by the USEPA and codified in 40 CFR § 300.430 ("Remedial investigation/feasibility study and selection of remedy").

- The flavor ingredients are present at levels that would result in estimated consumer exposure levels below thresholds of toxicological concern ("TTC") or health-based guidance values (MOE ≥ 1.0) under typical use and heavy use scenarios.

- Flavoring ingredients were determined to be at levels that do not indicate a potential hazard from acute toxicity.

- The heat degradation products expected from the primary ingredients have been evaluated and determined to be of low toxicological concern, and result in cancer and noncancer health risks substantially below the risks anticipated from combustible cigarettes.

See enclosed Toxicological Ingredient Risk Assessment Report and Attachments.

### III. Completed PBI Study (Amend PMTA PM0003460 Module 6 Section 6.2.1)

In prior PMTA Amendments (*see, e.g.*, the Fourth and Eleventh PMTA Amendments submitted on September 8, 2021, and December 23, 2021, respectively), as well as in correspondence to FDA dated August 27, 2021, Bidi Vapor informed the Agency that it had engaged McKinney Regulatory Science Advisors, LLC and Russell Burnett Research & Consultancy Ltd ("RBRC") to conduct an additional, product-specific, primary quantitative research study – the Perceptions and Behavioral Intentions ("PBI") Study of the BIDI® Stick E-



Cigarette – to supplement the company's Likelihood of Use ("LOU") behavioral study, the results of which were submitted as part of the Tenth PMTA Amendment on December 17, 2021.

The PBI Study is a product-specific cross-sectional, internet-based survey study of risk perceptions and behavioral intentions in relation to all 11 flavor profiles of the BIDI® Stick among large, U.S. nationally representative samples of adult current smokers, former smokers, and non-smokers of combustible cigarettes. Specifically, the study provides estimates of the probabilities that legal age adult tobacco users and non-users will trial, purchase, and regularly use the BIDI® Stick ENDS in each flavor profile if marketed in the United States. This study also provides estimates of how legal age adult tobacco users and non-users may perceive the health and addiction risks of using a BIDI® Stick ENDS in addition to, in place of, or instead of other tobacco products. Data from the PBI study has been compiled into a final report provided herein. Supporting data files are also enclosed.

The study questionnaire was completed by 8,056 adults old enough to purchase tobacco products in the United States (21 years and over) between December 7, 2021 and January 7, 2022. Overall, findings support the role of each flavor of BIDI® Stick as providing an option for adult smokers to move away from combustible cigarettes. Consistent with Bidi Vapor's LOU Study, the PBI study also found that, for each of the 11 flavors of BIDI® Stick ENDS, Current Smokers and E-Cigarette Current Users were, after adjustment for sociodemographic covariates, statistically significantly more likely than Non-Smokers and E-Cigarette Non-Users, respectively, to report a positive intention to trial, purchase to try, and regularly use each flavor of the BIDI® Stick. Approximately 1-in-5 Current Smokers would be likely to use a BIDI® Stick ENDS in at least one flavor to facilitate complete switching or reduction in combustible cigarette smoking, if they tried a BIDI® Stick ENDS and liked it enough to continue using it.

Specifically, study results suggest that:

- The BIDI® Stick ENDS in each flavor is likely to be acceptable to a moderate-high proportion of adult smokers as a partial or complete replacement for combustible cigarettes.

- Marketing of the BIDI® Stick ENDS in the current range of flavors may be effective for stimulating thoughts about switching or reducing cigarette consumption among adult smokers who are not planning to quit smoking in the near future.

- Exposure to the BIDI® Stick ENDS in each of 11 flavors generated moderate-high levels of positive intention to trial, purchase to try, and regularly use each BIDI® Stick flavor among legal age adults who currently smoke combustible cigarettes and/or currently use e-cigarettes.



- Exposure to the BIDI® Stick ENDS in each of 11 flavors generated low levels of positive intention to trial, purchase, and regularly use each BIDI® Stick flavor among legal age adults who have never used, have never regularly used, or do not currently smoke combustible cigarettes and/or use e-cigarettes.

- Current Smokers perceived a switch from smoking cigarettes to using a BIDI® Stick ENDS as the third-best option available to them behind a switch to nicotine replacement therapy (NRT) products (second-best option) and cessation of all tobacco and nicotine product use (best option).

- Former Smokers and Non-Smokers were clear and consistent in their beliefs that starting or restarting to use any tobacco product in the future, even occasionally, whether the product is combustible cigarettes, e-cigarettes in general, or a BIDI® Stick ENDS in particular, would substantially increase their long-term health risks.

Significantly, these study results were largely consistent across all 11 flavor profiles. We believe these results, when reviewed in combination with the company's other studies submitted to FDA to date, support that continued marketing of each BIDI® Stick ENDS flavor would be APPH.

### IV. Update on Population Prevalence Study (Amend PM0003460 Module 6 Section 6.2.1)

Based on the PMTA Final Rule (86 Fed. Reg. 55368), Bidi Vapor understands that FDA does not require research to be conducted on individuals below the minimum age of sale (21 years) and does not anticipate that such research will be necessary for PMTA authorization because inferences regarding individuals below the minimum age of sale may potentially be extrapolated from young adults (21-24 years). Thus, FDA has made clear that testing minors is not necessary and that young adults can be surrogates. FDA has also made clear, however, that the risk that ENDS, particularly non-tobacco flavored ENDS, pose to youth is paramount to the APPH determination.

Given this reality, and in order to better demonstrate that Bidi's products provide a significant benefit to adult smokers while **not** posing any substantial risk to youth, Bidi Vapor is participating in a population prevalence and patterns of use study that is being conducted and entirely self-funded by the Centre of Substance Use Research Ltd. ("CSUR"), a third-party research organization wholly independent of Bidi Vapor. This study is a cross-sectional online survey designed to estimate the prevalence and patterns of use of combustible cigarettes, e-cigarettes, e-cigarette brands, and individual e-cigarette devices among nationally representative samples of youth aged 13 to 17 years (who are the children of adult members of KnowledgePanel), young adults aged 18 to 24 years (who are either members of KnowledgePanel or the opt-in panel), and older adults aged 25 years and above. The survey



instrument will be administered to nationally representative samples of approximately 1,200 youths, 3,000 young adults, and 3,000 older adults.

The objectives of the Population Prevalence Study are:

- To describe and characterize the prevalence and patterns of use of BIDI® Stick among nationally representative samples of youth, young adults, and older adults.
- To describe and characterize the prevalence and patterns of use of combustible cigarettes among nationally representative samples of youth, young adults, and older adults.
- To describe and characterize the prevalence and patterns of use of e-cigarettes among nationally representative samples of youth, young adults, and older adults.
- To describe and characterize the prevalence and patterns of use of combustible cigarettes among users of the BIDI® Stick.
- To describe and characterize the prevalence and patterns of use of BIDI® Stick among smokers.
- To describe and characterize the prevalence and patterns of use of combustible cigarettes, e-cigarettes, BIDI® Stick by age, sex, race-ethnicity, and census region among nationally representative samples of youth, young adults, and older adults.

Population Prevalence Study Timing:

- April 2022 – IRB approval obtained (see enclosed)
- May 2022 – Start of data collection (estimate)
- June 2022 – End of data collection (estimate)
- July 2022 – Full study report and accompanying documentation (estimate)

Consistent with this timeline, Bidi Vapor anticipates receiving the full study report by the end of July 2022 and will provide results to FDA once available.

Bidi Vapor understands that this is an established approach and has been the subject of peer-reviewed publications in established scientific journals. See, e.g., the CSUR publications on JUUL prevalence.[2] Bidi Vapor has never itself tested youth and recognizes the risk that poses. As a responsible corporate citizen, Bidi Vapor does not engage in any research that could result in exposing any youth to nicotine or tobacco products. As detailed in the attachments hereto, this CSUR population prevalence study will use appropriate parental consent procedures and is

---

[2] *See*, *e.g.*, McKeganey N, Russell C. Prevalence of Awareness and Use of JUUL E-cigarettes in a National Probability Sample of Adolescents in the United States. Am J Health Behav. 2019 May 1;43(3):591-605. doi: 10.5993/AJHB.43.3.13. PMID: 31046889. *See also* Russell, C., McKeganey, N., Dickson, T. *et al.* Changing patterns of first e-cigarette flavor used and current flavors used by 20,836 adult frequent e-cigarette users in the USA. *Harm Reduct J* **15,** 33 (2018). https://doi.org/10.1186/s12954-018-0238-6.



CONFIDENTIAL

designed so that the rights, safety, and welfare of human subjects, including minors, are protected in accordance with ethical principles acceptable to the international community, such as those reflected in the ICH Good Clinical Practice standards.

Specifically, parental consent and youth assent will be obtained before any survey questions are shown to youth participants. Certain youth participants may be shown images of tobacco products to help them correctly identify any tobacco products they have used. Additional measures will be taken to limit youth exposure to questions about tobacco products and tobacco product imagery. Youth participants will not be shown any images of cigarettes. Youth participants will not be shown any images of e-cigarette brand logos or devices if they have never seen or heard of e-cigarettes or if they have never used an e-cigarette before this study. If youth participants report that they have not used a brand of e-cigarette, they will not be shown any images of e-cigarette devices made by that brand. Because the study involves individuals under the minimum age of sale, CSUR has developed a narrow research scope that is focused on key questions relating to use (e.g., prevalence of use and patterns of use. Further, youth participants will be informed that they are free to withdraw from the survey at any time for any reason by simply closing the browser, that they can refuse to participate in the survey, that they can stop at any time, and they may request their data to be withdrawn and destroyed anytime until the end of the study.

See Population Prevalence Study Protocol and supporting documents enclosed for more information.

## V. Conclusion

Accordingly, Bidi Vapor would like to amend PMTA (PM0003460) Module 4 Section 4.2.2 and Module 6 Section 6.2.1 for each of the BIDI® Stick applications with the information contained herein (i.e., ingredient toxicology, PBI Study, and Population Prevalence Study). Our expectation is that Bidi Vapor's continued efforts to improve its timely-submitted PMTAs during the pandemic demonstrate substantial progress on its applications. Furthermore, it is our expectation that Bidi Vapor's PMTA will be given due consideration by FDA during the scientific review process. As we complete our ongoing clinical, behavioral, and analytical studies, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

*        *        *        *

This PMTA amendment submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records

and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

We appreciate FDA's careful consideration of this eleventh PMTA amendment to PM0003460 and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH determination for our BIDI® Stick products.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor, LLC

**Enclosures:**

Toxicological Ingredient Risk Assessment (Amend Module 4 PMTA PM0003460 Section 4.2.2)

- Attachments 1 and 1a – 1i

Perceptions and Behavioral Intentions Study (Amend PMTA PM0003460 Module 6 Section 6.2.1)

- Attachments 2 and 2a – 2u

Population Prevalence Study (Amend PMTA PM0003460 Module 6 Section 6.2.1)

- Attachments 3 and 3a – 3e



Niraj Patel, CEO
(321) 223-3101
raj@bidivapor.com

**PMTA Fifteenth Amendment: PM0003460**                    **Via CTP Portal**

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products                   <span style="color:red">CONTAINS CONFIDENTIAL</span>
Office of Science                             <span style="color:red">BUSINESS INFORMATION</span>
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**RE**: Bidi Vapor LLC; Fifteenth Amendment to Premarket Tobacco Product Applications
for BIDI® Stick; FDA Submission Tracking Number (STN): PM0003460

    **I.    Background**

On September 8, 2020, Bidi Vapor LLC ("Bidi Vapor" or the "Company") timely submitted to the U.S. Food and Drug Administration ("FDA" or the "Agency") Premarket Tobacco Product Applications ("PMTAs") for eleven (11) BIDI® Stick electronic nicotine delivery system ("ENDS") products. The PMTAs are identified by Submission Tracking Number ("STN") PM0003460. To date, PMTA PM0003460 has not been the subject of any deficiency letters and the marketing denial order (MDO), issued with respect to the non-tobacco flavored products on September 7, 2021, was set aside (i.e., vacated) by the U.S. Court of Appeals for the Eleventh Circuit on August 23, 2022 for being arbitrary and capricious in violation of the Administrative Procedure Act.[1]

With respect to the Classic (tobacco-flavored) BIDI® Stick (PM0003460.PD2), on May 20, 2022, FDA informed Bidi Vapor that PM0003460.PD2 was entering Phase 3 scientific

---

[1] See *Bidi Vapor LLC v. U.S. Food and Drug Administration*, __ F.4th __, No. 21-13340, 2022 U.S. App. LEXIS 23607 (11th Cir. Aug. 23, 2022). The court determined that the MDO was arbitrary and capricious because FDA failed to consider all of the relevant evidence in the application, specifically Bidi Vapor's aggressive and comprehensive marketing and sales-access-restrictions plans. In setting aside the MDO, the court remanded PM0003460 back to FDA for further review. The Agency must now conduct a full, scientific review of the application, including this and all PMTA amendments submitted to date. See below Section IV, "Summary of Amendments Submitted to PM0003460 to Date".

review as of May 13, 2022.[2] On August 22, 2022, FDA began a PMTA-related Remote
Regulatory Assessment (RRA) of Bidi Vapor and its contract manufacturer, SMISS Technology
Co., Ltd. ("SMISS"), in relation specifically to the Classic BIDI® Stick (PM0003460.PD2).

      In addition to the significant data provided in the original September 8, 2020 submissions,
Bidi Vapor has continued to develop product-specific scientific evidence to support that its
ENDS, including the non-tobacco flavored ENDS, are appropriate for the protection of the public
health ("APPH"), as described in detail in the Company's previous PMTA amendments (see
Section IV below), and despite facing business and logistical challenges, including COVID-19
related issues.

      In the Twelfth PMTA Amendment submitted on May 20, 2022, Bidi Vapor informed
FDA that it was participating in a product-specific online behavioral survey study designed to
assess the prevalence and patterns of use of cigarettes and e-cigarettes among a nationally
representative sample of youth, young adults, and older adults in the United States ("Population
Prevalence Study of the BIDI® Stick"). Toward that end, the purpose of this **Fifteenth PMTA
Amendment** is to provide FDA with the final study report and data files for the Population
Prevalence Study of the BIDI® Stick. In addition, Bidi Vapor wishes to provide FDA with a
recently published preprint journal article covering the BIDI® Stick Likelihood of Use ("LOU")
study (LOU study final report submitted as part of the Tenth PMTA Amendment on December
17, 2021), as well as update the Agency on its own findings from the National Youth Tobacco
Survey and Monitoring the Future survey.

---

[2] In the May 20, 2022 e-mail from Donna N. Cheung (Donna.Cheung@fda.hhs.gov) to Niraj Patel
(raj@bidivapor.com) indicating that PM0003460.PD2 was entering scientific review on May 13, 2022, Dr. Cheung
noted that FDA began its scientific review of all information contained in the PM0003460.PD2 application, including
amendments that were received and processed by the day before the substantive review began, and that FDA is "not
obligated to review any amendments received after we begin scientific review." As noted below, we informed FDA
in a previous PMTA amendment of our on-going product-specific behavioral studies. In addition, the decision from
the Eleventh Circuit Court of Appeals makes clear that FDA must review all relevant evidence before it. Thus, as this
information is critical to the 'appropriate for the protection of the public health' analysis of PM0003460.PD2, we
respectfully request that FDA consider this Fifteenth PMTA Amendment, and all previous amendments, as part of its
scientific review of the application.

## II. Population Prevalence Study of the BIDI® Stick (Amend PMTA Module 6 Section 6.2.1)

Bidi Vapor participated[3] in a prevalence and patterns of use study conducted by Centre of Substance Use Research (CSUR) and approved by Advarra Institutional Review Board. The study was a cross-sectional online survey designed to estimate the prevalence and patterns of use of cigarettes and 11 variants of a BIDI® Stick among nationally representative samples of youth aged 13 to 17 years, young adults aged 18 to 24 years and older adults aged 25 years and above. The survey instrument was administered to a cross-sectional nationally representative sample of 1,215 youths, 3,370 young adults aged 18 to 24 years and 3,058 older adults aged 25 and over. We summarize the study results for 11 variants of a BIDI® Stick.

Respondents were asked about their lifetime and current use of BIDI® Stick that were available in the in the United States market. The study estimated the proportion of each age cohort that had ever used and currently used any of the 11 variants of a BIDI® Stick.

The results show that in June 2022, the prevalence of underage current use of a BIDI® Stick in the U.S. was very low for all 11 flavor variants (see data summary in Section II. A below). The results also demonstrate that the prevalence of underage current use of each individual flavor of BIDI® Stick was very low (see data in Table 1 through Table 4 below). For more details, please review Attachment 1.

### A. All BIDI® Stick Variants

**Adolescents (13-17 years):**

- 0.9% of adolescents have <u>ever</u> used a BIDI® Stick (estimated n = 190,000).

