IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

BIDI VAPOR LLC,

                Petitioner,

                v.

U.S. FOOD AND DRUG ADMINISTRATION,
*et al.*,

                Respondents.

No. 24-10263

## OPPOSITION TO PETITIONER'S
## MOTION FOR A STAY PENDING REVIEW

*Of Counsel:*

SAMUEL BAGENSTOS
*General Counsel*
*Department of Health and Human*
  *Services*

MARK RAZA
*Chief Counsel*
*Food and Drug Administration*

WENDY S. VICENTE
*Deputy Chief Counsel for*
  *Litigation*
*Food and Drug Administration*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

ARUN G. RAO
*Deputy Assistant Attorney General*

AMANDA N. LISKAMM
*Director*

JAMES W. HARLOW
*Acting Assistant Director*

SAMUEL BALLINGRUD
*Trial Attorney*
*Consumer Protection Branch*
*U.S. Department of Justice*

STEPHANIE NGUYEN
*Associate Chief Counsel*
*Department of Health and Human Services*
*Office of the Chief Counsel*
*Food and Drug Administration*
*10903 New Hampshire Avenue*
*Bldg. 32, Room 4397*
*Silver Spring, MD 20993*
*202-338-4896*

*P.O. Box 386*
*Washington, DC 20044-0386*
*202-616-0509*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, the undersigned counsel certifies that, in addition to those listed on Bidi's Certificate of Interested Persons and Corporate Disclosure Statement, to the best of our knowledge, the following persons and entities may have an interest in the outcome of this case:

Powell, Lindsey E., counsel for Respondents

Klein, Alisa B., counsel for Respondents

Vicente, Wendy, counsel for Respondents

Nguyen, Stephanie, counsel for Respondents

Harlow, James W., counsel for Respondents

Ballingrud, Samuel, counsel for Respondents

Kennedy, Scott P., counsel for Respondents

Respectfully submitted,

/s/ Sam Ballingrud
SAMUEL BALLINGRUD

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT...........................................................................................................3

I.   TCA's Regulation of New Tobacco Products...............................................3

II.  FDA's Denial of Bidi Classic's Marketing Application.............................6

ARGUMENT ...........................................................................................................9

III.   Bidi Is Unlikely To Succeed On The Merits Because Bidi's Application Failed To Satisfy The Statutory Standard...........................................................9

A. FDA Reasonably Found that Bidi's Three Deficiencies Were Fatal to its Application ....................................................................................................9

1. FDA Reasonably Denied the Application Based on Bidi Classic's Elevated Abuse Potential (Deficiency Three)...........................................10

2. FDA Reasonably Found Bidi's Data Regarding the Risk .... of Harmful Compounds Leaching into the Product  Materially Lacking (Deficiency Two)                               ...............................................14

3. FDA Reasonably Found that Bidi Failed To Provide Evidence Needed To Compare the Health Risks of Bidi  Classic to Other Products (Deficiency One)                     ....................................................17

B. FDA Complied with the TCA and Conducted a Holistic  Review of Bidi's PMTA ...................................................................................................21

IV. The Remaining Factors Also Do Not Support A Stay.............................24

# TABLE OF AUTHORITIES

Cases.................................................................................................. Pages

*Avail Vapor, LLC v. FDA*,
  55 F.4th 409 (4th Cir. 2022) ..............................................................26

*Bidi Vapor LLC v. FDA*,
  47 F.4th 1191 (11th Cir. 2022) ....................................................6, 23

*Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*,
  439 F.3d 715 (D.C. Cir. 2006) ..............................................................9

*Fontem US, LLC v. FDA*,
  82 F.4th 1207 (D.C. Cir. 2023)........................... 16, 17, 19, 21, 22, 26

*Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) .............................................................................16

*Gripum, LLC v. FDA*,
  47 F.4th 553 (7th Cir. 2022) ................................................................5

*Logic Tech. Dev. LLC v. FDA*,
  84 F.4th 537 (3d Cir. 2023) ...............................................20, 21, 24

*Prohibition Juice Co. v. FDA*,
  45 F.4th 8 (D.C. Cir. 2022)................................................................23

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) ...........................................................................24

Statutes

21 U.S.C. § 387j
  (a)(1)-(2)........................................................................................1, 4
  (a)(2) ...................................................................................................24
  (b)(1)(A)...............................................................................................5
  (b)(1)(G)....................................................................... 15, 18, 20, 21

(c)(2)................................................................................4, 20

(c)(4)....................................................... 7, 10, 14, 15

Pub. L. No. 111-31 ...........................................................1

Rules

11th Cir. R. 26.1-1 ........................................................ i

Other Authorities

81 Fed. Reg. 28, 974 ........................................................5

## INTRODUCTION

The Family Smoking Prevention and Tobacco Control Act (TCA) prohibits the marketing of any new tobacco product (defined as a tobacco product not on the market as of February 15, 2007) unless the U.S. Food and Drug Administration (FDA) authorizes an application for its marketing. 21 U.S.C. § 387j(a)(1)-(2). The statute provides that FDA "shall deny" a manufacturer's marketing application unless the agency finds that "permitting such tobacco product to be marketed would be appropriate for the protection of the public health." *Id.* § 387j(c)(2)(A).

In making this determination, FDA must evaluate "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," "taking into account" both the "likelihood that existing users of tobacco products will stop using such products" and the "likelihood that those who do not use tobacco products will start." *Id.* § 387j(c)(4). Because "[v]irtually all new users of tobacco products are under the minimum legal age to purchase such products," TCA, Pub. L. No. 111-31, div. A, § 2(4), 123 Stat. 1776, 1777 (2009), the statute requires FDA to, among other things, weigh the risk that an e-cigarette will be attractive to youth against the product's potential for helping adult

1

smokers completely switch from, or significantly reduce their use of, combustible cigarettes.

FDA reasonably applied this standard in comprehensively reviewing and denying, on multiple independent grounds, Bidi Vapor LLC's ("Bidi") application to market a tobacco-flavored e-cigarette device, Bidi Stick – Classic ("Bidi Classic"). Bidi's evidence revealed that its product has an abuse liability (*i.e.*, a tendency to promote continued use and nicotine dependence) at least as great as combustible cigarettes for some users and even higher for others. FDA therefore concluded that current tobacco users would be more likely to "maintain or augment their nicotine dependence" by using this product, and that those who do not currently use tobacco products—including youth—would be more likely to "develop nicotine addiction and dependence."

In addition, FDA could not complete its assessment of the product's risks and benefits because, despite FDA's requests, Bidi failed to provide information necessary to assess the product's yields of harmful aerosol compounds relative to other products. And the agency found that Bidi did not perform sufficient testing to adequately assess various contaminants that could leach from the container closure system into the e-liquid, which

is likewise necessary to the agency's assessment of a product's overall risks and benefits. Bidi thus failed to carry its burden of showing that the potential benefit of this product would outweigh its risks so as to be appropriate for the protection of the public health. Accordingly, Bidi is not likely to succeed on the merits and this Court should deny Bidi's stay motion.

Bidi has never had authorization to market its product under the TCA, and FDA's denial did not change that fact. If Bidi wishes to restore the status quo of a pending application, it can resubmit its application as FDA invited in its denial order. A1-2.[1] Here, Petitioner cannot show error in FDA's analysis, and so cannot show a likelihood of success on the merits, and the balance of harms weighs in favor of the agency's implantation of Congress's statutory scheme.

## STATEMENT

### I. TCA's Regulation of New Tobacco Products

The TCA established a comprehensive scheme for the regulation of tobacco products. 123 Stat. at 1776. Among other requirements, Congress

---

[1] References to A### are to Bidi's Appendix. Doc. 4. Respondents omit leading zeros for readability.

made it unlawful for a manufacturer to introduce in interstate commerce any "new tobacco product" unless the manufacturer obtains premarket authorization from FDA. 21 U.S.C. § 387j(a)(1)-(2).

When enacting the TCA, Congress recognized that the use of tobacco products "is a pediatric disease of considerable proportions," TCA § 2(1), 123 Stat. at 1777. Given the risks posed by new tobacco products—including the substantial risks to youth—Congress provided that FDA "shall deny" an application to market a new tobacco product "if, upon the basis of the information submitted to [FDA] as part of the application and any other information before [FDA] with respect to such tobacco product," the agency "finds that[] . . . there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2). The manufacturer thus bears both the burden of producing evidence of marketing eligibility *and* the ultimate burden of establishing that eligibility.

When reviewing an application, FDA must evaluate "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," taking into account both the "likelihood that existing users of tobacco products will stop using such products" and the

"likelihood that those who do not use tobacco products will start." *Id.*

§ 387j(c)(4). Practically speaking, FDA weighs, among other things, the

product's potential to addict new users—especially youth—against its

potential to help adults completely switch from or significantly reduce

their smoking of combustible cigarettes. *See, e.g.*, *Gripum, LLC v. FDA*, 47

F.4th 553, 555 (7th Cir. 2022). The statutory standard further contemplates a

comparative analysis by directing applicants to include information

showing "whether [the new] tobacco product presents less risk than other

tobacco products." 21 U.S.C. § 387j(b)(1)(A).

This case involves e-cigarettes—that is, devices that aerosolize

nicotine-laced e-liquids that users then inhale. In 2016, FDA exercised its

statutory authority by promulgating a rule that regulates e-cigarettes and

e-liquids in accordance with the TCA. *Deeming Tobacco Products To Be*

*Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family*

*Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and*

*Distribution of Tobacco Products and Re-quired Warning Statements for Tobacco*

*Products*, 81 Fed. Reg. 28,974, 29,028-29,044 (May 10, 2016). It is uncontested

that Bidi Classic is a "new tobacco product" within the meaning of the

statute, and therefore may not be lawfully marketed without FDA's authorization.

## II.   FDA's Denial of Bidi Classic's Marketing Application

Bidi submitted an application to market one tobacco-flavored e-cigarette product (Bidi Classic) and ten non-tobacco-flavored products. *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1200 (11th Cir. 2022) (*Bidi I*). FDA denied Bidi's applications for its non-tobacco-flavored products in September 2021, and these denials were the subject of a petition before this Court in 2022. *See id.* at 1206 (granting the petition for review on narrow grounds that do not apply here). Those products are not now at issue. This petition concerns Bidi's application to market its tobacco-flavored product, Bidi Classic. *See* Technical Project Lead Review (TPL) 7, Stay Opp. Addendum.[2]

In March 2023, FDA sent petitioner a letter identifying specific evidentiary deficiencies in its application. A12. After providing an

---

[2] As in *Bidi I*, here FDA provided a TPL that evaluated the subject application's evidence in detail. *Bidi I*, 47 F.4th at 1201. FDA attaches a version with Bidi's confidential information redacted. FDA does not believe the redacted portions are material for present purposes, but Bidi has an unredacted copy which FDA does not object to Bidi filing under seal in reply.

opportunity to cure those deficiencies, FDA performed comprehensive compliance and scientific reviews of Bidi's application, TPL 8-9. FDA weighed the available evidence regarding the potential "risks and benefits to the population as a whole," 21 U.S.C. § 387j(c)(4), and concluded that Bidi had not met its burden of demonstrating that the marketing of its product was appropriate for the protection of the public health, TPL 49-50.

FDA concluded that Bidi's application suffered from three fatal deficiencies. TPL49-50. First, based in part on Bidi's own clinical study, the agency found evidence that Bidi Classic was likely to have a higher abuse liability than combustible cigarettes for experienced e-cigarette users, and at least as addictive as combustible cigarettes for current combustible cigarette users. TPL 50-54 (discussing "Deficiency Three"). Consequently, tobacco users who start using Bidi Classic "are likely to maintain or augment their nicotine dependence and addiction" rather than eventually quitting altogether, whereas "tobacco nonusers (including youth)" who start using the product "are likely to continue using it and develop nicotine addiction and dependence." TPL 50.

Second, FDA concluded that Bidi failed to provide information critical to assessing potential health hazards. TPL 49-50 (discussing

"Deficiency Two"). Despite explicit requests from the agency, Bidi did not provide evidence that adequately assessed whether various contaminants could leach from the container closure system into the e-liquid and potentially "pose an acute or chronic health risk." TPL 50. FDA analyzed the information Bidi provided, but simply found it materially lacking.

Third, again ignoring requests, Bidi did not submit adequate comparative aerosol data so FDA could meaningfully assess the amount of harmful and potentially harmful constituents (HPHC) that users might inhale from Bidi Classic compared to similar products. TPL 49 (discussing "Deficiency One"). Without adequate information on these potential health hazards, FDA could "not complete [its] assessment of risks and benefits" for Bidi Classic, as required by statute; given the data limitations, there was the "potential for overestimation and underestimation" of HPHC data in Bidi's application. TPL 49-50. Again, FDA analyzed what information Bidi did provide, but found it materially lacking in the absence of the full comparison data.

Thus, FDA concluded that Bidi had not satisfied its burden of establishing that the marketing of Bidi Classic is appropriate for the protection of public health. Bidi now asks this Court to override that

determination and stay FDA's order based on a disagreement with the agency's scientific assessment.

## ARGUMENT

### III. Bidi Is Unlikely To Succeed On The Merits Because Bidi's Application Failed To Satisfy The Statutory Standard

#### A. FDA Reasonably Found that Bidi's Three Deficiencies Were Fatal to its Application

To succeed on the merits of its challenge to FDA's marketing denial order, Bidi must establish that each of the three conclusions FDA reached about the fatal deficiencies in its application was arbitrary and capricious. *See, e.g., Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 718 (D.C. Cir. 2006) ("[W]hen an agency relies on multiple grounds for its decision," courts will "sustain the decision as long as one is valid and the agency would clearly have acted on that ground even if the other[s] were unavailable."). Bidi contends that FDA arbitrarily and capriciously concluded that Bidi's application was deficient in these three respects because Bidi believes that its scientific conclusions are superior to FDA's assessment of its application. Mot. at 15. FDA's comprehensive analysis, as set forth in the TPL, explains the scientific rationale underlying each

deficiency and the implications for public health. Bidi's arguments therefore fail as to all three deficiencies.

### 1. FDA Reasonably Denied the Application Based on Bidi Classic's Elevated Abuse Potential (Deficiency Three)

FDA found scientific evidence in Bidi's application indicating that Bidi Classic is *especially* likely to promote continued tobacco-product use and lead to nicotine dependence and addiction compared to combustible cigarettes. The agency identified this "high abuse liability" as "Deficiency Three." TPL 25-28; A4-5. This determination cuts to the very heart of the TCA standard. Congress specifically provided that the rates at which people initiate and cease use of tobacco products due to the particular characteristics of a product is critical to FDA's evaluation. 21 U.S.C. § 387j(c)(4). Bidi does not challenge the substance of FDA's determination about the high abuse liability of its product. Instead, Bidi deflects from this fact with two cursory arguments, both of which fail.

First, Bidi contends there was "a wholesale shift in FDA's approach to . . . abuse liability," based on its purportedly different treatment from other product manufacturers and brands (NJOY and IQOS). Mot. at 19. Bidi's comparison to those applications fails because it focuses solely on

nicotine levels, *id.*, whereas FDA's holistic determination about Bidi Classic was also based on nicotine exposure, abuse liability, and addiction potential. TPL 26-28, 54 (discussing "subjective experiences and product characteristics"). Bidi thus compares apples to oranges.

For example, while FDA noted that Bidi Classic's nicotine concentration is "on the higher end of most [e-cigarette products] tested in the literature," TPL 26, FDA also determined, based on Bidi's own clinical study, that users' "[t]otal nicotine *exposure*" to the product was "statistically significantly higher" than exposure to other e-cigarette products and combustible cigarettes in real-world conditions involving actual use. TPL 25-26 (emphasis added). In addition, the agency emphasized that "the presence of nicotine salts" in Bidi Classic "reduces the harshness of" its high nicotine concentration, thereby "making it more palatable" and "promot[ing] continued use." TPL 27.

It is the "combination of [these] characteristics," FDA explained, that gives Bidi Classic "similar *or higher*" abuse liability than combustible cigarettes for smokers, and "*higher*" than combustible cigarettes for experienced e-cigarette users, who tend to take "longer" and "larger puffs." TPL 26-27 (emphasis added). By contrast, for the NJOY and IQOS

11

products Bidi references, FDA determined that those products' abuse liability was only "similar to" or "approaching that of" combustible cigarettes. A76-77. "Given that [combustible cigarettes] are among the most addictive consumer products," a product with potentially higher abuse liability "poses a high risk" that existing users will "maintain[] or augment[]" their addiction and that "nonusers who . . . experiment with the new product" will become addicted. TPL 43.

FDA additionally found that Bidi's application failed to provide evidence of a sufficient benefit to offset the product's substantial risk. FDA considered whether Bidi Classic's abuse liability could help "already addicted" smokers reduce or eliminate their use of combusted cigarettes. TPL 28. The agency explained that, although combustible cigarette use may cause greater "toxicant exposure and adverse health outcomes" than Bidi's product, the evidence was "inconclusive" as to whether combustible cigarette users "would likely use [Bidi's product] to partially or completely switch" from that more harmful product. TPL 40. Because Bidi Classic can benefit combustible cigarettes smokers only if it actually encourages those users to switch, this shortcoming in Bidi's application is significant.

On the other side of the ledger, in assessing the risks to nonusers, FDA found that Bidi Classic's high abuse liability "may increase the likelihood that tobacco users and nonusers, including youth, who try the new product for the first time will continue using it." TPL 28. Weighing all of these considerations, FDA reasonably concluded that the totality of evidence in Bidi's application prevents a finding that Bidi Classic is appropriate for the protection of the public health due to the product's high abuse liability.

Second, Bidi also argues that FDA's analysis ignored Bidi's studies, Mot. at 20, but the record squarely refutes that claim and shows that FDA's conclusion about the product's high abuse liability was premised on Bidi's *own* clinical study, TPL 25-28. Based on that study, FDA concluded that use of Bidi Classic "may lead to partial switching and dual use with [combustible cigarettes], preventing complete tobacco cessation among adults who want to quit smoking [combustible cigarettes]." TPL 31. FDA likewise reviewed Bidi's other studies and explained, over 14 pages of analysis, why they failed to carry Bidi's burden of showing that marketing the product would be appropriate for the protection of the public health. TPL 28-42. FDA thus amply considered the available evidence, and Bidi

offers no persuasive basis for second-guessing the agency's scientific judgment.

>    **2.    FDA Reasonably Found Bidi's Data Regarding the Risk of Harmful Compounds Leaching into the Product Materially Lacking (Deficiency Two)**

As a second and independent basis for denying Bidi's application, FDA determined that Bidi failed to provide evidence that adequately evaluated its product for harmful compounds that could leach into the e-liquid and ultimately be inhaled by users. A4; TPL 24, 50. Specifically, Bidi provided a study that analyzed its product's aerosol vapors using only gas chromatography, a specific form of mass spectrometry, TPL 50, contrary to FDA's explicit instructions. FDA specifically asked Bidi also to submit a study using other mass spectrometry methods capable of testing for other compounds, but Bidi did not and instead provided something else.

Bidi acknowledges that "FDA asked in [a] deficiency letter that Bidi perform a leachability study of the e-liquid itself," but the company instead "conducted an aerosol study for any leachable compounds." Mot. at 18. Bidi claims this is just as good because "[i]f substances that leached from the device into the e-liquid do not transfer to the aerosol, then there is no risk from those constituents." *Id.* But FDA explained that Bidi's studies

were not suitable replacements for the information the agency requested because their methodology was less effective at detecting some harmful compounds and wholly incapable of detecting others. *Id.*; *see also* TPL 24. And without knowing whether such compounds might leach into the Bidi Classic e-liquid, FDA could not fully assess the risks presented by the product (or weigh those unknown risks against the product's benefits) as required by statute.

Bidi misses FDA's point: Bidi's application was deficient because it did not test the aerosol with methods that would accurately capture all potential contaminants, as directed by FDA. A4 (noting that Bidi's study would only capture certain types of compounds).

Bidi does not suggest that FDA exceeded its authority in requesting this evidence. *See, e.g.*, 21 U.S.C. § 387j(b)(1)(G) (requiring applicants to provide "such other information . . . as the [agency] may require"). Instead, Bidi maintains the agency should have been satisfied with the study it provided because the company believes it is "better" than the information FDA requested. Mot at 18. But FDA explained that Bidi's testing was materially deficient because some harmful compounds which cannot be detected and quantified by the company's method can nonetheless be

vaporized and inhaled in sufficient quantities to pose potential health risks to users. TPL 17, 24; A23. That is a major shortcoming in Bidi's data and one that bears on the agency's assessment of whether Bidi carried its statutory burden of showing that marketing the product would be appropriate for the protection of the public health.

FDA communicated these concerns to Bidi in a deficiency letter, A21-23 (March 2023 deficiency letter), which refutes Bidi's claim that "FDA never indicated Bidi's testing methodology for evaluating aerosols was inappropriate," Mot. at 18. Bidi failed to adequately address those concerns, and FDA's denial order explained that the company's methodology was "limited to chemical compounds that have high vapor pressure (volatile) and are thermally stable" and was not designed to detect certain other highly relevant chemical compounds. A4. This Court should decline Bidi's invitation to override FDA's scientific judgment. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

Bidi also errs in suggesting, Mot. at 13, that FDA failed to "explain how the deficienc[y] relate[s] to the overall public health consequences of" Bidi's product. *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1219 (D.C. Cir. 2023). FDA emphasized that the compounds potentially undetected by Bidi's

method can pose serious "acute or chronic" health risks to users. TPL 50. In the absence of information about the full range of potentially harmful compounds in this product, FDA was unable to fully weigh the "risks and benefits" of Bidi Classic to the population as a whole, TPL 7—including both its overall risk and its risk relative to other products. Thus, FDA did not deny Bidi's application due to a "highly technical deficienc[y]," *Fontem*, 82 F.4th at 1219. Rather, that denial was due to Bidi's failure to carry its burden of demonstrating the extent of the potential health risks of its product as needed to assess the magnitude of those risks in relation to the product's purported benefits.

3. **FDA Reasonably Found that Bidi Failed To Provide Evidence Needed To Compare the Health Risks of Bidi Classic to Other Products (Deficiency One)**

Finally, FDA concluded that Bidi failed to provide adequate evidence necessary to compare Bidi Classic with similar products for health risks from harmful and potentially harmful constituents in the product's aerosol. TPL 49; A2 (¶ 1). The data Bidi provided did not use "comparable puffing life cycle[s], puffing regimens, [or] puffing machines" and did not use FDA-recognized methods. *Id.* In reviewing an application, the TCA requires FDA to balance "the risks and benefits to the population as a

whole," 21 U.S.C. § 387j(c)(4), and to evaluate data concerning "whether such tobacco product presents less risk than other tobacco products," *id.* § 387j(b)(1)(A). The applicant must therefore provide adequate comparison data, obtained through reliable and consistent testing methods, for FDA to evaluate the risks of the product. Here again, Bidi did not.

FDA informed Bidi via a deficiency letter that the agency needed specific information about harmful and potentially harmful constituents in comparator products to enable a meaningful comparison. TPL 22; A12. Bidi instead offered data from a different set of published literature that did not include critical information about, for example, whether the comparator measurements were collected using "puffing volume, frequency, and intervals" comparable to those used to test Bidi Classic. TPL 21. FDA explained that "the applicant-provided [harmful and potentially harmful constituents] data for these comparison ENDS were not measured and collected in a manner that is sufficient or appropriate to compare to the new product's data," and "[t]he lack of information on methods used to collect the data prevent FDA from assessing [its] reliability." TPL 6.

FDA found that Bidi had failed to provide data that met the minimum required for a complete analysis. Bidi claims that the protocols

used in the data it provided for Bidi Classic were "similar" to those used in testing the comparator products. Mot. at 16. But the denial order comprehensively details FDA's concerns about this "similar" data. It notes, for example, that Bidi's data comparison for JUUL's Virginia Tobacco products (3% and 5%) were based on a 50-puff cycle rather than the lifetime cycle. A2. Bidi submitted this 50-puff data despite FDA specifically requesting lifecycle data in its deficiency letter. A19-20 (¶ 13) ("[P]rovide the aerosol constituent yields of *the entire lifetime of the ENDS comparison products*, and provide aerosol data in mass (e.g., mg, μg, ng) *per device and per puff . . . .*" (emphases added)). Bidi declined to do so, again.

FDA explained that, as with the information on leachable compounds discussed above, this information regarding harmful and potentially harmful constituents was critical to assessing Bidi Classic's relative health risks and, in turn, weighing the product's "risks and benefits." TPL 49. Bidi's failure to provide data critical to FDA's assessment of Bidi Classic's risks and benefits plainly "relate[s] to the overall public health consequences of" that product. *Fontem*, 82 F.4th at 1219. Bidi asks to be excused from this requirement because it believes FDA should prefer the data Bidi provided for policy reasons in promoting the use of publicly

available data. Mot. at 17 n.4. But FDA reasonably concluded that Bidi's failure to provide data "necessary" to its analysis left the agency unable to "determine whether the comparison ENDS data are suitable and reliable to compare to the new product." TPL 52. Bidi's argument is at odds with the "fundamental principle of judicial restraint" that counsels against courts' involvement in such scientific disputes. *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 555-56 (3d Cir. 2023) (citation omitted).