- 0.0% of adolescents <u>currently</u> use a BIDI® Stick (estimated n < 10,000).

- 0.0% of adolescents <u>frequently</u> use a BIDI® Stick (i.e., use on ≥20 of past 30 days) (estimated n < 10,000)

**Underage Young Adults (18-20 years) (n=1,125):**

- 3.9% of underage young adults have <u>ever</u> used a BIDI® Stick (estimated n = 470,000).

---

[3] Bidi Vapor only provided CSUR with product-specific materials (e.g., labels) and did not participate in any other aspect of the study, which was designed and conducted independently by CSUR. Bidi Vapor purchased access to the data and results being provided to FDA in this PMTA amendment.

- 0.1% of underage young adults <u>currently</u> use a BIDI<sup>®</sup> Stick (estimated n = 10,000).

**Legal Age Young Adults (21-24 years):**

- 3.6% of legal age young adults have <u>ever</u> used a BIDI<sup>®</sup> Stick (estimated n = 600,000).

- 0.4% of legal age young adults <u>currently</u> use a BIDI<sup>®</sup> Stick (estimated n = 60,000).

**Older Adults (25 years and older):**

- 0.4% of older adults have <u>ever</u> used a BIDI<sup>®</sup> Stick (estimated n = 890,000).

- 0.0% of older adults <u>currently</u> use a BIDI<sup>®</sup> Stick (estimated n < 10,000).

A0134

**Table 1 Adolescents (13-17 years) (n= 1,215) by Flavor**

| Use Status | Arctic BIDI® Stick W% [95% CI] | Arctic BIDI® Stick EWNP [95% CI]* | Classic BIDI® Stick W% [95% CI] | Classic BIDI® Stick EWNP [95% CI]* | Zest BIDI® Stick W% [95% CI] | Zest BIDI® Stick EWNP [95% CI]* | Winter BIDI® Stick W% [95% CI] | Winter BIDI® Stick EWNP [95% CI]* | Tropic BIDI® Stick W% [95% CI] | Tropic BIDI® Stick EWNP [95% CI]* | Gold BIDI® Stick W% [95% CI] | Gold BIDI® Stick EWNP [95% CI]* | Marigold BIDI® Stick W% [95% CI] | Marigold BIDI® Stick EWNP [95% CI]* | Regal BIDI® Stick W% [95% CI] | Regal BIDI® Stick EWNP [95% CI]* | Summer BIDI® Stick W% [95% CI] | Summer BIDI® Stick EWNP [95% CI]* | Solar BIDI® Stick W% [95% CI] | Solar BIDI® Stick EWNP [95% CI]* | Dawn BIDI® Stick W% [95% CI] | Dawn BIDI® Stick EWNP [95% CI]* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Never Users | 99.5 [98.9-99.8] | 21,020,000 [20,890,000-21,080,000] | 99.5 [98.8-99.8] | 21,020,000 [20,870,000-21,080,000] | 99.3 [98.6-99.7] | 20,980,000 [20,830,000-21,060,000] | 99.6 [99.0-99.9] | 21,040,000 [20,890,000-21,110,000] | 99.5 [98.9-99.8] | 21,020,000 [20,890,000-21,080,000] | 99.5 [98.9-99.8] | 21,020,000 [20,890,000-21,080,000] | 99.6 [99.0-99.9] | 21,040,000 [20,910,000-21,110,000] | 99.6 [99.0-99.8] | 21,040,000 [20,910,000-21,080,000] | 99.4 [98.8-99.8] | 21,000,000 [20,870,000-21,080,000] | 99.5 [98.9-99.8] | 21,020,000 [20,890,000-21,080,000] | 99.6 [99.0-99.9] | 21,040,000 [20,910,000-21,110,000] |
| Ever Users | 0.1 [0.0-0.4] | 20,000 [0,000-80,000] | 0.1 [0.0-0.5] | 20,000 [0,000-100,000] | 0.2 [0.1-0.7] | 40,000 [20,000-140,000] | 0.1 [0.0-0.5] | 20,000 [0,000-100,000] | 0.1 [0.0-0.4] | 20,000 [0,000-80,000] | 0.0 [‡] | <10,000 | 0.0 [0.0-0.3] | <10,000 | 0.1 [0.0-0.4] | 20,000 [0,000-100,000] | 0.1 [0.0-0.5] | 20,000 [0,000-100,000] | 0.0 [‡] | <10,000 |
| Current Users | 0.0 [‡] | <10,000 | 0.0-0.5 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [0.0-0.4] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 |

Abbreviations: W% = weighted percentage; CI = confidence interval; EWNP = estimated weighted number of persons
*= rounded down to the nearest 10,000 persons
[‡] = 95% CI not Reported

**Table 2 Underage Young Adults (18-20 years) (n=1,125) by Flavor**

| Use Status | Arctic BIDI® Stick W% [95% CI] | Arctic BIDI® Stick EWNP [95% CI]* | Classic BIDI® Stick W% [95% CI] | Classic BIDI® Stick EWNP [95% CI]* | Zest BIDI® Stick W% [95% CI] | Zest BIDI® Stick EWNP [95% CI]* | Winter BIDI® Stick W% [95% CI] | Winter BIDI® Stick EWNP [95% CI]* | Tropic BIDI® Stick W% [95% CI] | Tropic BIDI® Stick EWNP [95% CI]* | Gold BIDI® Stick W% [95% CI] | Gold BIDI® Stick EWNP [95% CI]* | Marigold BIDI® Stick W% [95% CI] | Marigold BIDI® Stick EWNP [95% CI]* | Regal BIDI® Stick W% [95% CI] | Regal BIDI® Stick EWNP [95% CI]* | Summer BIDI® Stick W% [95% CI] | Summer BIDI® Stick EWNP [95% CI]* | Solar BIDI® Stick W% [95% CI] | Solar BIDI® Stick EWNP [95% CI]* | Dawn BIDI® Stick W% [95% CI] | Dawn BIDI® Stick EWNP [95% CI]* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ever Users | 1.1 [0.5-2.3] | 130,000 [60,000-270,000] | 0.3 [0.0-1.0] | 30,000 [0,000-120,000] | 0.7 [0.2-1.8] | 80,000 [20,000-210,000] | 1.1 [0.5-2.3] | 130,000 [60,000-270,000] | 0.9 [0.3-2.0] | 100,000 [30,000-240,000] | 1.6 [0.7-2.9] | 190,000 [80,000-350,000] | 0.6 [0.2-1.5] | 70,000 [20,000-180,000] | 0.7 [0.2-1.7] | 80,000 [20,000-200,000] | 0.5 [0.1-1.5] | 60,000 [10,000-180,000] | 0.5 [0.1-1.5] | 60,000 [10,000-180,000] | 0.5 [0.1-1.3] | 60,000 [10,000-150,000] |
| Current Users | 0.1 [0.0-0.7] | 10,000 [0,000-80,000] | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.1 [0.0-0.7] | 10,000 [0,000-80,000] | 0.1 [0.0-0.7] | 10,000 [0,000-80,000] | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 |
| Former Users | 0.3 [0.1-1.2] | 30,000 [10,000-140,000] | 0.0 [‡] | <10,000 | 0.3 [0.1-1.2] | 30,000 [10,000-140,000] | 0.3 [0.1-1.2] | 30,000 [10,000-140,000] | 0.0 [‡] | <10,000 | 0.3 [0.1-1.2] | 30,000 [10,000-140,000] | 0.3 [0.1-1.2] | 30,000 [10,000-140,000] | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.3 [0.1-1.2] | 30,000 [10,000-140,000] |
| Non-users | 99.4 [98.4-99.8] | 11,990,000 [11,870,000-12,040,000] | 99.8 [99.2-100.0] | 12,040,000 [11,970,000-12,070,000] | 99.5 [98.6-99.9] | 12,010,000 [11,900,000-12,050,000] | 99.8 [98.6-99.9] | 12,010,000 [11,900,000-12,050,000] | 99.5 [99.2-100.0] | 12,040,000 [11,970,000-12,070,000] | 99.5 [98.6-99.9] | 12,010,000 [11,900,000-12,050,000] | 99.5 [98.6-99.9] | 12,010,000 [11,900,000-12,050,000] | 99.8 [99.0-100.0] | 12,040,000 [11,950,000-12,070,000] | 99.8 [99.2-100.0] | 12,040,000 [11,950,000-12,070,000] | 99.8 [99.2-100.0] | 12,040,000 [11,970,000-12,070,000] | 99.5 [98.6-99.9] | 12,010,000 [11,900,000-12,050,000] |
| Refused | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] | 0.2 [0.0-0.8] | 20,000 [0,000-90,000] |

Abbreviations: W% = weighted percentage; CI = confidence interval; EWNP = estimated weighted number of persons
*= rounded down to the nearest 10,000 persons
[‡] = 95% CI not Reported

Table 3 Legal Age Young Adults (21-24 years) (n=2,245) by Flavor

| Use Status | Arctic BIDI® Stick W% [95% CI] | Arctic EWNP [95% CI]* | Classic BIDI® Stick W% [95% CI] | Classic EWNP [95% CI]* | Zest BIDI® Stick W% [95% CI] | Zest EWNP [95% CI]* | Winter BIDI® Stick W% [95% CI] | Winter EWNP [95% CI]* | Tropic BIDI® Stick W% [95% CI] | Tropic EWNP [95% CI]* | Gold BIDI® Stick W% [95% CI] | Gold EWNP [95% CI]* | Marigold BIDI® Stick W% [95% CI] | Marigold EWNP [95% CI]* | Regal BIDI® Stick W% [95% CI] | Regal EWNP [95% CI]* | Summer BIDI® Stick W% [95% CI] | Summer EWNP [95% CI]* | Solar BIDI® Stick W% [95% CI] | Solar EWNP [95% CI]* | Dawn BIDI® Stick W% [95% CI] | Dawn EWNP [95% CI]* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ever Users | 0.8 [0.4-1.6] | 130,000 [60,000-260,000] | 0.3 [0.1-0.8] | 50,000 [10,000-130,000] | 0.4 [0.1-0.9] | 60,000 [10,000-150,000] | 0.8 [0.3-1.5] | 130,000 [50,000-250,000] | 0.8 [0.3-1.5] | 130,000 [50,000-250,000] | 0.4 [0.1-1.0] | 60,000 [10,000-160,000] | 0.3 [0.1-0.8] | 50,000 [10,000-130,000] | 0.7 [0.3-1.4] | 110,000 [50,000-230,000] | 0.2 [0.1-0.7] | 30,000 [10,000-110,000] | 0.9 [0.4-1.7] | 150,000 [60,000-280,000] | 0.2 [0.0-0.7] | 30,000 [0,000-110,000] |
| Current Users | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [0.0-0.3] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 |
| Former Users | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 | | <10,000 |
| Non-users | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.9 [99.5-100.0] | 16,740,000 [16,680,000-16,760,000] | 99.8 [99.4-100.0] | 16,730,000 [16,660,000-16,760,000] |
| Refused | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.1 [0.0-0.5] | 10,000 [0,000-80,000] | 0.2 [0.0-0.6] | 30,000 [0,000-100,000] |

Abbreviations: W% = weighted percentage; CI = confidence interval; EWNP = estimated weighted number of persons
*= rounded down to the nearest 10,000 persons
[‡] = 95% CI not Reported

Table 4 Older Adults (25 years and older) (n=3,058) by Flavor

| Use Status | Arctic BIDI® Stick W% [95% CI] | Arctic EWNP [95% CI]* | Classic BIDI® Stick W% [95% CI] | Classic EWNP [95% CI]* | Zest BIDI® Stick W% [95% CI] | Zest EWNP [95% CI]* | Winter BIDI® Stick W% [95% CI] | Winter EWNP [95% CI]* | Tropic BIDI® Stick W% [95% CI] | Tropic EWNP [95% CI]* | Gold BIDI® Stick W% [95% CI] | Gold EWNP [95% CI]* | Marigold BIDI® Stick W% [95% CI] | Marigold EWNP [95% CI]* | Regal BIDI® Stick W% [95% CI] | Regal EWNP [95% CI]* | Summer BIDI® Stick W% [95% CI] | Summer EWNP [95% CI]* | Solar BIDI® Stick W% [95% CI] | Solar EWNP [95% CI]* | Dawn BIDI® Stick W% [95% CI] | Dawn EWNP [95% CI]* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ever Users | 0.1 [0.0-0.3] | 220,000 [0,000-670,000] | 0.1 [0.0-0.2] | 220,000 [0,000-440,000] | 0.0 [0.0-0.2] | <10,000 | 0.0 [‡] | <10,000 | 0.1 [0.0-0.3] | 220,000 [0,000-670,000] | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 |
| Current Users | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 |
| Former Users | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 | 0.0 [‡] | <10,000 |
| Non-users | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] | 99.4 [99.0-99.6] | 223,110,000 [222,210,000-223,560,000] |
| Refused | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] | 0.6 [0.4-1.0] | 1,340,000 [890,000-2,240,000] |

Abbreviations: W% = weighted percentage; CI = confidence interval; EWNP = estimated weighted number of persons
*= rounded down to the nearest 10,000 persons
[‡] = 95% CI not Reported

In conclusion, data from a nationally representative product specific population prevalence study show that BIDI® Stick's 11 flavor variants do not significantly contribute to underage use of disposable ENDS. Additionally, the results of this study align with the 2021 National Youth Tobacco Survey (NYTS) raw data, where there was only 5 mentions of "Bidi" or BIDI® Stick out of 20,413 participants, (i.e., 0.02% positive response rate). This is a drop from 2020 NYTS raw data, where there were 14 mentions out of 14,531 participants (i.e., 0.096% positive response rate). See **Attachments 3 and 4**.

The Population Prevalence Study of the BIDI® Stick data is also consistent with results from the Monitoring the Future (MTF) study, which shows that between 2019 and 2021, the prevalence of "daily" vaping (defined as use on 20 or more occasions in the previous 30 days) fell from 2 percent to 1.1 percent among eighth graders, from 6.8 percent to 2.5 percent among 10th graders, and from 11.6 percent to 5.4 percent among 12th graders. These findings are also broadly consistent with <u>results</u> from the NYTS, which shows the prevalence of past-month e-cigarette use by high school students peaking at 27.5 percent in 2019 before falling to 11.3 percent in 2021. From a harm reduction perspective, these data support that youth usage is declining despite the fact that adults have access to ENDS in a variety of flavors. Further, given the downward trend in adolescent smoking, neither survey provides any evidence of ENDS serving as a "gateway" to smoking. *See* National Institute on Drug Abuse, Monitoring the Future: https://nida.nih.gov/research-topics/trends-statistics/monitoring-future and 1975-2021 Data for In-School Surveys of 8th, 10th, and 12th Grade Students: http://monitoringthefuture.org/data/21data.htm.

The totality of the evidence submitted to FDA to date, including in this amendment, supports an APPH finding for all the BIDI® Stick flavors, without the need to directly compare switching rates of BIDI® Stick tobacco and nontobacco flavors. This is especially evident as the data from the Population Prevalence Study of the BIDI® Stick included here demonstrate that none of the 11 flavors of BIDI® Stick have contributed to adolescent and underage young adult use of nicotine products, and thoughts about switching or reducing cigarette consumption did not vary among the various flavors. The data from this new study and previous amendments clearly demonstrate that the benefits of all 11 BIDI® Stick products for adult combusted cigarette smokers would outweigh any potential risks to youth.

Accordingly, we hereby amend Module 6 Section 6.2.1 of the Company's PMTAs with the Population Prevalence Study of the BIDI® Stick Final Report (**Attachment 1**), as well as the NYTS and MTF surveys noted above.

### III. Appeal and Likelihood of Use of Multiple Flavor Varieties of BIDI® Stick Electronic Nicotine Delivery Systems among Adult Current, Former, and Never Tobacco Users in the United States (Amend PMTA Module 6 Section 6.2.1)

Bidi Vapor has published a preprint journal[4] article that will be subject to peer review. The research paper, entitled "Appeal and Likelihood of Use of Multiple Flavor Varieties of BIDI® Stick Electronic Nicotine Delivery Systems among Adult Current, Former, and Never Tobacco Users in the United States," describes the findings from a study administered between May and August 2021 to adult participants using a web-based survey to assess tobacco use behavior, perceptions, and intentions. The purpose of the study was to assess product appeal, likelihoods of use, and intended use of the BIDI® Stick (all flavors) among adults and young adults in the United States with different tobacco use histories. Researchers found that tobacco non-users, including young adult tobacco non-users, are unlikely to use any BIDI® Stick product, regardless of flavor. Current tobacco users reported significantly higher likelihood to try and likelihood to regularly use BIDI® Stick than tobacco non-users and reported higher likelihood to try non-tobacco flavored BIDI® Stick products. Current cigarette users reported they intend to use BIDI® Stick to reduce or quit smoking. These results support that the availability of the BIDI® Stick, and specifically the non-tobacco/non-menthol flavored BIDI® Stick products, may benefit current cigarette users without posing a substantial risk of initiation by tobacco non-users, including minors. Accordingly, we hereby amend Module 6 Section 6.2.1 of the Company's PMTAs with this updated study information and the enclosed preprint manuscript as published (**Attachment 2**).