For all of these reasons, Bidi failed to meet its burden of showing that marketing its product would be appropriate for the protection of the public health, and FDA was required to deny its application. A5; *see also* 21 U.S.C. § 387j(c)(2), (4).[3]

---

[3] Bidi also faults FDA for rejecting a comparison to JUUL data that may have failed to detect some HPHC. Mot. at 16. According to Bidi, if the JUUL data had captured more HPHC, Bidi Classic's HPHC levels would only have appeared more favorable by comparison. *Id.* But FDA explained that the literature data provided by Bidi for the JUUL products was problematic because the collection method may have masked the presence of certain substances, and because it lacked a description of the "method" and "protocols" used for collection. TPL 22.

**B.** **FDA Complied with the TCA and Conducted a Holistic Review of Bidi's PMTA**

Bidi argues that FDA failed to "engage in a holistic approach that considers all data and information in a PMTA when deciding whether to grant marketing authority." Mot. at 9. But this ignores how, in all the ways discussed above, FDA performed precisely the analysis called for by the statute: It evaluated all of the evidence Bidi provided in an effort to assess Bidi Classic's potential to help users of tobacco products quit versus its potential to cause nonusers to start. To support that analysis, FDA required data that would enable an evaluation of the product's "risks and benefits to the population as a whole," 21 U.S.C. § 387j(c)(4), as well as data concerning "whether such tobacco product presents less risk than other tobacco products," *id*. § 387j(b)(1)(A).

Bidi's reliance on *Fontem* is therefore misplaced because "[t]his is not a situation" in which FDA "failed to 'address the potential benefits of the applicant's products for the public at large' or to 'consider the possibility that existing users of combustible tobacco products such as cigarettes would reap health benefits by transitioning to [Bidi's product].'" *Logic*, 84 F.4th at 555 (quoting *Fontem*, 82 F.4th at 1219). "This is instead a scientific

debate" about the risks and benefits of Bidi Classic and the quality of Bidi's evidence, which courts should "avoid." *Id*.

Bidi focuses on the fact that FDA identified "a mere three, discrete deficiencies" in denying its application. Mot. at 1. But FDA amply explained that each of these independent shortcomings in the application is foundational to the statutory public health analysis. As the *Fontem* court recognized, a single deficiency may be so foundational that it alone supports denial. *Fontem* explained that an applicant's failure to show "how . . . [the] products would be sufficiently beneficial to adults to offset their attractiveness to youth" was a sufficient basis for denial. 82 F.4th at 1217. Similarly, here each of the deficiencies FDA cited reflect "critical question[s]" that are "central to the public health inquiry." *Id*. FDA analyzed all of the evidence Bidi provided, and the TPL provides a "multi-factored and multi-disciplinary analysis that weighed and balanced all of the potential risks and benefits" of the company's product. Mot. at 3.

FDA's analysis refutes Bidi's suggestion, Mot. at 13-14, that the agency failed to review its marketing plan for Bidi Classic, TPL 34-42. FDA discussed at length the significance and limitations of marketing plans generally, and of Bidi's particularly. *Id.* This discussion renders the narrow

grounds for vacatur and remand in *Bidi I* inapplicable here. 47 F.4th at

1201, 1206 (noting FDA's explicit acknowledgement that it had *not*

reviewed Bidi's marketing plans in connection with Bidi's non-tobacco-

flavored e-cigarettes and vacating the denial orders on that basis).

Nor did FDA ignore Bidi's evidence regarding youth use of its

products. Mot. at 12, 20. FDA acknowledged that, because of Bidi Classic's

tobacco flavor, which is generally less popular with young people, youth

use and appeal of the product are likely to be "limited" for now. TPL 41; *see*

*also* TPL 40 (discussing Bidi's evidence showing "low likelihood" of youth

use). But FDA explained that youth preference "may shift" if other

products on the market, like non-tobacco-flavored e-cigarettes, become less

available. TPL 41; *see also Prohibition Juice Co. v. FDA*, 45 F.4th 8, 26 (D.C.

Cir. 2022) (noting "fluidity" of youth preferences). And for youth who try

Bidi Classic, "it is likely that they would continue" and develop

dependency given the product's especially addictive characteristics. TPL

41.

For all these reasons, Bidi has no credible argument that FDA ignored

the evidence regarding its product. Instead, Bidi's grievance is "that the

FDA did not weigh the evidence to [Bidi's] liking"—an argument

23

incompatible with the deference owed to the agency's scientific expertise. *Logic*, 84 F.4th at 555-56. The shortcomings Bidi purports to find in FDA's analysis are simply not there, and Bidi provides no reason to doubt FDA's judgment on the scientific merits of the company's application.  Bidi thus cannot succeed on the merits.

## IV.    The Remaining Factors Also Do Not Support A Stay

The remaining factors also do not support a stay. Congress determined that the public interest favors prohibiting the marketing of a new tobacco product until FDA finds that it will produce, on balance, a benefit to the public health. 21 U.S.C. § 387j(a)(2). There is no status quo in which Bidi has FDA authorization under the TCA to market its product. A "court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation," and "override Congress' policy choice . . . as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (quotation marks omitted).

There is also reason to doubt Bidi's claims of imminent financial disaster. After all, while this Court reviews the Order about Bidi Classic, Bidi continues to market the numerous products at issue in *Bidi I*.

Moreover, Bidi relies on the Declaration of Nirajkumar Patel, the CEO of

Bidi and the founding partner of the affiliated entity Kavial Brands

Innovations Group, Inc., which is "the exclusive distributor of Bidi's

'BIDI® Stick' ENDS device in the U.S." A179. In its most recent publicly

filed quarterly report, Kavial specifically addressed the impact of an MDO

for Bidi's products: "We believe we have the financial resources to weather

any short-term impacts of the FDA's [premarket review] process and Bidi's

receipt of a MDO from the FDA  . . . ." Kaival Brands Innovations Group,

Inc., Quarterly Report 8 (for the quarter ending July 31, 2023),

https://ir.kaivalbrands.com/financials/sec-filings/default.aspx.

Petitioner's claims of irreparable harm reflect a fundamental

misunderstanding of the governing statutory scheme.  Petitioner's asserted

injury, the inability to profit from unlawful marketing, stems from

Congress's judgment, expressed in the TCA, not from FDA's order. The Act

makes the marketing of a new tobacco product unlawful absent a finding

by FDA that the product satisfies this public-health standard. Bidi therefore

has no entitlement to market its e-cigarette in the absence of that

determination.

Congress charged FDA with "the daunting task of ensuring that another generation of Americans does not become addicted to nicotine and tobacco products," and it "g[ave] FDA the flexibility to" make these important determinations. *Avail Vapor, LLC v. FDA*, 55 F.4th 409, 428 (4th Cir. 2022). Bidi's insistence its product should remain on the market pending the Court's review runs counter to Congress's determination that new tobacco products may be sold only after an affirmative finding that their marketing is appropriate for the protection of the public health. *See* Order, *Fontem US, LLC v. FDA*, No. 22-1076 (D.C. Cir. July 12, 2022) (denying a stay motion and observing that the "public interest favors the likely proper enforcement of laws that protect the public health").

*/s/ Sam Ballingrud*
SAMUEL BALLINGRUD
Fla. Bar. No. 1004115
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
(202) 305-0168
(202) 514-8742 (fax)

DATED: February 13, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this opposition satisfies the type-volume limitation in Rule 27(d)(2)(A) because it contains 5,115 words. This opposition was prepared using Book Antiqua, 14-point font, a proportionally-spaced typeface.

*/s/ Sam Ballingrud*
SAMUEL BALLINGRUD

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2024, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ECF system. The participants in this case are registered CM/ECF users and will be served via the CM/ECF system.

*/s/ Sam Ballingrud*
SAMUEL BALLINGRUD

**Addendum to Stay Opposition**

(Redacted) Technical Project Lead Review ......................................................1



# Technical Project Lead (TPL) Review of PMTA

| New Product Subject to this Review[1] | |
|---|---|
| STN | PM0003460.PD2 |
| **Common Attributes** | |
| Submission date | September 8, 2020 |
| Receipt date | September 8, 2020 |
| Applicant | Bidi Vapor LLC |
| Product manufacturer | Bidi Vapor LLC |
| Application type | Standard |
| Product category | ENDS (VAPES) |
| Product subcategory | Closed E-Cigarette |
| **Cross-Referenced Submissions** | |
| PM0003460.PD2 | ███████████████ |
| **Supporting FDA Memoranda Relied Upon in this Review** | |
| PM0003460.PD2 | None |
| **Recommendation** | |
| Issue a marketing denial order for the new tobacco product subject to this review. | |

**Technical Project Lead (TPL):**

> Digitally signed by Lida Oum -S
> Date: 2024.01.22 07:01:47 -05'00'

Lida Oum, Ph.D.
Chemist
Division of Product Science

**Signatory Decision:**     Concur with TPL recommendation and basis of recommendation

> Matthew C. Farrelly -S
> Digitally signed by Matthew C. Farrelly -S
> Date: 2024.01.22 07:58:10 -05'00'

Matthew Farrelly, Ph.D.
Director
Office of Science

---

[1] Product details, amendments, and dates provided in the Appendix. STN means submission tracking number including product static identification number (PD) if applicable. PMTA means premarket tobacco application.

# TABLE OF CONTENTS

1. EXECUTIVE SUMMARY ........................................................................................................ 4
   1.1. APPH STANDARD ..................................................................................................... 4
   1.2. SUBJECT APPLICATION.............................................................................................. 6

2. BACKGROUND................................................................................................................... 7
   2.1. NEW PRODUCT ........................................................................................................ 7
   2.2. REGULATORY ACTIVITY............................................................................................. 8
   2.3. SCOPE OF REVIEW .................................................................................................... 8

3. SCIENTIFIC REVIEW ......................................................................................................... 10
   3.1. COMPARISON PRODUCTS........................................................................................ 10
      3.1.1. Discipline key findings ................................................................................. 10
      3.1.2. Synthesis ..................................................................................................... 11
   3.2. PRODUCT CHARACTERIZATION ............................................................................... 12
      3.2.1. Discipline key findings ................................................................................. 12
      3.2.2. Synthesis ..................................................................................................... 22
   3.3. ABUSE LIABILITY .................................................................................................... 25
      3.3.1. Discipline key findings ................................................................................. 25
      3.3.2. Synthesis ..................................................................................................... 27
   3.4. USER POPULATIONS ............................................................................................... 28
      3.4.1. Discipline key findings ................................................................................. 28
      3.4.2. Synthesis ..................................................................................................... 38
   3.5. TOXICANT EXPOSURE ............................................................................................ 42
      3.5.1. Discipline key findings ................................................................................. 42
      3.5.2. Synthesis ..................................................................................................... 42
   3.6. HEALTH EFFECTS.................................................................................................... 43
      3.6.1. Discipline key findings ................................................................................. 43
      3.6.2. Synthesis ..................................................................................................... 47
   3.7. POPULATION AND PUBLIC HEALTH ........................................................................ 47
      3.7.1. Discipline key findings ................................................................................. 47
      3.7.2. Synthesis ..................................................................................................... 48
   3.8. STATUTORY REQUIREMENTS.................................................................................. 48
      3.8.1. Public health conclusion .............................................................................. 48
      3.8.2. Tobacco product manufacturing practices.................................................... 48
      3.8.3. Labeling ...................................................................................................... 48
      3.8.4. Product standards ....................................................................................... 48

4. ENVIRONMENTAL DECISION............................................................................................ 48
   4.1. DISCIPLINE FINDINGS............................................................................................. 48
   4.2. ENVIRONMENTAL CONCLUSION ............................................................................. 48

5. CONCLUSION AND RECOMMENDATION ......................................................................... 49
   5.1. DEFICIENCIES ........................................................................................................ 51

6. REFERENCES ................................................................................................................... 54

7. APPENDIX ...................................................................................................................... 63
   APPENDIX A. NEW PRODUCT ........................................................................................ 65
   APPENDIX B. AMENDMENTS ........................................................................................ 65

2

**LIST OF TABLES**

Table 1. Disciplines reviewed ....................................................................................................... 9
Table 2. Consultations .................................................................................................................. 9
Table 3. Acronyms and abbreviations ......................................................................................... 63
Table 4. New product subject to Denial Order ........................................................................... 65
Table 5. Amendments .................................................................................................................. 65

# 1. EXECUTIVE SUMMARY

Based on the information provided in the application and other scientific data, as described in this Technical Project Lead (TPL) review, I find that the applicant has not demonstrated that permitting the marketing of the new product listed above ("new product" or "subject product") is appropriate for the protection of the public health (APPH). Accordingly, I recommend that a marketing denial order (MDO) be issued for the new product.

## 1.1. APPH STANDARD

Section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) requires that, for a product to receive a premarket tobacco product application (PMTA) marketing authorization, FDA must conclude, among other things, that permitting the product to be marketed would be APPH. Section 910(c)(2)(A). The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." Section 910(c)(2)(A).

The statute further specifies that, in assessing whether permitting the marketing of the new product would be APPH, FDA must consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such product. Section 910(c)(4). The APPH standard requires a showing that permitting the marketing of a new tobacco product would have a net benefit to public health based upon the risks and benefits to the population as a whole, which includes youth, young adults, and other vulnerable populations. As the statutory text makes clear, it is the applicant's burden to make a "showing"—with sufficient supporting information—that permitting the marketing of a new tobacco product would have a net benefit to public health based upon the risks and benefits to the population as a whole. In determining whether permitting the marketing of any new tobacco product would result in a net benefit to public health, FDA weighs the potential negative public health impacts (e.g., harm from initiation and use among nonusers, particularly youth) against the potential positive public health impacts (e.g., benefit to adults who use cigarettes and then completely switch to lower risk products).

In making the APPH assessment specifically for a noncombustible tobacco product such as an electronic nicotine delivery system (ENDS), FDA weighs, among other things, the negative public health impact stemming from youth initiation and use of the product against the potential positive public health impact stemming from adults who use combusted cigarettes (CC) transitioning away, i.e., completely switching, from CC to the ENDS or significantly reducing smoking of CC. In order to show that the marketing of an ENDS is APPH, an applicant must show that the benefits, including those to adults who use CC, outweigh the risks, including those to youth, resulting in a net benefit to the public health. As the known risks of the product increase or decrease, the burden of demonstrating a substantial enough benefit likewise increases or decreases.

4

Current scientific literature demonstrates that ENDS are generally likely to have fewer and lower concentrations of harmful and potentially harmful constituents (HPHCs) than CC, and biomarker studies demonstrate significantly lower exposure to HPHCs among current exclusive ENDS users than current smokers. However, whether this is true for any particular new ENDS is considered on a case-by-case basis during the course of FDA's scientific review of a PMTA. FDA considers the potential that adults who use CC may experience a reduction in health risks if they switch completely to ENDS, or if they use both products but substantially reduce their cigarette smoking.

For flavored ENDS[2] (i.e., ENDS with e-liquid flavors other than tobacco, such as fruit), there is a known and substantial risk of youth initiation and use; accordingly, an applicant has a higher burden to establish that the likely benefits to adults who use CC outweigh that risk. For tobacco-flavored ENDS the risk to youth is lower compared to flavored ENDS; accordingly, a lesser showing of benefit may suffice.

Before determining that permitting the marketing of a new tobacco product would be APPH, FDA also considers the potential impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and use of tobacco products. Marketing restrictions include advertising and promotion restrictions intended to limit youth exposure to and appeal of tobacco product marketing (e.g., measures such as limiting advertising to platforms that are predominantly used by adults and using advertising content and methods that are not known to resonate with youth, or even eliminating advertising in certain media channels altogether) and sales access restrictions intended to restrict youth access to tobacco products (e.g., measures such as selling products only in face-to-face interactions, in adult-only facilities, or via websites that require robust age and identity verification). In recent years, there have been efforts to develop novel and potentially more effective types of risk mitigation measures aimed at reducing youth initiation risks, such as device access restrictions (e.g., technologies that require adult user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product). FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the benefit to adults. In the case of flavored ENDS, the risk of youth initiation and use is well documented and substantial. Thus far, FDA's experience shows that advertising and promotion restrictions and sales access restrictions cannot mitigate the substantial risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit required to demonstrate APPH.[3] Rather, for flavored ENDS, only the most stringent mitigation measures have such potential; to date, the only such measures identified with the potential for that kind of impact have been device access restrictions. FDA is currently aware of no other restrictions with the potential to alter the overall net benefit assessment for flavored ENDS. In contrast to flavored ENDS, the risk of youth initiation and use with tobacco-flavored ENDS is lower. Restrictions on advertising and promotion and sales access for tobacco-flavored ENDS could mitigate that more limited risk and impact the overall net benefit assessment. In addition, restrictions on

---

[2]The term "flavored ENDS" in this review refers to an ENDS product with any characterizing flavor other than tobacco, including menthol flavor. For the purposes of this review, it is synonymous with "non-tobacco-flavored ENDS."

[3]*See* FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised): Guidance for Industry* 44 (Apr. 2020) ("The reality is that youth have continued access to ENDS products in the face of legal prohibitions and even after voluntary actions by some manufacturers."); *see also id.* at 45 (noting "data that many youth obtain their ENDS products from friends or sources in their social networks").

advertising and promotion and sales access are important to include in marketing granted orders (MGOs) because they can help ensure that the marketing of a new tobacco product remains APPH after authorization. FDA has included such restrictions in MGOs issued to date.

FDA also takes into account whether the applicant has provided sufficient information regarding product design, chemistry, stability, manufacturing controls including process controls and quality assurance procedures, toxicology, abuse liability, and other factors that can impact the product's risks and benefits to individual users, including relative to those of other tobacco products on the market. If an applicant does not include information that is needed for FDA to fully assess the risks and benefits of the product, the applicant has failed to carry its statutory burden of demonstrating that the product's benefits outweigh the risks.

## 1.2. SUBJECT APPLICATION

FDA's evaluation of the new product in the PMTA subject to this review determined that the PMTA lacks sufficient evidence to address the health risks associated with the new product with respect to leachables and HPHC exposure as compared to comparison ENDS. Additionally, the PMTA shows the new product has a high abuse liability, which is particularly concerning since it can lead to increased nicotine addiction and dependence among current tobacco users and non-users (including youth) as a whole. Without information to address health risk concerns and given the high abuse liability of the new product, FDA cannot find the marketing of the new product subject to this review is APPH. In total, this review finds three independent deficiencies in this application that are each an independently sufficient reason to support a MDO for the subject product.

Deficiency 1 relates to the lack of aerosol HPHC yields for comparison ENDS that are needed to evaluate comparative health risks of the new product subject to this review relative to other tobacco products from the same category. The applicant provided 11 sets of comparison ENDS data from six different manufacturers (i.e., ███████████████████████████████████████ ███████████████████████████████████ ), ███████████████████████████████████████████████████ However, the applicant-provided HPHC data for these comparison ENDS were not measured and collected in a manner that is sufficient or appropriate to compare to the new product's data. The HPHC data were not sufficient or appropriate for one or more of the following reasons: (1) lacked information on aerosol yield testing method validations and/or method protocols, (2) the HPHC was not collected from the full puffing life cycle of the test product and/or from comparable puffing regimens, (3) failed to identify whether the puffs represent the full puffing life cycle of the test product and failed to identify the puffing regimens (e.g., frequency, volume, duration), and (4) the smoking machine used to collect the HPHC was not sufficiently described or defined. The lack of information on methods used to collect the data prevent FDA from assessing the reliability of the reported HPHC data. Additionally, for the latter three reasons, the differences in puffing life cycle, regimens, and smoking machine can impact the reported HPHC levels (potential for overestimation and underestimation) in the comparison ENDS. Appropriate comparison ENDS data are needed to allow FDA to assess the relative health risks associated with HPHC exposure for individuals who use the new product as compared to other marketed ENDS that the population would likely have access to and use interchangeably. Without appropriate comparison ENDS data, FDA cannot complete the assessment of risks and benefits and determine whether the marketing of the new product subject to this review would be APPH.

Deficiency 2 relates to the lack of a complete leachable study to fully characterize the health risks associated with using the new product. The applicant provided a leachable study As a result of only using the applicant did not provide a comprehensive study that would allow for a complete evaluation of other possible leachables such as NVOCs, thermally labile compounds, and other additional SVOCs, which can be detected using other mass spectrometry (MS)-based techniques (e.g., liquid chromatography mass spectrometry [LC-MS] technique). Undetected SVOCs, NVOCs, and thermally labile compounds can pose health risks to the users.

A comprehensive leachable study including ▮▮▮▮▮▮▮▮▮▮▮▮▮ is needed to fully characterize all possible leachable contaminants that can migrate from the new product's container closure system. Leachables are a source of potentially harmful constituents. Exposures to any of these contaminants may pose an acute or chronic health risk to individuals using the new product. Therefore, because the applicant failed to provide such information, the health risks associated with the presence other possible leachables including SVOCs, NVOCs, and thermally labile compounds in the new product have not been fully evaluated and cannot be accounted for in the assessment of risks and benefits of the marketing of the new product. Without a comprehensive leachable study, FDA cannot find that marketing of the new product subject to this review is APPH.

Deficiency 3 relates to the new product's high abuse liability. The applicant-sponsored clinical study showed the new product has similar to or higher abuse liability than CC among current CC users with no experience using ENDS, and higher abuse liability than CC among experienced ENDS users. A new product with higher abuse liability compared to CC will promote compulsive and continued use of the new product despite harm or risk of harm. Due to the new product's high abuse liability, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product, and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence. Therefore, FDA cannot find that marketing of the new product subject to this review is APPH.

Based on the information provided in the PMTA and the available evidence, the PMTA lacks sufficient evidence to demonstrate that marketing this product would be APPH.

## 2. BACKGROUND

### 2.1. NEW PRODUCT

The applicant submitted information for the new product listed in Appendix A, which is intended to be marketed under the brand name Bidi Stick - Classic (formerly known as Bidi Stick Classic Tobacco). Briefly, the new product is a completely self-contained (closed) and disposable ENDS device composed of a non-rechargeable power unit and a prefilled e-liquid enclosure system containing a sponge-like material pre-saturated with e-liquid. The power unit settings and the e-liquid are intended to be non-adjustable and non-replaceable by the user. The new product

contains 1.4 mL of e-liquid with 6% w/v (weight to volume) or 60 mg/mL tobacco-derived nicotine, in salt form with benzoic acid, and uses a cobalt-based lithium battery. The applicant identifies the characterizing flavor of the e-liquid as tobacco-flavored and states that the new product is marketed to adults (aged 21 and older) who use tobacco for non-medicinal or non-therapeutic use.

## 2.2. REGULATORY ACTIVITY

On September 8, 2020, FDA received one PMTA from Bidi Vapor LLC. FDA completed an acceptance review on February 5, 2021 and issued an Acceptance letter to the applicant on February 5, 2021. FDA issued a Filing letter to the applicant on February 23, 2021. FDA issued a Deficiency letter to the applicant on March 20, 2023. FDA also issued an Extension Denied letter to the applicant on July 25, 2023. In response to the Deficiency letter, FDA received two amendments dated June 18, 2023, from the applicant.

For the PMTA under review, one amendment was submitted by the applicant after the response due date of June 18, 2023 (see Appendix B for amendment details). Although FDA received this amendment after the response due date and after the discipline reviewers had started scientific review, I conducted a review of the amendment to determine its impact on the evaluation and findings from the discipline reviews. The amendment notified the Agency of a study being conducted by ███████████████████████████ I determined that the January 18, 2024, amendment does not impact the discipline reviews because the amendment did not provide any new substantive scientific information, and therefore, I determined that the late amendment does not impact the evaluation and findings of the discipline reviews.

Refer to Appendix B for a complete list of amendments received and reviewed by FDA.

## 2.3. SCOPE OF REVIEW

This review captures all compliance and scientific reviews including TPMF discipline reviews (████████████████████████████████████) completed for the new product that is the subject of this review.

In the response to FDA Deficiency letter dated March 20, 2023, the applicant cross-referenced ████████ but they stated that the information in this TPMF is no longer relevant. Thus, FDA did not complete the TPMF review of ████████ because the applicant noted it was not needed to support FDA's scientific evaluation of this PMTA.

For ████████, toxicology and chemistry reviews were completed by Geoffrey Cole on March 17, 2023, and Lauren Girard on March 10, 2023, respectively. In response to FDA Deficiency letter dated March 20, 2023, the applicant provided updated nonclinical studies and considered previously submitted toxicology information in ████████ not relevant.