### IV. Summary of Amendments Submitted to PM0003460 to Date

As described in this PMTA Amendment and previous amendments, Bidi Vapor has developed (and continues to develop) additional robust and reliable evidence intended to demonstrate that the benefits of the BIDI® Stick products for adult combusted cigarette smokers outweigh any potential risks to youth posed by flavored ENDS. This includes several product-specific behavioral studies designed to measure product perception and intention (e.g., likelihood of use, behavioral intentions, and patterns of use of the BIDI® Stick), as well as a clinical pharmacokinetic ("PK") study designed to measure the abuse liability/dependence potential of the

---

[4] Mcdowell, E.H., Yue, L., Lyden, J.T., Bagwell, W.R., 2022. Appeal and Likelihood of Use of Multiple Flavor Varieties of BIDI® Stick Electronic Nicotine Delivery Systems among Adult Current, Former, and Never Tobacco Users in the United States. doi:10.21203/rs.3.rs-1962398/v1

BIDI® Stick and the exposure to nicotine during product use (compared to combusted cigarettes and JUUL). As noted in previous PMTA amendments, these product-specific studies will allow for additional bridging to the published literature included in PMTA PM0003460 and its amendments. Bidi Vapor provides below a summary of PMTA PM0003460 Amendments to date (Table 5).

**Table 5 Amendments Submitted to PM0003460**

| PMTA Amendment No. [5] | Submission Date | Applications Being Amended | Brief Description |
|---|---|---|---|
| 1 | October 13, 2020 | All | Technomic Consumer Insight Survey Final Report |
| 2 | March 23, 2021 | All | • Updated Marketing Plan for the BIDI® Stick (Termination of Direct-to-Consumer Online Sales Through Bidi Website)<br>• Final Report: Technomic Disposable Vape User Insights Study<br>• Update on planned behavioral and abuse liability studies<br>• UL Notice of Completion and Authorization to Apply the UL Mark, File E514030<br>• Updated BIDI® Stick Labeling with authorized UL logo<br>• Update on ongoing Quality Management System improvements<br>• Status of analytical testing (e.g., Stability Study)<br>• Update on Smiss Technology Co. Ltd permits |
| 3 | April 20, 2021 | All | • Updates for the following studies:<br>  o BV 2021-01: BIDI® Stick Patterns of Use Study<br>    ▪ Protocol: v1.0<br>  o BV 2021-02F: Likelihood of Use Study for BIDI® Stick<br>    ▪ Protocol: v1.0<br>  o BIDI-PK-01: Abuse liability and puffing topography assessments of the BIDI® Stick electronic nicotine delivery system (ENDS) in comparison to a combustible cigarette and JUUL® pod-based ENDS<br>    ▪ Protocol: v1.0 |
| 4 | September 8, 2021 | All | • Bidi Vapor's June 25, 2021 Letter to the CTP Office of Compliance and Enforcement Requesting Case-By-Case Discretion and Continued Marketing Pending PMTA Review |

---

[5] For ease of reference, this list omits non-substantive PMTA Amendments such as the Technical Update submissions dated November 24-25, 2021.

| PMTA Amendment No. [5] | Submission Date | Applications Being Amended | Brief Description |
|---|---|---|---|
| | | | • Cardno ChemRisk Updated Literature Review – ENDS & E-Liquid Updated State of the Science – Behavioral Endpoints<br>• Updates for the following studies:<br>  o BV 2021-01: BIDI® Stick Patterns of Use Study<br>    ▪ Protocol: v4.0<br>    ▪ Questionnaire: v3.0<br>  o BV 2021-02F: Likelihood of Use Study for BIDI® Stick<br>    ▪ Protocol: v2.0<br>    ▪ Questionnaire: v2.0<br>  o RB-BV-01-01 Perception and Behavioral Intentions (PBI) Study of the BIDI® Stick Electronic Nicotine Delivery System (ENDS)<br>    ▪ Protocol: v0.1<br>    ▪ Questionnaire: v0.2 |
| 5 | September 16, 2021 | PM0003460.PD1 | • Updated Product Description for BIDI® Stick Arctic<br>• Updated Ingredient Specifications BIDI® Stick Arctic<br>• Updates to Product Labels and Labeling BIDI® Stick Arctic |
| 6 | October 24, 2021 | All | • Update to Ingredient Specifications for Dawn, Marigold and Winter BIDI® Stick<br>• Final Report: 6-month accelerated stability study<br>• T6 Report: for 24-month ambient stability study<br>• Final Report: BIDI® Stick Elemental Impurities Study |
| 7 | October 29, 2021 | All | Manuscript: A Randomized, Crossover Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI® Stick ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers |
| 8 | November 5, 2021 | All | • Updates for the following studies:<br>  o BV 2021-01: BIDI® Stick Patterns of Use Study<br>  o BV 2021-02F: Likelihood of Use Study for BIDI® Stick<br>  o RB-BV-01-01 Perception and Behavioral Intentions (PBI) Study of the BIDI® Stick Electronic Nicotine Delivery System (ENDS)<br>    ▪ Protocol: v0.1<br>    ▪ Questionnaire: v0.3<br>    ▪ Subject informed consent form: v1.0 |
| 9 | December 3, 2021 | All | • Updates for the following studies:<br>  o BV 2021-02F Likelihood of Use Study for BIDI® Stick<br>  o BIDI-PK-01: Abuse liability and puffing topography assessments of the BIDI® Stick electronic nicotine delivery system (ENDS) in comparison to a combustible cigarette and JUUL® pod-based ENDS |

| PMTA Amendment No. [5] | Submission Date | Applications Being Amended | Brief Description |
|---|---|---|---|
| | | | • Final Report: BV 2021-01: BIDI® Stick Patterns of Use Study<br>• Preprint: A Randomized, Crossover Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI® Stick ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers |
| 10 | December 17, 2021 | All | • Final Report: BV 2021-02F Likelihood of Use Study for BIDI® Stick<br>• Final Report: Toxicological Human Health Risk Assessment of Aerosol HPHCs<br>• T12 Report: 24-month ambient stability study |
| 11 | December 23, 2021 | All | • Final report: BIDI-PK-01: Abuse liability and puffing topography assessments of the BIDI® Stick electronic nicotine delivery system (ENDS) in comparison to a combustible cigarette and JUUL® pod-based ENDS<br>• Published Journal Article: A Randomized, Crossover Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI Stick® ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers<br>• DRAFT Quality Agreement with SMISS |
| 12 | May 20, 2022 | All | • Final Report: Toxicological Human Health Risk Assessment of Ingredients (Arctic and Classic)<br>• Final Report: RB-BV-01-01 Perception and Behavioral Intentions (PBI) Study of the BIDI® Stick Electronic Nicotine Delivery System (ENDS)<br>• CSUR-0041 Population Prevalence Study of the BIDI® Stick<br>   ○ Protocol: v1.0<br>   ○ Informed Consent Forms v1.0<br>   ○ Notification of IRB approval |
| 13 | July 5, 2022 | All | Comprehensive Quality Management System Updates:<br>   ○ Finalized Quality Agreement with SMISS<br>   ○ Bidi Vapor's newly implemented SOPs and Forms<br>   ○ Kaival's newly implemented SOPs and Forms<br>   ○ SMISS' updated SOPs and Work Instruction<br>   ○ Specifications, Certifications and Test results that relate to Quality<br>   ○ Preprint: Market Survey of Disposable E-Cigarette Nicotine Content and E-liquid Volume |
| 14 | July 28, 2022 | All | Legal name change for contract manufacturer Smiss Technology Co. Ltd |
| 15 | September 9, 2022 | All | • Population Prevalence Study of the BIDI® Stick final report and data |



| PMTA Amendment No. [5] | Submission Date | Applications Being Amended | Brief Description |
|---|---|---|---|
| | | | • Preprint "Appeal and Likelihood of Use of Multiple Flavor Varieties of BIDI® Stick Electronic Nicotine Delivery Systems among Adult Current, Former, and Never Tobacco Users in the United States." (Likelihood of Use Study)<br>• NYTS and MTF National Survey Data |

## V.    Conclusion

Bidi Vapor has developed (and continues to develop) robust and reliable evidence demonstrating that all 11 flavors of BIDI® Stick products are APPH. For example, data from our product specific, nationally representative Population Prevalence Study of the BIDI® Stick show that adolescents and underage adults have never used -- and do not currently use -- any of the 11 variants of BIDI® Stick. Previously, we demonstrated that the 11 flavors of BIDI® Stick were equally effective for stimulating thoughts about switching or reducing cigarette consumption among adult smokers who were not planning to quit smoking in the near future. The totality of the evidence submitted to FDA to date, including in this amendment, supports an APPH finding for all the BIDI® Stick flavors, without the need to directly compare switching rates of BIDI® Stick tobacco and nontobacco flavors.  This is especially evident as the data from the Population Prevalence Study of the BIDI® Stick included here demonstrate that none of the 11 flavors of BIDI® Stick have contributed to adolescent and underage young adult use of nicotine products, and thoughts about switching or reducing cigarette consumption did not vary among the various flavors.  The data from this new study and previous amendments clearly demonstrate that the benefits of all 11 BIDI® Stick products for adult combusted cigarette smokers would outweigh any potential risks to youth.

Bidi Vapor would like to amend PMTA (PM0003460) with the above-mentioned study data. It is our expectation that this information will assist FDA in reviewing Bidi Vapor's PMTAs and will be given due consideration by FDA during the scientific review process. As we complete our ongoing product-specific studies and analytical work, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

*      *      *      *

This PMTA amendment submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected



from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

We appreciate FDA's careful consideration of this Fifteenth PMTA amendment to PM0003460 and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH determination for our BIDI® Stick products.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor LLC

**Enclosures**

**Attachment 1 Population Prevalence Study of the BIDI® Stick**

- **CSUR-Final Report-0041-BIDI Stick-Version 1.pdf** along with documents contained in the appendices listed below:
  - Appendix 1 - IRB Documentation
  - Appendix 2 - Study Protocol

- Appendix 3 - Informed Consent Forms
- Appendix 4 - Weighting Benchmark Distributions
- Appendix 5 - Survey Instrument, Data Dictionary and Materials
- Appendix 6 - Statistical Analysis Plans
- Appendix 7 - Datasets, Syntax and Outputs
- Appendix 8 - Youth Data Tables
- Appendix 9 - Young Adult Data Tables
- Appendix 10 - Older Adult Data Tables

**Attachment 2 Preprint** - Appeal and Likelihood of Use of Multiple Flavor Varieties of BIDI®
Stick Electronic Nicotine Delivery Systems among Adult Current, Former, and Never Tobacco
Users in the United States

**Attachment 3 – 2020 NYTS Data**

**Attachment 4 – 2021 NYTS Data**



February 16, 2023

Niraj Patel, CEO
(321) 223-3101
raj@bidivapor.com

<u>**PMTA Eighteenth Amendment: PM0003460.PD2**</u>

<u>**Via CTP Portal**</u>

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products                          CONTAINS CONFIDENTIAL
Office of Science                                    BUSINESS INFORMATION
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

> RE:   **Bidi Vapor LLC; Eighteenth (18th) Amendment to Premarket Tobacco
> Product Application for the BIDI® Stick ENDS; Completed 24-month
> Ambient Stability Study for Classic BIDI® Stick; STN PM0003460.PD2**

The purpose of this submission is to amend Bidi Vapor, LLC's ("Bidi Vapor" or the
"Company") pending Premarket Tobacco Product Application ("PMTA") for its **Classic BIDI®
Stick** tobacco-flavored electronic nicotine delivery system ("ENDS") product (STN
PM0003460.PD2) with the now completed 24-month ambient stability study results.[1]

## I.      Stability Testing (Update Module 3, Section 3.3.3.2)

As provided in Section 3.3.3.2 of its PMTAs, Bidi Vapor conducted real time stability
testing for pH, boiling point, specific gravity, viscosity, water activity at condition of $25\pm2$ °C and
$60\%\pm5\%$ RH for total duration of 24 months. The study consisted of four time points: 0 time, 6
months, 12 months, and 24 months for both the e-liquid and the finished BIDI® Stick product.[2]

---

[1]     To date, PMTA PM0003460.PD2, which was timely submitted on September 8, 2020, has not been the
subject of any deficiency letters or marketing denial order ("MDO") entered scientific review on or about May 13,
2022.  On September 9, 2022, FDA completed a PMTA-related Remote Regulatory Assessment ("RRA") of Bidi
Vapor and its contract manufacturer, SMISS Technology Co., Ltd. ("SMISS"), in relation specifically to the Classic
BIDI® Stick (PM0003460.PD2).

[2]     *See* PMTA Amendments dated October 24, 2021 (Amendment No. 6) and December 17, 2021 (Amendment
No. 10), respectively, for the previous stability data submissions (accelerated and ambient conditions), as well as the



The 24-month stability testing has now been completed for BIDI® Stick Classic and the report is provided herein (**Attachment 1**). Key Study findings include the following:

- BIDI® Stick is consistently manufactured and stable for up to 24 months when stored at ambient temperatures;
- BIDI® Stick HPHCs are below or similar to HPHC levels in FDA authorized products (e.g., combustible cigarettes, IQOS);
- BIDI® Stick nicotine levels were within the product release specifications and in line with packaging labels (60 mg/mL); and
- BIDI® Stick e-liquid does not support microbial growth.

### II.     Conclusion

Bidi Vapor has developed (and continues to develop) robust and reliable evidence demonstrating that all 11 flavor varieties of the BIDI® Stick are appropriate for the protection of the public health ("APPH"). For example, data from the enclosed 24- month ambient stability study demonstrates that BIDI® Stick products, including the Classic, are a low-risk for chemical instability and microbial growth over a two-year period.

The totality of the evidence submitted to FDA to date, including in this amendment, supports an APPH finding for all the BIDI® Stick flavors without the need to directly compare switching rates of BIDI® Stick Classic (tobacco) and the non-tobacco flavor varieties of the product. The data presented in this and previous PMTA Amendments clearly demonstrate that the benefits of all 11 flavor varieties of the BIDI® Stick for adult combusted cigarette smokers would outweigh any potential risks to youth.

We appreciate FDA's careful consideration of this Eighteenth PMTA amendment to PM0003460.PD2 and look forward to working with the Agency to secure a marketing authorization order under the Food, Drug and Cosmetic Act ("FDCA") § 910.  We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH evaluation of the BIDI® Stick products.  It is our expectation that this information will assist FDA in reviewing Bidi Vapor's PMTA and will be given due consideration by the Agency during the scientific review process.  As we complete our ongoing product-specific studies and analytical work, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

<div align="center">*          *          *          *</div>

---

updated Integrated Summary (Module 2, Section 2.2) submitted February 13, 2023 (Amendment No. 17), for a summary of same.



Please note that this submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor, LLC

Enclosures

- Form 4057a
- Attachment 1 – BIDI® Stick Classic 24-Month Ambient Stability Report and Appendices

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

BIDI VAPOR, LLC,

        Petitioner,

    v.

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

        Respondents.

No. 24-10263

## <u>DECLARATION OF DR. WILLIE J. MCKINNEY</u>

1.     My name is Dr. Willie J. McKinney. The following declaration is based on personal knowledge and is submitted in support of Petitioner Bidi Vapor LLC's ("Bidi") Motion for a Stay Pending Review.

2.     I am board certified in toxicology by the American Board of Toxicology. I have authored numerous peer-reviewed scientific articles on toxicology, including tobacco use and harm reduction. I served on the Food and Drug Administration's ("FDA" or "agency") Tobacco Product Scientific Advisory Committee ("TPSAC") in 2016–2019 as the non-voting member of the tobacco manufacturing industry. As part of that committee, we approved the introduction into the U.S. market several tobacco products that serve as alternatives to traditional cigarettes and make reduced harm claims. My curriculum vitae is attached.

3.     I am a regulatory scientist with several decades of industry experience conducting research and developing strategies for tobacco product manufacturers seeking regulatory approval for their products. Three years ago, I founded McKinney Regulatory Science Advisors, LLC ("McKinney"), a company that I currently lead. We help manufacturers responsibly bring harm-reduction tobacco products to market by ensuring that the scientific datasets that we help our clients generate are comprehensive and robust, use the most advanced scientific methodologies available, and meet mandated regulatory requirements.