A cycle 2 toxicology review was not completed for this PMTA. The toxicology reviewers conducted a cycle 1 review and identified four deficiencies for this PMTA. However, in light of the other non-toxicological deficiencies (as described in Section 1.2) that form the bases for denial of the PMTA, completing a cycle 2 toxicology review is not warranted. This TPL review therefore does not include a toxicological evaluation of the new product and does not rely on any toxicological findings.

8

**Table 1. Disciplines reviewed**

| Discipline | Cycle 1 | | Cycle 2 | |
|---|---|---|---|---|
| | **Reviewer** | **Review Date** | **Reviewer** | **Review Date** |
| Regulatory | Not assigned | N/A | Maliha Choudhury | 10/3/2023 |
| Engineering | Robert Meyer | 3/17/2023 | Robert Meyer | 1/19/2024 |
| Chemistry | David (Yuan-wei) Nei | 3/17/2023 | David (Yuan-wei) Nei | 1/19/2024 |
| Microbiology | Amma Baidoo | 3/17/2023 | Amma Baidoo | 1/19/2024 |
| Toxicology | Geoffrey Cole | 3/20/2023 | Not assigned[4] | N/A |
| Behavioral and clinical pharmacology | Babita Das | 3/20/2023 | Babita Das[5] | 1/19/2024 |
| Medical | Holly Griffin (Bhargava) | 3/20/2023 | Holly Griffin (Bhargava) | 1/19/2024 |
| Epidemiology | Jamal Jones | 3/17/2023 | Aaron Blakney | 1/19/2024 |
| Social science | Sabeeh Baig | 3/20/2023 | Alexander Persoskie | 1/19/2024 |
| Environmental science | Alexander Lowe | 3/17/2023 | Alexander Lowe | 1/19/2024 |
| OCE – BIMO | Rachel Dailey | 7/6/2022[6] | Not assigned | N/A |
| OCE – manufacturing/lab | Abraham Agyapong | 6/10/2022 | Abraham Agyapong | 1/19/2024 |

**Table 2. Consultations**

| Discipline or Office | Cycle 1 | | Cycle 2 | |
|---|---|---|---|---|
| | **Reviewer** | **Review Date** | **Reviewer** | **Review Date** |
| Statistics | Chunfeng Ren | 9/13/2022 | Jia Wang | 1/19/2024 |
| OCE – DPAL | Qumerunnisa Syed | 3/17/2023[7] | Amy Liu | 1/18/2024 |
| OHCE | Emily Talbert | 6/22/2022[8] | Emily Talbert | 11/7/2023 |
| TPST | Anna Sophie Weidner | 5/19/2022 | Not assigned | N/A |

---

[4] As described in Section 2.3, toxicology did not complete a second cycle review.
[5] "8/9/23 Memo: Bidi Stick Classic (PM00007379.PD2) Cycle 2 PMTA consult" documented within the Behavioral and Clinical Pharmacology Cycle 2 review cover page, finalized on 1/19/2024, inadvertently referenced the incorrect STN. The correct STN.PD should reflect "PM0003460.PD2".
[6] A memo addendum was completed by Rachel Dailey on 9/19/2022.
[7] The TPL memo-to-file dated 3/20/2023, modified deficiencies to be conveyed to the applicant.
[8] Memo addendums were completed by Emily Talbert on 8/24/2022, and 2/8/2023.

# 3. SCIENTIFIC REVIEW

## 3.1. COMPARISON PRODUCTS

### 3.1.1. Discipline key findings

The following discussion is based on key findings provided in discipline reviews.

Per the chemistry review:

- The applicant provided mainstream smoke (MSS) yield for the University of Kentucky 1R6F reference CC from the literature (Jaccard et al., 2019). The reference CC are not in the same category as the new product. The applicant noted 1R6F reference CC was an appropriate comparison product to the new product because 1R6F reference CC is commonly used as reference CC product in industry and academia for tobacco analysis quality control and research purposes. Chemistry finds this is a reasonable justification for choosing 1R6F reference CC as comparison product to the new product and accepts that comparing the new product to 1R6F reference CC is appropriate to show the potential health benefit of switching from CC to the new product. The MSS yield dataset in Jaccard et al. did not contain all HPHC yields for comparison with the aerosol yield dataset of the new product. However, upon review of the published literature (Forster et al., 2018), the chemistry reviewer found additional HPHC yield data for the 1R6F reference CC (Forster et al., 2018) that were not reported in Jaccard et al. The MSS yield dataset for the 1R6F reference CC from the literature contains sufficient information or comparison to the new product and is acceptable from a chemistry perspective.

- The applicant provided aerosol yield data from published literatures and a tobacco report brochure for 11 comparison products in the same category (ENDS) as the new product:  However, the applicant-provided literature did not provide sufficient data because the HPHC yields were not measured and collected from a comparable puffing life cycle, puffing regimen, and/or puffing machine as the HPHC yields for the new product. Additionally, the test method and validation (e.g., accuracy, precision, sensitivity, specificity) information were either limited or not provided for all comparison ENDS to make meaningful comparison to the new product. Without a comparable and reliable comparison dataset from products in the same category as the new product (ENDS), FDA cannot fully evaluate the potential health risks of the new product when the consumer switches from other products (in the same category as the new product) to the new product or uses them interchangeably.

Per the medical review:

- One randomized clinical study (BIDI-PK-01) provided data on adverse experiences and health effects for six of the applicant's selected products (including the new product) and two comparison products, namely usual brand (UB) CC and JUUL Virginia Tobacco 5%. UB CC is an appropriate comparison product as the target population of the new

product is adults who use cigarettes. JUUL Virginia Tobacco 5% pod-based ENDS is also an appropriate comparison product for the new product, as the JUUL product and the new product share a common product category and subcategory (ENDS, Closed E-Cigarette) and flavor profile (tobacco flavor).

- The applicant reviewed ENDS literature as a general category only, without reviewing literature specific to any products. Because of the diversity of products within the ENDS category, the ability to bridge health effects identified in general ENDS literature to any particular ENDS, including the new product, is limited. Therefore, from this discipline's perspective, the applicant's literature review of ENDS did not bridge the identified health effects from the literature to the new product. While this lack of bridging from the literature is a limitation, this discipline finds that the health effects identified in the clinical study referenced above (BIDI-PK-01) are consistent with those previously described with this ENDS product category and are thus acceptable.

Per the behavioral and clinical pharmacology (BCP) review:

- The applicant compared the new product to UB CC and a comparison ENDS (████████████████) in all key studies that provided data on abuse liability, use behaviors, and biomarkers of exposure (BOE). From a BCP perspective, CC are appropriate for comparison to the new product as the applicant's stated intended user population for the new product is adults who use CC and who may or may not use ENDS.

### 3.1.2. Synthesis

As TPL, I agree with the chemistry review that the applicant's selected literature comparison data for the reference CC 1R6F is appropriate, but the applicant's selected ENDS comparison data from literature and a brochure are not sufficient for this application. Additionally, I also agree with the medical and BCP reviews (see Section 3.1.1) that the applicant's selected UB CC and ████████████████████ as comparison products are appropriate.

Per the chemistry review, the applicant provided data from a publication for the reference cigarette 1R6F (Jaccard et al., 2019), and two publications (Chen et al., 2021; El-Hellani et al., 2018) and a tobacco product brochure for 11 tobacco-flavored ENDS to assess the comparative health risks of the new product. The 1R6F reference CC are commonly used in industry and academia for tobacco analysis quality control and research purpose. As TPL, I agree with the chemistry review that the collected MSS data for 1R6F that were submitted by the applicant (Jaccard et al., 2019), as well as the additional constituents (i.e., PG, glycerol, diacetyl, ██████ included and considered by the chemistry review from Forster et al. paper (Forster et al., 2018), is appropriate and adequate for use in comparing the MSS data between 1R6F and the new product. Additionally, I agree that the applicant-submitted aerosol data for the 11 tobacco-flavored ENDS are not sufficient comparison data (see Section 3.2.2 for further discussion on this and Deficiency 1 in Section 5.1). Thus, without adequate comparison data to assess whether the overall HPHC levels in the aerosol of the new product are comparable to or lower than other comparison ENDS, FDA cannot determine health risks associated with the use of the new product compared with other ENDS in the same product category. As TPL, I recommend a deficiency to cite for the lack of appropriate comparative health risk data between the new product and ENDS comparison products (see Deficiency 1 in Section 5.1).

Per the medical and BCP reviews, the UB CC and JUUL Virginia Tobacco 5% were used as the comparative data in the key clinical study (BIDI-PK-01). As TPL, I agree with the conclusions that UB CC and JUUL Virginia Tobacco 5% comparative data are appropriate since the applicant's stated intended user population is adult tobacco users (aged 21+) who use CC and who may or may not use ENDS.

## 3.2. PRODUCT CHARACTERIZATION

### 3.2.1. Discipline key findings

The following discussion is based on key findings provided in discipline reviews.

#### 3.2.1.1. Product design and composition

Per the engineering review:

- The principles of operation are adequately described. The new product is a closed, pre-charged, non-rechargeable, disposable ENDS. The user activates the new product by inhaling at the mouthpiece, which triggers the controller and battery to send power to the heating element to heat and aerosolize the e-liquid. The LED light indicator turns on with one flicker to show power is on and then illuminates gradually while inhaling. After aerosolization, the wick absorbs more e-liquid from the oil storage cotton, and the new product is ready to be activated again.
- The applicant states the product is "child proof" and provides a child resistant packaging (CRP) test report to demonstrate the effectiveness of the packaging per requirements within 16 CFR § 1700.15.
- The new product is demonstrated to be tamper evident and tamper resistant. The applicant provides testing that shows it is difficult to access the e-liquid reservoir, heating element, and battery without permanently damaging the product. The new product's packaging is sealed with plastic wrap; if the wrapping is broken, it would be evident that tampering had occurred.
- The consumer packaging described in the amendment received on June 18, 2023, is different from the packaging described in the application provided on September 8, 2020. The new packaging in the amendment received on June 18, 2023 consists of the new product being placed inside a labeled heat-sealed plastic enclosure that is placed inside a labeled cardboard box. From an engineering perspective, the consumer packaging is adequate and tamper evident because there is a sealed plastic wrapping that would need to be cut or torn open, and the packaging would be permanently damaged and evident if tampering of the new product had occurred. The product packaging is multi-layered, and the shipping packaging is verified to resist damage due to vibration, pressure, and dropping. In addition, the applicant provided information that the product itself without packaging was tested and determined to resist damage due to shipping conditions such as vibration, pressure, and dropping.
- From an engineering perspective, the applicant provides the applicable design parameter target specifications and range limits, which demonstrates that the new product meets the requirements of section 910(b)(1) of the FD&C Act.

Per the microbiology review:

12

- The finished new product contains ████████████████████████ ████████ which may impact microbial activity during product shelf life and raise microbiological concerns. However, the applicant provided adequate microbial counts data (measured in Total Aerobic Microbial Count and Total Yeast and Mold Count or TAMC/TYMC) for the finished new product from ███ months of shelf life. This data shows microbial levels remain stable across all time points, which reported at or below the limit of detection (<10 colony forming unit/milliliter [CFU/mL]). Thus, the lack of change in microbial counts (growth) indicates the humectants and preservative are adequate from a microbiology perspective for up to ███ months of shelf life.
- Adequate stability data were provided for the finished new product over the proposed ███ months shelf life; therefore, ████████████████████ and ████████████████████ levels of the new product are acceptable from a microbiology perspective.

Per the chemistry review:

- The new product contains ███████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████ Information in the COA demonstrates the appropriate nicotine quality and purity needed for new product manufacturing. The quality of the nicotine incoming raw material is also verified by ████████████████ ████████████████████ that it meets the supplier's COAs. The applicant stated that they provided analytical method information, a validation report, and reference dataset for the quality control (QC) analysis of nicotine ████████████ ████████████ in the amendment dated June 18, 2023. Upon review, the files supporting this information were not attached or provided when the amendment (dated June 18, 2023) was received by FDA. This, however, is only a limitation since the applicant has provided COAs from ████████████████████ ████████████████████████████████ that demonstrate the purity of nicotine ████████████████████████████████████ used in the manufacturing of the new product. The applicant has also provided e-liquid test results for ██████████████ finished bulk e-liquid to demonstrate that the new product's e-liquid can be manufactured consistently. Additionally, the ███ months stability data that the applicant provided also verify the nicotine purity in the bulk e-liquid and finished product. Therefore, the lack of documents describing the analytical method information, validation report, and reference dataset for the QC analysis of nicotine does not prevent chemistry from analyzing the purity specification of the nicotine. The applicant-provided COAs and stability data sufficiently demonstrate the purity of nicotine and the manufacturing batch testing of the bulk e-liquid, and the finished new product were consistently manufactured.
- E-liquid: In response to FDA Deficiency letter dated March 20, 2023, the applicant provided updated ingredient information in the amendment dated June 18, 2023,

that supersedes all previously submitted ingredient information. The e-liquid ingredients information in the amendment dated June 18, 2023, is sufficient and acceptable from a chemistry perspective. The new product comprised of ███

- The applicant provided names, part numbers, material description, and function for all structural components of the new product. The applicant also provided material safety data sheets (MSDS) and COAs for all structural components of the new product. This information submitted by the applicant is acceptable from a chemistry perspective.
- The applicant provided detailed information about the structural material of the plastic container used to store bulk e-liquid (e.g., name, chemical composition, MSDS, COA). The applicant also provided a standard operating procedure (SOP) for the filling, sealing, and storage of the finished bulk e-liquid in the plastic container. The information is adequate from a chemistry perspective.

### 3.2.1.2. Manufacturing

Per the engineering review:
- From an engineering perspective, the manufacturing process information for the new product hardware is acceptable.
    - Design information, such as process descriptions and QC measures, for each part is provided. Verification of each part's specifications deemed applicable by the applicant are provided.
    - Procurement processes are adequately described.
    - Inspection processes are sufficient.
- The applicant demonstrates that the physical specifications for each part are established, manufacturing operations are established and validated, procurement processes are in place and monitored, there are in-process part inspections, finished parts are inspected, packaging operations are validated, and consumer feedback methods are established. Each of the listed steps supported the evaluation of the total manufacturing process as adequate and the conclusion that the new product is likely to be manufactured consistently from an engineering perspective.

Per the microbiology review:
- The finished new product includes e-liquid, which contained tobacco-derived nicotine but does not include processed (i.e., cured, fermented, heat-treated) tobacco. Information related to tobacco processing is not applicable to the finished new product.
- The manufacturing process of the new product is divided into ███



he applicant provided proof of certifications for ███ that are sufficient from a microbiology perspective.

- Stability studies for the bulk e-liquid and the finished new product were provided to ensure microbial control of the manufacturing process and were found acceptable. Therefore, the manufacturing process is adequate from a microbiology perspective.
- A Remote Regulatory Assessment (RRA) of ███████████████████████ ██ Bidi Vapor LLC (BIDI) was conducted on August 22, 2022 through September 09, 2022. Batch records, SOPs for cleaning, production process control procedures, and pest control management regulations were examined and found adequate from a microbiology perspective. In addition, ████ is ISO 9001:2015 certified and implements the ISO13485:2016/FDA(QSR) 21 CFR Part 820 quality management system; therefore, the findings of the RRA were sufficient from a microbiology perspective.

Per the chemistry review:
- The applicant stated that the first █████ batches of the new product were manufactured by ████████████████████████████████████████ █████████████████████████████████████████████████ are cGMP compliant and have a certified quality management system (QMS) (████████████ and ISO9001:2015). The applicant provided proof of certifications for cGMP and QMS that are sufficient from a chemistry perspective.
- The applicant provided information about manufacturing certification, raw material supplier management, incoming raw material inspection, managerial oversight and employee training, manufacturing documentation management, manufacturing process and quality control of the new product, non-conforming product control, and storage requirement of the finished new product. The applicant stated that they provided analytical method information, validation reports, and reference datasets for the QC analysis of PG, VG, nicotine, benzoic acid, and tobacco flavor ingredients in the amendment dated June 18, 2023. However, the files supporting this information were not attached or provided when the amendment (dated June 18, 2023) was received by FDA. The applicant has provided COAs from both suppliers and a third-party testing laboratory █████████████████████ that demonstrate the purity of PG, VG, nicotine, and benzoic acid used in the manufacturing of the new product. The applicant has also provided e-liquid test results for ███ batches of finished bulk e-liquid to demonstrate that the new product's e-liquid can be manufactured consistently. Additionally, the ███ months stability data that the applicant provided verifies the PG, VG, nicotine, and benzoic acid quantities and purities in the bulk e-liquid and finished product, and thus, despite the lack of documents describing the analytical method information, validation report, and reference dataset for the QC analysis of PG, VG, nicotine, benzoic acid, and tobacco flavor ingredients, chemistry was able to evaluate the purity and adequacy of these incoming raw materials. The applicant provided COAs and stability data that sufficiently demonstrate purity of incoming raw materials and the manufacturing batch testing of the bulk e-liquid and that of the finished new product were consistently manufactured.
- The applicant provided copies of COAs and batch records to demonstrate the finished new product meets their manufacturing specification and these documents

are acceptable traceable records. These documents are appropriate for chemistry evaluation and acceptable from a chemistry perspective.
- The applicant provided release specifications for the bulk e-liquid and finished new product. The information provided by the applicant for the release specification of the new product's finished bulk e-liquid is sufficient and acceptable from a chemistry perspective. The applicant also provided test results for ▮ batches of finished bulk e-liquid to demonstrate that the new product's e-liquid can be manufactured consistently.

### 3.2.1.3. Product life cycle

Per the chemistry review:
- The applicant advertised that the new product has a



his is acceptable from a chemistry perspective since puffing life cycle (life span) of a product can vary depending on the puffing regimens used.

Per the engineering review:
- An explicit life cycle is not stated by the applicant. The new product is a non-rechargeable, disposable closed ENDS and the life cycle is limited to the amount of e-liquid. The product is designed with a specific e-liquid volume (1.4 mL), and this is the new product's life cycle limit. In addition, the applicant selected batteries with enough capacity to operate and aerosolize all the e-liquid volume and provided test data demonstrating that the maximum puff count for new product is approximately ▮ puffs during non-intense smoke regimen. Thus, engineering considers the life cycle of the new product to be approximately ▮ puffs, which is when all the e-liquid is expected to be aerosolized.

### 3.2.1.4. Product stability

Per the microbiology review:
- The applicant proposed a shelf life of ▮ months for the finished new product and the bulk e-liquid is stored for no more than ▮ months prior to filling.
- Adequate stability data of TAMC/TYMC was provided for the bulk e-liquid and the finished new product at storage times ▮▮▮▮ and based on this data for microbial levels (<10 CFU/mL), stability was adequate up to ▮ months from a microbiology perspective. Therefore, applicant has provided sufficient stability data to support the proposed shelf life of ▮ months for the finished new product and ▮ months for the bulk e-liquid.
- Additional stability testing data for the bulk e-liquid and the finished new product were provided at a storage time up to ▮ months. This data ▮▮▮▮ was not evaluated by microbiology, because the stability data provided in the original

submission ▮▮▮▮▮ adequately addressed the microbial stability of the products over the proposed ▮ months of shelf life for the bulk e-liquid and ▮ months of shelf life for the finished new product.

Per the chemistry review:
- The applicant provided stability data up to ▮ months that adequately supports the shelf-life of the bulk e-liquid ▮▮▮▮) and finished new product ▮▮▮▮▮). The stability data for the chemical constituents and physicochemical properties are all within the release specifications that support the applicant's proposed shelf-life for the bulk e-liquid ▮▮▮) and new product ▮▮▮▮). The applicant referenced a TPMF, ▮▮▮▮▮, for the analytical method protocols and validation reports of the stability study. The chemistry review of ▮▮▮▮ (Date: 1/19/2024, reviewer: Trevon Swain) indicates that the TPMF provided sufficient information to demonstrate the appropriateness of the analytical methods used in the stability study. The information provided by the applicant for the stability of the bulk e-liquid and new product is sufficient and acceptable from a chemistry perspective.
- The applicant provided data on semi-quantitative non-targeted analysis (NTA) of aerosol yields collected from the new product stored for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- The applicant provided semi-quantitative NTA extractable study data for the new product. The applicant provided data on the extraction of the ENDS component of the new product (with the exception of battery, electronics, and aluminum tube enclosure) with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The applicant also provided data on the extraction of mouthpiece component of the new product with artificial saliva. The analytical methodology information provided by the applicant for the

extractable study of the new product is adequate. Therefore, the analytical results from the extractable study are reliable and acceptable from a chemistry perspective. Potential health implications and risks from the extractables are evaluated by toxicology.

### 3.2.1.5. Product test data

Per the engineering review:

- The applicant provides all applicable design parameter target values and range limits, and this demonstrates that the new product meets the requirements of section 910(b)(1) of the FD&C Act.
- The applicant provides sufficient post-manufacturing verification data using COAs to demonstrate that all purchased subcomponents and parts of the new product hardware meet manufacturing specifications and to demonstrate that the new product's parts are manufactured consistently. The applicant demonstrates that the purchased parts used for assembling the new product are made consistently per specifications to reduce the likelihood of a product failure.
- The applicant provides the Design Failure Mode and Effect Analysis (DFMEA) report that addresses all design concerns related to failure of parts, functions, or design features that are associated with design hazards (dry puffing, extreme coil temperature, inaccurate e-liquid volume, battery overheating, fire, or explosions). FDA evaluates all potential failure modes that are associated with a potential hazard to determine if they are considered in the design and adequately mitigated to determine if the finished product functions as intended under foreseeable conditions. The DFMEA analysis considers failure of components associated with an e-liquid leaking risk, battery failure, and hot aerosol and surface temperatures of the new product. In conclusion, the DFMEA report is considered by engineering as sufficient and each failure mode identified is mitigated adequately.
- The applicant provided a User Failure Mode and Effects Analysis (UFMEA) report that identifies risks associated with a person who inhales vapor from the new product. Each of the risks is associated with causes and mitigation methods. The UFMEA report identifies common ENDS risks, such as burns, leaks, and battery explosions. The risks identified are acceptable. The applicant quantifies each risk by evaluating the associated harm, cause, detectability, and mitigation methods. The applicant references associated test reports for the new product that are provided when applicable, such as UL 8139:2020 - UL Standard for Safety Electrical Systems of Electronic Cigarettes and Vaping Devices. All risks are considered reasonably low by the applicant. Engineering reviewed each risk and its associated cause, as well as the mitigation method and determined all risks identified are reasonably low and acceptable.
- The RRA memo dated October 7, 2022, documents consumer complaints regarding leaking. ███████████████████████████████████████████████████████ ███████████████████. The internal fixation base design was changed to address the leaks, and after the changes were made the applicant demonstrates the new product will not leak after dropping, vibration, and shipping conditions are applied. The internal fixation base change and the associated verification is adequate.

18

- The applicant reports that the batteries used are UL 1642 certified and includes adequate test reports for each of the batteries made from those manufacturers stated to provide batteries for the new product. The UL 1642 – Standard for Safety for Lithium Batteries, is an applicable battery standard that verifies the battery is manufactured as intended and functions properly after foreseeable conditions are applied (vibration, thermal abuse, temperature cycling, shock, forced discharge, impact, crush, short circuit, and drop).
- The applicant demonstrates the new product is UL 8139 certified to support the functionality and safety of the battery and the power distribution unit (PDU). The applicant provides the full test reports. The battery test reports demonstrate that provided tests were passed and the batteries and the new product as a system function as designed. The reports demonstrate that the new product's protective circuits and controls keep the battery within the normal operating range during operation. This is necessary for evaluating the total product safety because if the assembled product and PDU do not function within the battery's normal operating range then hazardous conditions (e.g., overheating, fire, explosions) could occur and injure a user. Collectively, it is determined by engineering that the battery selected by the applicant is manufactured adequately and functions with the new product design.