4.     Our work has been used to support various applications submitted to FDA under the Family Smoking Prevention and Tobacco Control Act of 2009 ("Tobacco Control Act" or "TCA") seeking market approval for various tobacco products, including those in support of substantial equivalence findings, modified risk claims, and as pertinent to the stay motion, Premarket Tobacco Product Applications ("PMTAs"). This work has included designing and carrying-out clinical studies, consumer perception studies, and other research.

5.     We have worked extensively with Bidi on preparing and filing the company's PMTAs and amendments, including conducting supporting studies and surveys, and responding to inquiries and a deficiency letter (discussed below) from

2

FDA. This work included Bidi's PMTA for the tobacco-flavored product (branded the BIDI® Stick Classic) at issue in this case.[1]

### Overview of the PMTA Process and Bidi's PMTA

6.     Under the TCA, FDA was granted authority to regulate the production, distribution, and promotion of tobacco products. Initially, the TCA only governed certain types of tobacco products (such as combustible cigarettes). But FDA was also permitted to expand the list of products to be regulated and did so in 2016 when it deemed the TCA to cover, among other items, electronic nicotine delivery systems ("ENDS") (commonly known as e-cigarettes).

7.     Congress enacted the TCA to both regulate the tobacco industry and to "encourage the development of innovative products and treatments," including products that are "nicotine-based" in order to reduce the "consumption of tobacco" and the "harm associated with continued tobacco use." 21 U.S.C. § 387r(b)(1). In the TCA's purposes section, Congress indicated that it was giving FDA "new and flexible enforcement authority to ensure that there is effective oversight of the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." Pub. L. No. 111-31, § 3(4), 123 Stat. 1776, 1782 (2009).

---

[1] The BIDI® Stick Classic is a disposable ENDS product. Disposable ENDS are completely self-contained devices, where the e-liquid is pre-filled into a sealed reservoir by the manufacturer. Once the e-liquid in a disposable is consumed by the user, the product is discarded.

3

8.     ENDS are regulated as "new tobacco products" under the TCA and are subject to premarket review by FDA. This review primarily consists of the agency's evaluation of a comprehensive PMTA submitted by a company wishing to bring an ENDS product to market. That evaluation consists of three stages: acceptance, filing, and scientific review. 21 C.F.R. § 1114.27.

9.     At the acceptance stage, FDA conducts an initial assessment to confirm that the product is subject to regulation by the agency's Center for Tobacco Products ("CTP") and verifies that the application contains basic information needed for review. Following this assessment, FDA will either issue an acceptance letter or a Refuse to Accept ("RTA") order.

10.    At the filing stage, the agency determines whether the application contains sufficient data and information to make a substantive scientific evaluation possible. Following this review, FDA either issues a letter indicating that the PMTA has been "filed" or a Refuse to File ("RTF") order.

11.    Bidi's PMTA for the BIDI® Stick Classic was accepted and filed by FDA.

12.    At the substantive or scientific review stage, the TCA requires an interdisciplinary analysis that examines the product's suitability for market from a public health perspective. This requires FDA to conduct a comprehensive review of the PMTA based on studies and "other valid scientific evidence" that balances the

4

"risks and benefits to the population as a whole," including whether the subject ENDS will lead people to start using tobacco products (i.e., initiation) or to stop using such products (i.e., cessation). 21 U.S.C. § 387j(c)(4)-(5). This review also requires FDA to evaluate all data and information submitted by the applicant including health risk evaluations, toxicological and pharmacological testing, public scientific literature reviews, consumer perception and intention research, and clinical studies. Ultimately, under the TCA, FDA is charged with taking a holistic approach, balancing all of the materials submitted with a PMTA and determining whether, given all the data and information in an application, the ENDS product is "appropriate for the protection of the public health" ("APPH").

13.     Completing a PMTA is a complex and time-consuming endeavor, so FDA's regulations allow applicants to submit amendments to a PMTA before the agency makes a final decision on the application. 21 C.F.R. § 1114.9.

14.     Between October 13, 2020 and January 18, 2024, Bidi submitted twenty amendments to its original PMTA covering the company's tobacco-flavored and non-tobacco flavored ENDS. These amendments included, among other things, a consumer insight survey, product pattern of use and likelihood of use studies, updated scientific literature reviews, abuse liability assessments, product stability studies, a consumer perception and behavioral intentions study, aerosol testing

5

results, a toxicological assessment, a nicotine pharmacokinetics and effects study, and, most recently, an update on an ongoing adult smoker switching study.

15.     During scientific review, FDA also has authority to issue deficiency letters to the applicant that identify scientific and procedural issues to be addressed before the application review is completed. 21 C.F.R. § 1114.25.

16.     On March 20, 2023, FDA sent Bidi a deficiency letter, which identified thirty-two items for the company to address regarding the BIDI® Stick Classic. A0012-0038.[2] Bidi filed a comprehensive response on June 18, 2023. A0039-0040 (cover letter).

17.     Following scientific review, FDA may issue either a marketing granted order ("MGO") if it determines that the ENDS product is APPH, 21 C.F.R. § 1114.31, or deny the PMTA and issue a marketing denial order ("MDO) if it finds that the ENDS product is not APPH, 21 C.F.R. § 1114.33.

**FDA's MDO For Bidi's Tobacco-Flavored ENDS Product**

18.     On January 22, 2024, FDA issued an MDO for the BIDI® Stick Classic (STN PM0003460.PD2). A0001-0011. Specifically, FDA issued the MDO after finding that the company's tobacco-flavored ENDS product was not APPH pursuant to 21 U.S.C. 387j(c)(2)(A).

---

[2] For the Court's convenience, this declaration references bates numbers assigned to documents contained in the Addendum to the stay motion.

19.  FDA listed only three grounds (or deficiencies) in support of the MDO.

20.  The first alleged deficiency involves FDA's request that manufacturers compare the overall levels of Harmful and Potentially Harmful Constituents ("HPHCs") in the aerosol of the new product (the BIDI® Stick Classic) and the aerosols of similar ENDS. FDA wants to know whether the new product poses a greater or lower risk when an ENDS user switches from the new product to another similar product or uses them interchangeably. A0002-0003. FDA argued that HPHC aerosol data from published literature on similar ENDS products were insufficient or inappropriate to compare to HPHC aerosol data from the BIDI® Stick Classic. A0003.

21.  The second purported deficiency involves FDA's request for a leachability study that would determine what chemical substances had leached from the device and its components into the enclosed, pre-filled e-liquid. FDA reasons that users could eventually be exposed to and inhale any leachable substances. In the MDO, FDA maintains that Bidi should have conducted a leachability test on the e-liquid itself rather than testing BIDI® Stick Classic's aerosol for leachable substances. A0004.

22.  The third alleged deficiency claims that data submitted with the PMTA, including a clinical study and survey results, indicate that the abuse liability (or risk of addiction) of the BIDI® Stick Classic is the same or higher than a typical

7

combustible cigarette due to the product's nicotine levels. FDA concluded tobacco users are likely to maintain or augment their nicotine dependence with the new product and that this also poses a risk to nonusers (including youth). A0004-0005.

## MDO First Deficiency

23.     Bidi concluded in its June 2023 response to FDA's March 2023 deficiency letter that "[o]verall, the comparisons of HPHCs from the BIDI® Stick Classic and other ENDS products indicate the levels of measured constituents in aerosols of the BIDI® Stick Classic (Table 2) are within those reported for the ENDS product category (tobacco flavored e-liquids)." A0067. However, FDA argued that aerosol data for comparator products that were taken from published literature lacked certain evidence or used different aerosol testing parameters and thus could not be used to compare against HPHC levels in the BIDI® Stick Classic. A0002-0003.

24.     First, FDA claimed that data for certain JUUL tobacco-flavored products used a different aerosol collection protocol than was used for the BIDI® Stick Classic. Specifically, aerosol for the JUUL products was collected using 50 machine puffs while laboratory testing on the BIDI® Stick Classic consumed at least 90 percent of the product – i.e., more than 50 puffs. According to FDA, the limited puff regime for the JUUL products resulted in certain HPHCs not being found above the detection limit – i.e., raising the question in FDA's mind whether those HPHCs

8

would have been detected in some amount if the JUUL products had been tested at a higher puff count. A0002.

25.     FDA never explained how the difference in puff regimes could change Bidi's conclusion that there were no material differences in the HPHC levels between the comparator ENDS products and the BIDI® Stick Classic. Specifically, FDA never addressed Bidi's comments in its response to the deficiency letter that the JUUL data based on a limited 50 puff regime could only "underestimate" the HPHC yields, and thus by using such data Bidi took a conservative approach. A0066-0067. If the JUUL devices had been subjected to a testing protocol that consumed all of the device's e-liquid via a higher puff count, HPHCs not detected at the 50 puff count may have been detected and thus the comparator product could conceivably present additional risk. But this would only further support Bidi's conclusion that the BIDI® Stick Classic is no more risky than the JUUL products (i.e., it would only further demonstrate that the BIDI® Stick Classic presents relatively less risk).

26.     Second, as to other comparator products (e.g. BLU Classic Tobacco), FDA generally claimed that the "aerosol constituents were collected using different puffing regimens, puffing life cycle, and puffing machine than the [BIDI® Stick Classic] aerosol study, and thus cannot be reliably and consistently compared to the aerosol yield data for the [BIDI® Stick Classic]." A0002. Similarly, FDA generally

9

stated that Bidi should have provided data from published literature using similar puffing life cycle, puffing regimens, and puffing machines, with validated methods and accredited laboratories. A0003.

27.    FDA never explains why the testing protocols and results for the comparator products cited by Bidi prevented a comparison in HPHC levels with the BIDI® Stick Classic. In particular, Bidi pointed out in its response to the deficiency letter that either the same standardized non-intense puffing conditions (for the JUUL products and the National Institute of Drug Abuse ("NIDA") Standardized Research Electronic Cigarette ("SREC")) or only a slightly modified non-intense puffing regimen (for the remaining comparator products) were used to collect data reported in the published literature. A0063-0066. With the exception of FDA's argument regarding the puff counts for the JUUL products (which I address above), FDA does not discuss how the protocols used for the comparator products – including results from a study that was funded by FDA's Center for Tobacco Products – materially impacted Bidi's HPHC analysis.

28.    Third, FDA claims that Bidi did not provide certain information regarding the HPHC tests for the comparator products, including analytical method validation information, the length of time between date(s) of product manufacture and date(s) of testing, and testing laboratories and their accreditation(s). A0003.

10

29.    FDA ignored comments made by Bidi in its response to the deficiency letter that, by requiring such information, the agency was completely foreclosing the use of HPHC data in published literature or government databases, which existing FDA guidance had indicated was otherwise permitted. A0063. Specifically, in FDA's extensive guidance for assembling and completing PMTAs (dated March 2023) (http://tinyurl.com/mrfexddz), FDA stated (at pg. 51) that "data from the published literature or government-sponsored databases" could be used in lieu of studies conducted by the applicant. When discussing the comparison of aerosols between the new product and comparators, FDA also never mentioned in the guidance (at pg. 40) the type of information that it now, for the first time in FDA's deficiency letter, says is required. A0067. As Bidi noted in its deficiency response, items like full validation reports and laboratory testing accreditations are not included in published literature or relevant government databases. A0063. Full validation reports for each analytical method are in fact proprietary information that would not be reported in publicly available resources. FDA never addresses that issue in the MDO or explains why it was essentially making it impossible for applicants like Bidi to seek out and rely upon HPHC data that are publicly available. As a result, FDA instead suggested in the MDO, for the first time, that Bidi conduct its own time-consuming and expensive testing on various comparator products (A0004) – testing that, in my experience, would have cost the company well over

11

one million dollars. Moreover, as Bidi noted in its response, even if the company had done its own testing, it would still not have all the requested information, such as the "Length of time between date(s) of manufacture and date(s) of testing." That information would not be disclosed by the product manufacturer. A0063.

30. Fourth, FDA permitted Bidi and other manufacturers to use aerosol data from published literature when comparing the BIDI® Stick Classic to other types of tobacco products. For example, Bidi used the same approach when comparing HPHC levels in the BIDI® Stick Classic against combustible cigarette smoke. Just like the comparison with other ENDS that I discuss above, the various information required by FDA was not available in the published literature. Moreover, the combustible cigarette studies also used aerosol testing parameters different than those used for the BIDI® Stick Classic. A0068-0069. But FDA never explained why relying on data from published literature for comparisons involving traditional cigarettes was acceptable, but that the same approach was not acceptable for comparisons involving other ENDS products.

31. FDA also allowed NJOY, another manufacturer of ENDS products, to use published literature as a source of aerosol data for ENDS comparator products when granting marketing authorization for NJOY's tobacco-flavored ENDS product. FDA concluded:

12

The toxicology review concludes that the majority of HPHC yields measured in aerosols of the new products were decreased compared to literature-reported yields from combusted cigarettes, ENDS products of the same category (disposable ENDS) and subcategory (closed e-cigarette), and other ENDS products form different categories (i.e., ciga-a-like, pod, and tank systems).

A0071 (excerpt).

32. But FDA never explained why the company's comparisons to other ENDS products using data from published literature was inappropriate when the same approach was used and accepted by the agency for NJOY.

## MDO SECOND DEFICIENCY

33. While FDA requested in its deficiency letter that Bidi conduct a leachability study that would characterize the substances (e.g., nickel) that may have leached from the device and its components into the enclosed, pre-filled e-liquid, A0021-0022, Bidi conducted an analysis of all such potential substances that were found in the aerosol of the BIDI® Stick Classic. As Bidi explained in its deficiency response, users are exposed to and inhale constituents in the aerosol, and are not exposed to the e-liquid which is contained in the device. A0072. Analysis of the aerosol is appropriate to fully evaluate the health risks from use of the BIDI® Stick Classic, as well as for comparison to traditional cigarettes. It is the aerosol (from the ENDS product) and the smoke (from cigarettes) that consumers are exposed to

13

during product use. If compounds leached from the BIDI® Stick Classic container closure system do not transfer to aerosol, then there is no risk from that substance.

34. The results from the aerosol testing were positive for the BIDI® Stick Classic. The number and concentration of aerosol HPHCs were fewer and lower in the BIDI® Stick Classic than aerosols found in combustible cigarette smoke. The chemical complexity of the aerosol for the BIDI® Stick Classic was also 96% reduced versus a combustible cigarette. A0073. Bidi concluded:

> Taken together, the aerosol chemistry data show substantial reductions in the numbers and levels of constituents, including HPHCs in the aerosols generated by the BIDI® Stick Classic product relative to cigarettes. The result is likely significant reductions in exposures and associated cancer risks and non-cancer hazards from the BIDI® Stick Classic product compared to smoking combusted cigarettes. The data and available information also show potential exposures and overall health risks from the BIDI® Stick Classic product are within those associated with other tobacco-flavored comparator ENDS products on the market in the U.S.

A0074.

35. In the MDO, however, FDA never evaluated the testing or analytical method used by Bidi to evaluate the aerosol. Instead, FDA maintained that Bidi's method could not be used to test for various substances in the e-liquid itself. But FDA never indicated that Bidi's testing methodology for evaluating actual user exposures associated with aerosol or that submitting an aerosol test in lieu of a leachability test was inappropriate or any less informative.

14

## MDO THIRD DEFICIENCY

36.     FDA concluded in the MDO that "[d]ue to the high abuse liability of the new product, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product; and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence." A0005. FDA claimed "the totality of the evidence demonstrates that the abuse liability of the new product is similar or higher than" a typical combustible cigarette based on nicotine exposures measured in the BIDI® Stick Classic. A0004. This is contrary to existing evidence and FDA's approach to abuse liability in the past.

37.     First, FDA provided no support for its concerns regarding nonusers.  In fact, FDA ignored contrary evidence submitted by Bidi in its response to the deficiency letter based on a perceptions and intentions survey study involving the product. Specifically, low proportions of former smokers (6.0%-9.7%), non-smokers (3.4% to 5.2%), and never-smokers (1.0%-2.4%) indicated any positive intention to try the product. A0077. Moreover, current smokers and ENDS users had a significantly higher likelihood of using a BIDI® Stick than non-smokers and non-ENDS users. A0077. Even though these data demonstrate the BIDI® Stick Classic will not pose a relevant degree of initiation risk among non-users of nicotine, FDA

15

never addressed this evidence in the MDO and offered no contrary evidence of its own.

38.    As I discuss below, Bidi submitted additional studies and surveys also indicating that nonusers, young adults, and youth are unlikely to use the BIDI® Stick Classic. For example, one published survey found that 0.00% of adolescents and young adults had used the product within the last 30 days.