Per the chemistry review:
- The applicant provided aerosol HPHC yields from 90% end of life (EOL) of the new product for acetaldehyde, acrolein, cadmium, chromium, ███, diacetyl, diethylene glycol, ethylene glycol, formaldehyde, glycerol, ███, lead, nickel, nicotine, propylene glycol, propylene oxide, 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone (NNK), and N-Nitrosonornicotine (NNN), in mass per device and mass per puff using the standardized non-intense (ISO 20768:2018) puffing regimen (55 mL puff volume, 3 s puff duration, and 30 s puff frequency) and non-standardized intense (110 mL puff volume, 6 s duration, and 30 s puff frequency) puffing regimen. The aerosol HPHC yields of the new product were measured by ███████████ ██████████. The applicant compared aerosol HPHC yields of the new product to the MSS HPHC yields of 1R6F reference cigarette published in scientific literature (Jaccard et al., 2019).
- The applicant provided data on the levels of NNN and NNK in the e-liquid. These levels, which were supported by adequate method protocols and validation reports, tested below the level of detection. The applicant also provided NNN and NNK aerosol data. Although the PMTA did not include sufficient method protocols and validation reports to support the aerosol data for NNN and NNK, these aerosol data are not needed because the NNN and NNK levels in the e-liquid of the new product were below the limit of detection. These low levels of NNN and NNK in the e-liquid of the new product obviate concerns about the levels of these analytes in the aerosol, and thus, the NNN and NNK aerosol levels in the new product are not required.
- Acetaldehyde, acrolein, cadmium, chromium, ███, diacetyl, diethylene glycol, ethylene glycol, formaldehyde, glycerol, and lead quantities in the aerosol yields of the new product are acceptable compared to the MSS yield of the University of Kentucky 1R6F reference cigarette from a chemistry perspective. ███████ and nickel

quantities are low in the aerosol yield of new product: 0.02 µg/puff or 3.99 µg/device under non-intense ISO puffing regimen and 0.04 µg/puff or 4.42 µg/device under intense puffing regimen for ▇▇▇▇ 0.34 ng/puff or 79.25 ng/device under non-intense ISO puffing regimen and 0.63 ng/puff or 71.08 ng/device under intense puffing regimen for nickel. However, ▇▇▇▇ and nickel were measured BLOQ and BLOD, respectively, in the MSS yield of 1R6F reference cigarette. This is expected since ▇▇▇▇ and nickel are byproducts of PG/VG and heating coil, respectively, and CC do not contain heating coil while PG/VG is typically presence in small quantity. ▇▇▇▇ is currently listed as Group 2A agent by International Agency for Research on Cancer (IARC), i.e., probably carcinogenic to humans, and nickel metal is currently listed as Group 2B agent by IARC, i.e., possibly carcinogenic to humans (IARC, 2012). The potential health implications (or impacts) of ▇▇▇▇ and nickel in the aerosol yield of the new product compared to CC are evaluated by toxicology.

- Propylene glycol quantity in the aerosol yield of the new product, under non-intense ISO puffing regimen (55 mL puff volume, 3 s puff duration, and 30 s puff frequency), is acceptable from a chemistry perspective because acetaldehyde, formaldehyde, and propylene oxide (thermal degradants of propylene glycol) are lower in the aerosol yield of the new product compared to the MSS yield of the 1R6F reference cigarette. However, propylene oxide collected using intense puffing regimen (110 mL puff volume, 6 s duration, and 30 s puff frequency) is 498% (4.48 µg/mg of nicotine) higher in the aerosol yield of the new product than the MSS yield of 1R6F reference cigarette (Jaccard et al., 2019). The propylene oxide aerosol yield is 2.56 µg/puff or 286.72 µg/device for the new product, which may cause health risks when the new product is puffed under an intense puffing regimen (110mL/6s/30s). The potential health implications (or impacts) of these increases are evaluated by toxicology.

- The aerosol yield data for the new product were obtained from only a single batch of the finished new product and three replicates of measurement. From a chemistry perspective, testing of a single batch and three replicates of measurement is not sufficient to substantiate the results of the aerosol yield data. The small sample size and number of replicates do not demonstrate the statistical significance of the aerosol yield measurements and variation in aerosol yields of different batches of finished new product. However, there were no other concerns related to aerosol test data, associated testing methods, or product manufacturing consistency issues. Compared to MSS of 1R6F reference cigarette, majority of the HPHCs in the new product are significantly lower than 1R6F reference cigarette, except for PG, VG, and propylene oxide. The applicant has demonstrated that the PG and VG quantities in the bulk e-liquid can be manufactured consistently across ▇▇▇ different batches. Thus, chemistry does not expect the aerosol yields of PG and VG to vary significantly. Additionally, propylene oxide is a thermal degradant of PG, and PG has been shown to be manufactured consistently across ▇▇▇ batches of bulk e-liquid. Thus, chemistry also does not expect the aerosol yield of propylene oxide to vary significantly. Therefore, the lack of sufficient sample size and number of replicates in this application do not prevent chemistry from evaluating the aerosol yield data from the new product.

- In the amendment received December 17, 2021, the applicant provided comparison data for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████████████████████

and consumption per day (weight/day), which were not appropriate and do not include standard deviations and number of replicates needed for chemistry evaluation. Chemistry needs aerosol HPHC yields from the comparison ENDS in mass per product, mass per aerosol collection (including aerosol collection puff counts), or mass per puff (including puff number), along with standard deviation of the measurements and number of replicates, in order to compare to and evaluate the health risk and benefit of the new product. Additionally, the applicant did not provide the actual names of these ENDS and indicate whether the comparison data were extracted from literatures or measured by the applicant. In response to FDA Deficiency letter, the applicant did not address concerns FDA identified. Instead, the applicant provided comparison aerosol yield data from the published literatures for products in the same category as the new product: ███████████████ and ████████████ as prefilled, closed, cartridge-based ENDS (Chen et al., 2021); Apollo Classic Tobacco, BLU Classic Tobacco, Ever Smoke Classic Tobacco, and South Beach Smoke Classic Tobacco as disposable, prefilled, and tank ENDS (El-Hellani et al., 2018). The applicant also provided comparison aerosol yield data from a tobacco product brochure for the SREC ENDS. However, as explained in detail in the bullets below, all the comparison aerosol yield data lack information needed to determine whether the data are appropriate for comparison to the new product.

- For the SREC product, the provided HPHC data from a tobacco brochure are reported as approximate values and lacked analytical precision and statistical confidence, nor do they include standard deviations, number of replicates, puffing regimen information, analytical method information, method validations, testing laboratory name and accreditation, and puff counts per aerosol collection. Without this information, FDA cannot determine whether the comparison aerosol yield data reported for the SREC product are reliable or measured and collected in a manner that would be comparable to compare to the new product's data. FDA needs aerosol yield dataset from a comparable puffing regimen and puffing life cycle (i.e., 90% end of life or product consumption), and validated test methods so that we can accurately evaluate the HPHC exposure risk of the new and comparison products when the consumer switches from other products (in the same category as the new product) to the new product or use them interchangeably. Aerosol yield data collected using a comparable puffing regimen (puffing volume, frequency, and intervals) and puffing life cycle (i.e., 90% end of life or product consumption) to the new product are needed so that FDA can compare the comparator product to the new product appropriately without reporting bias. Varying the puffing volume, frequency, or intervals can influence the overall HPHC yields of an ENDS. In addition, validated test methods are needed so that FDA can determine if the aerosol yield dataset for the comparison product is reliable in terms of accuracy, precision, selectivity, sensitivity, linearity, and range.
- For ████████████████ and ████████████ the HPHC yields provided from the published literature (Chen et al., 2021) were collected from a portion of the products (50 puffs) and majority of the HPHC (45 out of 53 constituents) were reported as BLOD and BLOQ. Had the authors collected the aerosol data from a whole pod or 90% EOL, the reportable

constituents would likely be higher, and it is not clear to FDA if constituents that were reported as BLOD and BLOQ would be present. Additionally, Chen et al. paper contains very limited analytical method information (e.g., method name, name of testing lab) and no method description or validation information. Therefore, the literature data provided by the applicant for ███████████████████████ did not contain sufficient and comparable data to compare to the new product's data. Without sufficient and comparable data, FDA cannot fully evaluate the health risk of the new product in comparison to the ███ products.

o   For ████████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████ provides a brief description of each test methods along with the name of the testing laboratory but lacks method validation information. The HPHC data were collected using different puffing regimens (puff duration, frequency, and volume), puffing machine (non-standardized puffing machine was used), and puffing life cycle (i.e., 90% end of life or product consumption) than the new product. Without appropriate test data, collected in a manner that is comparable to the new product test dataset, and reliable and accurate, the new product cannot be appropriately evaluated for risks or benefits to the user and non-user in comparison to similar ENDS.

### 3.2.2. Synthesis

As TPL, I agree with the engineering and microbiology reviews that the PMTA contains sufficient information to characterize the product design, packaging, and microbial stability of the new product. Per the engineering review, the applicant provided sufficient information on the product design and packaging of the new product. The applicant provided a CRP test report to demonstrate the effectiveness of the packaging per requirements within 16 CFR § 1700.15 in minimizing unintended exposure to young children. The applicant demonstrated the new product is tamper-evident and tamper resistant. The applicant also provided evidence demonstrating that attempting to misuse the new product will result in permanent damage and prevent it from functioning. Furthermore, the batteries to be used with the new product are UL8139 certified. As TPL, I agree with engineering's conclusion that the applicant submitted sufficient information on product design and packaging. Per the microbiology review, the applicant provided the appropriate microbial stability data (up to ██ months) for the new product to support the applicant's proposed shelf life of ██ months for the finished new product and ██ months for bulk e-liquid. As TPL, I agree with microbiology's conclusion that there is sufficient information on the microbial stability data.

I also agree with the chemistry review that the PMTA does not contain sufficient test data with regard to aerosol data for comparison ENDS and leachable contaminants including SVOCs, NVOCs, and thermally labile compounds in the new product to determine health risks associated with using the new product. Per the chemistry review, the applicant provided adequate MSS yields for the 1R6F CC compared to the new product. Because the applicant did not provide data on MSS yields for PG, glycerol (also known as VG), diacetyl,

and ▮▮▮▮▮ chemistry reviewers utilized data from the published literature (Forster et al., 2018) to further facilitate comparison of these constituents to the new product. The majority of the HPHCs were lower in the new product compared to the 1R6F; however, PG and VG were higher in both non-intense ISO and intense puffing regimen. Because PG and VG are main chemical components of the new product, and they are typically added in relatively small amounts as humectants in the 1R6F, higher levels of PG and VG in the aerosol yields of the new product are expected. PG and VG can produce acetaldehyde, acrolein, ▮▮▮▮▮ and formaldehyde upon heating. Although the new product had high levels of PG and VG compared to the 1R6F CC, the lower levels of these constituents (70-100%) in the aerosol of the new product compared with the MSS yields for the 1R6F are acceptable. However, the aerosol yield of propylene oxide, a thermal degradant of PG and a possible carcinogen per International Agency for Research on Cancer (IARC) (IARC, 2012), is 498% higher (4.48 µg/mg of nicotine) in the new product compared to 1R6F when measured under intense puffing regimen. Thus, as TPL, I agree with the chemistry review that a toxicological evaluation would be needed to fully characterize the potential public health impact of high level of propylene oxide in the new product on users. In the absence of a cycle 2 toxicology review, this TPL review cannot draw final conclusions with respect to the toxicant exposure posed by the new product.

I also agree with the chemistry review that the PMTA does not contain sufficient information with regard to aerosol HPHC yield data for comparison ENDS to fully analyze the health risks associated with using the new product.  Per the chemistry review, in the amendment received on December 17, 2021, in the cycle 1 review, the applicant provided comparison data for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the applicant provided new comparison aerosol HPHC yield data for a different 11 tobacco-flavored ENDS from anothe ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, per the chemistry review, these comparison data were not sufficient because they lack one or more of the following: analytical and statistical confidence, method validation information, and a scientifically supported justification for why aerosol HPHC yield data collected from a small amount of puff counts or different puffing regimen would be reliable and appropriate for comparison to the new product's aerosol data. Thus, the applicant did not submit sufficient and appropriate data for FDA to evaluate the comparative health risks between the new product and other comparison ENDS and determine whether individuals who use the new product would likely be exposed to HPHCs that are comparable to or lower than other marketed comparison ENDS that the population may have access to or use interchangeably. Without appropriate comparison ENDS data, FDA cannot assess if use of the new product may present less health risks than other marketed ENDS to both users and nonusers and whether the marketing of the new product subject to this review would be APPH. As TPL, I recommend a deficiency to cite for the lack of sufficient comparative health risk data between the new product and comparison products (see Deficiency 1 in Section 5.1).

I also agree with the chemistry review that the PMTA does not contain sufficient information with regard to leachable contaminants (including SVOCs, NVOCs, and thermally labile compounds) to fully analyze the health risks associated with using the new product.

Leachables are chemical compounds that can migrate into an e-liquid formulation, or into the aerosol, as a result of direct contact with or the interaction of materials or components during the manufacturing process or under typical use and/or storage conditions. Possible sources of leachables include components or parts of container closure systems (e.g., e-liquid enclosure, heating element, wick), manufacturing equipment (e.g., storage and mixing, tubing, gaskets, valves, connectors), and packaging (e.g., cellophane). Interaction of leachable compounds with the product or product components can increase the product's toxicity to consumers. A product's leachable contaminant profile varies depending on the product's manufacturing processes, components, and ingredients used. Thus, detailed product knowledge is vital in designing and selecting appropriate analytical techniques for a comprehensive extractable and leachable studies. In general, in order to detect, identify, and quantify leachable compounds that are potentially toxic or otherwise harmful to users, a comprehensive study should comprise of a combination of analytical techniques including but not limited to GC-MS, LC-MS, and inductively coupled plasma mass spectrometry (ICP-MS).

FDA noted as such in its March 20, 2023 deficiency letter, explaining that in order for FDA to fully evaluate the health risks of the new product, leachables need to be identified in a study using non-targeted semi-quantitative chemical analysis to identify all possible chemical compounds that may leach out of ENDS components during normal product use. Leachable contaminants are a source of potential harmful constituents. A comprehensive leachable study utilizing both would have allowed detections of NVOCs, SVOCs, and thermally labile compounds, and provided information that is needed to fully evaluate the health risks associated with the new product.

Thus, the applicant has not provided sufficient data for full evaluation of the health risks associated with and leachables including additional SVOCs, NVOCs, and thermally labile compounds in the new product. Without this information, FDA cannot complete the assessment of risks and benefits of marketing the new product and find that marketing of the new product subject to this review would be APPH. As TPL, I recommend deficiencies to cite for the lack of a comprehensive leachable study that utilizes other MS-based techniques that would allow for the detections of other possible leachable such as NVOCs, additional SVOCs, and thermally labile compounds (see Deficiency 2 in Section 5.1).

I also agree with the chemistry review that the PMTA does not contain sufficient information with respect to test method and validation report to support the NNN and NNK

aerosol data for the new product. However, the aerosol data for NNN and NNK are not needed because the NNN and NNK levels in the e-liquid of the new product were below the limit of detection. Thus, the NNN and NNK aerosol levels in the new product are expected to be low and are not of concern.

Overall, the applicant did not provide sufficient health risks (i.e., test data for comparison ENDS and a complete leachable study for the new product) to support an APPH determination for the marketing of the new product.

## 3.3. ABUSE LIABILITY

### 3.3.1. Discipline key findings

The following discussion is based on key findings provided in the BCP review with respect to the applicant-sponsored clinical study (BIDI-PK-01), which assessed subjective effects and nicotine exposure (maximum nicotine exposure [$C_{max}$] and area under the curve [AUC—an estimate of total nicotine exposure]) following actual use (controlled use and ad libitum use) of the new product and UB CC.

#### 3.3.1.1. Abuse liability

Per the BCP review:

- Abuse liability refers to the ability of the product to promote continued use and the development of addiction and dependence. This can be relevant to determining the likelihood that addicted users of one nicotine product would switch to another. For example, if a new product has a low abuse liability, individuals who are currently dependent on nicotine may find it to be an inadequate substitute for the product they are currently using. On the other hand, low abuse liability makes it less likely that new users will become addicted. Abuse liability evaluations include pharmacokinetic (PK) evaluations and consider the addictiveness and abuse potential of the tobacco products and the exposure to nicotine during product use.
- The applicant-submitted clinical study (BIDI-PK-01) assessed the abuse liability of the new product as compared to UB CC and JUUL Virginia Tobacco 5%.
  - This study measured PK nicotine exposure from these three products (and five other Bidi Stick ENDS which were not evaluated in this PMTA review) during controlled and ad libitum product use sessions.
  - The new product had higher nicotine exposure than UB CC and JUUL Virginia Tobacco 5% during ad libitum use. Total nicotine exposure (AUC) was statistically significantly higher for the new product than UB CC during ad libitum use (see September 13, 2022 statistical consult Memo). Higher nicotine exposure than UB CC indicates the new product may promote continued use and lead to higher nicotine dependence and addiction (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993).
    - Total nicotine exposure (AUC) was statistically significantly higher for the new product than UB CC during ad libitum use (see September 13, 2022 statistical analysis consult Memo).
    - █████████████████████████████████████████████████████

████████████████████████ This lack of statistical analysis is a limitation from BCP's perspective.

- The applicant provided statistical analyses comparing nicotine exposure outcomes of the new product to UB CC following controlled use, but not following ad libitum use. The applicant's analysis showed nicotine exposure ($C_{max}$) following controlled use of the new product was similar to UB CC.
- While not required, the lack of statistical analysis for the ad libitum use data limited BCP's ability to evaluate the abuse liability of the new product. Since ad libitum product use is more generalizable to real-world use than measures collected during controlled use, FDA consulted with the statistical branch (see September 13, 2022 Memo) to conduct a statistical analysis to evaluate differences in nicotine exposure between the new product and UB CC following ad libitum use. While nicotine exposure during controlled use was similar between the new product and UB CC, the statistical analysis consult determined that total nicotine exposure measured by AUC following ad libitum use of the new product was statistically significantly higher than with UB CC in adults who use CC but have no ENDS experience. The statistical analysis provided by the consult demonstrates at least a 95% mathematical probability that the higher nicotine AUC following ad libitum use of the new product is due to a clinical effect of the independent variable rather than to chance. Thus, BCP concludes that while nicotine exposure during controlled use was similar between the new product and UB CC, total nicotine exposure measured by AUC following ad libitum use of the new product was greater than with UB CC in adults who use CC but have no ENDS experience.
- The clinical study's subjective effects data suggest that the new product will be liked by users, promoting continued use and contributing to the product's abuse liability. Also, the abuse liability of the new product was assessed using the totality of evidence including nicotine exposure outcomes and subjective outcomes from the clinical study plus the product characteristics (higher nicotine concentration and presence of nicotine salts). BCP has no concerns about the clinical study.
- Published literature supports that adults with ENDS experience are likely to achieve even higher nicotine exposure from use of the new product than adults with no ENDS experience (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016; Spindle et al., 2017; Yan et al., 2015). Experienced ENDS users take longer/larger puffs from ENDS and obtain more nicotine from the same ENDS compared to adults who use CC and are inexperienced with ENDS. Thus, BCP expects the abuse liability of the new product will be higher than CC in adults who have experience using ENDS, which is a population that is likely to use the new product.
- The new product contains a nicotine concentration (6% or 60 mg/mL) that is on the higher end of most ENDS tested in the literature which range from 3-60 mg/mL (Bansal et al., 2018; Duell et al., 2020; El-Hellani et al., 2018; Goniewicz et al., 2018) and contains nicotine salts. The new product's high nicotine concentration is associated with higher nicotine exposure (Goniewicz et al., 2019; Hajek et al., 2020; Kosmider et al., 2018; St Helen et al., 2017), which increases the abuse liability of the new product; further, the presence of nicotine salts reduces the harshness of

the high nicotine concentration in the new product making it more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019).

- Applicant-submitted survey data ███████████████████████████ showed that self-reported nicotine dependence was not statistically significantly different between adults who exclusively used CC (N=███ and adults who exclusively used any of the eleven flavors of Bidi Stick ENDS (N=███ However, the applicant did not measure nicotine dependence in exclusive users of the new product or bridge the study findings to exclusive users of the new product.

- The totality of evidence from the clinical study (e.g., nicotine exposure) and new product characteristics (i.e., high nicotine concentration, nicotine salt formulation) suggest that the abuse liability of the new product is similar to or higher than the abuse liability of CC among inexperienced ENDS users.

- Based on clinical evidence provided by the applicant and published literature, BCP concludes that the high abuse liability of the new product increases the likelihood that tobacco users who try the new product will continue using it. The high abuse liability of the new product also increases the likelihood that tobacco nonusers, including youth, who try the new product will continue using it, particularly since the nicotine salts in the e-liquid will likely reduce the harshness of the high (6%) nicotine concentration (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). These continued use behaviors will likely increase nicotine dependence and addiction in all of these populations (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993).

### 3.3.2. Synthesis

As TPL, I agree with BCP's conclusions that the abuse liability of the new product is similar to or higher than that of CC among CC users with no experience using ENDS and higher than CC among experienced ENDS users. The applicant provided a clinical study (BIDI-PK-01) that measured nicotine PK and subjective effects following use of the new product to assess abuse liability of the new product. Per the BCP review, nicotine $C_{max}$ of the new product was similar to UB CC following controlled use while nicotine exposure (AUC) of the new product was higher than UB CC following ad libitum use among CC users with no experience using ENDS. Because ad libitum product use is more generalizable to real-world use than measures collected during controlled use, BCP concluded that nicotine exposure of the new product is higher than that of UB CC among adults who use CC with no experience using ENDS. The subjective effects results demonstrated that the new product was liked by adults who use CC, suggesting that it is reinforcing in these populations. In addition, the new product also contains 6% or 60 mg/mL of nicotine salt (benzoic acid), which is on the higher end of nicotine concentration for most of known ENDS evaluated in literature (3-60 mg/mL) (Bansal et al., 2018; Duell et al., 2020; El-Hellani et al., 2018; Goniewicz et al., 2018). Further, nicotine salt formulations promote continued use because they make the e-liquid more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). Based on the combination of new product's characteristics (i.e., high e-liquid nicotine concentration [6%] and nicotine salts in the e-liquid), together with subjective effects showing the new product is liked by users and nicotine exposure that is similar or higher in the new product compared to CC, BCP concluded that the abuse liability of the new product is similar to or higher than CC among adults who use CC with no experience using ENDS. However, because experienced ENDS users take longer or larger puffs and obtain more nicotine from the same

ENDS compared to CC users with no experience using ENDS, abuse liability in the new product is expected to be higher than CC among experienced ENDS users. Thus, as TPL, I agree with BCP's assessment about abuse liability of the new product.

The new product's higher abuse liability compared to CC will likely increase continued use of the new product among adults who use CC (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993). That continued use may increase the likelihood of this already addicted population switching from CC to the new product and reducing or eliminating their CC use. On the other hand, the higher abuse liability may increase the likelihood that tobacco users and nonusers, including youth, who try the new product for the first time will continue using it, particularly since the presence of nicotine salts in the new product reduces the harshness of the high nicotine concentration (6%) in the new product making it more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). These continued use behaviors could maintain or augment nicotine dependence and addiction in tobacco users (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) and develop nicotine dependence and addiction in tobacco nonusers, including youth.

There is evidence that the high abuse liability will increase the likelihood and severity of nicotine dependence, including in youth (Fu et al., 2012; Goldenson et al., 2017; Muscat et al., 2009; Van Overmeire et al., 2016; Vogel et al., 2020). Compared to CC, a new product with high abuse liability could promote compulsive and continued use of the new product despite harm or risk of harm. A new product with high abuse liability could also increase the potential for addiction to the new product, relative to CC, in individuals who use tobacco and tobacco nonusers, including youth. Based on the totality of evidence provided in the PMTA and the BCP review conclusions, as TPL, I recommend a deficiency citing that the new product's high abuse liability prevents a find that the new tobacco product is APPH (see Deficiency 3 in Section 5.1).

## 3.4. USER POPULATIONS

### 3.4.1. Discipline key findings

The following discussion is based on key findings provided in the epidemiology, BCP, and social science reviews. The PMTA provided evidence from one clinical study ███████████ and ████████████████████████████████████████████████████████████████████████████████, ████████ to address factors related to abuse liability, the likelihood of use, initiation, switching, harm perceptions, and behavioral intention of the new product. The applicant did not include any evidence that evaluate transitions in tobacco use behavior (i.e., the transition to dual use or complete switching) in adults who currently use CC.

Per the BCP review:
- Applicant-submitted clinical data were collected mostly from adults who used CC but had no ENDS use experience and demonstrated that nicotine exposure with the new product is similar to or higher than CC in this population.
- Published literature supports that experienced users of ENDS are likely to achieve even higher nicotine exposure from use of the new product than adults without ENDS

experience (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016; Spindle et al., 2017; Yan et al., 2015). BCP expects that experienced users of ENDS are likely to use the new product because they already use ENDS, and the new product has a high abuse liability.

- Tobacco users who initiate the new product are likely to continue using it to maintain or increase nicotine dependence. Tobacco nonusers, including youth, are likely to continue using the new product after initiation because of its high abuse liability and nicotine salt formulation.

- Progression to regular use of the new product in adults who currently smoke CC and who dual use CC with ENDS is likely to increase nicotine dependence and addiction.

- BCP acknowledges that the higher abuse liability of the new product compared to UB CC in experienced users of ENDS makes it likely that people who use CC will switch to the new product. However, the extent to which adults will switch partially or completely to the new product is unknown. The lack of actual use switching data is a limitation rather than a deficiency from BCP's perspective because the clinical data and product characteristics were sufficient to evaluate the abuse liability of the new product.