39.    Second, in its response to the deficiency letter, Bidi also cited to both a clinical study and a BIDI® Stick dependence study to show that nicotine exposure levels, and thus the risk of abuse liability, were not significantly different between the BIDI® Stick Classic and a typical combustible cigarette. A0075. This is important because smokers are most likely to switch away from cigarettes to ENDS when there are comparable levels of nicotine in each. As Bidi's deficiency response noted in the context of tobacco harm reduction ("THR"):

> THR relies on the fundamental principle that the harms associated with cigarette smoking, at both the individual and population levels, can be reduced by providing adult smokers with alternatives to cigarettes which deliver a satisfying nicotine level but with lower levels of harmful chemicals found in cigarette smoke. Acceptability of novel tobacco and nicotine products to adult smokers is an important driver of the likelihood that a given product will support smokers in transitioning away from cigarette smoking…[I]t is generally considered that more cigarette-like nicotine delivery is important to the uptake of novel tobacco products such as ENDS, their continued use, and prevention of relapse back to cigarette smoking…Therefore, the comparable dependence of cigarettes and the BIDI® Stick Classic supports the notion that this product can assist smokers' switching and

16

contribute to reductions in the individual- and population-level harms associated with cigarette smoking.

A0075.

40.     In granting marketing approval for NJOY's tobacco-flavored ENDS product and IQOS device (a tobacco-flavored heat-not-burn product), FDA likewise made clear that comparable nicotine levels support an APPH finding because this helps smokers move away from more dangerous cigarettes, despite some risk of addiction to non-tobacco users. In those cases, FDA wanted a new ENDS product to help sustain dependence in already nicotine-dependent populations. A0076- 0077.

41.     In the MDO, however, FDA appears to have completely changed, without any explanation, its approach to the appropriate level of nicotine in risk reduction products. FDA now says that comparable or relatively higher nicotine levels will likely maintain or augment dependence, A0004-0005, without ever acknowledging or discussing the fact that such levels will instead help addicted smokers switch to much less risky ENDS products. FDA is now apparently saying that an ENDS product, to be APPH, has to result in less nicotine exposure than a cigarette, and thus less addictive potential. In fact, FDA appears to be saying that, to be APPH, an ENDS product has to be a complete cessation product. We are not aware of any other instance of FDA taking this position in a PMTA review.

17

## EVIDENCE SUPPORTING APPH

42.     The Tobacco Control Act requires FDA to review all of the data contained in a PMTA and its amendments, taking a holistic approach that balances all of scientific and technical information submitted to the agency when determining whether a product is APPH and should be issued an MGO. Bidi submitted extensive materials in both the PMTA and through amendments regarding its BIDI® Stick Classic demonstrating it is APPH. The following is just a sampling:

43.     **Population Prevalence Study of the BIDI® Stick** – This 2022 independent survey involved over 4,500 youths and young adults aged 13-24 and looked at the prevalence of use of various ENDS products, including the BIDI® Stick Classic. The study, which was published in the *Harm Reduction Journal*, found that 0.00% of adolescents (13-17 years) and young adults (18-20 years) currently use (past 30 days) the BIDI® Stick Classic. *See* http://tinyurl.com/34pxrtyp. This is consistent with the fact that FDA did not raise any concerns in the March 2023 deficiency letter about underage use.

44.     **Perceptions and Behavioral Intentions ("PBI") Study of the BIDI® Stick E-Cigarette** – This 2021-2022 cross-sectional survey, published in *Drug Testing and Analysis*, of almost 8,000 non-smokers, current smokers, and former smokers aged 21 years or older assessed consumer intentions to try and use a BIDI® Stick. Current smokers and e-cigarette current users were significantly more likely

18

than non-smokers and e-cigarette non-users, respectively, to report a positive intention to try and use a BIDI® Stick regularly. As to the BIDI® Stick Classic, less than 1% (0.9%) of Young Adult Non-Smokers who had never used an e-cigarette in their lifetime reported a positive intention to try a BIDI Stick Classic at least once. In contrast, a positive intention to try a BIDI Stick Classic was reported by around 1-in-5 (22.4%) adult Current Smokers. *See* http://tinyurl.com/mu82vu5n.

45. **BIDI® Stick Likelihood of Use ("LOU") Study** – This survey of almost 3,000 participants was conducted in 2021. It involved individuals 21 years and older, including tobacco product users, former users, current smokers with intention to quit, current cigarette smokers without intention to quit, and current ENDS users. Per FDA regulations (PMTA Final Rule, 86 Fed. Reg. 55300, 55368 (Oct. 5, 2021)), young adults (ages 21-24 years) served as a proxy for youth (under 21 years). Key study findings for each BIDI® Stick, including the Classic, suggest low appeal to all cohorts, including non-users, former users, and youth. Specifically, non-users (both former and never users), as well as young adult non-users, reported no interest ("no chance") of using the product. Current cigarette smokers indicated a statistically significant greater intention to try and use BIDI® Stick regularly compared to non-users. A0078-0106.

46. **BIDI® Stick Patterns of Use ("POU") Study** – Approximately 250 current adult (21 years or older) BIDI® Stick users participated in a 2021

A0166

retrospective, self-reported, cross-sectional survey to recall usage and perceived health risk of the company's products. Specifically, the study addressed usage habits, devices used, potential switching, and absolute/relative health risks versus other tobacco/nicotine products. Study findings support the conclusion that users of BIDI® Stick may be using the product in substitution for other tobacco products, such as combustible cigarettes. For example, over 60% of current BIDI® Stick users who reported prior combustible cigarette use had not smoked in the past 30 days. A0107-0113.

47.    **Survey on BIDI® Stick Usage and Potential Impact** – This survey involved over 200 BIDI® Stick users. More than half of the participants indicated that they have stopped smoking combustible cigarettes. Specifically, 53% of the respondents reported having quit smoking, with 54% indicating that they would be "highly unlikely" to use cigarettes again after using the BIDI® Stick. A0114-0115.

48.    **BIDI® Stick Classic Nonclinical Studies** – Various *in vitro* studies using aerosols generated from the BIDI® Stick Classic showed less toxicity and substantial reductions in associated cancer and non-cancer risks when compared to combusted cigarettes i.e., likely reductions in user exposures and associated health hazards from the use of the BIDI® Stick Classic. A0116.

49.    In the MDO, however, FDA did not consider or balance any of this evidence against the three alleged deficiencies when deciding whether the BIDI®

20

Stick Classic is APPH. In fact, FDA did not mention in the MDO any other data or information contained in Bidi's extensive PMTA or amendments before denying the company marketing authorization.

I certify under penalty of perjury that the foregoing is true and correct.

Executed February 2, 2024.

Willie J. McKinney

A0168

# Willie J. McKinney, Jr. Ph.D., D.A.B.T.

4940 Old Main Ste #603, Henrico VA 23231 / 804.938.3000 / Willie@McKinneyRSA.com

## PROFESSIONAL EXPERIENCE

**CEO**

McKinney Specialty Labs, LLC., Henrico, VA                 **2024 - Present**

Responsibilities include making major business decisions and managing the overall operations and resources of McKinney Specialty Labs.

- Providing clients product testing services for internal decision making and regulatory submission.

**CEO**

McKinney Regulatory Science Advisors, LLC., Henrico, VA        **2020 - Present**

Responsibilities include making major business decisions and managing the overall operations and resources of McKinney RSA.

- Preparing clients to navigate a complex and dynamic regulatory environment by identifying opportunities and advising on regulatory science and stakeholder engagement strategy.

**Vice President-Global Regulatory Affairs**                **2019 - 2020**

JUUL Labs, Inc., San Francisco, CA

Responsibilities included building a Global Regulatory Affairs organization as well as leading the company's efforts to prepare Premarket Tobacco Product Applications (PMTA).

- Improved communication and collaboration by establishing a Global Regulatory Affairs Council.
- Improved product development efficiency by implementing a comprehensive toxicological evaluation process.
- Established and led PMTA progress/issues management meetings that resulted in all stakeholders working from a comprehensive regulatory strategy.

**Vice President - Regulatory Sciences**                **2016 - 2019**

Altria Client Services Inc., Richmond, VA

Responsibilities included leading a team of 100 scientist/regulatory affairs professionals as well as developing & executing scientific strategies to support product development, facilitate regulatory engagement and compliance, and advance business goals.

- Represented the entire tobacco industry on FDA's Tobacco Product Scientific Advisory Committee.
- Successfully represented several companies that have obtained tobacco product market and claims authorizations from FDA.
- Expanded industry knowledge of important topics by serving on Smithers Rapra, Electronic Nicotine Delivery Systems (ENDS) US advisory board.

**Senior Director - Product Integrity & Regulatory Reporting**      **2012 - 2016**

Regulatory Affairs, Altria Client Services Inc., Richmond, VA

Responsibilities included leading a team of 25 scientists/regulatory affairs professionals and managing a budget of $11.8MM. Developed and implemented innovative regulatory strategies that provided business flexibility and met regulatory requirements.

- Successfully integrated two departments into one high performing organization.
- Reduced staff regulatory report preparation time by 13 weeks.
- Utilized automation to reduce regulatory evaluation time by 70%.

A0169

- Developed scientific strategies that resulted in the companies first FDA tobacco product market orders.

**Director - Product Integrity**
Tobacco Research & Health Sciences, Altria Client Services Inc., Richmond, VA                    **2010 – 2012**
Responsibilities included leading a team of 12 scientists and managing a budget of $6.2MM.

- Developed and implemented scientific strategies to ensure product integrity and address business unit issues. Team also collaborated with all R&D functions in the development of new product claims.
- Increased number of product and packaging evaluations completed within two-week target from 68% to 89%.
- Improved toxicological and regulatory evaluation times while the number of operating companies supported increased from 3 to 5.

**Director - Strategic Product Planning**
Research & Development, Altria Client Services Inc., Richmond, VA                    **2008 – 2010**
Responsibilities included leading a team of 7 employees with a budget of $2.7MM and providing operational and strategic support to the Altria Client Services Chief Technology Officer.

- Led the integration of acquired smokeless tobacco company RD&E team.  Identified integration synergies of $4.2MM.
- Reduced budget by 15% while maintaining quality client service.
- Increased use and awareness of company leadership development system by 90%.

**Senior Manager – Cellular & Molecular Biology Group**
Health Sciences Research, Philip Morris USA, Richmond, VA                    **2004 - 2008**

- Built an organization focused on using molecular techniques to disclose mechanisms of smoke induced disease.
- Published several scientific papers and presented several abstracts at national conferences.
- Received recognition award for leading Research & Technology program team.
- Organized/Led COPD symposium (2007 American College of Toxicology Conference).

**Visiting Scientist – Institut fur Biologische Forschung GmbH (INBIFO)**                    **2000**
Koln, Germany

- Enhanced individual capabilities to critically review scientific information.

**Toxicologist – Product Integrity**                    **1998 - 2004**
Worldwide Scientific Affairs, Richmond, VA

- Developed a non-clinical program to study Chronic Obstructive Pulmonary Disease (COPD).
- Designed toxicological studies to support acceptability of product ingredient(s) modifications.

Nelson Institute of Environmental Medicine
New York University Medical Center, Tuxedo, NY
**Associate Research Scientist**                    **1997 – 1998**

- Investigated potential mechanisms of particulate matter-induced lung injury.

Center for Environmental Medicine and Lung Biology
University of North Carolina, Chapel Hill, NC
**Graduate Research Assistant**                    **1994 - 1997**

- Investigated the potential role of IL-6 in O3-induced lung injury.

United States Environmental Protection Agency

A0170

Health Effects Research Laboratory, Research Triangle Park, NC
**Scientist Associate**                                                      **1991 – 1993**


United States Department of Agriculture
Agricultural Research Center, New Orleans, LA
**Research Assistant**                                                       **1989 - 1990**
New Orleans Ecological Mosquito Control, New Orleans, LA
**Research Assistant**                                                       **Summer 1989**

# EDUCATION

**Diplomat** - The American Board of Toxicology                              **2004**
**Doctor of Philosophy** – Toxicology-Gillings School of Public Health,
University of North Carolina, Chapel Hill, NC                                **1998**
**Patricia Roberts Harris Fellow**- University of North Carolina, Chapel Hill NC   **1993**
**Master of Science** - Biology- North Carolina Central University, Durham NC      **1993**
**Bachelor of Science** - Biology- Xavier University, New Orleans, LA          **1990**

# PUBLICATIONS

Russell, C., **W. J. McKinney** and I. M. Fearon (2023). "Behavioral intentions assessment of a disposable e-cigarette among adult current, former, and non-smokers in the United States." *Drug Test Anal.*

Olson, C. K., N. Sherwood, M. Berkane, K. Gilligan and **W. J. McKinney, Jr.** (2023). "Perceptions, intentions, and actual use of a consumer nicotine gum." *Harm Reduct J* 20(1): 132.

Appleton, S., H. Cyrus-Miller, R. Seltzer, K. Gilligan and **W. McKinney** (2022). "Market survey of disposable e-cigarette nicotine content and e-liquid volume." *BMC Public Health* 22(1): 1760.

Noel, A., M. Campen and **W. McKinney** (2022). "The Importance of Conventional Toxicological Metrics of Aerosol Characterization." *Toxicol Sci* 189(2): 153-154.

Rostami, A. A., J. L. Campbell, Y. B. Pithawalla, H. Pourhashem, R. S. Muhammad-Kah, M. A. Sarkar, J. Liu, **W. J. McKinney**, R. Gentry and M. Gogova (2022). "A comprehensive physiologically based pharmacokinetic (PBPK) model for nicotine in humans from using nicotine-containing products with different routes of exposure." *Sci Rep* 12(1): 1091.

Fearon, I. M., K. Gilligan, R. G. N. Seltzer and **W. McKinney** (2022). "A randomised, crossover, clinical study to assess nicotine pharmacokinetics and subjective effects of the BIDI (®) stick ENDS compared with combustible cigarettes and a comparator ENDS in adult smokers." *Harm Reduct J* 19(1): 57.

Iskandar, A. R., F. Zanetti, A. Kondylis, F. Martin, P. Leroy, S. Majeed, S. Steiner, Y. Xiang, L. Ortega Torres, K. Trivedi, E. Guedj, C. Merg, S. Frentzel, N. V. Ivanov, U. Doshi, K. M. Lee, **W. J. McKinney, Jr.,** M. C. Peitsch and J. Hoeng (2019). "A lower impact of an acute exposure to electronic cigarette aerosols than to cigarette smoke in human organotypic buccal and small airway

A0171

cultures was demonstrated using systems toxicology assessment." *Intern Emerg Med* 14(6): 863-883.

Kogel, U., F. Calvino-Martin, B. Titz, G. Vuillaume, N. Ivanov, E. Guedj, A. Elamin, P. Vanscheeuwijck, J. Hoeng, M. Peitsch, K. Lee, M. Oldham, W. Gardner and **W. McKinney** (2017). "Comparison of molecular changes associated with cigarette smoke-induced toxicity pathways following mice whole body and nose-only exposure." *Toxicology Letters* 280: S241.

Lee, K. M., J. Hoeng, S. Harbo, U. Kogel, W. Gardner, M. Oldham, E. Benson, M. Talikka, A. Kondylis, F. Martin, B. Titz, S. Ansari, K. Trivedi, E. Guedj, A. Elamin, N. V. Ivanov, P. Vanscheeuwijck, M. C. Peitsch and **W. J. McKinney, Jr.** (2018). "Biological changes in C57BL/6 mice following 3 weeks of inhalation exposure to cigarette smoke or e-vapor aerosols." *Inhal Toxicol* 30(13-14): 553-567.

Wagner, K. A., J. W. Flora, M. S. Melvin, K. C. Avery, R. M. Ballentine, A. P. Brown and **W. J. McKinney** (2018). "An evaluation of electronic cigarette formulations and aerosols for harmful and potentially harmful constituents (HPHCs) typically derived from combustion." *Regul Toxicol Pharmacol* 95: 153-160.

Richard W. Morgan, Lisa M. Merriman, Donna C. Smith, Michael J. Oldham, **Willie J. McKinney**. Toxicological evaluation of in vitro and in vivo effects of Jambu Oleoresin. Manuscript in preparation for submission to *Food and Chemical Toxicology*.

Flora, J. W., N. Meruva, C. B. Huang, C. T. Wilkinson, R. Ballentine, D. C. Smith, M. S. Werley and **W. J. McKinney** (2016). "Characterization of potential impurities and degradation products in electronic cigarette formulations and aerosols." *Regul Toxicol Pharmacol* 74: 1-11.

Werley, M. S., J. H. Miller, D. B. Kane, C. S. Tucker, **W. J. McKinney** and M. J. Oldham (2016). "Prototype e-cigarette and the capillary aerosol generator (CAG) comparison and qualification for use in subchronic inhalation exposure testing." *Aerosol Science and Technology* 50(12): 1284-1293.

**McKinney, W. J.**, R. H. Jaskot, J. H. Richards, D. L. Costa and K. L. Dreher (1998). "Cytokine mediation of ozone-induced pulmonary adaptation." *Am J Respir Cell Mol Biol* 18(5): 696-705.