### 3.4.1.1. Intended user population(s) (target population)

Per the epidemiology review:
- The intended user population for the new product is current adult tobacco product users. Specifically, the applicant states in the cover letter that the new product is marketed to adult tobacco users (aged ≥21).

Per the BCP review:
- Applicant-submitted clinical data showed the intended users of the new product are adults who use CC and who may or may not have used ENDS.

- The applicant also referred to the intended user population for the new product as "adult tobacco users" in a cover letter.

- Applicant-submitted clinical data demonstrated that nicotine exposure with the new product is similar to or higher than CC nicotine exposure for adults who use CC and have no ENDS experience. Published literature supports that adults with ENDS experience are likely to achieve even higher nicotine exposure from use of the new product than adults with no ENDS experience (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016; Spindle et al., 2017; Yan et al., 2015). Given its high abuse liability, adults with ENDS experience are also likely to use the new product, and the abuse liability is likely higher than a CC in this population.

### 3.4.1.2. Current tobacco users

Per the epidemiology review:
- Evidence from the  suggests that ████████████████████████████. However, results showed users of Bidi Stick have used them fo ███████████████████████████████████████████████████████████████████████████████

- *Switching*. The applicant provided minimal evidence to address the likelihood that current CC users will switch to the new product. Among respondents reporting

tobacco product use in the weeks prior to initiating Bidi Stick (N=███ ), ██ % of respondents reported no current use of any tobacco product (POU survey). However, the applicant did not provide data on whether use of the new product would lead to tobacco use transitions, reductions in CC consumption, or complete switching. In the ████████████████████████████████ , ████ reported that they reduced their cigarette use and ████ reported that they quit or replaced their cigarette use by using Bidi Stick; however, these findings were not specific to the new product and included other flavored variants of Bidi Stick Evidence from the published literature on switching behavior suggests that complete switching from CC to ENDS does occur among a small proportion of users (less than 10%)—typically through a period of dual use (Abi Nehme et al., 2022; Piper et al., 2020; Stanton et al., 2020). Additionally, findings from the Population Assessment on Tobacco and Health (PATH) Study, National Health Interview Survey (NHIS), and Tobacco Use Supplement to the Current Population Survey (TUS-CPS) indicate that those who use ENDS daily (vs. non-daily) have an increased odds of switching; however, the stability of these patterns over time remains unknown (Abi Nehme et al., 2022; Giovenco et al., 2018; Levy et al., 2018). While the applicant did not provide product-specific data on switching, published literature studies on switching to ENDS indicate some proportion of adult current tobacco users will switch.

- Conclusions from the applicant-provided data are limited because the applicant did not provide the time frame for the number of weeks respondents used any tobacco products prior to initiating the new product. Thus, is it unclear whether respondents used the new product before quitting or reducing consumption of other tobacco products (particularly combusted tobacco products) based on the cross-sectional evidence submitted by the applicant. Additionally, the lack of longitudinal data to assess whether new product use is associated with combusted tobacco product cessation is a limitation. The data submitted by the applicant provide limited evidence that adult tobacco products users will switch to the new product.

- Evidence submitted by the applicant suggests that initiation and current use of the new product is low, and no respondent in the Population Prevalence Study reported current use of the new product. The Behavioral Survey similarly suggests that the use of the new product is low. Among the ██ established Bidi Stick users in the Behavioral Survey, ██ respondents (████ reported using the new product and it was used most often by two respondents (████ The published literature suggests that roughly a quarter of adult (defined as 18+) ENDS users report using tobacco flavors, which are not common among youth and young adults (Birdsey, 2023; Leventhal et al., 2021). While the applicant did not submit a longitudinal study, the evidence referenced from the Population Prevalence Survey and the Behavioral Survey suggest that the ██████████████████████████ , and the literature suggests that tobacco-flavored ENDS products are not commonly used among youth and young adults. Thus, the information provided by the studies that were submitted by the applicant is sufficient from the epidemiology perspective to draw conclusions about the prevalence of new product use.

Per the social science review:

- ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████



Per the BCP review:

- Initiation of the new product by current tobacco users and nonusers, including youth, will likely lead to continued use (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) of the new product because it has an abuse liability similar to or higher than that of CC and a comparison ENDS (████████ ████████ among inexperienced users of ENDS. In current tobacco users, the high abuse liability of the new product suggests that it will promote continued use which will maintain or augment their nicotine dependence (Martínez et al., 2020; Morean et al., 2018; Morean et al., 2019).

- Adults who have ENDS experience are likely to achieve higher nicotine exposure from the new product than adults with no ENDS experience because they take longer and larger puffs and obtain more nicotine from the same ENDS (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016; Spindle et al., 2017; Yan et al., 2015). Thus, in experienced users of ENDS, BCP expects that the abuse liability will be higher than CC.

- Switching, dual or poly use, and/or tobacco cessation:
  - Adults who use CC and initiate use of the new product may partially switch or dual use the new product with CC because the new product provides nicotine exposure higher than that of CC. However, the applicant did not provide evidence to show that adults who use CC will partially or completely switch from CC to the new product.
  - Because of its high abuse liability, use of the new product may lead to partial switching and dual use with CC, preventing complete tobacco cessation among adults who want to quit smoking CC.

### 3.4.1.3. Tobacco non-users (including youth)

Per the social science review:



- No definitive conclusion about harm perceptions of the new product or Bidi Stick in general can be made among current tobacco non-users due to inconsistent study findings on tobacco product risk perceptions. The applicant does not present youth-specific data on the new product, which is a limitation from a social science perspective. ███████████████████████████████████████████████ ███████████████████████████████, no conclusions about behavioral intentions, product appeal, and harm perceptions can be extrapolated for youth. Published data generally suggest that tobacco-flavored ENDS have limited appeal for youth (Hoffman et al., 2016; Soneji et al., 2019). In the absence of product-specific data on youth appeal and given the similarity in product characteristic and flavor of the new product to tobacco-flavored ENDS, it may be reasonably expected that youth appeal for the new product would also be limited, similar to that found in the published literature for tobacco-flavored ENDS. Therefore, despite the lack of youth-specific data on the new product, social science was able to conclude that youth appeal for the new product would likely be limited.

Per the epidemiology review:
- *Youth*. The applicant provided the Population Prevalence Study which collected data on current users of the new product stratified by self-reported cigarette use history. The data from this study suggests that few youth will initiate with the new product (e.g., zero youth aged 13 to 17 who were never smokers reported ever using the new product). Additionally, the published literature indicates that youth report significantly lower preference for tobacco-flavored ENDS compared to flavored ENDS (Miech et al., 2021; Schneller et al., 2019). While all ENDS pose risks to youth, youth are less likely to initiate with tobacco-flavored ENDS, and to subsequently progress to regular use of such products than with flavored ENDS (Audrain-McGovern et al., 2019; Leventhal et al., 2019; Villanti et al., 2019). Because youth are unlikely to use the new product, the data on youth new product use is sufficient from the epidemiology perspective.

- *Adult nonusers.* Findings from the POU survey found that ▮▮▮▮ of ever users of tobacco products (i.e., cigars, cigarillos, little filtered cigars, smokeless tobacco, ENDS other than Bidi Stick, nicotine pouches, pipe tobacco, hookah/waterpipes) and nicotine replacement therapy (NRT) such as Nicorette and Nicoderm CQ, report not using these products in the weeks prior to initiating Bidi Stick. It is unclear whether the lack of use of these tobacco products is among former established users or experimental users of these products. ENDS use among adult and young adult former tobacco users is higher than nonusers, but generally lower than use among current tobacco users (Bao et al., 2020; Cornelius, 2023; Owusu et al., 2019). Other literature has suggested that the majority of adult current ENDS users are former smokers (Abi Nehme et al., 2022; King et al., 2019). Additionally, there is some indication in the literature that once former tobacco users re-initiate tobacco use with ENDS, there is some likelihood that they will progress to cigarette smoking, particularly if they have a prior history of cigarette smoking and quit five or more years ago (Stanton et al., 2019). Although the applicant provides limited evidence on the likelihood of adults who ever used tobacco product initiating the new product, considering ENDS use among adult and young adult former tobacco users is higher than nonusers, the applicant's data on adult new product use is sufficient from the epidemiology perspective.
- The results from the Population Prevalence study ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The pattern of the new product use showed that among young adult non-smokers, ▮▮▮ reported ever using the new product while ▮▮▮ non-smokers reported using the new product currently, formerly, or formerly experimenting.

Per the BCP review:
- The applicant did not provide studies of progression to regular use of the new product in tobacco nonusers.
- Because of its high abuse liability and nicotine salt formulation which reduces the harshness of its high nicotine concentration (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019), tobacco nonusers, including youth, who initiate tobacco use with the new product are likely to continue using it and develop nicotine dependence and addiction.

### 3.4.1.4. Vulnerable populations (other than youth)[9]

Per the epidemiology review:
- The applicant submitted an additional literature review and summarized the literature on ENDS use particularly among populations that are known to use tobacco products at greater rates than the general population. Although the applicant did not bridge the literature to the new product, the applicant's submitted literature review and findings on ENDS use among youth and young adults with mental health conditions are consistent with epidemiology's understanding of the available evidence in the literature. Data on ENDS use among individuals diagnosed with mental health conditions are limited; nevertheless, cross-sectional studies suggest higher prevalence of ENDS use among individuals with a chronic mental

---

[9] This term refers to groups that are susceptible to tobacco product risk and harm due to disproportionate rates of tobacco product initiation, use, burden of tobacco-related diseases, or decreased cessation.

illness compared to those without chronic mental illness (Chadi et al., 2019; Cho et al., 2018; Conway et al., 2018; Leventhal et al., 2016; Miller et al., 2018; Riehm et al., 2019; Silveira et al., 2018; Veliz et al., 2020). Additionally, the literature shows that tobacco use is not evenly distributed in the U.S. population and certain groups are at greater risk of tobacco related disparities. The published literature suggests that ENDS use is higher in certain populations such as lesbian, gay, bisexual and transgender (LGBT) youth and adults, individuals with mental health conditions or other chronic conditions, and Native Americans who use cigarettes. Cigarette smoking prevalence is generally also higher among these groups, suggesting that there may be additional benefit if people in these groups who use CC switch completely to ENDS use. Based upon our understanding of the literature, no additional information is needed concerning use by these populations that may be at higher risk.

Per the social science review:
- We did not identify concerns with other populations at increased risk. Thus, the information submitted by the applicant is acceptable from the social science perspective.

Per the BCP review:
- The applicant did not provide data about use of the new product by any specific populations at increased risk that allows examination of potential differences relative to a general sample of adults who use CC or use ENDS.
- From a BCP perspective, it is unknown whether the impact of the new product on abuse liability or product use behavior would differ for certain populations (other than youth) relative to the general population studied. Raising a deficiency about use of the new product in vulnerable populations is outside of BCP's scope of scientific review.

### 3.4.1.5. Actions taken to mitigate risk of unintended use
- Before determining that permitting the marketing of a new tobacco product would be APPH, FDA considers the impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and tobacco use.[10] Marketing restrictions include advertising and promotion restrictions intended to limit youth exposure to and appeal of tobacco product marketing (e.g., measures such as limiting advertising to platforms that are predominantly used by adults and using advertising content and methods that are not known to resonate with youth, or even eliminating advertising in certain media channels altogether) and sales access restrictions intended to restrict youth access to tobacco products (e.g., measures such as selling products only in face to face interactions, in adult-only facilities, or via websites that require robust age verification). In recent years, there have been efforts to develop novel and potentially more effective mitigation measures aimed

---

[10] Separately, marketing restrictions and other mitigation measures are also critical to helping ensure that any new tobacco product continues to be APPH after authorization. As a result, all new tobacco products that FDA has authorized under the PMTA pathway are subject to advertising and promotion and sales access restrictions. The fact that these restrictions are critical to ensuring that a new tobacco product remains APPH after authorization, does not mean that they are – by themselves – sufficient to establish that a product is APPH in the first place.

at reducing youth initiation risks, such as device access restrictions (e.g., technologies that require adult user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product). FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the benefit to adults. For example, as discussed in section 3.4.2 below, in the case of flavored ENDS, the risk of youth initiation and use is well documented and substantial, and thus more stringent restrictions are needed in order to meaningfully mitigate that risk.

Restrictions on advertising and promotion include measures such as: limiting advertising in various media channels like point-of-sale, print, TV, radio, digital media such as Internet websites, mobile applications, social media platforms like Facebook, Twitter, Instagram (e.g., placing advertising only in media with audience compositions of at least 85% adults 21+; limiting social media promotion to only platforms with age-gating controls; not advertising on billboards located within 500 feet of any elementary or secondary schools, youth-oriented facilities, childcare facilities, or hospitals; requiring point-of-sale advertising be placed only in areas of the facility that cannot be seen outside); limiting the timing, frequency, or overall amount of advertising (e.g., advertising on TV and radio only during certain hours; airing no more than one advertisement per half hour of programming with a minimum 20-minute separation between spots); limiting the use of certain advertising and promotional tactics (e.g., sending direct e-mail communication to only age-verified customers who have opted to receive such content; avoiding the use of direct mail advertising; avoiding use of influencers; avoiding use of product giveaways and product samples; avoiding use of sponsorships and events); developing advertising content that is intended to appeal to adults and avoid themes and images known to resonate with youth (e.g., avoiding use of cartoons; avoiding use of content depicting youth culture or lifestyle appeal; avoiding use of user-generated social media content featuring underage users; using only models who will be and appear to be ages 25+ in advertising); and utilizing product labeling and packaging designs intended to reduce youth appeal (e.g., avoiding use of confectionary or candy-like naming conventions or images; limiting use of colors and imagery, using only black and white labels). The purpose of these restrictions is to reduce youth exposure to and appeal of tobacco product images, which in turn reduces product appeal among youth, which in turn reduces the desire to buy and/or try products, which in turn reduces the likelihood of youth initiation and youth use. Because these restrictions are intended to curb youth appeal but do not directly prevent youth use, they do not in themselves provide enough assurance of a sufficient reduction in youth use to mitigate the substantial risk that flavored ENDS pose to youth — a risk that is supported by direct, robust and reliable data of behavioral outcomes (e.g., actual youth initiation rates and youth use rates). Accordingly, for flavored ENDS, these promotion and advertising restrictions do not have the potential to reduce the magnitude of adult benefit required to establish APPH. In other words, for flavored ENDS, these promotion and advertising restrictions do not reduce the risk of youth initiation and use to a sufficient degree that FDA could find that marketing of a product is APPH in the absence of robust evidence of a countervailing benefit to adults.

Restrictions on sales access include measures such as: complying with local, state, and federal minimum age of sale restrictions; requiring age- and identity-verification prior to selling products online; utilizing independent and reliable age- and identity-verification services; selling products only in face to face interactions; selling products only in adult-only facilities; using trace and verify QR codes linked to the purchaser's driver's license; setting limits on the number of products that can be purchased in a single transaction; requiring retailers and distributors to sign written agreements stating they will cooperate with "secret shopper" programs and audits; penalizing retailers and distributors for underage sales; conducting retailer training programs; participating in responsible retailing programs (e.g., We Card); and monitoring distribution channels for compliance. These measures tend to be more direct than advertising and promotion restrictions in that they are intended to curtail access to products. However, FDA has found that to date these restrictions do not by themselves mitigate the high risk to youth posed by flavored ENDS to a degree sufficient to establish that marketing of a product is APPH in the absence of robust and reliable evidence of benefit to adults. This is because youth have been able to obtain products, including flavored ENDS, despite sales restrictions.

As FDA explained in the 2020 Enforcement Priorities Guidance, from April 2018 to August 2019, the agency sent more than 6,000 warning letters and more than 1,000 civil money penalty complaints to online and brick-and-mortar retailers for illegal sales of e-cigarettes to minors (U.S. Food and Drug Administration, 2020). FDA also asked manufacturers to propose measures they could implement to help restrict youth access to e-cigarettes (U.S. Food and Drug Administration, 2020). The proposed measures included the use of age-verification technology for online sales, enhanced monitoring of retailer compliance with age-verification requirements, and contractual penalties for retailers that failed to comply with sales restrictions (U.S. Food and Drug Administration, 2020).

Youth continue to be able to access e-cigarettes, despite legal prohibitions and voluntary actions by some manufacturers (U.S. Food and Drug Administration, 2020). This is due in substantial part to the fact that the majority of youth do not purchase e-cigarettes themselves from retail locations but rather they obtain them from social sources, including from friends or family members, stealing them, or use someone else's product (Gentzke et al., 2022; Liu et al., 2019; Meyers et al., 2017; Tanski et al., 2019). In addition, with respect to youth who do attempt to purchase e-cigarettes themselves, one study (Meyers et al., 2017) found that some e-cigarette users <18 years of age reported having last obtained e-cigarettes from adult-only locations or those that should have had age verification procedures in place: namely, at smoke shops (18.3%), and liquor stores (10.0%). Only one-quarter of youth who tried to buy tobacco products were refused sale because of their age (Liu et al., 2019).

Therefore, FDA has found to date that these sales access restrictions do not in themselves provide enough assurance of a sufficient reduction in youth use to mitigate the substantial risk flavored ENDS pose to youth. Accordingly, for flavored ENDS, these sales access restrictions do not have the independent potential to

reduce the magnitude of adult benefit needed to show that marketing of the product would be APPH.

In contrast, in recent years there have been efforts to develop novel and potentially more effective mitigation measures such as device access restrictions. These include implementation of device technologies, such as age-gating technologies that require user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product or geo-fencing technologies (e.g., technologies that make it impossible to operate a tobacco product in a particular location such as a school or playground). In contrast to advertising and promotion and sales access restrictions discussed above, FDA believes that these novel device access technologies may offer a potential to sufficiently mitigate the risk to youth if they can be shown to restrict product access in a way that cannot be disabled or defeated. The use of device access restrictions in the current marketplace is limited, and FDA continues to assess them.

In conclusion, before determining that permitting the marketing of a new tobacco product would be APPH, FDA considers the impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and tobacco use. FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the possible benefit to adults. The assessment for flavored ENDS is different from other tobacco products because of (1) the substantial risk of youth initiation and youth use as shown by well-established data, and (2) the lack of robust evidence in the scientific literature regarding the potential of flavored ENDS to benefit adults who use CC, particularly when compared to alternatives posing less risk to youth, such as tobacco-flavored ENDS. Given those considerations, as well as the information discussed above regarding advertising, promotion, and sales access restrictions, we have thus far determined that restrictions on advertising and promotion and sales access have not been adequate to mitigate the risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit needed to show that marketing of the products would be APPH. In contrast, only the most stringent mitigation measures could provide sufficient assurance of youth risk mitigation. To date, the only such measures identified with the potential for that kind of impact have been device access restrictions. Nonetheless, consistent with the concerns expressed by certain federal courts, FDA is reviewing all applicant-proposed marketing restrictions and mitigation measures to ensure that there are no other types of novel and materially different proposals.

Per the Office of Health Communication and Education (OHCE) consult:
- OHCE noted concerns about age-restriction and identity-verification of the applicant owned website and social media platform. OHCE also noted that although the applicant states they do not currently advertise or market to consumers directly, they also state they are foregoing direct consumer marketing until FDA completes the PMTA review. This suggests that the applicant may alter their marketing plans after authorization. Thus, OHCE recommends that these concerns be addressed by imposing the marketing restrictions and reporting requirements as part of post marketing requirements including the requirement to conduct age- and identify-

verification at the first point of access at any owned digital media, and the requirement to submit 30-day advance notification of marketing plans for a period of time.

- Overall, OHCE concluded that, if the new product is authorized to be marketed, the marketing granted order should include additional marketing restrictions and reporting requirements.

Per the social science review:

- The applicant did not provide any information on measures to mitigate youth use beyond what was included in the marketing plan, and the marketing plan is reviewed by OHCE.

### 3.4.1.6. Labeling and advertising

Per the Division of Promotion, Advertising, and Labeling (DPAL) memorandum:

- In response to FDA Deficiency letter dated March 20, 2023 outlining an issue regarding potential free samples, the applicant clarified that the Bidi CARES program is designed to promote sustainable manufacturing, waste disposal, and recycling and does not provide coupons for free products to consumers returning products for recycling that would otherwise raise concerns regarding distribution of free samples per 21 CFR § 1140.16(d).
- In response to FDA Deficiency letter issued dated March 20, 2023 regarding the lack of required nicotine warning statements, the applicant provided the updated proposed package labeling for the new product to include the required nicotine warning statements on two principal display panels as required by 21 CFR § 1143.3(a).
- Overall, OCE-DPAL concluded that, if the new product is otherwise authorized to be marketed, the applicant should be reminded of its responsibility to comply with all applicable statutory and regulatory requirements, including 21 CFR § 1143.3(a) and 21 CFR § 1140.16(d).

### 3.4.2. Synthesis

Section 910 of the FD&C Act requires that, for a product to receive PMTA marketing authorization, FDA must conclude, among other things, that the marketing of the product is APPH. The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." Section 910(c)(2)(A).

The statute specifies that, in assessing whether permitting marketing of a new product would be APPH, FDA consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such products. My review of whether the marketing of the new products is APPH takes into

account the information from the discipline reviews described above as well as other relevant information.

*Intended user populations (target population).* Per the epidemiology review, the applicant states in the cover page that the new product is marketed to adult tobacco users (aged 21+). Per the BCP review, the evaluation of the applicant sponsored clinical study (BIDI-PK-01) showed that the intended users of the new product were adults who used CC and who may or may not have used ENDS. Additionally, due to the new product's high abuse liability, adults with ENDS experience are likely to use the new product. As TPL, I agree with the epidemiology and BCP reviews that current adult tobacco users, including CC users with and without experience using ENDS, are the intended population for the new product. Additionally, the likely users of the new product are experienced ENDS users.

*Current tobacco users.* As discussed in Section 3.3.2, per the BCP review, the new product's higher abuse liability compared to CC will likely increase the likelihood of adults who use CC to switch to the new product. The new product's higher abuse liability may also promote continued use and lead to higher nicotine dependence and addiction (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) in all populations, including youth. Evidence from the applicant submitted data on likelihood of use, initiation, switching, and behavioral intention of the new product is discussed below.

Per the social science review, evidence from the applicant submitted PBI Study showed that some current smokers (about ███ and some current smokers who have prior experience with ENDS ██████████) or who are also current ENDS users (██████████ generally expressed low to moderate interest in trying the new product and progressing to regular use. In addition, ███ of current smokers indicated that they would use the new product to completely switch from CC. Because appeal and behavioral intentions are considered precursors to individuals' future use behaviors and may not be correlated with the actual use of the new product, use behaviors associated with the new product were also evaluated. Per the epidemiology review, ██████████████████████████████ ████████████ the Population Prevalence Study. Among the ██ established Bidi Stick users (including the new product and other Bidi Stick flavor variants) in the Behavioral Survey, ██ respondents (██ reported using the new product and the new product was used most often by ██ respondents (████ Overall, while the perception and intention study (PBI Study) showed low to moderate interest in trying and progressing to regular use, the prevalence of use studies (Population Prevalence Study and Behavioral Survey) showed that initiation and likelihood of use of the new product were low (not likely).

With respect to switching (partially or completely), per the epidemiology review, the applicant provided minimal evidence to address the likelihood that current CC users will use the new product (or Bidi Stick, in general) to switch. In the POU survey, among respondents who regularly used (defined as using the product every day or some days in the past 30 days) tobacco products in the weeks prior to initiating Bidi Stick (N=███ ██ reported no current use of any tobacco product except for Bidi Stick at the time of the survey. In the ██████████████████████████████, ███ of the respondents reported that they reduced their cigarette use and ███ of the respondents reported that they quit or replaced their cigarette use by using Bidi Stick. However, these cross-sectional studies make it challenging to establish the temporal relationship between respondents' use of the new

product and their CC use. Specifically, whether respondents used the new product before or after switching from CC, or whether adult CC users used the new product to switch or reduce their consumption of CC. Overall, the applicant did not provide adequate data or information to demonstrate that current tobacco users or CC users would be likely to use and switch to the new product that such use would enable completely switching or significant reduction in current tobacco product or CC use.

As discussed below in "*Youth*" and "*Adult tobacco non-users*," the applicant-submitted data and published literature have shown that youth and adult tobacco non-users are not likely to use the new product given that it is a tobacco flavor and its overall low appeal, use pattern, and actual use. However, use of the new product by adult tobacco non-users, including youth, may shift depending on the availability of other tobacco products on the market. In addition, per the BCP review, because of the new product's high abuse liability, tobacco nonusers, including youth, who try and do initiate use of the new product will likely continue using it, particularly because the nicotine salts in the e-liquid reduces the harshness of the high nicotine concentration (6%) in the new product making it more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). These continued use behaviors will likely increase nicotine dependence and addiction risks in tobacco nonusers, including youth. Although published literature and the applicant-submitted observational studies showed low likelihood of use of the new product, likelihood of increased nicotine dependence and addiction risks due to continued use of the new product among those tobacco nonusers, including youth, who do initiate are concerning. This has not been addressed by the applicant, and a deficiency citing the new product's high abuse liability is recommended.