Obot, C., K. Lee, A. Fuciarelli, R. Renne and **W. McKinney** (2004). "Characterization of mainstream cigarette smoke-induced biomarker responses in ICR and C57Bl/6 mice." *Inhal Toxicol* 16(10): 701-719.

Oldham, M. J., C. R. Coggins and **W. J. McKinney, Jr.** (2013). "A comprehensive evaluation of selected components and processes used in the manufacture of cigarettes: approach and overview." *Inhal Toxicol* 25 Suppl 2: 1-5.

Coggins, C. R., **W. J. McKinney, Jr.** and M. J. Oldham (2013). "A comprehensive evaluation of the toxicology of experimental, non-filtered cigarettes manufactured with different circumferences." *Inhal Toxicol* 25 Suppl 2: 69-72.

Coggins, C. R., A. M. Jerome, P. D. Lilly, **W. J. McKinney, Jr.** and M. J. Oldham (2013). "A comprehensive toxicological evaluation of three adhesives using experimental cigarettes." *Inhal Toxicol* 25 Suppl 2: 6-18.

Werley, M. S., A. M. Jerome, D. J. DeSoi, C. R. Coggins, M. J. Oldham and **W. J. McKinney** (2013). "A comprehensive evaluation of the toxicology of experimental cigarettes manufactured with banded papers." *Inhal Toxicol* 25 Suppl 2: 19-33.

Oldham, M. J., H. J. Haussmann, W. Gomm, L. T. Rimmer, M. J. Morton and **W. J. McKinney, Jr.** (2012). "Discriminatory power of standard toxicity assays used to evaluate ingredients added to cigarettes." *Regul Toxicol Pharmacol* 62(1): 49-61.

York, T. P., E. J. van den Oord, T. B. Langston, J. S. Edmiston, **W. McKinney**, B. T. Webb, E. L. Murrelle, B. K. Zedler and J. W. Flora (2010). "High-resolution mass spectrometry proteomics for the identification of candidate plasma protein biomarkers for chronic obstructive pulmonary disease." *Biomarkers* 15(4): 367-377.

Scian, M. J., M. J. Oldham, D. B. Kane, J. S. Edmiston and **W. J. McKinney** (2009). "Chemical analysis of cigarette smoke particulate generated in the MSB-01 in vitro whole smoke exposure system." *Inhal Toxicol* 21(12): 1040-1052.

Scian, M. J., M. J. Oldham, J. H. Miller, D. B. Kane, J. S. Edmiston and **W. J. McKinney** (2009). "Characterization of a whole smoke in vitro exposure system (Burghart Mimic Smoker-01)." *Inhal Toxicol* 21(3): 234-243.

Edmiston, J. S., J. W. Flora, M. J. Scian, G. Li, G. S. Rana, T. B. Langston, T. K. Sengupta and **W. J. McKinney** (2009). "Cigarette smoke extract induced protein phosphorylation changes in human microvascular endothelial cells in vitro." *Anal Bioanal Chem* 394(6): 1609-1620.

Pounds, J. G., J. W. Flora, J. N. Adkins, K. M. Lee, G. S. Rana, T. Sengupta, R. D. Smith and **W. J. McKinney** (2008). "Characterization of the mouse bronchoalveolar lavage proteome by micro-capillary LC-FTICR mass spectrometry." *J Chromatogr B Analyt Technol Biomed Life Sci* 864(1-2): 95-101.

Flora, J. W., J. Edmiston, R. Secrist, G. Li, G. S. Rana, T. B. Langston and **W. McKinney** (2008). "Identification of in vitro differential cell secretions due to cigarette smoke condensate exposure using nanoflow capillary liquid chromatography and high-resolution mass spectrometry." *Anal Bioanal Chem* 391(8): 2845-2856.

Hodge-Bell, K. C., K. M. Lee, R. A. Renne, K. M. Gideon, S. J. Harbo and **W. J. McKinney** (2007). "Pulmonary inflammation in mice exposed to mainstream cigarette smoke." *Inhal Toxicol* 19(4): 361-376.

Obot, C., K. Lee, A. Fuciarelli, R. Renne and **W. McKinney** (2004). "Characterization of mainstream cigarette smoke-induced biomarker responses in ICR and C57Bl/6 mice." *Inhal Toxicol* 16(10): 701-719.

Shukla, A., C. Timblin, K. BeruBe, T. Gordon, **W. McKinney**, K. Driscoll, P. Vacek and B. T. Mossman (2000). "Inhaled particulate matter causes expression of nuclear factor (NF)-kappaB-related genes and oxidant-dependent NF-kappaB activation in vitro." *Am J Respir Cell Mol Biol* 23(2): 182-187.

**McKinney, W. J.**, R. H. Jaskot, J. H. Richards, D. L. Costa and K. L. Dreher (1998). "Cytokine mediation of ozone-induced pulmonary adaptation." *Am J Respir Cell Mol Biol* 18(5): 696-705.

# PATENTS

Biomarkers of lung function.
Patent number: 9945872

Inventors: Jason Flora, Barbara K. Zedler, Edward Lenn Murrelle, Mark Leppert, Edwin J. C. G. van den Oord, Bradley Todd Webb, Timothy York, Gaurav S. J. B. Rana, Jeffrey S. Edmiston, Willie J. McKinney

Abstract: Cigarette smoking is a primary determinant of chronic obstructive pulmonary disease (COPD), which is the fourth leading cause of morbidity and mortality in the United States. Unique proteins associated with COPD capable of differentiating subjects likely to experience rapid (RPD) or slow (SLW) decline in lung function have been identified using comprehensive high-throughput proteomic approaches. Thirty peptides, which mapped to 21 unique proteins, were linearly associated with annualized rates of lung function decline among smokers with COPD characterized as having rapid or slow decline and smokers without COPD. Using three different statistical approaches to assess the data, the RPD and SLW groups are differentiated by 55 peptides, which mapped to 33 unique proteins. A number of the identified peptides are proteolytic fragments of proteins that are involved in the complement and/or coagulation systems, have anti-protease activity, or metabolic functions.

Type: Grant
Filed: July 3, 2012
Date of Patent: April 17, 2018 Assignee: Lineagen, Inc

# POSTERS AND PRESENTATIONS

*Risk Assessment & Toxicological Evaluation for Cannabis Terpene Concentrates Intended for Inhalation.* **Willie J. McKinney**, McKinney Regulatory Science Advisors, VA, USA. To be presented at Cannabis Science Conference – Fall, Providence, Rhode Island, September 20-22, 2023

*Behavioral Intentions Assessment of a Disposable E Cigarette Among Adult Current, Former, and Non Smokers in the United States.* Christopher Russell[1], **Willie J. McKinney**[2] and Ian M. Fearon[3]; [1]Russell Burnett Research & Consultancy, Glasgow, UK, [2]McKinney Regulatory Science Advisors, VA, USA, [3]whatIF? Consulting, Harwell, UK. To be presented at 76th Tobacco Science Research Conference, Norfolk, VA, September 2023

*Risk Assessment and Toxicological Evaluation Program for Cannabis Terpene Concentrates Intended for Inhalation.* **Willie J. McKinney**, McKinney Regulatory Science Advisors, VA, USA, Cannabis Science Conference – Spring, Portland, Oregon from April 19-21, 2023

*Risk Assessment and Toxicological Evaluation Program for Terpene Concentrates Intended for Inhalation.* **Willie J. McKinney Ph.D., DABT**, McKinney Regulatory Science Advisors, LLC., Ranulfo Lemus ScD, DABT, LeTox World, LLC., Jennifer Guild, Vice President of Regulatory and Quality, and Thomas J. Martin Jr., Vice President of Research and Development, Abstrax Tech, Inc. Cannabis Science Conference – Spring, Portland, Oregon from April 19-21, 2023

*Perceptions and Use of an Ends Device for a Vulnerable Population: Incarcerated Persons.* Cheryl Olson[1], Neil Sherwood[2] and **Willie McKinney**[3]; [1]Cheryl K. Olson, Sc.D., San Carlos, CA, USA, [2]Neil Sherwood Consulting, Nyon, Vaud, Switzerland and [3]McKinney Regulatory Science Advisors, Henrico, VA, USA. 75th Tobacco Science Research Conference New Orleans, LA September 2022

*Use of Dissolution to Characterize and Compare Oral Nicotine Products.* Helen Cyrus-Miller[1] and **Willie McKinney Jr.**[2]; [1]HF Cyrus Miller, Sandston, VA, USA and [2]McKinney Regulatory Science Advisors, Richmond, VA, USA. 75th Tobacco Science Research Conference September 2022

*A Randomized, Crossover, Clinical Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the Bidi Stick Ends Compared with Combustible Cigarettes and a Comparator Ends in Adult Smokers.* Ian M. Fearon[1], Karin M. Gilligan[2], Ryan G. N. Seltzer[3], **Willie J. McKinney**[4]. [1]whatIF? Consulting Ltd, Harwell, United Kingdom, [2]Grey Manor Consulting, Moseley, VA, USA, [3]Safety in Numbers, LLC, Tucson, AZ, USA, [4]McKinney Regulatory Science Advisors, LLC, Henrico, VA, USA. 28th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), Baltimore, MD, March 17, 2022

*What Might the Population Health Impact Have Been Had Chew and Park Oral Tobacco Products Been Introduced into The U.S. Market In 1990?* Peter Lee[1], John Fry[2], Neil Sherwood[3], Samy Hamdouche[4], **Willie McKinney**[5]. [1]P N Lee Statistics and Computing Ltd., Sutton, United Kingdom, [2]RoeLee Statistics Ltd., Sutton, United Kingdom, [3]Neil Sherwood Consulting, Nyon, Switzerland, [4]Lucy Goods, Inc., Los Angeles, CA, USA, [5]McKinney Regulatory Science Advisors, LLC., Henrico, VA, USA. 27th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), Virtual, February 24, 2021

*Perception And Intention Studies - Making Sense of Behavior Research For New Tobacco Products.* Cheryl K. Olson, M.P.H., Sc.D.[1], Neil Sherwood, Ph.D.[2], Samy Hamdouche, Ph.D.[3], **Willie McKinney**, Ph.D.[4]. [1]Cheryl K. Olson Sc.D., LLC, San Carlos, CA, USA, [2]Neil Sherwood Consulting, Nyon, Vaud, Switzerland, [3]Lucy Goods, Inc., Los Angeles, CA, USA, [4]McKinney

Regulatory Science Advisors, LLC, Henrico, VA, USA 27th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT) Virtual February 24, 2021

*Prediction of Analyte Yields, Mutagenicity, and Cytotoxicity of Mainstream Tobacco Smoke from Tobacco Blends*. Smith, D.C.; Mason, D.J.; Morton, M.J.; Oldham, M.J.; **McKinney, W.J.,** 25th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), San Francisco, CA, February 20-23, 2019.

*Method for Estimating Non-study Cigarette Use Among Switchers to Very Low Nicotine Content (VLNC) Cigarettes in Ambulatory Clinical Trials*. Zhang, M.; Edmiston, J.; Karles, G.; **McKinney, W.;** Smith, D., 25th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), San Francisco, CA, February 20-23, 2019.

*A 7-Month Inhalation Study in C57BL/6 Mice to Investigate Potential Toxicity of E-vapor Aerosols Compared to Cigarette Smoke Using Cessation and Switching Study Design*. Kumar, A.; Harbo, S.; Benson, E.; Oldham, M.; Gardner, B.; Hoeng, J.; **McKinney, W.;** Lee, K.M., 58th Annual Meeting of the Society of Toxicology (SOT), Baltimore, MD, March 10-14, 2019.

*Reporting Formaldehyde in Electronic Cigarette Aerosol and the Relevance of Formaldehyde Hemiacetals and Acetals*. Melvin, M.S.; Avery, K.; Ballentine, R.; Gardner, W.P.; Jin, X.; **McKinney, W.;** Pithawalla, Y.B.; Smith, D.C.; Wagner, K.A., 2019 American Chemical Society (ACS) National Meeting & Expo, Orlando, FL, March 31 - April 4, 2019.

*Characterization of an Air-Liquid-Interface (ALI) in vitro Exposure System (VITROCELL® 24/48) Using a Prototype e-Vapor Product*. Zhang, J.; Oldham, M.J.; Doshi, U.; Gilman, G.; Wolz, R.L.; Kosachevsky, P.; Coffa, B.; **McKinney, W.J.;** Lee, K.M., 58th Annual Meeting of the Society of Toxicology (SOT), Baltimore, MD, March 10-14, 2019.

*Comparison of the impacts of an acute exposure to electronic cigarette aerosol and cigarette smoke on small airway epithelial cultures: In vitro systems toxicology assessment*. Iskandar, A.R.; Kondylis, A.; Martin, F.; Steiner, S.; Majeed, S.; Leroy, P.; Guedj, E.; Merg, C.; Trivedi, K.; Frentzel, S.; Ivanov, N.V.; Doshi, U.; Lee, K.M.; **McKinney, W.J.;** Peitsch, M.C.; Hoeng, J., 58th Annual Meeting of the Society of Toxicology (SOT), Baltimore, MD, March 10-14, 2019.

*Structure-Activity Relationships of Propylene Glycol, Glycerin, And Select Analogs for Carbonyl Thermal Degradation Products*. Matt S. Melvin, Regina M. Ballentine, William P. Gardner, **Willie J. McKinney**, Yezdi B. Pithawalla, Donna C. Smith and Karl A. Wagner. (2018). 72nd Tobacco Science Research Conference September 2018

*Evaluation of the Formaldehyde Hemiacetals and Acetals Relevant to Electronic Cigarettes*. Xiaohong Cathy JIN, Karen C. Avery, Regina M. Ballentine, William P. Gardner, **Willie J. McKinney**, Matt S. Melvin, Yezdi B. Pithawalla, Donna C. Smith and Karl A. Wagner. (2018). 72nd Tobacco Science Research Conference September 2018

*Challenges and Opportunities in Cigar Science*. Jennifer H. Smith[1], Shamina M. Aubuchon[1], Karl A. Wagner[1], **Willie J. McKinney**[1], Gene Gillman[2] and Rob Stevens[3]; [1]Altria Client Services LLC,

Richmond, VA USA, [2]Enthalpy Analytical, Henrico, VA USA and [3]ITG Brands LLC, Greensboro, NC USA.72nd Tobacco Science Research Conference September 2018

*Evaluation of Novel, Oral Tobacco-Derived Nicotine Products for HPHCs*. Timothy L. Danielson, Christopher B. McFarlane, Anthony P. Brown, Xiaohong Jin, Celeste T. Wilkinson, Yezdi B. Pithawalla and **Willie J. McKinney Jr**.; Altria Client Services LLC, Richmond, VA USA. 72nd Tobacco Science Research Conference September 2018

*Toxicological Assessment of E-Liquid Formulations Using In Vitro Genotoxicity and Cytotoxicity Assays*. Bonnie G. Coffa, Utkarsh Doshi, Jingjie Zhang, **Willie J. McKinney** and K. Monica Lee; Altria Client Services LLC, Richmond, VA USA.72nd Tobacco Science Research Conference September 2018

*The Weight of Evidence for Nicotine to Play a Role in Adverse Reproductive and Developmental Outcomes: Challenges to Long Held Perspectives*. Franzen, H. Wu, R. Gentry, SI. Sulsky, DC. Smith, **WJ. McKinney**. 2016. 23rd Annual Society for Research on Nicotine and Tobacco Conference, Florence, Italy. March 2017.

*An Evaluation of Electronic Cigarette Formulations and Aerosols for HPHCs Typically Derived from Tobacco Combustion*. Karl A. Wagner, Karen C. Avery, Anthony P. Brown, Jason W. Flora, Xiaohong (Cathy) Jin, Matt S. Melvin, **Willie J. McKinney**. 23rd Annual Society for Research on Nicotine and Tobacco Conference, Florence, Italy. March 2017.

*Protein Phosphorylaton Changes in Human Microvascular Endothelial Cells Induced by Cigarette Smoke Exposure*. Flora, J.W., Edmiston, J.S., Langston, T.B., Rana, G.S.J.B Secrist R., **McKinney, W.J** (2008) 56th American Society of Mass Spectrometry (ASMS), Denver, Colorado

*Characterization of In Vitro Lung Cancer Secretome and a Comparison with Differentially Expressed Plasma Proteins from Lung Cancer Patients*. Huang, D., Langston, T.B., **W.J. McKinney**, W.J. Rana, G.S.J.B., Flora, J.W. (2008) 56th American Society of Mass Spectrometry, Denver, Colorado

*A Proteomic Technique to Characterize In Vitro Cellular Response using Nano-Flow Capillary LC Coupled to an LTQ-FTMS*. Flora, J.W., Edmiston, J.S., Secrist, R., Rana, G.S.J.B., Li, G., **McKinney W.J.** (2007) 55th American Society of Mass Spectrometry, Indianapolis, Indiana.