In summary, based on conclusions in the social science, BCP, and epidemiology reviews, information provided in the PMTA indicated that the intended user populations of the new product are current tobacco users and CC users with and without experience using ENDS. Although evidence from the applicant-provided studies showed some evidence of current tobacco users intending to try or progress to regular use of the new product, product use data showed a low likelihood of initiation and use of the new product overall among current tobacco users. Additionally, evidence from the applicant-submitted data was inconclusive to demonstrate that current tobacco users (including CC users) would likely use the new product to partially or completely switch to the new product (and therefore, reduce CC use, toxicant exposure, and adverse health outcomes). On the other hand, because the new product has a high nicotine concentration and is associated with high abuse liability, the continued use and increased likelihood of addiction and nicotine dependence risks, particularly among youth and adult tobacco nonusers, are concerning. Thus, as TPL, I agree with the BCP review and recommend a deficiency to cite the new product's high abuse liability (see Deficiency 3 in Section 5.1).

*Youth.* The applicant provided several cross-sectional studies to evaluate behavioral intentions, product appeal, harm perceptions, and prevalence and pattern of use of the new product (i.e., PBI, LOU, Population Prevalence). Per the social science review, although both PBI and LOU studies oversampled young adult (aged 21-24 years) who did not smoke, data from these participants were combined with other tobacco product user groups. Thus, no conclusions about behavioral intentions, product appeal, and harm perceptions can be extrapolated for youth. Per the epidemiology review, the results from the Population

Prevalence study showed that prevalence of use of the new product was low overall. Ever use of the new product among adolescents (aged 13-17 years; ▮▮▮) and underage young adults (aged 18-20 years; ▮▮▮) were estimated to be between ▮▮▮. The pattern of use of the new product showed that among youth (aged 13-17 years) who had never smoked, no participants reported ever using the new product, while just ▮▮▮ of people who ever smoked in this age group reported ever use of the new product. This suggests few youth will initiate use of the new product. Additionally, the applicant provided a literature review that evaluated ENDS use initiation among youth showing that older youth (aged 15-17 years) were more likely to initiate ENDS compared to younger youth (aged 12-14 years). This evidence is consistent with FDA's understanding of the available evidence in the literature, but the applicant did not bridge the literature to the new product. Other published literature also indicates that youth report significantly lower preference for tobacco-flavored ENDS compared to flavored ENDS (Miech et al., 2021; Schneller et al., 2019), and are less likely to initiate with tobacco-flavored ENDS (Audrain-McGovern et al., 2019; Leventhal et al., 2019; Villanti et al., 2019) and to subsequently progress to regular use of the new product. Further, published data generally suggests that tobacco-flavored ENDS have limited appeal for youth (Hoffman et al., 2016; Soneji et al., 2019). Overall, as TPL, I agree with the social science and epidemiology reviews that given the tobacco flavor of the new product, it is expected that youth are unlikely to use the new product and the appeal for the new product would also be limited. However, use of the new product by youth may shift depending on the availability of other tobacco products on the market. Thus, if youth do initiate using the new product, it is likely that they would continue new product use due to the new product's high abuse liability. This is particularly concerning since continued use of the new product would likely result in increased nicotine dependence and addiction risks among youth who do initiate (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) .

*Adult tobacco non-users.* Per the social science review, evidence from the PBI Study showed that adults who have never smoked CC and adults who previously smoked CC expressed low interest (i.e., likely to try, likely to use regularly) in the new product ▮▮▮▮▮▮▮▮ respectively). In the LOU Study, product appeal (i.e., likelihood to try) among adults who have never used tobacco products and adults who previously used tobacco products were low ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Per the epidemiology review, the results from the Population Prevalence study showed that prevalence of the new product was also low overall. The pattern of the new product use showed that among young adult non-smokers, ▮▮▮ reported ever using the new product while no non-smokers reported using the new product currently, formerly, or formerly experimenting. Considering the overall low appeal and use pattern per the applicant-submitted data and low rate of ENDS use among adult tobacco non-users per published literature review (Hoffman et al., 2016; Soneji et al., 2019), as TPL, I agree with the social science and epidemiology reviews, that it is expected that adult tobacco nonusers are unlikely to use the new product. However, use of the new product by adult tobacco non-users may shift depending on the availability of other products on the market. Thus, if adult tobacco non-users do initiate using the new product, it is likely that they would continue new product use due to the new product's high abuse liability. This is particularly concerning since continued use of the new product would likely result in increased nicotine dependence and addiction risks among adults tobacco

nonusers who do initiate (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993).

As TPL, I agree with conclusions of OHCE's evaluation of the applicant's marketing plan, which raised concerns regarding the marketing of the new product (see Section 3.4.1.5). OHCE raised concerns about age-restriction and identify-verification of the applicant owned website and social media platform. Further, the applicant's statement that they forego direct consumer marketing until FDA completes the PMTA review suggests that the applicant may alter their marketing plans after authorization (see Section 3.4.1.5).

## 3.5. TOXICANT EXPOSURE

### 3.5.1. Discipline key findings

The following discussion is based on key findings provided in discipline reviews. As described in Section 2.3, there is no second cycle toxicology review to inform this assessment. However, information reviewed by BCP on BOE is described below.

#### 3.5.1.1. Biomarkers of exposure

Per the BCP review:
- The applicant did not provide data about long-term biomarkers of nicotine exposure following extended use of the new product.
- BCP assessed the nicotine exposure of the new product using data from an applicant-submitted clinical study. These data showed that total nicotine exposure (AUC) was higher following ad libitum use of the new product than UB CC and a comparison ENDS (███████████████ The higher nicotine exposure from the new product may contribute to increases in use behavior and toxicant exposure compared to UB CC or other ENDS.

### 3.5.2. Synthesis

As TPL, I agree with the BCP review that the overall exposure risk to users of the new product is higher than UB CC and a comparison ENDS (JUUL Virginia Tobacco 5%).

Per the BCP review, based on the applicant-submitted clinical study (BIDI-PK-01), the total nicotine exposure (AUC) to the new product following ad libitum use was higher than UB CC and a comparison ENDS (JUUL Virginia Tobacco 5%). Higher nicotine exposure from the new product may contribute to increases in use behavior and toxicant exposure compared to UB CC or other ENDS.

Although the impact on long-term disease risk was not evaluated, the existing evidence supports that complete switching may reduce exposure to some carcinogens and other toxicants known to be associated with tobacco-related diseases from using CC. The long-term impacts of dual use on BOE levels and the associated health effects were not assessed and it is not possible to extrapolate findings from a short-term study with select BOE.

In the absence of a cycle 2 toxicology review, this TPL review cannot draw final conclusions with respect to the toxicant exposure posed by the new product.

42

**3.6. HEALTH EFFECTS**

### 3.6.1. Discipline key findings

The following discussion is based on key findings provided in discipline reviews.

**3.6.1.1. BIMO inspection findings**

- No Bioresearch Monitoring (BIMO) inspections were recommended or conducted during either cycle of substantive review.

**3.6.1.2. Addiction as a health endpoint**

Per the BCP review:

- Applicant-submitted clinical data showed that in adults who use CC, but have no ENDS experience, the new product has higher nicotine exposure (AUC) than UB CC and a comparison ENDS (JUUL Virginia Tobacco 5%) following ad libitum use. This higher nicotine exposure may cause higher abuse liability, nicotine dependence, and addiction.
- Relative to CC, a new product with higher abuse liability could produce compulsive and continued use of the new product despite harm or risk of harm. A new product with higher abuse liability could also increase the potential for addiction to the new product, relative to CC, in individuals who use tobacco and nonusers, including youth. Given that CC are among the most addictive consumer products, use of a product with an abuse liability similar to or greater than a CC puts users who switch at risk of maintaining or augmenting their addiction and poses a high risk of addiction to nonusers who initiate tobacco use or experiment with the new product.
- The higher abuse liability of the new product compared to CC and comparison ENDS (JUUL Virginia Tobacco 5%) signifies that the new product can sustain and may increase addiction in nicotine-dependent populations, like experienced users of ENDS and users of CC who have no ENDS experience. The higher abuse liability of the new product also signifies tobacco nonusers, including youth, who initiate use with the new product are likely to develop nicotine addiction and dependence.

**3.6.1.3. Short and long-term health effects (clinical and observational)**

Per the epidemiology review:

- See the detailed evaluation of ███████████ available in the epidemiology TPMF review (dated March 16, 2023). The TPMF contains sufficient information on the literature of health effects of ENDS to support this review.
- Few observational studies have been published on the short- and long-term health effects of ENDS use. Some published literature suggests an association between ENDS use and adverse health outcomes such as cardiovascular disease (CVD), respiratory disease, and oral disease compared to those who were never users (Alqahtani et al., 2022; Atuegwu et al., 2019; Brunette et al., 2023; Chaffee et al., 2021; Chaffee et al., 2023; Huilgol et al., 2019; Pesce et al., 2022; Stevens et al., 2022; Vora et al., 2019; Wasfi et al., 2022). As many of these studies utilized cross-sectional surveys to examine these relationships, the timing of ENDS use and disease onset cannot be established with certainty. In addition, most of the ENDS users in these studies were former combusted tobacco product users or dual users;

therefore, it is not currently possible to determine ENDS-related health effects in these studies.

- Researchers have generally found that those who use ENDS exclusively or predominantly have lower levels of exposure to some constituents, including nicotine, cotinine, total nicotine equivalent (TNE)2, TNE3, tobacco-specific nitrosamines (TSNAs), VOCs, and some metals than those who smoke cigarettes or use other combustible tobacco products but have higher biomarker levels than never tobacco users (De Jesus et al., 2020; Feng et al., 2022; Goniewicz et al., 2018; Hecht et al., 2015; Rubinstein et al., 2018; Shahab et al., 2017; Xia et al., 2021).

- Among those who dual use ENDS and cigarettes, the scientific evidence on health effects is very limited. Generally, studies that examined cardiovascular outcomes have found that dual use of ENDS and cigarettes may carry similar or greater cardiovascular risks than exclusive cigarette smoking (Osei et al., 2019; Pisinger et al., 2022).

- People who dual use ENDS and CC have generally not been found to have reduced levels of constituents such as TSNAs and VOCs compared to smokers. Individuals who use ENDS exclusively often have lower levels of nicotine, TSNAs, and VOCs compared to those who engage in dual use (Czoli et al., 2019; Rostron et al., 2020; Smith et al., 2021).

Per the medical review:

- Short-term health effects (approximate one month) reported in the clinical study (BIDI-PK-01) for the new product included minor, transient increases in blood pressure (BP) and heart rate (HR). These increases are consistent with those reported for other ENDS in the literature. Although peer-reviewed studies agree that ENDS use causes less short-term damage to a young, healthy cardiovascular system than cigarette smoking (George et al., 2019; Osei et al., 2019), the available data limit evaluation of the long-term effects of ENDS use on otherwise healthy users, and short- and long-term effects on a larger population.

- The clinical study evaluates short-term, but not long-term, health effects of the new product. The evaluation is limited as it was conducted on a small sample size (N=18) and the duration of product use was short (approximately one month); thus, the health effects identified in the new product, including minor transient increases in HR and BP are not generalizable to a larger user population. Despite these limitations, the applicant supplied sufficient health safety data (AE, HR and BP) to assess short-term health effects that may be associated with product use.

- lthough conclusions from these surveys about the subjective health effects of the new product are limited, adverse experience (AE) data from the clinical study is adequate to assess the short-term health impact of the new product from this discipline's perspective.

44

- In the BIDI-PK-01 study, mean BP and HR for the new product did not deviate significantly compared to UB cigarettes and returned to mean baseline or near baseline by the end of each session, as expected. No AEs were reported in the study for the new product; of the nine AEs reported for UB cigarettes, the most common were cough/intensive cough and headache. These findings may suggest a possible short-term reduction in cough and headache for users who switch from CC to the new product. To lend additional support to this conclusion, ███████████████████████ ███████████████████████████████████████████████████ he relatively small sample size and short-term study period of the applicant-sponsored clinical study limit the ability to assess effect of switching behaviors on long-term health effects. While conclusions related to long term health effects cannot be drawn, the clinical study provides sufficient short-term evidence to evaluate the health effects of the new product.
- Aside from E-Cigarette or Vaping Use-Associated Lung Injury (EVALI), for which the primary cause has been found to be tetrahydrocannabinol (THC)-containing products, the applicant's review of the literature does not provide any short- or long-term health effects specific to the new product.
- The applicant did not provide clinical data or a literature review on biomarkers of potential harm. However, based on the totality of the evidence including AEs reported in the clinical study and consumer reports, this discipline was able to assess the short-term health effects of the new product in the absence of this information.

### 3.6.1.4. Likelihood and effects of product misuse

Per the medical review:

- The applicant provides a CRP Test Report and ███████████████████ ██████████████████████████ certifying that the new product complies with requirements in accordance with 16 CFR § 1700.
- The applicant provides Drop Test evidence that the new product design maintains structural integrity when dropped, thereby mitigating the risk of unintended ingestion, dermal exposure, and ocular exposure to children should the product be dropped. A Drop Test is a method used for evaluating the ability of a product to maintain structural integrity when dropped in various orientations (e.g., corners, edges, and faces) in a controlled setting. However, the applicant does not fully address potential harm to children from inhalation of the new product once opened. Although this is a limitation, nearly all (99.4%) of the nicotine exposure cases among children under age 5 treated in U.S. Emergency Departments involve ingestion of e-liquid (Chang et al., 2019), not inhalation. In addition, only 0.6% of exposure cases result in hospital admission (Tashakkori et al., 2023). Therefore, this discipline determined that the risks of short-term detrimental health effects to children from inhalation would be limited. However, if the new product is granted marketing authorization, medical suggests that the applicant provides post-market reporting that would include a specific plan to monitor the incidence of accidental exposure to the new product, be it by inhalation, ingestion, dermal, ocular, or other routes.

- The applicant states that the new product is designed to be tamper-proof, thereby mitigating the likelihood of misuse from the addition of other ingredients. The label states that the product is disposable and is not to be recharged. While the label does not specifically caution users against adding ingredients or making other modifications to the new product, the closed system design of the new product would help mitigate potential adverse effects resulting from intentional misuse.
- The label addresses areas of misuse such as ingestion; exposure to fire, heat, water; physical damage of the new product; access by children; underage sale; and pregnancy and breastfeeding. However, the label does not address the likelihood and effects of ocular exposure, which can occur with the unintentional exposure of children. Child-resistant packaging can mitigate unintentional exposures such as these and the applicant submitted CRP testing procedures and test reports consistent with 16 CFR § 1700 that are acceptable from this discipline's perspective.
- The new product uses a closed system designed to discourage adulteration, thereby reducing the risk of negative health sequelae caused by adulteration, and is thus, acceptable from this discipline's perspective.
- The product labeling, as reviewed in the initial new product submission, lacked warnings for persons with underlying comorbidities such as high BP or CVD. This was not considered a deficiency, as the increases in BP and HR from new product use were transient and consistent with findings from other nicotine delivery products.  Thus, the product labeling provides adequate warnings from this discipline's perspective.

Per the BCP review:
- The new product is a closed-system, disposable ENDS. The new product settings are non-adjustable, and the e-liquid is enclosed in a pod, thereby reducing chances that users may manipulate ENDS settings and e-liquid constituents, including nicotine levels, which may influence exposure to nicotine and other HPHCs in the aerosol. These characteristics limit the likelihood of product misuse; the new product's misuse potential is low.

### 3.6.1.5. Adverse experiences

Per the engineering review:
- No adverse experiences related to the design of the new product were identified by FDA Safety Reporting Portal or reported by the applicant.

Per the medical review:
- The applicant-sponsored clinical study, BIDI-PK-01, reported no AEs or serious adverse experiences (SAEs) associated with the new product.
- No AEs were identified from the Safety Reporting Portal search and the AEs reported in the two applicant-submitted consumer surveys were not specific to the new product.
- During the RRA, the applicant stated that there have been no AEs reported to date.

46

### 3.6.2. Synthesis

In the absence of a cycle 2 toxicology review, the evaluation of the health effects of the new product relies on the findings of the remaining disciplines.

As TPL, I agree with the medical review that the PMTA provided adequate information to assess AEs and short-term health effects of the new product. The health effects were evaluated in an applicant sponsored clinical study (BIDI-PK-01), which showed minor increases in BP and HR consistent with those reported for other ENDS in the literature; no AEs were reported for the new product. The mean BP and HR for users of the new product did not deviate significantly compared to users of UB CC. The study also provided limited (relatively small sample size, N=18) short-term (approximately one month) health outcomes, showing a possible short-term reduction in coughing and headache in CC users who switch to the new product. The relatively small sample size and short-term study period of the applicant-sponsored clinical study limit the ability to assess the effect of switching behaviors on long-term health effects. While long-term health effects were not evaluated in the clinical study, the applicant provides sufficient evidence to evaluate the short-term health effects of the new product. AEs or SAEs were not identified in the Safety Reporting Portal search, Remote Regulatory Assessment memo, or in any of the applicant submitted studies that were specific to the new product.

As TPL, I agree with the medical, BCP, and engineering reviews that the likelihood of product misuse of the new product is low or minimal based on product design. The new product is a closed-system, non-rechargeable, disposable ENDS and has been shown to be tamper resistant. If the new product is tampered with, it is likely damaged and no longer usable.

With respect to addiction as an endpoint, per the BCP review, the higher abuse liability of the new product compared to CC and comparison ENDS (JUUL Virginia Tobacco 5%) indicates that the new product can maintain and augment addiction in already nicotine-dependence user populations (CC users who are inexperienced with ENDS and experienced ENDS users). Thus, as TPL, I agree with the BCP review and recommend a deficiency to cite the new product's high abuse liability (see Deficiency 3 in Section 5.1).

## 3.7. POPULATION AND PUBLIC HEALTH

### 3.7.1. Discipline key findings

The following discussion is based on key findings provided in the epidemiology review:

#### 3.7.1.1. Population health impact (PHI)

Per the epidemiology review:
- The applicant did not submit a population health model. Instead, the applicant submitted a review of the literature on population health modeling but did not bridge the information from the literature to the new product. Thus, the literature review submitted by the applicant is not informative for the overall assessment of the population health impact. Despite the lack of population health model and bridging the literature review to the new product, the overall information provided by the applicant, as discussed in section 3.3, was sufficient from the epidemiology perspective.

### 3.7.2. Synthesis

As TPL, I agree with the epidemiology review that the applicant-provided literature review is not specific to the new product, and the applicant did not bridge to the new product. Given the information provided is not informative to assess the overall population health impact of the new product, FDA will make an APPH determination for the new product based on the overall information submitted in the PMTA, including use behavior information discussed in section 3.3.

## 3.8. STATUTORY REQUIREMENTS

### 3.8.1. Public health conclusion

Based on the findings and evaluations discussed in Sections 3.1-3.7, and further described in Section 5 below, I find that the applicant has not demonstrated that permitting the marketing of the new product would be APPH.

### 3.8.2. Tobacco product manufacturing practices[11]

The PMTA contains sufficient information to characterize the tobacco product design and adequate processes and controls to help ensure that the new product meets the manufacturer's specifications. The methods used in, and the facilities or controls used for, the manufacture, processing, and packing of the new product conform to the requirements in Section 906(e) of the FD&C Act.

### 3.8.3. Labeling

The applicant provided proposed labeling for their PMTA. Based on the information presented at this time, we concluded that the proposed labeling is not false or misleading in any particular.

### 3.8.4. Product standards

There are no applicable product standards for this PMTA.


## 4. ENVIRONMENTAL DECISION

### 4.1. DISCIPLINE FINDINGS

Environmental science concluded that the environmental assessments for this PMTA qualified as a type of Categorical Exclusions under 21 CFR § 25.35(b) because the new product may not be introduced or delivered for introduction in interstate commerce. As TPL, I agree with this conclusion.

### 4.2. ENVIRONMENTAL CONCLUSION

Under 21 CFR § 25.35(b), issuance of an order under section 910(c) of the Federal Food, Drug, and Cosmetic Act that a new product may not be introduced or delivered for introduction into interstate commerce (i.e., a marketing denial order, MDO) falls within a class of actions that are ordinarily categorically excluded from the preparation of an Environmental Assessment (EA) or Environmental Impact Statement (EIS). To the best of our knowledge, no extraordinary

---

[11] FDA has not promulgated a tobacco product manufacturing practices (TPMP) rule.

circumstances exist that would preclude application of this categorical exclusion. FDA concludes that categorical exclusion is warranted, and no EA or EIS is required.


## 5. CONCLUSION AND RECOMMENDATION

Section 910 of the FD&C Act requires that, for a product to receive a PMTA marketing authorization, FDA must conclude, among other things, that permitting the product to be marketed would be APPH. Section 910(c)(2)(A). The statute specifies that, in assessing whether the marketing of the new products would be APPH, FDA must consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such products. Section 910(c)(4). The APPH standard requires a showing that permitting the marketing of a new tobacco product would have a net benefit to public health based upon the risks and benefits to the population as a whole, which includes youth, young adults, and other vulnerable populations. In determining whether permitting the marketing of a new tobacco product would result in a net benefit to public health, FDA weighs the potential negative public health impacts (e.g., harm from initiation and use among nonusers, particularly youth) against the potential positive public health impacts (e.g., benefit from adult users of more harmful tobacco products completely switching).

Based on the information provided in the application and as described in this Technical Project Lead review, I find that the applicant has not demonstrated that permitting the marketing of the new product in the PMTA listed above would be APPH. This review finds three independent deficiencies in the application that are each an independently sufficient reason to support a marketing denial order for the subject product.

Deficiency 1 relates to the lack of aerosol HPHC yields for comparison ENDS that are needed to evaluate comparative health risks of the new product subject to this review relative to other tobacco products from the same category. The applicant provided ▌ sets of comparison ENDS data from six different manufacturers (i.e. ███████████████████████████████████████
████████████████████████ However, the applicant-provided HPHC data for the comparison ENDS were not measured and collected in a manner that is sufficient or appropriate to compare to the new product's data. The HPHC data were not sufficient or appropriate for one or more of the following reasons: (1) lacked information on aerosol yield testing method validations and/or method protocols, (2) the HPHC was not collected from the full puffing life cycle of the test product and/or from comparable puffing regimens, (3) failed to identify whether the puffs represent the full puffing life cycle of the test product and failed to identify the puffing regimens (e.g., frequency, volume, duration), and (4) the smoking machine used to collect the HPHC was not sufficiently described or defined. The lack of information on methods used to collect the data prevent FDA from assessing the reliability of the reported HPHC data. Additionally, for the latter three reasons, the differences in puffing life cycle, conditions, and smoking machine can impact the reported HPHC levels (potential for overestimation and underestimation) in the comparison ENDS. Appropriate comparison ENDS data are needed to allow FDA to assess the relative health risks associated with HPHC exposure for individuals who use the new product as compared to other marketed ENDS that the population would likely have access to and use interchangeably. Without appropriate comparison ENDS data,

FDA cannot complete the assessment of risks and benefits and determine whether the marketing of the new product subject to this review would be APPH.

Deficiency 2 relates to the lack of a complete leachable study to fully characterize the health risks associated with using the new product. The applicant provided a leachable study that utilizes semi-quantitative non-targeted gas chromatography mass spectrometry (GC-MS) technique. GC-MS can detect and identify volatile organic compounds (VOCs) and some semi-volatile organic compounds (SVOCs), but the technique is not as effective at detecting and identifying other additional SVOCs and cannot detect non-volatile organic compounds (NVOCs) or thermally labile leachable compounds. As a result of only using the GC-MS technique, the applicant did not provide a comprehensive study that would allow for a complete evaluation of other possible leachables such as NVOCs, thermally labile compounds, and other additional SVOCs, which can be detected using other mass spectrometry (MS)-based techniques (e.g., liquid chromatography mass spectrometry (LC-MS) technique). Undetected SVOCs, NVOCs, and thermally labile compounds can pose health risks to the users.

A comprehensive leachable study including both GC-MS and other MS-based analyses is needed to fully characterize all possible leachable contaminants that can migrate from the new product's container closure system. Leachables are a source of potentially harmful constituents. Exposures to any of these contaminants may pose an acute or chronic health risk to individuals using the new product. Therefore, because the applicant failed to provide such information, the health risks associated with the presence of other possible leachables including SVOCs, NVOCs, and thermally labile compounds in the new product have not been fully evaluated and cannot be accounted for in the assessment of risks and benefits of the marketing of the new product. Without a comprehensive leachable study, FDA cannot find that marketing of the new product subject to this review is APPH.