*Constituent and biological characterization of mainstream cigarette smoke generated from a direct pump exposure system*. Hodge-Bell, K., Lee, K.M., Hayden B.K., Mac Isaac B.D., Wisse, L.A., Harbo, S.J., **McKinney, W.J.** (2005). Frontiers in Aerosol Dosimetry Research Conference – October 24-25,2005, Conference Proceedings – June 2006.

*Comparative analysis of bronchoalveolar lavage (BAL) fluid biomarkers in mice following acute cigarette smoke exposure*. Obot, C.J., Fuciarelli, A.F., Lee, M.K., Westerberg, R.B., and **McKinney, W.J.** (2003) The Toxicologist, 72(S-1), 294.

A0177

*Evaluation of Cigarette Smoke-Induced Intermediate Chronic Obstructive Pulmonary Disease (COPD) Biomarker Responses in Mice.* Obot C.J., Lee, KM., Fuciarelli, A.F., Westerberg, R.B., and **McKinney W.J.** (2003). Toxicology Letters, 144 (Suppl. 1), s104; 382.

*Proteomic Characterization of Mouse Bronchoalveolar Lavage Fluid by Mass Spectrometry.* I. Adkins, J.N., Lee, K.M., Tolic, N., Auberry, K., Smith, R.D., Pounds, J.G., **McKinney, W.J.** (2003). Methods. Toxicology Letters, 144 (Suppl. 1), s162; 602.

A0178

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BIDI VAPOR, LLC,

Petitioner,

v.

No.: 24-10263

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

Respondents.

## DECLARATION OF NIRAJKUMAR PATEL

1.      My name is Nirajkumar ("Niraj") Patel. The following declaration is based on personal knowledge and is submitted in support of Petitioner Bidi Vapor LLC's ("Bidi") Motion for a Stay Pending Review.

2.      I am the founder, Chief Executive Officer, and principal owner of Bidi, which is a privately held Florida limited liability company in the business of manufacturing and selling electronic nicotine delivery systems ("ENDS") to adult smokers and tobacco users 21 years of age and over.

3.      Separate from Bidi, I am one of the founding partners of Kaival Brands Innovations Group, Inc. ("Kaival Brands"), which is listed on the NASDAQ. Formed in March 2020, Kaival Brands continues its original focus as the exclusive distributor of Bidi's "BIDI® Stick" ENDS device in the U.S. I currently hold the titles of Chief Science Officer and Director of Kaival Brands.

## Personal Background

4.      I am a U.S. citizen holding a Bachelor of Science Degree in Pharmacy from AISSMS College of Pharmacy in Pune, India, and a Master of Science in Chemistry from the Florida Institute of Technology. I am 41 years old and currently reside in Melbourne, Florida with my wife and two children.

5.      My family in India has been in the tobacco business for three generations. My paternal grandfather was a tobacco farmer and trader. My father followed in my grandfather's footsteps on the farm and worked to expand the business into tobacco blending and processing. As a young boy, I would visit the factory and see the harmful effects tobacco was having on the workers, especially those that had to handle the raw tobacco plants and were often covered in tobacco dust and waste generated from the processing equipment. Even the workers that did not smoke would often get ill and suffered from inhaling harmful toxins all day from working in the factory.

6.      Many members of my family and friends in India smoke cigarettes and use tobacco products and are facing the health consequences. My maternal grandfather was 70 years old when he died from years of smoking. He was a daily smoker for almost his entire life, and literally died with a cigarette in his hand. My father suffered two heart attacks after years of smoking but was only able to quit after he began using my company's product, the BIDI® Stick.

A0180

7.      Despite witnessing these harmful effects from tobacco and smoking cigarettes, I also began smoking cigarettes when I joined the family business at the age of 20.

8.      I might have continued down the same path as my father and grandfather, but in 2010 I learned about e-cigarettes and vaping technology. After some research, I became very excited by what this new technology could offer for adult smokers like myself and my father. Not long after, I was able to use an e-cigarette – specifically, a disposable product – to quit my own cigarette smoking habit. My health has improved dramatically since I quit smoking.

9.      This inspired me to leave my family's tobacco business and start my own company developing ENDS technology. In 2013, I formed Just Chill Products, LLC, and used my background in chemistry and pharmaceutical studies to develop various ENDS products for adult smokers, including flavored e-liquid formulations containing USP-grade tobacco-derived nicotine.

**Background on Disposable ENDS**

10.     There are two broad categories of ENDS products: open-systems and closed-systems. Open-system devices utilize a refillable e-liquid tank and large, rechargeable 18650 lithium-ion batteries. These products raise several safety concerns. The larger batteries in these products are often unregulated and are prone to overheating and exploding. Open-systems also require consumers to purchase

A0181

separately bottled e-liquid to fill the tanks on their own. This means the consumers must directly handle the nicotine e-liquids. Both the Food and Drug Administration ("FDA") as well as the Consumer Product Safety Commission ("CPSC") have raised serious concerns about the danger this presents to young children and pets who could accidentally come into contact with or ingest flavored e-liquids in unsealed bottles.

11.     Closed-system devices include pod/cartridge-based ENDS, as well as disposable ENDS. Pod/cartridge-based ENDS (like the JUUL) use smaller batteries, but are still rechargeable, presenting some potential to overheat. While the pods are prefilled with e-liquid by the manufacturer, they are often easily manipulated, sometimes leak, and can be refilled by consumers. Counterfeit pods made by black market entities to fit with authentic products also present major safety and health concerns.

12.     While all ENDS products are beneficial for adult cigarette smokers who are unable to quit completely, because of the safety concerns associated with open-systems and pod/cartridge systems, I focused my research on developing disposable ENDS. Disposable ENDS are completely self-contained single units that use smaller batteries that cannot be recharged. These do not present any overheating concerns or fire hazards. The e-liquid in these devices is also prefilled into a sealed reservoir by the manufacturer, so there is no way for consumers (or

children or pets) to ever come into direct contact with the e-liquid. High quality disposables (like the BIDI® Stick) are designed to be tamper-resistant so that the contained e-liquid cannot be contaminated or adulterated. There are also no pods or cartridges that can be lost or misplaced, and no recharging is required.

13.     Disposables are also draw activated and provide a much more consistent nicotine delivery than open system devices, which typically have numerous components and parts and various temperature and other settings. Once the e-liquid in a disposable is consumed the product is discarded (or, like BIDI® Sticks, can be recycled).

14.     Disposable ENDS are often painted in a negative light because they are user-friendly, which may make them easier for non-smokers and young people to try. However, it is precisely because disposables are easy to use compared to multi-component open-systems and rechargeable pod/cartridge systems that they have the potential to help millions of adult smokers switch to vaping, particularly older Americans. Like me and my father, these consumers are used to simply "lighting up" a cigarette, but are often not interested in the other, more complicated ENDS products.

15.     When I was exploring vaping for personal use, I tried many different ENDS products. But it was a first-generation disposable ENDS that was simple and easy enough to finally help me make the switch and stay off cigarettes. It was

A0183

for all these reasons that I decided to focus on developing disposable ENDS technology for adult smokers.

16. It also subsequently became clear that the path to FDA authorization would be less onerous for a disposable ENDS compared to an open-system ENDS. In May 2016, FDA published its draft Premarket Tobacco Product Application ("PMTA") guidance for ENDS along with the Deeming Rule. This was the first agency guidance on the PMTA process specifically for ENDS and summarized FDA's recommendations to meet the "appropriate for the protection of the public health" ("APPH") standard. Among other things, the draft PMTA guidance made clear that constituent testing for closed-system ENDS would be much more straightforward compared to open-systems. More specifically, FDA indicated that testing for an open-system device should reflect the range of operating conditions (such as various temperature, voltage, wattage settings) and use patterns (such as use conditions by light users, typical users, and heavy users) within which consumers are likely to use the product, and that testing for those products should be conducted with a reasonable range of available e-liquids. FDA recommended that a closed-system ENDS (like a disposable), on the other hand, need only be tested with the e-liquids with which it is packaged and sold.

A0184

## The Tobacco Control Act and FDA's Deeming Rule

17.     By way of background, ENDS products like the BIDI® Stick that contain tobacco-derived nicotine fall within the meaning of a "tobacco product" in the Food, Drug and Cosmetic Act, as amended by the Tobacco Control Act ("TCA"). When the TCA was enacted, it gave FDA immediate authority over certain tobacco product categories: cigarettes, cigarette tobacco, smokeless tobacco and roll-your-own tobacco. It also gave FDA the authority to use its rulemaking powers to "deem" unregulated tobacco products, like ENDS, to be regulated.

18.     In May 2016, FDA published its long-awaited "Deeming Rule" which became effective on August 8, 2016. As of that effective date, all ENDS became subject to the TCA's requirements, including the requirement that all new tobacco products be subject to FDA premarket review. Since there are no grandfathered ENDS that were on the market back in February 2007, all ENDS products must retroactively apply for premarket authorization through the PMTA process.

19.     In the Deeming Rule, FDA created an enforcement discretion "compliance policy" to allow ENDS like the BIDI® Stick that were already on the market as of the rule's effective date to remain on the market until PMTAs became due. The deadline to submit PMTAs for currently marketed products changed multiple times over the years and, after a July 2019 federal district court order, finally landed on September 9, 2020.

A0185

**Background on Bidi Vapor and the BIDI® Stick**

20.     In 2014, I purchased the patent rights to a disposable ENDS product

from a Chinese manufacturer, SMISS Technology Co. Ltd. ("SMISS"), and

contracted with SMISS to begin manufacturing disposable ENDS products

prefilled with my own proprietary nicotine e-liquid formulations.

21.     The product now known as the BIDI® Stick was first marketed (in all

eleven (11) flavors) in the United States under the Just Chill brand, albeit with

limited success, prior to the Deeming Rule becoming effective in August 2016.

Unlike certain other ENDS manufacturers, we chose <u>not</u> to market our product to

young people, use social media, hire models or influencers, or advertise our

products on mediums that could be accessed or viewed by minors. Rather, we sold

our products only to a core group of confirmed adult smokers.

22.     I was deeply disturbed by what appeared to be youth-targeting

marketing tactics that companies like Juul Labs were engaged in at the time. It

became my mission to ensure that my products never got into the hands of minors.

My goal has always been to provide quality, fully compliant products for adult

smokers, even if that puts us at a competitive disadvantage.

23.     In early 2019, I formed Bidi Vapor LLC and rebranded all our

products under the Bidi name. We rebranded our disposable ENDS device as the

A0186

BIDI® Stick and began marketing it widely as a recreational cigarette alternative for adult smokers.

24.    Utilizing a high-quality aluminum frame, the tamper-resistant BIDI® Stick contains 1.4 mL of e-liquid made with Class A tobacco-derived nicotine (60 mg/ml or 6% w/v concentration), high-quality ingredients (propylene glycol, glycerin and flavor additives), a 280 mAh cell phone grade recyclable battery that is UL-8139 certified, an innovated sensitivity control system to ensure consistent nicotine delivery, and a heat-resistant medical-grade absorption pad. The BIDI® Sticks have passed multiple tests and obtained numerous global certifications, such as FCC, UL-8139, UL-1642, UL-62133, FCM, CE, ROHS, TPD, as well as REACH certification in Europe.

25.    There are eleven (11) BIDI® Stick varieties, including our tobacco flavored (Classic) (hereinafter "Classic"). The other ten (10) are non-tobacco flavors (Dawn, Gold, Marigold, Regal, Summer, Tropic, Winter, Zest, Solar, and Arctic). In line with FDA's guidance, we decided to use non-descriptive terms to identify the products to further distance the BIDI® Stick from potentially resembling kid-friendly foods, drinks, and other non-ENDS products that are often marketed and/or appealing to youth.

26.    The BIDI® Stick is currently contract manufactured at SMISS's facilities in Shenzhen, China. Bidi Vapor has invested more than $5 million in

A0187

SMISS's manufacturing facilities and quality control systems to ensure that the production of the BIDI® Stick is APPH and will meet FDA's good manufacturing practices for tobacco products, which have been proposed but not yet finalized. The BIDI® Stick is produced in an ISO 9001:2015 certified facility that uses manufacturing controls, documented work instructions and standard operating procedures, and a quality management system based on ISO 13485 (2016) and FDA Quality System Regulation (QSR), 21 CFR Part 820. We have also established an unprecedented 1,000-level e-liquid production facility, which far exceeds the cleanliness level of many pharmaceutical production facilities.

### Bidi Vapor's Focus on Youth Access Prevention

27.    Our founding mission is to provide recreational non-combustible cigarette alternatives to adult smokers. We are vehemently opposed to all illegal underage tobacco use, including ENDS use, by minors (under 21 years of age), and have gone to great lengths and expense to ensure that the BIDI® Sticks are not marketed toward or sold to such persons. There is no evidence whatsoever that authentic BIDI® Sticks are being illegally purchased or used by minors. In fact, the studies we have conducted as part of our PMTAs show that our product is being used by older adults, the vast majority of whom were already smoking cigarettes. *See* McKinney Decl. at A0165-167.

28.     Our opposition to illegal underage use is not just important from a
moral and ethical standpoint, but also because FDA made clear starting with its
2016 draft PMTA guidance that marketing restrictions and youth-access prevention
measures would be critical to ultimately obtaining PMTA authorization.
Specifically, that draft guidance stated that, "to the extent that you propose specific
restrictions on sale and distribution that can help support a showing that the
marketing of a product is appropriate for the protection of the public health (e.g., a
restriction that decreases the likelihood that those who do not use tobacco products
will start using tobacco products), FDA may consider your product in that context
and may include your proposed restrictions as mandatory conditions in your
marketing order."

29.     As detailed in our PMTAs, Bidi Vapor does not use social media to
market to consumers. We only use certain age-gated accounts such as LinkedIn,
Instagram, Facebook, and YouTube for informational purposes. We also do not use
social media influencers, brand ambassadors, models, or actors. We have never
engaged in any television or radio advertising and have never sponsored sporting
or entertainment events.

30.     In fact, we do not market directly to consumers at all, but only to retail
and business partners, such as convenience store owners, wholesalers, and
distributors. The marketing materials produced for these business customers do not

A0189

include content that could be perceived as directed towards youth. We have prohibited the use of any marketing and advertising material that could reasonably be perceived to be targeting minors as identified by FDA. This would include any materials that contain aspirational imagery, cartoons, characters/mascots, fruity images, kid-friendly foods, drinks, and other non-ENDS products that are often marketed and/or appealing to youth, or childish or juvenile designs or graphics that might appeal to youth. All of this was in line with FDA's various guidance documents, proposed rules, and recommendations for marketing of tobacco products.

31.     In addition, we developed one of the most comprehensive child-resistant packaging and labeling systems among ENDS (and particularly, disposable ENDS) for the BIDI® Stick. The packaging surface area is covered with warnings, instructions, and informational text intended to inform and protect consumers. This includes the FDA required nicotine addiction warnings, state required warnings such as Proposition 65, as well as several additional warnings, icons, and disclaimers alerting consumers that the product is not for underage sale and intended for adult smokers and vapers over 21 years of age only. An authenticity check sticker on the label makes use of advanced anti-counterfeit technology to protect consumers from counterfeit products. Neither the packaging nor labeling contain any images or graphics that would appeal to youth.

A0190

32.     Each BIDI® Stick is also packaged with a product leaflet that contains a full set of warnings, disclaimers, safety information and instructions for use.

33.     To further ensure minors are not able to get access to our products, we voluntarily discontinued our online direct-to-consumer ("DTC") sales through our age-gated website, www.bidivapor.com. Although we had previously implemented one of the most stringent age-verification programs for our online DTC sales, we nevertheless decided to stop all online DTC sales through our website to ensure compliance with the Prevent All Cigarette Trafficking ("PACT") Act, and to help address the larger concerns regarding youth access to ENDS.

34.     In March 2021, Bidi partnered with GoPuff (www.gopuff.com) as the exclusive online DTC retailer of authentic BIDI® Sticks. But unlike traditional Internet retailers, GoPuff provides an online platform for consumers to purchase products and have them personally delivered from local brick-and-mortar convenience stores, similar to food delivery platforms such as DoorDash and UberEats. With a long history of distribution of 21+ alcoholic beverages, GoPuff has pioneered a stringent compliance program including PACT Act compliance and age-gating processes, including face-to-face ID verification and adult signature on delivery. With these established procedures, GoPuff is one of the most secure online delivery services in the country. No other Internet-based e-commerce platforms are authorized to sell authentic BIDI® Sticks online directly to adult

A0191

consumers. In addition, Bidi has a long history of pursuing online retailers who appear to be selling products with the "Bidi" name illegally, having sent dozens of cease-and-desist letters and notifications to local authorities. We remain vigilant on this front.