Deficiency 3 relates to the new product's high abuse liability. The applicant-sponsored clinical study showed the new product has similar to or higher abuse liability than CC among current CC users with no experience using ENDS, and higher abuse liability than CC among experienced ENDS users. A new product with higher abuse liability compared to CC will promote compulsive and continued use of the new product despite harm or risk of harm. Due to the new product's high abuse liability, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product, and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence. Therefore, FDA cannot find that marketing of the new product subject to this review is APPH.

FDA's evaluation of the PMTA determined that the new tobacco product has high abuse liability and the applicant failed to demonstrate sufficient evidence regarding health risks associated with use of the new product. In total, as TPL, I find that the data and information within the application did not address three deficiencies.

Based on my review of the PMTA, I determined that the new product as described in the application and specified in Appendix Table 3, lacks sufficient evidence to demonstrate that permitting the marketing of the new product would be appropriate for the protection of the public health. Because the new product lacks premarketing authorization, the applicant cannot introduce or deliver for introduction the product into interstate commerce in the United States. Doing so is a prohibited act under section 301(a) of the FD&C Act, the violation of which could result in enforcement action by FDA.

Because the applicant has not demonstrated that permitting the marketing of the products subject to this review would be appropriate for the protection of the public health, a Denial letter should be issued to the applicant, citing three deficiencies from chemistry and BCP.

## 5.1. DEFICIENCIES

The following deficiencies should be conveyed to the applicant:

1. Your PMTA provided comparison aerosol yield data from published literature for products in the same category and flavor ███████████████████) as the new product: ███████████████ and ███



. However, the published aerosol data you provided for the comparison ENDS either lacked certain evidence or used different aerosol testing parameters and thus the published aerosol data was insufficient or inappropriate for comparison to the new product. The comparison aerosol data you submitted should have come from studies utilizing comparable puffing life cycle, puffing regimens, and puffing machine as the studies for the new product, and such studies should use methods that have been appropriately validated and conducted in accredited laboratories.

   In the case of ███████████████ and ███████████████ the published aerosol yield data were collected using 50 puffs aerosol collection rather than the entire puffing life cycle or the same puffing life cycle (i.e., 90% end of life or product consumption) as the new product. Because of the differences in ENDS aerosol collection between the new product and these comparison products, ███████████████████ and ███████████, you were only able to provide quantified aerosol yield for formaldehyde, glycerol, nicotine, and propylene glycol for comparison to the new product, while the aerosol yields for acetaldehyde, acrolein, cadmium, chromium, █████, diacetyl, diethylene glycol, ethylene glycol, █████ lead, nickel, and propylene oxide were provided as below the limit of detection (BLOD) or below the limit of quantitation (BLOQ). Since the █████ aerosol data were collected not from the entire puffing life cycle or 90% EOL, it is unclear for those constituents reported as BLOD and BLOQ if they would have been measurable above the LOD and LOQ had the JUUL aerosol data been collected from the entire puffing life cycle or 90% EOL. In addition, the names of the testing laboratory and methods were provided for █████ comparison data but lacked method description or protocols. For ███████████████████████ a brief description of each test methods and the name of the testing laboratory were provided. However, the aerosol constituents were collected using different puffing regimens, puffing life cycle, and puffing machine than the new product aerosol study, and thus cannot be reliably and consistently compared to the aerosol yield data for the new product. In the case of the SREC product, the tobacco report brochure you provided does not include the standard deviation of the aerosol yield measurements and number of replicates; puffing

regimen information; analytical method protocols; testing laboratory name and accreditation; and puff counts per aerosol collection to determine that the test data are accurate and reliable as comparative data to the new product. For all comparison ENDS data, you did not provide analytical method validation information. Without this information, FDA cannot determine whether the comparison ENDS data are suitable and reliable to compare to the new product, in terms of precision, accuracy, selectivity, sensitivity, linearity, and range.

Comparison ENDS data is necessary for FDA to determine whether the overall levels of HPHC in the aerosol of the new product pose greater or lower risk when a current ENDS user switches from other similar ENDS to the new product or uses them interchangeably. Thus, for FDA to characterize the comparative health risks of the new product to the same category ENDS, you could have submitted comparison aerosol data from ENDS with comparable puffing life cycle, puffing regimens, and puffing machine as the new product and used methods that have been appropriately validated and conducted in accredited laboratories. If such datasets cannot be extracted from published literatures, you could have provided measured data using the same standard puffing regimens and fully validated analytical methods by the accredited analytical laboratory as the new product. You should have provided the aerosol constituent yields in mass (e.g., mg, µg, ng) per device and per puff for the following constituents for the ENDS comparison products:

a) Acetaldehyde
b) Acrolein
c) Cadmium
d) Chromium
e) █████
f) Diacetyl
g) Diethylene glycol
h) Ethylene glycol
i) Formaldehyde
j) Glycerol
k) █████
l) Lead
m) Nickel
n) Nicotine
o) Propylene glycol
p) Propylene oxide

In addition, you should have provided all of the following information about HPHC testing so that we could have evaluated the HPHC quantities in the ENDS comparison products and thus the risk and benefit of the new product:

q) Complete description of all puff regimens used to generate aerosol yield data, quantitative test protocols and analytical methods used, and full validation reports for each analytical method
r) Testing laboratories and their accreditation(s)
s) Length of time between date(s) of manufacture and date(s) of testing
t) Complete raw aerosol HPHC yield datasets, with units of measure
u) Standard deviation(s)

  v) Number of replicates
  w) A summary of the results for all testing performed
  x) Storage conditions prior to initiating testing
  y) Whole stick or pod puff counts

2. Your PMTA provided data on non-targeted analysis (NTA) of aerosol yields collected from the new product stored for ████████ months for your leachable study. You stated that your NTA study was performed by ████████████████ using gas chromatography mass spectrometry (GC-MS) technique. However, GC-MS NTA methodology is typically used to identify volatile organic compounds (VOCs) and some semi-volatile organic compounds (SVOCs) in the leachable study (ISO 10993-18:2020 ). This is because gas chromatography (GC) methodology vaporizes analytes via thermal heating into the gas-phase and separates analytes (leachables) in a complex mixture into individual components based on the adsorption affinity of analytes with stationary and mobile phases. Additionally, GC-MS is scientifically known to employ hard ionization techniques such as electron impact ionization that causes fragmentation of the molecular structure of analyte ions such that the mass-to-charge ratio ($m/z$) and exact mass of the intact leachable compounds cannot be determined. Therefore, GC-MS analysis is limited to chemical compounds that have high vapor pressure (volatile) and are thermally stable.

You did not conduct a complete leachable study to identify other possible leachables from the container closure system of the new product such as additional SVOCs, non-volatile organic compounds (NVOCs), and thermally labile leachable compounds (ISO 10993-18:2020). Furthermore, because different analytes have different propensity to be ionized and detected in positive or negative ion mode of mass spectrometry methodology, a comprehensive leachable study should have also included mass spectrometry analysis in both positive and negative ion modes to unbiasedly identify all possible leachables that can leach out of the ENDS components. As additional SVOCs, NVOCs, and thermally labile leachable compounds can pose health risks to users, FDA cannot fully evaluate the health risks of all leachable chemical constituents that can leach from the container closure systems or product components of the new product without leachable results from additional leachable analysis of the components of the new product. To fully characterize the health risks of the new product, your leachable study could have also been conducted using other MS-based techniques other than GC-MS to identify other possible leachables (e.g., SVOCs, NVOCs, thermally labile leachable compounds) that could be leached from the components of the new product.

3. Your PMTA includes a clinical study that measured nicotine exposure, including nicotine pharmacokinetic (PK) endpoints, following use of the new product. In the clinical study, you provided data which demonstrated higher nicotine exposure following use of the new product than following use of usual brand (UB) combusted cigarettes. In your response to FDA's Deficiency letter signed March 20, 2023, you clarified that maximum nicotine concentration ($C_{max}$) is not higher following controlled use of the new product than use of UB cigarettes based on statistical findings in your study report. You also stated the new product has an abuse liability similar to that of combusted cigarettes (CC), and therefore, adults who use CC are likely to switch to the new product. Additionally, your response includes a survey study which demonstrates that nicotine

dependence in adults who exclusively use any of eleven flavors of Bidi Stick ENDS (including the new product) is similar to nicotine dependence in adults who exclusively use CC. Some evidence in your PMTA suggests the new product has an abuse liability similar to that of CC (i.e., data from nicotine exposure following controlled use of the new product and the survey study), but given the higher nicotine exposure following ad libitum use as well as subjective experiences and product characteristics, the totality of evidence demonstrates that the abuse liability of the new product is similar to or higher than CC. Clinical studies estimating nicotine exposure from ad libitum use provide a better assessment of nicotine exposure from ENDS because they represent more natural use behaviors. Furthermore, your data show that nicotine exposure is higher (than UB cigarettes) following ad libitum use of the new product, specifically in adults who use CC and mostly have no ENDS experience. Nicotine exposure among experienced ENDS users may be even greater than among inexperienced ENDS users as published studies show that experienced ENDS users take longer/larger puffs from ENDS and obtain more nicotine from the same ENDS compared to adults who use CC and are inexperienced with ENDS.

Due to the high abuse liability of the new product, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product; and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence. For these reasons, FDA cannot find that the marketing of the new product is APPH.


# 6. REFERENCES

Abi Nehme AM, Lou XY, Yan X, et al. Transition to smoking cessation among dual cigarette and e-cigarette users in the population assessment of tobacco and health study, waves 3 and 4 (2015–2017). *Addict Behav*. 2022; 129: 107284.

Alqahtani AS, Alqhtani NR, Gufran K, Alsakr AM, Alshehri A, Binauadm TM, Alzamil FF, Alowiri AS, Alotaibi NM, Harun HMW. Comparative assessment of periodonta treatment needs among the electronic cigarette users and traditional smokers. Article. *Eur. Rev. Med. Pharmacol. Sci.* 2022; 26 (8): 2676-2682. <Go to ISI>://WOS:000795509000007

Atuegwu NC, Perez MF, Oncken C, Thacker S, Mead EL, Mortensen EM. Association between regular electronic nicotine product use and self-reported periodontal disease status: Population assessment of tobacco and health survey. *Int J Environ Res Public Health*. Apr 9 2019; 16 (7): doi:10.3390/ijerph16071263

Audrain-McGovern J, Rodriguez D, Pianin S, Alexander E. Initial e-cigarette flavoring and nicotine exposure and e-cigarette uptake among adolescents. *Drug Alcohol Depend*. Sep 1 2019; 202: 149-155. doi:10.1016/j.drugalcdep.2019.04.037

Bansal M, Sharma M, Bullen C, Svirskis D. A stability indicating hplc method to determine actual content and stability of nicotine within electronic cigarette liquids. *Int J Environ Res Public Health*. Aug 13 2018; 15 (8): doi:10.3390/ijerph15081737

Bao W, Liu B, Du Y, Snetselaar LG, Wallace RB. Electronic cigarette use among young, middle-aged, and older adults in the united states in 2017 and 2018. *JAMA Intern Med*. Feb 1 2020; 180 (2): 313-314. doi:10.1001/jamainternmed.2019.4957

Birdsey J. Tobacco product use among us middle and high school students—national youth tobacco survey, 2023. *MMWR. Morbidity and Mortality Weekly Report*. 2023; 72:

Brunette MF, Halenar MJ, Edwards KC, Taylor KA, Emond JA, Tanski SE, Woloshin S, Paulin LM, Hyland A, Lauten K, Mahoney M, Blanco C, Borek N, DaSilva LC, Gardner LD, Kimmel HL, Sargent JD. Association between tobacco product use and asthma among us adults from the population assessment of tobacco and health (path) study waves 2-4. Article. *BMJ Open Respir. Res.* Feb 2023; 10 (1): 16. e001187. doi:10.1136/bmjresp-2021-001187

Caldwell B, Sumner W, Crane J. A systematic review of nicotine by inhalation: Is there a role for the inhaled route? *Nicotine Tob Res*. Oct 2012; 14 (10): 1127-39. doi:10.1093/ntr/nts009

Centers for Disease C, Prevention, National Center for Chronic Disease P, Health P, Office on S, Health. Publications and reports of the surgeon general. In: *How tobacco smoke causes disease: The biology and behavioral basis for smoking-attributable disease: A report of the surgeon general*. Centers for Disease Control and Prevention (US); 2010.

Chadi N, Li G, Cerda N, Weitzman ER. Depressive symptoms and suicidality in adolescents using e-cigarettes and marijuana: A secondary data analysis from the youth risk behavior survey. *J Addict Med*. Sep/Oct 2019; 13 (5): 362-365. doi:10.1097/ADM.0000000000000506

Chaffee BW, Barrington-Trimis J, Liu F, Wu R, McConnell R, Krishnan-Sarin S, Leventhal AM, Kong G. E-cigarette use and adverse respiratory symptoms among adolescents and young adults in the united states. *Prev Med*. Dec 2021; 153: 106766. doi:10.1016/j.ypmed.2021.106766

Chaffee BW, Halpern-Felsher B, Cheng J. E-cigarette, cannabis and combustible tobacco use: Associations with xerostomia among california adolescents. Article; Early Access. *Community Dentist. Oral Epidemiol.* 2023: 7. doi:10.1111/cdoe.12721

Chang JT, Rostron BL. Electronic nicotine delivery system (ends) liquid nicotine exposure in young children presenting to us emergency departments, 2018. *Inj Epidemiol*. 2019; 6: 43. doi:10.1186/s40621-019-0219-6

Chen X, Bailey PC, Yang C, Hiraki B, Oldham MJ, Gillman IG. Targeted characterization of the chemical composition of juul systems aerosol and comparison with 3r4f reference cigarettes and iqos heat sticks. *Separations*. 2021; 8 (10): doi:10.3390/separations8100168

Cho J, Goldenson NI, Stone MD, McConnell R, Barrington-Trimis JL, Chou CP, Sussman SY, Riggs NR, Leventhal AM. Characterizing polytobacco use trajectories and their associations with substance use and mental health across mid-adolescence. *Nicotine Tob Res*. Aug 14 2018; 20 (suppl_1): S31-S38. doi:10.1093/ntr/ntx270

Conway KP, Green VR, Kasza KA, Silveira ML, Borek N, Kimmel HL, Sargent JD, Stanton CA, Lambert E, Hilmi N, Reissig CJ, Jackson KJ, Tanski SE, Maklan D, Hyland AJ, Compton WM. Co-occurrence of tobacco

product use, substance use, and mental health problems among youth: Findings from wave 1 (2013-2014) of the population assessment of tobacco and health (path) study. *Addict Behav*. Jan 2018; 76: 208-217. doi:10.1016/j.addbeh.2017.08.009

Cornelius ME. Tobacco product use among adults–united states, 2021. *MMWR. Morbidity and Mortality Weekly Report*. 2023; 72:

Czoli CD, Fong GT, Goniewicz ML, Hammond D. Biomarkers of exposure among "dual users" of tobacco cigarettes and electronic cigarettes in canada. *Nicotine Tob Res*. Aug 19 2019; 21 (9): 1259-1266. doi:10.1093/ntr/nty174

De Jesus VR, Bhandari D, Zhang L, Reese C, Capella K, Tevis D, Zhu W, Del Valle-Pinero AY, Lagaud G, Chang JT, van Bemmel D, Kimmel HL, Sharma E, Goniewicz ML, Hyland A, Blount BC. Urinary biomarkers of exposure to volatile organic compounds from the population assessment of tobacco and health study wave 1 (2013-2014). *Int J Environ Res Public Health*. Jul 28 2020; 17 (15): doi:10.3390/ijerph17155408

de Wit H, Zacny J. Abuse potential of nicotine replacement therapies. Cns drugs, 4, 456-468. *CNS Drugs*. 1995; 4: 456-468.

Duell AK, Pankow JF, Peyton DH. Nicotine in tobacco product aerosols: 'It's deja vu all over again'. *Tob Control*. Nov 2020; 29 (6): 656-662. doi:10.1136/tobaccocontrol-2019-055275

El-Hellani A, Salman R, El-Hage R, Talih S, Malek N, Baalbaki R, Karaoghlanian N, Nakkash R, Shihadeh A, Saliba NA. Nicotine and carbonyl emissions from popular electronic cigarette products: Correlation to liquid composition and design characteristics. *Nicotine Tob Res*. 2018; 20 (2): 215-223. doi:10.1093/ntr/ntw280

Farsalinos KE, Spyrou A, Stefopoulos C, Tsimopoulou K, Kourkoveli P, Tsiapras D, Kyrzopoulos S, Poulas K, Voudris V. Nicotine absorption from electronic cigarette use: Comparison between experienced consumers (vapers) and naive users (smokers). *Sci Rep*. Jun 17 2015; 5 (1): 11269. doi:10.1038/srep11269

Feng J, Sosnoff CS, Bernert JT, Blount BC, Li Y, Del Valle-Pinero AY, Kimmel HL, van Bemmel DM, Rutt SM, Crespo-Barreto J, Borek N, Edwards KC, Alexander R, Arnstein S, Lawrence C, Hyland A, Goniewicz ML, Rehmani I, Pine B, . . . Wang LQ. Urinary nicotine metabolites and self-reported tobacco use among adults in the population assessment of tobacco and health (path) study, 2013-2014. Article. *Nicotine Tob Res*. Mar 2022; 24 (5): 768-777. doi:10.1093/ntr/ntab206

Food and Drug Administration CfDEaR. Guidance for industry on nasal spray and inhalation solution, suspension, and spray drug products-chemistry, manufacturing, and controls documentation. 2002: https://www.federalregister.gov/documents/2002/07/05/02-16797/guidance-for-industry-on-nasal-spray-and-inhalation-solution-suspension-and-spray-drug

Forster M, Fiebelkorn S, Yurteri C, Mariner D, Liu C, Wright C, McAdam K, Murphy J, Proctor C. Assessment of novel tobacco heating product thp1.0. Part 3: Comprehensive chemical characterisation of harmful and potentially harmful aerosol emissions. *Regul Toxicol Pharmacol*. Mar 2018; 93: 14-33. doi:10.1016/j.yrtph.2017.10.006

Fu M, Martínez-Sánchez JM, Agudo A, Pascual JA, Ariza C, Moncada A, Fernández E. Nicotine depedence and salivary cotinine concentration in daily smokers. *Eur J Cancer Prev*. Jan 2012; 21 (1): 96-102. doi:10.1097/CEJ.0b013e32834a7e59

Gentzke AS, Wang TW, Cornelius M, Park-Lee E, Ren C, Sawdey MD, Cullen KA, Loretan C, Jamal A, Homa DM. Tobacco product use and associated factors among middle and high school students - national youth tobacco survey, united states, 2021. *MMWR Surveill Summ*. Mar 11 2022; 71 (5): 1-29. doi:10.15585/mmwr.ss7105a1

George J, Hussain M, Vadiveloo T, Ireland S, Hopkinson P, Struthers AD, Donnan PT, Khan F, Lang CC. Cardiovascular effects of switching from tobacco cigarettes to electronic cigarettes. *Journal of the American College of Cardiology*. 2019/12/24/ 2019; 74 (25): 3112-3120. doi:https://doi.org/10.1016/j.jacc.2019.09.067

Giovenco DP, Delnevo CD. Prevalence of population smoking cessation by electronic cigarette use status in a national sample of recent smokers. *Addict Behav*. Jan 2018; 76: 129-134. doi:10.1016/j.addbeh.2017.08.002

Goldenson NI, Leventhal AM, Stone MD, McConnell RS, Barrington-Trimis JL. Associations of electronic cigarette nicotine concentration with subsequent cigarette smoking and vaping levels in adolescents. *JAMA Pediatr*. Dec 1 2017; 171 (12): 1192-1199. doi:10.1001/jamapediatrics.2017.3209

Goniewicz ML, Boykan R, Messina CR, Eliscu A, Tolentino J. High exposure to nicotine among adolescents who use juul and other vape pod systems ('pods'). *Tob Control*. Nov 2019; 28 (6): 676-677. doi:10.1136/tobaccocontrol-2018-054565

Goniewicz ML, Smith DM, Edwards KC, Blount BC, Caldwell KL, Feng J, Wang L, Christensen C, Ambrose B, Borek N, van Bemmel D, Konkel K, Erives G, Stanton CA, Lambert E, Kimmel HL, Hatsukami D, Hecht SS, Niaura RS, . . . Hyland AJ. Comparison of nicotine and toxicant exposure in users of electronic cigarettes and combustible cigarettes. *JAMA network open*. Dec 7 2018; 1 (8): e185937. doi:10.1001/jamanetworkopen.2018.5937

Hajek P, Pittaccio K, Pesola F, Myers Smith K, Phillips-Waller A, Przulj D. Nicotine delivery and users' reactions to juul compared with cigarettes and other e-cigarette products. *Addiction*. Jun 2020; 115 (6): 1141-1148. doi:10.1111/add.14936

Hecht SS, Carmella SG, Kotandeniya D, Pillsbury ME, Chen M, Ransom BW, Vogel RI, Thompson E, Murphy SE, Hatsukami DK. Evaluation of toxicant and carcinogen metabolites in the urine of e-cigarette users versus cigarette smokers. *Nicotine Tob Res*. Jun 2015; 17 (6): 704-9. doi:10.1093/ntr/ntu218

Henningfield JE, Keenan RM. Nicotine delivery kinetics and abuse liability. *J Consult Clin Psychol*. Oct 1993; 61 (5): 743-50. doi:10.1037//0022-006x.61.5.743

Hiler M, Breland A, Spindle T, Maloney S, Lipato T, Karaoghlanian N, Shihadeh A, Lopez A, Ramoa C, Eissenberg T. Electronic cigarette user plasma nicotine concentration, puff topography, heart rate, and subjective effects: Influence of liquid nicotine concentration and user experience. *Exp Clin Psychopharmacol*. Oct 2017; 25 (5): 380-392. doi:10.1037/pha0000140

Hoffman AC, Salgado RV, Dresler C, Faller RW, Bartlett C. Flavour preferences in youth versus adults: A review. *Tob Control*. Nov 2016; 25 (Suppl 2): ii32-ii39. doi:10.1136/tobaccocontrol-2016-053192

Huilgol P, Bhatt SP, Biligowda N, Wright NC, Wells JM. Association of e-cigarette use with oral health: A population-based cross-sectional questionnaire study. *J Public Health (Oxf)*. Jun 1 2019; 41 (2): 354-361. doi:10.1093/pubmed/fdy082

IARC. Personal habits and indoor combustions. *IARC Monogr Eval Carcinog Risks Hum*. 2012; 100 (Pt E): 1-538. https://www.ncbi.nlm.nih.gov/pubmed/23193840

ISO 10993-18:2020. Biological evaluation of medical devices — part 18: Chemical characterization of medical device materials within a risk management process. https://www.iso.org/obp/ui/en/#iso:std:iso:10993:-18:ed-2:v1:en

ISO. *Iso 20768:2018(en): Vapour products - routine analytical vaping machine - definitions and standard conditions*. Retrieved from http://dx.doi.org/10.3403/30439649u. DOI 10.3403/30439649u.

Jaccard G, Djoko DT, Korneliou A, Stabbert R, Belushkin M, Esposito M. Mainstream smoke constituents and in vitro toxicity comparative analysis of 3r4f and 1r6f reference cigarettes. *Toxicol Rep*. 2019; 6: 222-231. doi:10.1016/j.toxrep.2019.02.009

King JL, Reboussin BA, Wiseman KD, Ribisl KM, Seidenberg AB, Wagoner KG, Wolfson M, Sutfin EL. Adverse symptoms users attribute to e-cigarettes: Results from a national survey of us adults. *Drug Alcohol Depend*. Mar 1 2019; 196: 9-13. doi:10.1016/j.drugalcdep.2018.11.030

Kosmider L, Spindle TR, Gawron M, Sobczak A, Goniewicz ML. Nicotine emissions from electronic cigarettes: Individual and interactive effects of propylene glycol to vegetable glycerin composition and device power output. *Food and chemical toxicology : an international journal published for the British Industrial Biological Research Association*. May 2018; 115: 302-305. doi:10.1016/j.fct.2018.03.025

Leventhal AM, Dai H. Prevalence of flavored e-cigarette use among subpopulations of adults in the united states. *JNCI: Journal of the National Cancer Institute*. 2021; 113 (4): 418-424.