35.    Aside from GoPuff, Bidi is committed to brick-and-mortar retail, which we believe is a stronger age-verification distribution model compared to traditional online retail channels for ENDS. All our wholesalers and direct retailers are required to sign our Wholesaler & Direct Retailer Agreement which, among other things, requires parties to comply with all applicable regulations and abide by our comprehensive age verification procedures. Our direct retailers are also required to sign a Retailer Pledge that commits them to comply with, among other things, age-verification requirements and adult-focused marketing, as well as participate in our mystery shopper program if no established program exists within the chain. If a retailer does not sign our pledge or breaks it, Bidi will stop doing business with them.

36.    To help our business partners understand FDA's tobacco retailer requirements, Bidi has produced training videos for our authorized retailers, an example of which can be found here: https://www.youtube.com/watch?v=o-_4MihIJNc.

37.     Beyond FDA, Kaival Brands, as the exclusive distributor of the BIDI®
Stick in the United States, has made great efforts to comply with all applicable
state and federal laws regarding the distribution of ENDS, including obtaining all
necessary state licenses, complying with all excise tax requirements, and ensuring
compliance with the PACT Act, which was extended to cover ENDS at the end of
March 2021.

38.     Kaival Brands is doing everything required with respect to PACT Act
compliance. Specifically, Kaival Brands has retained a team of legal, tax, and
accounting experts to advise on state and local tax, licensing, and regulatory
matters associated with the distribution of the BIDI® Stick. We ensured that Kaival
Brands is appropriately licensed or registered in every state where required and
invested substantially in excise tax reporting and compliance software to ensure
that all appliable taxes are properly calculated and remitted to the appropriate
taxing authorities. Kaival Brands also registered with the Bureau of Alcohol,
Tobacco, Firearms and Explosives ("ATF") and with the states into which it ships,
as required. Finally, Kaival Brands implemented processes to ensure timely filing
of all required state reporting. We fully support the PACT Act, including the
prohibition on using the U.S. Postal Service to deliver ENDS to consumers via the
mail, and believe that compliance with the law will further ensure authentic BIDI®
Stick products are not getting into the hands of minors.

A0193

**Bidi Vapor's Efforts to Increase Enforcement to Protect Youth**

39.     We recognize the legitimate public health concerns about the use of disposable ENDS by minors, and completely agree that all efforts should be made to remove non-compliant products from the market – particularly those marketed to youth.

40.     We have developed a state-of-the-art authentication system to ensure supply chain security and prevent counterfeit, subpar, and potentially dangerous products from getting in the hands of consumers. Counterfeit products made to resemble authentic BIDI® Sticks are often manufactured using substandard materials that can put consumer health and safety at risk and increase the potential for illegal youth access.

41.     Because of the general lack of enforcement, we have shouldered the burden of pursuing wholesalers and retailers dealing with counterfeit, lookalike products. We have sent dozens of cease-and-desist letters to retailers selling counterfeit "Bidi" products. In December 2020, for example, we announced that a federal judge in the Southern District of New York granted a temporary restraining order and asset freeze against 24 defendants—most based overseas in China—selling counterfeit, illegally labeled "Bidi" products through the wholesale website, DHGate.com.

A0194

42.     We have worked hard to raise awareness and seek enforcement against counterfeit and non-compliant ENDS products by engaging with members of the U.S. Congress, Attorneys General, and federal agencies, including the FDA, the ATF, the Federal Trade Commission, and U.S. Customs and Border Patrol. We have submitted over a dozen tobacco product violation reports to FDA identifying ENDS on the market that appear to be in violation of the Food, Drug and Cosmetic Act, including the TCA's adulteration and misbranding provisions. We conducted our most recent awareness effort last fall, when we sent retail partners, trade press, regulators, and enforcement authorities links to a webcast and infographics we developed around the topic of illicit vaping products. We have even sued some of our competitors for selling adulterated and misbranded disposable ENDS.

43.     Since 2021, I participated with my team in two voluntary Listening Sessions with FDA on the disposable ENDS industry. We presented to over sixty (60) FDA Center for Tobacco Product ("CTP") staff and provided insights into the current disposable ENDS market and enforcement considerations, highlighting the many ways our competitors were marketing ENDS products illegally – including by using synthetic nicotine to avoid the PMTA process. We informed FDA about all of Bidi Vapor's youth-access prevention efforts, marketing restrictions, comprehensive packaging and labeling requirements and offered suggestions for how FDA might curtail the growing black market. Then just last year, I presented

A0195

at the Next Generation Nicotine Delivery conference in Miami, as well as the

Tobacco conference in Tucson, AZ, for the Federation of Tax Administration. I

also sent my marketing director, Russell Quick, to speak at the Food and Drug Law

Institute's ("FDLI") Tobacco and Nicotine Products Regulation and Policy

Conference in Washington, D.C., last October. The CTP's Dr. Brian King was also

a speaker at that FDLI meeting.

**FDA's Evolving Compliance Policy and Bidi Vapor's Comprehensive PMTAs**

44.     When the Deeming Rule became effective in August 2016, the initial

PMTA deadline for ENDS already on the market was set for August 2018,

although FDA's only guidance on PMTAs for ENDS was still in draft form.

45.     In July 2017, then-FDA Commissioner Dr. Scott Gottlieb announced

the Agency's "Comprehensive Plan for Tobacco and Nicotine Regulation". As part

of that plan, FDA extended the PMTA deadline to August 8, 2022 by way of a

final guidance, and separately announced that it would initiate the notice and

comment rulemaking process to establish a "foundational" PMTA rule. I vividly

recall Commissioner Gottlieb's statement explaining that more time was necessary

to ensure FDA would be able to strike the right balance between consumer

protection and fostering innovation for potentially less harmful forms of nicotine

delivery for adult smokers.

A0196

46.     As a small business, the lack of a final guidance and any formal rules made it very difficult to understand how to navigate and invest in the complicated PMTA process. Nevertheless, by early 2018 we began working on our PMTA including, among other things, e-liquid and aerosol testing for potentially harmful chemicals, toxicological analysis of the ingredients, preparing comprehensive literature reviews, implementing good manufacturing practices, and developing and implementing marketing restrictions and youth-access prevention measures.

47.     FDA finally released the final PMTA guidance for ENDS in June 2019 and, a few months later in September 2019, published for comment a proposed rule on the PMTA and recordkeeping requirements. FDA also hosted a two-day seminar on the PMTA process in October 2019, which we were able to attend virtually. We reviewed all these materials very closely and hired legal and scientific consultants to confirm what data and information would be required to ensure that our PMTAs would be accepted and filed to enter scientific review.

48.     FDA made clear throughout the PMTA final guidance, the proposed rule, and in its public meetings that the APPH standard is complex and requires FDA to assess multiple factors, including marketing restrictions, youth-access prevention measures, and information in the published literature.

49.     Pursuant to a court-order, ENDS products subject to timely submitted applications by September 9, 2020, would be permitted to remain on the market

A0197

during FDA's review for up to one year, or until September 9, 2021. However, FDA was not obligated to make final marketing authorization determinations by that date. Rather, after September 9, 2021, any ENDS product whose PMTA remains under review would be *subject to* FDA enforcement on a case-by-case basis. At this point in time, we are unaware of any instance when FDA has sent a warning letter or initiated an enforcement action against a manufacturer with a pending PMTA.

50. Despite the business, logistical, and human challenges that directly resulted from the COVID-19 pandemic, Bidi was able to submit PMTAs covering all eleven (11) BIDI® Stick varieties on September 8, 2020. The PMTAs Bidi submitted on September 8, 2020 were comprehensive and scientifically rigorous and included, among other things, *in vitro* toxicity testing, e-liquid and aerosol analysis of harmful and potentially harmful chemicals, comprehensive literature reviews containing randomized controlled trials, comparisons to other tobacco products, hardware safety and battery certification information, manufacturing and quality control details, independent and validated consumer insight surveys, environmental assessments and stability data, as well as details about our unique BIDI® Cares recycling program, stringent youth-access prevention measures, adult-focused marketing practices, and post-market surveillance strategies. The

A0198

submitted PMTAs, including the underlying data, spanned over 285,000 pages combined.

51.    The aerosol and toxicological data included in our PMTAs, along with the supporting comprehensive scientific literature review, clearly demonstrate that the BIDI® Sticks, including the Classic, present substantially lower health risks compared to other tobacco products, including combustible cigarettes and the FDA-authorized IQOS heat-not-burn device.

52.    At the annual FDLI tobacco conference in October 2020, CTP Director Mitch Zeller stated that FDA encouraged companies to provide information on any content missing from their application, including how COVID-19 or any other unforeseen circumstances had prevented them from providing the information, and a timeframe for submission of the missing information. We explained in our PMTAs that while not all product-specific studies were completed by the deadline, such additional information would be forthcoming.

53.    In early 2021, we informed FDA that we had initiated product-specific tobacco product perception and intention ("TPPI") studies designed to measure product perception and intention (such as likelihood of use, behavioral intentions, human factors, and patterns of use of the BIDI® Sticks), as well as a clinical pharmacokinetic trial designed to measure the abuse liability and

A0199

dependence potential of the BIDI® Sticks, and the exposure to nicotine during product use compared to combustible cigarettes and JUUL.

54.     Bidi's PMTAs were officially accepted on February 5, 2021 and filed on February 23, 2021. FDA assigned a single submission tracking number (STN) PM0003460 to all our PMTAs. The Classic was assigned PM0003460.PD2.

55.     Following the original submission of our PMTAs, we continued to keep FDA updated on the progress of our on-going product-specific studies. As FDA requested, we submitted twenty (20) PMTA amendments. These amendments included, among other things, a consumer insight survey, product pattern of use and likelihood of use studies, updated scientific literature reviews, abuse liability assessments, product stability studies, a consumer perception and behavioral intentions study, aerosol testing results, a toxicological assessment, a nicotine pharmacokinetics and effects study, and, most recently, an update on an ongoing adult smoker switching study. *See* McKinney Decl. at A0152-153. Among other findings, these studies tend to show that BIDI® Sticks may be a satisfying alternative to cigarettes among current adult smokers and may support their transitioning away from cigarette smoking. *See* McKinney Decl. at A0165-167.

## Marketing Denial Orders

56.     In September 2021, Bidi received a marketing denial order from the FDA for the PMTAs it submitted for its non-tobacco flavored BIDI® Stick. This

A0200

Court subsequently set aside and remanded the order as arbitrary and capricious in violation of the Administrative Procedure Act.[1] The Court issued a stay of the MDO in that matter and ultimately determined that the MDO was arbitrary and capricious because FDA failed to consider all of the relevant evidence in the application, specifically Bidi's aggressive and comprehensive marketing and sales-access-restriction plans. Bidi's PMTAs for its non-tobacco flavored products remain pending.

57.     On January 22, 2024, FDA issued an MDO for Bidi's Classic tobacco-flavored product. FDA's stated reasons for issuing the MDO focused on three alleged deficiencies. However, FDA did not take a holistic approach in evaluating these alleged deficiencies relative to the significant evidence submitted by Bidi establishing that the Classic product is APPH. *See generally* McKinney Decl.

### Bidi Suffered Irreparable Harm as a Result of the MDO for its Classic Product

58.     Bidi, via Kaival Brands, sells its products to four (4) distributor customers: Core-Mark, CStore Masters (Bidi's distributor for the Circle K chain of stores), GPM, and H.T. Hackney. Bidi built its existing relationships with these customers over several years. Bidi's sales to these customers represented

---

[1] *Bidi Vapor LLC v. U.S. Food and Drug Administration*, 47 F.4th 1191 (11th Cir. 2022).

A0201

approximately ninety-five percent (95%) of its total business prior to the MDO for the Classic product being issued.

59.    The MDO has led to a serious and disastrous domino effect in causing these four (4) customers to communicate to Bidi that they are not comfortable continuing to do business with Bidi, including as to its non-tobacco flavored products, if an MDO is in place for any of its products. As such, these customers have indicated they will not replenish their current inventories of Bidi's products and/or that their retail customers will remove Bidi's products from their shelf space within a few weeks unless a judicial stay of the MDO is obtained. In fact, Bidi's customer CStore Masters has represented to Bidi that it will not purchase Bidi's products and that Circle K stores will no longer provide shelf space for Bidi's entire product line until such time as an order staying the MDO is issued. Moreover, Bidi's other three (3) major customers have not placed new orders for Bidi's products since the MDO was issued or have significantly slowed new orders. Overall, new orders for Bidi's products in January 2024 dropped by seventy percent (70%) relative to the monthly orders Bidi received in November 2023 and in December 2023.

60.    Given the significant drop off in sales since the MDO was issued, Bidi's cash flows are plummeting, and it has been required to lay off thirty percent (30%) of its workforce with additional downsizing expected. In addition, Bidi's

A0202

inventory of products will begin to expire rendering the products worthless and causing further damage.

61.     As a result of the MDO, Bidi is projecting a loss of nearly $1.5 million in monthly sales from its four (4) distributor customers resulting in tens of millions of dollars in total lost revenue. Ultimately, Bidi will be required to cease operations within three (3) weeks from the date of this declaration if a stay of the MDO is not issued.

62.     Further, including the costs for our TPPI behavioral studies, our clinical trial, numerous cross-sectional surveys, and the plethora of non-clinical data included in our PMTAs, we have spent over $8.2 million on our applications to date. Of this amount, approximately $1.6 million was spent on responding to a deficiency letter Bidi received from FDA as to the Classic product PMTA, including conducting additional testing based on the deficiency. In addition to expenses directly related to PMTA preparation, and as previously discussed, we have also invested over $5 million in manufacturing infrastructure and quality control systems at our manufacturing facility in China to ensure compliance with FDA's eventual Tobacco Product Manufacturing Practices rules. Those are funds, all of which have been expended in an effort to satisfy regulatory requirements, Bidi will never recover if it is forced to cease operations.

A0203

63.    The MDO has also caused harm to Bidi stemming from FDA's public communication of the MDO. The FDA posted a press release announcing the MDO on January 22, 2024, with the main headline: "FDA Denies Marketing of Bidi E-Cigarette."[2] The press release states, in part, that the "evidence submitted by the applicant [Bidi] did not demonstrate an overall net benefit to people who use tobacco products and lacked sufficient evidence to address health risks." This has resulted in reputational harm to Bidi's entire brand, particularly with our four (4) distributors, given that the statement directly undermines the credibility and scientific basis for Bidi's PMTAs. This harm can only be corrected by an expedient stay of the MDO.

64.    Finally, the MDO as to Bidi's Classic product means that it is prevented from having any market presence in jurisdictions that have prohibitions on the sale of flavored tobacco products including California, Massachusetts, New Jersey, New York, Rhode Island, and numerous other localities.

### Consumers Will Suffer Harm as a Result of the MDO for Bidi's Classic Product

65.    The MDO on the Classic product, and the removal of Bidi's products from the marketplace, will have additional negative consequences beyond the

---

[2] U.S. Food and Drug Administration, (2024, January 22). "FDA Denies Marketing of Bidi E-Cigarette" [Press Release]. FDA Denies Marketing of Bidi E-Cigarette | FDA.

A0204

economic and reputational harm to Bidi. Indeed, the removal of Bidi's products from the market, which are proven to replicate nicotine-delivery levels[3] of combustible tobacco products and thereby successfully promote the conversion of smokers of combustible cigarettes to vaping, may result in greater danger to public health. We have seen evidence of this from an internal study that tracked customer receipts at the point of sale. After a 2020 flavored-vape ban in Massachusetts, six percent (6%) of customers who used vaping products with no flavor loyalty reverted to purchasing combustible cigarettes[4], inferring that a significant number of adult smokers trying vaping switched back to combustibles when those options disappeared. As brand-loyal consumers switch from the BIDI® Stick to other legal but unsatisfactory options that do not replicate the nicotine delivery levels of combustible cigarettes, they will likely return to combustible tobacco products or go to non-compliant products, both potentially causing greater harm to their health.

---

[3] Fearon, I.M., Gilligan, K., Seltzer, R.G.N. *et al.* "A randomised, crossover, clinical study to assess nicotine pharmacokinetics and subjective effects of the BIDI® stick ENDS compared with combustible cigarettes and a comparator ENDS in adult smokers." *Harm Reduction Journal.* **19**, 57 (2022). https://doi.org/10.1186/s12954-022-00638-0.

[4] PDI staff, "Bidi Vapor Historical Flavor Historical Ban Study," PDI Technologies, (2022, July 30) [Proprietary data provided to Bidi Vapor from PDI Technologies, Atlanta].

A0205

66.     These consequences cause great concern and constitute irreparable harm not only to our business, but to adult smokers of legal age looking for alternatives to combustible cigarettes.

*     *     *     *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 2, 2024

Nirajkumar Patel, CEO
Bidi Vapor LLC

A0206