Leventhal AM, Goldenson NI, Cho J, Kirkpatrick MG, McConnell RS, Stone MD, Pang RD, Audrain-McGovern J, Barrington-Trimis JL. Flavored e-cigarette use and progression of vaping in adolescents. *Pediatrics*. Nov 2019; 144 (5): doi:10.1542/peds.2019-0789

Leventhal AM, Madden DR, Peraza N, Schiff SJ, Lebovitz L, Whitted L, Barrington-Trimis J, Mason TB, Anderson MK, Tackett AP. Effect of exposure to e-cigarettes with salt vs free-base nicotine on the appeal and sensory experience of vaping: A randomized clinical trial. *JAMA network open*. Jan 4 2021; 4 (1): e2032757. doi:10.1001/jamanetworkopen.2020.32757

Leventhal AM, Strong DR, Sussman S, Kirkpatrick MG, Unger JB, Barrington-Trimis JL, Audrain-McGovern J. Psychiatric comorbidity in adolescent electronic and conventional cigarette use. *J Psychiatr Res*. Feb 2016; 73: 71-8. doi:10.1016/j.jpsychires.2015.11.008

Levy DT, Yuan Z, Luo Y, Abrams DB. The relationship of e-cigarette use to cigarette quit attempts and cessation: Insights from a large, nationally representative u.S. Survey. *Nicotine Tob Res*. Jul 9 2018; 20 (8): 931-939. doi:10.1093/ntr/ntx166

Liu ST, Snyder K, Tynan MA, Wang TW. Youth access to tobacco products in the united states, 2016-2018. *Tob Regul Sci*. Nov 2019; 5 (6): 491-501. doi:10.18001/trs.5.6.2

Martínez Ú, Martínez-Loredo V, Simmons VN, Meltzer LR, Drobes DJ, Brandon KO, Palmer AM, Eissenberg T, Bullen CR, Harrell PT, Brandon TH. How does smoking and nicotine dependence change after onset of vaping? A retrospective analysis of dual users. *Nicotine Tob Res*. Apr 21 2020; 22 (5): 764-770. doi:10.1093/ntr/ntz043

Meyers MJ, Delucchi K, Halpern-Felsher B. Access to tobacco among california high school students: The role of family members, peers, and retail venues. *J Adolesc Health*. Sep 2017; 61 (3): 385-388. doi:10.1016/j.jadohealth.2017.04.012

Miech R, Leventhal A, Johnston L, O'Malley PM, Patrick ME, Barrington-Trimis J. Trends in use and perceptions of nicotine vaping among us youth from 2017 to 2020. *JAMA pediatrics*. 2021; 175 (2): 185-190.

Miller ME, Tidey JW, Bunn JY, Gaalema DE, Scott-Sheldon LAJ, Pericot-Valverde I, Japuntich SJ. Self-perceived mental health and population-level tobacco use disparities. *Tob Regul Sci*. Jul 2018; 4 (4): 3-11. doi:10.18001/trs.4.4.1

Morean M, Krishnan-Sarin S, O'Malley SS. Comparing cigarette and e-cigarette dependence and predicting frequency of smoking and e-cigarette use in dual-users of cigarettes and e-cigarettes. *Addict Behav*. Dec 2018; 87: 92-96. doi:10.1016/j.addbeh.2018.06.027

Morean ME, Krishnan-Sarin S, Sussman S, Foulds J, Fishbein H, Grana R, O'Malley SS. Psychometric evaluation of the e-cigarette dependence scale. *Nicotine Tob Res*. Oct 26 2019; 21 (11): 1556-1564. doi:10.1093/ntr/ntx271

Muscat JE, Stellman SD, Caraballo RS, Richie JP, Jr. Time to first cigarette after waking predicts cotinine levels. *Cancer Epidemiol Biomarkers Prev*. Dec 2009; 18 (12): 3415-20. doi:10.1158/1055-9965.Epi-09-0737

Osei AD, Mirbolouk M, Orimoloye OA, Dzaye O, Uddin SMI, Benjamin EJ, Hall ME, DeFilippis AP, Stokes A, Bhatnagar A, Nasir K, Blaha MJ. Association between e-cigarette use and cardiovascular disease among never and current combustible-cigarette smokers. *Am J Med*. Aug 2019; 132 (8): 949-954 e2. doi:10.1016/j.amjmed.2019.02.016

Owusu D, Huang J, Weaver SR, Pechacek TF, Ashley DL, Nayak P, Eriksen MP. Patterns and trends of dual use of e-cigarettes and cigarettes among u.S. Adults, 2015-2018. *Prev Med Rep*. Dec 2019; 16: 101009. doi:10.1016/j.pmedr.2019.101009

Pesce P, Menini M, Ugo G, Bagnasco F, Dioguardi M, Troiano G. Evaluation of periodontal indices among non-smokers, tobacco, and e-cigarette smokers: A systematic review and network meta-analysis. Review. *Clin. Oral Investig.* Jul 2022; 26 (7): 4701-4714. doi:10.1007/s00784-022-04531-9

Piper ME, Baker TB, Benowitz NL, Jorenby DE. Changes in use patterns over 1 year among smokers and dual users of combustible and electronic cigarettes. *Nicotine Tob Res*. Apr 21 2020; 22 (5): 672-680. doi:10.1093/ntr/ntz065

Pisinger C, Rasmussen SKB. The health effects of real-world dual use of electronic and conventional cigarettes versus the health effects of exclusive smoking of conventional cigarettes: A systematic review. Review. *International Journal of Environmental Research and Public Health*. Oct 2022; 19 (20): 23. 13687. doi:10.3390/ijerph192013687

Ramoa CP, Hiler MM, Spindle TR, Lopez AA, Karaoghlanian N, Lipato T, Breland AB, Shihadeh A, Eissenberg T. Electronic cigarette nicotine delivery can exceed that of combustible cigarettes: A preliminary report. *Tob Control*. Apr 2016; 25 (e1): e6-9. doi:10.1136/tobaccocontrol-2015-052447

Riehm KE, Young AS, Feder KA, Krawczyk N, Tormohlen KN, Pacek LR, Mojtabai R, Crum RM. Mental health problems and initiation of e-cigarette and combustible cigarette use. *Pediatrics*. Jul 2019; 144 (1): doi:10.1542/peds.2018-2935

Rostron BL, Coleman B, Cheng YC, Kimmel HL, Oniyide O, Wang L, Chang CM. Nicotine exposure by device type among adult electronic nicotine delivery system users in the population assessment of tobacco and health study, 2015-2016. *Cancer Epidemiol Biomarkers Prev*. Oct 2020; 29 (10): 1968-1972. doi:10.1158/1055-9965.EPI-20-0317

Rubinstein ML, Delucchi K, Benowitz NL, Ramo DE. Adolescent exposure to toxic volatile organic chemicals from e-cigarettes. *Pediatrics*. Apr 2018; 141 (4): doi:10.1542/peds.2017-3557

Schneller LM, Bansal-Travers M, Goniewicz ML, McIntosh S, Ossip D, O'Connor RJ. Use of flavored e-cigarettes and the type of e-cigarette devices used among adults and youth in the us-results from wave 3 of the population assessment of tobacco and health study (2015-2016). *Int J Environ Res Public Health*. Aug 20 2019; 16 (16): doi:10.3390/ijerph16162991

Shahab L, Goniewicz ML, Blount BC, Brown J, McNeill A, Alwis KU, Feng J, Wang L, West R. Nicotine, carcinogen, and toxin exposure in long-term e-cigarette and nicotine replacement therapy users: A cross-sectional study. *Ann Intern Med*. Mar 21 2017; 166 (6): 390-400. doi:10.7326/M16-1107

Silveira ML, Conway KP, Green VR, Kasza KA, Sargent JD, Borek N, Stanton CA, Cohn A, Hilmi N, Cummings KM, Niaura RS, Lambert EY, Brunette MF, Zandberg I, Tanski SE, Reissig CJ, Callahan-Lyon P, Slavit WI, Hyland AJ, Compton WM. Longitudinal associations between youth tobacco and substance use in waves 1 and 2 of the population assessment of tobacco and health (path) study. *Drug Alcohol Depend*. Oct 1 2018; 191: 25-36. doi:10.1016/j.drugalcdep.2018.06.018

Smith DM, Christensen C, van Bemmel D, Borek N, Ambrose B, Erives G, Niaura R, Edwards KC, Stanton CA, Blount BC, Wang L, Feng J, Jarrett JM, Ward CD, Hatsukami D, Hecht SS, Kimmel HL, Travers M, Hyland A, Goniewicz ML. Exposure to nicotine and toxicants among dual users of tobacco cigarettes and e-cigarettes: Population assessment of tobacco and health (path) study, 2013-2014. *Nicotine Tob Res*. Feb 16 2021: doi:10.1093/ntr/ntaa252

Soneji SS, Knutzen KE, Villanti AC. Use of flavored e-cigarettes among adolescents, young adults, and older adults: Findings from the population assessment for tobacco and health study. *Public Health Rep*. May/Jun 2019; 134 (3): 282-292. doi:10.1177/0033354919830967

Spindle TR, Hiler MM, Breland AB, Karaoghlanian NV, Shihadeh AL, Eissenberg T. The influence of a mouthpiece-based topography measurement device on electronic cigarette user's plasma nicotine concentration, heart rate, and subjective effects under directed and ad libitum use conditions. *Nicotine Tob Res*. Apr 1 2017; 19 (4): 469-476. doi:10.1093/ntr/ntw174

St Helen G, Dempsey DA, Havel CM, Jacob P, 3rd, Benowitz NL. Impact of e-liquid flavors on nicotine intake and pharmacology of e-cigarettes. *Drug Alcohol Depend*. Sep 1 2017; 178: 391-398. doi:10.1016/j.drugalcdep.2017.05.042

Stanton CA, Bansal-Travers M, Johnson AL, Sharma E, Katz L, Ambrose BK, Silveira ML, Day H, Sargent J, Borek N. Longitudinal e-cigarette and cigarette use among us youth in the path study (2013–2015). *JNCI: Journal of the National Cancer Institute*. 2019; 111 (10): 1088-1096.

Stanton CA, Sharma E, Edwards KC, Halenar MJ, Taylor KA, Kasza KA, Day H, Anic G, Gardner LD, Hammad HT, Bansal-Travers M, Limpert J, Borek N, Kimmel HL, Compton WM, Hyland A. Longitudinal transitions of exclusive and polytobacco electronic nicotine delivery systems (ends) use among youth, young adults and adults in the USA: Findings from the path study waves 1-3 (2013-2016). *Tob Control*. May 2020; 29 (Suppl 3): s147-s154. doi:10.1136/tobaccocontrol-2019-055574

Stevens ER, Xu S, Niaura R, Cleland CM, Sherman SE, Mai A, Karey E, Jiang N. Youth e-cigarette use and functionally important respiratory symptoms: The population assessment of tobacco and health (path) study waves 3 and 4. *International Journal of Environmental Research and Public Health*. 2022; 19 (22): 15324.

Talih S, Salman R, El-Hage R, Karam E, Karaoghlanian N, El-Hellani A, Saliba N, Shihadeh A. Characteristics and toxicant emissions of juul electronic cigarettes. *Tob Control*. Nov 2019; 28 (6): 678-680. doi:10.1136/tobaccocontrol-2018-054616

Tanski S, Emond J, Stanton C, Kirchner T, Choi K, Yang L, Ryant C, Robinson J, Hyland A. Youth access to tobacco products in the united states: Findings from wave 1 (2013-2014) of the population assessment of tobacco and health study. *Nicotine Tob Res*. Nov 19 2019; 21 (12): 1695-1699. doi:10.1093/ntr/nty238

Tashakkori NA, Rostron BL, Christensen CH, Cullen KA. Notes from the field: E-cigarette-associated cases reported to poison centers - united states, april 1, 2022-march 31, 2023. *MMWR Morb. Mortal. Wkly. Rep.* Jun 23 2023; 72 (25): 694-695. doi:10.15585/mmwr.mm7225a5

U.S. Food and Drug Administration. *Enforcement priorities for electronic nicotine delivery systems (ends) and other deemed products on the market without premarket authorization (revised). Guidance for industry*. Silver Spring, MD: U.S. Department of Health and Human Services, Food and Drug Administration, Center for Tobacco Products (2020).

USP-NF. <1664> assessment of drug product leachables associated with pharmaceutical packaging/delivery systems. *USP 43-NF 38*. 2015; 39 (5):

Van Overmeire IP, De Smedt T, Dendale P, Nackaerts K, Vanacker H, Vanoeteren JF, Van Laethem DM, Van Loco J, De Cremer KA. Nicotine dependence and urinary nicotine, cotinine and hydroxycotinine levels in daily smokers. *Nicotine Tob Res*. Sep 2016; 18 (9): 1813-9. doi:10.1093/ntr/ntw099

Veliz P, Eisman A, McCabe SE, Evans-Polce R, McCabe VV, Boyd CJ. E-cigarette use, polytobacco use, and longitudinal changes in tobacco and substance use disorder symptoms among u.S. Adolescents. *J Adolesc Health*. Jan 2020; 66 (1): 18-26. doi:10.1016/j.jadohealth.2019.05.026

Villanti AC, Johnson AL, Glasser AM, Rose SW, Ambrose BK, Conway KP, Cummings KM, Stanton CA, Edwards KC, Delnevo CD, Wackowski OA, Feirman SP, Bansal-Travers M, Bernat JK, Holder-Hayes E, Green VR, Silveira ML, Hyland A. Association of flavored tobacco use with tobacco initiation and subsequent use among us youth and adults, 2013-2015. *JAMA network open*. Oct 2 2019; 2 (10): e1913804. doi:10.1001/jamanetworkopen.2019.13804

Vogel EA, Prochaska JJ, Rubinstein ML. Measuring e-cigarette addiction among adolescents. *Tob Control*. May 2020; 29 (3): 258-262. doi:10.1136/tobaccocontrol-2018-054900

Vora MV, Chaffee BW. Tobacco-use patterns and self-reported oral health outcomes: A cross-sectional assessment of the population assessment of tobacco and health study, 2013-2014. *J Am Dent Assoc*. May 2019; 150 (5): 332-344 e2. doi:10.1016/j.adaj.2018.12.004

Wasfi RA, Bang F, de Groh M, Champagne A, Han AR, Lang JJ, McFaull SR, Melvin A, Pipe AL, Saxena S, Thompson W, Warner E, Prince SA. Chronic health effects associated with electronic cigarette use: A systematic review. Review. *Front. Public Health*. Oct 2022; 10: 29. 959622. doi:10.3389/fpubh.2022.959622

Xia B, Blount BC, Guillot T, Brosius C, Li Y, Van Bemmel DM, Kimmel HL, Chang CM, Borek N, Edwards KC, Lawrence C, Hyland A, Goniewicz ML, Pine BN, Xia Y, Bernert JT, De Castro BR, Lee J, Brown JL, . . . Wang L. Tobacco-specific nitrosamines (nnal, nnn, nat, and nab) exposures in the us population assessment of tobacco and health (path) study wave 1 (2013-2014). *Nicotine Tob Res*. Feb 16 2021; 23 (3): 573-583. doi:10.1093/ntr/ntaa110

Yan XS, D'Ruiz C. Effects of using electronic cigarettes on nicotine delivery and cardiovascular function in comparison with regular cigarettes. *Regul Toxicol Pharmacol*. Feb 2015; 71 (1): 24-34. doi:10.1016/j.yrtph.2014.11.004

## 7. APPENDIX

**Table 3. Acronyms and abbreviations**

| Acronym, abbreviation, term | Use |
|---|---|
| AE | Adverse experience |
| APPH | Appropriate for the protection of the public health |
| AUC | Area under the curve |
| BCP | Behavioral and clinical pharmacology |
| BLOD | Below limit of detection |
| BLOQ | Below limit of quantitation |
| BIMO | Bioresearch Monitoring |
| BOE | Biomarkers of nicotine exposure |
| BP | Blood pressure |
| CAPA | Corrective and preventative actions |
| CC | Combustible cigarettes |
| CCS | Container closure system |
| CI | Chemical ionization |
| cGMP | Current Good Manufacturing Practices |
| COA | Certificate of analysis |
| CRP | Child resistant packaging |
| CVD | Cardiovascular disease |
| DFMEA | Design Failure Mode and Effect Analysis |
| DPAL | Division of Promotion, Advertising, and Labeling |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ENDS | Electronic nicotine delivery system |
| EOL | End of life |
| ESI | Electrospray ionization |
| EVALI | E-Cigarette or Vaping Use-Associated Lung Injury |
| GC-MS | Gas chromatography mass spectrometry |
| HPHC | Harmful and potentially harmful constituents |
| HR | Heart rate |
| ICP-MS | Inductively coupled plasma mass spectrometry |
| ISO | International Organization of Standardization |
| LC-MS | Liquid chromatography mass spectrometry |
| LGBT | Lesbian, Gay, Bisexual and Transgender |
| LOA | Letter of Authorization |
| LOU | Likelihood of Use |
| MDO | Marketing denial order |
| MGO | Marketing granted order |
| MS | Mass spectrometry |
| MSDS | Material safety data sheet |
| MSS | Mainstream smoke |
| NHIS | National Health Interview Survey |
| NNK | 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone |
| NNN | N-Nitrosonornicotine |

| Acronym, abbreviation, term | Use |
| --- | --- |
| NRT | Nicotine replacement therapy |
| NTA | Non-targeted analysis |
| NVOC | Non-volatile organic compounds |
| OHCE | Office of Health Communication and Education |
| PATH | Population Assessment on Tobacco and Health |
| PBI | Perceptions and Behavioral Intention |
| PDU | Power distribution unit |
| PG | Propylene glycol |
| PHI | Population health impact |
| PK | Pharmacokinetic |
| PMTA | Premarket tobacco product application |
| POU | Pattern of Use |
| QC | Quality control |
| QMS | Quality management system |
| RRA | Remote Regulatory Assessment |
| SAE | Serious adverse experiences |
| SOP | Standard operating procedure |
| SREC | Standardized research electronic cigarette |
| SVOC | Semi-volatile organic compounds |
| TAMC | Total Aerobic Microbial Count |
| THC | Tetrahydrocannabinol |
| TNE | Total nicotine equivalent |
| TPL | Technical Project Lead |
| TPMF | Tobacco product master file |
| TPST | Tobacco Product Surveillance Team |
| TSNA | Tobacco-specific nitrosamine |
| TUS-CPS | Tobacco Use Supplement to the Current Population Survey |
| TYMC | Total Yeast and Mold Count |
| UB | Usual brand |
| UFMEA | User Failure Mode and Effects Analysis |
| USP | United States Pharmacopeia |
| VG | Vegetable glycerin |
| VOC | Volatile organic compounds |

## Appendix A. New product

**Table 4. New product subject to Denial Order**

| Common Attributes[12,13] | |
|---|---|
| Submission date | September 8, 2020 |
| Receipt date | September 8, 2020 |
| Applicant | Bidi Vapor LLC |
| Product manufacturer | Bidi Vapor LLC |
| Product category | ENDS (VAPES) |
| Product subcategory | Closed E-Cigarette |
| **Attributes** | **New Product** |
| STN | **PM0003460.PD2** |
| Product name | Bidi Stick - Classic |
| Package type | Plastic Box |
| Product quantity | 1 E-Cigarette |
| Characterizing flavor (CF) | Tobacco |
| Nicotine source | Tobacco |
| Length | 112.5 mm |
| Diameter | 0.12 mm[14] |
| Wattage | 5.4 watt (W) |
| Battery capacity | 280 milliampere hours (mAh) |
| E-liquid volume | 1.4 mL |
| Nicotine concentration | 60 mg/mL |
| PG/VG ratio | 48.67/51.33 |
| Additional property | Width: 15.5 mm, Thickness: 7 mm |

## Appendix B. Amendments

**Table 5. Amendments**

| Submission Date | Receipt Date | Amendment STN | Applications being amended[15] | Reviewed | Brief Description |
|---|---|---|---|---|---|
| October 13, 2020 | October 13, 2020 | PM0004039 | All | Yes | Submission of Consumer Insight Survey Summary |
| November 24 2020 | November 24 2020 | PM0004312 | All | Yes | Response to November 21, 2020, FDA Request for Classic Bidi Stick |
| January 6, 2021 | January 6, 2021 | PM0004500 | All | Yes | Request for application review status; notification of forthcoming submissions |

---

[12] We interpret package type to mean container closure system and package quantity to mean product quantity within the container closure system, unless otherwise identified.

[13] Product name is brand/sub-brand or other commercial name used in commercial distribution.

[14] The heating element diameter and length range limits are calculated by the FDA reviewer based on the tolerances provided by the applicant (e.g., length: 3 ± .05).

[15] This amendment applies to the STN subject of this review.

| Submission Date | Receipt Date | Amendment STN | Applications being amended[15] | Reviewed | Brief Description |
|---|---|---|---|---|---|
| March 23, 2021 | March 23, 2021 | PM0004612 | All | Yes | Additional study results; updated Marketing Plan; final report for ███████████; notification of forthcoming submissions; battery certification and updated product packaging; updates on quality management system, quantitative flavor analysis, and ambient stability testing; updated EA information |
| April 20, 2021 | April 20, 2021 | PM0004646 | All | Yes | Additional information on Tobacco Product Perception and Intention (TPPI) studies and Abuse Liability Assessment |
| September 8, 2021 | September 8, 2021 | PM0005013 | All | Yes | Actual Use (AU) and TPPI study updates; ongoing studies and literature review updates; copy of applicant's request for enforcement discretion dated June 25, 2021 |
| October 24, 2021 | October 24, 2021 | PM0005117 | All | Yes | Updates to storage and stability information, and literature review |
| October 29, 2021 | October 29, 2021 | PM0005121 | All | Yes | Updates on PK/Abuse Liability Assessment |
| November 4, 2021 | November 4, 2021 | PM0005139 | All | Yes | Submission of a randomized crossover clinical study |
| November 5, 2021 | November 5, 2021 | PM0005140 | All | Yes | Status updates on the TPPI studies |
| December 3, 2021 | December 3, 2021 | PM0005142 | All | Yes | Updates on TPPI and behavioral studies and PK/Abuse Liability Assessment; final TPPI study report for Bidi Stick Patterns of Use (POU) study report; preprint journal article for |

| Submission Date | Receipt Date | Amendment STN | Applications being amended[15] | Reviewed | Brief Description |
|---|---|---|---|---|---|
| | | | | | PK/Abuse Liability Assessment; notification of forthcoming ambient stability testing results; and updated Marketing Plan |
| December 17, 2021 | December 17, 2021 | PM0005155 | All | Yes | Final TPPI study report for Bidi Stick Likelihood of Use (LOU) study; ambient stability testing reports; summary and report of toxicological human health risk assessment study |
| December 23, 2021 | December 23, 2021 | PM0005157 | All | Yes | Final study report and data files for Bidi Stick PK/Abuse Liability Assessment; PBI study update; updates on quality management system and draft Quality Agreement with contract manufacturer |
| December 23, 2022 | December 23, 2022 | PM0005158 | All | Yes | Duplicate of previous December 23, 2021, amendment |
| December 23, 2022 | December 23, 2022 | PM0005159 | All | Yes | Duplicate of previous December 23, 2021, amendment |
| May 20, 2022 | May 20, 2022 | PM0006517 | All | Yes | Toxicological Ingredient Risk Assessment; final TPPI study report and data files for PBI Study; and update on Population Prevalence Study |
| July 5, 2022 | July 5, 2022 | PM0006596 | All | Yes | Updates to quality and manufacturing control information |
| July 11, 2022 | July 11, 2022 | PM0006606 | All | Yes | Copy of July 5, 2022, cover letter and submission report; copy of email correspondence with RHPM |

| Submission Date | Receipt Date | Amendment STN | Applications being amended[15] | Reviewed | Brief Description |
|---|---|---|---|---|---|
| July 28, 2022 | July 28, 2022 | PM0006746 | All | Yes | Updates to the legal business name of the contract manufacturer to ▮▮▮▮ |
| September 9, 2022 | September 9, 2022 | PM0006933 | All | Yes | Final study report and data files for Bidi Stick Population Prevalence Study; preprint article for the BIDI Stick LOU study |
| September 15, 2022 | September 15, 2022 | PM0006944 | All | Yes | Request to include (12) 4057a forms with the previously submitted corresponding PM0003460 amendments and OCE correspondence in the Agency's files |
| February 6, 2023 | February 6, 2023 | PM0007230 | All | Yes | Technical update of EAs for PM0003460.PD1 – PD11 |
| February 13, 2023 | February 13, 2023 | PM0007276 | All | Yes | Updated Integrated Summary, LOA, and translation certification |
| February 16, 2023 | February 16, 2023 | PM0007280 | All | Yes | Technical update of Ambient Stability Study for Classic BIDI Stick, PM0003460.PD2 |
| April 21, 2023 | April 21, 2023 | PM0007329 | All | Yes | Request for extension of time to respond to FDA's March 20, 2023, Deficiency letter |
| June 18, 2023 | June 18, 2023 | PM0007367 | All | Yes | Response to FDA's March 20, 2023, Deficiency letter |
| June 18, 2023 | June 18, 2023 | PM0007379 | All | Yes | Additional information in response to FDA's March 20, 2023, Deficiency letter |
| January 18, 2024 | January 18, 2024 | PM0007618 | All | Yes | Update to inform FDA of an additional adult smoker switching study independently being conducted by ▮▮▮▮ |