**Case No.: 24-10263**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

Bidi Vapor LLC,

*Petitioner,*

v.

U.S. Food and Drug Administration; Robert M. Califf, M.D., Commissioner; U.S. Department of Health and Human Services; Xavier Becerra, Secretary,

*Respondents.*

---

On Review Of FDA Marketing Denial Order (STN PM0003460.PD2)
Issued Under The Federal Tobacco Control Act

---

## PETITIONER'S REPLY IN SUPPORT OF TIME SENSITIVE MOTION (FEBRUARY 19, 2024) FOR A STAY PENDING REVIEW

Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, Petitioner hereby certifies that the following have an interest in the outcome of this petition for review:

1.   Ballingrud, Samuel (counsel for Respondents)

2.   Becerra, Xavier (Secretary, Department of Health and Human Services)

3.   Bidi Vapor LLC (Petitioner)

4.   Butler, Samuel (counsel for Petitioner)

5.   Chowdhury, Azim (counsel for Petitioner)

6.   Farrelly, Matthew, Ph.D. (Director, Office of Science, Center for Tobacco Control, Food and Drug Administration)

7.   Garland, Merrick B. (Attorney General of the United States)

8.   Gill, Neelam (counsel for Petitioner)

9.   Gotting, Eric (counsel for Petitioner)

10.  Harlow, James W. (counsel for Respondents)

11.  Keller & Heckman LLP (counsel for Petitioner)

12.  Kennedy, Scott (counsel for Respondents)

13.  King, Brian (Director, Center for Tobacco Control, Food and Drug Administration)

14.  Klein, Alisa B. (counsel for Respondents)

15.  Mednick, David (counsel for Respondents)

16.     Nguyen, Stephanie (counsel for Respondents)

17.     Patel, Nirajkumar (member of Petitioner)

18.     Powell, Lindsey (counsel for Respondents)

19.     Sabnis, Rohit (counsel for Petitioner)

20.     United States Attorney's Office, Middle District of Florida

21.     United States Department of Health & Human Services (Respondents)

22.     United States Department of Justice

23.     United States Food & Drug Administration (Respondents)

24.     Van-Tull, LieAnn (counsel for Petitioner)

25.     Vicente, Wendy (FDA Office of Chief Counsel)

26.     Zeimer, Sara (counsel for Petitioner)

FRAP 26.1 Disclosure Statement: No parent corporation or publicly held corporation owns 10% or more of any stock in Bidi Vapor LLC.

11th Cir. R. 26.1-3 Certification: No publicly traded company or corporation has an interest in the outcome of this appeal.

11th Cir. R. 26.1-2 Certification: The undersigned certifies that this CIP is complete at the time of filing.

Dated: February 15, 2024

Respectfully submitted,

/s Eric P. Gotting
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................i

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION ....................................................................................1

ARGUMENT ............................................................................................1

I.     FDA Concedes It Did Not Conduct A Toxicological
Assessment ....................................................................................1

II.    FDA Adopted A New APPH Policy Without  Explanation And
Acted Contrary To Its Own Findings On Nonusers And Youth...........3

III.   FDA Failed To Address Relevant Information Regarding
Aerosol Data For Comparator ENDS ..................................6

IV.   FDA Ignored Relevant Evidence On Leachability .............................7

V.    FDA Did Not Engage In A Holistic Review........................................8

VI.   The Remaining Factors Weigh In Favor Of A Stay............................10

CONCLUSION.........................................................................................12

CERTIFICATE OF COMPLIANCE.......................................................14

CERTIFICATE OF SERVICE ...............................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
  140 S.Ct. 1891 (2020)...............................................................................4

*Fontem v. FDA*,
  82 F.4th 1207 (D.C. Cir. 2023)................................................................9

*League of Women Voters of Florida, Inc. v. Florida Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ..............................................................10

*R.J. Reynolds Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) ...................................................................11

*Sathanthrasa v. Att'y Gen.*,
  968 F.3d 285 (3d Cir. 2020) ......................................................................9

*Thamotar v. Att'y Gen.*,
  1 F.4th 958 (11th Cir. 2021) ......................................................................9

*Wages and White Lion Inv., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) .................................................................11

**Statutes**

21 U.S.C. §387j(b)(1)(A)..................................................................................2
21 U.S.C. §387j(c)(4).........................................................................................3

**Regulations**

21 C.F.R. §1114.7(i)(A)....................................................................................2

**INTRODUCTION**

Respondent U.S. Food and Drug Administration ("FDA" or the "Agency") relies almost entirely on an internal staff memo called a Technical Project Lead ("TPL") Review – a document that was not explicitly cited in the marketing denial order ("MDO"). FDA argues that evidence discussed in the TPL justifies its conclusion that Petitioner Bidi Vapor LLC's ("Bidi" or the "Company") BIDI® Stick Classic does not meet the Tobacco Control Act's ("TCA") "appropriate for the protection of the public health" ("APPH") standard. FDA misses the point. Bidi's challenge to the MDO is not about the weight of the scientific evidence; rather, it is based on FDA's violations of the TCA and the Administrative Procedure Act ("APA").[1]

**ARGUMENT**

**I.      FDA Concedes It Did Not Conduct A Toxicological Assessment**

FDA claims it evaluated "all" evidence required by the TCA, including any health risks of the BIDI® Stick Classic. Resp. 21. Not true. FDA concedes in the TPL that it did not complete a "cycle 2" review, meaning the "TPL review…does not include a toxicological evaluation of the new product and does not rely on any toxicological findings." A0211. FDA further admits that without a cycle 2

_____

[1] FDA says it provided the TPL to Bidi, Resp. 6 n.2, but fails to acknowledge that it did not provide a copy of the TPL, despite repeated requests from Bidi, until after the motion was filed. A0373-99.

1

assessment it "cannot draw final conclusions with respect to the toxicant exposure posed by the new product and does not rely on any toxicological findings." A0228. In fact, the TPL does not even identify a cycle 2 reviewing toxicologist. TPL 9. But the TCA, as well as FDA's rules and guidance, confirm toxicological information is a key factor in any APPH determination. 21 U.S.C. §387j(b)(1)(A); 21 C.F.R. §1114.7(i)(A); A0265.

Indeed, toxicological information submitted by Bidi which was not subjected to a cycle 2 review is highly relevant to an APPH finding. A cycle 2 toxicological review is conducted on information submitted by the applicant in response to the deficiency letter. Here, Bidi provided test results showing: significant reductions in harmful and potentially harmful constituents ("HPHC") when compared to combustible cigarettes; that metal and non-metal leachables in the product's e-liquid are at levels that would result in exposures of low toxicological concern; and that *in vitro* findings demonstrate fewer health hazards relative to cigarette smoke. A0414. Yet none of this was evaluated by a toxicologist. FDA therefore cannot know whether the BIDI® Stick Classic is APPH. As FDA concedes the TCA requires it to consider all submitted evidence, the absence of any cycle 2 evaluation alone is fatal to the MDO.

## II. FDA Adopted A New APPH Policy Without Explanation And Acted Contrary To Its Own Findings On Nonusers And Youth

It is difficult to overstate the sea change under Deficiency Three to FDA's interpretation of the APPH standard. The MDO plainly states continued nicotine dependence and addiction are not APPH. A0004. An ENDS product can no longer result in continued abuse liability and still be granted marketing authorization. This is a stunning claim. The TCA specifically requires FDA to consider the "likelihood" an ENDS product will help addicted smokers move away from combustible cigarettes. 21 U.S.C. §387j(c)(4). And as the TPL itself concedes, a low abuse liability means an ENDS product will not serve as an adequate smoking substitute. A0217. Yet FDA never denies Bidi's assertion that this is the first time the Agency has issued an MDO based on continued abuse liability. A0164. Indeed, nowhere did FDA address Bidi's comments demonstrating that only continued abuse liability will promote the TCA's goals of tobacco harm reduction ("THR"). A0163-64. A failure to even acknowledge such a sweeping change in its APPH policy, let alone explain its rationale, is arbitrary and capricious. Mot. 14-15.

FDA responds that the BIDI® Stick Classic, unlike the NJOY and IQOS products, has a higher abuse liability than combustible cigarettes and is thus not APPH. Resp. 10-12. But that is not what the MDO said; rather, the mere fact that smokers will "maintain or augment their nicotine dependance and addiction" is

3

now determinative. A0005. In FDA's mind, the relative abuse liability is irrelevant; it matters not whether an ENDS products has a similar or higher abuse liability; any continued abuse liability will result in a no APPH finding. Indeed, the MDO concludes "the totality of evidence demonstrates that the abuse liability of the new product is *similar to or higher than*" a combustible cigarette. A0004 (emphasis added). FDA can change its APPH policy if it is consistent with the TCA. But it must explain and justify such a decision. *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1912 (2020). It did not do so here.[2]

Further, even if FDA did not change its policy, the TPL still fails to explain how it balanced all available evidence. FDA claims nonusers and youth may become addicted to the BIDI® Stick Classic. Resp. 13; A0005. But FDA blatantly ignores the TPL's final conclusions that youth and adult nonusers are unlikely to initiate use. A0227 ("Overall, as TPL, I agree with the social science and epidemiology reviews that given the tobacco flavor of the new product, it is expected that youth are unlikely to use the new product and the appeal…would

_____

[2] Bidi's comparison to the NJOY and IQOS products was not an "apples to oranges" exercise. Resp. 10-11. FDA maintains Bidi's comparison was based on nicotine levels, whereas FDA's assessment of the BIDI® Stick Classic included factors like nicotine exposure, abuse liability, addiction potential, and consumer experience. *Id.* But those factors were considered by FDA in the NJOY and IQOS assessments. A0076-77. Regardless, as the BIDI® Stick Classic and the other products will sustain abuse liability, FDA has treated similarly situated products differently without explanation. Mot. 15.

also be limited."); A0227 ("Considering the overall low appeal and use pattern per [Bidi's] data and low rate of ENDS use among adult tobacco non-users per published literature review…, as TPL, I agree with the social science and epidemiology reviews, that it is expected that adult tobacco nonusers are unlikely to use the product."); A0417-19 (citing similar TPL statements). Rather, FDA simply concludes that youth and nonuser initiation "may shift" depending on future market forces and that high abuse liability could lead to addiction. A0227. This is pure speculation. The TPL offers no evidence this will happen and never estimates how many of these "unlikely" users there might be.

And it gets worse. FDA fails to recognize its conclusions regarding youth and nonusers constitute a massive tipping of the scales in favor of an APPH finding. FDA argues Bidi's data were "inconclusive" as to whether the BIDI® Stick Classic helps smokers switch. Mot. 12-13. But at the same time, the TPL acknowledges that a manufacturer has a lower burden in showing benefits to smokers for tobacco flavored (as opposed to non-tobacco flavored) products. A0208. Indeed, the TPL provides that "[a]s the known risks of the product…decrease, the burden of demonstrating a substantial enough benefit likewise…decreases." A0207. And here, as to current tobacco users, the TPL concludes the BIDI® Stick Classic's "higher abuse liability…will likely increase the likelihood of [smokers] to switch…" A0225. This is not surprising as the TPL

notes various Bidi surveys showed that not insubstantial percentages of smokers indicated either an intent to switch or actual switching. A0225; A0166-67; A0420. But when it came time to balance this evidence, even if limited, against overwhelming evidence showing youth and nonusers are unlikely to use the BIDI® Stick Classic, the TPL merely falls back on its wholly speculative conclusions that someday an undefined number of these individuals might try the new product. A0226. This is not balancing evidence on both sides of the ledger. It is arbitrary and capricious decision-making. Mot. 14-15.[3]

### III. FDA Failed To Address Relevant Information Regarding Aerosol Data For Comparator ENDS

As to Deficiency One, FDA in conclusory fashion maintains the published studies cited by Bidi, which provided data showing similar aerosol HPHC yields for comparator ENDS, did not contain sufficient information regarding validations and/or method protocols. The Agency also argues that such data were collected using different puffing regimes and smoking machines which could impact reported HPHC levels. Resp. 17-18; A0209. But FDA cites to nothing in the TPL addressing contrary information and responsive comments made by Bidi.

---

[3] If FDA wanted more switching data, the TPL also does not explain (A0211) why FDA could not wait a mere two months for an additional BIDI® Stick Classic switching study to be completed. A0153; A0254-63 (amendment notifying FDA of anticipated March 30, 2024 completion date).

For instance, the TPL never mentions the extensive information in Chen *et al.* regarding validation and method description for the JUUL comparators. A0215-16; A0406-07. Moreover, the TPL ignores Bidi's comments that different puffing regimes for the JUUL and other ENDS comparators (El-Hellani *et al.*) would either underestimate the aerosol HPHC's in those products or have no measurable impact on the results, meaning that Bidi's comparisons represent a conservative approach. A0216; A0408-09.[4] Further, the TPL never acknowledges that information like full validation reports and production dates is typically not available in published literature or government databases. A0405-06.

While FDA generally complains about missing information and different testing protocols, the TPL never explains how these purported shortcomings, in fact, materially impacted the comparisons. An agency must explain its decision and address relevant information. Mot. 14-15. FDA failed to do so here.

## IV. FDA Ignored Relevant Evidence On Leachability

In Deficiency Two, FDA claims Bidi did not provide sufficient evidence showing which constituents could leach from the device components into the e-liquid and eventually the aerosol. FDA specifically criticized one aerosol study for not using multiple mass spectrometry methods capable of testing for all such

---

[4] The El-Hellani study was funded, in part, by FDA. A0408.

7

compounds.  Resp. 14-16.  But FDA did not factor into its evaluation other studies provided by Bidi in response to the deficiency letter showing which compounds may be leaching into the e-liquid and aerosol.

Significantly, FDA ignored another "extractables" study provided in response to FDA's deficiency letter that employed all of the Agency's recommended testing methods and thus likely detected the compounds FDA alleged were missed in the aerosol study.  A0412-13.  Moreover, as noted above, FDA did not do a cycle 2 toxicological assessment, and therefore did not consider broader aerosol testing results showing significant reductions in HPHCs and overall health risks when compared to combustible cigarettes.  It was arbitrary and capricious to not include these results in the APPH analysis.

## V.     FDA Did Not Engage In A Holistic Review

Contrary to FDA's claims, Resp. 21, 23, this motion is not a dispute over the weighing of scientific evidence.  Rather, as demonstrated above, it is about FDA's failure to comply with the TCA and the APA.  FDA ignored relevant evidence and comments submitted by Bidi, departed from its prior policy regarding APPH and abuse liability without acknowledgment or adequate explanation, applied different standards to similarly situated products and competitors, and completely abandoned, in the case of a toxicological assessment, a key aspect of any APPH determination.  The opposition does nothing to change this.

Perhaps realizing that it did not, in fact, conduct a holistic review, FDA argues that each alleged deficiency independently justifies the MDO and that for Bidi to prevail it must show all three are arbitrary and capricious. Resp. 9. But this cannot be the rule when the underlying statute, as does the TCA, requires a balancing test. *Sathanthrasa v. Att'y Gen.*, 968 F.3d 285, 296 (3d Cir. 2020) (An agency's error on even one factor in a balancing test requires remand for the agency to "reconsider the factor on which it erred 'before then weighing the various [relevant] factors.'" (citation omitted); *Thamotar v. Att'y Gen.*, 1 F.4th 958, 972 (11th Cir. 2021) (requiring re-weighing of evidence where relevant factor not considered and law requires a "totality of circumstances" assessment).

This is particularly evident as to Deficiencies One and Two. FDA never explains how each purported shortcoming is "so serious" as to outweigh evidence of the BIDI® Stick Classic's benefits. *See Fontem v. FDA*, 82 F.4th 1207, 1220-21 (D.C. Cir. 2023). FDA counters that those deficiencies go to key factors in the APPH calculus and are thus more than just the "technical deficiencies" seen in *Fontem*. Resp. 17, 22. But the deficiencies in *Fontem* also involved the safety of ENDS products, such as the quantities of various compounds in aerosols and whether puffing regimes adequately determined "toxicant yields." *Fontem*, 82 F.4th at 1220. If FDA is going to insist that each deficiency stands on its own, it

must still weigh the alleged missing evidence against all the other data supporting a finding of APPH.

## VI.     The Remaining Factors Weigh In Favor Of A Stay

Bidi has clearly demonstrated it is likely to succeed on the merits.  But even if this Court finds that Bidi has made a lesser showing in that regard, it may still grant a stay where the remaining factors weigh heavily in favor of relief.  *League of Women Voters of Florida, Inc. v. Florida Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (citation omitted).  Here, FDA fails to cast any doubt on the devastating consequences to Bidi if a stay is not entered or otherwise show that the public interest lies elsewhere.

FDA completely mischaracterizes Mr. Patel's declaration when arguing Bidi will not be forced to cease operations because it has continued to sell non-tobacco flavored ENDS.  Resp. 24.  Mr. Patel made clear that the MDO is impacting Bidi's entire line of business, not just the BIDI® Stick Classic.  A0202.  And FDA never addresses related harms in the form of ongoing layoffs, dwindling cash flows, and reputational harm.  A0202-04.  But if the MDO is stayed, the status quo will be restored.  A0202.  Indeed, FDA does not deny that it has never issued a warning

letter or initiated an enforcement action against a product that has a PMTA pending (*i.e.*, no MDO) before the Agency. Mot. 3; A0198.[5]

FDA also incorrectly maintains the motion should be denied because it is the TCA, not the MDO, that has caused Bidi financial harm – *i.e.*, there is purportedly no status quo under which Bidi can lawfully sell its products. Resp. 24-25. FDA's argument, however, is foreclosed by this Court's stay in *Bidi I.* In that case, where Bidi sought a stay of MDOs denying marketing authorization for the Company's non-tobacco flavored ENDS products, FDA similarly maintained that any harm flowed solely from the TCA's prohibition on sales without a marketing granted order. FDA Oppo. 5-6, No. 21-13340 (Jan. 10, 2022). This Court nevertheless granted a stay where, as here, the Company demonstrated the MDO would cause significant financial harm. Order, No. 21-13340 (Feb. 1, 2022). *See R.J. Reynolds Co. v. FDA*, 65 F.4th 182, 194-95 (5th Cir. 2023); *Wages and White Lion Inv., LLC v. FDA*, 16 F.4th 1130, 1142-43 (5th Cir. 2021).

Finally, the TPL repeatedly states there is virtually no risk of uptake by nonusers and youth. But if the BIDI® Stick Classic is removed from the

---

[5] Confusingly, FDA cites to a Kaival Brands quarterly financial report that was filed in September 2023, *before* the challenged MDO was issued, as indicating Bidi will not suffer substantial financial harm. Resp. 25. This report is entirely irrelevant to Bidi's current financial status. A0400-02.

marketplace, Bidi's customers will lose a product that evidence shows will help them move away from more dangerous cigarettes.

## CONCLUSION

Based on the foregoing, this Court should grant the stay.

Dated: February 15, 2024

Respectfully submitted,

/s Eric P. Gotting
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

**CERTIFICATE OF COMPLIANCE**

I hereby certify the foregoing complies with the length limitations of Federal Rule of Appellate Procedure ("Rule") 27(d)(2)(A) because it is 2597 words, excluding the parts that are exempted under Rule 32(f). It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Times New Roman font.

/s Eric P. Gotting

Eric P. Gotting

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2024, a true and correct copy of the foregoing reply brief was filed via the Court's CM/ECF system and served on counsel of record.

/s Eric P. Gotting
Eric P. Gotting

**ADDENDUM**

**Table of Contents**

Excerpts from Technical Project Lead (TPL) Review of PMTA .....................A0207

Bidi Vapor LLC Second Amendment regarding Marketing
Plan (March 23, 2021)........................................................................A0231

Bidi Vapor LLC Fourth Amendment regarding Cardno ChemRisk
Literature Review (September 8, 2021)..............................................A0239

Bidi Vapor LLC Twentieth Amendment regarding Additional
Adult Smoker Switching Study (January 18, 2024) ..........................A0254

Excerpt from Cardno ChemRisk Updated Literature Review ..........................A0264

Excerpt from FDA's Guidance for Industry: Premarket Tobacco Product
Applications for Electronic Nicotine Delivery Systems (March 2023)............A0265

Bidi Vapor LLC Response to Deficiency Letter Question
12 (June 18, 2023)............................................................................A0266

Bidi Vapor LLC Response to Deficiency Letter Question
13 (June 18, 2023)............................................................................A0309

Bidi Vapor LLC Response to Deficiency Letter Question
15 (June 18, 2023)............................................................................A0321

Bidi Vapor LLC Response to Deficiency Letter Question
16 (June 18, 2023)............................................................................A0332

Bidi Vapor LLC Response to Deficiency Letter Question
21 (June 18, 2023)............................................................................A0341

Bidi Vapor LLC Response to Deficiency Letter Question
22 (June 18, 2023)............................................................................A0353

Azim Chowdhury Declaration ........................................................................A0373

Niraj Patel Supplemental Declaration.............................................................A0400

McKinney Declaration ........................................................................................A0403

## 1. EXECUTIVE SUMMARY

Based on the information provided in the application and other scientific data, as described in this Technical Project Lead (TPL) review, I find that the applicant has not demonstrated that permitting the marketing of the new product listed above ("new product" or "subject product") is appropriate for the protection of the public health (APPH). Accordingly, I recommend that a marketing denial order (MDO) be issued for the new product.

### 1.1. APPH STANDARD

Section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) requires that, for a product to receive a premarket tobacco product application (PMTA) marketing authorization, FDA must conclude, among other things, that permitting the product to be marketed would be APPH. Section 910(c)(2)(A). The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." Section 910(c)(2)(A).

The statute further specifies that, in assessing whether permitting the marketing of the new product would be APPH, FDA must consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such product. Section 910(c)(4). The APPH standard requires a showing that permitting the marketing of a new tobacco product would have a net benefit to public health based upon the risks and benefits to the population as a whole, which includes youth, young adults, and other vulnerable populations. As the statutory text makes clear, it is the applicant's burden to make a "showing"—with sufficient supporting information—that permitting the marketing of a new tobacco product would have a net benefit to public health based upon the risks and benefits to the population as a whole. In determining whether permitting the marketing of any new tobacco product would result in a net benefit to public health, FDA weighs the potential negative public health impacts (e.g., harm from initiation and use among nonusers, particularly youth) against the potential positive public health impacts (e.g., benefit to adults who use cigarettes and then completely switch to lower risk products).

In making the APPH assessment specifically for a noncombustible tobacco product such as an electronic nicotine delivery system (ENDS), FDA weighs, among other things, the negative public health impact stemming from youth initiation and use of the product against the potential positive public health impact stemming from adults who use combusted cigarettes (CC) transitioning away, i.e., completely switching, from CC to the ENDS or significantly reducing smoking of CC. In order to show that the marketing of an ENDS is APPH, an applicant must show that the benefits, including those to adults who use CC, outweigh the risks, including those to youth, resulting in a net benefit to the public health. As the known risks of the product increase or decrease, the burden of demonstrating a substantial enough benefit likewise increases or decreases.

A0207

Current scientific literature demonstrates that ENDS are generally likely to have fewer and lower concentrations of harmful and potentially harmful constituents (HPHCs) than CC, and biomarker studies demonstrate significantly lower exposure to HPHCs among current exclusive ENDS users than current smokers. However, whether this is true for any particular new ENDS is considered on a case-by-case basis during the course of FDA's scientific review of a PMTA. FDA considers the potential that adults who use CC may experience a reduction in health risks if they switch completely to ENDS, or if they use both products but substantially reduce their cigarette smoking.

For flavored ENDS[2] (i.e., ENDS with e-liquid flavors other than tobacco, such as fruit), there is a known and substantial risk of youth initiation and use; accordingly, an applicant has a higher burden to establish that the likely benefits to adults who use CC outweigh that risk. For tobacco-flavored ENDS the risk to youth is lower compared to flavored ENDS; accordingly, a lesser showing of benefit may suffice.

Before determining that permitting the marketing of a new tobacco product would be APPH, FDA also considers the potential impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and use of tobacco products. Marketing restrictions include advertising and promotion restrictions intended to limit youth exposure to and appeal of tobacco product marketing (e.g., measures such as limiting advertising to platforms that are predominantly used by adults and using advertising content and methods that are not known to resonate with youth, or even eliminating advertising in certain media channels altogether) and sales access restrictions intended to restrict youth access to tobacco products (e.g., measures such as selling products only in face-to-face interactions, in adult-only facilities, or via websites that require robust age and identity verification). In recent years, there have been efforts to develop novel and potentially more effective types of risk mitigation measures aimed at reducing youth initiation risks, such as device access restrictions (e.g., technologies that require adult user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product). FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the benefit to adults. In the case of flavored ENDS, the risk of youth initiation and use is well documented and substantial. Thus far, FDA's experience shows that advertising and promotion restrictions and sales access restrictions cannot mitigate the substantial risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit required to demonstrate APPH.[3] Rather, for flavored ENDS, only the most stringent mitigation measures have such potential; to date, the only such measures identified with the potential for that kind of impact have been device access restrictions. FDA is currently aware of no other restrictions with the potential to alter the overall net benefit assessment for flavored ENDS. In contrast to flavored ENDS, the risk of youth initiation and use with tobacco-flavored ENDS is lower. Restrictions on advertising and promotion and sales access for tobacco-flavored ENDS could mitigate that more limited risk and impact the overall net benefit assessment. In addition, restrictions on

---

[2] The term "flavored ENDS" in this review refers to an ENDS product with any characterizing flavor other than tobacco, including menthol flavor. For the purposes of this review, it is synonymous with "non-tobacco-flavored ENDS."

[3] *See* FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised): Guidance for Industry* 44 (Apr. 2020) ("The reality is that youth have continued access to ENDS products in the face of legal prohibitions and even voluntary actions by some manufacturers."); *see also id.* at 45 (noting "data that many youth obtain their ENDS products from friends or sources in their social networks").

advertising and promotion and sales access are important to include in marketing granted orders (MGOs) because they can help ensure that the marketing of a new tobacco product remains APPH after authorization. FDA has included such restrictions in MGOs issued to date.

FDA also takes into account whether the applicant has provided sufficient information regarding product design, chemistry, stability, manufacturing controls including process controls and quality assurance procedures, toxicology, abuse liability, and other factors that can impact the product's risks and benefits to individual users, including relative to those of other tobacco products on the market. If an applicant does not include information that is needed for FDA to fully assess the risks and benefits of the product, the applicant has failed to carry its statutory burden of demonstrating that the product's benefits outweigh the risks.

## 1.2. SUBJECT APPLICATION

FDA's evaluation of the new product in the PMTA subject to this review determined that the PMTA lacks sufficient evidence to address the health risks associated with the new product with respect to leachables and HPHC exposure as compared to comparison ENDS. Additionally, the PMTA shows the new product has a high abuse liability, which is particularly concerning since it can lead to increased nicotine addiction and dependence among current tobacco users and non-users (including youth) as a whole. Without information to address health risk concerns and given the high abuse liability of the new product, FDA cannot find the marketing of the new product subject to this review is APPH. In total, this review finds three independent deficiencies in this application that are each an independently sufficient reason to support a MDO for the subject product.

Deficiency 1 relates to the lack of aerosol HPHC yields for comparison ENDS that are needed to evaluate comparative health risks of the new product subject to this review relative to other tobacco products from the same category. The applicant provided 11 sets of comparison ENDS data from six different manufacturers (i.e., Apollo, BLU, JUUL, Ever Smoke, South Beach Smoke, standardized research electronic cigarette [SREC]), two different published literature sources, and one tobacco report brochure. However, the applicant-provided HPHC data for these comparison ENDS were not measured and collected in a manner that is sufficient or appropriate to compare to the new product's data. The HPHC data were not sufficient or appropriate for one or more of the following reasons: (1) lacked information on aerosol yield testing method validations and/or method protocols, (2) the HPHC was not collected from the full puffing life cycle of the test product and/or from comparable puffing regimens, (3) failed to identify whether the puffs represent the full puffing life cycle of the test product and failed to identify the puffing regimens (e.g., frequency, volume, duration), and (4) the smoking machine used to collect the HPHC was not sufficiently described or defined. The lack of information on methods used to collect the data prevent FDA from assessing the reliability of the reported HPHC data. Additionally, for the latter three reasons, the differences in puffing life cycle, regimens, and smoking machine can impact the reported HPHC levels (potential for overestimation and underestimation) in the comparison ENDS. Appropriate comparison ENDS data are needed to allow FDA to assess the relative health risks associated with HPHC exposure for individuals who use the new product as compared to other marketed ENDS that the population would likely have access to and use interchangeably. Without appropriate comparison ENDS data, FDA cannot complete the assessment of risks and benefits and determine whether the marketing of the new product subject to this review would be APPH.

Deficiency 2 relates to the lack of a complete leachable study to fully characterize the health risks associated with using the new product. The applicant provided a leachable study that utilizes semi-quantitative non-targeted gas chromatography mass spectrometry (GC-MS) technique. GC-MS can detect and identify volatile organic compounds (VOCs) and some semi-volatile organic compounds (SVOCs), but the technique is not as effective at detecting and identifying other additional SVOCs and cannot detect non-volatile organic compounds (NVOCs) or thermally labile leachable compounds. As a result of only using the GC-MS technique, the applicant did not provide a comprehensive study that would allow for a complete evaluation of other possible leachables such as NVOCs, thermally labile compounds, and other additional SVOCs, which can be detected using other mass spectrometry (MS)-based techniques (e.g., liquid chromatography mass spectrometry [LC-MS] technique). Undetected SVOCs, NVOCs, and thermally labile compounds can pose health risks to the users.

A comprehensive leachable study including both GC-MS and other MS-based analyses is needed to fully characterize all possible leachable contaminants that can migrate from the new product's container closure system. Leachables are a source of potentially harmful constituents. Exposures to any of these contaminants may pose an acute or chronic health risk to individuals using the new product. Therefore, because the applicant failed to provide such information, the health risks associated with the presence other possible leachables including SVOCs, NVOCs, and thermally labile compounds in the new product have not been fully evaluated and cannot be accounted for in the assessment of risks and benefits of the marketing of the new product. Without a comprehensive leachable study, FDA cannot find that marketing of the new product subject to this review is APPH.

Deficiency 3 relates to the new product's high abuse liability. The applicant-sponsored clinical study showed the new product has similar to or higher abuse liability than CC among current CC users with no experience using ENDS, and higher abuse liability than CC among experienced ENDS users. A new product with higher abuse liability compared to CC will promote compulsive and continued use of the new product despite harm or risk of harm. Due to the new product's high abuse liability, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product, and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence. Therefore, FDA cannot find that marketing of the new product subject to this review is APPH.

Based on the information provided in the PMTA and the available evidence, the PMTA lacks sufficient evidence to demonstrate that marketing this product would be APPH.

## 2. BACKGROUND

### 2.1. NEW PRODUCT

The applicant submitted information for the new product listed in Appendix A, which is intended to be marketed under the brand name Bidi Stick - Classic (formerly known as Bidi Stick Classic Tobacco). Briefly, the new product is a completely self-contained (closed) and disposable ENDS device composed of a non-rechargeable power unit and a prefilled e-liquid enclosure system containing a sponge-like material pre-saturated with e-liquid. The power unit settings and the e-liquid are intended to be non-adjustable and non-replaceable by the user. The new product

A0210

contains 1.4 mL of e-liquid with 6% w/v (weight to volume) or 60 mg/mL tobacco-derived nicotine, in salt form with benzoic acid, and uses a cobalt-based lithium battery. The applicant identifies the characterizing flavor of the e-liquid as tobacco-flavored and states that the new product is marketed to adults (aged 21 and older) who use tobacco for non-medicinal or non-therapeutic use.

## 2.2. REGULATORY ACTIVITY

On September 8, 2020, FDA received one PMTA from Bidi Vapor LLC. FDA completed an acceptance review on February 5, 2021 and issued an Acceptance letter to the applicant on February 5, 2021. FDA issued a Filing letter to the applicant on February 23, 2021. FDA issued a Deficiency letter to the applicant on March 20, 2023. FDA also issued an Extension Denied letter to the applicant on July 25, 2023. In response to the Deficiency letter, FDA received two amendments dated June 18, 2023, from the applicant.

For the PMTA under review, one amendment was submitted by the applicant after the response due date of June 18, 2023 (see Appendix B for amendment details). Although FDA received this amendment after the response due date and after the discipline reviewers had started scientific review, I conducted a review of the amendment to determine its impact on the evaluation and findings from the discipline reviews. The amendment notified the Agency of a study being conducted by Rose Research Center, LLC (NCT05855343). I determined that the January 18, 2024, amendment does not impact the discipline reviews because the amendment did not provide any new substantive scientific information, and therefore, I determined that the late amendment does not impact the evaluation and findings of the discipline reviews.

Refer to Appendix B for a complete list of amendments received and reviewed by FDA.

## 2.3. SCOPE OF REVIEW

This review captures all compliance and scientific reviews including TPMF discipline reviews (MF0000241, MF0000276, MF0000403, MF0000494, and MF0000498) completed for the new product that is the subject of this review.

In the response to FDA Deficiency letter dated March 20, 2023, the applicant cross-referenced MF0000241, but they stated that the information in this TPMF is no longer relevant. Thus, FDA did not complete the TPMF review of MF0000241 because the applicant noted it was not needed to support FDA's scientific evaluation of this PMTA.

For MF0000494, toxicology and chemistry reviews were completed by Geoffrey Cole on March 17, 2023, and Lauren Girard on March 10, 2023, respectively. In response to FDA Deficiency letter dated March 20, 2023, the applicant provided updated nonclinical studies and considered previously submitted toxicology information in MF0000494 not relevant.

A cycle 2 toxicology review was not completed for this PMTA. The toxicology reviewers conducted a cycle 1 review and identified four deficiencies for this PMTA. However, in light of the other non-toxicological deficiencies (as described in Section 1.2) that form the bases for denial of the PMTA, completing a cycle 2 toxicology review is not warranted. This TPL review therefore does not include a toxicological evaluation of the new product and does not rely on any toxicological findings.

submission (0-12 months) adequately addressed the microbial stability of the products over the proposed six months of shelf life for the bulk e-liquid and 12 months of shelf life for the finished new product.

Per the chemistry review:

- The applicant provided stability data up to 24 months that adequately supports the shelf-life of the bulk e-liquid (6 months) and finished new product (12 months). The stability data for the chemical constituents and physicochemical properties are all within the release specifications that support the applicant's proposed shelf-life for the bulk e-liquid (6 months) and new product (12 months). The applicant referenced a TPMF, MF0000494, for the analytical method protocols and validation reports of the stability study. The chemistry review of MF0000494 (Date: 1/19/2024, reviewer: Trevon Swain) indicates that the TPMF provided sufficient information to demonstrate the appropriateness of the analytical methods used in the stability study. The information provided by the applicant for the stability of the bulk e-liquid and new product is sufficient and acceptable from a chemistry perspective.

- The applicant provided data on semi-quantitative non-targeted analysis (NTA) of aerosol yields collected from the new product stored for four and 17 months for the leachable study. The applicant only provided leachable study data obtained from gas chromatography mass spectrometry (GC-MS) which is only capable of identifying volatile organic compounds (VOCs) and some semi-volatile organic compounds (SVOCs) of the leachables of the new product (ISO 10993-18:2020). GC-MS technique is not as effective at detecting and identifying other additional SVOC, non-volatile organic compound (NVOC), or thermally labile chemical leachable compounds (ISO 10993-18:2020). Thus, the applicant has not provided a comprehensive study that allow for a complete evaluation of other possible leacheables such as NVOCs, thermally labile compounds, and other additional SVOCs, which can only be detected using other MS-based techniques (e.g., liquid chromatography-MS) in both positive and negative ion modes. Additional SVOCs, NVOCs, and thermally labile leachable compounds that cannot be detected and quantified by GC-MS method can pose potential health risks to users. Furthermore, different analytes have different propensity to be ionized to positive or negative ions and subsequently detected by the mass spectrometers. This depends on the ionization technique used in the mass spectrometry analysis, the state of matter of the sample (e.g., solid, gas, liquid), proton affinity, acid-base chemistry, electron affinity, and ionization energy of the analytes just to name a few. Therefore, it is not possible for the applicant to predict what leachable constituents can be leached from the container closure system of the new product and whether the leachable constituents will be detected in positive or negative ion modes of their mass spectrometry leachable analyses. The leachable study provided by the applicant is not adequate from a chemistry perspective and additional leachable data from other suitable analytical techniques should have also been provided.

- The applicant provided semi-quantitative NTA extractable study data for the new product. The applicant provided data on the extraction of the ENDS component of the new product (with the exception of battery, electronics, and aluminum tube enclosure) with hexane, isopropanol, and water solvent. The applicant also provided data on the extraction of mouthpiece component of the new product with artificial saliva. The analytical methodology information provided by the applicant for the

extractable study of the new product is adequate. Therefore, the analytical results from the extractable study are reliable and acceptable from a chemistry perspective. Potential health implications and risks from the extractables are evaluated by toxicology.

### 3.2.1.5. Product test data

Per the engineering review:

- The applicant provides all applicable design parameter target values and range limits, and this demonstrates that the new product meets the requirements of section 910(b)(1) of the FD&C Act.

- The applicant provides sufficient post-manufacturing verification data using COAs to demonstrate that all purchased subcomponents and parts of the new product hardware meet manufacturing specifications and to demonstrate that the new product's parts are manufactured consistently. The applicant demonstrates that the purchased parts used for assembling the new product are made consistently per specifications to reduce the likelihood of a product failure.

- The applicant provides the Design Failure Mode and Effect Analysis (DFMEA) report that addresses all design concerns related to failure of parts, functions, or design features that are associated with design hazards (dry puffing, extreme coil temperature, inaccurate e-liquid volume, battery overheating, fire, or explosions). FDA evaluates all potential failure modes that are associated with a potential hazard to determine if they are considered in the design and adequately mitigated to determine if the finished product functions as intended under foreseeable conditions. The DFMEA analysis considers failure of components associated with an e-liquid leaking risk, battery failure, and hot aerosol and surface temperatures of the new product. In conclusion, the DFMEA report is considered by engineering as sufficient and each failure mode identified is mitigated adequately.

- The applicant provided a User Failure Mode and Effects Analysis (UFMEA) report that identifies risks associated with a person who inhales vapor from the new product. Each of the risks is associated with causes and mitigation methods. The UFMEA report identifies common ENDS risks, such as burns, leaks, and battery explosions. The risks identified are acceptable. The applicant quantifies each risk by evaluating the associated harm, cause, detectability, and mitigation methods. The applicant references associated test reports for the new product that are provided when applicable, such as UL 8139:2020 - UL Standard for Safety Electrical Systems of Electronic Cigarettes and Vaping Devices. All risks are considered reasonably low by the applicant. Engineering reviewed each risk and its associated cause, as well as the mitigation method and determined all risks identified are reasonably low and acceptable.

- The RRA memo dated October 7, 2022, documents consumer complaints regarding leaking. The applicant determined the leaks could have been because of the internal fixation base (gasket) design. The internal fixation base design was changed to address the leaks, and after the changes were made the applicant demonstrates the new product will not leak after dropping, vibration, and shipping conditions are applied. The internal fixation base change and the associated verification is adequate.

AC Disposable, and Brand P Liquid AD Disposable in exposure concentration ($\mu g/m^3$) and consumption per day (weight/day), which were not appropriate and do not include standard deviations and number of replicates needed for chemistry evaluation. Chemistry needs aerosol HPHC yields from the comparison ENDS in mass per product, mass per aerosol collection (including aerosol collection puff counts), or mass per puff (including puff number), along with standard deviation of the measurements and number of replicates, in order to compare to and evaluate the health risk and benefit of the new product. Additionally, the applicant did not provide the actual names of these ENDS and indicate whether the comparison data were extracted from literatures or measured by the applicant. In response to FDA Deficiency letter, the applicant did not address concerns FDA identified. Instead, the applicant provided comparison aerosol yield data from the published literatures for products in the same category as the new product: JUUL Virginia Tobacco 5% and Virginia Tobacco 3% as prefilled, closed, cartridge-based ENDS (Chen et al., 2021); Apollo Classic Tobacco, BLU Classic Tobacco, Ever Smoke Classic Tobacco, and South Beach Smoke Classic Tobacco as disposable, prefilled, and tank ENDS (El-Hellani et al., 2018). The applicant also provided comparison aerosol yield data from a tobacco product brochure for the SREC ENDS. However, as explained in detail in the bullets below, all the comparison aerosol yield data lack information needed to determine whether the data are appropriate for comparison to the new product.

- o For the SREC product, the provided HPHC data from a tobacco brochure are reported as approximate values and lacked analytical precision and statistical confidence, nor do they include standard deviations, number of replicates, puffing regimen information, analytical method information, method validations, testing laboratory name and accreditation, and puff counts per aerosol collection. Without this information, FDA cannot determine whether the comparison aerosol yield data reported for the SREC product are reliable or measured and collected in a manner that would be comparable to compare to the new product's data. FDA needs aerosol yield dataset from a comparable puffing regimen and puffing life cycle (i.e., 90% end of life or product consumption), and validated test methods so that we can accurately evaluate the HPHC exposure risk of the new and comparison products when the consumer switches from other products (in the same category as the new product) to the new product or use them interchangeably. Aerosol yield data collected using a comparable puffing regimen (puffing volume, frequency, and intervals) and puffing life cycle (i.e., 90% end of life or product consumption) to the new product are needed so that FDA can compare the comparator product to the new product appropriately without reporting bias. Varying the puffing volume, frequency, or intervals can influence the overall HPHC yields of an ENDS. In addition, validated test methods are needed so that FDA can determine if the aerosol yield dataset for the comparison product is reliable in terms of accuracy, precision, selectivity, sensitivity, linearity, and range.
- o For JUUL Virginia Tobacco 5% and Virginia Tobacco 3%, the HPHC yields provided from the published literature (Chen et al., 2021) were collected from a portion of the products (50 puffs) and majority of the HPHC (45 out of 53 constituents) were reported as BLOD and BLOQ. Had the authors collected the aerosol data from a whole pod or 90% EOL, the reportable

constituents would likely be higher, and it is not clear to FDA if constituents that were reported as BLOD and BLOQ would be present. Additionally, Chen et al. paper contains very limited analytical method information (e.g., method name, name of testing lab) and no method description or validation information. Therefore, the literature data provided by the applicant for JUUL's Virginia Tobacco 5% and Virginia Tobacco 3% did not contain sufficient and comparable data to compare to the new product's data. Without sufficient and comparable data, FDA cannot fully evaluate the health risk of the new product in comparison to the JUUL products.

o   For Apollo Classic Tobacco (3 products: disposable, prefilled closed, and tank ENDS), BLU Classic Tobacco (2 products: disposable and prefilled closed pod ENDS), Ever Smoke Classic Tobacco (prefilled closed pod ENDS), and South Beach Smoke Classic Tobacco (2 products: pre-filled closed pod and tank ENDS), the referenced published literature (El-Hellani et al., 2018) provides a brief description of each test methods along with the name of the testing laboratory but lacks method validation information. The HPHC data were collected using different puffing regimens (puff duration, frequency, and volume), puffing machine (non-standardized puffing machine was used), and puffing life cycle (i.e., 90% end of life or product consumption) than the new product. Without appropriate test data, collected in a manner that is comparable to the new product test dataset, and reliable and accurate, the new product cannot be appropriately evaluated for risks or benefits to the user and non-user in comparison to similar ENDS.

### 3.2.2. Synthesis

As TPL, I agree with the engineering and microbiology reviews that the PMTA contains sufficient information to characterize the product design, packaging, and microbial stability of the new product. Per the engineering review, the applicant provided sufficient information on the product design and packaging of the new product. The applicant provided a CRP test report to demonstrate the effectiveness of the packaging per requirements within 16 CFR § 1700.15 in minimizing unintended exposure to young children. The applicant demonstrated the new product is tamper-evident and tamper resistant. The applicant also provided evidence demonstrating that attempting to misuse the new product will result in permanent damage and prevent it from functioning. Furthermore, the batteries to be used with the new product are UL8139 certified. As TPL, I agree with engineering's conclusion that the applicant submitted sufficient information on product design and packaging. Per the microbiology review, the applicant provided the appropriate microbial stability data (up to 24 months) for the new product to support the applicant's proposed shelf life of 12 months for the finished new product and six months for bulk e-liquid. As TPL, I agree with microbiology's conclusion that there is sufficient information on the microbial stability data.

I also agree with the chemistry review that the PMTA does not contain sufficient test data with regard to aerosol data for comparison ENDS and leachable contaminants including SVOCs, NVOCs, and thermally labile compounds in the new product to determine health risks associated with using the new product. Per the chemistry review, the applicant provided adequate MSS yields for the 1R6F CC compared to the new product. Because the applicant did not provide data on MSS yields for PG, glycerol (also known as VG), diacetyl,

aerosol data for the new product. However, the aerosol data for NNN and NNK are not needed because the NNN and NNK levels in the e-liquid of the new product were below the limit of detection. Thus, the NNN and NNK aerosol levels in the new product are expected to be low and are not of concern.

Overall, the applicant did not provide sufficient health risks (i.e., test data for comparison ENDS and a complete leachable study for the new product) to support an APPH determination for the marketing of the new product.

## 3.3. ABUSE LIABILITY

### 3.3.1. Discipline key findings

The following discussion is based on key findings provided in the BCP review with respect to the applicant-sponsored clinical study (BIDI-PK-01), which assessed subjective effects and nicotine exposure (maximum nicotine exposure [$C_{max}$] and area under the curve [AUC—an estimate of total nicotine exposure]) following actual use (controlled use and ad libitum use) of the new product and UB CC.

#### 3.3.1.1. Abuse liability

Per the BCP review:

- Abuse liability refers to the ability of the product to promote continued use and the development of addiction and dependence. This can be relevant to determining the likelihood that addicted users of one nicotine product would switch to another. For example, if a new product has a low abuse liability, individuals who are currently dependent on nicotine may find it to be an inadequate substitute for the product they are currently using. On the other hand, low abuse liability makes it less likely that new users will become addicted. Abuse liability evaluations include pharmacokinetic (PK) evaluations and consider the addictiveness and abuse potential of the tobacco products and the exposure to nicotine during product use.
- The applicant-submitted clinical study (BIDI-PK-01) assessed the abuse liability of the new product as compared to UB CC and JUUL Virginia Tobacco 5%.
  - This study measured PK nicotine exposure from these three products (and five other Bidi Stick ENDS which were not evaluated in this PMTA review) during controlled and ad libitum product use sessions.
  - The new product had higher nicotine exposure than UB CC and JUUL Virginia Tobacco 5% during ad libitum use. Total nicotine exposure (AUC) was statistically significantly higher for the new product than UB CC during ad libitum use (see September 13, 2022 statistical consult Memo). Higher nicotine exposure than UB CC indicates the new product may promote continued use and lead to higher nicotine dependence and addiction (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993).
    - Total nicotine exposure (AUC) was statistically significantly higher for the new product than UB CC during ad libitum use (see September 13, 2022 statistical analysis consult Memo).
    - The clinical data provided by the applicant do not include statistical analysis to compare nicotine exposure (i.e., $C_{max}$, AUC) following use

of the JUUL Virginia Tobacco 5% comparison product and the new
product. This lack of statistical analysis is a limitation from BCP's
perspective.

- The applicant provided statistical analyses comparing nicotine exposure outcomes
of the new product to UB CC following controlled use, but not following ad libitum
use. The applicant's analysis showed nicotine exposure ($C_{max}$) following controlled
use of the new product was similar to UB CC.

- While not required, the lack of statistical analysis for the ad libitum use data limited
BCP's ability to evaluate the abuse liability of the new product. Since ad libitum
product use is more generalizable to real-world use than measures collected during
controlled use, FDA consulted with the statistical branch (see September 13, 2022
Memo) to conduct a statistical analysis to evaluate differences in nicotine exposure
between the new product and UB CC following ad libitum use. While nicotine
exposure during controlled use was similar between the new product and UB CC,
the statistical analysis consult determined that total nicotine exposure measured by
AUC following ad libitum use of the new product was statistically significantly higher
than with UB CC in adults who use CC but have no ENDS experience. The statistical
analysis provided by the consult demonstrates at least a 95% mathematical
probability that the higher nicotine AUC following ad libitum use of the new product
is due to a clinical effect of the independent variable rather than to chance. Thus,
BCP concludes that while nicotine exposure during controlled use was similar
between the new product and UB CC, total nicotine exposure measured by AUC
following ad libitum use of the new product was greater than with UB CC in adults
who use CC but have no ENDS experience.

- The clinical study's subjective effects data suggest that the new product will be liked
by users, promoting continued use and contributing to the product's abuse liability.
Also, the abuse liability of the new product was assessed using the totality of
evidence including nicotine exposure outcomes and subjective outcomes from the
clinical study plus the product characteristics (higher nicotine concentration and
presence of nicotine salts). BCP has no concerns about the clinical study.

- Published literature supports that adults with ENDS experience are likely to achieve
even higher nicotine exposure from use of the new product than adults with no
ENDS experience (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016;
Spindle et al., 2017; Yan et al., 2015). Experienced ENDS users take longer/larger
puffs from ENDS and obtain more nicotine from the same ENDS compared to adults
who use CC and are inexperienced with ENDS. Thus, BCP expects the abuse liability
of the new product will be higher than CC in adults who have experience using
ENDS, which is a population that is likely to use the new product.

- The new product contains a nicotine concentration (6% or 60 mg/mL) that is on the
higher end of most ENDS tested in the literature which range from 3-60 mg/mL
(Bansal et al., 2018; Duell et al., 2020; El-Hellani et al., 2018; Goniewicz et al., 2018)
and contains nicotine salts. The new product's high nicotine concentration is
associated with higher nicotine exposure (Goniewicz et al., 2019; Hajek et al., 2020;
Kosmider et al., 2018; St Helen et al., 2017), which increases the abuse liability of
the new product; further, the presence of nicotine salts reduces the harshness of

the high nicotine concentration in the new product making it more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019).

- Applicant-submitted survey data ("BIDI Stick Dependence Survey Report FINAL") showed that self-reported nicotine dependence was not statistically significantly different between adults who exclusively used CC (N=400) and adults who exclusively used any of the eleven flavors of Bidi Stick ENDS (N=61). However, the applicant did not measure nicotine dependence in exclusive users of the new product or bridge the study findings to exclusive users of the new product.

- The totality of evidence from the clinical study (e.g., nicotine exposure) and new product characteristics (i.e., high nicotine concentration, nicotine salt formulation) suggest that the abuse liability of the new product is similar to or higher than the abuse liability of CC among inexperienced ENDS users.

- Based on clinical evidence provided by the applicant and published literature, BCP concludes that the high abuse liability of the new product increases the likelihood that tobacco users who try the new product will continue using it. The high abuse liability of the new product also increases the likelihood that tobacco nonusers, including youth, who try the new product will continue using it, particularly since the nicotine salts in the e-liquid will likely reduce the harshness of the high (6%) nicotine concentration (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). These continued use behaviors will likely increase nicotine dependence and addiction in all of these populations (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993).

### 3.3.2. Synthesis

As TPL, I agree with BCP's conclusions that the abuse liability of the new product is similar to or higher than that of CC among CC users with no experience using ENDS and higher than CC among experienced ENDS users. The applicant provided a clinical study (BIDI-PK-01) that measured nicotine PK and subjective effects following use of the new product to assess abuse liability of the new product. Per the BCP review, nicotine $C_{max}$ of the new product was similar to UB CC following controlled use while nicotine exposure (AUC) of the new product was higher than UB CC following ad libitum use among CC users with no experience using ENDS. Because ad libitum product use is more generalizable to real-world use than measures collected during controlled use, BCP concluded that nicotine exposure of the new product is higher than that of UB CC among adults who use CC with no experience using ENDS. The subjective effects results demonstrated that the new product was liked by adults who use CC, suggesting that it is reinforcing in these populations. In addition, the new product also contains 6% or 60 mg/mL of nicotine salt (benzoic acid), which is on the higher end of nicotine concentration for most of known ENDS evaluated in literature (3-60 mg/mL) (Bansal et al., 2018; Duell et al., 2020; El-Hellani et al., 2018; Goniewicz et al., 2018). Further, nicotine salt formulations promote continued use because they make the e-liquid more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). Based on the combination of new product's characteristics (i.e., high e-liquid nicotine concentration [6%] and nicotine salts in the e-liquid), together with subjective effects showing the new product is liked by users and nicotine exposure that is similar or higher in the new product compared to CC, BCP concluded that the abuse liability of the new product is similar to or higher than CC among adults who use CC with no experience using ENDS. However, because experienced ENDS users take longer or larger puffs and obtain more nicotine from the same

tobacco product use in the weeks prior to initiating Bidi Stick (N=229), 14% of respondents reported no current use of any tobacco product (POU survey). However, the applicant did not provide data on whether use of the new product would lead to tobacco use transitions, reductions in CC consumption, or complete switching. In the Survey on Bidi Stick Usage and Potential Impact, 5.2% reported that they reduced their cigarette use and 6.3% reported that they quit or replaced their cigarette use by using Bidi Stick; however, these findings were not specific to the new product and included other flavored variants of Bidi Stick Evidence from the published literature on switching behavior suggests that complete switching from CC to ENDS does occur among a small proportion of users (less than 10%)—typically through a period of dual use (Abi Nehme et al., 2022; Piper et al., 2020; Stanton et al., 2020). Additionally, findings from the Population Assessment on Tobacco and Health (PATH) Study, National Health Interview Survey (NHIS), and Tobacco Use Supplement to the Current Population Survey (TUS-CPS) indicate that those who use ENDS daily (vs. non-daily) have an increased odds of switching; however, the stability of these patterns over time remains unknown (Abi Nehme et al., 2022; Giovenco et al., 2018; Levy et al., 2018). While the applicant did not provide product-specific data on switching, published literature studies on switching to ENDS indicate some proportion of adult current tobacco users will switch.

- Conclusions from the applicant-provided data are limited because the applicant did not provide the time frame for the number of weeks respondents used any tobacco products prior to initiating the new product. Thus, is it unclear whether respondents used the new product before quitting or reducing consumption of other tobacco products (particularly combusted tobacco products) based on the cross-sectional evidence submitted by the applicant. Additionally, the lack of longitudinal data to assess whether new product use is associated with combusted tobacco product cessation is a limitation. The data submitted by the applicant provide limited evidence that adult tobacco products users will switch to the new product.

- Evidence submitted by the applicant suggests that initiation and current use of the new product is low, and no respondent in the Population Prevalence Study reported current use of the new product. The Behavioral Survey similarly suggests that the use of the new product is low. Among the 61 established Bidi Stick users in the Behavioral Survey, six respondents (9.8%) reported using the new product and it was used most often by two respondents (3.3%). The published literature suggests that roughly a quarter of adult (defined as 18+) ENDS users report using tobacco flavors, which are not common among youth and young adults (Birdsey, 2023; Leventhal et al., 2021). While the applicant did not submit a longitudinal study, the evidence referenced from the Population Prevalence Survey and the Behavioral Survey suggest that the current use of the new product is low, and the literature suggests that tobacco-flavored ENDS products are not commonly used among youth and young adults. Thus, the information provided by the studies that were submitted by the applicant is sufficient from the epidemiology perspective to draw conclusions about the prevalence of new product use.

Per the social science review:

- Based on the applicant's data in the LOU Study, some (25.4-45.3%) current tobacco users generally perceive that regular use of Bidi Stick carries a high chance of causing diseases (i.e., lung cancer, lung disease, heart disease, stroke) known to be

associated with tobacco use. This finding pertains to Bidi Stick generally, given that participants viewed product information and labeling for a variety of Bidi Stick flavors (including tobacco and others) before reporting their perceptions, and therefore it is not specific to the new product, Bidi Stick – Classic. Larger proportions of current tobacco users thought the same for regular CC smoking (47.3-74.8%).

- Based on the applicant's data in the PBI Study, among current adult smokers, some (20.2%) are likely to try the new product, and some (20%) are likely to progress to regular use.
  - o Some current smokers who have prior experience with ENDS were likely to try the new product (41.3%) and to progress to regular use of the new product (37.5%).
  - o Some current smokers who are also current ENDS users were likely to try the new product (44.1%) and to progress to regular use of the new product (44.9%).
  - o Some current smokers (17.8%) were likely to use the new product to completely switch from combusted cigarettes.
  - o Behavioral intentions do not appear to differ by quit intentions among current smokers.

Per the BCP review:

- Initiation of the new product by current tobacco users and nonusers, including youth, will likely lead to continued use (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) of the new product because it has an abuse liability similar to or higher than that of CC and a comparison ENDS (JUUL Virginia Tobacco 5%) among inexperienced users of ENDS. In current tobacco users, the high abuse liability of the new product suggests that it will promote continued use which will maintain or augment their nicotine dependence (Martínez et al., 2020; Morean et al., 2018; Morean et al., 2019).
- Adults who have ENDS experience are likely to achieve higher nicotine exposure from the new product than adults with no ENDS experience because they take longer and larger puffs and obtain more nicotine from the same ENDS (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016; Spindle et al., 2017; Yan et al., 2015). Thus, in experienced users of ENDS, BCP expects that the abuse liability will be higher than CC.
- Switching, dual or poly use, and/or tobacco cessation:
  - o Adults who use CC and initiate use of the new product may partially switch or dual use the new product with CC because the new product provides nicotine exposure higher than that of CC. However, the applicant did not provide evidence to show that adults who use CC will partially or completely switch from CC to the new product.
  - o Because of its high abuse liability, use of the new product may lead to partial switching and dual use with CC, preventing complete tobacco cessation among adults who want to quit smoking CC.

### 3.4.1.3. Tobacco non-users (including youth)

Per the social science review:

- In the LOU Study, when current tobacco users are asked about the risk of tobacco products causing disease, a smaller proportion (approximately 36-50%) associate Bidi Stick with the diseases compared to CC smoking (approximately 52-82%).
- In the LOU Study, data on relative risk perceptions of Bidi Stick indicated that 36.1-43.3% of current non-users of tobacco products thought that daily use of Bidi Stick had the same chance of causing the same health conditions as daily cigarette smoking.
- In the PBI Study, between 37.1-50.0% of former and never smokers thought that not smoking but starting daily use of Bidi Stick carried a high or a very high lifetime risk of developing lung cancer, lung disease, heart disease, or stroke.
- Based on the PBI Study, a small proportion (0.9%) of never smokers (are likely to try the new product. Former smokers were generally more likely to try than never smokers (1.3%).
- In the LOU study, product appeal (i.e., likelihood to try) among adults who never used tobacco products and adults who previously used tobacco products were low (means = 0.31 and 0.44, respectively, on a Juster purchase probability scale ranging from 0 = "no chance, almost none" to 10 = "certain, practically certain").
- No definitive conclusion about harm perceptions of the new product or Bidi Stick in general can be made among current tobacco non-users due to inconsistent study findings on tobacco product risk perceptions. The applicant does not present youth-specific data on the new product, which is a limitation from a social science perspective. Also, although the PBI and LOU studies oversampled young adult (aged 21 to 24 years) non-smokers, data from these participants were combined with other tobacco product user groups. Thus, no conclusions about behavioral intentions, product appeal, and harm perceptions can be extrapolated for youth. Published data generally suggest that tobacco-flavored ENDS have limited appeal for youth (Hoffman et al., 2016; Soneji et al., 2019). In the absence of product-specific data on youth appeal and given the similarity in product characteristic and flavor of the new product to tobacco-flavored ENDS, it may be reasonably expected that youth appeal for the new product would also be limited, similar to that found in the published literature for tobacco-flavored ENDS. Therefore, despite the lack of youth-specific data on the new product, social science was able to conclude that youth appeal for the new product would likely be limited.

Per the epidemiology review:

- *Youth*. The applicant provided the Population Prevalence Study which collected data on current users of the new product stratified by self-reported cigarette use history. The data from this study suggests that few youth will initiate with the new product (e.g., zero youth aged 13 to 17 who were never smokers reported ever using the new product). Additionally, the published literature indicates that youth report significantly lower preference for tobacco-flavored ENDS compared to flavored ENDS (Miech et al., 2021; Schneller et al., 2019). While all ENDS pose risks to youth, youth are less likely to initiate with tobacco-flavored ENDS, and to subsequently progress to regular use of such products than with flavored ENDS (Audrain-McGovern et al., 2019; Leventhal et al., 2019; Villanti et al., 2019). Because youth are unlikely to use the new product, the data on youth new product use is sufficient from the epidemiology perspective.

A0222

reduce the magnitude of adult benefit needed to show that marketing of the product would be APPH.

In contrast, in recent years there have been efforts to develop novel and potentially more effective mitigation measures such as device access restrictions. These include implementation of device technologies, such as age-gating technologies that require user identification by fingerprint or other biometric parameters in order to unlock and use a tobacco product or geo-fencing technologies (e.g., technologies that make it impossible to operate a tobacco product in a particular location such as a school or playground). In contrast to advertising and promotion and sales access restrictions discussed above, FDA believes that these novel device access technologies may offer a potential to sufficiently mitigate the risk to youth if they can be shown to restrict product access in a way that cannot be disabled or defeated. The use of device access restrictions in the current marketplace is limited, and FDA continues to assess them.

In conclusion, before determining that permitting the marketing of a new tobacco product would be APPH, FDA considers the impact of marketing restrictions and other mitigation efforts that aim to reduce the risk of youth initiation and tobacco use. FDA evaluates these measures in the context of the overall public health evaluation of the product, weighing the known risks to youth against the possible benefit to adults. The assessment for flavored ENDS is different from other tobacco products because of (1) the substantial risk of youth initiation and youth use as shown by well-established data, and (2) the lack of robust evidence in the scientific literature regarding the potential of flavored ENDS to benefit adults who use CC, particularly when compared to alternatives posing less risk to youth, such as tobacco-flavored ENDS. Given those considerations, as well as the information discussed above regarding advertising, promotion, and sales access restrictions, we have thus far determined that restrictions on advertising and promotion and sales access have not been adequate to mitigate the risk to youth from flavored ENDS sufficiently to reduce the magnitude of adult benefit needed to show that marketing of the products would be APPH. In contrast, only the most stringent mitigation measures could provide sufficient assurance of youth risk mitigation. To date, the only such measures identified with the potential for that kind of impact have been device access restrictions. Nonetheless, consistent with the concerns expressed by certain federal courts, FDA is reviewing all applicant-proposed marketing restrictions and mitigation measures to ensure that there are no other types of novel and materially different proposals.

Per the Office of Health Communication and Education (OHCE) consult:
- OHCE noted concerns about age-restriction and identity-verification of the applicant owned website and social media platform. OHCE also noted that although the applicant states they do not currently advertise or market to consumers directly, they also state they are foregoing direct consumer marketing until FDA completes the PMTA review. This suggests that the applicant may alter their marketing plans after authorization. Thus, OHCE recommends that these concerns be addressed by imposing the marketing restrictions and reporting requirements as part of post marketing requirements including the requirement to conduct age- and identify-

verification at the first point of access at any owned digital media, and the requirement to submit 30-day advance notification of marketing plans for a period of time.

- Overall, OHCE concluded that, if the new product is authorized to be marketed, the marketing granted order should include additional marketing restrictions and reporting requirements.

Per the social science review:

- The applicant did not provide any information on measures to mitigate youth use beyond what was included in the marketing plan, and the marketing plan is reviewed by OHCE.

### 3.4.1.6. Labeling and advertising

Per the Division of Promotion, Advertising, and Labeling (DPAL) memorandum:

- In response to FDA Deficiency letter dated March 20, 2023 outlining an issue regarding potential free samples, the applicant clarified that the Bidi CARES program is designed to promote sustainable manufacturing, waste disposal, and recycling and does not provide coupons for free products to consumers returning products for recycling that would otherwise raise concerns regarding distribution of free samples per 21 CFR § 1140.16(d).
- In response to FDA Deficiency letter issued dated March 20, 2023 regarding the lack of required nicotine warning statements, the applicant provided the updated proposed package labeling for the new product to include the required nicotine warning statements on two principal display panels as required by 21 CFR § 1143.3(a).
- Overall, OCE-DPAL concluded that, if the new product is otherwise authorized to be marketed, the applicant should be reminded of its responsibility to comply with all applicable statutory and regulatory requirements, including 21 CFR § 1143.3(a) and 21 CFR § 1140.16(d).

### 3.4.2. Synthesis

Section 910 of the FD&C Act requires that, for a product to receive PMTA marketing authorization, FDA must conclude, among other things, that the marketing of the product is APPH. The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." Section 910(c)(2)(A).

The statute specifies that, in assessing whether permitting marketing of a new product would be APPH, FDA consider the risks and benefits to the population as a whole, including both tobacco users and nonusers, taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products and the increased or decreased likelihood that those who do not use tobacco products will start using such products. My review of whether the marketing of the new products is APPH takes into

account the information from the discipline reviews described above as well as other relevant information.

*Intended user populations (target population).* Per the epidemiology review, the applicant states in the cover page that the new product is marketed to adult tobacco users (aged 21+). Per the BCP review, the evaluation of the applicant sponsored clinical study (BIDI-PK-01) showed that the intended users of the new product were adults who used CC and who may or may not have used ENDS. Additionally, due to the new product's high abuse liability, adults with ENDS experience are likely to use the new product. As TPL, I agree with the epidemiology and BCP reviews that current adult tobacco users, including CC users with and without experience using ENDS, are the intended population for the new product. Additionally, the likely users of the new product are experienced ENDS users.

*Current tobacco users.* As discussed in Section 3.3.2, per the BCP review, the new product's higher abuse liability compared to CC will likely increase the likelihood of adults who use CC to switch to the new product. The new product's higher abuse liability may also promote continued use and lead to higher nicotine dependence and addiction (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) in all populations, including youth. Evidence from the applicant submitted data on likelihood of use, initiation, switching, and behavioral intention of the new product is discussed below.

Per the social science review, evidence from the applicant submitted PBI Study showed that some current smokers (about 20%) and some current smokers who have prior experience with ENDS (37.5-41.3%) or who are also current ENDS users (44.1-44.9%) generally expressed low to moderate interest in trying the new product and progressing to regular use. In addition, 17.8% of current smokers indicated that they would use the new product to completely switch from CC. Because appeal and behavioral intentions are considered precursors to individuals' future use behaviors and may not be correlated with the actual use of the new product, use behaviors associated with the new product were also evaluated. Per the epidemiology review, no respondent reported current use of the new product (0.0%) in the Population Prevalence Study. Among the 61 established Bidi Stick users (including the new product and other Bidi Stick flavor variants) in the Behavioral Survey, six respondents (9.8%) reported using the new product and the new product was used most often by two respondents (3.3%). Overall, while the perception and intention study (PBI Study) showed low to moderate interest in trying and progressing to regular use, the prevalence of use studies (Population Prevalence Study and Behavioral Survey) showed that initiation and likelihood of use of the new product were low (not likely).

With respect to switching (partially or completely), per the epidemiology review, the applicant provided minimal evidence to address the likelihood that current CC users will use the new product (or Bidi Stick, in general) to switch. In the POU survey, among respondents who regularly used (defined as using the product every day or some days in the past 30 days) tobacco products in the weeks prior to initiating Bidi Stick (N=229), 14% reported no current use of any tobacco product except for Bidi Stick at the time of the survey. In the Survey on Bidi Stick Usage and Potential Impact, 5.2% of the respondents reported that they reduced their cigarette use and 6.3% of the respondents reported that they quit or replaced their cigarette use by using Bidi Stick. However, these cross-sectional studies make it challenging to establish the temporal relationship between respondents' use of the new

product and their CC use. Specifically, whether respondents used the new product before or after switching from CC, or whether adult CC users used the new product to switch or reduce their consumption of CC. Overall, the applicant did not provide adequate data or information to demonstrate that current tobacco users or CC users would be likely to use and switch to the new product that such use would enable completely switching or significant reduction in current tobacco product or CC use.

As discussed below in "*Youth*" and "*Adult tobacco non-users*," the applicant-submitted data and published literature have shown that youth and adult tobacco non-users are not likely to use the new product given that it is a tobacco flavor and its overall low appeal, use pattern, and actual use. However, use of the new product by adult tobacco non-users, including youth, may shift depending on the availability of other tobacco products on the market. In addition, per the BCP review, because of the new product's high abuse liability, tobacco nonusers, including youth, who try and do initiate use of the new product will likely continue using it, particularly because the nicotine salts in the e-liquid reduces the harshness of the high nicotine concentration (6%) in the new product making it more palatable (Caldwell et al., 2012; A. M. Leventhal et al., 2021; Talih et al., 2019). These continued use behaviors will likely increase nicotine dependence and addiction risks in tobacco nonusers, including youth. Although published literature and the applicant-submitted observational studies showed low likelihood of use of the new product, likelihood of increased nicotine dependence and addiction risks due to continued use of the new product among those tobacco nonusers, including youth, who do initiate are concerning. This has not been addressed by the applicant, and a deficiency citing the new product's high abuse liability is recommended.

In summary, based on conclusions in the social science, BCP, and epidemiology reviews, information provided in the PMTA indicated that the intended user populations of the new product are current tobacco users and CC users with and without experience using ENDS. Although evidence from the applicant-provided studies showed some evidence of current tobacco users intending to try or progress to regular use of the new product, product use data showed a low likelihood of initiation and use of the new product overall among current tobacco users. Additionally, evidence from the applicant-submitted data was inconclusive to demonstrate that current tobacco users (including CC users) would likely use the new product to partially or completely switch to the new product (and therefore, reduce CC use, toxicant exposure, and adverse health outcomes). On the other hand, because the new product has a high nicotine concentration and is associated with high abuse liability, the continued use and increased likelihood of addiction and nicotine dependence risks, particularly among youth and adult tobacco nonusers, are concerning. Thus, as TPL, I agree with the BCP review and recommend a deficiency to cite the new product's high abuse liability (see Deficiency 3 in Section 5.1).

*Youth.* The applicant provided several cross-sectional studies to evaluate behavioral intentions, product appeal, harm perceptions, and prevalence and pattern of use of the new product (i.e., PBI, LOU, Population Prevalence). Per the social science review, although both PBI and LOU studies oversampled young adult (aged 21-24 years) who did not smoke, data from these participants were combined with other tobacco product user groups. Thus, no conclusions about behavioral intentions, product appeal, and harm perceptions can be extrapolated for youth. Per the epidemiology review, the results from the Population

Prevalence study showed that prevalence of use of the new product was low overall. Ever use of the new product among adolescents (aged 13-17 years; 0.1%) and underage young adults (aged 18-20 years; 0.3%) were estimated to be between 0.1-0.3%. The pattern of use of the new product showed that among youth (aged 13-17 years) who had never smoked, no participants reported ever using the new product, while just 0.8% of people who ever smoked in this age group reported ever use of the new product. This suggests few youth will initiate use of the new product. Additionally, the applicant provided a literature review that evaluated ENDS use initiation among youth showing that older youth (aged 15-17 years) were more likely to initiate ENDS compared to younger youth (aged 12-14 years). This evidence is consistent with FDA's understanding of the available evidence in the literature, but the applicant did not bridge the literature to the new product. Other published literature also indicates that youth report significantly lower preference for tobacco-flavored ENDS compared to flavored ENDS (Miech et al., 2021; Schneller et al., 2019), and are less likely to initiate with tobacco-flavored ENDS (Audrain-McGovern et al., 2019; Leventhal et al., 2019; Villanti et al., 2019) and to subsequently progress to regular use of the new product. Further, published data generally suggests that tobacco-flavored ENDS have limited appeal for youth (Hoffman et al., 2016; Soneji et al., 2019). Overall, as TPL, I agree with the social science and epidemiology reviews that given the tobacco flavor of the new product, it is expected that youth are unlikely to use the new product and the appeal for the new product would also be limited. However, use of the new product by youth may shift depending on the availability of other tobacco products on the market. Thus, if youth do initiate using the new product, it is likely that they would continue new product use due to the new product's high abuse liability. This is particularly concerning since continued use of the new product would likely result in increased nicotine dependence and addiction risks among youth who do initiate (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993) .

*Adult tobacco non-users.* Per the social science review, evidence from the PBI Study showed that adults who have never smoked CC and adults who previously smoked CC expressed low interest (i.e., likely to try, likely to use regularly) in the new product (0.9-1.3% and 3.1-3.3%, respectively). In the LOU Study, product appeal (i.e., likelihood to try) among adults who have never used tobacco products and adults who previously used tobacco products were low (Juster scale of mean=0.31 and 0.44, respectively; Juster scale of 0 being "no chance, almost none" and 10 being "certain, practically certain"). Per the epidemiology review, the results from the Population Prevalence study showed that prevalence of the new product was also low overall. The pattern of the new product use showed that among young adult non-smokers, 0.3% reported ever using the new product while no non-smokers reported using the new product currently, formerly, or formerly experimenting. Considering the overall low appeal and use pattern per the applicant-submitted data and low rate of ENDS use among adult tobacco non-users per published literature review (Hoffman et al., 2016; Soneji et al., 2019), as TPL, I agree with the social science and epidemiology reviews, that it is expected that adult tobacco nonusers are unlikely to use the new product. However, use of the new product by adult tobacco non-users may shift depending on the availability of other products on the market. Thus, if adult tobacco non-users do initiate using the new product, it is likely that they would continue new product use due to the new product's high abuse liability. This is particularly concerning since continued use of the new product would likely result in increased nicotine dependence and addiction risks among adults tobacco

nonusers who do initiate (Centers for Disease et al., 2010; de Wit et al., 1995; Henningfield et al., 1993).

As TPL, I agree with conclusions of OHCE's evaluation of the applicant's marketing plan, which raised concerns regarding the marketing of the new product (see Section 3.4.1.5). OHCE raised concerns about age-restriction and identify-verification of the applicant owned website and social media platform. Further, the applicant's statement that they forego direct consumer marketing until FDA completes the PMTA review suggests that the applicant may alter their marketing plans after authorization (see Section 3.4.1.5).

## 3.5. TOXICANT EXPOSURE

### 3.5.1. Discipline key findings

The following discussion is based on key findings provided in discipline reviews. As described in Section 2.3, there is no second cycle toxicology review to inform this assessment. However, information reviewed by BCP on BOE is described below.

#### 3.5.1.1. Biomarkers of exposure

Per the BCP review:
- The applicant did not provide data about long-term biomarkers of nicotine exposure following extended use of the new product.
- BCP assessed the nicotine exposure of the new product using data from an applicant-submitted clinical study. These data showed that total nicotine exposure (AUC) was higher following ad libitum use of the new product than UB CC and a comparison ENDS (JUUL Virginia Tobacco 5%). The higher nicotine exposure from the new product may contribute to increases in use behavior and toxicant exposure compared to UB CC or other ENDS.

### 3.5.2. Synthesis

As TPL, I agree with the BCP review that the overall exposure risk to users of the new product is higher than UB CC and a comparison ENDS (JUUL Virginia Tobacco 5%).

Per the BCP review, based on the applicant-submitted clinical study (BIDI-PK-01), the total nicotine exposure (AUC) to the new product following ad libitum use was higher than UB CC and a comparison ENDS (JUUL Virginia Tobacco 5%). Higher nicotine exposure from the new product may contribute to increases in use behavior and toxicant exposure compared to UB CC or other ENDS.

Although the impact on long-term disease risk was not evaluated, the existing evidence supports that complete switching may reduce exposure to some carcinogens and other toxicants known to be associated with tobacco-related diseases from using CC. The long-term impacts of dual use on BOE levels and the associated health effects were not assessed and it is not possible to extrapolate findings from a short-term study with select BOE.

In the absence of a cycle 2 toxicology review, this TPL review cannot draw final conclusions with respect to the toxicant exposure posed by the new product.

A0228

therefore, it is not currently possible to determine ENDS-related health effects in these studies.

- Researchers have generally found that those who use ENDS exclusively or predominantly have lower levels of exposure to some constituents, including nicotine, cotinine, total nicotine equivalent (TNE)2, TNE3, tobacco-specific nitrosamines (TSNAs), VOCs, and some metals than those who smoke cigarettes or use other combustible tobacco products but have higher biomarker levels than never tobacco users (De Jesus et al., 2020; Feng et al., 2022; Goniewicz et al., 2018; Hecht et al., 2015; Rubinstein et al., 2018; Shahab et al., 2017; Xia et al., 2021).
- Among those who dual use ENDS and cigarettes, the scientific evidence on health effects is very limited. Generally, studies that examined cardiovascular outcomes have found that dual use of ENDS and cigarettes may carry similar or greater cardiovascular risks than exclusive cigarette smoking (Osei et al., 2019; Pisinger et al., 2022).
- People who dual use ENDS and CC have generally not been found to have reduced levels of constituents such as TSNAs and VOCs compared to smokers. Individuals who use ENDS exclusively often have lower levels of nicotine, TSNAs, and VOCs compared to those who engage in dual use (Czoli et al., 2019; Rostron et al., 2020; Smith et al., 2021).

Per the medical review:

- Short-term health effects (approximate one month) reported in the clinical study (BIDI-PK-01) for the new product included minor, transient increases in blood pressure (BP) and heart rate (HR). These increases are consistent with those reported for other ENDS in the literature. Although peer-reviewed studies agree that ENDS use causes less short-term damage to a young, healthy cardiovascular system than cigarette smoking (George et al., 2019; Osei et al., 2019), the available data limit evaluation of the long-term effects of ENDS use on otherwise healthy users, and short- and long-term effects on a larger population.
- The clinical study evaluates short-term, but not long-term, health effects of the new product. The evaluation is limited as it was conducted on a small sample size (N=18) and the duration of product use was short (approximately one month); thus, the health effects identified in the new product, including minor transient increases in HR and BP are not generalizable to a larger user population. Despite these limitations, the applicant supplied sufficient health safety data (AE, HR and BP) to assess short-term health effects that may be associated with product use.
- The applicant supplied two ENDS health effects surveys asking: "Is your health better, worse, or the same since using ENDS?" The first survey, Bidi Vapor Consumer Insights Survey, included responses from users of unspecified ENDS. The second survey, Survey on Bidi Stick Usage and Potential Impact, included responses from users of all Bidi Stick flavored products including the new product. Both surveys collected responses in aggregate and neither survey isolated responses from users of the new product. Although conclusions from these surveys about the subjective health effects of the new product are limited, adverse experience (AE) data from the clinical study is adequate to assess the short-term health impact of the new product from this discipline's perspective.

- The applicant states that the new product is designed to be tamper-proof, thereby mitigating the likelihood of misuse from the addition of other ingredients. The label states that the product is disposable and is not to be recharged. While the label does not specifically caution users against adding ingredients or making other modifications to the new product, the closed system design of the new product would help mitigate potential adverse effects resulting from intentional misuse.
- The label addresses areas of misuse such as ingestion; exposure to fire, heat, water; physical damage of the new product; access by children; underage sale; and pregnancy and breastfeeding. However, the label does not address the likelihood and effects of ocular exposure, which can occur with the unintentional exposure of children. Child-resistant packaging can mitigate unintentional exposures such as these and the applicant submitted CRP testing procedures and test reports consistent with 16 CFR § 1700 that are acceptable from this discipline's perspective.
- The new product uses a closed system designed to discourage adulteration, thereby reducing the risk of negative health sequelae caused by adulteration, and is thus, acceptable from this discipline's perspective.
- The product labeling, as reviewed in the initial new product submission, lacked warnings for persons with underlying comorbidities such as high BP or CVD. This was not considered a deficiency, as the increases in BP and HR from new product use were transient and consistent with findings from other nicotine delivery products. In the amendment received on June 18, 2023, the applicant provided a leaflet for insertion into new product packaging that includes warnings for those with "underlying medical conditions such as asthma or other lung conditions, depression, heart disease, high blood pressure, diabetes, or stomach ulcers." Thus, the product labeling provides adequate warnings from this discipline's perspective.

Per the BCP review:
- The new product is a closed-system, disposable ENDS. The new product settings are non-adjustable, and the e-liquid is enclosed in a pod, thereby reducing chances that users may manipulate ENDS settings and e-liquid constituents, including nicotine levels, which may influence exposure to nicotine and other HPHCs in the aerosol. These characteristics limit the likelihood of product misuse; the new product's misuse potential is low.

### 3.6.1.5. Adverse experiences

Per the engineering review:
- No adverse experiences related to the design of the new product were identified by FDA Safety Reporting Portal or reported by the applicant.

Per the medical review:
- The applicant-sponsored clinical study, BIDI-PK-01, reported no AEs or serious adverse experiences (SAEs) associated with the new product.
- No AEs were identified from the Safety Reporting Portal search and the AEs reported in the two applicant-submitted consumer surveys were not specific to the new product.
- During the RRA, the applicant stated that there have been no AEs reported to date.



Niraj Patel, CEO
(321) 223-3101
raj@bidivapor.com

March 23, 2021

<u>Via CTP Portal</u>

**PMTA Second Amendment**

CONTAINS CONFIDENTIAL
BUSINESS INFORMATION

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products
Office of Science
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**RE**: **Bidi Vapor, LLC; Second Amendment to Premarket Tobacco Product Applications**
**for BIDI® Stick ENDS; FDA Submission Tracking Number (STN): PM0003460**

To Whom It May Concern:

On September 8, 2020, Bidi Vapor LLC (Bidi) timely submitted eleven (11) Premarket Tobacco Product Applications (PMTAs) for BIDI® Stick electronic nicotine delivery systems (ENDS) products to FDA. Please find below a list of BIDI® Stick products that are the subject of these applications, which have been accepted and filed by the Agency:

1. **Tropic** (Formerly Blazing Vibe)
2. **Marigold** (Formerly Icy Mango)
3. **Solar** (Formerly Berry Blast)
4. **Winter** (Formerly Lush Ice)
5. **Dawn** (Formerly Champion Juice)
6. **Classic** (Formerly Classic Tobacco)
7. **Gold** (Formerly Fruity Mango)
8. **Zest** (Formerly Jungle Juice)
9. **Regal** (Formerly Dragon Venom)
10. **Summer** (Formerly Kick Start)
11. **Arctic** (Formerly Mint Freeze)

In these original PMTA submissions, Bidi made FDA aware that our business continues to face numerous challenges in preparing PMTAs due to the COVID-19 pandemic. While the information contained in the original submissions meet the statutory requirements for application acceptance, filing and appropriate for the protection of the public health ("APPH") determination as set forth in Section 910 of Federal Food, Drug, and Cosmetic Act (FDCA), as well as FDA's guidance and proposed rules, we are continuing to make substantial progress on further studies and updates to our quality

A0231



management system to support our PMTAs and assist FDA in establishing that these products are APPH.

On October 13, 2020, we submitted an amendment to the PMTAs that provides an additional study ("Consumer Insight Survey") that was designed to assess, among other things, the impact of flavors, access, and nature of usage for flavored ENDS products such as the BIDI® Sticks. The purpose of the first PMTA Amendment was to update the above-referenced BIDI® Stick PMTAs with the Consumer Insight Survey results and data analysis to support the original PMTA submissions. Now, we have received additional study results that we wish to incorporate into our PMTAs with this Second Amendment. Bidi also seeks to notify FDA of additional work in progress with respect to these applications, as well as its efforts to combat underage use and ensure availability of quality, consistent products to adult consumers.

Specifically, Bidi seeks to inform FDA of the following important updates: (1) Bidi's decision to discontinue online direct-to-consumer sales through its website to further combat access to minors; (2) new consumer insight study results specific to disposable ENDS; (3) forthcoming FDA meeting request to discuss product-specific Tobacco Product Perception and Intention Studies (TPPI) studies and abuse liability assessment; (4) achievement of UL 8139 battery certification; (5) update on status of pending BIDI® Stick flavor quantitative analysis; (6) status of stability testing; (7) summary of recent quality management system improvement efforts; and (8) status of environmental local permits. We discuss these further below. The specific PMTA modules and sections that are being amended with this Amendment are specified below.

## I.     Termination of Direct-to-Consumer Online Sales Through Bidi Website (Update PMTA Section 2.4.2)

To further curb underage access to vaping devices, and consistent with Bidi's desire to go above and beyond regulatory requirements to ensure its products are APPH, Bidi has discontinued its online direct-to-consumer ("DTC") sales of the BIDI® Stick product through its website as of February 22, 2021. While Bidi Vapor believes its online age verification program for DTC sales was one of the most stringent programs in the industry, Bidi hopes that its decision to halt online DTC sales through www.bidivapor.com will set an example for the industry and help address the larger concerns regarding underage access to vaping devices.  The decision also reinforces Bidi's commitment to brick-and-mortar retail, which Bidi believes to be a stronger age-verification distribution model than online sales. This is particularly true when considering that, throughout the ongoing COVID-19 pandemic, minors are switching to online sources for products, which are less likely to enforce strict, age-verification processes.  Bidi goes above and beyond and requires its brick-and-mortar partners to sign a Retailer Pledge and has produced training videos for all authorized retailers of Bidi Vapor products. Bidi also has a mystery shopper program to better ensure retailer compliance with its age-verification policies.

To further ensure supply chain security and prevent counterfeit, subpar, and potentially dangerous products from getting in the hands of consumers, Bidi has partnered with goPuff as the exclusive, online DTC marketer for all of Bidi Vapor's products.  With a long history of distribution of 21+ alcoholic beverages, goPuff has pioneered a very stringent and dynamic compliance program (including Prevent All Cigarette Trafficking (PACT) Act compliance) and age-gating process, which

A0232



Bidi Vapor endorses. In fact, with its commitment to protecting minors and stringent procedural implementations, goPuff is one of the fastest growing and most secure online delivery services in the country with face-to-face ID verification on delivery.

Bidi has updated its Marketing Plan to reflect this recent change to discontinue online DTC sales through www.bidivapor.com and to update FDA on various corporate initiatives related to the BidiCares (recycling) Program and authentication efforts, among other things. See attached updated Marketing Plan for the BIDI® Stick (Attachment 1). Bidi would like to amend Section 2.4.2 of its PMTAs with these additional marketing information and restrictions.

## II.      New Technomic Disposable Vape User Insights Study (Update PMTA Section 1.2.9)

In December 2020, Bidi received results from a Disposable Vape User Insights study conducted by Technomic, Inc. ("Technomic"). The research provides valuable consumer insights around disposable ENDS relative to other products, as well as user perspectives on the BIDI® Stick brand. The study incorporated recommendations from the FDA's draft TPPI guidance[1], including the inclusion of cognitive interview questions in the soft launch and development of measures to avoid bias.

Bidi commissioned this consumer research to better understand consumer decision drivers, attitudes, usage and perspectives relative to the available product types, as well as to better understand the disposable user, including the BIDI® Stick user. Specifically, the study sought to gain understanding about, among other things, ENDS product type selection decision drivers (including user knowledge of various product types, prioritized attributes, and user demographic profiles by product type), brand awareness, perceptions, usage of BIDI® Stick products relative to other *disposable* ENDS, Bidi user demographics, and perspectives on underage use, counterfeit products, flavored product restrictions, as well as other market dynamics.

Technomic conducted secondary research and developed a quantitative survey for this assessment. As part of the secondary research, Technomic gathered and analyzed all relevant published materials, including trade publications, available market research, and Technomic nonproprietary studies. For the quantitative survey, Technomic developed a custom, online structured survey fielded to a sample of 1,000 consumers ages 21+ who use electronic/vape products and an oversample of 500 users in Alabama, Georgia, and Tennessee. Consistent with FDA's draft TPPI guidance, an initial 100-respondent soft launch of the survey was performed to collect cognitive interview data. The survey covered three user groups, consisting of converts, dual users, and new singular users. Key findings from the survey include:

- BIDI® Stick is used in conjunction with combusted cigarettes by the largest share of users (46%), indicating the brand may be utilized as a smoking cessation tool.

- Disposable ENDS are the least likely to be used as a consumer's primary ENDS device.

---

[1] U.S. Food & Drug Admin., Draft Guidance for Industry: Tobacco Products: Principles for Designing and Conducting Tobacco Product Perception and Intention Studies (October 2020) (available at https://www.fda.gov/media/143322/download) (hereafter, "draft TPPI guidance").

A0233



- Almost a quarter (23%) of dual users using a nicotine concentration of 6% report that it helps them use fewer conventional cigarettes.

- Bidi awareness and usage is the lowest among all brands listed.

- Bidi outperforms others for non-counterfeit authentication methods, adult-only positioning, customer service, and device recyclability

Please see attached Disposable Vape User Insights Study final report for details around these and other significant findings from the assessment, along with the data files (**Attachment 2**). Bidi would like to amend Section 1.2.9 of its PMTAs with these additional data.

### III. <u>Forthcoming Product-Specific TPPI Studies and Abuse Liability Assessment and FDA Meeting Request (Update PMTA Sections 4.3 and 4.4)</u>

Bidi seeks to notify FDA of forthcoming, product-specific study data. As stated in our PMTAs, due to the pandemic and associated challenges, Bidi was unable to secure laboratory and research organizations to complete certain TPPI and abuse liability studies in advance of FDA's September 9, 2020 PMTA deadline.

Bidi has engaged research firms to complete TPPI studies (that would measure, among other things, likelihood of use, behavioral intentions, human factors, and patterns of use), along with a separate abuse liability assessment. Together, we believe these studies will address critical PMTA elements to support the submission and APPH marketing standard. Consistent with the draft FDA TPPI guidance, the TPPI studies will involve development of a detailed protocol that will discuss research methods, strengths and limitations, data quality procedures, power and sample size, study sample size justification, and representativeness. TPPI study objectives will address, among other things, dual use, consumer perceptions and intentions, likelihood of use, behavioral intentions, labeling comprehension, product use patterns, and actual use. Based on our discussions with the research firms to date, these studies are expected to be completed by Q3/Q4 2021. Bidi will provide these data to FDA as they become available.

A separate abuse liability assessment will be conducted in light of the fact that BIDI® Sticks are marketed exclusively with a higher nicotine content (6%) intended to appeal to and satisfy current combusted cigarette smokers, and to get seasoned smokers to transition over to exclusive use of the BIDI® Stick. The abuse liability study will be designed to measure the addictiveness, abuse, and misuse potential of the new product and the exposure to nicotine during product use. Bidi has made considerable progress in securing laboratory availability and expects to have study completed around the October - November 2021 timeframe. These data will be provided to FDA once they become available. Bidi would like to amend Sections 4.3 and 4.4 of its PMTAs with these additional studies.

The fact that the BIDI® Stick is a completely self-contained disposable further supports this conclusion that marketing of the BIDI® Stick is APPH because these non-cartridge-based ENDS products are designed to appeal to seasoned adult smokers. The BIDI® Stick is engineered for a precisely calculated dose and consistent delivery with a sensitivity control system, packaged in a child-

A0234



resistant container with a simple yet sophisticated design, and manufactured with medical-grade recyclable components and a reusable, certified battery that recently obtained UL-8139 certification. The BIDI® Stick is intended to provide adults with a premium vaping experience and a satisfying recreational alternative to combusted cigarettes, but is not intended for any therapeutic use (including smoking cessation). Each of the BIDI® Stick disposable ENDS devices contains 1.4 ml e-liquid containing tobacco-derived nicotine with 6% w/v concentration (60 mg/ml). The BIDI® Stick is not offered in a lower or introductory nicotine level because the product is targeted to seasoned adult smokers, and not intended for smokers who recently began smoking or to non-users (especially minors). By offering this concentration exclusively, and no lower, introductory nicotine levels below 6%, Bidi intends to deliver a satisfaction similar to combusted cigarettes, and eventually curb seasoned adult smokers' cravings and dual-use of combusted cigarettes. We believe our product specific TPPI and abuse liability studies will provide sufficient data to support the PMTAs and that marketing of the BIDI® Stick is APPH.

Bidi will be submitting an FDA meeting request to further discuss these studies and their impact on the applications and FDA's compliance policy. Our expectation is that Bidi's continued efforts to improve its timely-submitted PMTAs during the pandemic demonstrate substantial progress on its applications as detailed in this amendment (and as will be described further in our forthcoming meeting request and future amendments), and will be given due consideration by FDA as part of the Bidi PMTAs' scientific review process. Bidi's objective is to give FDA sufficient notice and time to plan for the receipt of what we believe to be a major amendment critical to the BIDI® Stick's APPH determination. **Bidi hopes that FDA will consider all of these efforts when determining whether to allow the continued marketing of its products following the September 9, 2021 FDA review deadline.**

## IV. UL 8139 Battery Certification to Support PMTA "Human Factors" Analysis and Product Description/Manufacturing (Update PMTA Sections 2.6.3.2.11 and 3.1.5.1)

FDA and the U.S. Consumer Product Safety Commission (CPSC) have long held concerns with respect to battery safety in ENDS. For instance, the CPSC recently warned consumers about purchasing or using individual, loose 18650 lithium-ion battery cells without protection circuits due to possible fire risk. The concerns include, for example, exposed metal positive and negative terminals that can short-circuit when coming in contact with metal objects (*e.g.*, keys or loose change in a pocket). Once shorted, loose cells can overheat and experience thermal runaway, igniting the cell's internal materials and forcibly expelling burning contents, resulting in fires, explosions, serious injuries and even death.

Bidi is pleased to inform FDA that, effective October 2020, Bidi achieved the UL 8139 Standard for Safety for Electrical Systems of Electronic Cigarettes and Vaping Devices certification, which is intended to mitigate potential battery-related risks associated with battery-operated ENDS products. Bidi believes this certification stands as a testament to Bidi's commitment to delivering quality, consistent products to consumers. The BIDI® Stick's 280 mAH lithium ion battery has met rigorous safety standards and demonstrated compliance with various analyses (*e.g.*, water ingress, drop test, crush test, accidental activation test, *etc.*) required for the voluntary UL certification. *See* UL Notice of Completion and Authorization to Apply the UL Mark, File E514030 (**Attachment 3**). Accordingly, Bidi would like to amend Module 3, Section 3.1.5.1 of its PMTAs to reflect this new UL 8139 certification. We believe Bidi's UL certification addresses FDA's and CPSC's concerns with battery safety to ensure the

A0235



aforementioned safety concerns are not an issue, further supporting that marketing of the BIDI® Stick to adult consumers is APPH.[2]

To accommodate increased demand, Bidi has had to incorporate additional battery suppliers that can comply with the UL 8139 certification requirements. To meet this need, Bidi added the following, additional battery suppliers: DongGuan Golden CEL Battery Co., Ltd, HuiZhou Kaiyesheng Energy Co., Ltd., and Guangdong Miyear Technology Co., Ltd.

Bidi also believes the UL 8139 certification and associated lithium battery quality acceptance testing, including fire and explosion risk mitigation efforts, support Bidi's human factor analysis in the PMTAs. Generally, human factors involves a multidisciplinary approach. Human factors is a process to design products that people can use correctly. The battery testing resulting in issuance of the certificate is key to Bidi's human factors evaluation to identify risks associated with "real world" use of the BIDI® Stick and demonstrate that potential risks associated with use for both users and nonusers have been mitigated. Risk management is an important tool for determining and controlling unintended hazards, and risk management is a continuous process that includes postmarket monitoring for unanticipated user injuries or harm.

The UL battery certification mitigates human errors and risks based on a user-friendly interface. Accordingly, Bidi would like to amend the Human Factors Analysis section of its PMTAs (Section 2.6.3.2.11) to include this information.

## V. Updated Product Packaging to reflect UL 8139 Battery Certification (Update PMTA Section 1.9)

Bidi has updated its BIDI® Stick product packaging to reflect the new UL certification by using the authorized UL logo. *See* Updated BIDI® Stick Labeling (**Attachment 4**). Accordingly, Bidi would like to update section 1.9 of its PMTAs to reflect the updated product packaging.

## VI. Quality Management System Update (Update PMTA Sections 2.3 and 3.5)

Bidi strives to have its products meet the highest possible standards (*see*, *e.g.*, ROHS, FCC, and CE certifications). As provided in its PMTAs, Bidi's contract manufacturer Smiss Technology Co., Ltd. has been certified with quality management system ISO9001:2015, quality management system for medical instruments ISO13485:2016, enterprise intellectual property management system GB/T29490, and GMP system. To further its commitment to producing high-quality ENDS products, Bidi has performed a global assessment of its contract manufacturer's standard operating procedures (SOPs) and is in the process of updating its quality management system (QMS). Bidi will be undertaking various activities in the near future in furtherance of this goal, including conducting a comprehensive virtual

---

[2]  FDA's compliance policy provides that FDA does not intend to enforce violations of the premarket review requirements against battery-operated tobacco products that were on the market as of August 8, 2016 and that are then modified only to the extent necessary to comply with UL 8139.[2]  Bidi has made such modifications in compliance with this policy. *See* U.S. Food & Drug Admin., Guidance for Industry: Compliance Policy for Limited Modifications to Certain Marketed Tobacco Products (November 2019) (available at https://www.fda.gov/media/133009/download).

A0236



audit, revising SOPs, and implementing robust processes. Bidi has engaged the regulatory consulting firm EAS Consulting Group, LLC to assist with these quality control efforts. Bidi would like to amend section 3.5 of its PMTAs to revise the description of its quality controls and will provide detailed information once available.

## VII.    Status of BIDI® Stick Flavor Quantitative Analysis (Update PMTA Section 3.2.2.6)

In Module 3, Section 3.2.2.6 of its PMTAs, Bidi stated that it would perform additional quantitative flavor analysis on its various product formulations. Bidi informed FDA that method development and validation for flavor analysis was ongoing and likely to submitted to FDA by November 2020.  Due to delays associated with the pandemic, the analysis is now expected to be completed by April 2021. Once these data are available, we will forward to FDA for the purposes of amending this section of our application.

## VIII.   Status of Stability Testing (Update PMTA Section 3.3.3.2)

As provided in Section 3.3.3.2 of its PMTAs, Bidi conducted real time stability testing for pH, boiling point, specific gravity, viscosity, water activity at condition of 25±2 ºC and 60%±5% RH for total duration of 24 months. The study consisted of four time points: 0 time, 6 months, 12 months and 24 months for both the e-liquid and the finished BIDI® Stick product.  The 6-month ambient stability testing results were scheduled for February 9, 2021. The report is pending, and results will be provided to FDA as soon as they are available via another PMTA amendment.

## IX.    Updated Environment Assessment Information (Update PMTA Section 7.1)

Bidi provided an EA for every product variation in its PMTAs.  In those EAs, Bidi stated that Smiss Technology Co. Ltd. was in the process of obtaining local permits, and was working with the local government to get such permits in place. The final EA license is expected to be issued at the end of March. See attached China Environmental Assessment Process timeline (**Attachment 5**).

*       *       *       *



This PMTA Amendment submission contains trade secret and confidential commercial information that Bidi considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of these submissions is disclosable, Bidi requests that FDA provide notice and an opportunity for Bidi to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

Bidi appreciates the FDA's careful consideration of this Second Amendment to its BIDI® Stick PMTAs and looks forward to working with the Agency to secure an order under FDCA § 910. We trust that the information enclosed herein provides sufficient information for the Agency to conclude that the marketing of the BIDI® Stick is appropriate for the protection of the public health.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor, LLC

**Enclosures (Attachments 1-5):**

Attachment 1 – Marketing Plan for the BIDI® Stick

Attachment 2 – Technomic Disposable Vape User Insights Study Final Report and Data Files

Attachment 3 – UL Notice of Completion and Authorization to Apply the UL Mark, File E514030

Attachment 4 – Updated BIDI® Stick Labeling

Attachment 5 – China Environmental Assessment Process timeline

A0238



September 8, 2021

**Niraj Patel, CEO**
**(321) 223-3101**
**raj@bidivapor**

<u>**Via CTP Portal**</u>

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products
Office of Science
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

<u>**PMTA Fourth Amendment: PM0003460**</u>

CONTAINS CONFIDENTIAL
BUSINESS INFORMATION

**RE**: **Bidi Vapor LLC; Fourth Amendment to Premarket Tobacco Product Applications for BIDI® Stick ENDS; FDA Submission Tracking Number (STN): PM0003460**

**I.      Background**

On September 8, 2020, Bidi Vapor LLC ("Bidi Vapor" or the "Company") timely submitted to the U.S. Food and Drug Administration ("FDA" or the "Agency") eleven (11) Premarket Tobacco Product Applications ("PMTAs") for the following BIDI® Stick electronic nicotine delivery system ("ENDS") products, identified by Submission Tracking Number ("STN") PM0003460:

1. **Tropic** (Formerly Blazing Vibe)
2. **Marigold** (Formerly Icy Mango)
3. **Solar** (Formerly Berry Blast)
4. **Winter** (Formerly Lush Ice)
5. **Dawn** (Formerly Champion Juice)
6. **Classic** (Formerly Classic Tobacco)
7. **Gold** (Formerly Fruity Mango)
8. **Zest** (Formerly Jungle Juice)
9. **Regal** (Formerly Dragon Venom)
10. **Summer** (Formerly Kick Start)
11. **Arctic** (Formerly Mint Freeze)

The PMTAs for these products have been accepted and filed by the Agency.  On August 24, 2021, Bidi Vapor received an e-mail notification from FDA stating that the PMTAs for our non-tobacco flavored ENDS have now entered scientific review.[1]  This email notification did not specify the products to which the notification of scientific review applies, but referred to our PMTA acceptance letter.  For the purposes of this Amendment, Bidi Vapor hereinafter refers to all of its non-tobacco flavored BIDI® Stick ENDS (i.e., other than the Classic BIDI® Stick) as

---

[1] See e-mail dated August 24, 2021 from Dr. Samuel Motto (Samuel.motto@fda.hhs.gov) to Niraj Patel (raj@bidivapor.com).



the "Non-Tobacco BIDI® Sticks," but notes that four of these products (e.g., the Arctic, Winter, and Marigold and Dawn BIDI® Sticks) contain menthol as a characterizing flavor. The remaining Non-Tobacco BIDI® Sticks (e.g., Tropic, Solar, Gold, Zest, Regal and Summer BIDI® Sticks) contain other non-menthol characterizing flavors.

In our original PMTA submissions, Bidi Vapor made FDA aware that our business continues to face numerous challenges in preparing PMTAs due to the COVID-19 pandemic. While we put forth our best efforts and diligence in the original submissions, as FDA has recommended on numerous occasions, we have been working hard to make substantial progress on additional studies and updates to youth access restriction measures, as well as our quality management system to support our PMTAs and inform FDA in making its appropriate for the protection of the public health ("APPH") determination. We have provided these data and updated information generated from our on-going work and studies in three PMTA amendments submitted on October 13, 2020, March 23, 2021 and April 20, 2021.

This submission contains our **fourth** PMTA amendment, the purpose of which is to inform FDA of Bidi Vapor's additional, recently commenced Actual Use ("AU") and tobacco product perception and intention ("TPPI") studies which are intended to assess, among other things, whether our Non-Tobacco BIDI® Sticks provide an "added benefit" for adult combusted cigarette smokers compared to the tobacco-flavored Classic BIDI® Stick, and that such benefit outweighs any potential risk that the Non-Tobacco BIDI® Sticks may pose to youth.[2]  We also use this opportunity to provide FDA with an update on the status of our additional, ongoing studies that Bidi Vapor provided to FDA in previous amendments, as well as our updated literature review.

## II.  Role of Non-Tobacco BIDI® Sticks for Adult Combusted Cigarette Smokers

In addition to the comprehensive literature review (Module 2 Section 2.9), the original PMTA submissions contain product-specific evidence regarding the role of Non-Tobacco BIDI® Sticks for adult combusted cigarette smokers.  This includes, but is not limited to, surveys of Bidi Vapor's customer base and surveys commissioned by Technomic, Inc.

---

[2] See FDA Press Release, FDA Denies Marketing Applications for About 55,000 Flavored E-Cigarette Products for Failing to Provide Evidence They Appropriately Protect Public Health, available at: https://www.fda.gov/news-events/press-announcements/fda-denies-marketing-applications-about-55000-flavored-e-cigarette-products-failing-provide-evidence (quoting CTP Director Mitch Zeller, "[c]ompanies who want to continue to market their flavored ENDS products must have robust and reliable evidence showing that their products' potential benefit for adult smokers outweighs the significant known risk to youth.").



Leading up to the expedited, court-ordered September 9, 2020, PMTA submission deadline[3], and in light of the on-going challenges brought about by the COVID-19 public health emergency and absence of FDA guidance on tobacco product perception and behavioral studies, Bidi Vapor was still able to conduct the surveys of our adult customers provided in Module 5 Section 5.3 of the PMTAs. As encouraged by FDA on numerous occasions, Bidi Vapor has continued to make substantial progress on its submission, and continue product-specific testing, such as our stability, leachability, flavor analyses and additional consumer insight surveys since our original PMTA submissions.

At the end of October 2020, almost two months after the original September 9, 2020 deadline, FDA issued draft guidance to industry that provided direction on designing and conducting TPPI studies.[4] Bidi Vapor swiftly took action following release of this guidance (which is still in draft form) and immediately began working with the limited available research organizations and firms proficient in this area, to design and conduct behavioral studies that would measure the perception and appeal of BIDI® Sticks, including the Non-Tobacco BIDI® Sticks, on current and never users. These behavioral studies are intended to, among other things, further assess the role of Non-Tobacco BIDI® Stick ENDS products in combusted cigarette switching and cessation for adult smokers. These ongoing studies include four studies evaluating BIDI® Stick consumer perceptions and intentions (*e.g.*, likelihood of use, patterns of use/actual use). Around that time, Bidi Vapor also, on its own initiative (i.e., without waiting for any FDA deficiency or other Agency communication), commissioned a separate clinical pharmacokinetic ("PK") study that is designed to measure the abuse liability and dependence potential of the BIDI® Sticks, as well as the levels of exposure to nicotine during product use (compared to combusted cigarettes and JUUL). Because of our swift, voluntary action, Bidi Vapor is pleased to report to FDA that we have recently completed this PK study and have preliminary findings available for FDA's review. Together, we hope that all of these studies (i.e., both the recently completed and currently on-going studies) will provide robust and reliable product-specific scientific evidence on the BIDI® Sticks to inform FDA's APPH determination. These studies are also intended to specifically address whether the public health impact of the Non-Tobacco BIDI® Sticks for adult combusted

---

[3] *See American Academy of Pediatrics v. Food and Drug Administration*, No. 8:18-cv-883 (PWG), (D. Md. Apr. 22, 2020), ECF #182.

[4] Bidi Vapor initiated TPPI studies following the publication of FDA's October 2020 draft guidance. *See* U.S. Food & Drug Admin., Draft Guidance for Industry: Tobacco Products: Principles for Designing and Conducting Tobacco Product Perception and Intention Studies (October 2020) (available at https://www.fda.gov/media/143322/download) (hereafter, "draft TPPI guidance").


cigarette smokers outweighs any risks to youth posed by the flavored products, in light of the Company's extensive youth-access prevention measures.[5]

In addition to these product-specific studies, Bidi Vapor commissioned Cardno ChemRisk to update its literature review (**Attachment 2**) to address, among other things, the impact of non-tobacco flavored ENDS on the public health, focusing on abuse liability, initiation, transition, and cessation. The summary of the review is enclosed herein (**Attachment 2**), but we highlight the following findings with respect to flavored ENDS products and smoking cessation:

- Study results suggest that the use of flavored e-cigarettes can facilitate smoking cessation (Glasser et al. (2021));
- Study results indicate that adults who began using non-tobacco flavored ENDS were more likely to quit smoking than those who used tobacco flavored ENDS (Friedman and Xiu (2020));
- Analyses demonstrate that flavor preferences varied depending on the product, and that both tobacco and non-tobacco flavors are important to adult e-cigarette users (Schneller et al. (2020));
- Compared to tobacco flavor users, participants who used sweet flavors at baseline were significantly more likely to quit smoking and that, regarding flavor transitions between baseline and follow-up, there was more movement away from tobacco to any other flavors than to tobacco from other flavors. Overall, study results demonstrate that use of sweet flavored e-cigarettes at baseline were positively associated with smoking cessation at follow-up (Li et al. (2021));
- A recent study shows that a variety of nontobacco flavors, especially fruit, are popular among adult vapers, particularly among those who have quit smoking and are now exclusively vaping. (Gravely et al. (2020)).
- E-cigarettes most likely to promote cessation will be those that deliver nicotine in a manner that is reliable and consistent with the nicotine delivery profile of a combusted cigarette. (Blank et al. (2020))

---

[5] See **Attachment 1**, Bidi Vapor's June 25, 2021 letter to the CTP Office of Compliance and Enforcement (OCE) requesting enforcement discretion to continue marketing the BIDI® Sticks for the duration of the Agency's PMTA review. The letter describes the Company's ongoing efforts to market its products strictly to adult tobacco users 21 and over and to ensure youth-access prevention.



Furthermore, based on preliminary PK data and the importance of nicotine delivery enabling ENDS to act as a substitute for combusted cigarettes,[6] we believe that the BIDI® Sticks are going to exceed comparable ENDS products (e.g., JUUL, Myblu, and Vuse Solo) and an FDA authorized tobacco product (e.g., IQOS) in converting smokers to noncombustible tobacco products. Our preliminary PK data indicate that the BIDI® Sticks deliver nicotine like a combusted cigarette and produces positive subjective effects. These data suggest, similar to published literature, that the tobacco-flavored Classic BIDI® Stick and the Non-Tobacco BIDI® Sticks are likely to be used by existing smokers as a satisfying alternative to smoking combusted cigarettes.

We provide an update to the ongoing studies and literature review below.

## III.   Update on PK/Abuse Liability Study (Amend PMTA Module 5 Section 5.2)

McKinney Regulatory Science Advisors, LLC working with whatIF Consulting LTD (Dr. Ian Fearon), executed an assessment of abuse liability (incorporating nicotine PK and subjective effects measures) and puffing topography in users of BIDI® Stick in comparison to a similar e-vapor product (JUUL) and combusted cigarettes.

This study was conducted in full compliance with International Council for Harmonization Good Clinical Practice (ICH-GCP). In a randomized, crossover manner, study subjects either smoked a combusted cigarette of their usual brand, used a BIDI® Stick, or used JUUL, by taking 10 puffs 30-seconds apart (defined use). Before, during and after this use session, venous blood samples were collected for plasma nicotine analysis and various questionnaires were administered (urge to smoke, product liking, intent to use again, and a Product Evaluation Scale) to gain subjective effects information. Both PK and subjective effects data will facilitate a robust examination of the abuse liability of BIDI® Stick relative to combusted cigarettes and a comparator e-vapor product (JUUL).

Two hours after the start of the product use session, a further 1-hour ad libitum product use session was initiated. During this session, puffing topography data were collected and a single blood sample was taken at the end of the session for plasma nicotine analysis.

---

[6] "However, for many individual addicted cigarette smokers, the potential for ENDS to act as a substitute for cigarettes, thereby encouraging smokers to seek to switch completely away from combustible cigarettes, may be dependent, in part, upon the product having acceptability and abuse liability more comparable to a cigarette." (*See* January 2020 FDA Enforcement Priorities Guidance)


Our preliminary analysis of the plasma nicotine data shows that use of the BIDI® Stick under defined use conditions delivered nicotine in a manner comparable to combusted cigarettes. Thus, mean $C_{max}$ values for all BIDI® Stick products were not significantly different to that from a combusted cigarette. Furthermore, preliminary analysis of the subjective effects data showed that satisfaction and liking when using all BIDI® Stick products were similar to satisfaction and liking seen when subjects smoked their usual brand of combusted cigarettes. Significantly, the preliminary data suggest that use of BIDI® Stick was just as effective as combusted cigarettes in reducing smoking urges.

Our conclusion based on these preliminary analyses is that the BIDI® Stick delivers nicotine in a manner comparable to combusted cigarettes while producing positive subjective effects and reducing urges to smoke. These data suggest that BIDI® Stick is likely to be used by existing adult smokers as a satisfying alternative to smoking combusted cigarettes.

## IV. Update on Kantar Health TPPI Studies on BIDI® Stick: Likelihood of Use and Patterns of Use (Amend PMTA Module 5 Section 5.3 and Module 6 Section 6.2.1)

Bidi Vapor engaged Kantar Health, LLC ("Kantar") to conduct two quantitative tobacco product perception and intention ("TPPI") studies for its BIDI® Stick product: Likelihood of Use ("LOU") and Patterns of Use ("POU") studies. Both studies were designed as self-report surveys and have received approval from the Sterling Institutional Review Board ("IRB"). Consistent with the draft FDA TPPI guidance,[7] these TPPI studies involve development of detailed protocols (**Attachments 3 and 5**) that discuss research methods, strengths and limitations, data quality procedures, power and sample size, study sample size justification, and representativeness. The TPPI study objectives address, among other things, perceptions and intentions, likelihood of use, label comprehension and product use patterns, including dual use.

### a. BIDI® Stick Likelihood of Use Study

The BIDI® Stick LOU study was administered between May 17 and August 13, 2021 to BIDI® Stick nonusers using a web-based survey (**Attachment 4**) to participants age 21 years and older to assess tobacco use behavior, perceptions, and intentions (Table 1). All study participants were exposed to the BIDI® Stick product description and package label, and provided a picture of

---

[7] U.S. Food & Drug Admin., Draft Guidance for Industry, Tobacco Products: Principles for Designing and Conducting Tobacco Product Perception and Intention Studies (October 2020) (available at https://www.fda.gov/media/143322/download).



the product and a schematic of the label for the top, bottom, and side of the package for one variety of the BIDI® Stick. The package label included the description of contents, strength, flavor, and the nicotine warning statement. Additionally, participants were shown the front of the packaging (as the other parts of the packaging do not vary) for each of the other 10 flavors of BIDI® Stick.

**Table 1 BIDI® Stick LOU Study Cohort Summary**

| Cohort |
| --- |
| 1) Never tobacco/nicotine users |
| 2) Former tobacco/nicotine users from legal age and older |
| 3) Current cigarette smokers with intention to quit |
| 4) Current cigarette smokers without intention to quit |
| 5) Current ENDS users |
| 6) Oversampling young adults (21 to 24 years) |

Future intention to try BIDI® Stick flavors was asked of all participants. Future intention to try was assessed post-exposure to the BIDI® Stick product description and package label via an 11-point Juster Scale. This item was asked for all 11 currently available flavors of BIDI® Stick:

- Solar (Strawberry + Blueberry)
- Tropic (Mango + Apple + Orange)
- Dawn (Mint + Ginger + Lemon)
- Regal (Dragon Fruit + Strawberry)
- Gold (Mango)
- Marigold (Mango + Menthol)
- Winter (Watermelon + Melon + Menthol)
- Arctic (Mint + Menthol)
- Zest (Melon + Pineapple + Banana)
- Summer (Blueberry + Pomegranate)
- Classic (Tobacco Leaf)

Future intention to use BIDI® Stick fairly regularly was also asked for similar flavors. These future intention results will be compared for the Non-Tobacco BIDI® Sticks versus the



Classic BIDI® Stick to highlight any differences in interest due to flavors among Tobacco and/or Nicotine Product ("TNP")[8] study cohorts and young adults versus older adults.

The relevant stated hypotheses are:

1. "After exposure to the BIDI® Stick product description and packaging, the likelihood to try BIDI® Stick among non-users (never and former) of TNP will not differ by flavors."

2. "After exposure to the BIDI® Stick product description and packaging, the association between the likelihood to try BIDI® Stick and flavors of BIDI® Stick will not differ between non-users age 21-24 (never and former) and non-users age 25 or above (never and former)."

Reasons for interest in using BIDI® Stick was measured where respondents were given a list of potential reasons and could select as many reasons as possible that apply to them. This question will only be answered by people who indicate greater than or equal to "4" interest in trying BIDI® Stick. Response options include:

- To help me reduce my combustible cigarette smoking
- To completely replace my combustible cigarette smoking
- To help me quit smoking combustible cigarettes
- It is a more appealing option that my current ENDS
- It is a less harmful option than my current ENDS
- Less harmful to my health than combustible cigarettes
- Less harmful to my health than other tobacco products, excluding combustible cigarettes
- Comes in flavors I like
- Comes in one nicotine strength
- None of the above

The responses will provide information on the importance of flavors for users with an interest in using BIDI® Stick.

---

[8] TNP is defined in the protocol as combustible cigarettes, electronic nicotine delivery systems (ENDS) other than BIDI® Stick (ENDS are also known as e-cigs, electronic cigarettes, vaping devices, vape pens and/or e-liquids), smokeless tobacco products (moist snuff, chewing tobacco, snus), nicotine pouches (tobacco-free pouch, placed in the mouth), cigars, cigarillos, filtered cigars filled with tobacco, pipe tobacco, hookah or water pipe tobacco and aids to help stop smoking (e.g., Nicorette, Nicoderm CQ).


### b. BIDI® Stick Patterns of Use Study

The BIDI® Stick POU surveyed BIDI® Stick users, specifically those who had used BIDI® Sticks every day or some days within the 30 days prior to taking the survey. The study utilized a retrospective, self-reported, cross-sectional design to measure recalled TNP usage and perceived TNP health risks among current users of BIDI® Stick. Surveys (**Attachment 5**) were completed between May 3 and August 17, 2021.

Kantar recruited potential respondents via email invitation, directly from Bidi Vapor's consumer databases. Bidi Vapor's consumer databases are comprised of people who have either purchased a product directly from Bidi Vapor (via e-commerce prior to the Company halting direct-to-consumer online sales) or are enrolled in the BIDI® Cares product recycling program. Bidi Vapor's consumer databases retain names of people who have opted out of receiving email communication from the Company. Those consumers were not invited to participate in this research study. In addition to the study email invitation, BIDI® Stick users who are enrolled in the BIDI® Cares product recycling program and opted-in for contact information were contacted via telephone, utilizing a verbal script approved in advance by the Sterling Institutional Review Board.

In addition to recruiting participants directly from the Company's consumer databases, participants were also recruited from high volume retail stores where BIDI® Stick is sold. Purchasers of BIDI® Stick were provided a postcard inviting them to participate in the study. Age of respondents recruited from stores will have been age verified to be 21 years of age or older via personal ID provided in store.

The POU survey questions on flavors included an assessment of:

- BIDI® Stick flavors currently used

- BIDI® Stick flavor used most often

- Importance of flavor in the decision to start using BIDI® Stick.

This information will show the importance of flavors in the use of BIDI® Stick among TNP users who switch from combusted cigarettes.

In addition to these questions on flavor, both studies included a series of questions regarding past use and current use of other TNPs and evaluation of absolute and relative health risks of BIDI® Stick versus other TNPs for several conditions.



c.  **Current Status of LOU and POU Studies**

The studies are currently undergoing data quality control checks, with development of Descriptive Tables to begin soon according to the approved Statistical Analysis Plan. Preliminary information is anticipated to be available in mid-October 2021 with technical regulatory reports available in late November 2021.

**V.  Additional Nationally Representative TPPI and Actual Use Studies Assessing, Among Other Things, the Role and Added Benefit of the Non-Tobacco BIDI® Sticks for Adult Combusted Cigarette Smokers in Terms of Adult Switching/Cigarette Reduction**

McKinney Regulatory Science Advisors, LLC, working with Russell Burnett Research and Consultancy Ltd ("RBRC"), was commissioned to design, conduct and report two additional quantitative research studies: (i) Perceptions and Behavioral Intentions (PBI) Study of the BIDI® Stick ENDS; and (ii) Patterns of Use of the BIDI® Stick ENDS and Transitions in Cigarette Smoking Status in a Convenience Sample of BIDI® Stick Ever-Users. Together, these two studies will collect data that address, among other important research questions, the likelihood that adult current combusted cigarette smokers would partially or completely replace combusted cigarettes with one of Non-Tobacco BIDI® Sticks or the Classic BIDI® Stick. These studies will also allow, if applicable, bridging to published behavioral studies.[9] The current expected timeline for reporting of these studies is Q1 of 2022 for end of data collection and preliminary data analysis, and Q2 of 2022 for submission of the final report to FDA.

a.  **Study 1: Perceptions and Behavioral Intentions (PBI) Study of the BIDI® Stick ENDS ('the PBI Study')**

- The PBI Study is a cross-sectional, internet-based survey study of risk perceptions and behavioral intentions in relation to the BIDI® Stick ENDS in 11 flavor profiles among large, U.S. nationally representative samples of adult current combusted cigarette smokers, former smokers, and non-smokers of combusted cigarettes.

- Subjects in this study will be adults aged 21 years and older who are living in the United States and are enrolled either as a panelist in Ipsos-Insight LLC's proprietary KnowledgePanel® – the largest probability-based online research panel in the United States that is designed to be representative of the non-institutionalized U.S. population aged 18 years and older – or as a panelist in a non-probability internet research panel to which Ipsos has access.

---

[9] Citation to Juul AJHB Special Issue, available at: https://ajhb.org/wp-content/uploads/2021/04/AJHB_JUUL_Special_Issue.pdf.



- Approximately 7,700 subjects will be recruited to this study, comprised of approximately 2,200 current smokers, 2,200 former smokers, 2,200 non-smokers, and an oversample of 1,100 young adult (aged 21-24 years) non-smokers.

- This study will form part of Bidi Vapor's program of research on the potential population health impact of the BIDI® Stick ENDS by obtaining quantitative data that characterize:

  1. Intentions to try, purchase to try, and regularly use the BIDI® Stick ENDS in each of the 11 flavor profiles among legal age adult current smokers, former smokers, and non-smokers.

  2. Current smokers' intentions to use the BIDI® Stick ENDS (in each of the 11 flavor profiles) in addition to combusted cigarettes (i.e., dual use) or as a partial or complete replacement for combusted cigarettes (i.e., product switching).

  3. Adults' conditional and unconditional perceptions of the absolute and comparative health and addiction risks associated with different tobacco product use behaviors, including starting to use the BIDI® Stick ENDS in addition to, in place of, and instead of combusted cigarettes.

  4. Adults' understanding of the nicotine warning statement and legal purchasing age information that is communicated on the packaging container of the BIDI® Stick ENDS.

- Draft (i.e., non-final) versions of the PBI study protocol and questionnaire are attached as **Attachments 7** and **8**.

  **b. Study 2: Patterns of Use of the BIDI® Stick ENDS and Transitions in Cigarette Smoking Status in a Convenience Sample of BIDI® Stick Ever-Users ("the Actual Use Study")**

- The Actual Use Study is a cross-sectional, internet-based survey study that will aim to characterize patterns of use of BIDI® Sticks in a convenience sample of legal age adult ever-purchasers of BIDI® Sticks, and describe transitions in these individuals' combusted cigarette smoking status since initiation of use of BIDI® Sticks.

- Subjects in this study will be adults aged 21 years and older in the United States who have ever purchased a BIDI® Stick (target n = 500). Subjects will be recruited from customer databases that are maintained by or accessible to Bidi Vapor.

- This study will obtain quantitative data that characterize:

  1. Consumers' combusted cigarette smoking status at the time of their first purchase of a BIDI® Stick for their own personal use.

  2. Consumers' reasons for first purchasing a BIDI® Stick for their own personal use.

  3. Consumers' reasons for continuing/discontinuing use of a BIDI® Stick.

  4. Patterns of use of BIDI® Sticks in each flavor profile, including volume, duration, frequency and intensity of consumption.



5. Distributions of BIDI® Stick ever-users across key demographic and socioeconomic variables.

6. The prevalence of transitions into and out of combusted cigarette smoking that are attributed by consumers to their use of BIDI® Sticks.

## VI.    Comprehensive Literature Review: Update to PMTA Module 2 Section 2.9

Bidi Vapor recently commissioned Cardno ChemRisk to update its existing literature review and state-of-science report (see Module 2 Section 2.9) specifically on the impact of non-tobacco flavored ENDS on patterns and features of ENDS abuse liability, initiation, transitions, and cessation.  This updated review starts where the last review left off and covers the relevant science published between July 1, 2019 and April 28, 2021. This is our most up-to-date literature review, and demonstrates some shifts in the appeal, preference, and use of flavored ENDS across age groups.  See **Exhibit B**.

**In short, the majority of all age groups reported that flavors, and particularly non-tobacco favors, are an important reason for using ENDS**. Regarding prevalence of flavored ENDS use, initial conclusions on youth and young adults remained consistent when considering the updated literature. Specifically, non-tobacco flavored ENDS are appealing to youth, although the prevalence of flavored ENDS use has remained relatively stable or even declined in recent years. Additionally, other factors associated with ENDS use among youth and young adults besides flavors should be considered, such as use of other tobacco products and substances (e.g., alcohol, marijuana, prescription drugs), psychological factors (e.g., internalizing and externalizing problems), and social factors (e.g., use of products by friends and family).  Adult appeal to flavored ENDS has evolved in the most recent years, with an increasingly greater number of adults reporting use of non-tobacco flavored ENDS.

Moreover, a review of the recently published literature on flavored ENDS demonstrated that the availability of these products, especially non-tobacco flavored ENDS, is becoming increasingly important for adult smokers who are looking for an alternative nicotine product to reduce or quit smoking combusted cigarettes.  **As discussed above,** among other things, this updated literature review noted the following findings in the literature on flavored ENDS products and smoking cessation:

- Study results suggest that the use of flavored e-cigarettes can facilitate smoking cessation (Glasser et al. (2021));



- Study results indicate that adults who began using non-tobacco flavored ENDS were more likely to quit smoking than those who used tobacco flavored ENDS (Friedman and Xiu (2020));
- Analyses demonstrate that flavor preferences varied depending on the product, and that both tobacco and non-tobacco flavors are important to adult e-cigarette users (Schneller et al. (2020));
- Compared to tobacco flavor users, participants who used sweet flavors at baseline were significantly more likely to quit smoking and that, regarding flavor transitions between baseline and follow-up, there was more movement away from tobacco to any other flavors than to tobacco from other flavors. Overall, study results demonstrate that use of sweet flavored e-cigarettes at baseline were positively associated with smoking cessation at follow-up (Li et al. (2021));
- A recent study shows that a variety of nontobacco flavors, especially fruit, are popular among adult vapers, particularly among those who have quit smoking and are now exclusively vaping. (Gravely et al. (2020)).
- E-cigarettes most likely to promote cessation will be those that deliver nicotine in a manner that is reliable and consistent with the nicotine delivery profile of a combusted cigarette. (Blank et al. (2020))

## VII. Continued Youth Access Prevention Efforts

Bidi Vapor continuously goes above and beyond regulatory requirements to employ rigorous youth-access prevention measures. These efforts are detailed in the Company's recent correspondence with the CTP OCE, (**Attachment 1**). Bidi Vapor also addressed its various industry-leading efforts in a Listening Session with the Agency on September 2, 2021.

## VIII. Conclusion

Bidi Vapor would like to amend Module 2 Section 2.9, Module 5 Sections 5.2 and 5.3, and Module 6 Section 6.2.1 of its PMTAs with the information contained herein. Our expectation is that Bidi Vapor's continued efforts to improve its timely-submitted PMTAs during the pandemic demonstrate substantial progress on its applications as detailed in this amendment (and as will be described further in our forthcoming meeting request and future amendments), and will be given due consideration by FDA as part of the Company's PMTAs' scientific review process. As we complete our ongoing clinical, behavioral and analytical studies, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

<span style="color:red">CONFIDENTIAL</span>



\*   \*   \*   \*

This PMTA amendment submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.

We appreciate FDA's careful consideration of this fourth PMTA amendment PM0003460 and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information for the Agency to conclude that the marketing of the BIDI® Stick, both the non-tobacco flavored and tobacco-flavored products, is APPH.

Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor LLC



IX.     **Enclosures (Attachments 1-8)**

**Attachment 1** – Bidi Vapor's June 25, 2021 Letter to the CTP Office of Compliance and Enforcement Requesting Case-By-Case Discretion and Continued Marketing Pending PMTA Review

**Attachment 2** – Cardno ChemRisk Updated Literature Review – ENDS & E-Liquid Updated State of the Science – Behavioral Endpoints (August 25, 2021)

**Attachment 3** – BIDI® Stick LOU Study Protocol

**Attachment 4** – BIDI® Stick LOU Study Survey

**Attachment 5** – BIDI® Stick POU Study Protocol

**Attachment 6** – BIDI® Stick POU Study Survey

**Attachment 7** – PBI Study of the BIDI® Stick ENDS Draft Protocol

**Attachment 8** – PBI Study of the BIDI® Stick ENDS Draft Questionnaire



Niraj Patel, CEO
(321) 223-3101
raj@bidivapor.com

January 18, 2024

**PMTA Twentieth Amendment: PM0003460.PD1 – PD11**     **Via CTP Portal**

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Tobacco Products                          **CONTAINS CONFIDENTIAL**
Office of Science                                    **BUSINESS INFORMATION**
Document Control Center
Building 71, Room G335
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

   **RE**: **Bidi Vapor LLC; Twentieth (20ᵗʰ) Amendment to Premarket Tobacco Product Applications for the BIDI® Stick ENDS; Submission Tracking Number (STN): PM0003460.PD1 – PD11**

   **I.   Background**

      This submission contains Bidi Vapor, LLC's ("Bidi Vapor" or the "Company") **Twentieth (20ᵗʰ) amendment** to its pending Premarket Tobacco Product Application ("PMTA") identified by STN PM0003460.PD1 – PD11 for its eleven (11) BIDI® Stick electronic nicotine delivery systems ("ENDS") products.[1] The purpose of this amendment is to inform FDA of an additional adult smoker switching study independently being conducted by Rose Research Center, LLC ("Rose Research"); and to provide the Agency with the expected study timeline and other information regarding this study.

---

[1]    On September 8, 2020, Bidi Vapor timely submitted to the U.S. Food and Drug Administration ("FDA" or the "Agency") PMTAs for eleven (11) BIDI® Stick ENDS products. To date, PM0003460 has been the subject of one FDA deficiency letter for the Classic tobacco-flavored BIDI® Stick. *See* U.S. Food & Drug Admin. STN PM0003460.PD2 Deficiency Letter to Bidi Vapor LLC (March 20, 2023). The marketing denial order ("MDO") issued with respect to the non-tobacco flavored products on September 7, 2021, was set aside (i.e., vacated) by the U.S. Court of Appeals for the Eleventh Circuit on August 23, 2022 for being arbitrary and capricious in violation of the Administrative Procedure Act. *See Bidi Vapor LLC v. U.S. Food and Drug Administration*, 47 F.4th 1191 (11th Cir. 2022). The court determined that the MDO was arbitrary and capricious because FDA failed to consider all of the relevant evidence in the application, specifically Bidi Vapor's aggressive and comprehensive marketing and sales-access-restrictions plans. In setting aside the MDO, the court remanded PM0003460.P1, PD3-11 back to FDA for further review. The Agency must now conduct a full, scientific review of the application, including this and all PMTA amendments submitted to date. See below Section III, "Summary of Amendments Submitted to PM0003460 to Date".



In various PMTA amendments submitted to FDA to date (*see* Section III, Table 1, PMTA PM0003460 Amendment Summary), Bidi Vapor informed FDA that it is continuing to develop robust and reliable evidence intended to demonstrate that the potential benefits of the BIDI® Stick ENDS products for adult combusted cigarette smokers outweigh any risks to youth posed by flavored ENDS. As noted in previous PMTA amendments, these product-specific studies will allow for additional bridging to the published literature included in PMTA PM0003460 and its amendments.

## II.    New BIDI Stick® E-Cigarette Exploratory Switching Study (Amend PMTA Module 5 Section 5.2)

Rose Research is conducting independent research on adult smoker switching and smoking reduction from combustible cigarettes to a market-leading e-cigarette. Specifically, Rose Research is independently conducting (without any funding or input from Bidi Vapor) an "Exploratory Study of Switching from Combustible Cigarettes to the BIDI Stick® E-Cigarette," (hereafter, "Exploratory Switching Study") a single-group, open-label, interventional 12-week study designed to ascertain the degree of smoking reduction when adult smokers attempt to switch to an e-cigarette that matches peak nicotine concentrations of a combustible cigarette. **The study has been registered on ClinicalTrials.gov under identification no. NCT05855343 (available at https://clinicaltrials.gov/study/NCT05855343?term=Bidi&rank=2).** Bidi Vapor was not involved in the funding or design of this study.

The Exploratory Switching Study is significant as the aim of this study is to shed light on the importance of nicotine pharmacokinetics in switching to a reduced-harm product by fully matching the nicotine pharmacokinetics of smokers' usual brands of combustible cigarettes. The primary outcome measure is degree of adult smoking reduction, measured by changes in expired air carbon monoxide at the end of the product use period (12 Weeks) and change in self-reported cigarettes smoked daily. The study will also measure the number of participants that completely switch from combustible cigarettes to e-cigarette as indicated by Expired air carbon monoxide (CO) value of <5 ppm and self-report of no smoking. Secondary outcome measures include subjective response to the BIDI Stick® e-cigarette that is intended to assess subjective satisfaction and other perceived rewarding or aversive effects accompanying e-cigarette use and combustible cigarette use using the modified (e-Cigarette) Cigarette Evaluation Questionnaire. This product-specific study will also allow, as applicable, bridging to published behavioral studies and help with informing the Agency's appropriate for the protection of the public health ("APPH") determination.

The Exploratory Switching Study commenced in February 2023, and data collection closed on December 31, 2023. We understand that Rose Research is in the process of closing the database and evaluating the data for public release, and is preparing an abstract that will be publicly shared at upcoming scientific conferences. We further understand that Rose Research will seek to have the study published in a reputable scientific journal. As soon as information regarding this study becomes publicly available, we plan to inform FDA and amend this PMTA.



### III.    Summary of Amendments Submitted to PM0003460 to Date

As described in this PMTA Amendment and previous amendments, Bidi Vapor has developed (and continues to develop) additional robust and reliable evidence intended to demonstrate that the benefits of the BIDI® Stick products for adult combusted cigarette smokers outweigh any potential risks to youth posed by flavored ENDS. This includes several product-specific behavioral studies designed to measure product perception and intention (e.g., likelihood of use, behavioral intentions, and patterns of use of the BIDI® Stick), as well as a clinical pharmacokinetic ("PK") study designed to measure the abuse liability/dependence potential of the BIDI® Stick and the exposure to nicotine during product use (compared to combusted cigarettes and JUUL). As noted in previous PMTA amendments, these product-specific studies will allow for additional bridging to the published literature included in PMTA PM0003460 and its amendments. Bidi Vapor provides below a summary of PMTA PM0003460 Amendments to date (Table 1).

### Table 1 – PMTA PM0003460 Amendment Summary

| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 1 | October 13, 2020 | Technomic Consumer Insight Survey Final Report | I-E-000-00-1DA-F8 |
| 2 | March 23, 2021 | • Updated Marketing Plan for the BIDI® Stick (Termination of Direct-to-Consumer Online Sales Through Bidi Website)<br>• Final Report: Technomic Disposable Vape User Insights Study<br>• Update on planned behavioral and abuse liability studies<br>• UL Notice of Completion and Authorization to Apply the UL Mark, File E514030<br>• Updated BIDI® Stick Labeling with authorized UL logo<br>• Update on ongoing Quality Management System improvements<br>• Status of analytical testing (e.g., Stability Study)<br>• Update on Smiss Technology Co. Ltd permits | I-E-000-00-1EF-D4 |



| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 3 | April 20, 2021 | <ul><li>Updates for the following studies:<ul><li>BV 2021-01: BIDI® Stick Patterns of Use Study<ul><li>Protocol: v1.0</li></ul></li><li>BV 2021-02F: Likelihood of Use Study for BIDI® Stick<ul><li>Protocol: v1.0</li></ul></li><li>BIDI-PK-01: Abuse liability and puffing topography assessments of the BIDI® Stick electronic nicotine delivery system (ENDS) in comparison to a combustible cigarette and JUUL® pod-based ENDS<ul><li>Protocol: v1.0</li></ul></li></ul></li></ul> | I-E-000-00-1F2-60 |
| OCE Correspondence | June 25, 2021 | <ul><li>Bidi Vapor's June 25, 2021 Letter to the CTP Office of Compliance and Enforcement Requesting Case-By-Case Discretion and Continued Marketing Pending PMTA Review</li></ul> | I-E-000-00-1FB-0B |
| 4 | September 8, 2021 | <ul><li>Cardno ChemRisk Updated Literature Review – ENDS & E-Liquid Updated State of the Science – Behavioral Endpoints</li><li>Updates for the following studies:<ul><li>BV 2021-01: BIDI® Stick Patterns of Use Study<ul><li>Protocol: v4.0</li><li>Questionnaire: v3.0</li></ul></li><li>BV 2021-02F: Likelihood of Use Study for BIDI® Stick<ul><li>Protocol: v2.0</li><li>Questionnaire: v2.0</li></ul></li><li>RB-BV-01-01 Perception and Behavioral Intentions (PBI) Study of the BIDI® Stick Electronic Nicotine Delivery System (ENDS)<ul><li>Protocol: v0.1</li></ul></li></ul></li></ul>Questionnaire: v0.2 | I-E-000-00-205-0C |
| 5 | September 16, 2021 | <ul><li>Updated Product Description for BIDI® Stick Arctic</li><li>Updated Ingredient Specifications BIDI® Stick Arctic Updates to Product Labels and Labeling BIDI® Stick Arctic</li></ul> | I-E-000-00-207-13 |

A0257



| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 6 | October 24, 2021 | • Update to Ingredient Specifications for Dawn, Marigold and Winter BIDI® Stick<br>• Final Report: 6-month accelerated stability study<br>• T6 Report: for 24-month ambient stability study<br>   Final Report: BIDI® Stick Elemental Impurities Study | I-E-000-00-20A-59<br><br>I-E-000-00-20A-5A<br><br>I-E-000-00-20A-5B<br><br>I-E-000-00-20A-5C |
| 7 | October 29, 2021 | Manuscript: A Randomized, Crossover Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI® Stick ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers | I-E-000-00-20A-EE |
| 8 | November 5, 2021 | • Updates for the following studies:<br>  ◦ BV 2021-01: BIDI® Stick Patterns of Use Study<br>  ◦ BV 2021-02F: Likelihood of Use Study for BIDI® Stick<br>  ◦ RB-BV-01-01 Perception and Behavioral Intentions (PBI) Study of the BIDI® Stick Electronic Nicotine Delivery System (ENDS)<br>    ▪ Protocol: v0.1<br>    ▪ Questionnaire: v0.3<br>    ▪ Subject informed consent form: v1.0 | I-E-000-00-20B-E0 |

A0258



| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 9 | December 3, 2021 | • Updates for the following studies:<br>  ○ BV 2021-02F Likelihood of Use Study for BIDI® Stick<br>  ○ BIDI-PK-01: Abuse liability and puffing topography assessments of the BIDI® Stick electronic nicotine delivery system (ENDS) in comparison to a combustible cigarette and JUUL® pod-based ENDS<br>• Final Report: BV 2021-01: BIDI® Stick Patterns of Use Study<br><br>Preprint: A Randomized, Crossover Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI® Stick ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers | I-3-000-00-20D-4D |
| 10 | December 17, 2021 | • Final Report: BV 2021-02F Likelihood of Use Study for BIDI® Stick<br>• Final Report: Toxicological Human Health Risk Assessment of Aerosol HPHCs T12 Report: 24-month ambient stability study | I-3-000-00-20E-54<br><br>I-3-000-00-20E-55<br><br>I-3-000-00-20E-56<br><br>I-3-000-00-20E-57 |
| 11 | December 23, 2021 | • Final report: BIDI-PK-01: Abuse liability and puffing topography assessments of the BIDI® Stick electronic nicotine delivery system (ENDS) in comparison to a combustible cigarette and JUUL® pod-based ENDS<br>• Published Journal Article: A Randomized, Crossover Study to Assess Nicotine Pharmacokinetics and Subjective Effects of the BIDI Stick® ENDS Compared with Combustible Cigarettes and a Comparator ENDS in Adult Smokers<br>• DRAFT Quality Agreement with SMISS | I-3-000-00-20E-AB<br><br>I-3-000-00-20E-AC<br><br>I-3-000-00-20E-AD |

A0259



| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 12 | May 20, 2022 | • Final Report: Toxicological Human Health Risk Assessment of Ingredients (Arctic and Classic)<br>• Final Report: RB-BV-01-01 Perception and Behavioral Intentions (PBI) Study of the BIDI® Stick Electronic Nicotine Delivery System (ENDS)<br>• CSUR-0041 Population Prevalence Study of the BIDI® Stick<br>   o Protocol: v1.0<br>   o Informed Consent Forms v1.0<br>   Notification of IRB approval | I-E-000-00-224-97 |
| 13 | July 5, 2022 | Comprehensive Quality Management System Updates:<br><br>• Finalized Quality Agreement with SMISS<br>• Bidi Vapor's newly implemented SOPs and Forms<br>• Kaival's newly implemented SOPs and Forms<br>• SMISS' updated SOPs and Work Instruction<br>• Specifications, Certifications and Test results that relate to Quality<br>• Preprint: Market Survey of Disposable E-Cigarette Nicotine Content and E-liquid Volume | I-E-000-00-227-F4 |
| 14 | July 28, 2022 | Legal name change for contract manufacturer Smiss Technology Co. Ltd | I-E-000-00-229-F3 |
| 15 | September 9, 2022 | • Final Report: CSUR Population Prevalence Study<br>• Preprint: Likelihood of Use (LOU) Study, "Appeal and Likelihood of Use of Multiple Flavor Varieties of BIDI® Stick Electronic Nicotine Delivery Systems among Adult Current, Former, and Never Tobacco Users in the United States" | I-E-000-00-22D-5E |
| General Correspondence Submission | September 15, 2022 | • Provide Forms FDA 4057a and original eSubmitter submission reports for PMTA PM0003460 Amendments 1-11 and the OCE correspondence. | I-E-000-00-22D-A4 |

A0260



| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 16 | February 6, 2023 | Update Environmental Assessments (Module 7.1) to revise:<br><br>• "Location of Manufacturing" (Section 4.3.4) to reflect new manufacturing facility address and other factory-specific information as required;<br>• Replace the Chemical Composition Table located in the original EA "Confidential Appendix 2" with a reference to the Company's Tobacco Product Master File ("TPMF") No. MF0000498, which contains Bidi Vapor's confidential e-liquid formulations (TPMF Letter of Authorization included);<br>• Update the first- and fifth-year projections of waste of packaging materials calculations and market volume projections; and<br>• Include the most recent local environmental permits and licenses for the manufacturing facility | I-E-000-00-236-B5 |
| 17 | February 13, 2023 | Provide FDA with:<br><br>• Updated Integrated Summary or the entire application, which brings together the originally submitted information with the numerous information and data that has been submitted to FDA via the Company's first sixteen (16) PMTA PM0003460 Amendments (Replace Original Module 2, Section 2.2 Integrated Summary);<br>• An updated Letter of Authorization for Bidi Vapor, LLC's Tobacco Product Master File (TPMF) No. MF0000498 which contains the Company's confidential e-liquid formulations as well as Standard Operating Procedures; and<br>• Documentation of the qualifications of the translator(s) that reviewed the Chinese to English translations of the relevant documents contained in Modules 1, 2, 3 and 7 of the original PMTA PM0003460 submission, as required by 21 CFR § 1114.7(b)(1). | I-E-000-00-237-54 |
| 18 | February 16, 2023 | Provide complete, real-time 24 month stability testing results and report (Update Module 3, Section 3.3.3.2) | I-E-000-00-237-B5 |

A0261



| Bidi Vapor PMTA PM0003460 Amendment No. | Submission Date (via CTP Portal) | Brief Description | CTP Portal Package ID No. for Submission |
|---|---|---|---|
| 19 | June 12, 2023 | Update Bidi Vapor LLC Points-of-Contact for purposes of corresponding with FDA regarding PMTA STN PM0003460 to include Dr. Willie McKinney of McKinney Regulatory Science Advisors, LLC and Angela Ho-Chen of FDA Regulatory and Legal Services, PLLC. | I-E-000-00-23B-F0 |
| **20 (Current PMTA Amendment)** | **January 18, 2024** | **Inform FDA of an additional adult smoker switching study independently conducted by Rose Research Center, LLC (Amend PMTA Module 5 Section 5.2)** | **TBD** |

## IV. Conclusion

Bidi Vapor would like to amend PM0003460.PD1 – PD11 (Module 5 Section 5.2) with the information summarized herein on the pending E-Cigarette Exploratory Switching Study by Rose Research. Additional information on this study will be provided via future PMTA amendments as it becomes publicly available. It is our expectation that this information will assist FDA in reviewing PM0003460 and will be given due consideration during the scientific review process. As we complete our ongoing product-specific studies and analytical work, Bidi Vapor expects to continue submitting all relevant data and information to FDA via additional PMTA amendments as soon as these data become available.

\*    \*    \*    \*

This PMTA amendment submission contains trade secret and confidential commercial information that Bidi Vapor considers to be proprietary and highly sensitive, and which is protected from disclosure under FDCA §§ 301(j) and 906(c) (21 USC §§ 331(j) and 387f(c)), the Trade Secrets Act (18 USC § 1905), the Freedom of Information Act (FOIA) (5 USC § 552), and FDA's implementing regulations, 21 CFR Part 20. If FDA receives a request for these records and tentatively determines that any portion of this submission is disclosable, Bidi Vapor requests that FDA provide notice and an opportunity for Bidi Vapor to object to any disclosure in accordance with 21 CFR §§ 20.47 and 20.61. Bidi Vapor reserves all legal rights to protect against public disclosure of its trade secret and confidential commercial information and to seek legal recourse against anyone who discloses such information without legal authorization.



　　　We appreciate FDA's careful consideration of this Twentieth PMTA amendment to PM0003460 and look forward to working with the Agency to secure a marketing authorization order under FDCA § 910. We trust that the information enclosed herein provides sufficient information to inform the Agency's APPH determination for our BIDI® Stick products.

　　　Should you have any questions regarding the enclosed submission, please do not hesitate to contact the undersigned with any questions, preferably by telephone or e-mail so that we may respond as soon as possible.

　　　　　　　　　　Respectfully submitted,

Niraj Patel
Chief Executive Officer
Bidi Vapor LLC

A0263

In terms of use behaviors and topography measures, all studies published since the Cardno ChemRisk SOS (2020) demonstrated self-titration behaviors. Specifically, all studies demonstrated that as nicotine concentration and/or device power increased, puff duration or volume decreased (Cox et al., 2021; Ebajemito et al., 2020; Eversole et al., 2020; Hiler et al., 2020; Phillips-Waller et al., 2021). Additionally, Blank et al. (2020) found that experienced e-cigarette users took longer puffs with greater volume than naïve e-cigarette users. Gades et al. (2020) found that number of e-cigarette puffs was significantly associated with positive attributes including e-cigarette liking and desire. In regard to attempts to quit, Strong et al. (2020) found that cigarette-only users had a statistically significant reduced odds of successful quit attempts, whereas no such association was observed among e-cigarette only users. However, Hammond et al. (2021) found that that in recent years, more ENDS users reported trying to quit use than combustible cigarette users. Additionally, Dunbar et al (2020) found that past 30-day ENDS use in smoke-free public places was significantly associated with reporting at least four attempts to quit tobacco use in the past year, first using ENDS 31-60 minutes after waking, and daily e-cigarette use.

Evidence from studies measuring subjective effects, including feeling of dependence, liking, mood state, and more demonstrated similar findings to the Cardno ChemRisk SOS (2020), in that ENDS reduced craving and withdrawal symptoms and were generally liked by those who used them. However, results around likability and feelings of dependence following use of ENDS compared to use combustible cigarettes were mixed. Shiffman & Sembower (2020) found that among current dual users, e-cigarette dependence was statistically significantly lower than cigarette dependence, and similarly, Harvanko et al. (2020) and St. Helen et al. (2020) found that dual users perceived e-cigarette use to have a lower rewarding effect than combustible cigarette smoking. Conversely, Rycroft et al. (2021), Kaplan et al. (2020), and Hajek et al. (2020) compared dependence among e-cigarette- and cigarette-only users or dual users and found that there were no statistically significant differences in dependence.

Several studies also compared subjective effects among ENDS products with varying nicotine levels and device design. All studies found decreases in withdrawal symptoms and increases in positive attribute scores with increasing ENDS use. While higher nicotine levels were found to significantly reduce cravings, at certain levels high nicotine content products were associated with greater aversion and higher scores on negative effects Hiler et al., 2020; Phillips-Waller et al., 2021). Among the four studies that assessed dependence in youth populations (Boyd et al., 2020; Gomez et al., 2020; Hammond et al., 2021; Jackson et al., 2021) all found higher rates of dependence among dual users of ENDS and combustible cigarettes than single product users. These studies also noted increases in the proportion of youth self-reporting ENDS dependence, but also demonstrated that ENDS dependence was still lower than that of combustible cigarette dependence. No studies published during this time period tested subjective effects among smokers who had never used ENDS.

The behavioral economics studies demonstrated that ENDS with high nicotine content e-liquids are most likely to function as a substitute for cigarettes (Pope et al., 2020). Generally, studies also found that ENDS and combustible cigarette users had similar dependency characteristics, but found that nicotine had a higher reinforcing effect in combustible cigarette smokers as they were willing to pay more to use their product compared to ENDS users.

A0264

(Section 910(c)(4) of the FD&C Act.) We provide information in this section to assist applicants in submitting an ENDS PMTA that could support a showing that the marketing of a new tobacco product would be APPH.

Throughout this guidance document, we recommend providing specific information pertaining to different topic areas and scientific disciplines to enable FDA to make a determination of whether your PMTA supports a showing that permitting the marketing of your new tobacco product would be APPH. For example, knowing the full assessment of the toxicological effects of your ENDS (e.g., ingredients, components, use of the product) is important to assess the health effects on users and nonusers under Section 910(b). As such, FDA assesses the toxicology of the product to determine whether product use would have a detrimental effect on users' and nonusers' health. FDA weighs all of the potential benefits and risks from the information contained in the PMTA to make an overall determination of whether the product should be authorized for marketing.

You may propose specific restrictions on sale and distribution that can help support a showing that permitting the marketing of the product would be APPH (e.g., a restriction that decreases the likelihood that those who do not use tobacco products will start using tobacco products). FDA may consider your product in that context and may include your proposed restrictions as mandatory conditions in your marketing order. These restrictions would be in addition to any other restrictions that FDA may require on the sale and distribution of the tobacco product, or any postmarket records and reports FDA may find necessary.

The following sections highlight several broad categories of issues that applicants should consider to help demonstrate that permitting the marketing of their products would be APPH and, consequently, should be authorized for marketing.

### 2. *Valid scientific evidence*

The FD&C Act states that the finding of whether permitting the marketing of a product would be APPH will be determined, when appropriate, on the basis of well-controlled investigations[23] (section 910(c)(5)(A)). However, section 910(c)(5)(B) of the FD&C Act also allows the Agency to consider other "valid scientific evidence" if found sufficient to evaluate the tobacco product. Given the relatively new entrance of ENDS on the U.S. market, FDA understands that limited data may exist from scientific studies and analyses.[24] If an application includes, for example, information on other products (e.g., published literature, marketing information) with appropriate bridging studies, FDA intends to review that information to determine whether it is valid scientific evidence sufficient to demonstrate that the

---

[23] Well-controlled investigations are generally those that are designed and conducted in such a way that minimizes or controls for bias, confounding variables, and other factors that may render the results unreliable.

[24] As discussed in section VI.H.2., due to the limited nonclinical or clinical research conducted on specific ENDS products, it is likely that applicants will conduct certain investigations themselves and submit their own research findings as a part of their PMTA.

A0265

# Table of Contents

**Table List** ................................................................................................................... **3**

**FDA Deficiency Letter Question 12** ...................................................................... **5**

**Bidi Vapor's Response to Deficiency Letter Question 12** ................................... **6**

**12.1 Introduction** ........................................................................................................6

**12.2 BIDI® Stick Classic Aerosol Testing (12q - 12y)** .............................................**8**

    12.2.1 Puff Regimens, Test Protocols, Analytical Methods, and Associated Validation Reports Information (12q)
.......................................................................................................................................8

        12.2.1.1 Puffing Regimens ................................................................................8

        12.2.1.2 Aerosol Characterization Methods ......................................................8

        12.2.1.3 Validation Reports Information ..........................................................10

    12.2.2 Testing Laboratories and Their Accreditation(s) (12r)......................................10

    12.2.3 Length of Time Between Date(s) of Manufacture and Date(s) of Testing (12s).........................10

    12.2.4 Complete Raw Aerosol HPHC Yield Datasets, With Units of Measure (12t) ............10

    12.2.5 Storage Conditions Prior to Initiating Testing (12i) ..........................................11

    12.2.6 BIDI® Stick Aerosol End of Life (12j) ...........................................................11

**12.3 BIDI® Stick Classic Product Characterization (12a-12p)** .............................**12**

    12.3.1 Comparison to Combusted Cigarettes ...........................................................15

**12.4 Carcinogenic HPHCs in the BIDI® Stick Classic Aerosols vs Cigarette Smoke.........................20**

    12.4.1 Carcinogenic HPHCs in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke ............21

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

12.4.1.1 Nickel from the BIDI® Stick Classic product aerosols are within the potential exposures to this HPHC from cigarettes on the US market ..................................................................................................21

12.4.2 Carcinogenic HPHCs at Lower Levels in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke ....22

12.4.2.1 Tobacco Specific Nitrosamines (NNK and NNN) ..................................................................22

12.4.2.2 Volatile Organic Compounds (Acetaldehyde and Formaldehyde)....................................................23

12.4.2.3 Other Carcinogenic HPHC Considerations..................................................................................24

12.4.3 Relative Cancer Risk Summary ..................................................................................................25

**12.5 Noncancer Hazards in BIDI® Stick Classic Aerosols vs Cigarette Smoke**....................................................**26**

12.5.1 Constituents Found at Higher Levels in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke........26

12.5.1.1 Propylene Glycol and Glycerol ..................................................................................................26

12.5.2 Constituents at Lower Levels in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke..................28

12.5.2.1 Acrolein ..................................................................................................................................29

12.5.2.2 Acetaldehyde..........................................................................................................................29

12.5.2.3 Formaldehyde..........................................................................................................................29

12.5.3 Noncancer Health Hazard Summary ..................................................................................................30

**12.6 Comparison to ENDS, Secondary Comparator Products** ..................................................................**31**

**12.7 Summary Results and Discussion** ..................................................................................................**37**

12.7.1 Metals ..................................................................................................................................37

12.7.2 Volatile Organic Compounds ..................................................................................................37

12.7.3 Main Ingredients and Potential Impurities ..................................................................................38

**12.8 Conclusion** ..................................................................................................................................**38**

---

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**12.9 Deficiency Letter Question 12 Attachments** ...............................................................................**39**

**12.10 References** ...................................................................................................................................**40**

## Table List

Table 1 Summary of the Analytical Test Methods Used ...................................................................9

Table 2 Summary of Whole Puff Count Results for the BIDI® Stick Classic Product Evaluated Under Non-intense and Intense Puffing Conditions (n=3) ..........................................................................12

Table 3 Summary of Constituent Levels in the BIDI® Stick Classic Aerosol Generated Using the Non-intense (55ml/3sec/30sec) Puffing Regimen (n=3) ...........................................................................13

Table 4 Summary of Constituent Levels in the BIDI® Stick Classic Aerosol Generated Using the Intense (110ml/6sec/30sec) Puffing Regimen (n=3) ....................................................................................14

Table 5 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick Using Non-intense Puffing, to Smoke from Combusted Cigarettes Using the ISO Puffing Regimen ...........................................16

Table 6 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick Using Intense Puffing (110mL/6s/30s), to Smoke from Combusted Cigarettes Using the Intense Puffing Regimen (ISO Intense) ...........................................................................................................................17

Table 7 Summary of HPHC (established and proposed) Levels in the BIDI® Stick Classic aerosol vs 1R6F Cigarette Smoke ..................................................................................................................................19

Table 8 Carcinogenic HPHC in the BIDI® Stick Classic aerosol vs 1R6F Cigarette Smoke ...................................20

Table 9 Summary of Measured HPHCs (established and proposed) with known known respiratory (RT), cardiovascular (CT), reproductive or developmental (RDT) toxicities in the BIDI® Stick Classic aerosol vs 1R6F Cigarette smoke ..............................................................................................................26

Table 10 Representative ENDS Products from Published Literature ................................................31

Table 11 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick to Aerosol from Representative ENDS Products Reported in Published Literature (non-intense puffing); Aerosol Yields Normalized by Nicotine (mg/mg) ...........................................................................................................35

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Table 12 Question 12 Attachments..................................................................................................39

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

A0269

**FDA Deficiency Letter Question 12**

*Your PMTA provides targeted quantitative chemical analysis of the following aerosol yields generated using the new product: 32 HPHCs, single chemical constituents (propylene glycol, glycerol, and nicotine), pH value, and menthol. However, your aerosol yield measurements were obtained from 100 puffs of the new product and you did not specify in which stage of the lifetime (beginning, middle, end) of the new product these puffs were collected. You provided quantified aerosol yields for propylene glycol, glycerol, nicotine, formaldehyde, and acetaldehyde for the new product, but HPHC yields for the remaining 30 aerosol yields were listed as below limit of detection (BLOD). Because your HPHC aerosol yields were obtained from 100 puffs of the new product and doesn't account for the entire usage, it is not clear whether the data are representative of the overall aerosol emission of the new product. Because aerosol constituent quantities do not stay consistent throughout the puffing cycle of the entire lifetime of the ENDS product, the aerosol yields collected from a portion (100 puffs) of the new product (375 puffs on average based on your measured data under ISO puffing regimen) does not provide sufficient information to evaluate the total HPHC exposure of the entire new product. In order for FDA to evaluate the full HPHC exposure of the new product, you need to measure the aerosol constituent yields of the entire lifetime of the new product, and provide aerosol data in mass (e.g., mg, µg, ng) per device and per puff for the following constituents:*

    *a.  Acetaldehyde*

    *b.  Acrolein*

    *c.  Cadmium*

    *d.  Chromium*

    *e.  Copper*

    *f.  Diacetyl*

    *g.  Diethylene glycol*

    *h.  Ethylene glycol*

    *i.  Formaldehyde*

    *j.  Glycerol*

    *k.  Glycidol*

    *l.  Lead*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

    *m. Nickel*

    *n. Nicotine*

    *o. Propylene glycol*

    *p. Propylene oxide*

*Provide all of the following information about HPHC testing so that we can evaluate the HPHC quantities in the new product:*

    *q. Complete description of all puff regimens used to generate aerosol yield data, quantitative test protocols and analytical methods used, and full validation reports for each analytical method*

    *r. Testing laboratories and their accreditation(s)*

    *s. Length of time between date(s) of manufacture and date(s) of testing*

    *t. Complete raw aerosol HPHC yield datasets, with units of measure*

    *u. Standard deviation(s)*

    *v. Number of replicates*

    *w. A summary of the results for all testing performed*

    *x. Storage conditions prior to initiating testing*

    *y. Whole stick puff counts*

*If your test methods are national or international test standards, identify the standards and any deviations from those standards. Alternatively, provide scientific evidence or justification for why HPHC aerosol yields collected from 100 puffs are appropriate and does not raise public health concerns.*

**Bidi Vapor's Response to Deficiency Letter Question 12**

**12.1 Introduction**

FDA requests additional information related to the levels of HPHCs and other constituents measured in the BIDI® Stick Classic product aerosols. More specifically, FDA requests analytical data and associated information related to the aerosol levels of the following constituents: acetaldehyde, acrolein, cadmium, chromium, copper, diacetyl, diethylene glycol, ethylene glycol, formaldehyde, glycerol, glycidol, lead, nickel, nicotine, propylene glycol and propylene oxide.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

To address this deficiency, Bidi Vapor performed an analytical chemistry study to evaluate all of the constituents specified by FDA, as well as the tobacco specific nitrosamines, N'-Nitrosonornicotine (NNN) and 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone (NNK). The BIDI® Stick Classic product aerosols were generated under non-intense (ISO 20768:2018) and intense puffing conditions, and the aerosol constituent yields were measured using aerosols collected throughout the lifespan of BIDI® Stick Classic product. The aerosol collection and analytical testing method information for the chemical characterization data for the BIDI® Stick Classic product aerosols are provided below in section 12.2 BIDI® Stick Classic Aerosol Testing (12q - 12y) of this deficiency response.

In addition, the FDA's final Premarket Tobacco Product Applications and Recordkeeping Requirements Rule (hereinafter PMTA Final Rule) (FDA, 2021) states that *"[a]pplicants must compare the health risks of its product to both products within the same category and subcategory, as well as products in different categories as appropriate*." The target consumer population for the BIDI® Stick Classic product are adult smokers (over the age of 21) who cannot or don't want to quit, and therefore cigarette smoking is the primary comparator product for the health risk evaluation of the BIDI® Stick Classic product. To inform the evaluation of potential exposures associated relative health risks for smokers switching to the BIDI® Stick Classic product as compared to potentially switching to other inhaled tobacco products, a comparison between BIDI® Stick Classic product aerosols relative to published data for ENDS tobacco products was also considered. The rationale for the secondary comparator products is provided below:

- The BIDI® Stick Classic is an ENDS product, and therefore comparison to tobacco products in this category is also appropriate. Albeit there is still uncertainty with respect to which of the ENDS products will remain on the market after FDA completes all PMTA reviews, data on the National Institute of Drug Abuse (NIDA) Standardized Research Electronic Cigarette (SREC), and data available in peer reviewed literature on ENDS purchased on the U.S. market are used as example ENDS systems for a comparison of potential exposures from constituents in the BIDI® Stick Classic product aerosol relative to tobacco products within the same product subcategory.

The BIDI® Stick Classic aerosol characterization data show that while some heat degradation by-products are present, these are fewer in number and present at lower levels in comparison to smoke from combusted cigarettes. The overall decreases in the number and levels of HPHCs measured in the BIDI® Stick Classic aerosols compared to cigarette smoke indicate that switching to the BIDI® Stick Classic is likely to result in lower toxicant exposures and associated health risks compared

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

to smoking cigarettes. In addition, the analytical data also indicate that potential exposures and associated health risks from BIDI® Stick Classic aerosols are comparable to aerosols generated from other U.S. market ENDS products.

## 12.2 BIDI® Stick Classic Aerosol Testing (12q - 12y)

The quantitative chemical analysis of acetaldehyde, acrolein, cadmium, chromium, copper, diacetyl, diethylene glycol, ethylene glycol, formaldehyde, glycerol, glycidol, lead, nickel, nicotine, propylene glycol and propylene oxide, NNN and NNK in the BIDI® Stick Classic product aerosols was conducted at Enthalpy Analytical, LLC (Enthalpy). The levels of tested constituents were evaluated in BIDI® Stick Classic product aerosols (generated under non-intense and intense puffing) collected throughout the life of the product. Briefly, prior to the start of the aerosol characterization study, an end-of-life study was performed under both non-intense and intense puffing conditions to determine the number of machine puffs needed to deplete a BIDI® Stick to approximately 90% consumption. Detailed information on aerosol collection and analytical methods used for the chemical characterization of the BIDI® Stick Classic product aerosols are summarized below and detailed in Enthalpy study report (see "0423-025_0423-505 Final Report v0.0.pdf" available in the "Q12_Attachments" folder).

## 12.2.1 Puff Regimens, Test Protocols, Analytical Methods, and Associated Validation Reports Information (12q)

### 12.2.1.1 Puffing Regimens

As recommended in the Final PMTA Guidance (FDA, 2021), Bidi Vapor conducted the chemical characterization of constituent yields in BIDI® Stick Classic product aerosols generated under non-intense and intense puffing conditions. The non-intense (ISO) puffing regimen followed the ISO 20768:2018 standard regimen (55ml over 3s, every 30s). The intense puffing regimen used a puff volume of 110 ml over 6s, every 30s. Both the non-intense and intense puffing parameters use a square wave puff profile. More detailed information on the aerosol collection methods is provided Enthalpy study report (see "0423-025_0423-505 Final Report v0.0.pdf" available in the "Q12_Attachments" folder)

### 12.2.1.2 Aerosol Characterization Methods

As requested by the FDA in this deficiency, Bidi Vapor conducted analytical testing to evaluate the levels of acetaldehyde, acrolein, cadmium, chromium, copper, diacetyl, diethylene glycol, ethylene glycol, formaldehyde, glycerol, glycidol, lead, nickel, nicotine, propylene glycol and

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

propylene oxide in BIDI® Stick Classic product aerosols generated under non-intense and intense puffing conditions. In addition to the constituents requested by the FDA, the aerosol testing also included NNN and NNK. All targeted chemical analyses were conducted at Enthalpy using three replicates.

The analytical methods used for the targeted analysis of constituents in the BIDI® Stick Classic product aerosols are listed in Table 1. Full descriptions of the test methods and associated information (e.g., limit of detection [LOD], and limit of quantification [LOQ]) for each analyte measured are available in Enthalpy study report (see "0423-025_0423-505 Final Report v0.0.pdf" available in the 'Q12_Attachments' folder).

**Table 1 Summary of the Analytical Test Methods Used**

| Analysis | Method(s) | Analytes | IUPAC Name |
|---|---|---|---|
| **Carbonyls** | AM-244 v7.0 Carbonyls in e-Liquid and Aerosol by LC-MSMS | Acetaldehyde | Acetaldehyde |
| | | Acrolein | prop-2-enal |
| | | Diacetyl | butane-2,3-dione |
| | | Formaldehyde | Formaldehyde |
| **Glycidol** | AM-274 v2.0 Glycidol in ENDS Aerosol by GC-MS | Glycidol | oxiran-2-ylmethanol |
| **Metals/Metalloids** | AM-249 v5.0 Metals in Aerosol - EP Tube | Cadmium | Cadmium |
| | | Chromium | Chromium |
| | | Copper | Copper |
| | | Lead | Lead |
| | | Nickel | Nickel |
| **Primary Constituents** | AM-224 v3.0 Primary Constituents in Aerosol | Nicotine | 3-[(2S)-1-methylpyrrolidin-2-yl]pyridine |
| | | Diethylene glycol | 2-(2-hydroxyethoxy)ethanol |
| | | Ethylene glycol | ethane-1,2-diol |
| | | Glycerol | propane-1,2,3-triol |
| | | Propylene glycol | propane-1,2-diol |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

| Analysis | Method(s) | Analytes | IUPAC Name |
|---|---|---|---|
| **Propylene Oxide** | ENT208A v5.0 Analysis of Volatile Organic Compounds in E-Cigarette Liquids and on Sorbent Media Collected from E-Cigarette Aerosol and Heated Tobacco Products by GC/MS | Propylene oxide | 2-methyloxirane |
| **TSNA** | AM-220 4.0 TSNAs in eCigarette Vapor by LC-MS/MS | NNK | N-methyl-N-(4-oxo-4-pyridin-3-ylbutyl)nitrous amide |
| | | NNN | 3-[(2S)-1-nitrosopyrrolidin-2-yl]pyridine |

### 12.2.1.3 Validation Reports Information

The full validation reports for each of the analytical methods used in this study are available in Tobacco Product Master File (TPMF) No. MF0000276 submitted by Enthalpy Analytical, LLC, (Enthalpy). The Letter of Authorization (LOA) for the master file can be found in "Enthalpy_Attachments.pdf" found in the "Q12_Attachments" folder.

### 12.2.2 Testing Laboratories and Their Accreditation(s) (12r)

Bidi Vapor contracted Enthalpy Analytical, LLC, (Enthalpy) 1470 East Parham Road, Richmond, VA 23228-2300, an ISO 17025 accredited laboratory that meets the FDA certification recommendations (American Association for Laboratory Accreditation Certificate number 1873.01 [*see* "Enthalpy_Attachments.pdf" found in the "Q12_Attachments" folder]) to conduct the analytical chemistry studies for the BIDI® Stick Classic product aerosol.

### 12.2.3 Length of Time Between Date(s) of Manufacture and Date(s) of Testing (12s)

The length of time between the product manufacture date and testing date is approximately three (3) months. The BIDI® Stick Classic products (Lot Number BS6-CT-019) that were used in the end-of-life study and aerosol chemical analysis were manufactured in January 2023, and were tested at Enthalpy in April 2023.

### 12.2.4 Complete Raw Aerosol HPHC Yield Datasets, With Units of Measure (12t)

The complete raw aerosol HPHC yield datasets, with units of measure are available in the "0423-025_0423-505 Final Report v0.0_Final Results" folder inside the "Q12_Attachments" folder.

- 0423-025-02 AM-244 Carbonyls in Aerosol (CORESTA Regime).xlsx

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

- 0423-025-03 AM-249 Metals in Aerosol (CORESTA Regime).xlsx
- 0423-025-04 AM-224 Primary Constituents in Aerosol (CORESTA Regime).xlsx
- 0423-025-06 AM-274 Glycidol in Aerosol (CORESTA Regime).xlsx
- 0423-025-07 AM-220 Nitrosamines in Aerosol (CORESTA Regime).xlsx
- 0423-025-11 AM-244 Carbobyls in Aerosol (INTENSE Regime).xlsx
- 0423-025-12 AM-249 Metals in Aerosol (INTENSE Regime).xlsx
- 0423-025-13 AM-224 Primary Constituents in Aerosol (INTENSE Regime).xlsx
- 0423-025-15 AM-274 Glycidol in Aerosol (INTENSE Regime).xlsx
- 0423-025-16 AM-220 Nitrosamines in Aerosol (INTENSE Regime).xlsx
- 0423-505-1 ENT208A Volatile Compunds in Aerosol (CORESTA Regime).xlsx
- 0423-505-2 ENT208A Volatile Compunds in Aerosol (INTENSE Regime).xlsx
- Bidi Stick Classic 0423-025 Intense Repeat EOL - Reps 8,9.xlsx
- Bidi Stick Classic 0423-025 ISO EOL.xlsx

### 12.2.5 Storage Conditions Prior to Initiating Testing (12i)

All of the BIDI® Stick Classic products used for the end-of-life study and aerosol chemical analysis were stored at room temperature (ambient conditions 25°C and 60% RH) prior to initiating testing. (see "0423-025_0423-505 Final Report v0.0.pdf" available in the "Q12_Attachments" folder).

### 12.2.6 BIDI® Stick Aerosol End of Life (12j)

Prior to the start of the chemical characterization study, end of life (EOL) testing was conducted on the BIDI® Stick Classic product to determine the total number of puffs needed to deplete the product to approximately 90% consumption. The BIDI® Stick Classic product is a single use closed system (disposable) device that cannot be recharged. To establish the total number of puff counts over the device lifespan, each device was run in blocks of fifty puffs until the battery was depleted; the device blinked prior to turning off. The EOL testing was conducted on three (3) replicate samples for both the non-intense and intense puffing conditions.

Products from the same batch were evaluated for both the EOL testing and the aerosol characterization study. Summary results for the total number of puffs, device mass loss (DML) and accumulated mass (ACM) measured in the EOL Study of BIDI® Stick Classic product are provided in Table 2. The data is reported as average puff count, along with their respective standard deviations (SD).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**Table 2 Summary of Whole Puff Count Results for the BIDI® Stick Classic Product Evaluated Under Non-intense and Intense Puffing Conditions (n=3)**

| Testing Regimen | EOL Puff Count | | Device Mass Loss | | Accumulated Mass (ACM) | |
|---|---|---|---|---|---|---|
| | Mean | SD | Mean (mg/stick) | SD | Mean (mg/stick) | SD |
| Non-intense (55ml/3sec/30sec) | 260 | 8.66 | 1067 | 23.4 | 1159 | 68.5 |
| Intense - (110ml/6sec/30sec) | 124 | 0.00 | 1096 | 6.79 | 1052 | 32.5 |

Datasets (Bidi Stick Classic 0423-025 Intense Repeat EOL - Reps 8,9.xlsx and Bidi Stick Classic 0423-025 ISO EOL.xlsx) are available in the "0423-025_0423-505 Final Report v0.0_Final Results" folder inside the "Q12_Attachments" folder.

The number of puffs for the aerosol collection used to evaluate whole product HPHC levels was calculated as 90% of the EOL puff counts. The number of puffs defined for the second phase of testing to 90% of device depletion, were 234 puffs for the non-intense puffing condition and 112 puffs for the intense regimen.

## 12.3 BIDI® Stick Classic Product Characterization (12a-12p)

The BIDI® Stick Classic product neither contains nor burns tobacco leaf, instead heating a nicotine-containing liquid (concentration of 6% nicotine by volume) to produce an aerosol that the user inhales. The e-liquid is formulated with propylene glycol (PG), vegetable glycerin (VG or glycerol), nicotine, and benzoic acid, as well as the tobacco flavor which is complex ingredient that is added to the base formulation. The BIDI® Stick Classic product is designed to deliver nicotine via an aerosol that contains significantly lower levels of toxicants than cigarette smoke. The nicotine (derived from tobacco), PG, VG base ingredients are USP-grade. The use of USP-grade nicotine minimizes the potential for the presence of, and subsequent user exposure to, tobacco-related impurities such as the carcinogens -NNN and NNK, whereas the use of USP-grade PG and VG minimizes the potential for contaminants such as diethylene glycol, ethylene glycol.

The PG and VG are added as base e-liquid ingredients, and are carriers for the other ingredients and to support aerosol formation. PG is also present in the final BIDI® Stick Classic formulation as a subcomponent of the tobacco flavor complex ingredient; the total amount of PG in the final formulation is the sum of PG added as base and the PG levels in the tobacco flavor complex ingredient. For this reason, the PG:VG ratio of the base formulation is optimized to support the solubility of nicotine and benzoic acid, as well as the fluid properties (e.g., viscosity, surface tension, wicking, and aerosolization) of the product formulation.

In response to this deficiency Bidi Vapor conducted chemical characterization of the BIDI® Stick Classic product aerosols to evaluate potential user exposures to base e-liquid ingredients, as well

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

as potential heat degradation byproducts (acetaldehyde, acrolein, diacetyl, formaldehyde, glycidol, propylene oxide), contaminants or impurities (diethylene glycol, ethylene glycol, NNN and NNK) and potential coil material leacheable compounds (cadmium, chromium, copper, lead, nickel). The targeted chemical characterization study was conducted on aerosols generated from the BIDI® Stick Classic products under both non-intense, and intense puffing conditions, and the data is summarized below in Table 3 (non-intense) and Table 4 (intense).

**Table 3 Summary of Constituent Levels in the BIDI® Stick Classic Aerosol Generated Using the Non-intense (55ml/3sec/30sec) Puffing Regimen (n=3)**

| Analyte | Units | LOD/LOQ | Per Puff Mean (SD) | Per Device Mean* |
|---|---|---|---|---|
| Acetaldehyde | µg | 0.000672/ 0.00481 | 0.034 (0.0125) | 7.96 |
| Acrolein | µg | 0.000618/ 0.00484 | 0.014 (0.0126) | 3.28 |
| Cadmium | ng | 0.00427/ 0.0214 | ND | ND |
| Chromium | ng | 0.0427/ 0.214 | ND | ND |
| Copper | ng | 0.107/ 0.321 | ND | ND |
| Diacetyl | µg | 0.000490/ 0.00491 | 0.040 (0.0021) | 9.36 |
| Diethylene Glycol | mg | 0.0000537/ 0.000334 | ND | ND |
| Ethylene Glycol | mg | 0.0000390/ 0.000341 | ND | ND |
| Formaldehyde | µg | 0.000899/ 0.00482 | 0.034 (0.0117) | 7.96 |
| Glycerol | mg | 0.00162/ 0.0161 | 1.25 (0.02) | 293 |
| Glycidol | µg | 0.0000214/ 0.000214 | 0.017 (0.0115) | 3.98 |
| Lead | ng | 0.0107/ 0.0427 | BLOQ | BLOQ |
| Nickel | ng | 0.0214/ 0.0427 | 0.339 (0.031) | 79.3 |
| Nicotine | mg | 0.000385/ 0.00385 | 0.228 (0.006) | 53.4 |
| NNK | ng | 0.000260/ 0.00205 | 0.019 (0.002) | 4.45 |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

| Analyte | Units | LOD/LOQ | Per Puff Mean (SD) | Per Device Mean* |
|---|---|---|---|---|
| NNN | ng | 0.000692/ 0.00205 | 0.097 (0.028) | 22.7 |
| Propylene Glycol | mg | 0.00103/ 0.0102 | 2.20 (0.05) | 515 |
| Propylene Oxide | μg | 0.000595/ 0.00560 | 0.094 (0.152) | 22.0 |

BLOQ = below level of quantitation, ND = not detected/ no different than background, SD = standard deviation
* The "Per Device Mean" was calculated by multiplying the "Per Puff Mean" by the total number of puffs. (234)

**Table 4 Summary of Constituent Levels in the BIDI® Stick Classic Aerosol Generated Using the Intense (110ml/6sec/30sec) Puffing Regimen (n=3)**

| Analyte | Units | LOD/LOQ | Per Puff Mean (SD) | Per Device Mean* |
|---|---|---|---|---|
| Acetaldehyde | μg | 0.00164/ 0.0117 | 2.56 (1.67) | 287 |
| Acrolein | μg | 0.0015/ 0.0118 | 1.13 (0.87) | 1.7 |
| Cadmium | ng | 0.00893/ 0.0446 | ND | ND |
| Chromium | ng | 0.0893/ 0.446 | BLOQ | BLOQ |
| Copper | ng | 0.223/ 0.670 | BLOQ | BLOQ |
| Diacetyl | μg | 0.00119/ 0.0120 | 0.143 (0.006) | 16.0 |
| Diethylene Glycol | mg | 0.000150/ 0.00104 | ND | ND |
| Ethylene Glycol | mg | 0.000109/ 0.000995 | ND | ND |
| Formaldehyde | μg | 0.00219/ 0.0118 | 4.85 (3.28) | 543 |
| Glycerol | mg | 0.00450/ 0.0450 | 2.56 (0.07) | 287 |
| Glycidol | μg | 0.0000446/ 0.000448 | 0.0395 (0.0186) | 4.42 |
| Lead | ng | 0.0223/ 0.0893 | BLOQ | BLOQ |
| Nickel | ng | 0.0446/ 0.0893 | 0.635 (0.336) | 71.1 |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

A0279

| Analyte | Units | LOD/LOQ | Per Puff Mean (SD) | Per Device Mean* |
|---|---|---|---|---|
| Nicotine | mg | 0.000536/ 0.00536 | 0.476 (0.009) | 53.3 |
| NNK | ng | 0.000543/ 0.00429 | 0.048 (0.012) | 5.38 |
| NNN | ng | 0.00145/ 0.00429 | 0.165 (0.040) | 18.5 |
| Propylene Glycol | mg | 0.00143/ 0.0143 | 4.53 (0.11) | 507 |
| Propylene Oxide | µg | 0.0248/ 0.234 | 2.56 (0.72) | 287 |

BLOQ = below level of quantitation, ND = not detected/ no different than background, SD = standard deviation
* The "Per Device Mean" was calculated by multiplying the "Per Puff Mean" by the total number of puffs. (112)

Bidi Vapor conducted a comprehensive evaluation of the non-cancer hazard and cancer risk from potential exposures to these constituents in aerosols from the BIDI® Stick Classic products and as compared to cigarette smoke using a quantitative risk assessment (QRA) approach (see "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C). However, given the overall substantial reductions in the numbers and levels of HPHCs (established and proposed) in the BIDI® Stick Classic aerosol, compared to cigarette smoke, the potential for substantial reductions in user exposures and associated health hazards from use from the BIDI® Stick does not require a QRA approach for the comparison to cigarette smoke exposures.

The potential reductions in exposures and associated cancer risks and noncancer hazards from the BIDI® Stick Classic product compared to cigarette smoking can also be evaluated by focusing on the aerosol yields of the HPHCs, their respective toxicities, and magnitude of decrease between the levels measured in the BIDI® Stick Classic aerosol compared to cigarette smoke. Taken together, the chemical characterization data for the BIDI® Stick Classic product aerosols demonstrate that although some thermal degradation products are present, these are fewer in number and overall are present in the BIDI® Stick Classic aerosols at lower relative levels.

### 12.3.1 Comparison to Combusted Cigarettes

During smoking, nicotine is delivered via the smoke generated from burning of the cigarette (made of wrapping paper, tobacco filler, humectants, flavor ingredients, etc.,), and burning of the cigarette rod (tobacco plant components and non-tobacco ingredients). This results in a highly complex mixture of >5000 constituents (Rodgman et al., 2008), 93 of which have been established by the FDA as harmful and potentially harmful constituents (HPHCs) (FDA, 2012). Unlike

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

smoking, nicotine delivery during use of the BIDI® Stick Classic product occurs via an aerosolized nicotine-containing liquid.

The levels of aerosol constituents measured in the BIDI® Stick Classic aerosol using the targeted analysis (under non-intense and intense puffing) were compared to constituent levels in cigarette smoke (Table 5 and Table 6). The levels of HPHCs (established and proposed) in mainstream smoke for the Kentucky Reference 1R6F cigarette (1R6F) (Jaccard et al., 2019). The 1R6F reference cigarette was chosen as a representative CC, because several studies comparing Kentucky reference cigarettes (e.g., 1R4F, 1R5F and 3R4F) to commercially marketed cigarettes have shown that reference cigarettes have similar HPHC profiles (Patskan et al., 2008; Roemer et al., 2004; Vu et al., 2015).

Table 5 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick Using Non-intense Puffing, to Smoke from Combusted Cigarettes Using the ISO Puffing Regimen

| HPHC or Chemical Analyte (associated health hazard#) | Aerosol or Smoke Yields Normalized by Nicotine (mg/mg) | | % Difference |
|---|---|---|---|
| | BIDI® Stick Classic | 1R6F[a] | vs_1R6F |
| Acetaldehyde (CA, RT) | 1.49E-04 | 6.84E-01 | ↓ ≥99.9 |
| Acrolein (RT, CT) | 6.14E-05 | 6.66E-02 | ↓ ≥99.9 |
| Cadmium (CA, RT, RDT) | ND | 3.35E-05 | ↓ ≥99.9* |
| Chromium (CA, RT, RDT) | ND | BLOD | NC |
| Copper | ND | NT | N/A |
| Diacetyl (RT) | 1.75E-04 | NT | N/A |
| Diethylene Glycol (RT) | ND | NT | N/A |
| Ethylene Glycol (RT) | ND | NT | N/A |
| Formaldehyde (CA, RT) | 1.49E-04 | 4.31E-02 | ↓ ≥99.7 |
| Glycerol (RT) | 5.48E+00 | | ↑ ≥128 |
| Glycidol (CA) | 7.46E-05 | NT | N/A |
| Lead (CA, CT, RDT) | BLOQ | BLOD | NC |
| Nickel (CA, RT) | 1.49E-06 | BLOD | NC** |
| Nicotine (RDT, AD) | 1.00E+00 | 1 | N/A |
| NNK (CA) | 8.33E-08 | 1.29E-04 | ↓ ≥99.7 |
| NNN (CA) | 4.25E-07 | 1.09E-04 | ↓ ≥99.9 |
| Propylene Glycol (RT) | 9.65E+00 | NT | N/A |
| Propylene Oxide (CA, RDT) | 4.14E-04 | 8.44E-01 | ↓ ≥99.9 |

AD = addictive; BLOD = below level of detection; CA=carcinogen; CT=Cardiovascular toxicant; ND = not detected/ no different than background; NT = not tested; RDT= reproductive or developmental toxicant; RT=respiratory toxicant; SD = standard deviation

Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.

NC = Not Calculated; the % Difference could not be calculated because the values were BLOD/BLOQ (or ND) in both the BIDI® Stick Classic and comparator product

N/A = Not Applicable; the % Difference could not be calculated because a value was not reported for the constituent yield in the comparator product.

#Note: Corresponding health hazards as noted in the FDA 2021 HPHC established list., or the FDA 2019 HPHC proposed list.

*Note: The analyte in the BIDI® Stick Classic aerosol was reported as below the method LOD; the % difference was estimated based on ½ the method LOD (LOD/2) as the numeric value for cadmium in the BIDI® Stick Classic aerosol

**Note: The % Difference for nickel could not be calculated because the value for the method LOD was not reported in Jaccard et al., 2019.

ᵃ Jaccard, G., et al. (2019). "Mainstream smoke constituents and in vitro toxicity comparative analysis of 3R4F and 1R6F reference cigarettes." Toxicology Reports 6: 222-231

*Analyte was reported as below the method LOQ; the numeric value was estimated based on the average of the LOD and LOQ ([LOQ+LOD]/2)

Table 6 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick Using Intense Puffing (110mL/6s/30s), to Smoke from Combusted Cigarettes Using the Intense Puffing Regimen (ISO Intense)

| HPHC or Chemical Analyte (associated health hazard#) | Aerosol or Smoke Yields Normalized by Nicotine (mg/mg) | | % Difference |
|---|---|---|---|
| | BIDI® Stick Classic | 1R6Fᵃ | vs_1R6F |
| Acetaldehyde (CA, RT) | 5.38E-03 | 8.43E-01 | ↓ ≥99.4 |
| Acrolein (RT, CT) | 2.37E-03 | 9.11E-02 | ↓ ≥97.4 |
| Cadmium (CA, RT, RDT) | ND | 4.01E-05 | ↓ ≥99.9* |
| Chromium (CA, RT, RDT) | BLOQ | BLOQ | NC |
| Copper | BLOQ | NT | N/A |
| Diacetyl (RT) | 3.00E-04 | NT | N/A |
| Diethylene Glycol (RT) | ND | NT | N/A |
| Ethylene Glycol (RT) | ND | NT | N/A |
| Formaldehyde (CA, RT) | 1.02E-02 | 5.47E-02 | ↓≥ 81.4 |
| Glycerol (RT) | 5.38E+00 | NT | N/A |
| Glycidol (CA) | 8.30E-05 | NT | N/A |
| Lead (CA, CT, RDT) | BLOQ | BLOD | NC |
| Nickel (CA, RT) | 1.33E-06 | BLOD | N/A ** |
| Nicotine (RDT, AD) | 1 | 1 | N/A |
| NNK (CA) | 1.01E-07 | 1.01E-04 | ↓≥ 99.9 |
| NNN (CA) | 3.47E-07 | 1.21E-04 | ↓≥ 99.7 |
| Propylene Glycol (RT) | 9.52E+00 | NT | N/A |
| Propylene Oxide (CA, RDT) | 5.38E-03 | 9.00E-01 | ↓≥ 99.4 |

Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.

AD=addictive BLOD = below level of detection; CA=carcinogen; CT=Cardiovascular toxicant; ND = not detected/ no different than background, NT = not tested; RDT= reproductive or developmental toxicant; RT=respiratory toxicant; SD = standard deviation

NC= Not Calculated; the % Difference could not be calculated because the values were BLOD/BLOQ (or ND) in both the BIDI® Stick Classic and comparator product

N/A = Not Applicable; the % Difference could not be calculated because a value was not reported for the constituent yield in the comparator product.

#Note: Corresponding health hazards as noted in the FDA 2021 HPHC established list., or the FDA 2019 HPHC proposed list.

*Note: The analyte in the BIDI® Stick Classic aerosol was reported as below the method LOD; the % difference was estimated based on ½ the method LOD (LOD/2) as the numeric value for cadmium in the BIDI® Stick Classic aerosol

**Note: The % Difference for nickel could not be calculated because the value for the method LOD was not reported in Jaccard et al., 2019[a] Jaccard, G., et al. (2019). "Mainstream smoke constituents and in vitro toxicity comparative analysis of 3R4F and 1R6F reference cigarettes." Toxicology Reports 6: 222-231.

Of the 17 constituents (excluding nicotine), evaluated, seven (6) chemicals did not have published data on yields for the 1R6F cigarette (1R6F) under non-intense puffing and seven (7) under intense (noted as NT) so a percent difference could not be calculated (noted as N/A) in Table 5 and Table 6 above (glycerol was only reported for non-intense). Following non-intense puffing, five chemicals the BIDI® Stick Classic product aerosol were no different than background (ND) and one was below the level of quantitation (Table 5) Following intense puffing three chemicals in the BIDI® Stick Classic product aerosol. were either no different than background (ND), or below the level of quantitation (Table 6).

Of the constituents measured by both puffing regimens, chromium and lead were reported to be BLOD/BLOQ in both the BIDI® Stick Classic product and 1R6F cigarette smoke (Jaccard et al., 2019), and thus could not be compared (the % difference was noted as NC in Table 5 and Table 6).

Nickel values in the smoke of 1R6F cigarettes were reported as BLOD (Jaccard et al., 2019). However, the LOD value was not reported in the publication. For this reason, a percent difference could not be calculated (noted as NC) in Table 5 and Table 6.

An in-depth toxicological assessment and quantitative health risk assessment has been conducted for all constituents found in the BIDI® Stick Classic product aerosol (see "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C). For the constituents in aerosol where a comparison to the levels in the 1R6F cigarette smoke could be made, summary of the differences between the constituent levels measured in the BIDI® Stick Classic product aerosol compared to the levels published in smoke from the 1R6F cigarette is provided in Table 7 and discussed below.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**Table 7 Summary of HPHC (established and proposed) Levels in the BIDI® Stick Classic aerosol vs 1R6F Cigarette Smoke**

| Constituents with Higher or Potentially Higher ( ↑ ) Levels in BIDI® Stick Classic vs 1R6F Smoke |
|---|
| • PG[a] (RT)<br>• VG[a] (RT)<br>• Nickel[b] (CA, RT) |
| **Constituents with Lower# ( ↓ ) Levels in BIDI® Stick Classic vs 1R6F Smoke** |
| • Acetaldehyde (CA, RT) [↓ ≥99.4]<br>• Acrolein (RT, CT) [↓ ≥97.4]<br>• Cadmium (CA, RT, RDT) [↓ ≥99.9]<br>• Formaldehyde (CA, RT) [↓ ≥ 81.4]<br>• NNK(CA) [↓ ≥ 99.9]<br>• NNN (CA) [↓ ≥ 99.7]<br>• Propylene Oxide (CA, RDT) [↓ ≥ 99.4] |

AD=addictive BLOD = below level of detection; CA=carcinogen; CT=Cardiovascular toxicant; NT = not tested; RDT= reproductive or developmental toxicant; RT=respiratory toxicant;

[a] Note: PG and VG are main e-liquid ingredients and thus are expected to be higher in the BIDI® Stick Classic product aerosol compared to cigarette smoke

[b]Note: Nickel was reported in (Jaccard et al., 2019) as BLOD, however, the LOD was not reported, and thus this is included as potentially higher.

#The percent difference is based on the comparison conducted using the Intense Puffing conditions because this showed the lowest % Difference. The % decrease in the HPHC levels compared to cigarettes is greater when calculated based on the non-intense puffing regimen.

The levels of PG, VG (base e-liquid ingredients) are expected to be higher in the BIDI® Stick Classic product aerosol compared to smoke from the 1R6F cigarette reference cigarette. A detailed toxicological evaluation of potential exposures to PG and VG from the levels in the is provided in "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C and are discussed briefly below in the comparison of potential exposures and associated non-cancer health effects from use of the BIDI® Stick Classic product aerosol compared to cigarette smoke.

Unlike other constituents reported in the (Jaccard et al., 2019) publication, we could not compare the levels of Nickel in the aerosol of Bidi Vapor with the levels in 1R6F cigarette smoke because the LOD value for nickel in 1R6F smoke is not disclosed in the publication. However, we can look at other sources for information about the levels of nickel in cigarette smoke for comparison. Additionally, we can also assume a worst case based on the coil material, that the level of nickel is higher in the BIDI® Stick Classic product aerosol compared to nickel in the 1R6F smoke. The overall relative cancer risks and non-cancer hazards associated with potential exposures to constituents in the BIDI® Stick Classic product aerosol compared to smoke from combusted cigarettes is discussed below.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 12.4 Carcinogenic HPHCs in the BIDI® Stick Classic Aerosols vs Cigarette Smoke

The aerosol chemical characterization study included analytical measurements for seven carcinogenic HPHCs; of these, one (glycidol) is a proposed HPHC (FDA, 2019) and six are on the HPHC established list. The levels of carcinogenic HPHCs evaluated were ($\geq 81.4$ to $\geq 99.9$) lower in the BIDI® Stick Classic product aerosol compared to smoke generated from the 1R6F cigarette, in both the non-intense and intense puffing regimens (Table 8). Since the LOD values for nickel in 1R6F cigarette smoke were not disclosed in the publication, we did not compare the levels of Nickel in the aerosol of Bidi Vapor with the levels in the 1R6F cigarette smoke. Instead, we leveraged other sources of information about nickel in cigarette smoke for comparison.

The overall substantial reductions in the overall number and levels of these carcinogenic constituents in the BIDI® Stick Classic aerosol compared to cigarette smoke indicate potential for substantial reductions in exposures and associated cancer risks from use of the BIDI® Stick Classic product compared to cigarette smoking.

**Table 8 Carcinogenic HPHC in the BIDI® Stick Classic aerosol vs 1R6F Cigarette Smoke**

| Constituents with Potentially Higher ( ↑ ) Levels in BIDI® Stick Classic vs 1R6F Smoke |
| --- |
| • Nickel[a] |
| **Constituents with Lower ( ↓ ) Levels in BIDI® Stick Classic vs 1R6F Smoke** |
| • Acetaldehyde [↓$\geq$99.4]<br>• Cadmium [↓$\geq$99.9]<br>• Formaldehyde [↓$\geq$ 81.4]<br>• NNK(CA) [↓$\geq$ 99.9]<br>• NNN (CA) [↓$\geq$ 99.7]<br>• Propylene Oxide [↓$\geq$ 99.4] |

[a]A percent difference for nickel could not be calculated because the LOD value for the analytical methods was not reported in the Jaccard et al., 2019 publication. Since a value was reported for nickel in the BIDI® Stick Classic product aerosol, and this was reported as BLOD in the 1R6F cigarette, the evaluation assumes the level of Nickel is potentially higher in BIDI® Stick Classic product aerosol compared to smoke

The evaluation of potential reductions in cancer risks associated with exposures to BIDI® Stick Classic product aerosols compared to cigarette smoking can be conducted using an analysis focused on the HPHC yields, their respective carcinogenic potencies, and the magnitude of the decreases between the levels measured in aerosols from the BIDI® Stick Classic product relative to cigarette smoke (FDA, 2019). This is also supported by the QRA approach provided in "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 12.4.1 Carcinogenic HPHCs in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke

### 12.4.1.1 Nickel from the BIDI® Stick Classic product aerosols are within the potential exposures to this HPHC from cigarettes on the US market

Nickel has been identified by the FDA as an HPHC in tobacco products and tobacco smoke, and is listed on the HPHC established list (FDA, 2012) as a carcinogen and respiratory toxicant (see "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C for an in-depth toxicological evaluation).

Nickel was found in the BIDI® Stick Classic aerosols at levels of up to 0.15 ug/mg nicotine (1.5E-04 mg/mg nicotine); the highest concentration is based on the non-intense puffing (Table 5). The levels of nickel in the 1R6F Kentucky reference cigarette were reported as below the LOD. However, since the LOD value for nickel in cigarette smoke is not disclosed in the publication, we could not compare the levels of Nickel in the aerosol of Bidi Vapor with the levels is the 1R6F cigarette smoke.

We did, however, look at other sources for information about the levels of nickel in cigarette smoke. The levels of nickel in smoke from US market cigarettes has been reviewed by the Agency for Toxic Substances and Disease Registry (ATSDR) Toxicological Profile for Nickel (ATSDR, 2005). Based on a study by Sunderman (1986) the ATSDR (2005) report on nickel estimates that smokers are exposed to ~2–12 µg of nickel for each pack of cigarettes, which is the equivalent to approximately 0.1 to 0.6µg of nickel per cigarette (2µg÷20cigarettes/pack = 0.1µg; 12µg÷20cigarettes/pack = 0.6µg). Given that the levels of nicotine measured in cigarette smoke is ~1mg for cigarettes (Jaccard et al., 2019), the nickel levels in cigarette smoke reported in the ATSDR (2005) report on nickel indicate that potential exposures to nickel from the BIDI® Stick Classic product aerosol are within the potential exposures to this HPHC from cigarettes on the US market.

Even if we assume that the levels of nickel are present at higher levels in the aerosols generated from the BIDI® Stick Classic product compared with smoke from combusted cigarettes, when taking into account the substantial decreases the yields other carcinogenic HPHCs and respiratory toxicants including: acetaldehyde (CA, RT) [↓ ≥99.4]; cadmium (CA, RT, RDT) [↓ ≥99.9]; formaldehyde (CA, RT) [↓≥ 81.4]; NNN (CA) [↓≥ 99.7]; NNK (CA) [↓≥ 99.9]; propylene oxide (CA, RDT) [↓≥ 99.4], their respective potencies, and the magnitude of the decreases between the levels measured in aerosols relative to cigarette smoke, the levels of nickel in the BIDI® Stick Classic product are not likely to raise toxicological concerns.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 12.4.2 Carcinogenic HPHCs at Lower Levels in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke

The analytical data demonstrate substantially lower levels of acetaldehyde (CA, RT) [↓ ≥99.4]; cadmium (CA, RT, RDT) [↓≥99.9]; formaldehyde (CA, RT) [↓≥81.4]; NNK (CA) [↓≥ 99.9]; NNN (CA) [↓≥ 99.7]; propylene oxide (CA, RDT) [↓≥ 99.4] in the BIDI® Stick Classic aerosol compared to smoke generated from the 1R6F cigarette, with both non-intense and intense puffing conditions. The substantial reductions in the levels of these constituents in the BIDI® Stick Classic aerosol compared to cigarette smoke indicate potential for substantial reductions in the overall exposures and associated cancer risk from use of the BIDI® Stick Classic product relative to smoking.

Several of the constituents evaluated in aerosols generated from the BIDI® Stick Classic: NNK, NNN, acetaldehyde and formaldehyde were previously identified by the World Health Organization (WHO) Study Group on Tobacco Product Regulation (WHO, 2008) as some of the "most hazardous" toxicants in cigarette smoke. The above constituents, along with several compounds that are present in cigarettes as byproducts of combustion and thus do not apply to ENDS products, (e.g., benzo[a]pyrene (representative polyaromatic hydrocarbon [PAHs], benzene and carbon monoxide) were recommended by the WHO (2008) to be mandated for lowering in combusted cigarettes. An evaluation of the potential reduction in cancer risk associated with the magnitude of decrease in the levels, and subsequent decrease in exposures to these constituents (and associated cancer risks) from the BIDI® Stick Classic product aerosol compared combusted cigarettes is discussed below.

### 12.4.2.1 Tobacco Specific Nitrosamines (NNK and NNN)

NNK and NNN and other TSNAs are natural constituents of the tobacco plant and can form during the processing of the tobacco leaves (Djordjevic et al., 1989) and thus are present in smoke from combusted cigarettes at relatively high levels. Both NNK and NNN have been identified by the FDA as carcinogenic HPHCs (FDA, 2012) and are classified as Group 1 (known human carcinogens) by the International Agency for Research on Cancer (IARC, 2007; 2012).

For NNN, an inhalation unit risk (IUR) of $4.0 \times 10^{-4}$ per ug/m$^3$ was developed by California EPA (1992) based on cancers of the respiratory system in male hamsters. NNK has also been shown to produce lung tumors in animal studies regardless of the route of exposure (Zheng et al., 2011). Although an inhalation cancer unit has not been developed by NNK, an oral cancer factor of 49 (mg/kg-day)-1 was developed by California EPA (2001) based on tumors in the pancreas, liver, nasal cavity and lungs following oral exposures. Although there are uncertainties when

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

extrapolating from an oral cancer value to a cancer unit risk for inhalation exposures (US EPA, 1994), NNK is a lung-specific carcinogen (WHO, 2008) when delivered via inhalation directly to the target tissue. For this reason, the use of the oral cancer value in the relative risk evaluation for NNK would likely underestimate the true potential reduction in the cancer risk associated with the decreases in NNK from use of the BIDI® Stick Classic compared to cigarettes.

The levels of TSNAs in mainstream smoke from 50 cigarette brands on the U.S market was evaluated by Edwards et al. (2017). For the non-intense (ISO) smoking regimen, Edwards et al. (2017) reports TSNA smoke yield ranges of 13 to 122ng/cig for NNK, and 18 to 171 ng/cig for NNN. Under the Canadian Intense (CI) smoking regimen, the levels reported range between 40 to 246 ng/cig for NNK and 33 to 323ng/cig for NNN (Edwards et al., 2017).

The levels of TSNAs in the BIDI® Stick Classic aerosols are up to 1.01E-07 and 3.47E-07 mg/mg nicotine for NNK and NNN, respectively. By comparison, the NNK and NNN yields reported in smoke from the 1R6F are 1.29E-04 and 1.09E-04 mg/mg nicotine under non-intense, and 1.01E-04 and 1.21E-04 mg/mg nicotine under intense puffing conditions. The substantial reductions ($\geq$ 99.7) in the levels of NNK and NNN in the BIDI® Stick Classic aerosols relative to cigarette smoke indicate substantial reductions in the potential exposures and associated cancer risk from use of the BIDI® Stick Classic product relative to combusted cigarettes.

### 12.4.2.2 Volatile Organic Compounds (Acetaldehyde and Formaldehyde)

### 12.4.2.2.1 Acetaldehyde

Acetaldehyde is classified as Group 2B (possibly carcinogenic to humans) by IARC (1999), and as identified by the FDA as a carcinogen and respiratory toxicant on the HPHC established list (FDA, 2012). The U.S. EPA has developed an IUR of $2.2 \times 10^{-6}$ per $mg/m^3$ based on tumors in the respiratory tract (US EPA, 1988). During smoking, acetaldehyde and other VOCs form as a result of burning the cigarette paper and tobacco filler, as well as heat degradation byproducts of tobacco filler ingredients and additives including humectants, sugars and flavors (FDA, 2015). The levels of acetaldehyde in smoke from 50 brands of cigarettes on the U.S. market was evaluated by Pazo et al. (2016). The levels of acetaldehyde reported in U.S. commercial cigarettes range from 126 to 1143 µg/cig (ISO) and from 1098 to 2244 µg/cig (CI).

The levels of acetaldehyde measured in the BIDI® Stick Classic aerosols were up to 5.38E-03 mg/mg nicotine. By comparisons, acetaldehyde yields reported in smoke from the were 6.84E-01 (ISO) and 8.43E-01 mg/mg nicotine (CI). Overall, the aerosol chemistry data show substantial

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

(≥99.4) reductions in the levels of acetaldehyde in the BIDI® Stick Classic aerosols relative to cigarette smoke. The aerosol characterization data thus indicate substantial reductions in the potential exposures and associated cancer risk from use of the BIDI® Stick Classic product relative to combusted cigarettes.

## 12.4.2.2.2 Formaldehyde

Formaldehyde was classified as a Group 1 (carcinogenic to humans) by IARC (2006), and was identified as HPHC (carcinogen and respiratory toxicant) (FDA, 2012). The U.S. EPA developed an IUR of 1.x 10-5 per ug/m$^3$ based on tumors in the respiratory tract (USEPA, 1990).

Similar to acetaldehyde and other VOCs, formaldehyde can form as a result of burning the cigarette paper and tobacco filler, and as a heat degradation byproducts of tobacco filler ingredients and additives including humectants, sugars and flavors (FDA, 2015). The levels of formaldehyde in mainstream smoke from 48 brands of Philip Morris USA cigarettes were evaluated by Counts et al. (2005), using the ISO puffing regimen. The formaldehyde yields were reported to range 4μg/cig (Merit KS F SP Ultima/ US- 0.13 mg nicotine/cig) to 33 μg/cig (Marlboro KS F SP/US – 1.02 mg nicotine/ cig) (Counts et al., 2005). Normalized to nicotine, the range for the formaldehyde yields (IS0) range from 30.8 to 32.4 μg/mg nicotine.

The levels of formaldehyde measured in the BIDI® Stick Classic aerosols were up to 1.02E-02 mg/mg nicotine. By comparison, formaldehyde yields reported in smoke from the 1R6F cigarette were 4.31E-02 (ISO) and 5.47E-02 mg/mg nicotine (CI). Overall, the aerosol chemistry data show substantial (≥ 81.4) reductions in the levels of formaldehyde in the BIDI® Stick Classic aerosols relative to cigarette smoke. The aerosol characterization data thus indicate substantial reductions in the potential exposures and associated cancer risk from use of the BIDI® Stick Classic product relative to combusted cigarettes.

## 12.4.2.3 Other Carcinogenic HPHC Considerations

In addition to the decreases between the BIDI® Stick Classic aerosols and cigarette smoke observed in the measured HPHCs, it is important to note that the chemical characterization of HPHC yields in the BIDI® Stick Classic aerosols conducted herein, focused on the constituents identified by the FDA as needed to evaluate potential exposures to HPHCs from the BIDI® Stick Classic product. However, since the BIDI® Stick Classic is an ENDS device and not a combustible tobacco product, carcinogenic HPHCs that are found in smoke from burning of the cigarette (e.g., benzo[a]pyrene) are not considered applicable to the chemical characterization of aerosols

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

generated from the BIDI® Stick Classic product, and thus were not identified by the FDA in this deficiency as constituents that are needed to "*evaluate the full HPHC exposure of the new product*".

For example, benzo[a]pyrene (BaP) and other PAHs form as a result of incomplete combustion (pyrolysis) of organic material. PAHs in cigarette smoke result from burning the tobacco leaf, paper and other organic materials as the cigarette is smoked (Li et al., 2022). The smoke yields of BaP and other PAHs. The levels of BaP and other PAHs in mainstream smoke from 50 cigarette brands on the U.S market were evaluated by Vu et al. (2015). The smoke yields of BaP reported by Vu et al. (2015) for the U.S. market cigarettes range from 3.3 to 22ng/cig (IS) and 1.3 to 38 ng/cig (CI). As with other ENDS products, the BIDI® Stick Classic product neither contains nor burns tobacco leaf, BaP (and other PAHs) that form as a result of incomplete combustion of organic materials do not apply. For these reasons, switching from combusted cigarettes to the BIDI® Stick Classic product is likely to also result in substantial reductions in PAH exposures and associated health risks compared to continued smoking.

### 12.4.3 Relative Cancer Risk Summary

With the exception of nickel (which lacked information on the LOD in Jaccard et al. (2019) study, and thus could not be fully evaluated), all other measured carcinogenic HPHCs were lower in the aerosols generated from the BIDI® Stick Classic compared to smoke from the 1R6F cigarette:

- Acetaldehyde [↓≥99.4]
- Cadmium [↓≥99.9]
- Formaldehyde [↓≥ 81.4]
- NNK(CA) [↓≥ 99.9]
- NNN (CA) [↓≥ 99.7]
- Propylene Oxide [↓≥ 99.4]

In addition, switching from combusted cigarettes to the BIDI® Stick Classic product is likely to also result in substantial reductions in exposures to PAHs and other byproducts combustion that are present in cigarette smoke, but not applicable to ENDS product.

Taken together, the overall substantial reductions in the levels of carcinogenic HPHCs in BIDI® Stick Classic aerosols compared to cigarette smoke indicates likely reductions in user exposures and associated cancer risks.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 12.5 Noncancer Hazards in BIDI® Stick Classic Aerosols vs Cigarette Smoke

The aerosol chemistry data show that with the exception of the base e-liquid ingredients (PG and VG) and nickel, the levels of all other measured constituents identified by the FDA (2012) as HPHCs with known respiratory (RT), cardiovascular (CT), reproductive or developmental (RDT) toxicities were lower in the BIDI® Stick Classic aerosol compared to cigarette smoke (Table 9).

**Table 9 Summary of Measured HPHCs (established and proposed) with known known respiratory (RT), cardiovascular (CT), reproductive or developmental (RDT) toxicities in the BIDI® Stick Classic aerosol vs 1R6F Cigarette smoke**

| Constituents with Higher ( ↑ ) Levels in BIDI® Stick Classic vs 1R6F Smoke |
|---|
| <ul><li>PGª (RT)</li><li>VGª (RT)</li><li>Nickelᵇ (RT)</li></ul> |
| **Constituents with Lower# ( ↓ ) Levels in BIDI® Stick Classic vs 1R6F Smoke** |
| <ul><li>Acetaldehyde (RT) [↓ ≥99.4]</li><li>Acrolein (RT, CT) [↓ ≥97.4]</li><li>Cadmium (RT, RDT) [↓ ≥99.9]</li><li>Formaldehyde (RT) [↓≥ 81.4]</li><li>Propylene Oxide (RDT) [↓≥ 99.4]</li></ul> |

AD=addictive   BLOD = below level of detection; CA=carcinogen; CT=Cardiovascular toxicant; NT = not tested; RDT= reproductive or developmental toxicant; RT=respiratory toxicant;
ª Note: PG and VG are main e-liquid ingredients and thus are expected to be higher in the BIDI® Stick Classic product aerosol compared to cigarette smoke
ᵇNote: Nickel was reported in (Jaccard et al., 2019) as BLOD, however, the LOD was not reported, and thus this is included as potentially higher.
#The percent difference is based on the comparison conducted using the Intense Puffing conditions because this showed the lowest % Difference. The % decrease in the HPHC levels compared to cigarettes is greater when calculated based on the non-intense puffing regimen.

### 12.5.1 Constituents Found at Higher Levels in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke

#### 12.5.1.1 Propylene Glycol and Glycerol

PG and VG are base e-liquid ingredients in the BIDI® Stick Classic formulations and thus are expected to be present at higher levels in aerosols compared to cigarette smoke. The levels of PG were not reported in (Jaccard et al., 2019) and thus a comparison of relative increases of these constituents to the 1R6F cigarette could not be made. Smoke yields for glycerol have been reported in (Jaccard et al., 2019) for the 1R6F Kentucky reference cigarette as 1.7 mg (non-intense only) the glycerol level in the 1R6F cigarette normalized to nicotine is 2.18 mg/mg nicotine. The levels of glycerol in the BIDI® Stick Classic are up to 5.48E+00 mg/mg nicotine (non-intense), which is

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

~2-fold higher than the glycerol yields published for the 1R6F reference cigarette. The levels of PG from the 3R4F were not found in the published literature, and thus a comparison could not be made to the 3R4F either.

A comprehensive toxicological evaluation of PG and VG, as well as a QRA of potential health hazards are provided in (see "Bidi Vapor Deficiency Letter Q21 Response.pdf" Appendix A). Both PG and VG are common base e-liquid ingredients in ENDS products (National Academies of Sciences, 2018) and are added to combusted cigarettes as humectants (WHO, 2015).

NIOSH identified both PG and VG as respiratory irritants in occupational settings. Using this classification as criteria, PG and VG were proposed by FDA to be added to the list of HPHCs in tobacco products and tobacco smoke and aerosol (FDA, 2019). Although inhalation exposure to PG and VG has been reported as irritating, the available data and information on inhalation toxicity of these compounds, while not extensive, indicate that PG and VG are not strong respiratory irritants (Flora et al., 2016; Renne et al., 1992; FDA, 2019) The potential health hazards associated with PG and VG in the context of potential exposures from ENDS products have been reviewed and evaluated by the National Academies of Sciences, Engineering, and Medicine (NASEM) report on Public Health Consequences of E-Cigarettes (NASEM, 2018). Based on the totality of evidence, including considerations for potential exposures to PG and VG, the NASEM (2018) report concluded:

> "There is substantial evidence that except for nicotine, under typical conditions of use, exposure to potentially toxic substances from e-cigarettes is significantly lower compared with combustible tobacco cigarettes."

Although the NASEM (2018) report conclusion was not made specifically based on the BIDI® Stick Classic product that is the subject of this application, it is informative, and more specifically for the toxicological evaluation of potential exposures to PG and VG. Taken together, and considering that PG and VG are relatively weak respiratory irritants (Flora et al., 2016; Renne et al., 1992; FDA, 2019) the levels of PG and VG in the BIDI® Stick Classic are unlikely to pose toxicological concerns compared to cigarette smoke. For a comprehensive toxicology evaluation of PG and VG, including a QRA evaluation see (see "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C).

### 12.5.1.1.1 Nickel

Nickel was found in the BIDI® Stick Classic aerosols at levels of up to 0.15 ug/mg nicotine (1.5E-04 mg/mg nicotine); the highest concentration is based on the non-intense puffing, whereas the

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

nickel yield in smoke from the 3R4F was reported as below the LOD (Jaccard et al., 2019). However, since the LOD value for nickel in cigarette smoke is not disclosed in the publication, we could not compare the levels of Nickel in the aerosol of Bidi Vapor with the levels is the 1R6F cigarette smoke. We did, however, look at other sources for information about the levels of nickel in cigarette smoke. The Information on potential exposures to nickel from smoking was previously summarized herein, and an in-depth toxicological evaluation including a QRA of potential health hazards associated with nickel from the BIDI® Stick Classic aerosols is provided in "Bidi Vapor Deficiency Letter Q20 Response.pdf" Appendix C.

Additionally, if we assume that the levels of nickel are present at higher levels in the aerosols generated from the BIDI® Stick Classic product compared with smoke from combusted cigarettes, when taking into account the substantial reductions in the yields of known respiratory toxicants such as acetaldehyde [↓ ≥99.4], acrolein [↓ ≥97.4] and formaldehyde [↓≥ 81.4] among other, their respective potencies, and the magnitude of the decreases between the levels measured in aerosols relative to cigarette smoke, the levels of nickel in the BIDI® Stick Classic product are not likely to raise toxicological concerns.

### 12.5.2 Constituents at Lower Levels in BIDI® Stick Classic Aerosol Compared to Cigarette Smoke

As summarized in Table 9 above, with the exception of the base e-liquid ingredients (PG and VG) and nickel, the levels of all other measured constituents identified by the FDA (2012) as HPHCs with known respiratory (RT), cardiovascular (CT), reproductive or developmental (RDT) toxicities were lower in the BIDI® Stick Classic aerosol compared to cigarette smoke (Table 9):

- Acetaldehyde (RT) [↓ ≥99.4]
- Acrolein (RT, CT) [↓ ≥97.4]
- Cadmium (RT, RDT) [↓ ≥99.9]
- Diacetyl (RT) [↓≥ 99.4]
- Formaldehyde (RT) [↓≥ 81.4]
- Propylene Oxide (RDT) [↓≥ 99.4]

Of these HPHCs, six (acetaldehyde, acrolein and formaldehyde) were identified by the WHO (2008) and other published studies (Fowles et al., 2003; Haussmann, 2012) to be the greatest contributors to the noncancer hazards associated with cigarette smoke. The decreases in the levels of acetaldehyde, acrolein and formaldehyde, and subsequent reductions in potential exposures and

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

associated noncancer hazards from the BIDI® Stick Classic compared to cigarettes is summarized below:

### 12.5.2.1 Acrolein

Acrolein was identified by the FDA as a respiratory and cardiovascular toxicant on the HPHC established list (FDA, 2012). The U.S EPA developed an inhalation reference concentration (RfC) of $2.0 \times 10^{-5}$ mg/m$^3$. An evaluation of smoke constituents conducted by Haussmann (2012) estimates that among the constituents found in smoke, acrolein exposure represents approximately 88.5% of the known noncancer hazard from smoking (Haussmann, 2012). Acrolein has also been linked to the majority of smoking-related noncancer respiratory toxicities (CDC, 2014; Moretto et al., 2012).

Counts et al. (2005) evaluated acrolein levels in the mainstream smoke from 48 brands of Philip Morris USA cigarettes using ISO smoking regimen. The acrolein yields were reported to range from 9.7mg/cig (Merit KS F SP Ultima/ US- 0.13 mg nicotine/cig) to 55ug/cig (Marlboro KS F SP/US – 1.02 ug nicotine/ cig) (Counts et.al., 2005). Normalized to nicotine, the range for the acrolein yields (IS0) range from 74.6 to 54.5 ug/mg nicotine for cigarettes on the US market. The percent difference in acrolein yields measured in the BIDI® Stick Classic aerosol compared to smoke from the 1R4F reference cigarette indicates substantial reduction (≥97.4) in potential exposures and associated health hazards from the BIDI® Stick Classic aerosol compared to cigarette smoke.

### 12.5.2.2 Acetaldehyde

Acetaldehyde was identified by the FDA as a respiratory toxicant on the HPHC established list (FDA, 2012). The U.S. EPA developed an RfC value of $9 \times 10^{-3}$ mg/m$^3$ for inhalation exposure, bases on effects on the respiratory and nervous systems (US EPA, 1988). As discussed in more detail previously, the levels of acetaldehyde in the BIDI® Stick Classic aerosols were substantially (≥99.4) lower compared to cigarette smoke. These reductions in the levels of acetaldehyde in the BIDI® Stick Classic aerosols compared to cigarette smoke indicate subsequent substantial reductions in acetaldehyde exposures and associated noncancer hazards from use of the BIDI® Stick Classic product relative to combusted cigarettes.

### 12.5.2.3 Formaldehyde

Similar to acetaldehyde and other VOCs, formaldehyde can form as a result of burning the cigarette paper and tobacco filler, and as a heat degradation byproducts of tobacco filler ingredients and

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

additives including humectants, sugars and flavors (FDA, 2015). The levels of formaldehyde in mainstream smoke from 48 brands of Philip Morris USA cigarettes were evaluated by Counts et al. (2005), using the ISO puffing regimen. The formaldehyde yields were reported to range 4μg/cig (Merit KS F SP Ultima/ US- 0.13 mg nicotine/cig) to 33 μg/cig (Marlboro KS F SP/US – 1.02 mg nicotine/ cig) (Counts et al., 2005). Normalized to nicotine, the range for the formaldehyde yields (IS0) range from 30.8 to 32.4 μg/mg nicotine.

The levels of formaldehyde measured in the BIDI® Stick Classic aerosols were up to 1.02E-02 mg/mg nicotine. By comparison, formaldehyde yields reported in smoke from the 1R6F cigarette were 4.31E-02 (ISO) and 5.47E-02 mg/mg nicotine (CI). Overall, the aerosol chemistry data show substantial ($\geq 81.4$) reductions in the levels of formaldehyde in the BIDI® Stick Classic aerosols relative to cigarette smoke, indicating subsequent reductions in user exposures and associated noncancer hazards from use of the BIDI® Stick Classic product relative to combusted cigarettes.

### 12.5.3 Noncancer Health Hazard Summary

The analytical chemistry data show that with the exception of the base e-liquid ingredients (PG and VG) and nickel, the levels of all other measured constituents identified by the FDA (2012) as HPHCs with known respiratory (RT), cardiovascular (CT), reproductive or developmental (RDT) toxicities were lower in the BIDI® Stick Classic aerosol compared to cigarette smoke:

- Acetaldehyde (RT) [↓ ≥99.4]
- Acrolein (RT, CT) [↓ ≥97.4]
- Cadmium (RT, RDT) [↓≥99.9]
- Diacetyl (RT) [↓≥ 99.4]
- Formaldehyde (RT) [↓≥ 81.4]
- Propylene Oxide (RDT) [↓≥ 99.4]

In addition, as discussed above, switching from combusted cigarettes to the BIDI® Stick Classic product is likely to also result in substantial reductions in exposures to byproducts of combustion that are present in cigarette smoke, but not applicable to ENDS products such as the BIDI® Stick Classic. Taken together, the overall substantial reductions in the levels of these HPHCs in BIDI® Stick Classic aerosols compared to cigarette smoke support likely reductions in user exposures and associated noncancer hazards from use of the BIDI® Stick Classic product compared to cigarette smoking.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 12.6 Comparison to ENDS, Secondary Comparator Products

The 2021 PMTA Final Rule (FDA, 2021) states that "[a]pplicants must compare the health risks of its product to both products within the same category and subcategory, as well as products in different categories as appropriate."

To inform the evaluation of potential exposures associated relative health risks for smokers switching to BIDI® Stick Classic as compared to potentially switching to other ENDS products, a comparison between BIDI® Stick Classic aerosols relative to published data on the NIDA SREC and peer-reviewed literature available for ENDS products on the US market across the spectrum of the ENDS product category (e.g., disposable, pre-filled closed-pod systems, and tank devices) was also considered. BIDI® Stick Classic is a prefilled (closed) disposable ENDS product, with a tobacco flavored e-liquid and therefore comparison to ENDS tobacco products in this flavor profile is considered most informative. This approach allows for a comparison of the BIDI® Stick Classic and a variety of ENDS products, as representative market ENDS that may potentially be considered as alternatives to the BIDI® Stick Classic product (Table 10).

**Table 10 Representative ENDS Products from Published Literature**

| Product Type | Brand | Flavor | PG/VG ratio (vol/vol) | Total Nicotine concentration (mg/mL) |
|---|---|---|---|---|
| Disposable | Apollo[a] | Classic Tobacco | 58/42 | 7.11 ± 0.09 |
| | Blu[a] | Classic Tobacco | 0/100 | 9.83 ± 0.09 |
| Pre-filled (closed pod) | NIDA SREC[b] | Rich Tobacco (5%) | 40/60 | ~54* |
| | JUUL[c] | Virginia Tobacco 3% (VT 3%) | 30/70 | 35 |
| | JUUL[c] | Virginia Tobacco 5% (VT 5%) | 30/70 | 59 |
| | Apollo[a] | Classic Tobacco | 76/24 | 7.57 ± 0.74 |
| | Blu[a] | Classic Tobacco | 0/100 | 8.79 ± 0.46 |
| | Eversmoke | Classic Tobacco | 77/23 | 12.62 ± 0.64 |
| | South Beach smoke[a] | Classic Tobacco | 78/22 | 13.07 ± 0.16 |
| Tank | Apollo[a] | Tobacco | 51/49 | 8.11 ± 0.64 |
| | South Beach smoke[a] | Classic Tobacco | 61/39 | 14.54 ± 1.08 |

[a] El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. Nicotine Tob Res, 20(2), 215-223. doi:10.1093/ntr/ntw280

[b] NIDA Standardized Research Electronic Cigarette [SREC] reported by https://srecproduct.com/

[c] Chen X, Bailey PC, Yang C, Hiraki B, Oldham MJ, Gillman IG. Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. *Separations*. 2021; 8(10):168. https://doi.org/10.3390/separations8100168

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

*Nicotine value was calc

As stated by the National Institute of Drug Abuse (NIDA) (NIDA, 2023) (Accessed June 9 2013; https://srecproduct.com/), the Standardized Research Electronic Cigarette [SREC] product was developed as a collaboration between NIDA and NJOY LLC part of the National Institutes of Health to facilitate clinical research into the impact of e-cigarettes on public health (NIDA). Similar to the Kentucky reference cigarettes, the SREC was designed to be a standardized device that produces a consistent, well-characterized aerosol (see "Standardized Research Electronic Cigarette.pdf" in folder titled "Q12_Attachments" for additional information on the NIDA SREC standard e-cigarette). Also, the analytical data on the levels of HPHCs in aerosols from the SREC device was collected using the same standardized non-intense puffing conditions (55ml/3sec/30sec), used for the BIDI® Stick Classic aerosols, and thus it is informative for the comparison (see "Standardized Research Electronic Cigarette.pdf" in folder titled "Q12_Attachments" for additional information on the NIDA SREC standard e-cigarette). Although the aerosol chemistry data for the SREC e-cigarette is not published in peer-reviewed literature, the data is published by NIDA, one of the National Institutes of Health (US Department of Health and Human Services), and therefore the data is considered reliable, and thus appropriate to inform the evaluation of the BIDI® Stick Classic aerosols. Taken together, the available data on aerosol constituent levels published by NIDA for the SREC device is informative for the overall evaluation of potential exposures and associated health hazards from use of the BIDI® Stick Classic compared to other products in the ENDS tobacco product category.

To further inform the comparison of HPHC yields in aerosol of the BIDI® Stick Classic product relative to comparator ENDS products, the levels of HPHCs reported in the studies by Chen et al. (2021) and El-Hellani et al. (2018) for U.S. market ENDS products is also provided. Chen et al. (2021) measured constituent yields in aerosols from the JUUL systems currently on the US market (Virginia Tobacco e-liquids in both 5.0% [VT5%] and 3.0% [VT3%] nicotine concentration by weight). The study by El-Hellani et al. (2018) assessed nicotine and carbonyl yields in several e-cigarette brands the authors identified as "popular brands in the U.S. market." This study was funded by NIH/NIDA and FDA CTP[1] and included disposable, prefilled cartridge, and tank-based ENDS products, and thus cover a wide spectrum of US market products. Applicability of the

---

[1] Funding information reported by El-Hellani et al., 2018: "Research reported in this publication was supported by the National Institute on Drug Abuse of the National Institutes of Health under Award Number P50DA036105 and the Center for Tobacco Products of the U.S. Food and Drug Administration."

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

aerosol data published in these studies to inform the overall evaluation of the BIDI® Stick Classic comparison to US market ENDS products is discussed below.

The aerosol collection methods in the study by Chen et al. (2021) included the same standardized non-intense puffing conditions (55ml/3sec/30sec) used for the BIDI® Stick Classic aerosols (and the NIDA SREC device). The HPHC analysis was conducted in aerosol collected over 50 puff blocks from the beginning, middle and end of the pod (to ~85-90% pod life), and these were used to estimate the HPHC aerosol levels for the whole pod (see "Chen_2021_with Supplemental.pdf" in the "Q12_Attachments" folder for detailed information on aerosol collection and analytical methods). Because the HPHC aerosol yields for the JUUL product aerosols in Chen et al. (2021) were estimated based on the levels measured in 50-puff blocks, there is some uncertainty with respect to differences in method sensitivity compared to the evaluation conducted for the BIDI® Stick Classic aerosols which used the whole pod aerosol for the analytical chemistry evaluation. Specifically, based on the 50 puff block approach used by Chen et al. (2021) it is unclear how many of the constituents reported as below the analytical methods' limits of detection (LOD) or quantitation (LOQ) would be present at measurable levels had the authors conducted the measurements in aerosols collected from the whole pod, rather than only from 50-puff blocks. For this reason, the study by Chen et al. (2021) may underestimate the HPHC yields in the JUUL VT 5% and VT 3% product aerosols. However, in the specific context of conducting a comparison between the BIDI® Stick Classic aerosols to US market ENDS products, use of the aerosol chemistry data reported by Chen et al. (2021) for the JUUL VT 5% and VT 3% products provides a conservative approach, and thus the publication by Chen et al. (2021) is informative for the evaluation of BIDI® Stick Classic aerosols to US market ENDS products.

Aerosol collection in the study by El-Hellani et al. (2018) was conducted using a slightly modified non-intense puffing regimen (1.5 L/min puff velocity, 4s puff duration and 10s duration), and the HPHC yields were measured from a 15-puff session (see "El-Hellani et al 2018 with Supplemental.pdf" in folder "Q12_Attachments" for additional information). Since the difference in the puff duration between the study by El-Hellani et al. (2018) (4 sec puff) and the standard ISO non-intense puffing (3 sec puff) is minimal (1s), the difference in puffing topography is not likely to have a measurable impact on the aerosol chemistry, and thus does not preclude the use of this study to inform the comparison of HPHC yields measured in the BIDI® Stick Classic relative to the ENDS products in the study by El-Hellani et al. (2018). Because the HPHC aerosol yields for the product aerosols evaluated by El-Hellani et al. (2018) were measured using aerosols from a 15-puff session, these don't fully account for the whole pod usage, and thus could underestimate the HPHC levels for the ENDS products tested by El-Hellani et al. (2018). However, in the specific

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

context of conducting a comparison between the BIDI® Stick Classic aerosols to US market ENDS products, use of the aerosol chemistry data reported by El-Hellani et al. (2018) provides a conservative approach, and thus this study is informative for the evaluation of BIDI® Stick Classic aerosols to US market ENDS products.

Due to puff limitations of the comparator ENDS, only the non-intense puffing regimen was used for the comparison of the BIDI® Stick Classic to other U.S. market ENDS products. Because there are product differences in nicotine concentrations and aerosol mass, the average nicotine-adjusted aerosol concentration data was used for the comparisons with the data available for the NIDA SREC representative ENDS product, and studies by Chen et al. (2021) and El-Hellani et al. (2018).

Although there is uncertainty with respect to which of the ENDS products will remain on the market after FDA completes all PMTA reviews, the aerosol chemistry data on the NIDA Standardized Research Electronic Cigarette (SREC) and data available in peer reviewed literature on U.S market ENDS provide adequate insight for the HPHC comparison of the BIDI® Stick Classic to other US market ENDS products, and allows for the consideration of possible HPHC exposures for non-users who may initiate use of the new products compared to other ENDS products. Overall, the comparisons of HPHCs from the BIDI® Stick Classic and other ENDS products indicate the levels of measured constituents in aerosols of the BIDI® Stick Classic (Table 11) are within those reported for the ENDS product category (tobacco flavored e-liquids).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**Table 11 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick to Aerosol from Representative ENDS Products Reported in Published Literature (non-intense puffing); Aerosol Yields Normalized by Nicotine (mg/mg)**

| HPHC or Chemical Analyte | BIDI® Stick | SREC[a] | JUUL[b] | | Various Brands[c] | | | | | | | |
| | | | | | Disposable | | Pre-filled (closed pod) | | | | Tanked | |
| | | | VT5 | VT3 | Apollo - Classic Tobacco | Blu - Classic Tobacco | Apollo - Classic Tobacco | Blu - Classic Tobacco | Ever Smoke - Classic Tobacco | South Beach Classic Tobacco | Apollo - Tobacco | South Beach Classic Tobacco |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acetaldehyde | 1.49E-04 | 1.00E-04 | 3.97E-04 | 6.49E-04 | 6.93E-03 | 2.25E-03 | 1.21E-03 | 4.15E-03 | 1.87E-03 | 1.05E-03 | 1.05E-02 | 2.55E-03 |
| Acrolein | 6.14E-05 | 1.33E-04 | ≤1.92E-04* | ≤3.55E-04* | 8.21E-04 | 1.11E-03 | 3.78E-04 | 1.15E-03 | N/A[#] | N/A[#] | N/A[#] | 3.39E-04 |
| Cadmium | **ND** | ≤1.00E-06** | ≤9.66E-08** | ≤1.79E-07** | NT | NT | NT | NT | NT | NT | NT | NT |
| Chromium | **ND** | ≤1.17E-06** | **ND** | **ND** | NT | NT | NT | NT | NT | NT | NT | NT |
| Copper | **ND** | NT | ≤2.71E-06** | ≤9.70E-06** | NT | NT | NT | NT | NT | NT | NT | NT |
| Diacetyl | 1.75E-04 | ≤1.00E-5** | ≤1.60E-05** | ≤2.93E-5** | NT | NT | NT | NT | NT | NT | NT | NT |
| Diethylene Glycol | **ND** | NT | ≤2.21E-03** | ≤4.09E-03** | NT | NT | NT | NT | NT | NT | NT | NT |
| Ethylene Glycol | **ND** | NT | ≤2.01E-01** | ≤3.73E03** | NT | NT | NT | NT | NT | NT | NT | NT |
| Formaldehyde | 1.49E-04 | 1.00E-04 | 9.82E-04 | 1.35E-03 | 5.29E-03 | 4.27E-03 | 1.04E-03 | 1.28E-02 | 1.10E-03 | 8.64E-04 | 6.07E-03 | 3.26E-03 |
| Glycerol | 5.48E+00 | 1.00E+01 | 1.19E+01 | 2.31E+01 | NT | NT | NT | NT | NT | NT | NT | NT |
| Glycidol | 7.46E-05 | NT | NT | NT | NT | NT | NT | NT | NT | NT | NT | NT |
| Lead | ≤1.17E-07* | 6.67E-07 | ≤4.3E-07* | ≤1.55E-06* | NT | NT | NT | NT | NT | NT | NT | NT |
| Nickel | 1.49E-06 | 1.67E-05 | ≤8.03E-06* | ≤5.41E-07* | NT | NT | NT | NT | NT | NT | NT | NT |
| Nicotine | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |
| NNK | 8.33E-08 | NT | ≤1.39E-07** | ≤2.57E-07** | NT | NT | NT | NT | NT | NT | NT | NT |
| NNN | 4.25E-07 | NT | ≤9.06E-08** | ≤1.68E-07** | NT | NT | NT | NT | NT | NT | NT | NT |
| Propylene Glycol | 9.65E+00 | 6.67E+00 | 5.07E+00 | 8.85E+00 | NT | NT | NT | NT | NT | NT | NT | NT |
| Propylene Oxide | 4.12E-04 | NT | 2.87E-05 | 5.32E-05 | NT | NT | NT | NT | NT | NT | NT | NT |

BLOD = below level of detection; BLOQ = below level of quantification; N/A - Value not Available; ND = not detected/ no different than background; NT = not tested;

a   NIDA Standardized Research Electronic Cigarette [SREC]) reported by https://srecproduct.com/

b   Chen X, Bailey PC, Yang C, Hiraki B, Oldham MJ, Gillman IG. Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. Separations. 2021; 8(10):168. https://doi.org/10.3390/separations8100168

c   El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions from Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. Nicotine Tob Res, 20(2), 215-223. doi:10.1093/ntr/ntw280

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

A0300

**Analyte was reported as below the method LOD; the numeric value was estimated based on ½ the method LOD (LOD/2)
*Analyte was reported as below the method LOQ; the numeric value was estimated based on the average of the LOD and LOQ ([LOQ+LOD]/2)
# Reported in the El-Hellani 2018 Supplementary Tables as "0.00", rather than BLOD or BLOQ.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 12.7 Summary Results and Discussion

The ingredients used in the BIDI® Stick Classic e-liquid formulation, such as PG, VG, nicotine, organic acids such as benzoic acid (Harvanko et al., 2020) are also used in tobacco flavored comparator ENDS products on the US market.

The comparison BIDI® Stick Classic aerosols and representative tobacco flavored market ENDS products indicate that the constituent levels, potential exposures and overall associated health hazards from the BIDI® Stick Classic aerosols are within the range reported for tobacco-flavored ENDS products. Of the 18 constituents measured in BIDI® Stick Classic product:

### 12.7.1 Metals

The aerosol characterization testing requested by the FDA for the BIDI® Stick Classic aerosols included five (5) metals (cadmium, chromium, copper, lead and nickel). Data on metal aerosol yields for comparator ENDS product aerosols was available for the NIDA reference ENDS product (SREC) and in the study by Chen et al. (2021) for JUUL VT3% and VT5%. Of the five metals tested in the BIDI® Stick Classic aerosols, three (cadmium, chromium and copper) were not found in (not different than background) in the BIDI® Stick Classic aerosol and were also below the limits of detection in the three comparator, tobacco-flavored ENDS for which data was available. Lead was below the LOQ in the BIDI® Stick Classic aerosol but found at measurable levels in the NIDA SREC reference ENDS product. The aerosol chemistry data also indicates that nickel was present at lower levels in the BIDI® Stick Classic aerosols compared to data on nickel levels in aerosols from the comparator ENDS products (Table 11).

### 12.7.2 Volatile Organic Compounds

The aerosol characterization testing requested by the FDA for the BIDI® Stick Classic aerosols included six (6) VOCs (acetaldehyde, acrolein, diacetyl, formaldehyde, glycidol and propylene oxide). Data on aerosol levels of glycidol in aerosols of the reference SREC and market ENDS products was not available for the comparison. The BIDI® Stick Classic aerosols had lower levels of acrolein and formaldehyde relative to the reference SREC product, and showed substantially lower levels of acetaldehyde, acrolein and formaldehyde relative to all of the tobacco-flavored ENDS market products evaluated in the studies by Chen et al. (2021) (JUUL VT3% and VT5%), and El-Hellani et al. (2018) (two disposable [Apollo - Classic Tobacco [Blu - Classic Tobacco; six pre-filled closed pod [Apollo - Classic Tobacco, Blu - Classic Tobacco, Ever Smoke - Classic Tobacco, South Beach Classic Tobacco] and two tank [Apollo - Tobacco, South Beach Classic

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Tobacco], but the BIDI® Stick Classic aerosols showed higher levels of diacetyl (compared to the SREC, JUUL VT3% and VT5% data) and propylene oxide (vs JUUL VT3% and VT5%).

### 12.7.3 Main Ingredients and Potential Impurities

The ratios of PG to VG in the BIDI® Stick Classic e-liquid are within the range reported in the tobacco flavored ENDS (Table 10). Consistent with the differences in the PG:VG ratio between the BIDI® Stick Classic product the reference SREC ENDS product and the JUUL (VT3% and VT5%) products published by Chen et al. (2021), the aerosol levels of VG are consistently lower in the BIDI® Stick Classic aerosols compared to comparator tobacco flavored ENDS, and the levels of PG are higher.

The nicotine (derived from tobacco), and the PG, VG base ingredients are USP-grade. The use of USP-grade nicotine minimizes the potential for the presence of, and subsequent user exposure to, tobacco-related impurities such as NNK and NNN, whereas the use of USP-grade PG and VG minimizes the potential for impurities or contaminants such as diethylene glycol, ethylene glycol. The levels of potential ingredient impurities (NNK, NNN, diethylene glycol and ethylene glycol) in aerosols of example comparator ENDS products were evaluated in the study by Chen et al. (2021), and the data indicate that the levels of these constituents identified in the aerosol of BIDI® Stick Classic are within the range found in other tobacco-flavored ENDS product. While Chen et al. (2021), reports the levels of NNK and NNN in the JUUL product aerosols as below the LOD, a comparison between the levels of these HPHCs in the BIDI® Stick Classic to estimated levels in the JUUL product aerosols (based on half the LOD [LOD/2]) indicates that levels of these HPHCs in the BIDI® Stick Classic aerosols may be slightly lower (NNK), and higher (NNN) compared to their respective levels in the JUUL products aerosols.

Diethylene glycol and ethylene glycol were not found (i.e., no different than background) in the BIDI® Stick Classic aerosols and were reported below the LOD in the aerosols generated by the JUUL VT3% and VT5% products Chen et al. (2021).

### 12.8 Conclusion

To address FDA's request in this deficiency, Bidi Vapor performed an analytical chemistry study to evaluate all of the constituents specified by FDA, as well as the tobacco specific nitrosamines, NNK and NNN. The BIDI® Stick Classic product aerosols were generated under non-intense and intense puffing conditions, and the aerosol constituent yields were measured using aerosols collected throughout the lifespan of BIDI® Stick Classic product.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Taken together, the aerosol chemistry data show substantial reductions in the numbers and levels of constituents, including HPHCs in the aerosols generated by the BIDI® Stick Classic product relative to cigarettes. The result is likely significant reductions in exposures and associated cancer risks and non-cancer hazards from the BIDI® Stick Classic product compared to smoking combusted cigarettes. The data and available information also show that potential exposures and overall health risks from the BIDI® Stick Classic product are within those associated with other tobacco-flavored comparator ENDS products on the market in the US.

### 12.9 Deficiency Letter Question 12 Attachments

The following files can be found in the "Q12_Attachments" folder.

**Table 12 Question 12 Attachments**

| Folder Name | Files Contained Within |
|---|---|
| Q12_Attachments | • 0423-025_0423-505 Final Report v0.0.pdf<br>• Chen_2021_with Supplemental.pdf<br>• El-Hellani et al 2018 with Supplemental.pdf<br>• Enthalpy_Attachments.pdf<br>• Standardized Research Electronic Cigarette.pdf |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

| Folder Name | Files Contained Within |
|---|---|
| 0423-025_0423-505 Final Report v0.0_Final Results | • 0423-025-02 AM-244 Carbonyls in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-03 AM-249 Metals in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-04 AM-224 Primary Constituents in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-06 AM-274 Glycidol in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-07 AM-220 Nitrosamines in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-11 AM-244 Carbonbyls in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-12 AM-249 Metals in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-13 AM-224 Primary Constituents in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-15 AM-274 Glycidol in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-16 AM-220 Nitrosamines in Aerosol (INTENSE Regime).xlsx<br>• 0423-505-1 ENT208A Volatile Compounds in Aerosol (CORESTA Regime).xlsx<br>• 0423-505-2 ENT208A Volatile Compounds in Aerosol (INTENSE Regime).xlsx<br>• Bidi Stick Classic 0423-025 Intense Repeat EOL - Reps 8,9.xlsx<br>• Bidi Stick Classic 0423-025 ISO EOL.xlsx |

## 12.10 References

(ATSDR), A. f. T. S. a. D. R. (2005). *Toxicological Profile for Nickel*. Atlanta, GA Retrieved from https://www.atsdr.cdc.gov/ToxProfiles/tp15.pdf

(NIDA), N. I. o. D. A. Standardized Research Electronic Cigarette (SREC) for Clinical Research. Retrieved from https://srecproduct.com/

California Enivornmental Protection Agency. (1992). *EXPEDITED CANCER POTENCY VALUES AND PROPOSED REGULATORY LEVELS FOR CERTAIN PROPOSITION 65 CARCINOGENS*. Retrieved from https://oehha.ca.gov/chemicals/n-nitrosonornicotine

California Enivornmental Protection Agency. (2001). *EXPEDITED CANCER POTENCY VALUES AND NO SIGNIFICANT RISK LEVELS (NSRLs) FOR SIX PROPOSITION 65 CARCINOGENS: CARBAZOLE, MeIQ, MeIQx, METHYL CARBAMATE, 4-N-*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

NITROSOMETHYLAMINO)-1-(3-PYRIDYL)-1-     *BUTANONE,     TRIMETHYL PHOSPHATE.*

Centers for Disease Control and Prevention (CDC), N. c. f. C. D. P. a. H. P., Office on Smoking and Health. (2014). *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General. Atlanta (GA): Centers for Disease Control and Prevention.* Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK179276/

Chen, X., Bailey, P. C., Yang, C., Hiraki, B., Oldham, M. J., & Gillman, I. G. (2021). Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. *Separations, 8*(10), 168. doi:10.3390/separations8100168

Counts, M. E., Morton, M. J., Laffoon, S. W., Cox, R. H., & Lipowicz, P. J. (2005). Smoke composition and predicting relationships for international commercial cigarettes smoked with three machine-smoking conditions. *Regulatory Toxicology and Pharmacology, 41*(3), 185-227. doi:https://doi.org/10.1016/j.yrtph.2004.12.002

Djordjevic, M. V., Brunnemann, K. D., & Hoffmann, D. (1989). Identification and analysis of a nicotine-derived N-nitrosamino acid and other nitrosamino acids in tobacco. *Carcinogenesis, 10*(9), 1725-1731. doi:10.1093/carcin/10.9.1725

Edwards, S. H., Rossiter, L. M., Taylor, K. M., Holman, M. R., Zhang, L., Ding, Y. S., & Watson, C. H. (2017). Tobacco-Specific Nitrosamines in the Tobacco and Mainstream Smoke of U.S. Commercial Cigarettes. *Chem Res Toxicol, 30*(2), 540-551. doi:10.1021/acs.chemrestox.6b00268

El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. *Nicotine Tob Res, 20*(2), 215-223. doi:10.1093/ntr/ntw280

Flora, J. W., Meruva, N., Huang, C. B., Wilkinson, C. T., Ballentine, R., Smith, D. C., . . . McKinney, W. J. (2016). Characterization of potential impurities and degradation products in electronic cigarette formulations and aerosols. *Regul Toxicol Pharmacol, 74*, 1-11. doi:10.1016/j.yrtph.2015.11.009

Fowles, J., & Dybing, E. (2003). Application of toxicological risk assessment principles to the chemical constituents of cigarette smoke. *Tob Control, 12*(4), 424-430. doi:10.1136/tc.12.4.424

Harvanko, A. M., Havel, C. M., Jacob, P., & Benowitz, N. L. (2020). Characterization of Nicotine Salts in 23 Electronic Cigarette Refill Liquids. *Nicotine Tob Res, 22*(7), 1239-1243. doi:10.1093/ntr/ntz232

Haussmann, H. J. (2012). Use of hazard indices for a theoretical evaluation of cigarette smoke composition. *Chem Res Toxicol, 25*(4), 794-810. doi:10.1021/tx200536w

IARC. (1999). Summaries & Evaluations. ACETALDEHYDE (Group 2B). *71*.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. (2007). Smokeless tobacco and some tobacco-specific N-nitrosamines. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, 89*, 1-592. Retrieved from https://www.ncbi.nlm.nih.gov/pubmed/18335640

International Agency for Research on Cancer [IARC]. (2012). Personal habits and indoor combustions. Volume 100 E. A review of human carcinogens. *IARC Monogr Eval Carcinog Risks Hum, 100*(Pt E), 1-538.

Jaccard, G., Djoko, D. T., Korneliou, A., Stabbert, R., Belushkin, M., & Esposito, M. (2019). Mainstream smoke constituents and in vitro toxicity comparative analysis of 3R4F and 1R6F reference cigarettes. *Toxicology Reports, 6*, 222-231. doi:https://doi.org/10.1016/j.toxrep.2019.02.009

Li, Y., & Hecht, S. S. (2022). Carcinogenic components of tobacco and tobacco smoke: A 2022 update. *Food Chem Toxicol, 165*, 113179. doi:10.1016/j.fct.2022.113179

Moretto, N., Bertolini, S., Iadicicco, C., Marchini, G., Kaur, M., Volpi, G., . . . Facchinetti, F. (2012). Cigarette smoke and its component acrolein augment IL-8/CXCL8 mRNA stability via p38 MAPK/MK2 signaling in human pulmonary cells. *Am J Physiol Lung Cell Mol Physiol, 303*(10), L929-938. doi:10.1152/ajplung.00046.2012

National Academies of Sciences, E., and Medicine [NASEM],. (2018). Public Health Consequences of E-Cigarettes. In D. L. Eaton, L. Y. Kwan, & K. Stratton (Eds.), *Public Health Consequences of E-Cigarettes*. Washington (DC): National Academies Press (US).

National Institute of Drug Abuse [NIDA]. (2023). NIDA Standardized Research Electronic Cigarette (SREC) for Clinical Research. Retrieved from https://srecproduct.com

Patskan, G. J., Podraza, K. F., Meurrens, K., Coggins, C. R., Friedrichs, B., Gerstenberg, B., . . . Terpstra, P. (2008). Toxicological comparisons of three styles of a commercial U.S. cigarette (Marlboro with the 1R4F reference cigarette. *Inhal Toxicol, 20*(7), 695-721. doi:10.1080/08958370801935174

Pazo, D. Y., Moliere, F., Sampson, M. M., Reese, C. M., Agnew-Heard, K. A., Walters, M. J., . . . Chambers, D. M. (2016). Mainstream Smoke Levels of Volatile Organic Compounds in 50 U.S. Domestic Cigarette Brands Smoked With the ISO and Canadian Intense Protocols. *Nicotine & Tobacco Research, 18*(9), 1886-1894. doi:10.1093/ntr/ntw118

Renne, R. A., Brown, H. R., & Jokinen, M. P. (1992). Morphology of nasal lesions induced in Osborne-Mendel rats and B6C3F1 mice by chronic inhalation of allyl glycidyl ether. *Toxicol Pathol, 20*(3 Pt 1), 416-425. doi:10.1177/019262339202000311

Rodgman, A., & Perfetti, T. (2008). *The Chemical Components of Tobacco and Tobacco Smoke*.

Roemer, E., Stabbert, R., Rustemeier, K., Veltel, D. J., Meisgen, T. J., Reininghaus, W., . . . Podraza, K. F. (2004). Chemical composition, cytotoxicity and mutagenicity of smoke from US commercial and reference cigarettes smoked under two sets of machine smoking conditions. *Toxicology, 195*(1), 31-52. doi:10.1016/j.tox.2003.08.006

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Sunderman, F. W. (Ed.) (1986). *Sources of exposure and biological effects of nickel*. Lyon, France: International Agency for Research on Cancer.

U..S. Environmental Protection Agency [EPA]. (1988). *Integrated Risk Information System (IRIS). Chemical Assessment Summary. Acetaldehyde*.

U.S Food and Drug Administration [FDA]. (2015). *SE Review: Evaluation of estimated HPHC Impact of Single Ingredient (saccharides) Pyrolysis*.

U.S. Environmental Protection Agency [EPA]. (1994). *Methods for Derivation of Inhalation Reference Concentrations and Application of Inhalation Dosimetry*. (EPA/600/8-90/066F). Research Triangle Park, North Carolina Retrieved from https://www.epa.gov/sites/default/files/2014-11/documents/rfc_methodology.pdf

U.S. Food and Drug Administration [FDA]. (2012). Harmful and Potentially Harmful Constituents in Tobacco Products and Tobacco Smoke; Established List. *Federal Register., Docket No. FDA–2012–N–0143*(77), 64.

U.S. Food and Drug Administration [FDA]. (2019). *Harmful and Potentially Harmful Constituents in Tobacco Products; Established List; Proposed Additions;*. Federal Register Retrieved from https://www.federalregister.gov/d/2019-16658

U.S. Food and Drug Administration [FDA]. (2021). *86 FR 55300 Premarket Tobacco Product Applications and Recordkeeping Requirements (Final Rule)*. Federal Register: Office of the Federal Register, National Archives and Records Administration, Retrieved from https://www.federalregister.gov/d/2021-21011

Vu, A. T., Taylor, K. M., Holman, M. R., Ding, Y. S., Hearn, B., & Watson, C. H. (2015). Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes. *Chemical Research in Toxicology, 28*(8), 1616-1626. doi:10.1021/acs.chemrestox.5b00190

World Health, O., & Initiative, W. H. O. T. F. (2008). The scientific basis of tobacco product regulation : second report of a WHO study group. In. Geneva: World Health Organization.

World Health Organization [WHO]. (2015). WHO global report on trends in prevalence of tobacco smoking 2015. Retrieved from https://apps.who.int/iris/handle/10665/156262

Zheng, H. C., & Takano, Y. (2011). NNK-Induced Lung Tumors: A Review of Animal Model. *J Oncol, 2011*, 635379. doi:10.1155/2011/635379

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

# Table of Contents

**Table List** .................................................................................................................... **1**

**FDA Deficiency Letter Question 13** ........................................................................... **2**

**13.1 Introduction** ...............................................................................................................3

**13.1 Comparison to ENDS, Secondary Comparator Products** .........................................4

**13.2 Deficiency Letter Question 13 Attachment Files** ....................................................11

**13.3 References** ................................................................................................................12

## Table List

Table 1 Representative ENDS Products from Published Literature ....................................5

Table 2 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick to Aerosol from Representative ENDS Products Reported in Published Literature (non-intense puffing); Aerosol Yields Normalized by Nicotine (mg/mg)...................................................................................................9

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## FDA Deficiency Letter Question 13

*Your PMTA provides HPHC aerosol data for the following comparison ENDS products: ePen 3 BT 18, ePen 3 MB 18, Brand N Liquid AB Disposable, Brand O Liquid AC Disposable, and Brand P Liquid AD Disposable. However, the aerosol data provided are in exposure concentration ($\mu g/m^3$) and consumption per day (weight/day), which are not appropriate and do not include standard deviations and number of replicates needed for chemistry to perform two one-sided t-test (TOST) analysis. You also did not provide the aerosol testing methods used to obtain and complete raw datasets of the comparative aerosol yield data. Additionally, you did not fully identify your comparator ENDS products (Brand N Liquid AB Disposable, Brand O Liquid AC Disposable, and Brand P Liquid AD Disposable) by their actual names or include their manufacturers information. This information and complete testing methods information and dataset are needed to evaluate the comparative health risks of the new product to the same category ENDS products. Provide identity and manufacturers information for each of the ENDS comparison products and a rationale for selecting them for comparison to the new product. In addition, provide the aerosol constituent yields of the entire lifetime of the ENDS comparison products, and provide aerosol data in mass (e.g., mg, µg, ng) per device and per puff for the following constituents:*

    *a. Acetaldehyde*

    *b. Acrolein*

    *c. Cadmium*

    *d. Chromium*

    *e. Copper*

    *f. Diacetyl*

    *g. Diethylene glycol*

    *h. Ethylene glycol*

    *i. Formaldehyde*

    *j. Glycerol*

    *k. Glycidol*

    *l. Lead*

    *m. Nickel*

    *n. Nicotine*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

    o.  Propylene glycol

    p.  Propylene oxide

*Provide all of the following information about HPHC testing so that we can evaluate the HPHC quantities in the comparison products:*

    q.  *Complete description of all puff regimens used to generate aerosol yield data, quantitative test protocols and analytical methods used, and full validation reports for each analytical method*

    r.  *Testing laboratories and their accreditation(s)*

    s.  *Length of time between date(s) of manufacture and date(s) of testing*

    t.  *Complete raw aerosol HPHC yield datasets, with units of measure*

    u.  *Standard deviation(s)*

    v.  *Number of replicates*

    w.  *A summary of the results for all testing performed*

    x.  *Storage conditions prior to initiating testing*

    y.  *Whole stick or pod puff counts*

*If your test methods are national or international test standards, identify the standards and any deviations from those standards. Alternatively, provide scientific evidence or justification for why HPHC aerosol yields collected from 100 puffs are appropriate and does not raise public health concerns.*

**Bidi Vapor's Response to Deficiency Letter Question 13**

**13.1 Introduction**

FDA requests additional information on the previously submitted information for ENDS *comparator ENDS products (Brand N Liquid AB Disposable, Brand O Liquid AC Disposable, and Brand P Liquid AD Disposable)*

In FDA's Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (Revised) Final Guidance for Industry (March 2023), FDA makes it abundantly clear that conducting studies are a last resort when the applicant cannot address the requisite points regarding

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

comparator products through literature review. In this deficiency, however, FDA has foreclosed Bidi Vapor's opportunity from choosing to use scientific literature in lieu of conducting additional and costly studies to satisfy this deficiency, which reverses its long-standing guidance to industry. For example, FDA's request for information on *"Testing laboratories and their accreditation(s)"* and *"... full validation reports for each analytical method"* prohibits use of published scientific literature as a resource for industry to identify comparator data and products. Additionally, even if an ENDS manufacture were to test retail products, they would not be able to address the FDA request for information on *"Length of time between date(s) of manufacture and date(s) of testing."*

Finally, the FDA has stated that guidance documents do not establish legally enforceable rights or responsibilities; however, the guidance documents are published to provide industry with FDA thinking and insights on a particular issue and/or regulation. If FDA were to reverse its position and prohibit use of published scientific literature to satisfy this deficiency, industry cannot truly rely on the FDA's published guidance documents.

The target consumer population for the BIDI® Stick Classic product are adult smokers (over the age of 21) who cannot, or do not want to quit, and therefore cigarettes are the primary comparator product for the health risk evaluation of the BIDI® Stick Classic product. However, to inform the FDA's evaluation of BIDI® Stick Classic product and address deficiency 13, Bidi Vapor identified published scientific information and data on a diverse category (e.g., disposable, pre-filled closed-pod systems, and tank devices) of ENDS comparator products that is sufficient for meaningful comparisons with BIDI® Stick Classic (Chen et al., 2021; El-Hellani et al., 2018; National Institute of Drug Abuse [NIDA], 2023). Although, there is still uncertainty with respect to which of the ENDS products will remain on the market after FDA completes all PMTA reviews, data on the National Institute of Drug Abuse (NIDA) Standardized Research Electronic Cigarette (SREC), and data available in peer reviewed scientific literature on ENDS purchased on the U.S. market are viable options as comparator products. Lastly, the BIDI® Stick Classic is an ENDS product, and therefore comparison to tobacco products in this category is also appropriate.

## 13.1  Comparison to ENDS, Secondary Comparator Products

Bidi Vapor identified several scientific publications that contain information about comparator products that is sufficient for meaningful comparisons with BIDI® Stick Classic (Chen et al., 2021; El-Hellani et al., 2018; National Institute of Drug Abuse [NIDA], 2023).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

The 2021 PMTA Final Rule (FDA, 2021) states that "[a]pplicants must compare the health risks of its product to both products within the same category and subcategory, as well as products in different categories as appropriate."

To inform the evaluation of potential exposures associated relative health risks for smokers switching to BIDI® Stick Classic as compared to potentially switching to other ENDS products, a comparison between BIDI® Stick Classic aerosols relative to published data on the NIDA SREC and peer-reviewed literature available for ENDS products on the US market across the spectrum of the ENDS product category (e.g., disposable, pre-filled closed-pod systems, and tank devices) was also considered. BIDI® Stick Classic is a prefilled (closed) disposable ENDS product, with a tobacco flavored e-liquid and therefore comparison to ENDS tobacco products in this flavor profile is considered most informative. This approach allows for a comparison of the BIDI® Stick Classic and a variety of ENDS products, as representative market ENDS that may potentially be considered as alternatives to the BIDI® Stick Classic product (Table 1).

**Table 1 Representative ENDS Products from Published Literature**

| Product Type | Brand | Flavor | PG/VG ratio (vol/vol) | Total Nicotine concentration (mg/mL) |
|---|---|---|---|---|
| Disposable | Apollo[a] | Classic Tobacco | 58/42 | 7.11 ± 0.09 |
| | Blu[a] | Classic Tobacco | 0/100 | 9.83 ± 0.09 |
| Pre-filled (closed pod) | NIDA SREC[b] | Rich Tobacco (5%) | 40/60 | ~54* |
| | JUUL[c] | Virginia Tobacco 3% (VT 3%) | 30/70 | 35 |
| | JUUL[c] | Virginia Tobacco 5% (VT 5%) | 30/70 | 59 |
| | Apollo[a] | Classic Tobacco | 76/24 | 7.57 ± 0.74 |
| | Blu[a] | Classic Tobacco | 0/100 | 8.79 ± 0.46 |
| | Eversmoke | Classic Tobacco | 77/23 | 12.62 ± 0.64 |
| | South Beach smoke[a] | Classic Tobacco | 78/22 | 13.07 ± 0.16 |
| Tank | Apollo[a] | Tobacco | 51/49 | 8.11 ± 0.64 |
| | South Beach smoke[a] | Classic Tobacco | 61/39 | 14.54 ± 1.08 |

[a] El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. Nicotine Tob Res, 20(2), 215-223. doi:10.1093/ntr/ntw280

[b] NIDA Standardized Research Electronic Cigarette [SREC]) reported by https://srecproduct.com/

[c] Chen X, Bailey PC, Yang C, Hiraki B, Oldham MJ, Gillman IG. Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. *Separations*. 2021; 8(10):168. https://doi.org/10.3390/separations8100168

*Nicotine value was calc

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

As stated by the National Institute of Drug Abuse (NIDA) (NIDA, 2023) (Accessed June 9 2013; https://srecproduct.com/), the Standardized Research Electronic Cigarette [SREC] product was developed as a collaboration between NIDA and NJOY LLC part of the National Institutes of Health to facilitate clinical research into the impact of e-cigarettes on public health (NIDA). Similar to the Kentucky reference cigarettes, the SREC was designed to be a standardized device that produces a consistent, well-characterized aerosol (see "Standardized Research Electronic Cigarette.pdf" in folder titled "Q13_Attachments" for additional information on the NIDA SREC standard e-cigarette). Also, the analytical data on the levels of HPHCs in aerosols from the SREC device was collected using the same standardized non-intense puffing conditions (55ml/3sec/30sec), used for the BIDI® Stick Classic aerosols, and thus it is informative for the comparison (see "Standardized Research Electronic Cigarette.pdf" in folder titled "Q13_Attachments" for additional information on the NIDA SREC standard e-cigarette). Although the aerosol chemistry data for the SREC e-cigarette is not published in peer-reviewed literature, the data is published by NIDA, one of the National Institutes of Health (US Department of Health and Human Services), and therefore the data is considered reliable, and thus appropriate to inform the evaluation of the BIDI® Stick Classic aerosols. Taken together, the available data on aerosol constituent levels published by NIDA for the SREC device is informative for the overall evaluation of potential exposures and associated health hazards from use of the BIDI® Stick Classic compared to other products in the ENDS tobacco product category.

To further inform the comparison of HPHC yields in aerosol of the BIDI® Stick Classic product relative to comparator ENDS products, the levels of HPHCs reported in the studies by Chen et al. (2021) and El-Hellani et al. (2018) for U.S. market ENDS products is also provided. Chen et al. (2021) measured constituent yields in aerosols from the JUUL systems currently on the US market (Virginia Tobacco e-liquids in both 5.0% [VT5%] and 3.0% [VT3%] nicotine concentration by weight). The study by El-Hellani et al. (2018) assessed nicotine and carbonyl yields in several e-cigarette brands the authors identified as "popular brands in the U.S. market." This study was funded by NIH/NIDA and FDA CTP[1] and included disposable, prefilled cartridge, and tank-based ENDS products, and thus cover a wide spectrum of US market products. Applicability of the

---

[1] Funding information reported by El-Hellani et al., 2018: "Research reported in this publication was supported by the National Institute on Drug Abuse of the National Institutes of Health under Award Number P50DA036105 and the Center for Tobacco Products of the U.S. Food and Drug Administration."

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

aerosol data published in these studies to inform the overall evaluation of the BIDI® Stick Classic comparison to US market ENDS products is discussed below.

The aerosol collection methods in the study by Chen et al. (2021) included the same standardized non-intense puffing conditions (55ml/3sec/30sec) used for the BIDI® Stick Classic aerosols (and the NIDA SREC device). The HPHC analysis was conducted in aerosol collected over 50 puff blocks from the beginning, middle and end of the pod (to ~85-90% pod life), and these were used to estimate the HPHC aerosol levels for the whole pod (see "Chen_2021_with Supplemental.pdf" in the "Q13_Attachments" folder for detailed information on aerosol collection and analytical methods). Because the HPHC aerosol yields for the JUUL product aerosols in Chen et al. (2021) were estimated based on the levels measured in 50-puff blocks, there is some uncertainty with respect to differences in method sensitivity compared to the evaluation conducted for the BIDI® Stick Classic aerosols which used the whole pod aerosol for the analytical chemistry evaluation. Specifically, based on the 50 puff block approach used by Chen et al. (2021) it is unclear how many of the constituents reported as below the analytical methods' limits of detection (LOD) or quantitation (LOQ) would be present at measurable levels had the authors conducted the measurements in aerosols collected from the whole pod, rather than only from 50-puff blocks. For this reason, the study by Chen et al. (2021) may underestimate the HPHC yields in the JUUL VT 5% and VT 3% product aerosols. However, in the specific context of conducting a comparison between the BIDI® Stick Classic aerosols to US market ENDS products, use of the aerosol chemistry data reported by Chen et al. (2021) for the JUUL VT 5% and VT 3% products provides a conservative approach, and thus the publication by Chen et al. (2021) is informative for the evaluation of BIDI® Stick Classic aerosols to US market ENDS products.

Aerosol collection in the study by El-Hellani et al. (2018) was conducted using a slightly modified non-intense puffing regimen (1.5 L/min puff velocity, 4s puff duration and 10s duration), and the HPHC yields were measured from a 15-puff session (see "El-Hellani et al 2018 with Supplemental.pdf" in folder "Q13_Attachments" for additional information). Since the difference in the puff duration between the study by El-Hellani et al. (2018) (4 sec puff) and the standard ISO non-intense puffing (3 sec puff) is minimal (1s), the difference in puffing topography is not likely to have a measurable impact on the aerosol chemistry, and thus does not preclude the use of this study to inform the comparison of HPHC yields measured in the BIDI® Stick Classic relative to the ENDS products in the study by El-Hellani et al. (2018). Because the HPHC aerosol yields for the product aerosols evaluated by El-Hellani et al. (2018) were measured using aerosols from a 15-puff session, these don't fully account for the whole pod usage, and thus could underestimate the HPHC levels for the ENDS products tested by El-Hellani et al. (2018). However, in the specific

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

context of conducting a comparison between the BIDI® Stick Classic aerosols to US market ENDS products, use of the aerosol chemistry data reported by El-Hellani et al. (2018) provides a conservative approach, and thus this study is informative for the evaluation of BIDI® Stick Classic aerosols to US market ENDS products.

Due to puff limitations of the comparator ENDS, only the non-intense puffing regimen was used for the comparison of the BIDI® Stick Classic to other U.S. market ENDS products. Because there are product differences in nicotine concentrations and aerosol mass, the average nicotine-adjusted aerosol concentration data was used for the comparisons with the data available for the NIDA SREC representative ENDS product, and studies by Chen et al. (2021) and El-Hellani et al. (2018).

Although there is uncertainty with respect to which of the ENDS products will remain on the market after FDA completes all PMTA reviews, the aerosol chemistry data on the NIDA Standardized Research Electronic Cigarette (SREC) and data available in peer reviewed literature on U.S market ENDS provide adequate insight for the HPHC comparison of the BIDI® Stick Classic to other US market ENDS products, and allows for the consideration of possible HPHC exposures for non-users who may initiate use of the new products compared to other ENDS products. Overall, the comparisons of HPHCs from the BIDI® Stick Classic and other ENDS products indicate the levels of measured constituents in aerosols of the BIDI® Stick Classic (Table 2) are within those reported for the ENDS product category (tobacco flavored e-liquids).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Table 2 Comparison of HPHCs (established and proposed) in the Aerosol Generated from the BIDI® Stick to Aerosol from Representative ENDS Products Reported in Published Literature (non-intense puffing); Aerosol Yields Normalized by Nicotine (mg/mg)

| HPHC or Chemical Analyte | BIDI® Stick | SREC[a] | JUUL[b] | | Various Brands[c] | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | VT5 | VT3 | Disposable | | Pre-filled (closed pod) | | | | Tanked | |
| | | | | | Apollo - Classic Tobacco | Blu - Classic Tobacco | Apollo - Classic Tobacco | Blu - Classic Tobacco | Ever Smoke - Classic Tobacco | South Beach Classic Tobacco | Apollo - Tobacco | South Beach Classic Tobacco |
| Acetaldehyde | 1.49E-04 | 1.00E-04 | 3.97E-04 | 6.49E-04 | 6.93E-03 | 2.25E-03 | 1.21E-03 | 4.15E-03 | 1.87E-03 | 1.05E-03 | 1.05E-02 | 2.55E-03 |
| Acrolein | 6.14E-05 | 1.33E-04 | ≤1.92E-04* | ≤3.55E-04* | 8.21E-04 | 1.11E-03 | 3.78E-04 | 1.15E-03 | N/A# | N/A# | N/A# | 3.39E-04 |
| Cadmium | ND | ≤1.00E-06** | ≤9.66E-08** | ≤1.79E-07** | NT | NT | NT | NT | NT | NT | NT | NT |
| Chromium | ND | ≤1.17E-06** | ND | ND | NT | NT | NT | NT | NT | NT | NT | NT |
| Copper | ND | NT | ≤2.71E-06** | ≤9.70E-06** | NT | NT | NT | NT | NT | NT | NT | NT |
| Diacetyl | 1.75E-04 | ≤1.00E-5** | ≤1.60E-05** | ≤2.93E-5** | NT | NT | NT | NT | NT | NT | NT | NT |
| Diethylene Glycol | ND | NT | ≤2.21E-03** | ≤4.09E-03** | NT | NT | NT | NT | NT | NT | NT | NT |
| Ethylene Glycol | ND | NT | ≤2.01E-01** | ≤3.73E03** | NT | NT | NT | NT | NT | NT | NT | NT |
| Formaldehyde | 1.49E-04 | 1.00E-04 | 9.82E-04 | 1.35E-03 | 5.29E-03 | 4.27E-03 | 1.04E-03 | 1.28E-02 | 1.10E-03 | 8.64E-04 | 6.07E-03 | 3.26E-03 |
| Glycerol | 5.48E+00 | 1.00E+01 | 1.19E+01 | 2.31E+01 | NT | NT | NT | NT | NT | NT | NT | NT |
| Glycidol | 7.46E-05 | NT | NT | NT | NT | NT | NT | NT | NT | NT | NT | NT |
| Lead | ≤1.17E-07* | 6.67E-07 | ≤4.3E-07* | ≤1.55E-06* | NT | NT | NT | NT | NT | NT | NT | NT |
| Nickel | 1.49E-06 | 1.67E-05 | ≤8.03E-06* | ≤5.41E-07* | NT | NT | NT | NT | NT | NT | NT | NT |
| Nicotine | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 | 1.00E+00 |
| NNK | 8.33E-08 | NT | ≤1.39E-07** | ≤2.57E-07** | NT | NT | NT | NT | NT | NT | NT | NT |
| NNN | 4.25E-07 | NT | ≤9.06E-08** | ≤1.68E-07** | NT | NT | NT | NT | NT | NT | NT | NT |
| Propylene Glycol | 9.65E+00 | 6.67E+00 | 5.07E+00 | 8.85E+00 | NT | NT | NT | NT | NT | NT | NT | NT |
| Propylene Oxide | 4.12E-04 | NT | 2.87E-05 | 5.32E-05 | NT | NT | NT | NT | NT | NT | NT | NT |

BLOD = below level of detection; BLOQ = below level of quantification; N/A - Value not Available; ND = not detected/ no different than background; NT = not tested;

a   NIDA Standardized Research Electronic Cigarette [SREC]) reported by https://srecproduct.com/

b   Chen X, Bailey PC, Yang C, Hiraki B, Oldham MJ, Gillman IG. Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. Separations. 2021; 8(10):168. https://doi.org/10.3390/separations8100168

c   El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. Nicotine Tob Res, 20(2), 215-223. doi:10.1093/ntr/ntw280

Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.

**Analyte was reported as below the method LOD; the numeric value was estimated based on ½ the method LOD (LOD/2)
*Analyte was reported as below the method LOQ; the numeric value was estimated based on the average of the LOD and LOQ ([LOQ+LOD]/2)
# Reported in the El-Hellani 2018 Supplementary Tables as "0.00", rather than BLOD or BLOQ.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

A0318

## 13.2 Deficiency Letter Question 13 Attachment Files

The following files can be found in the "Q13_Attachments" folder.

**Table 3 Question 13 Attachments**

| Folder Name | Files Contained Within |
|---|---|
| Q13_Attachments | • 0423-025_0423-505 Final Report v0.0.pdf<br>• Chen_2021_with Supplemental.pdf<br>• El-Hellani et al 2018 with Supplemental.pdf<br>• Enthalpy_Attachments.pdf<br>• Standardized Research Electronic Cigarette.pdf |
| 0423-025_0423-505 Final Report v0.0_Final Results | • 0423-025-02 AM-244 Carbonyls in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-03 AM-249 Metals in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-04 AM-224 Primary Constituents in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-06 AM-274 Glycidol in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-07 AM-220 Nitrosamines in Aerosol (CORESTA Regime).xlsx<br>• 0423-025-11 AM-244 Carbonbyls in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-12 AM-249 Metals in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-13 AM-224 Primary Constituents in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-15 AM-274 Glycidol in Aerosol (INTENSE Regime).xlsx<br>• 0423-025-16 AM-220 Nitrosamines in Aerosol (INTENSE Regime).xlsx<br>• 0423-505-1 ENT208A Volatile Compounds in Aerosol (CORESTA Regime).xlsx<br>• 0423-505-2 ENT208A Volatile Compounds in Aerosol (INTENSE Regime).xlsx<br>• Bidi Stick Classic 0423-025 Intense Repeat EOL - Reps 8,9.xlsx<br>• Bidi Stick Classic 0423-025 ISO EOL.xlsx |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC*

A0319

## 13.3 References

(NIDA), N. I. o. D. A. Standardized Research Electronic Cigarette (SREC) for Clinical Research. Retrieved from https://srecproduct.com/

Chen, X., Bailey, P. C., Yang, C., Hiraki, B., Oldham, M. J., & Gillman, I. G. (2021). Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks. *Separations, 8*(10), 168. doi:10.3390/separations8100168

El-Hellani, A., Salman, R., El-Hage, R., Talih, S., Malek, N., Baalbaki, R., . . . Saliba, N. A. (2018). Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics. *Nicotine Tob Res, 20*(2), 215-223. doi:10.1093/ntr/ntw280

National Institute of Drug Abuse [NIDA]. (2023). NIDA Standardized Research Electronic Cigarette (SREC) for Clinical Research. Retrieved from https://srecproduct.com

U.S. Food and Drug Administration [FDA]. (2021). *86 FR 55300 Premarket Tobacco Product Applications and Recordkeeping Requirements (Final Rule)*. Federal Register: Office of the Federal Register, National Archives and Records Administration, Retrieved from https://www.federalregister.gov/d/2021-21011

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC*

# Table of Contents

**Figure List**..................................................................................................................... **2**

**FDA Deficiency Letter Question 15**.............................................................................. **3**

**Bidi Vapor's Response to Deficiency Letter Question 15**........................................... **4**

**15.1 Response Summary**....................................................................................................**4**

15.1.1 Reference product datasets if a reference e-liquid is used (15a) ...................................4

15.1.2 Analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020 and detailed information on how it is derived. (15b) ...................................................................................5

15.1.3 Complete description of all test protocols and analytical methods used, full validation reports for each analytical method, and scientific rationale for conditions (e.g., physical properties and compositions of solvents used, temperatures, time) chosen in the NTA study (15c) ...................................................................................................5

15.1.4 Testing laboratory name and associated accreditation certificates (15d) .....................5

15.1.5 Length of time between date(s) of manufacture and testing, and storage conditions prior to testing (15e) ...6

15.1.6 Complete raw data sets with units and a summary of the results for all aerosol NTA testing performed (15f) ...........................................................................................................6

15.1.7 Number of replicates performed and standard deviation(s) (15g) ................................7

15.1.8 Storage conditions of study samples (15h)....................................................................7

15.1.9 Database search: name, type, algorithm, parameters used (15i)....................................7

15.1.10 Data analysis and conclusion (15j).............................................................................7

**15.2 Results**........................................................................................................................**9**

**15.3 Data Analysis**.............................................................................................................**9**

**15.4 Conclusion**................................................................................................................**10**

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**15.5 Deficiency Letter Question 15 Attachment Files**................................................................**10**

**15.6 References**..........................................................................................................................**11**

## Figure List

Figure 1 Comparative Chemicals Counts Found in BIDI® Stick Classic Relative to Cigarette Smoke Across all Puffing

Regimens                                                                                                                                                9

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**FDA Deficiency Letter Question 15**

*Your PMTA provides results of an accelerated stability study across six months that include targeted quantitative chemical analysis of 32 HPHCs, single chemical constituents (propylene glycol, glycerol, nicotine, and benzoic acid), nicotine related impurities A - G (i.e., anatabine, β-nicotyrine, cotinine, myosmine, nicotine-N-oxide, nornicotine, and anabasine), pH value, menthol, and 24 metals. You reported the accelerated stability study data as the leachables data for the new product. However, the accelerated stability study data are not an appropriate replacement of the leachable data, because leaching of chemical constituents from the ENDS components to the e-liquid in the new product is unpredictable by nature. The leachables need to be identified in a study using non-targeted semi-quantitative chemical analysis to identify all possible chemical compounds that may leach out of ENDS components during normal product use. The leachable study needs to cover the shelf life of the new product under ambient long term storage condition, and you did not establish a shelf-life period for the new product. It could be acceptable to conduct the leachable study under accelerated conditions and in a time period shorter than the proposed shelf-life of the product. However, a scientific justification and proper references are needed to demonstrate that the result of the accelerated leachable study is equivalent to the long-term leachable study. In order for FDA to fully evaluate the health risk of the new product, you need to conduct a study using non-targeted semi-quantitative chemical analysis to identify all possible leachables from the ENDS components of the new product. Provide all of the following information about your leachable analysis:*

a. *Reference product datasets if a reference e-liquid is used*

b. *Analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020 and detailed information on how it is derived*

c. *Complete description of all test protocols and analytical methods used, full validation reports for each analytical method, and scientific rationale for conditions (e.g., physical properties and compositions of solvents used, temperatures, time) chosen in your leachable study*

d. *Testing laboratory name and associated accreditation certificates*

e. *Length of time between date(s) of manufacture and testing, and storage conditions prior to testing*

f. *Complete raw data sets with units and a summary of the results for all leachables testing performed*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

    g.   *Number of replicates performed and standard deviation(s)*

    h.   *Storage conditions of leachable study samples*

    i.   *Database search: name, type, algorithm, parameters used*

    j.   *Data analysis and conclusion*

*If you provide accelerated leachable study data in lieu of ambient long-term leachable study data across the shelf life of the new product, you need to specify the shelf life of the new product, and provide a scientific justification and proper references to demonstrate that the accelerated leachable study is equivalent to the ambient long-term leachable study.*

**Bidi Vapor's Response to Deficiency Letter Question 15**

## 15.1 Response Summary

Question 15 outlines deficiencies regarding previously provided accelerated stability study data that was used as a substitute for leachables data for the new product. Bidi Vapor has addressed these deficiencies by generating the following new data:

In response to this deficiency, we conducted non-targeted analysis (NTA) on the aerosol from 4- and 17-month-old BIDI® Stick Classic products. We conducted this analysis to identify all possible chemical compounds that may have leached into the e-liquid from a fresh and aged BIDI® Stick Classic product. Most importantly our analysis approach will identify compounds that may transfer to the aerosol during normal product use and be inhaled by the consumer. The data generated by non-targeted analysis supersedes the accelerated stability study data that was used as a substitute for leachables data. Additionally, Bidi Vapor conducted an extractables study on the BIDI® Stick mouthpiece and device in order to identify potential chemicals to which the user may be exposed. We are not including the extractables information in our response to this question. For more detailed information on the extractables study methods and results, see question 16 (Bidi Vapor Deficiency Letter Q16 Response.pdf).

Below, Bidi Vapor provides information requested in question 15.

### 15.1.1 Reference product datasets if a reference e-liquid is used (15a)

We did not use a reference e-liquid in the BIDI® Stick non targeted aerosol analysis study (NTA 0423-024 Final Report v0.0 [see "0423-024 Final Report v0.0.pdf" in the "Q15_Attachments" folder).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 15.1.2 Analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020 and detailed information on how it is derived. (15b)

An analytical evaluation threshold (AET) in µg/mL is calculated and considered when planning nontarget constituent analysis. For this application, the dose-based threshold (DBT) in µg/day is chosen based on the equivalent threshold of toxicological concern (TTC)

In general, the calculated AET is compared to the method limit of detection (LOD) to ensure AET ≥ LOD. For semi-quantitative scanning methods LOD is considered to be the limit of quantitation (LOQ). The application of the AET concept is complicated in headspace GC-MS analysis due to a compound's response factor not only being influenced by detector response, but also the partitioning of the analyte from the extract solution into the headspace of the vial. Hence, uncertainty factors for headspace screening methods are large (>10) and as a result an AET is not applied.

## 15.1.3 Complete description of all test protocols and analytical methods used, full validation reports for each analytical method, and scientific rationale for conditions (e.g., physical properties and compositions of solvents used, temperatures, time) chosen in the NTA study (15c)

The full validation reports for each Enthalpy non-targeted analytical method are available in Tobacco Product Master File (TPMF) No. MF0000276. The Letter of Authorization (LOA) for the master file can be found in "Enthalpy_Attachments.pdf" in the "Q15_Attachments" folder.

The test protocols and methods for the analyses performed at Enthalpy can be found in "0423-024 Final Report v0.0.pdf" in the "Q15_Attachments" folder.

## 15.1.4 Testing laboratory name and associated accreditation certificates (15d)

The NTA End of Life (EOL) Studies were performed by Enthalpy Analytical, LLC, 1470 East Parham Road, Richmond, VA 23228-2300, an ISO 17025 accredited laboratory that meets the Food and Drug Administration (FDA) certification recommendations (American Association for Laboratory Accreditation Certificate number 1873.01 [see "Enthalpy_Attachments.pdf" in the "Q15_Attachments" folder])

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## 15.1.5 Length of time between date(s) of manufacture and testing, and storage conditions prior to testing (15e)

Two batches (one fresh and one aged) of BIDI® Stick Classic products were submitted to Enthalpy for NTA EOL Testing. The first batch (fresh) was manufactured in January 2023, the sample ID in the study report is "Bidi Stick Classic (Jan 2023) BS6-CT-019 / Jan 2023", these products were approximately 4 months old at the time of testing. The second batch (aged) was manufactured in December 2021, the sample was incorrectly identified in the study report as "Bidi Stick Classic (Jun 2021) BS6-CT-015 / Jun 2021", these products were approximately 17 months old at the time of testing.

## 15.1.6 Complete raw data sets with units and a summary of the results for all aerosol NTA testing performed (15f)

The complete raw aerosol yield datasets, with units of measure are available in the "0423-024 Final Report v0.0.pdf" in the "Q15_Attachments" folder.

- CORESTA Regime v0.0 A1001.xlsx
- CORESTA Regime v0.0 A1002.xlsx
- CORESTA Regime v0.0 A1003.xlsx
- CORESTA Regime v0.0 B1001.xlsx
- CORESTA Regime v0.0 B1002.xlsx
- CORESTA Regime v0.0 B1003.xlsx
- INTENSE Regime v0.0 A2001.xlsx
- INTENSE Regime v0.0 A2002.xlsx
- INTENSE Regime v0.0 A2003.xlsx
- INTENSE Regime v0.0 B2001.xlsx
- INTENSE Regime v0.0 B2002.xlsx
- INTENSE Regime v0.0 B2003.xlsx

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

### 15.1.7 Number of replicates performed and standard deviation(s) (15g)

Enthalpy conducted the BIDI® Stick Classic NTA EOL aerosol analysis for both ISO and Intense puffing regimes in triplicate.

### 15.1.8 Storage conditions of study samples (15h)

All of the BIDI® Stick Classic products used for the NTA analysis were stored at room temperature (ambient conditions 25°C and 60% RH) prior to initiating testing.

### 15.1.9 Database search: name, type, algorithm, parameters used (15i)

Enthalpy used Agilent MassHunter Unknowns to identify BIDI® Stick Classic non-targeted aerosol compounds and provide semi-quantitative results. It is an automated data processing software that identifies compounds based on a mass spectral search against the National Institute of Standards and Technology (NIST) mass spectral database. Compound identifications using this procedure are considered tentative until verified by comparison to reference standards. Tentative identification includes a visual inspection of the mass spectra by an experienced analyst, in addition to a match factor score. This method can only provide estimated concentrations for the compounds and therefore the results are only semi-quantitative. Quantitation is based on the response factor of an analog internal standard. All peaks and identifications were reviewed by the analyst and the subject matter expert (SME). Artifacts from the deconvolution were noted and removed from the final results.

### 15.1.10 Data analysis and conclusion (15j)

The aim of this non-targeted analysis was to identify potential chemical heat degradants or reaction products present in the BIDI® Stick Classic aerosol. As such, these non-targeted results present a comprehensive analysis of the chemical composition of BIDI® Stick Classic aerosols. The study aimed to identify and quantify the diverse range of chemical constituents present in aerosol and to gain insights into potential health risks associated with their use. The non-targeted chemical analysis was performed using state-of-the-art analytical techniques, including high-resolution mass spectrometry coupled with advanced data processing and statistical analysis tools. These methods allowed for the detection and identification of a broad range of chemical compounds present in the sample, including both known and unknown chemicals. During the analysis, a comprehensive list of potential chemical reaction products and heat degradants was generated based on their mass spectra, retention times, and spectral libraries. This list was then subjected to

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

thorough scrutiny to identify and prioritize compounds of concern based on their toxicity, potential health risks, and regulatory guidelines.

Enthalpy Analytical utilized a non-targeted GC-MS (Gas Chromatography-Mass Spectrometry) to fully characterize the aerosols of BIDI® Stick Classic. This is a well-known and generally accepted approach used to identify and semi-quantify a wide range of compounds with a diverse set of physio-chemical properties. This approach is suitable for gathering a large amount of data without specifically targeting or predefining the compounds of interest. This approach allows the possibility to detect compounds that are not known to be present beforehand.

Three replicates were collected for each puffing regimen, both intense and CORESTA (non-intense). Additionally, aerosols were generated from fresh (T=0) and aged (T=17 month) e-liquids. This allowed for the characterization of 12 individual replicates of the same formulations. Aerosols were collected until depletion – which was determined by an earlier study. This allowed the complete characterization of the aerosols that are likely to be generated during typical use.

Aerosols were generated using programable smoking machines. For intense puffing, a square wave puff profile was used to collect 110 mL puff volumes over a 6 second puff with a frequency of 30 seconds. For CORESTA puffing, the parameters were the same, except for a decreased puff volume (55 mL) and a shorter puff time (3 seconds). During aerosol generation the aerosol was directed to a filter pad and then to a solvent-filled impinger – which constituted the collection.

Once collected samples were subjected to analysis with minimal preparation to avoid biasing the sample. This involved direct injection into the GC-MS. Compounds were separated using gas chromatography and their mass spectra were collected using mass spectrometry. The compound identification was achieved through the comparison of their mass spectra with reference libraries or databases. The mass spectra obtained were matched against the spectra of known compounds to determine their identity. Semi-quantitation was achieved using the area counts under the chromatographic curve of the analyte in relation to the chromatographic area of a known compound at a known concentration.

By this process, a comprehensive and unbiased approach for exploring the chemical composition of complex samples was applied to BIDI® Stick Classic aerosols. These results provide valuable information about the quantity and presence of known and unknown compounds, facilitating a careful evaluation of potential toxicants, and understanding the aerosol complexity. As can be seen in the figure below, 129 compounds were detected in the NTA of BIDI® Stick Classic aerosol

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

across all puffing regimens and across the fresh and aged samples, 59 of which were in common with cigarette smoke.

**Figure 1 Comparative Chemicals Counts Found in BIDI® Stick Classic Relative to Cigarette Smoke Across all Puffing Regimens**



[1]Rodgman A, Perfetti TA. The Chemical Components of Tobacco and Tobacco Smoke. 2nd ed. Boca Raton: CRC Press; 2013.

## 15.2 Results

It was determined that across all the targeted and non-targeted studies -including aerosols generated from aged and fresh product, CORESTA and intense puffing conditions - there were at most 144 chemical constituents detected, representing a decrease in chemical complexity in BIDI® Stick Classic aerosols of more than 96% when compared to cigarette smoke (Rodgman et al., 2013). Regarding the chemical constituents measured in BIDI® Stick Classic aerosols, only 12 constituents were on FDA's recommended HPHC list. Lastly, the NTA results account for only approximately 0.1% of the total aerosol mass. The large majority of the aerosol mass is made of intact primary ingredients.

## 15.3 Data Analysis

In common to the all the NTA analyses were 1066.49 µg. This means that by mass the device delivered a very chemically consistent aerosol. In total, the NTA accounts for about 0.1% of the aerosol mass.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**15.4 Conclusion**

Bidi Vapor characterized the BIDI® Stick Classic device and aerosols using quantitative targeted analysis for a semi-quantitative non-targeted analysis. BIDI® Stick Classic aged (17 months) and fresh (4 months) aerosols were collected under CORESTA and intense puffing regimens throughout the life of the device. The study outcomes show that:

1) the number and concentration of aerosol HPHCs were fewer and lower in BIDI® Stick Classic aerosols than in combustible cigarette smoke,

2) the chemical complexity of the aerosol – based on the non-targeted analysis – was 96% reduced versus combustible cigarette smoke,

3) the product is stable for the proposed shelf life of 12 months.

Taken as a whole, the chemistry, and stability study data, along with the risk assessment, support the conclusion that the BIDI® Stick Classic is less toxic than combustible cigarettes and appropriate for the protection of public health.

**15.5 Deficiency Letter Question 15 Attachment Files**

The following files can be found in the "Q1_Attachments" folder.

| Folder Name | Files Contained Within |
|---|---|
| Q15_Attachments | • 0423-024 Final Report v0.0<br>• Enthalpy_Attachments.pdf |
| 0423-024 (Q23092) Final Report v0.0_NTA Results v0.0 | • CORESTA Regime v0.0 A1001.xlsx<br>• CORESTA Regime v0.0 A1002.xlsx<br>• CORESTA Regime v0.0 A1003.xlsx<br>• CORESTA Regime v0.0 B1001.xlsx<br>• CORESTA Regime v0.0 B1002.xlsx<br>• CORESTA Regime v0.0 B1003.xlsx<br>• INTENSE Regime v0.0 A2001.xlsx<br>• INTENSE Regime v0.0 A2002.xlsx<br>• INTENSE Regime v0.0 A2003.xlsx<br>• INTENSE Regime v0.0 B2001.xlsx<br>• INTENSE Regime v0.0 B2002.xlsx<br>• INTENSE Regime v0.0 B2003.xlsx |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**15.6 References**

Rodgman, A., & Perfetti, T. A. (2013). *The Chemical Components of Tobacco and Tobacco Smoke* (2nd ed.).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## Table of Contents

Table List ............................................................................................................................ 1

FDA Deficiency Letter Question 16 .................................................................................... 2

Bidi Vapor's Response to Deficiency Letter Question 16 ...................................................... 4

Response Summary ............................................................................................................ 4

Study Parameters ............................................................................................................... 6

Analysis and Processing ..................................................................................................... 7

Conclusion ........................................................................................................................ 8

Deficiency Letter Question 16 Attachment Files ................................................................. 9

## Table List

Table 1 Testing Conditions and Parameters for D56123-1 C30996 Extractables of BIDI® Stick Classic Tobacco ...... 6

Table 2 Testing Conditions and Parameters for D56122-1 C30994 Simulated Use Extractables of BIDI® Stick Classic Tobacco Mouthpiece ................................................................................................... 7

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## FDA Deficiency Letter Question 16

*Your PMTA provides information about extractables identified from extracted media (n-hexane, isopropyl alcohol (IPA), and water) of the ENDS components of the new product that have been submerged in the media for 72 hours at 37 °C. However, your extractable study was conducted in a targeted manner and non-targeted analysis was not evaluated to account for all possible extractables from undesirable and unpredictable chemical extraction and reaction. In addition, the four different analytical techniques you used to analyze the extractables are not appropriate and lack information for FDA evaluation. Each of the method limitations and concerns are outlined below:*

- *Headspace gas-chromatography flame ionization detector (HS-GC-FID) technique typically analyzes volatile organic compounds that have been released as gas or vapor directly (dry) from the test materials in a heated sealed container (e.g., vial). However, you used HS-GC-FID to analyze the n-hexane, IPA, and water extracts rather than directly analyze the ENDS components without extraction solvent. The extraction media may react with or hinder the volatile organic compounds from the ENDS components, which would then affect the sensitivity of HS-GC-FID analysis.*

- *Fourier-transform infrared spectroscopy (FT-IR) data report that the IR spectra of the sample solution (extracts) correspond to the IR spectra of blank solution, but you did not provide raw data to support this statement. Furthermore, FT-IR is not an appropriate analytical technique for the identification and characterization of extractable chemical constituents because FT-IR lacks chemical specificity and sensitivity.*

- *You used inductive coupled plasma optical emission spectroscopy (ICP-OES) technique and n-hexane, IPA, and water as extraction media for the elemental (metal) analysis of extractables from the ENDS components of the new product. These extraction media are not sufficient to extract elemental impurities from the samples. An acid extraction is needed. Additionally, ICP-OES is suitable for determination of medium with high concentrations of elements (>10 ppb) but for low level analytes, a more sensitive inductively coupled plasma mass spectrometry (ICP-MS) analysis is needed.*

- *Liquid chromatography mass spectrometry (LC-MS) and gas chromatography mass spectrometry (GC-MS) techniques are used to analyze non-volatile and semi-volatile extractables of the new product, respectively. You stated in the GC-MS and LC-MS*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

> analysis reports that no peaks were detected in the chromatograms of n-hexane, IPA, and water extracts of the investigated materials, but you did not provide complete raw datasets to support the findings. Furthermore, you did not provide any information on the instrument parameters (chromatography, mass spectrometry, column brand and type), database search type and parameters, sample preparation procedure, internal and external standards for chemical constituent quantitation, standard solution preparation procedure, solvents used, and sample run sequence for GC-MS and LC-MS analyses.

For all extractable analyses, it is unclear if you submerged the whole assembly or separate components of the new product into the extraction media in sample preparation. In a typical extractables study, each component is extracted separately in an extraction medium so that one can readily identify the source of extractables. A clarification is needed to fully understand your extraction process. Additionally, because the new product is intended to be puffed by mouth, any ENDS components in direct contact with user's mouth and saliva need to be analyzed for potential extractables. Artificial saliva is recommended to be used in the sample preparation process of the study to identify chemical compounds that may leach from the new product to users. Additionally, you did not establish an analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020. Without appropriate and sufficient extractable study data, FDA cannot fully evaluate the health impacts of the new product. Provide the following information about the extractable study for the new product:

a.  Non-targeted HS-GC-MS analysis of volatile organic compounds released from gas or vapor of the structural components of the new product

b.  Non-targeted ICP-MS analysis of extractables from the structural components of the new product using an acid digestion solution

c.  Non-targeted GC-MS and LC-MS analyses of extractables from the structural components of the new product using artificial saliva, polar, semi-polar, and non-polar extraction solutions

d.  Names of the extraction solutions and rationale for selection of these solutions for all the techniques used in extractable study

e.  Analytical evaluation threshold (AET) as detailed in ISO 10993-18:2020 and detailed information on how it is derived

Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.

    *f.*   *Complete description of all quantitative test protocols and analytical methods used, and full validation reports for each analytical method*

    *g.*   *Testing laboratory name and associated accreditation certificates*

    *h.*   *Length of time between date(s) of manufacture and testing, and storage conditions prior to testing*

    *i.*   *Complete raw data sets with units and a summary of the results for all extractables testing performed*

    *j.*   *Sample chromatograms*

    *k.*   *Number of replicates performed and standard deviation(s)*

    *l.*   *Extractables identified for each component of the ENDS components*

    *m.*   *Storage and extraction condition of extractables study samples*

    *n.*   *Database search used including the name, type, and parameters*

    *o.*   *Data analysis and conclusion*

## 16.1 Bidi Vapor's Response to Deficiency Letter Question 16

## 16.2 Response Summary

Question 16 outlines deficiencies regarding previously provided extractables data for the new product. Bidi Vapor has addressed these deficiencies by generating the following new data at WuXi AppTec (WuXi):

    1.   Extractables of device components that come in contact with e-liquid or aerosol generated by the device using solvents with different polarities (such as Hexane, Isopropanol [IPA], Water) and higher temperatures (the final report "D56123-1 C30996 Final.pdf" is available in the "Q16_Attachments" folder).

    2.   Extractables of device components that come in contact with the user's mouth or saliva, using artificial saliva and body temperature (the final report "D56122-1 C30994 Final.pdf" is available in the "Q16_Attachments" folder).

In response to this deficiency, Bidi Vapor conducted an extractables study on the BIDI® Stick mouthpiece and device components in order to identify potential chemicals to which the user may be exposed. The data generated by our extractable study supersedes the PMTA extractables data. The extractables studies were conducted at WuXi, a leading global contract research organization

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

which provides comprehensive extractable and leachable (E&L) testing services under an ISO 17025 scope of accreditation (a copy of WuXi's accreditations is available in "WuXi_accreditations.pdf" in the Q16_Attachments" folder)

The deficiency information requested (*a* thru *o*) are in the WuXi Apptec reports titled (*Simulated Use Extractables of BIDI® Stick Classic Tobacco Mouthpiece* D56122-1 C30994 and *Extractables of BIDI® Stick Classic Tobacco* D56123-1 C30996. Below we summarize the extractable study approach and results (both final reports are available in the "Q16_Attachments" folder).

The goal of extractable and leachable studies is to comprehensively identify and characterize as many compounds as feasible which may leach from a device, estimate their concentration, and evaluate their potential risks. WuXi generally follows a systematic approach to conducting E&L studies and has extensive experience in defining the scope, objectives, and specific requirements of E&L studies. This includes determining the appropriate regulatory guidelines, sample types, extraction conditions, and analytical techniques to be employed. Controlled extractions, using suitable solvents or extraction media that mimic relevant user contact or usage conditions were performed. Additionally, more aggressive solvents were used to target specific classes of compounds (e.g., polar or nonpolar solvents).

The extracted solutions underwent a comprehensive non-targeted chemical analysis using state-of-the-art analytical instruments such as high-performance liquid chromatography coupled to high resolving power mass spectrometry (both positive and negative mode ionization) and gas chromatography-mass spectrometry. These non-targeted methods were applied to comprehensively analyze the chemical composition of samples without specifically targeting known compounds. These methods allow for the detection and identification of a wide range of compounds, including unknown or unexpected substances that may be present in the samples. This allowed WuXi to provide detailed reports summarizing the results of the extractable studies, including a comprehensive list of identified compounds and their concentrations.

There were two general types of studies that were performed on components of the BIDI® Stick device based on extraction solution (aggressive solvents or artificial saliva). The first involved aggressive solvents (like hexane and isopropyl alcohol) applied to all components that come in contact with the e-liquid or aerosol. The purpose is to identify and characterize the potential compounds that could potentially be extracted (or leach) from the product. As expected, there were a number of compounds detected when aggressive solvents were applied to device components. This is partly due to the fact that hexane has the ability to extract a broad range of organic compounds. It has a high affinity for nonpolar substances, such as hydrocarbons, oils, and fats –

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

many of which are known to be present in plastics. When IPA (isopropyl alcohol) is used as the solvent for extractable and leachable studies, the types and numbers of compounds extracted may differ compared to using hexane or other solvents. IPA is a polar solvent, meaning it has a greater affinity for polar compounds, including water-soluble and moderately polar substances. These more aggressive solvents together extracted several constituents from the BIDI® Stick device components.

The second part of the extractables study was a simulated use experiment – where artificial saliva was used to extract only portions of the device that come into contact with the aerosol or the user. This portion of the extractables study focused on assessing the compounds that can potentially migrate from the mouthpiece during product use. These studies help evaluate the potential hazards associated with exposure to the constituents in the mouthpiece and assess their potential impact on product users.

Throughout the process, WuXi adhered to a strict quality system, ensuring the accuracy, reliability, and reproducibility of the testing results. Their laboratories are equipped with advanced instrumentation and staffed by experienced scientists who are knowledgeable about regulatory requirements and industry best practices.

### 16.3 Study Parameters

The fluid-contacting components of the test article(s) were subjected to aggressive extraction solvents. Each solvent listed below was used to immerse the components, and extraction was carried out as per the specified protocol. Gentle agitation was employed during the extraction process for a specified duration.

To ensure accuracy, a laboratory blank was prepared for each solvent to account for any background compounds. Compounds detected in the blanks were not included in the reported sample analysis. Please refer to Table 1 and Table 2 for detailed information.

Note: The exact details of the extraction solvents, agitation parameters, and extraction times will be specified in the respective protocol for each sample.

**Table 1 Testing Conditions and Parameters for D56123-1 C30996 Extractables of BIDI® Stick Classic Tobacco**

| Extraction Solvent | Replicates | Temperature | Time | Extraction Ratio* | Analysis By |
|---|---|---|---|---|---|
| Hexane | 1 | $50 \pm 2°C$ | $72 \pm 2$ hr | $14 \ cm^2/mL$ | GC-MS LC-MS |

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

| Extraction Solvent | Replicates | Temperature | Time | Extraction Ratio* | Analysis By |
|---|---|---|---|---|---|
| **Isopropanol (IPA)** | 1 | $50 \pm 2°C$ | 72 ± 2 hr | 14 cm$^2$/mL | GC-MS<br>LC-MS |
| **Water** | 1 | $50 \pm 2°C$ | 72 ± 2 hr | 14 cm$^2$/mL | GC-MS<br>LC-MS<br>ICP |
| **Water** | 1 | Room Temperature | 24 ± 2 hr | 14 cm$^2$/mL | HS-GC-MS |

\* See AET section for details regarding the chosen ratio
GC-MS – Gas Chromatography – Mass Spectrometry; LC-MS – Liquid Chromatography – Mass Spectrometry Electrospray ionization (ESI); ICP – Inductively Coupled Plasma (Mass Spectroscopy or Optical Emission Spectroscopy); HS-GC-MS – Headspace Gas Chromatography – Mass Spectrometry

The mouthpiece was extracted in singlet. Extractions were carried out using a ratio specified in ISO 10993 Part 12. The surface area, number of components, extraction volume, corresponding ratio per component, extraction solvent, and conditions are listed in Table 2

**Table 2 Testing Conditions and Parameters for D56122-1 C30994 Simulated Use Extractables of BIDI® Stick Classic Tobacco Mouthpiece**

| Extraction Solvent | Replicates | Temperature | Time | Extraction Ratio* | Analysis By |
|---|---|---|---|---|---|
| **Artificial Saliva** | 1 | $37 \pm 2°C$ | 24 ± 2 hr<br>168 ± 4 hr | 3 cm$^2$/mL | GC-MS<br>LC-MS |

## 16.4 Analysis and Processing

The data obtained from these studies underwent a series of processing steps to ensure accuracy and reliability. To quantify compounds detected surrogate standards were used. This is a common practice for non-targeted workflow. For the GC-MS analysis, a minimum of 5 calibration points with 3 surrogates were utilized, while the LC-MS analysis involved a minimum of 5 calibration points with 5 surrogates.

In reporting the results, certain criteria and scientific judgment were applied. Compounds and elements identified in the laboratory blank, which indicate background or process-related substances, were excluded from the final report. The reporting was conducted on a per-replicate basis to provide comprehensive information. Consistency in compound retention times across replicates was considered to ensure reliable identification. Compounds were semi-quantitated if their levels reached or exceeded the Action Level (AET). In cases where the AET was not met, the Limit of Detection (LOD) was used as the threshold. Elements were reported when their

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

concentrations were equal to or above the Limit of Quantitation (LOQ) as determined by ICP analysis.

The analysis techniques employed varied depending on the nature of the compounds. GC-MS analysis was used to analyze volatile and semi-volatile compounds. This involved comparing the obtained data to the NIST library to determine quality matches. The ion chromatograms were also visually inspected by the analysts for additional confirmation. For aqueous solutions, multiple solvent rinses were employed to facilitate the detection of semi-volatile compounds.

LC-MS analysis, on the other hand, focused on semi-volatile to non-volatile compounds. Positive and negative modes were employed during the analysis, and the system software was configured to identify unknown compounds through searches in mass spectral libraries, databases, and the use of molecular formula generators.

In the case of metals analysis, ICP was used to screen metals. The analysis involved verifying the results using multi-isotope and/or multi-wavelength detection with commercial standards prepared from NIST traceable sources.

Lastly, residual solvents were analyzed using HS-GC-MS, following the guidelines outlined in USP <467>. The analysts examined the ion chromatograms for any additional peaks beyond the specified solvents, ensuring a thorough assessment of the samples.

By applying these comprehensive analytical techniques and reporting criteria, WuXi confidently provided detailed and accurate information about the compounds and elements present in the tested samples.

## 16.5 Conclusion

As has been demonstrated, the battery of extraction solvents/conditions as well as the various advanced non-targeted analytical methods applied to the extracted represent a thorough and comprehensive approach to the extracable studies presented here. And while the use of aggressive solvents in the extraction process resulted in the expected extraction of several hundred compounds, the findings from the extraction using artificial saliva indicate that minimal leaching is likely to occur under actual usage conditions.

The choice of aggressive solvents in extractable studies aims to assess the maximum potential for compound extraction. These solvents, designed to mimic harsher conditions, can reveal a broader range of extractable compounds. However, it is important to note that the use of such solvents may

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

not reflect the actual leaching behavior when the BIDI® Stick product is in contact with salivary fluids or during real-world usage scenarios.

In contrast, the extraction using artificial saliva is designed to simulate the conditions that the BIDI® Stick product would encounter in the oral cavity at actual use temperatures. This approach provides a more realistic representation of the leaching that may occur during actual use. The results from the artificial saliva extraction indicate that the leaching of compounds from the BIDI® Stick device is minimal under these simulated conditions, suggesting that the risk of significant leachables reaching the user during real-world usage is low.

**16.6 Deficiency Letter Question 16 Attachment Files**

The following files are available in the "Q16_Attachments" folder.

1. D56123-1 C30996 Final.pdf

2. D56122-1 C30994 Final.pdf

3. WuXi_accreditations.pdf

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## Table of Contents

Figure List................................................................................................................. 1

FDA Deficiency Letter Question 21............................................................................ 2

Bidi Vapor's Response to Deficiency Letter Question 21 ........................................... 3

21.1 Response Summary .............................................................................................3

21.2 Ingredient Risk Assessment ................................................................................5

21.3 Aerosol HPHC and Target Constituent Quantitative Risk Assessment ...............6

21.4 Aerosol Non-Targeted Analyte Risk Assessment ................................................9

21.5 Conclusion .........................................................................................................10

21.6 Deficiency Letter Question 21 Attachment Files................................................10

21.7 References..........................................................................................................11

## Figure List

Figure 1 Risk Assessments of BIDI® Stick Classic Aerosol ..............................................4

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## FDA Deficiency Letter Question 21

*Your PMTA lacks complete ingredient information, including whether ingredients have inherent toxicities (including cytotoxicity, genotoxicity, and mutagenicity), enter the aerosol unchanged, or undergo thermal degradation changes that impact potential or associated toxicities, such as increasing HPHC levels in the primary route of user exposure (i.e., aerosol inhalation). For example, the main ingredients (e.g., PG and VG) could thermally degrade to form HPHCs (e.g., acetaldehyde and formaldehyde) that are carcinogens and respiratory toxicants. You also did not provide toxicological information on other constituents (i.e., leachables from e-liquid). This information is needed for FDA to evaluate toxicological concerns with your new product. Provide information regarding toxicities and adverse health outcomes associated with ingredients and identified leachables to cover health risks to users and non-users (i.e., non-cancer and cancer effects), including genotoxicity and mutagenicity. In addition, provide scientific evidence or rationale as to why your provided toxicity information or studies support the presence of these ingredients and leachables in your new product at their current levels.*

*If you choose to use previously conducted toxicology studies that tested aerosols to support that specific ingredients and leachables are not of toxicological concern in your new product, provide a rationale to demonstrate that the aerosolization process in ENDS devices does not create, through thermal degradation, confounding genotoxic constituents, including HPHCs. For putative negative results in assays with e-liquids or aerosols, within your interpretation of those results take into account the presence of potentially genotoxic HPHCs and nicotine as a dose-limiting factor, as the toxicity of nicotine can limit the concentrations of potentially toxic ingredients and leachables in nonclinical assays below those required to produce positive results. Additionally, provide the data and information demonstrating how you took into account and evaluated the dose-limiting effects of nicotine in the studies you submit or reference.*

*If you choose to reference studies with relevant toxicity endpoints, provide scientific rationale to bridge the information found in such studies to your new product and explain the appropriateness of the experimental methods, deviations from established or referenced protocols, and the conclusions and limitations of the studies in supporting the new product evaluation.*

*Alternatively, toxicity concerns regarding ingredients or leachables for your new product could be addressed by providing scientific evidence or data from targeted analyses of the e-liquid showing that the ingredients and leachables of concern do not transfer to the aerosol of the new product. If you choose this alternative, provide evidence that the analytical methods you used are*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

*capable of quantitating the ingredients and leachables of concern and showing that they are controlled to an acceptable level as part of your overall risk assessment.*

**Bidi Vapor's Response to Deficiency Letter Question 21**

**21.1 Response Summary**

Deficiencies regarding "toxicities and adverse health outcomes associated with ingredients and identified leachables to cover health risks to users and non-users (i.e., non-cancer and cancer effects), including genotoxicity and mutagenicity" have been outlined by FDA. To address these deficiencies, human health risk assessments were conducted to provide information on potential toxicities, including genotoxicity and mutagenicity, and hazard assessment for adverse non-cancer and cancer health outcomes from inhalation exposure of the ingredients, potential thermal degradation products, as well as metal and non-metal leachables (Appendix A - Ingredient Toxicological Risk Assessment Technical Report; Appendix B – Aerosol HPHCs and Target Constituents Quantitative Risk Assessment Report; Appendix C – Aerosol Non-targeted Analysis Risk Assessment Technical Report). The health risk evaluation shows that ingredients are present in the BIDI® Stick Classic product at levels that would result in estimated consumer exposure levels below health-based guidance values (MOE≥1.0) established for systemic and/or local effects under typical use and heavy use exposure scenarios, thus indicating a low toxicological concern at the levels present in BIDI® Stick Classic.

- Overall, there is an estimated reduction in potential risk for critical health hazards of many of the HPHCs and target constituents designated as carcinogens, respiratory toxicants, cardiovascular toxicants, and reproductive and developmental toxicants in the population of adult users, even under heavy use exposure scenarios, compared with the estimated noncancer and cancer health risks from lifetime combustible cigarette use.

- The potential toxicological concerns from ingredient thermal degradation products or leachables measured at low levels using non-targeted analysis are balanced by the significant reduction in the most potent thermal degradation HPHCs and metal leachables, including acetaldehyde, acrolein, and formaldehyde, cadmium, chromium, and lead compared to combustible cigarette smoke.

Therefore, the data supports that the marketing of BIDI® Stick Classic product subject to this application is appropriate for the protection of public health. An overview of the approach, steps and objectives, and key findings are also depicted in Figure 1.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**Figure 1 Risk Assessments of BIDI® Stick Classic Aerosol**



[HPHC=harmful and potential harmful constituent]

The specific approach for BIDI® Stick Classic presented here follows widely accepted human health risk assessment guidelines (NRC, 1983; 2009), with consideration of approaches that have been presented previously in the peer-reviewed literature (Berman et al., 2019; Hirn et al., 2020; Marano et al., 2018). During the human health risk assessment process, with inputs from planning and scoping, the approach for the framework is technically defined during the problem formulation stage. Information is then gathered in the second stage during three primary steps: hazard identification, dose-response assessment, and exposure assessment. Information from these three steps is then used in the fourth step to characterize the risk of exposure to an individual (NRC, 2009; Berman et al., 2019). The risk assessment process for ingredients is detailed in Appendix A; the quantitative risk assessment of HPHCs and target constituents measured in the aerosol of BIDI® Stick Classic are detailed in Appendix B; and the risk assessment for potential thermal

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

degradation compounds and leachables in the aerosol is detailed in Appendix C. Lastly, the *in vitro* summary reports are detailed in Bidi Vapor's response to Deficiency Letter Q22 (see "Bidi Vapor Deficiency Letter Q22 Response.pdf"). Key findings for these risk assessments are summarized below.

This assessment of integrated findings from multiple lines of evidence provides a weight of evidence determination regarding the potential human health risk of ingredients and leachables from BIDI® Stick Classic. This evaluation demonstrated that ingredients and leachables present a lower toxicological concern than combustible cigarettes. The potential hazards identified for compounds in the non-targeted analysis of the aerosol generated from BIDI® Stick Classic, which comprises less than 0.1% of the aerosol are balanced by the significant reduction (up to 100%) of the targeted HPHCs compared to combustible cigarette smoke. Furthermore, thermal degradant HPHCs that are released in the aerosol do not present a significant toxicological concern under typical use or heavy use scenarios. Lastly, aerosol hazard identification comparisons for the BIDI® Stick Classic aerosols (i.e., product as a whole) was also evaluated *in vitro* studies of aerosols generated from BIDI® Stick Classic, which demonstrate fewer comparative identified hazards relative to cigarette smoke (detailed in Bidi Vapor's response to Deficiency 22).Our weight of evidence approach to assess the potential health hazards from ingredients and leachables in the aerosol of BIDI® Stick Classic provides sufficient evidence and support that the marketing of BIDI® Stick Classic is appropriate for the protection of public health (APPH).

## 21.2 Ingredient Risk Assessment

The risk assessment of ingredients of BIDI® Stick Classic are described in detail in Appendix A.

Potential human health risk was characterized for each ingredient by determining the MOE risk estimate based on estimated inhalation exposure levels, or by determining Hazard Quotients (HQs) for the primary ingredients of propylene glycol and glycerol measured in the aerosol. Both risk quotients present the ratio between the anticipated consumer exposure and the daily exposure at which toxicological effects are not anticipated to occur. The results of this screening risk assessment provide support in a weight of evidence analysis that the marketing of BIDI Stick Classic is APPH.

1. The ingredients evaluated here have not been identified as mutagenic carcinogens. With the exception of furfuryl alcohol, no ingredient evaluated here has been classified as a carcinogen (IARC 2023; Cal-OEHHA 2023; USEPA IRIS 2023; US FDA 2012; US FDA 2019a; US FDA 2019b; NTP 2023; ECHA 2023).

2. With the exception of acetol, which is an endogenous metabolite, the ingredients evaluated here have not been confirmed or classified as genotoxicants or mutagens (IARC 2023; Cal-

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

OEHHA 2023; USEPA IRIS 2023; US FDA 2012; US FDA 2019a; US FDA 2019b; NTP 2023; ECHA 2023).

3. The ingredients evaluated here are not classified reproductive/developmental toxicants; respiratory sensitizers; or repeated exposure toxicants, with the exception of nicotine (Cal-OEHHA 2023; USEPA IRIS 2023; US FDA 2012; US FDA 2019a; US FDA 2019b; NTP 2023; ECHA 2023).

4. The ingredients identified as potential skin sensitizers are present at concentrations not anticipated to elicit a contact sensitization reaction (Costigan et al., 2017).

5. The flavoring ingredients are present at levels that would result in estimated consumer exposure levels below health-based guidance values (MOE≥1.0) established for systemic and/or local effects under typical use and heavy use exposure scenarios indicating a low toxicological concern at the levels in BIDI® Stick Classic.

6. The flavoring ingredients identified as respiratory irritants are present at levels resulting in MOEs >1, indicating a low toxicological concern.

7. The ingredients were determined to be at levels that indicate a low potential risk of acute toxicity under the anticipated consumer exposure scenarios.

8. The carrier ingredients, propylene glycol and glycerol, are at levels in the aerosol resulting in low toxicological concern as defined as a target risk ratio (HQ) of ≤ 1.0 as set forth by the USEPA and codified by US Code of Federal Regulations (US EPA, 1991) 40 CFR § 300.430).

9. The thermal degradation products of propylene glycol and glycerol, formaldehyde, acrolein, and acetaldehyde are present at levels resulting in substantial decreases in estimated health risks (up to 98%), even under heavy use exposure scenarios, compared with the estimated noncancer and cancer health risks from lifetime combustible cigarette use.

## 21.3 Aerosol HPHC and Target Constituent Quantitative Risk Assessment

The quantitative risk assessment of HPHCs and Target Constituents measured in the aerosol of BIDI® Stick Classic are described in detail in Appendix B.

To characterize potential human health risk associated with adult use of BIDI® Stick Classic, we utilized the well-accepted human health risk assessment framework outlined by numerous regulatory agencies and authoritative sources. We used this framework to identify the toxicological hazards and dose-response effects, and estimate inhalation exposures of compounds to produce quantifiable health risk estimates of key HPHCs and other target constituents identified by US

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

FDA for association with tobacco-related disease. As detailed in this report, 18 HPHCs (carbonyls, metals, tobacco-specific nitrosamines [TSNAs], volatile organic compounds [VOCs]) and other target constituents were analyzed in the aerosol from BIDI® Stick Classic [60 mg/ml] nicotine. Additionally, BIDI® Stick Classic aerosols were assessed using two puffing regimens, ISO and intense, and under two consumption scenarios to estimate typical and heavy use inhalation exposure scenarios. The health risk estimates of the HPHCs and target constituents of BIDI® Stick Classic were then compared with the health risk estimates of combustible cigarettes or heat-not-burn (HnB) products (e.g., IQOS), and standardized research e-cigarette product (SREC). The health risk assessment of BIDI® Stick Classic demonstrates that:

- Several HPHCs identified by the World Health Organization (WHO) Study Group on Tobacco Product Regulation (TobReg) as mandated for lowering in cigarette smoke (Burns et al., 2008), including carbonyls, demonstrate lower levels and reduced risk estimates from the aerosol of Bidi® Stick Classic compared with smoke from combustible cigarettes under a typical use exposure scenario.

- Most HPHCs and target constituents are present at levels resulting in risk estimates below unity (hazard quotient [HQ] ≤ 1), the target noncancer hazard defined by the U.S. Congress in NCP (40CFR§300.430, 2022) and the USEPA RAGS Part B (US EPA, 1991), including lead, cadmium, chromium, copper, nickel, formaldehyde, acrolein, and acetaldehyde, under a typical use exposure scenario.

- The individual noncancer hazard risk estimates (HQs) from exposure to HPHCs and target constituents are consistently below those of combustible cigarettes (up to 100%), even under a conservative puffing regimen and heavy use exposure scenario, with the exception of nickel.

- Although nickel is present at levels in the aerosol greater than in the smoke from 1R6F combustible cigarette, the HQs are below 1.0, indicating a low toxicological concern for noncancer hazards, particularly respiratory toxicity, from nickel.

- Although propylene oxide was measured at levels in the aerosol greater than in the smoke from 1R6F combustible cigarette under a heavy use exposure scenario, the HQ is below 1.0, indicating a low toxicological concern for noncancer hazards, particularly respiratory toxicity, from propylene oxide.

- Although the noncancer HQs of the respiratory toxicant HPHCs of acetaldehyde, acrolein, and formaldehyde exceed the noncancer target hazard of unity under a heavy use exposure scenario, the risk estimates are up to 94% below the estimated risks from combustible cigarettes, even under a heavy use exposure scenario.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

- Cardiovascular toxicant HPHC and target constituents examined here (acrolein and lead) have noncancer hazard estimates (HQs) up to 98% below that of combustible cigarettes, even under a heavy use exposure scenario.

- Reproductive and developmental toxicant HPHC and target constituents examined here (chromium, lead, cadmium) have noncancer hazard estimates (HQs) up to 100% below that of combustible cigarettes, even under a heavy use exposure scenario.

- The individual excess lifetime cancer risk (ELCR) estimates from exposures to HPHC and target constituents examined here are within or slightly exceed (formaldehyde) the target cancer risk range defined by the U.S. Congress in NCP (40CFR§300.430, 2022) and the USEPA RAGS Part B (US EPA, 1991), $10^{-6}$ to $10^{-4}$, and are up to approximately 76% to 100% lower than the estimated excess lifetime cancer risks from these HPHC and target constituents in combustible cigarettes, even under heavy use exposure scenarios, with the exception of nickel.

- Although the ELCR of nickel at typical (6E-07) and heavy (7E-07) use scenarios exceed that of combustible cigarettes, they are below the target cancer risk range defined by the U.S. Congress in NCP (40CFR§300.430, 2022) and the USEPA RAGS Part B (US EPA, 1991).

- Furthermore, the ELCRs of propylene oxide are within the target cancer risk range defined by the U.S. Congress in NCP (40CFR§300.430, 2022) and the USEPA RAGS Part B (US EPA, 1991).

- Overall, there is an estimated reduction in potential risk for critical health hazards of many of the HPHCs and target constituents designated as carcinogens, respiratory toxicants, cardiovascular toxicants, and reproductive and developmental toxicants in the population of adult users, even under heavy use exposure scenarios, compared with the estimated noncancer and cancer health risks from lifetime combustible cigarette use.

In conclusion, the human health risk evaluation of BIDI® Stick Classic (60 mg/ml) included an assessment of the aerosol HPHCs and other target constituents under multiple puffing regimens, including a conservative puffing regimen. The use of BIDI® Stick Classic under the scenarios evaluated here results in a reduction in risk estimates of critical health effects, including cancer, respiratory toxicity, cardiovascular toxicity, and reproductive and developmental toxicity from each of the HPHCs and target constituents analyzed compared to exposure from these HPHCs and target constituents from combustible cigarette smoke, providing strong supporting evidence that marketing of BIDI® Stick Classic is appropriate for the protection of public health.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**21.4 Aerosol Non-Targeted Analyte Risk Assessment**

The non-targeted analysis to evaluate potential thermal degradation products and potential leachables in the aerosol are described in detail in Attachment C.

The findings of the toxicological risk assessment of NTAs contribute to a robust analysis of the aerosol to identify ingredients, leachables, and new compounds generated by reaction processes (not defined as HPHCs or other target constituents). Several conclusions from this risk assessment support a WoE determination that the marketing of BIDI® Stick Classic is APPH.

Overall, the NTA evaluation, with the targeted assessment of HPHCs and target constituents, resulted in the characterization of approximately 95% of the aerosol for BIDI® Stick Classic. Given the substantial reductions in the most potent HPHCs and target constituents and their potential cancer and noncancer risks compared to combustible cigarette smoking[1], the potential risk estimates for NTA compounds (e.g., leachables and reaction products), which comprise a much lower proportion of the aerosol (0.1%), are likely to result in minimal risk contributions to the total potential cancer risk and noncancer hazards from use of BIDI® Stick Classic.

- Most ingredient or non-ingredient NTAs[2] (including potential leachables) identified in the aerosol of BIDI® Stick Classic are not classified carcinogens or mutagens, or predicted to be carcinogens or mutagens using in silico modeling. For potential carcinogens or mutagens that were identified or predicted, their aerosol mass is <0.1% of the total captured aerosol and, where available, their individual levels are reported to be lower than those in cigarette smoke. Therefore, the contribution to the total carcinogenic risk is likely to be low, and substantially decreased compared to the cancer risks associated with cigarette smoking.

- Although potential reproductive or developmental toxicants were identified as NTAs with limited findings, when comparable, the levels are below those of cigarette smoke, indicating a low potential toxicological risk compared to cigarette smoke.

- Furthermore, the reductions of the HPHCs and target constituents that comprise approximately 95% of the aerosol demonstrate potential reproductive or developmental toxicity (RDT) risk reductions of up to ≥99%**Error! Bookmark not defined.** compared to combustible cigarette smoke, indicating the potential contribution of the aerosol NTAs to

---

[1] As reported in Appendix B – Aerosol HPHCs and Target Constituents Quantitative Risk Assessment Report.

[2] Excluding glycidol harmful and potentially harmful constituent (HPHC) identified in the targeted aerosol analysis

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

the risk of reproductive or developmental toxicity is likely to be substantially decreased when compared with the reproductive or developmental toxicity of cigarette smoke.

- although potential respiratory irritants were identified with limited toxicological data (positive-limited hazards), any potential risks for respiratory irritation from the NTAs are likely outweighed by the marked reduction of potent respiratory toxicants (i.e., acetaldehyde, acrolein, and formaldehyde) in the aerosol of BIDI® Stick Classic compared to cigarette smoke, resulting in a likely substantial (up to 94%) reduction in potential respiratory toxicity risk estimates compared to combustible cigarette smoking, even under a heavy use exposure scenario.

No NTAs are confirmed respiratory sensitizers, and potential skin sensitizers are below a level anticipated to elicit a sensitization response. Thus, the potential risks for sensitization are determined to be low.

## 21.5 Conclusion

This assessment of integrated findings from multiple lines of evidence provides a weight of evidence determination regarding the potential human health risk of ingredients and leachables from BIDI® Stick Classic. This evaluation demonstrated that ingredients and leachables present a lower toxicological concern than combustible cigarettes. The potential hazards identified for compounds in the non-targeted analysis of the aerosol generated from BIDI® Stick Classic, which comprises less than 0.1% of the aerosol are balanced by the significant reduction (up to 100%) of the targeted HPHCs compared to combustible cigarette smoke. Furthermore, thermal degradant HPHCs that are released in the aerosol do not present a significant toxicological concern under typical use or heavy use scenarios. Lastly, aerosol hazard identification comparisons for the BIDI® Stick Classic aerosols (i.e., product as a whole) was also evaluated *in vitro* studies of aerosols generated from BIDI® Stick Classic, which demonstrate fewer comparative identified hazards relative to cigarette smoke (detailed in Bidi Vapor's response to Deficiency 22).Our weight of evidence approach to assess the potential toxicological concern of ingredients and leachables in the aerosol of BIDI® Stick Classic provided sufficient evidence and support that the marketing of BIDI® Stick Classic is appropriate for the protection of public health (APPH).

## 21.6 Deficiency Letter Question 21 Attachment Files

1. Appendix A – Ingredient Toxicological Risk Assessment Technical Report.pdf

2. Appendix B – Aerosol HPHC and Target Constituent Quantitative Risk Assessment Technical Report.pdf

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

    3.  Appendix C – Aerosol Non-targeted Analysis Risk Assessment Technical Report.pdf

        a.  FINAL QSAR Assessment of NTAs (Combined) - June 2023.pdf

## 21.7 References

Berman, M. L., El-Sabawi, T., & Shields, P. G. (2019). Risk Assessment for Tobacco Regulation. *Tob Regul Sci, 5*(1), 36-49. doi:10.18001/TRS.5.1.4

Burns, D. M., Dybing, E., Gray, N., Hecht, S., Anderson, C., Sanner, T., . . . Straif, K. (2008). Mandated lowering of toxicants in cigarette smoke: a description of the World Health Organization TobReg proposal. *Tob Control, 17*(2), 132-141. doi:10.1136/tc.2007.024158

Cal-OEHHA. 2023. California Environmental Protection Agency Office of Environmental Health Hazard Assessment. Retrieved April-June 2023 from https://oehha.ca.gov/

Costigan, S., & Lopez-Belmonte, J. (2017). An approach to allergy risk assessments for e-liquid ingredients. *Regul Toxicol Pharmacol, 87*, 1-8. doi:10.1016/j.yrtph.2017.04.003

European Chemicals Agency (ECHA). 2023. Retrieved April-June 2023 from https://echa.europa.eu/cs/information-on-chemicals/registered-substances

Hirn, C., Kanemaru, Y., Stedeford, T., Paschke, T., & Baskerville-Abraham, I. (2020). Comparative and cumulative quantitative risk assessments on a novel heated tobacco product versus the 3R4F reference cigarette. *Toxicol Rep, 7*, 1502-1513. doi:10.1016/j.toxrep.2020.10.019

International Agency for Research on Cancer (IARC). 2023. Agents Classified by the IARC Monographs, Volumes 1–130 - List of Classifications. Retrieved April-June 2023 from https://monographs.iarc.who.int/list-of-classifications/

Marano, K. M., Liu, C., Fuller, W., & Gentry, P. R. (2018). Quantitative risk assessment of tobacco products: A potentially useful component of substantial equivalence evaluations. *Regul Toxicol Pharmacol, 95*, 371-384. doi:10.1016/j.yrtph.2018.03.026

National Research Council Committee on Improving Risk Analysis Approaches Used by the U.S. EPA. (2009). Science and Decisions: Advancing Risk Assessment. In *Science and Decisions: Advancing Risk Assessment*. Washington (DC): National Academies Press (US).

National Research Council Committee on the Institutional Means for Assessment of Risks to Public Health. (1983). Risk Assessment in the Federal Government: Managing the Process. In *Risk Assessment in the Federal Government: Managing the Process*. Washington (DC): National Academies Press (US).

U.S. Environmental Protection Agency [EPA]. (1991). *Risk Assessment Guidance for Superfund (RAGS): Volume I: Human Health Evaluation Manual (Part B - Development of Risk-Based Remediation Goals)*. (EPA/540/R-92/003). Washington, D.C. Retrieved from https://www.epa.gov/risk/risk-assessment-guidance-superfund-rags-part-b

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

US Environmental Protection Agency (USEPA) Integrate Risk Information System (IRIS). 2023. Integrated Risk Information System (IRIS). U.S. Environmental Protection Agency. Retrieved April-June 2023 from https://www.epa.gov/iris

US Food and Drug Administration (US FDA). 2012. Harmful and Potentially Harmful Constituents in Tobacco Products and Tobacco Smoke; Established List. Federal Register.

US FDA. 2019a. Final Guidance for Industry. Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems. https://www.fda.gov/media/127853/download.

US Food and Drug Administration. 2019b. Harmful and Potentially Harmful Constituents in Tobacco Products; Established List; Proposed Additions.

National Toxicology Program (NTP). 2023. National Toxicology Program - Substance Search. Retrieved April-Dec 2023 from https://ntp.niehs.nih.gov/

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

# Table of Contents

Table List ........................................................................................................................ 2

Figure List ...................................................................................................................... 2

FDA Deficiency Letter Question 22 .......................................................................... 3

Bidi Vapor's Response to Deficiency Letter Question 22 ....................................... 4

22.1    Introduction .................................................................................................... 4

22.2    BIDI® Stick Classic In Vitro Toxicology Assays .......................................... 5

22.3    Methods ........................................................................................................... 6

    22.3.1    Aerosol Generation and Sampling ............................................................ 6

    22.3.2    Cytotoxicity Assay ..................................................................................... 7

    22.3.3    Genotoxicity Testing .................................................................................. 8

        22.3.3.1    Ames Assay .......................................................................................... 8

        22.3.3.2    Micronucleus Assay (MN) .................................................................. 8

22.4    In Vitro Assay Results and Comparison to Cigarette and ENDS Comparator Products ...................... 9

    22.4.1    Cytotoxicity Assay ..................................................................................... 9

    22.4.2    Summary of Cytotoxicity ........................................................................ 11

    22.4.3    Genotoxicity Testing ................................................................................ 11

        22.4.3.1    Ames Assay ........................................................................................ 12

        22.4.3.2    Micronucleus Assay (MN) ................................................................ 14

22.5    Deficiency Letter Question 22 Attachment Files ....................................... 17

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

**22.6**    **References** ...................................................................................................................**18**

## Table List

Table 1 Summary of *In Vitro* Toxicity Studies Conducted with the BIDI® Stick Classic Product Aerosol Condensates *All studies were conducted using non-intense and intense puffing conditions............................................................6

Table 2 Summary of Mutagenicity Assessment of the BIDI® Stick Classic Aerosol Condensates and Cigarette Comparator Using the Ames Assay ......................................................................... **Error! Bookmark not defined.**

Table 3 in vitro Micronucleus assay results and cigarette comparator .......................................................15

## Figure List

Figure 1 Cytotoxicity of BIDI® Stick Classic Aerosol Condensates Compared to the IC50 Published for the 3R4F Kentucky Reference Cigarette. ......................................................................... **Error! Bookmark not defined.**

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

## FDA Deficiency Letter Question 22

*Your PMTA contains nonclinical study reports (i.e., in vitro bacterial reverse mutation test, in vitro micronucleus test, in vitro chromosomal aberration test, and two in vitro cytotoxicity studies) to support a toxicological evaluation of the new product. However, the in vitro studies provided do not contain sufficient information for a complete toxicological evaluation. Specifically,*

- *The in vitro bacterial reverse mutation test, in vitro micronucleus test, in vitro chromosomal aberration test, and one of the in vitro cytotoxicity tests were performed with a flavored (i.e., Jungle Juice) e-liquid product that is not under review. You state that all nonclinical studies conducted for Jungle Juice can be directly correlated to assess the safety of your new product. However, bridging of results from these studies to the new product e-liquid is not scientifically supported due to unclear ingredient differences between the e-liquids.*

- *All in vitro nonclinical assays were performed using only e-liquid and not an aerosol condensate generated with the new product device under intense and non-intense puffing regimens.*

- *All nonclinical studies lack comparator product data and no comparison to other tobacco products was made. Therefore, the potential cytotoxicity, genotoxicity, and mutagenicity of the new product for users who switch from a same category ENDS or combusted cigarette is not addressed in these assays.*

- *All the in vitro study reports contain deviations from referenced Organisation for Economic Cooperation and Development (OECD) test guidelines without any provided justification or lack clarity in the test methods utilized. For the in vitro cytotoxicity studies, these issues include testing for and the absence of mycoplasma contamination in 3T3 test system cells was not indicated, laboratory historical positive control data were not provided or referenced, the test article concentrations and dilutions utilized in the assay were unclear; and experimental data were fit with a linear function, rather than a Hill function as described in the study protocol, to calculate $IC_{50}$ values.*

*Provide data or other scientific evidence to evaluate the genotoxicity, cytotoxicity, and mutagenicity of e-liquids and aerosols generated from your new product in comparison to other tobacco products (e.g., combusted cigarettes, closed ENDS product). If you choose to use your submitted nonclinical studies as evidence for aerosols, provide a clear explanation for why an e-liquid is an appropriate test article since the chemical composition of e-liquids and ENDS aerosols can be different, and the composition of aerosols derived under intense and non-intense conditions*

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

*can also be different, which may affect assay results. For all studies (i.e., previously submitted nonclinical or new), provide a clear description of all test methods, including test article preparation and dilution, reagent source and quality control, test result evaluation criteria, and historical negative and positive control data, as well as justification for any deviation from OECD test guidelines. If you choose to bridge information from different products or from the literature, provide information, including clear ingredient and constituent information for both the new and the test product, to explain specifically why these data are relevant to your new product under review.*

*Alternatively, if you do not have access to this information, one way to provide this information is through a tobacco product master file (TPMF). If you reference a TPMF, also provide an appropriate signed letter of authorization on the TPMF owner's letterhead that would allow FDA to reference the master file. Alternatively, the TPMF owner can provide FDA with a current list of each person authorized to reference the TPMF that identifies any limitation on each authorization (e.g., if the TPMF owner is authorizing use of only certain sections and, if so, identification of those sections).*

## Bidi Vapor's Response to Deficiency Letter Question 22

### 22.1  Introduction

FDA requests additional information related to the nonclinical studies (i.e., *in vitro* bacterial reverse mutation test, *in vitro* micronucleus test, *in vitro* chromosomal aberration test, and two *in vitro* cytotoxicity studies) previously provided in the PMTA to support the toxicological evaluation of the BIDI® Stick Classic product.

In response to this deficiency, Bidi Vapor conducted nonclinical studies (*in vitro* natural red uptake [NRU] studies to evaluate cytotoxicity and a battery of nonclinical *in vitro* genotoxicity studies [Ames and micronucleus assay] using aerosols generated from the BIDI® Stick Classic product using non-intense (55ml over 3s, every 30s) and intense (110ml over 6s, every 30s) puffing conditions. As these studies were conducted on the specific product subject to this application, these data are considered more relevant and thus will supersede the previously provided *in vitro* studies and information.

In addition, we leveraged data and information from published peer-reviewed literature on *in vitro* studies (NRU, Ames and MN) conducted with smoke from Kentucky reference cigarettes under relevant study conditions (similar puffing conditions, same bacterial strains or cell lines, etc.) for

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

A0356

the BIDI® Stick Classic aerosol hazard identification comparison. The data on the Kentucky reference cigarettes are informative as these are representative cigarette comparator products shown to have similar HPHC profiles and toxicological effects as commercially available combustible cigarettes (Patskan et al., 2008; Roemer et al., 2004; Vu et al., 2015). To further inform the hazard identification comparison as it relates to other ENDS products on the market and add to the body of information provided in response to Bidi Vapor's answers to Deficiencies 12 and 13 (aerosol chemistry and relative health risk evaluation), we also considered *in vitro* assay results from publicly available data for ENDS tobacco products.

As stated by FDA in its Guidance on PMTAs for ENDS (FDA, 2023), comparator products are included in *in vitro* assays for "hazard identification comparison" only. In the context of the toxicological evaluations of tobacco products, the *in vitro* toxicity assays can provide screening information for hazard identification (Lauterstein et al., 2020). Although these in vitro screening assays can provide supplemental information for hazard identification, the determination of potential exposures and associated cancer risks and non-cancer hazards from the BIDI® Stick Classic product relative to use of combusted cigarettes and other comparator products is conducted based on the aerosol chemistry characterization.

## 22.2  BIDI® Stick Classic In Vitro Toxicology Assays

To evaluate the likely potential reduction in individual-level health hazard and subsequent population level harm from the BIDI® Stick Classic product relative to smoke from combusted cigarettes and secondary comparator products, Bidi Vapor used converging lines of evidence from:

a.  aerosol characterization studies conducted to evaluate the levels of HPHCs and other constituents from the BIDI® Stick Classic product compared to smoke from combusted cigarettes (primary comparator product) and aerosols from secondary comparator tobacco products.

b.  nonclinical *in vitro* NRU studies to evaluate cytotoxicity and

c.  a battery of nonclinical *in vitro* genotoxicity studies (Ames and MN assay) to inform the hazard identification related to toxicological endpoints relevant to carcinogenicity. The *in vitro* studies conducted with aerosols generated from the BIDI® Stick Classic are provided in Table 1.

During product use of inhaled tobacco products, consumers are exposed to the product aerosols (for BIDI® Stick Classic) and smoke (for cigarettes). For this reason, studies conducted with

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

aerosol condensates are most relevant to the evaluation of potential exposures associated with BIDI® Stick Classic product use, and thus is most informative for the "hazard identification comparison" relative to smoke. All *in vitro* studies were conducted with the BIDI® Stick Classic product aerosol condensates generated under both non-intense and intense puffing conditions.

**Table 1 Summary of *In Vitro* Toxicity Studies Conducted with the BIDI® Stick Classic Product Aerosol Condensates** *All studies were conducted using non-intense and intense puffing conditions.

| Study Type and Study Number | Cell Line and Strain | GLP Compliance | Method | Testing Lab | Location in the Deficiency Letter Response |
|---|---|---|---|---|---|
| Neutral red uptake cytotoxicity assay 0423-023 | Balb/c 3T3 Cells | GLP | OECD TG 129 | Enthalpy Analytical | 22.4.1 Cytotoxicity Assay |
| Bacterial reverse mutation assay (Ames test) 0423-023 | Salmonella typhimurium strains TA98, TA100, TA102, TA1535, TA1537 | GLP | OECD TG 471 | Enthalpy Analytical | 22.4.2.1 Ames Assay |
| *In vitro* micronucleus assay 0423-023 | TK6 cells | GLP | OECD TG 487 | Enthalpy Analytical | 22.4.2.2 Micronucleus Assay |

## 22.3  Methods

Bidi Vapor contracted Enthalpy Analytical, LLC, (Enthalpy) 1470 East Parham Road, Richmond, VA 23228-2300, an ISO 17025 accredited laboratory that meets the FDA certification recommendations (American Association for Laboratory Accreditation Certificate numbers 1873.01 and 1873.02; see "Enthalpy_Attachments.pdf") to conduct all studies for the BIDI® Stick Classic *in vitro* testing.

The full validation or verification reports for each of the *in vitro* study methods used herein are available in Tobacco Product Master File (TPMF) No. MF0000276 submitted by Enthalpy Analytical, LLC, (Enthalpy). The Letter of Authorization (LOA) for the master file can be found in "Enthalpy_Attachments.pdf".

### 22.3.1  Aerosol Generation and Sampling

For the biological assays, aerosol condensates were generated from the BIDI® Stick Classic products under non-intense and intense puffing conditions. The non-intense puffing regimen followed the ISO 20768:2018 standard (55 mL over 3 seconds every 30 seconds). The intense

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

puffing regimen used a puff volume of 110 mL over 6 seconds, every 30 seconds. The condensate samples were collected by capturing the aerosol on Cambridge Filter pads (CFP) followed in series by an impinger containing 20 ml USP ethanol chilled in an ice bath (~0°C). Detailed information on aerosol generation methods and condensate collection for the BIDI® Stick Classic products is provided in Enthalpy NRU Study 0423-023 Report (Q23082 0423-023 Report NRU FINAL.pdf), Enthalpy Micronucleus Study 0423-023 Report (Q23082 0423-023 Report MN DRAFT.pdf), and Enthalpy Ames Study 0423-023 Report (Q23082 0423-023 Report AMES FINAL.pdf) available in "Q22_Attachments" folder.

Aerosol condensate characterization was determined at Enthalpy Analytical utilizing analytical method AM-224. This method encompasses the condensate collection described above and in further detail within the study reports Enthalpy NRU Study 0423-023 Report (Q23082 0423-023 Report NRU FINAL.pdf), Enthalpy Micronucleus Study 0423-023 Report (Q23082 0423-023 Report MN DRAF.pdf) and Enthalpy Ames Study 0423-023 Report (Q23082 0423-023 Report AMES FINAL.pdf) available in "Q22_Attachments" folder. Briefly, ethanol aerosol condensates were mixed with isopropyl alcohol and internal standards and analyzed by gas chromatography with flame ionization detection (GC-FID) and thermal conductivity detection (TCD).

## 22.3.2  Cytotoxicity Assay

The cytotoxicity of BIDI® Stick Classic aerosol condensates was evaluated at Enthalpy Analytical. Briefly, the *in vitro* NRU assays using the aerosol condensates (non-intense and intense) at doses up to 600 µg/ml were conducted in murine fibroblast Balb/c 3T3 cells in accordance with Good Laboratory Practice (GLP) regulation. The NRU assay was conducted consistent with OECD Test Guideline 129 (OECD, 2010), with one minor modification (deviation) in the final concentration of ethanol solvent (up to 1.0% instead of up to 0.5%); this is noted as a "minor modification" in the Enthalpy NRU study 0423-023 Report (see "Q23082 0423-023 Report NRU FINAL.pdf" available in the "Q22_Attachments" folder), thus a deviation report was not deemed necessary by the lab. This modification allowed use of higher (double) maximum exposure doses then could be achieved by the lab with 0.5% ethanol (up to 600 µg/mL instead of up to 300 µg/mL) (discussed in the Results section below).

Balb/c 3T3 cells were used in the NRU assay as this cell line has been validated in the *in vitro* Basal Cytotoxicity Validation Study with 72 reference substances (ICCVAM, 2006) and is the recommended cell line per the current OECD guideline (OECD, 2010). Thus, this cell model is appropriate and informative for the toxicological evaluation of the BIDI® Stick Classic aerosols and comparisons to smoke from combusted cigarettes. Detailed information on the NRU assay

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

method conducted with the BIDI® Stick Classic product aerosols and laboratory historical controls are provided in the Enthalpy NRU Study 0423-023 Report (Q23082 0423-023 Report NRU FINAL.pdf) available in "Q22_Attachments" folder.

### 22.3.3 Genotoxicity Testing

#### 22.3.3.1 Ames Assay

Mutagenicity of the BIDI® Stick Classic aerosols was evaluated using the bacterial reverse mutation (Ames) assay. Briefly, the Ames assays using the aerosol condensates (non-intense and intense) were conducted consistent with OECD guideline 471 (OECD, 1997) and in accordance with GLP. Consistent with OECD guideline 471, the Ames test evaluation used five tester strains (TA98, TA100, TA1535, TA1537, and TA102) of *Salmonella typhimurium* with and without metabolic activation, as well as positive and negative controls; BIDI® Stick Classic aerosol condensates were evaluated at test concentrations of up to 3000 µg aerosol condensate/plate. The negative and positive control data demonstrated the validity and sensitivity of this test system for detecting chemical mutagens with and without metabolic activation. Detailed information on the Ames assay method conducted with the BIDI® Stick Classic product aerosols and laboratory historical controls are provided in Enthalpy Ames study 0423-023 Report (Q23082 0423-023 Report AMES FINAL.pdf) available in "Q22_Attachments" folder.

#### 22.3.3.2 Micronucleus Assay (MN)

The BIDI® Stick Classic aerosols were also evaluated using the *in vitro* micronucleus assay (MN) for genotoxicity. Briefly, the MN assay is designed to identify potential for chromosomal damage by quantifying micronuclei in the cytoplasm, during interphase. Similar to the Ames assay for mutagenicity, the *in vitro* MN assay data is scored as positive, negative, or equivocal (not allowing a conclusion of positive or negative) based on an evaluation and interpretation of results against the set criteria to provide binary (yes/no) outcomes and equivocal responses are not biologically relevant (OECD, 2016). The test concentrations selected for the MN evaluation of the aerosol condensates (non-intense and intense) generated from the BIDI® Stick Classic product did not exceed 60% cytotoxicity, consistent with OECD TG 487 (OECD, 2016). Consistent with OECD guideline 487, the human lymphoblastoid TK6 cell line was used, and results were evaluated after 4-hour treatment periods with and without metabolic activation and after 27-hour treatment without metabolic activation. BIDI® Stick Classic aerosol condensates were tested at concentrations of up to 600 µg/ml in all three treatment schedules. Vehicle and positive controls were used to assess the validity of the assay. Detailed information on the MN assay method

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

conducted with the BIDI® Stick Classic product aerosols and laboratory historical controls is provided in the Enthalpy Micronucleus Study 0423-023 Report (Q23082 0423-023 Report MN DRAFT.pdf) available in the "Q22_Attachments" folder.

## 22.4 *In Vitro* Assay Results and Comparison to Cigarette and ENDS Comparator Products

### 22.4.1 Cytotoxicity Assay

The aerosol of BIDI® Stick Classic products were evaluated for cytotoxicity using the NRU assay. Aerosol condensates were generated using a non-intense and intense puffing regimen. The NRU assay was conducted consistent with OECD Test Guideline 129 (OECD, 2010), with one minor deviation in the final concentration of ethanol solvent (up to 1.0% instead of up to 0.5%); this is noted as a minor modification in the Enthalpy NRU study 0423-023 Report (see "Q23082 0423-023 Report NRU FINAL.pdf" available in the Q22_Attachments" folder.

Briefly, the OECD guideline 129 recommends using up to 0.5% ethanol in the exposure medium, to prevent the ethanol-induced cytotoxicity independent of the test articles. For the NRU assay conducted using the BIDI® Stick Classic aerosol condensates, the lab used ethanol (as a solvent for the aerosol condensates) at levels up to 1% of the dosing medium, in order to allow use of higher (double) maximum exposure doses than could be achieved by the lab with 0.5% ethanol (up to 600 µg/mL instead of up to 300 µg/mL).

Given that 1) the same amount of ethanol was used for the vehicle control, and 2) all assay positive and negative controls passed the assay acceptance criteria, this minor deviation did not impact the integrity of the assay and validity of the NRU assay results. In addition, since this minor modification allowed for double the maximum test concentrations of the BIDI® Stick Classic aerosol condensates than would have otherwise been possible, use of up to 1% ethanol solvent allowed testing of the aerosol condensates at high enough concentrations (450 µg/mL and 600 µg/mL) to be able to calculate an IC50 value (intense puffing only) for a comparison with data published on the IC50 of cigarette smoke and ENDS comparator products.

Full NRU assay results are provided in Enthalpy NRU study 0423-023 Report "Q23082 0423-023 Report NRU FINAL.pdf" available in "Q22_Attachments" folder. Briefly, an $IC_{50}$ for BIDI® Stick Classic aerosol condensates generated using the non-intense puffing could not be calculated and the IC50 for aerosol condensates generated using the intense puffing regiment was 8229 µg/ml. Comparatively, the IC50 for the 3R4F whole smoke condensates (generated using non-intense, ISO puffing regimen) evaluated in 3T3 cells was reported by Davis et al. (2019) as 81.2 µg/ml,

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

showing that aerosols generated from the BIDI® Stick Classic are substantially (~100-fold) less cytotoxic than smoke generated from burning combustible cigarettes (Figure 1). The *in vitro* cytotoxicity study conducted by Davis et al. (2019) evaluated the cytotoxicity of cigarette smoke generated from the 3R4F Kentucky reference cigarette using non-intense (ISO) puffing conditions. Similar to the in vitro cytotoxicity study conducted with the BIDI® Stick Classic aerosol condensates, cytotoxicity of cigarette smoke in the study by Davis et al. (2019) was also evaluated using the NRU assay in 3T3 cells, and thus the data from the study by Davis et al. (2019) is informative for the toxicological evaluation of the BIDI® Stick Classic product and comparison to cytotoxicity of smoke from combusted cigarettes.

**Figure 1 Cytotoxicity of BIDI® Stick Classic Aerosol Condensates Compared to the IC50 Published for the 3R4F Kentucky Reference Cigarette.**



Taken together, the data shows that aerosols generated from the BIDI® Stick Classic product are substantially less cytotoxic compared to cigarette smoke cytotoxicity reported in peer reviewed literature for the 3R4F reference cigarette and U.S. market products (Davis et al., 2019). The cytotoxicity results are consistent with the analytical aerosol chemistry data which show substantial reductions in the levels of HPHCs in aerosols generated from the BIDI® Stick Classic product compared to smoke from combusted cigarettes.

To inform the evaluation of hazard identification comparison between the BIDI® Stick Classic aerosols relative to other marketed ENDS products, a comparison between BIDI® Stick Classic aerosols and publicly available data on other commercially available ENDS products was also evaluated. Rudd et al. (2020) used the NRU *in vitro* assay to evaluate cytotoxicity of aerosols

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

generated from myblu ENDS product. The aerosols were generated form the myblu product using the non-intense puffing regimen (55 mL, 3sec puff duration, 30sec puff frequency), and compared to the cytotoxicity of smoke generated from the Kentucky reference cigarette. Similar to the aerosols generated from the BIDI® Stick Classic products (using both non-intense and intense puffing), aerosols generated from the myblu ENDS product in the study by Rudd et al. (2020) also showed substantially lower cytotoxicity in the NRU assay (IC50 ~777 µg/ml) compared to the cytotoxicity of smoke from the 3R4F reference cigarette.

## 22.4.2  Summary of Cytotoxicity

An IC50 for BIDI® Stick Classic aerosol condensates generated using the non-intense puffing could not be calculated. An IC50 for the intense condensate was 8229 µg/ml.

Consistent with the aerosol chemistry data, the in vitro NRU cytotoxicity data shows that the BIDI® Stick Classic product less cytotoxic compared to cigarette smoke, and comparable to aerosols from other ENDS products.

## 22.4.3  Genotoxicity Testing

The BIDI® Stick Classic aerosols were evaluated for genotoxicity hazard identification comparison relative to smoke using the Ames bacterial reverse mutation assay (OECD, 1997) and the in vitro MN genotoxicity assay in TK6 cells per OECD guideline 487 (OECD, 2016).

The Ames study conducted BIDI® Stick Classic aerosols met all the assay acceptance criteria required in the OECD guideline 471 (OECD, 1997) (Enthalpy Ames Study 0423-023 Report "Q23082 0423-023 Report AMES FINAL.pdf" available in "Q22_Attachments" folder). Additionally, the in vitro MN assay conducted BIDI® Stick Classic aerosols met all the assay acceptance criteria required in the OECD guideline OECD guideline 487 (OECD, 2016) (Enthalpy Micronucleus Study 0423-023 Report "Q23082 0423-023 Report MN DRAFT.pdf" available in "Q22_Attachments" folder.).

To inform the evaluation of the BIDI® Stick Classic product, and hazard identification comparison to smoking cigarettes, an evaluation was made using data on smoke mutagenicity and genotoxicity available in published literature for Kentucky reference cigarettes, as representative combusted cigarettes. In addition, data and information available on Ames and MN studies conducted on aerosols generated from US market tobacco-flavored ENDS products was used to further inform the evaluation of a hazard identification comparison relative to other marketed products in the tobacco-flavored ENDS product category. The study data available on comparator products, and

Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.

applicability to hazard identification comparison for the BIDI® Stick Classic product is discussed below for each assay.

### 22.4.3.1 Ames Assay

BIDI® Stick Classic aerosol condensates (non-intense and intense) were evaluated for mutagenicity in the Ames assay using five *Salmonella typhimurium* tester strains (TA98, TA100, TA1535, TA1537, and TA102), per OECD guideline 471 (OECD, 1997). A 3.8-373-fold increase in the count of revertants in response to positive controls demonstrated that the experiment worked appropriately (see Enthalpy Ames Study 0423-023 Report "Q23082 0423-023 Report AMES FINAL.pdf" available in "Q22_Attachments" folder.). The BIDI® Stick Classic aerosol condensates did not show a dose-response relationship in the Ames assay and did not show a positive response for mutagenicity at any dose tested, either with or without metabolic activation Table 2.

To inform the evaluation of the BIDI® Stick Classic product, and hazard identification comparison with smoke from combusted cigarettes, the evaluation considers the mutagenicity of smoke from the 1R6F Kentucky reference reported in published literature. The bacterial reverse mutation assays conducted with cigarette smoke parallel those conducted with the aerosol condensates. Specifically, the most recently published Ames test published by Hashizume et al. (2023) tested TPM and GVP smoke fractions collected from Kentucky reference cigarettes and used the same *Salmonella typhimurium* tester strains (TA98, TA100, TA1535, TA1537, and TA102) and OECD 471 methods as BIDI Vapor used for the Ames assays with the BIDI® Stick Classic aerosol condensates (non-intense and intense).

In addition, unlike the Ames study for the BIDI® Stick Classic products which was conducted using whole aerosol condensates, the Hashizume et al. (2023) study tested the TPM and GVP smoke fractions in the Ames assay separately. Separation of the two smoke phases limits chemical interactions that may occur in the complete smoke, and thus could underestimate the toxicity profile of the cigarette smoke. For these reasons, in the context of evaluating hazard identification comparison for mutagenicity of the BIDI® Stick Classic product aerosol condensates compared to cigarette smoke, the data and information on cigarette smoke mutagenicity from the published Ames study by Hashizume et al. (2023) is considered conservative, and thus informative for the toxicological evaluation of the BIDI® Stick Classic products.

As noted previously, and summarized in Table 2 below, the BIDI® Stick Classic aerosol condensates did not show a positive response for mutagenicity at any dose tested, either with or

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

without metabolic activation. By comparison, although the smoke GVP fraction of the 1R6F Kentucky reference cigarette was negative in the Ames assay, the TPM fraction of the smoke was positive for mutagenicity in four of the five *S. typhimurium* tester strains (with and without metabolic activation). The maximum smoke TPM dose evaluated in the Ames study by Hashizume et al. (2023) was 500 ug/plate, which is ~6-fold lower than the highest test dose (3000 ug/plate) used to evaluate the BIDI® Stick Classic aerosols (Table 2).

**Table 2 Summary of Mutagenicity Assessment of the BIDI® Stick Classic Aerosol Condensates and Cigarette Comparator Using the Ames Assay**

| *Salmonella typhimurium* tester strain | Metabolic activation | BIDI® Stick Classic Aerosol condensate results | | 1R6F results* | |
|---|---|---|---|---|---|
| | | Non-intense (55/3/30) | Intense (110/6/30) | TPM (55/2/30) | GVP (55/2/30) |
| | | Top dose 3000 ug/plate | Top dose 3000 ug/plate | Top dose 500 ug/plate | Top dose 500 ug/plate |
| TA98 | -S9 | | negative | negative | negative |
| | +S9 | negative | negative | **positive** | negative |
| TA100 | -S9 | negative | negative | negative | negative |
| | +S9 | negative | negative | **positive** | negative |
| TA1535 | -S9 | negative | negative | negative | negative |
| | +S9 | negative | negative | **positive** | negative |
| TA1537 | -S9 | negative | negative | **positive** | negative |
| | +S9 | negative | negative | **positive** | negative |
| TA102 | -S9 | negative | negative | negative | negative |
| | +S9 | negative | negative | negative | negative |

*Hashizume et al. (2023)

Positive results for smoke in the Ames mutagenicity assay has been well documented and reviewed in several public health reports (IARC, 1986, 2004; IOM, 2001) and published studies (Baker et al., 2004; Doolittle et al., 1990a, 1990b; Roemer et al., 2002). Also, as previously summarized by the World Health Organization International Agency for Research on Cancer (IARC, 2004) based on a study by Steele et al. (1995) cigarette smoke condensates generated from both Kentucky reference cigarettes (K1R4F) and cigarettes representative of over 70% of the US cigarette market were mutagenic in the Salmonella mutagenicity (Ames) assay (IARC, 2004).

Taken together, the BIDI® Stick Classic product aerosol condensates (non-intense and intense) were negative for mutagenicity in the Ames assay at all doses tested (with and without metabolic

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

activation). By comparison, smoke from the cigarette comparator product is positive for mutagenicity under the conditions of the Ames assay.

Misra et al. (2014) evaluated mutagenicity of aerosols generated from the commercially available, blu™ Classic Tobacco in the Ames reverse bacterial mutagenicity assay, using strains TA98 and TA100 with and without S9 activation, similar to the Ames assay conducted using aerosols generated from the BIDI® Stick Classic product. The *in vitro* mutagenicity study by Misra et al. (2014) shows that, similar to aerosols generated from BIDI® Stick Classic, the aerosols generated from the market ENDS comparator blu™ Classic Tobacco were also negative for mutagenicity in the Ames assay. By comparison, smoke generated from all combusted cigarettes tested (3R4F, 1R5F and Marlboro Gold) by Misra et al. (2014) were found to be mutagenic.

### 22.4.3.2 Micronucleus Assay (MN)

The potential genotoxicity of aerosol condensates (non-intense and intense) generated from the BIDI® Stick Classic products was also evaluated using the *in vitro* MN assay conducted in the human lymphoblastoid (TK6) cell line consistent with OECD guideline 487 (OECD, 2016). As summarized in Table 3, the BIDI® Stick Classic aerosol condensate generated under non-intense puffing conditions (55/3/30) was equivocal for genotoxicity under the conditions of the *in vitro* MN assay and the aerosol condensate generated under intense puffing conditions (110/6/30) was positive for genotoxicity under the conditions of the *in vitro* MN assay.

To inform the evaluation of the BIDI® Stick Classic product and relative risks from potential exposures associated with use of the BIDI® Stick Classic compared to smoking cigarettes, comparisons were made with genotoxicity of smoke from the 1R6F Kentucky reference cigarette reported in published literature. In comparison, the Kentucky reference cigarette TPM smoke fraction was positive for genotoxicity with the ISO 20778 smoking regime (35/2/60), 100% ventilation block).

The published information related to genotoxicity of cigarette smoke in the MN assay is informative for the evaluation of the BIDI® Stick Classic product and relative risks from potential exposures associated with use of the BIDI® Stick Classic compared to smoking cigarettes because the tests conducted with cigarette smoke parallel those conducted with the aerosol condensates. Specifically, the *in vitro* MN assay conducted with 3R4F TPM (Yamamoto et al., 2022) used the same human lymphoblastoid (TK6) cell line and experimental design used for the MN assays conducted with the BIDI® Stick Classic aerosol condensates (non-intense and intense), consistent with OECD Test No. 487 (OECD, 2010).

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

In addition, unlike the *in vitro* MN study for the BIDI® Stick Classic products, which was conducted using whole aerosol condensates, the Yamamoto et al. (2022) study tested only the TPM smoke fraction in the MN assay. Only testing the TPM limits chemical interactions that may occur in the complete smoke and thus could underestimate the cytotoxicity profile of cigarette smoke as a whole. For these reasons, in the context of evaluating the potential genotoxicity of the BIDI® Stick Classic product aerosol condensates compared to cigarette smoke, the data and information on cigarette smoke genotoxicity from the published MN study by Yamamoto et al. (2022) is considered conservative, and thus informative for the toxicological evaluation of the BIDI® Stick Classic products.

**Table 3 in vitro Micronucleus assay results and cigarette comparator**

| Schedule | BIDI® Stick Classic (Non-Intense; 55/3/30) | BIDI® Stick Classic (Intense; 110/6/30) | 3R4F TPM* (35/2/60) |
|---|---|---|---|
| i – 4 hour exposure without metabolic activation | Equivocal | Positive | Positive |
| ii – 4 hour exposure with metabolic activation | Equivocal | Positive | Positive |
| iii – 27 hour term exposure without metabolic activation | Equivocal | Positive | Positive |

*(Yamamoto et al., 2022)

To inform the evaluation of hazard identification comparison between the BIDI® Stick Classic aerosols relative to other marketed ENDS products, a comparison between BIDI® Stick Classic aerosols and publicly available data on other ENDS products on the US market was also evaluated. *In vitro* MN assays conducted in accordance with the 2016 OECD Guideline Test No. 487: In Vitro Mammalian Cell Micronucleus Test (OECD TG 487) were used evaluate genotoxicity of aerosol condensates generated from the JUUL Virginia Tobacco (VT 3% and VT 5%) under non-intense and intense puffing conditions (JLI's Request for 21 C.F.R. § 10.75 Supervisory Review dated July 29, 2022 https://www.juullabs.com/wp-content/uploads/2022/11/Juul-Labs-Inc-Operational-Evaluation-of-FDAs-Tobacco-Program-Signed.pdf).

The *in vitro* MN genotoxicity studies were conducted on the JUUL VT 3% and VT 5% aerosol condensates collected under two puffing regimens (ISO 20768 non-intense puffing and intense puffing regimen), using the human lymphoblastoid cell line TK6. The study was conducted in accordance with OECD TG 487, the samples were evaluated across three treatment conditions (4-

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

hour [short treatment] in the presence or absence of S9 metabolic activation, followed by recovery, and 27-hour [log-term treatment] in the absence of S9). The *in vitro* MN response for the VT 3% and VT 5% products was first evaluated counting 2,000 cells per concentration for each treatment condition (JLI's Request for 21 C.F.R. § 10.75 Supervisory Review dated July 29, 2022 https://www.juullabs.com/wp-content/uploads/2022/11/Juul-Labs-Inc-Operational-Evaluation-of-FDAs-Tobacco-Program-Signed.pdf; FDA TPL Review of JLI's PMTAs (Toxicology) PM0000864, PM0000872, PM0000874, PM0000876, PM0000878, PM0000879). The *in vitro* MN testing used to evaluate genotoxicity of the VT 3% and VT5% products was conducted in accordance with OECD TG 487 Guidelines and used the same study design (including puffing conditions for aerosol condensate collection, TK6 cell line, 2000 cell-count) as the *in vitro* MN study conducted to evaluate genotoxicity of the BIDI® Stick Classic aerosols. In addition, although the study data is not peer-reviewed literature, the methods and assay conclusions were confirmed upon review by the FDA in the FDA TPL Review of JLI's PMTAs (Toxicology) PM0000864, PM0000872, PM0000874, PM0000876, PM0000878, PM0000879, and thus the data is considered valid and informative for the evaluation of the hazard identification comparison with U.S. market ENDS comparator products:

> "*...data from the in vitro micronucleus assay showed positive genotoxic results for PM0000872 (Menthol, 5% nicotine concentration), PM0000874 (Virginia Tobacco 3%, nicotine concentration) and PM0000876 (Virginia Tobacco 5%, nicotine concentration) when these products were tested in accordance with applicant-provided assay guidelines*"

Overall, the BIDI® Stick Classic MN assays demonstrate that the hazards associated with BIDI® Stick products are within the range of marketed ENDS products and fewer than a combustible cigarette.

**Genotoxicity Summary**

- Bidi Stick Classic hazards are lower than a combustible cigarette and within the range of marketed ENDS products.

    o **Ames assay**-BIDI® Stick Classic aerosol condensates did not show a positive response for mutagenicity at any dose tested, either with or without metabolic activation

    o **MN assay**-BIDI® Stick Classic aerosol condensate generated under non-intense puffing conditions (55/3/30) was equivocal for genotoxicity.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

       ○ **MN assay**-BIDI® Stick Classic aerosol condensate generated under intense puffing conditions (110/6/30) was positive for genotoxicity.

**Conclusion**

In response to this deficiency, Bidi Vapor conducted *in vitro* cytotoxicity (NRU) studies and a battery of nonclinical *in vitro* genotoxicity studies [Ames and micronucleus assay] using aerosols generated from the BIDI® Stick Classic product using non-intense (55ml over 3s, every 30s) and intense (110ml over 6s, every 30s) puffing conditions. In addition, published data and information on cigarette and ENDS comparator products are included for hazard identification comparison. Bidi Stick *in vitro* study results show…

- Less cytotoxicity when compared to smoke from combusted cigarettes and comparable to ENDS comparator products

- Negative Ames mutagenicity, which is opposite a cigarette smoke (positive mutagenicity) and similar to ENDS comparators

- Equivocal MN genotoxicity under non-intense puffing and positive genotoxicity under intense puffing, which is similar to cigarette smoke and ENDS comparators

Although in vitro screening assays can provide supplemental information for hazard identification, the determination of potential exposures and associated cancer risks and non-cancer hazards from the BIDI® Stick Classic product relative to use of combusted cigarettes and other comparator products is conducted based on the aerosol chemistry characterization. The overall substantial reductions observed in the levels of HPHCs in BIDI® Stick Classic aerosols compared to cigarette smoke support likely reductions in user exposures and associated health hazards from use of the BIDI® Stick Classic product.

**22.5  Deficiency Letter Question 22 Attachment Files**

The following files are available in the "Q22_Attachment" folder.

1. 0423-023-24-TobaccoReport.xlsx

2. 0423-023-25-TobaccoReport.xlsx

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

3.  2022.06.23-JUUL-TPL_Review_Toxicology-Redacted-FINAL-2022-08-08_Redacted.pdf

4.  Ames 13_0423-023_AC_All Data_Repeat.xls

5.  Ames 13_0423-023_AI_All Data_Repeat.xls

6.  Davis-2019.pdf

7.  Enthalpy_Attachments.pdf

8.  Hashizume-2023.pdf

9.  Misra-2014.pdf

10. MN 12_0423-023_AC_Repeat.xlsx

11. MN 12_0423-023_AI_Repeat.xlsx

12. NRU 13_AC_repeat_0423-023.xlsx

13. NRU 13_AI_repeat_0423-023.xlsx

14. Q23082 0423-023 Report AMES FINAL.pdf

15. Q23082 0423-023 Report MN DRAFT.pdf

16. Q23082 0423-023 Report NRU FINAL.pdf

17. Q23082_0423-023_Study_Protocol with amendments.pdf

18. Rudd-2020.pdf

19. Yamamoto-2022.pdf

## 22.6   References

[FDA], U. S. F. a. D. A. (2023). Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems (Revised).

Baker, R., R., Massey, E., D, & Smith, G. (2004). An overview of the effects of tobacco ingredients on smoke chemistry and toxicity. *Food and Chemical Toxicology, 42*, 53-83. doi:https://doi.org/10.1016/j.fct.2004.01.001

Davis, B., To, V., & Talbot, P. (2019). Comparison of cytotoxicity of IQOS aerosols to smoke from Marlboro Red and 3R4F reference cigarettes. *Toxicol In Vitro, 61*, 104652. doi:10.1016/j.tiv.2019.104652

Doolittle, D. J., Lee, C. K., Ivett, J. L., Mirsalis, J. C., Riccio, E., Rudd, C. J., . . . Hayes, A. W. (1990a). Comparative studies on the genotoxic activity of mainstream smoke condensate

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

from cigarettes which burn or only heat tobacco. *Environ Mol Mutagen, 15*(2), 93-105. doi:10.1002/em.2850150206

Doolittle, D. J., Lee, C. K., Ivett, J. L., Mirsalis, J. C., Riccio, E., Rudd, C. J., . . . Hayes, A. W. (1990b). Genetic toxicology studies comparing the activity of sidestream smoke from cigarettes which burn or only heat tobacco. *Mutat Res, 240*(2), 59-72. doi:10.1016/0165-1218(90)90008-p

Hashizume, T., Ishikawa, S., Matsumura, K., Ito, S., & Fukushima, T. (2023). Chemical and in vitro toxicological comparison of emissions from a heated tobacco product and the 1R6F reference cigarette. *Toxicology Reports, 10*, 281-292. doi:https://doi.org/10.1016/j.toxrep.2023.02.005

IARC. (1986). Evaluation of the Carcinogenic Risk of Chemicals to Humans. In: International Agency on the Research of Cancer.

IARC. (2004). Tobacco Smoke and Involuntary Smoking. *IARC Monographs on the Evaluation Carcinogenic Risks to Humans, 83*. Retrieved from https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Tobacco-Smoke-And-Involuntary-Smoking-2004

ICCVAM, I. C. C. o. t. V. o. A. M. (2006). *BALB/c 3T3 NRU Cytotoxicity Test Method*. National Institutes of Health

Institute of Medicine [IOM]. (2001). Clearing the Smoke: Assessing the Science Base for Tobacco Harm Reduction. *The National Academies Press*. doi:10.17226/10029

JLI's Request for 21 C.F.R. § 10.75 Supervisory Review dated July 29, 2022 https://www.juullabs.com/wp-content/uploads/2022/11/Juul-Labs-Inc-Operational-Evaluation-of-FDAs-Tobacco-Program-Signed.pdf

JUUL-TPL_Review_Toxicology-Redacted-FINAL-2022-08-08_Redacted (juullabsscience.com)

Lauterstein, D., Savidge, M., Chen, Y., Weil, R., & Yeager, R. P. (2020). Nonanimal toxicology testing approaches for traditional and deemed tobacco products in a complex regulatory environment: Limitations, possibilities, and future directions. *Toxicology in Vitro, 62*, 104684. doi:https://doi.org/10.1016/j.tiv.2019.104684

Misra, M., Leverette, R. D., Cooper, B. T., Bennett, M. B., & Brown, S. E. (2014). Comparative In Vitro Toxicity Profile of Electronic and Tobacco Cigarettes, Smokeless Tobacco and Nicotine Replacement Therapy Products: E-Liquids, Extracts and Collected Aerosols. *International Journal of Environmental Research and Public Health, 11*(11), 11325-11347. Retrieved from https://www.mdpi.com/1660-4601/11/11/11325

OECD. (1997). *Test No. 471: Bacterial Reverse Mutation Test*.

OECD. (2010). *Test No. 129 Cytotoxicity Tests to Estimate Starting Doses for Acute Oral Systemic Toxicity Tests*.

OECD. (2016). *Test No. 487: In Vitro Mammalian Cell Micronucleus Test*.

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

Patskan, G. J., Podraza, K. F., Meurrens, K., Coggins, C. R., Friedrichs, B., Gerstenberg, B., . . . Terpstra, P. (2008). Toxicological comparisons of three styles of a commercial U.S. cigarette (Marlboro with the 1R4F reference cigarette. *Inhal Toxicol, 20*(7), 695-721. doi:10.1080/08958370801935174

Roemer, E., Stabbert, R., Rustemeier, K., Veltel, D. J., Meisgen, T. J., Reininghaus, W., . . . Podraza, K. F. (2004). Chemical composition, cytotoxicity and mutagenicity of smoke from US commercial and reference cigarettes smoked under two sets of machine smoking conditions. *Toxicology, 195*(1), 31-52. doi:10.1016/j.tox.2003.08.006

Roemer, E., Tewes, F. J., Meisgen, T. J., Veltel, D. J., & Carmines, E. L. (2002). Evaluation of the potential effects of ingredients added to cigarettes. Part 3: In vitro genotoxicity and cytotoxicity. *Food and Chemical Toxicology, 40*(1), 105-111. doi:https://doi.org/10.1016/S0278-6915(01)00086-2

Rudd, K., Stevenson, M., Wieczorek, R., Pani, J., Trelles Sticken, E., Dethloff, O., . . . Walele, T. (2020). Chemical Composition and In Vitro Toxicity Profile of a Pod-Based E-Cigarette Aerosol Compared to Cigarette Smoke. *Applied In Vitro Toxicology, 6*(1), 11-41. doi:10.1089/aivt.2019.0015

Steele, R. H., Payne, V. M., Fulp, C. W., Rees, D. C., Lee, C. K., & Doolittle, D. J. (1995). A comparison of the mutagenicity of mainstream cigarette smoke condensates from a representative sample of the U.S. cigarette market with a Kentucky reference cigarette (K1R4F). *Mutat Res, 342*(3-4), 179-190. doi:10.1016/0165-1218(95)90027-6

Vu, A. T., Taylor, K. M., Holman, M. R., Ding, Y. S., Hearn, B., & Watson, C. H. (2015). Polycyclic Aromatic Hydrocarbons in the Mainstream Smoke of Popular U.S. Cigarettes. *Chemical Research in Toxicology, 28*(8), 1616-1626. doi:10.1021/acs.chemrestox.5b00190

Yamamoto, H., Shibuya, K., Fukushima, T., & Hashizume, T. (2022). Effects of antioxidant capacity on micronucleus induction by cigarette smoke in mammalian cells. *Mutation Research/Genetic Toxicology and Environmental Mutagenesis, 873*, 503427. doi:https://doi.org/10.1016/j.mrgentox.2021.503427

*Confidentiality Statement: Data and information contained in this document are considered to constitute trade secrets and confidential commercial information, and the legal protections provided to such trade secrets and confidential information are hereby claimed under the applicable provisions of United States law. No part of this document may be publicly disclosed without the written consent of Bidi Vapor, LLC.*

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BIDI VAPOR LLC,

          Plaintiff,

v.

          Case No. 24-10263

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

          Defendants.

## <u>DECLARATION OF AZIM CHOWDHURY</u>

1.      My name is Azim Chowdhury. I am an attorney with Keller and Heckman LLP, located at 1001 G Street NW, Suite 500 West, Washington, DC 20001. I represent Bidi Vapor LLC ("Bidi Vapor" or the "Company") in U.S. Food and Drug Administration ("FDA" the "Agency") regulatory and corporate compliance matters. Keller and Heckman is also representing Bidi Vapor in the above-captioned lawsuit challenging FDA's marketing denial order ("MDO"), dated January 22, 2024, denying the Premarket Tobacco Product Application ("PMTA") for the tobacco-flavored BIDI® Stick Classic (PM0003460.PD2) Electronic Nicotine Delivery System (ENDS) product before this Court.

2.      I have personal knowledge as to the facts stated herein.

3.      After Bidi Vapor received the MDO denying marketing authorization for the tobacco-flavored BIDI® Stick Classic ENDS product, we immediately made

several requests on behalf of the Company to obtain FDA's internal review memoranda, including any Technical Project Lead ("TPL") memoranda.

4.      Specifically, Maliha Choudhury, a Regulatory Health Project Manager at the Office of Science, Center for Tobacco Products at FDA, sent an e-mail to Niraj Patel, CEO of Bidi Vapor, at 11:13 AM ET on January 22, 2024, the same day the MDO was issued, providing the Company with a courtesy electronic copy of the MDO.

5.      I responded to that e-mail on behalf of Bidi Vapor just over two hours later, at 1:36 PM ET on January 22, 2024, respectfully requesting unredacted courtesy copies of any TPL and other FDA review memoranda associated with the MDO for PM0003460.PD2. *See* **Exhibit A**. FDA did not immediately respond to my e-mail request.

6.      The next day on January 23, 2024, we filed on behalf of Bidi Vapor a Freedom of Information Act ("FOIA") request for FDA's unredacted review memoranda and correspondence related to the MDO for PM0003460.PD2. *See* **Exhibit B.**

7.      FDA FOIA Specialist Melinda S. Batson responded via email on January 30, 2024, acknowledging receipt of the FOIA request and noting that it had been assigned FOIA Request No. 2024-763. I responded to that e-mail the next day, January 31, 2024, urging FDA to respond to the FOIA request as soon as

possible since the request was being made on behalf of the subject company and, thus, FDA would not need to spend time and resources redacting confidential information. At Ms. Batson's request, I also provided an authorization letter from Bidi Vapor indicating that Keller and Heckman is a point of contact for PM0003460.PD2. *See* **Exhibit C**.

8.     Also on January 31, 2024, I followed-up via e-mail with Maliha Choudhury and Wendy Guan, the Regulatory Health Project Manager identified on the MDO, requesting they provide an update as soon as possible to my January 22, 2024 e-mail request for any unredacted TPL and other review memos related to the MDO for PM0003460.PD2. On February 1, 2024, Ms. Choudhury responded acknowledging receipt of my email and further stating, "[w]e will follow up as soon as we have any additional clarification." *See* **Exhibit D**.

9.     On February 2, 2024, we filed Bidi Vapor's Time Sensitive Motion (February 19, 2024) for a Stay Pending Review. At no time prior to this date had FDA indicated to us that there was a TPL or any other internal memo related to the MDO. The MDO itself never references a TPL or any other underlying memoranda.

10.    Subsequently, on February 8, 2024, a full 17 days after our first request and almost a week after we filed our Time Sensitive Motion for a Stay Pending Review, Ms. Choudhury responded to our earlier e-mail thread stating that

3

FDA would not provide the TPL and review memos via email, but that a FOIA request would need to be submitted. *See* **Exhibit E**. She apparently did not realize we had filed a FOIA response more than two weeks earlier. FDA still has not yet responded to FOIA Request No. 2024-763.

11. Separately, also on February 8, 2024, Stephanie Nguyen, Associate Chief Counsel at FDA, provided us with a TPL via email. No other FDA review memoranda related to the MDO for PM0003460.PD2 were provided.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2024

Azim Chowdhury
Partner, Keller and Heckman LLP

A0376

# EXHIBIT A

**Chowdhury, Azim**

| | |
|---|---|
| **From:** | Chowdhury, Azim |
| **Sent:** | Monday, January 22, 2024 1:36 PM |
| **To:** | Maliha.Choudhury@fda.hhs.gov |
| **Cc:** | Nirajkumar Patel - Bidi Vapor (raj@bidivapor.com) |
| **Subject:** | RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024 |
| **Attachments:** | Denial Letter_PM0003460.PD2_Jan_22_2024 - Courtesy Copy.pdf |

Dear Ms. Choudhury,

On behalf of our client, Bidi Vapor, LLC, we respectfully request unredacted courtesy copies of the Technical Project Lead (TPL) and other FDA review memoranda associated with the MDO for PM0003460.PD2. Could you provide this to us ASAP?

Thanks in advance for your prompt reply.

Best regards,
Azim



**Azim Chowdhury**
Partner

khlaw.com
thecontinuumofrisk.com

*Serving Business through Law and Science®*

direct   202.434.4230    chowdhury@khlaw.com

Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

Washington, DC    Brussels    San Francisco    Shanghai    Boulder

---

**From:** Niraj Patel <raj@bidivapor.com>
**Sent:** Monday, January 22, 2024 1:05 PM
**To:** Chowdhury, Azim <chowdhury@khlaw.com>
**Subject:** Fwd: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

** EXTERNAL EMAIL **

Sincerely,
Niraj Patel,
CEO

BIDI Vapor

Begin forwarded message:

> **From:** "Choudhury, Maliha" <Maliha.Choudhury@fda.hhs.gov>
> **Date:** January 22, 2024 at 11:13:05 AM EST

**To:** Niraj Patel <raj@bidivapor.com>
**Subject: RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024**


Good morning Niraj Patel,

Thank you for your email. On behalf of your assigned Regulatory Health Project Manager, please find attached the courtesy copy of the Denial letter for Bidi Vapor LLC. The letter was issued today on January 22, 2024, and mailed via UPS.

Please confirm your receipt of this email.

Thank you,

Maliha


**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov















A0379

**From:** Niraj Patel <raj@bidivapor.com>
**Sent:** Monday, January 22, 2024 10:46 AM
**To:** Choudhury, Maliha <Maliha.Choudhury@fda.HHS.gov>
**Subject:** [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Maliha,

I am granting permission to send response to this email.

Sincerely,
Niraj Patel,
CEO

BIDI Vapor

> On Jan 22, 2024, at 10:31 AM, Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov> wrote:
>
> Good morning Nirajkumar Patel,
>
> Thank you for your time. As we discussed, FDA issued a letter to your company, Bidi Vapor LLC. If you would like a courtesy copy of the letter, please let me know by responding to this email and granting permission to send the copy electronically.
>
> Please be aware that email may not be a secure form of communication.
>
> Best regards,
>
> Maliha
>
>
> **Maliha Choudhury, M.H.S. (she/her/hers)**
> *Regulatory Health Project Manager*
>
> **Office of Science**
> **Center for Tobacco Products**
> **U.S. Food and Drug Administration**
> Tel: 240-402-4549
> Maliha.Choudhury@fda.hhs.gov
>
> <image018.png>
>
> < i m a g e 0 0 3 . j p g >
>
> < i m a g e 0 1 9 . p n g >
> < i m a g e 0 2 0 . p n g >
>
> <image021.png>

A0380

<image022.png>

<image023.png>

<image024.png>

<image025.png>

# EXHIBIT B

A0382



khlaw.com
202.434.4100

Keller and Heckman LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001

Serving Business through Law and Science®

**Writer's Direct Access**
**Azim Chowdhury**
(202) 434-4230
chowdhury@khlaw.com

January 23, 2024

*Via Electronic Submission*

Food and Drug Administration
Division of Freedom of Information
Office of the Executive Secretariat, OC
5630 Fishers Lane, Room 1035
Rockville, MD 20857

    **Re:**    <u>FOIA Request for FDA Documents Related to Marketing Denial Order for</u>
                <u>BIDI Stick Classic; Submission Tracking No. PM0003460.PD2</u>

Dear Sir or Madam:

    On behalf of our client, Bidi Vapor, LLC ("Bidi Vapor" or the "Company") and pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the U.S. Food and Drug Administration's ("FDA") FOIA regulations, 21 C.F.R. Part 20, we hereby request the following <u>unredacted</u> FDA-generated materials related to the January 22, 2024 Marketing Denial Order ("MDO") issued to the Company for its Premarket Tobacco Product Application ("PMTA") for the BIDI Stick Classic, identified by Submission Tracking No. ("STN") PM00003460.PD2:

1. All related FDA memoranda, including but not limited to, Technical Project Lead ("TPL"), chemistry, toxicology, behavioral, public health, and clinical review memoranda;

2. All related FDA review documents (including, but not limited to, any review documents, notes, analyses, and conclusions as they pertain to regulatory reviews, and other scientific reviews);

3. All related FDA correspondence (including, but not limited to, all internal and external FDA correspondence, communications, and any other applicable documentation);

4. Any FDA memoranda, summaries, notes, or other documentation relating to any conclusions reached in the regulatory review, Office of Science review, and scientific review;

5. Any FDA memoranda, correspondence, summaries, notes, or other documentation relating to FDA's March 20, 2023 deficiency letter for PM00003460.PD2 and the Company's response thereto;

      **Washington, DC**    ◆    **Brussels**    ◆    **San Francisco**    ◆    **Shanghai**    ◆    **Boulder**
This document was delivered electronically.

A0383



6. Any FDA memoranda, summaries, notes, or other documentation relating to the final conclusions reached as it pertains to FDA's denial of PM00003460.PD2; and

7. Any FDA instructions given to FDA reviewers regarding PM00003460.PD2 and the Company's deficiency responses.

We would much appreciate receiving the responsive documents in electronic format. We agree to pay reasonable search and reproduction costs. Please let us know if such costs are likely to exceed $750.00.

Due to email file size limits, for larger files exceeding 50 megabytes (MB), please exchange them using a filesharing application. For convenience, we have created the following FileShare link for your ready use: https://fileshare.khlaw.com/filedrop/Rodriguez@khlaw.com. When you use this link, you will be directed to upload the file(s) and receive information on how to share files with us. The file size limitation per message through this link is 1000 MB. Once you have sent the files, either through your own filesharing link or the link above, please notify me through email.

Thank you for your attention to this matter. Should you have any questions related to this request, please do not hesitate to contact us.

Respectfully submitted,

Azim Chowdhury
Partner

# EXHIBIT C

**Chowdhury, Azim**

| | |
|---|---|
| **From:** | Chowdhury, Azim |
| **Sent:** | Wednesday, January 31, 2024 10:51 AM |
| **To:** | Batson, Melinda |
| **Cc:** | Rodriguez, Jessica; CTP FOIA; Nirajkumar Patel - Bidi Vapor (raj@bidivapor.com) |
| **Subject:** | Re: Acknowledgement of Your FOIA Request to the FDA CTP - FOIA Request 2024-763 |
| **Attachments:** | KH FOIA Agent Authorization Letter for Bidi Vapor LLC (PM0003460.PD2).pdf |

Ms. Batson, thanks for quick feedback on this. Indeed, this should be considered a 1st part request. I've attached Bidi's authorization letter and copied their CEO, Niraj Patel, if you have any questions. If there is anything else we can do to expedite this FOIA Request 2024-763, please let us know.

Best regards,
Azim



**Azim Chowdhury**
Partner

khlaw.com
thecontinuumofrisk.com

*Serving Business through
Law and Science®*

direct   202.434.4230   chowdhury@khlaw.com

Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

Washington, DC    Brussels    San Francisco    Shanghai    Boulder

---

**From:** Batson, Melinda <Melinda.Batson@fda.hhs.gov>
**Sent:** Wednesday, January 31, 2024 5:58 AM
**To:** Chowdhury, Azim <chowdhury@khlaw.com>
**Cc:** Rodriguez, Jessica <Rodriguez@khlaw.com>; CTP FOIA <CTPFOIA@fda.hhs.gov>
**Subject:** RE: [EXTERNAL] Re: Acknowledgement of Your FOIA Request to the FDA CTP - FOIA Request 2024-763

** EXTERNAL EMAIL **

Hello Azim,

Thank you for identifying the requested documents related to Bidi Vapor. I understand that you seek unredacted copies of records related to STN PM0003460. I check the authorized point of contacts for Bidi Vapor and Keller & Heckman is not listed as a point of contact. I will be glad to assist in providing unredacted records. However, I will need a signed authorization letter from Bidi Vapor stating that Keller and Heckman LLP is authorized to have access to all information related to Bidi Vapor's STN PM0003460.

If you could provide this letter as soon as possible; then I can process this FOIA request as a 1st party request. Please provide authorization letter by Wednesday, February 7th.

You are welcome to contact me with questions and concerns.

Thank you

A0386

**Melinda S. Batson, B.S. (she/her/hers)**
*Government Information Specialist*

**Center for Tobacco Products**
**Office of Health Communication and Education**
**U.S. Food and Drug Administration**
Telephone: (240) 402-8325
Melinda.batson@fda.hhs.gov



   

*This e-mail, and any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or protected information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

---

**From:** Chowdhury, Azim <chowdhury@khlaw.com>
**Sent:** Wednesday, January 31, 2024 12:45 AM
**To:** Batson, Melinda <Melinda.Batson@fda.hhs.gov>
**Cc:** Rodriguez, Jessica <Rodriguez@khlaw.com>; CTP FOIA <CTPFOIA@fda.hhs.gov>
**Subject:** [EXTERNAL] Re: Acknowledgement of Your FOIA Request to the FDA CTP - FOIA Request 2024-763

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Batson, I hope you are well. We have submitted this FOIA request on behalf of our client, Bidi Vapor, who received the Marketing Denial Order for PM0003460.PD2. As the company subject to the denial we have requested unredacted copies of the requested documents, which we also hope will reduce FDA's burden. Accordingly, we hope this request can be addressed as soon as possible.

Thank you,
Azim



**Azim Chowdhury**
Partner

khlaw.com
PackagingLaw.com

direct  202.434.4230   chowdhury@khlaw.com
Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

*Serving Business through Law and Science®*

Washington, DC   Brussels   San Francisco   Shanghai   Boulder

On Jan 30, 2024, at 11:26 AM, Batson, Melinda <Melinda.Batson@fda.hhs.gov> wrote:

** EXTERNAL EMAIL **

Dear Mr. Chowdhury,

2

A0387

I am the FOIA Specialist that has been assigned to process your Freedom of Information Act (FOIA) request to the U.S. Food and Drug Administration (FDA), Center for Tobacco Products (CTP).  This email acknowledges receipt of your FOIA request dated January 23, 2024 to the U.S. FDA CTP. Your request was received in this office January 23, 2024 and it has been assigned FOIA Request ==2024-763.== Please refer to this tracking number in your future correspondence to the agency. We will conduct a search for records responsive to your requests. If responsive records are located, they will be reviewed, pursuant to the FOIA, for release to you.

For purposes of fee assessment, you were categorized as a commercial requester, pursuant to 21 C.F.R. § 20.45 (a)(1).

Should you have any questions in the interim please do not hesitate to contact me directly.

**Melinda S. Batson, B.S. (she/her/hers)**
*Government Information Specialist*

**Center for Tobacco Products**
**Office of Health Communication and Education**
**U.S. Food and Drug Administration**
Telephone: **(240) 402-8325**
Melinda.batson@fda.hhs.gov





*This e-mail, and any attachments, is for the sole use of the intended recipient(s) and may contain confidential and/or protected information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

This message and any attachments may be confidential and/or subject to the attorney/client privilege, IRS Circular 230 Disclosure or otherwise protected from disclosure. If you are not a designated addressee (or an authorized agent), you have received this e-mail in error, and any further use by you, including review, dissemination, distribution, copying, or disclosure, is strictly prohibited. If you are not a designated addressee (or an authorized agent), we request that you immediately notify us by reply e-mail and delete it from your system.

A0388

# EXHIBIT D

A0389

**Chowdhury, Azim**

| | |
|---|---|
| **From:** | Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov> |
| **Sent:** | Thursday, February 1, 2024 10:13 AM |
| **To:** | Chowdhury, Azim; Guan, Wendy |
| **Cc:** | Nirajkumar Patel - Bidi Vapor (raj@bidivapor.com) |
| **Subject:** | RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024 |

** EXTERNAL EMAIL **

Good morning Azim,

Thank you for contacting us. We acknowledge receipt of your email below. We will follow up as soon as we have any additional clarification.

Best regards,

Maliha

**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov





---

**From:** Chowdhury, Azim <chowdhury@khlaw.com>
**Sent:** Wednesday, January 31, 2024 12:37 AM
**To:** Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov>; Guan, Wendy <Wendy.Guan@fda.hhs.gov>
**Cc:** Nirajkumar Patel - Bidi Vapor (raj@bidivapor.com) <raj@bidivapor.com>
**Subject:** Re: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Chowdhury and Ms. Guan, on behalf of Bidi Vapor, I am following up on the below request for the unredacted TPL and other review memos related to the MDO for PM0003460.PD2. Can you please provide to us as soon as possible.

Thanks,
Azim

A0390



## Azim Chowdhury
Partner

khlaw.com
PackagingLaw.com

direct   202.434.4230   chowdhury@khlaw.com

Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

*Serving Business through
Law and Science®*

Washington, DC   Brussels   San Francisco   Shanghai   Boulder

On Jan 22, 2024, at 10:36 AM, Chowdhury, Azim <chowdhury@khlaw.com> wrote:

Dear Ms. Choudhury,

On behalf of our client, Bidi Vapor, LLC, we respectfully request unredacted courtesy copies of the Technical Project Lead (TPL) and other FDA review memoranda associated with the MDO for PM0003460.PD2.  Could you provide this to us ASAP?

Thanks in advance for your prompt reply.

Best regards,
Azim



## Azim Chowdhury
Partner

khlaw.com
thecontinuumofrisk.com

direct   202.434.4230   chowdhury@khlaw.com

Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

*Serving Business through
Law and Science®*

Washington, DC   Brussels   San Francisco   Shanghai   Boulder

**From:** Niraj Patel <raj@bidivapor.com>
**Sent:** Monday, January 22, 2024 1:05 PM
**To:** Chowdhury, Azim <chowdhury@khlaw.com>
**Subject:** Fwd: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

** EXTERNAL EMAIL **

Sincerely,
Niraj Patel,
CEO


BIDI Vapor

Begin forwarded message:

A0391

**From:** "Choudhury, Maliha" <Maliha.Choudhury@fda.hhs.gov>
**Date:** January 22, 2024 at 11:13:05 AM EST
**To:** Niraj Patel <raj@bidivapor.com>
**Subject:** RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

Good morning Niraj Patel,

Thank you for your email. On behalf of your assigned Regulatory Health Project Manager, please find attached the courtesy copy of the Denial letter for Bidi Vapor LLC. The letter was issued today on January 22, 2024, and mailed via UPS.

Please confirm your receipt of this email.

Thank you,

Maliha

**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov

---

**From:** Niraj Patel <raj@bidivapor.com>
**Sent:** Monday, January 22, 2024 10:46 AM
**To:** Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov>
**Subject:** [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Maliha,

I am granting permission to send response to this email.

Sincerely,
Niraj Patel,
CEO

BIDI Vapor

A0392

On Jan 22, 2024, at 10:31 AM, Choudhury, Maliha
<Maliha.Choudhury@fda.hhs.gov> wrote:

Good morning Nirajkumar Patel,

Thank you for your time. As we discussed, FDA issued a letter to your
company, Bidi Vapor LLC. If you would like a courtesy copy of the letter,
please let me know by responding to this email and granting permission
to send the copy electronically.

Please be aware that email may not be a secure form of
communication.

Best regards,

Maliha

**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov

<image018.png>

< i m a g e 0 0 3 . j p g >

< i m a g e 0 1 9 . p n g >
< i m a g e 0 2 0 . p n g >

<image021.png>
<image022.png>

< i m a g e 0 2 3 . p n g >

< i m a g e 0 2 4 . p n g >

< i m a g e 0 2 5 . p n g >

This message and any attachments may be confidential and/or subject to the attorney/client privilege, IRS Circular 230
Disclosure or otherwise protected from disclosure. If you are not a designated addressee (or an authorized agent), you
have received this e-mail in error, and any further use by you, including review, dissemination, distribution, copying, or
disclosure, is strictly prohibited. If you are not a designated addressee (or an authorized agent), we request that you
immediately notify us by reply e-mail and delete it from your system.

A0393

# EXHIBIT E

**Chowdhury, Azim**

| | |
|---|---|
| **From:** | Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov> |
| **Sent:** | Thursday, February 8, 2024 12:29 PM |
| **To:** | Chowdhury, Azim |
| **Cc:** | Niraj Patel |
| **Subject:** | RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024 |

** EXTERNAL EMAIL **

Good afternoon Azim Chowdhury,

Thank you for your email. FDA does not provide the TPL Review for premarket tobacco product applications (PMTAs) via email or courtesy.

In order to access the referenced documents, you must submit a written Freedom of Information Act (FOIA) request to FDA. It is important to note that records being sought must be identified correctly and specifically as possible. Please ensure required information is provided, including correct STN and specific records being requested. Requesters can now submit a FOIA request online.

Additional resources around FOIA-related services can be found at FDA's Freedom of Information website: https://www.fda.gov/regulatory-information/freedom-information.

Thank you,

Maliha

**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov



      

**From:** Choudhury, Maliha
**Sent:** Thursday, February 1, 2024 10:13 AM
**To:** Chowdhury, Azim <chowdhury@khlaw.com>; Guan, Wendy <Wendy.Guan@fda.hhs.gov>
**Cc:** Nirajkumar Patel - Bidi Vapor (raj@bidivapor.com) <raj@bidivapor.com>
**Subject:** RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

Good morning Azim,

Thank you for contacting us. We acknowledge receipt of your email below. We will follow up as soon as we have any additional clarification.

A0395

Best regards,

Maliha


**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov





---

**From:** Chowdhury, Azim <chowdhury@khlaw.com>
**Sent:** Wednesday, January 31, 2024 12:37 AM
**To:** Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov>; Guan, Wendy <Wendy.Guan@fda.hhs.gov>
**Cc:** Nirajkumar Patel - Bidi Vapor (raj@bidivapor.com) <raj@bidivapor.com>
**Subject:** Re: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ms. Chowdhury and Ms. Guan, on behalf of Bidi Vapor, I am following up on the below request for the unredacted TPL and other review memos related to the MDO for PM0003460.PD2. Can you please provide to us as soon as possible.

Thanks,
Azim



**Azim Chowdhury**
Partner

khlaw.com
PackagingLaw.com

direct   202.434.4230   chowdhury@khlaw.com

Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

*Serving Business through*        Washington, DC   Brussels   San Francisco   Shanghai   Boulder
*Law and Science®*

On Jan 22, 2024, at 10:36 AM, Chowdhury, Azim <chowdhury@khlaw.com> wrote:

Dear Ms. Choudhury,

On behalf of our client, Bidi Vapor, LLC, we respectfully request unredacted courtesy copies of the Technical Project Lead (TPL) and other FDA review memoranda associated with the MDO for PM0003460.PD2. Could you provide this to us ASAP?

A0396

Thanks in advance for your prompt reply.

Best regards,
Azim




## Azim Chowdhury
Partner

khlaw.com
thecontinuumofrisk.com

direct  202.434.4230   chowdhury@khlaw.com

Keller and Heckman LLP | 1001 G Street NW, Suite 500 West | Washington, DC 20001

*Serving Business through
Law and Science®*

Washington, DC   Brussels   San Francisco   Shanghai   Boulder

---

**From:** Niraj Patel <raj@bidivapor.com>
**Sent:** Monday, January 22, 2024 1:05 PM
**To:** Chowdhury, Azim <chowdhury@khlaw.com>
**Subject:** Fwd: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

** EXTERNAL EMAIL **

Sincerely,
Niraj Patel,
CEO


BIDI Vapor

Begin forwarded message:

> **From:** "Choudhury, Maliha" <Maliha.Choudhury@fda.hhs.gov>
> **Date:** January 22, 2024 at 11:13:05 AM EST
> **To:** Niraj Patel <raj@bidivapor.com>
> **Subject: RE: [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024**
>
> Good morning Niraj Patel,
>
> Thank you for your email. On behalf of your assigned Regulatory Health Project
> Manager, please find attached the courtesy copy of the Denial letter for Bidi Vapor LLC.
> The letter was issued today on January 22, 2024, and mailed via UPS.
>
> Please confirm your receipt of this email.
>
> Thank you,
>
> Maliha
>
>
> **Maliha Choudhury, M.H.S. (she/her/hers)**
> *Regulatory Health Project Manager*

A0397

---

**From:** Niraj Patel <raj@bidivapor.com>
**Sent:** Monday, January 22, 2024 10:46 AM
**To:** Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov>
**Subject:** [EXTERNAL] Re: Courtesy Copy of FDA Letter Issued January 22, 2024

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Maliha,

I am granting permission to send response to this email.

Sincerely,
Niraj Patel,
CEO


BIDI Vapor


> On Jan 22, 2024, at 10:31 AM, Choudhury, Maliha <Maliha.Choudhury@fda.hhs.gov> wrote:
>
> Good morning Nirajkumar Patel,
>
> Thank you for your time. As we discussed, FDA issued a letter to your company, Bidi Vapor LLC. If you would like a courtesy copy of the letter, please let me know by responding to this email and granting permission to send the copy electronically.
>
> Please be aware that email may not be a secure form of communication.
>
> Best regards,
>
> Maliha

A0398

**Maliha Choudhury, M.H.S. (she/her/hers)**
*Regulatory Health Project Manager*

**Office of Science**
**Center for Tobacco Products**
**U.S. Food and Drug Administration**
Tel: 240-402-4549
Maliha.Choudhury@fda.hhs.gov

<image018.png>

< i m a g e 0 0 3 . j p g >

< i m a g e 0 1 9 . p n g >
< i m a g e 0 2 0 . p n g >

<image021.png>
<image022.png>

< i m a g e 0 2 3 . p n g >

< i m a g e 0 2 4 . p n g >

< i m a g e 0 2 5 . p n g >

---

This message and any attachments may be confidential and/or subject to the attorney/client privilege, IRS Circular 230 Disclosure or otherwise protected from disclosure. If you are not a designated addressee (or an authorized agent), you have received this e-mail in error, and any further use by you, including review, dissemination, distribution, copying, or disclosure, is strictly prohibited. If you are not a designated addressee (or an authorized agent), we request that you immediately notify us by reply e-mail and delete it from your system.

A0399

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BIDI VAPOR, LLC,

       Petitioner,

  v.

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

       Respondents.

No.: 24-10263

## SUPPLEMENTAL DECLARATION OF NIRAJ PATEL

1.     My name is Nirajkumar ("Niraj") Patel. The following declaration is based on personal knowledge and is submitted in support of Petitioner Bidi Vapor LLC's ("Bidi") Time-Sensitive Motion for a Stay Pending Review. This declaration supplements the initial declaration that I submitted on February 2, 2024 in this case. A0179-A0206.

2.     In the U.S. Food and Drug Administration's ("FDA") Opposition to Petitioner's Motion for a Stay Pending Review, filed on February 13, 2023, FDA argues that this Court should doubt Bidi's claim of imminent financial disaster, and points to Kavial Brands Innovation Group, Inc.'s ("Kaival Brands") most recent Quarterly Report filed with the U.S. Securities and Exchange Commission ("SEC") on September 19, 2023, for the quarter that ended on July 31, 2023.

3.      But FDA is totally off-base. As described in my initial declaration,

Kaival Brands is a completely separate company from Bidi and is not an "affiliated

entity." A0179. Kaival Brands is simply the U.S. distributor of BIDI® Sticks. But

in addition to BIDI® Sticks, it also has its other revenue sources which have

nothing to do with Bidi. Indeed, Kaival Brands is publicly traded on NASDAQ,

and its relationship to Bidi is made very clear in its numerous SEC filings,

including the Quarterly Report FDA quotes in its brief. Bidi, on the other hand, has

only one revenue source – the BIDI® Stick – sales of which have been decimated

since the MDO was issued. A0201-A0204.

4.      As to FDA's citation in its opposition brief to the Kaival Brands

September 2023 Quarterly Report, that report was filed several months *before* the

present MDO was issued for the BIDI® Stick Classic and does not discuss the fact

that, in response to the most recent MDO, Bidi's distributors are now pulling out

completely as to all of our ENDS products and will continue to refuse to do

business with Bidi unless a stay is granted.


*    *    *

A0401

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 15, 2024

_____
Niraj Patel, CEO
Bidi Vapor LLC

4873-5568-4517, v. 1

A0402

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

BIDI VAPOR LLC,

       Petitioner,

  v.

U.S. FOOD AND DRUG
ADMINISTRATION, *et al.*,

       Respondents.

No. 24-10263

---

## SUPPLEMENTAL DECLARATION OF DR. WILLIE J. MCKINNEY

1.     My name is Dr. Willie J. McKinney. The following declaration is based on personal knowledge and is submitted in support of Petitioner Bidi Vapor LLC's ("Bidi") Time-Sensitive Motion for a Stay Pending Review. This declaration supplements the initial declaration that I submitted on February 2, 2024 in this case. A0148-0168.

2.     In my initial declaration, I described how the three discrete deficiencies described in the January 22, 2024 Marketing Denial Order ("MDO") issued to Bidi for its tobacco-flavored BIDI® Stick Classic disposable electronic nicotine delivery system ("ENDS") product were <u>each</u> inappropriate bases for the MDO, and how the U.S. Food and Drug Administration ("FDA") failed to consider all of the relevant data and information contained in the PM0003460.PD2, as well as in the June 18, 2023 comprehensive response to FDA's March 20, 2023 deficiency letter.

3.    On February 8, 2024, counsel for Bidi forwarded to me FDA's Technical Project Lead (TPL) Review associated with the MDO for PM0003460.PD2. No other internal disciplinary reviews or memoranda associated with this MDO were provided by FDA.  For the reasons detailed below, the TPL makes even more clear that FDA's review of PM0003460.PD2 and its determination that the BIDI® Stick Classic was not appropriate for the protection of the public health ("APPH") was flawed. The Agency failed to consider and properly balance all of the relevant information submitted – and did not review or consider any toxicology information.  Put simply, based on its own statements in the TPL, FDA failed to take a holistic approach in reviewing this application of a non-combustible, tobacco-flavored ENDS product that can switch smokers, and that Bidi demonstrated has virtually no risk of being used by non-smokers or youth.

**MDO First Deficiency**

4.    The first alleged deficiency involves FDA's request that manufacturers compare the overall levels of Harmful and Potentially Harmful Constituents ("HPHCs") in the aerosol of the new product (the BIDI® Stick Classic) and the HPHCs in the aerosols of similar "comparator" ENDS products.  It is important to note that FDA provides no criteria or guidance for how many comparator products an applicant can select to include in its PMTA. That decision is totally within the discretion of the applicant. In this case, Bidi selected comparator tobacco-flavored

A0404

ENDS products that were either the subject of peer-reviewed and published studies, or part of government-funded studies.

5.       In the MDO, FDA indicated that the published HPHC aerosol data that Bidi provided on several comparator ENDS products lacked certain information or used different aerosol testing parameters, and thus could not be used to compare against HPHC levels in the BIDI® Stick Classic. A0002-0003. In my initial declaration, I noted that FDA never explained how the difference in aerosol testing parameters (e.g., puff regimes) could change Bidi's conclusion that there were no material differences in the HPHC levels between the comparator ENDS products and the BIDI® Stick Classic. A0155-0156.

6.       The TPL sheds further light on FDA's failure to adequately review the comparator ENDS HPHC data provided.  With respect to the JUUL comparator data, for example, Bidi's deficiency response relied on data provided in the Chen et al. (2021) study, *Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks*, which was published in the peer-reviewed *Separations* open-access journal. *See* https://www.mdpi.com/2297-8739/8/10/168.

7.       Although reliance on data in the published literature (or in government-sponsored databases) in this regard is well-established in FDA guidance, as detailed in my initial declaration (A0158-0160), the TPL demonstrates FDA's review of the

A0405

Chen et al. (2021) study was wholly inadequate. FDA asserts in the TPL that the "Chen et al. paper contains very limited analytical method information (e.g., method name, name of testing lab) and no method description or validation information." A0216. This is incorrect. In fact, FDA completely ignores the detailed method description and information related to the method validation provided by Chen et al. (2021) in the paper's methods section and supplemental tables.

8.    For example, Chen et al. (2021) states that, "Both Labstat International ULC and Enthalpy Analytical were International Organization for Standardization (ISO) 17025 accredited at the time of this study. All analytical methods were validated for the analysis of ENDS aerosol according to ICH guidance Q2 (R1) with the exception of gold and carbon monoxide [39]. Method validations included an assessment of accuracy, precision, repeatability, intermediate precision, specificity, detection limit, quantitation limit, linearity, and recovery from the trapping systems. All method validations were reviewed by an independent accreditation body as part of the ISO 17025 accreditation process."

9.    Chen et al. (2021), in its Supplementary Methods Tables, also provides information on "Method of Capture", "Analysis Method", "Instrument", "Method Reference Code", and "ISO17025 Status", the "Method level of detection (LOD) and level of quantitation (LOQ)". See https://www.mdpi.com/article/10.3390/separations8100168/s1.

A0406

10.    Moreover, as noted in my initial declaration based on the information in the MDO (A0066-0067), and confirmed by review of the TPL, nowhere in the MDO or TPL does FDA address Bidi's scientific justification that the JUUL HPHC data generated using a limited 50 puff regime would "underestimate" the HPHC yields for the comparator ENDS products, and thus by using this data, Bidi took a conservative approach A0066-0067. If the JUUL devices had been tested using a protocol that consumed all of the device's e-liquid (i.e., similar to the one used to test BIDI® Stick Classic), HPHCs not detected after only 50 puffs may have been detected. Thus, the comparator product HPHC data could conceivably only present additional risk. But this would only further support Bidi's conclusion that the potential exposures and associated health risks from the BIDI® Stick Classic are within those reported for the ENDS product category.

11.    In other words, use of the published data from the Chen et al. (2021) study, which does contain analytical method information, descriptions, and validation information, was a *conservative* approach to compare the potential health risks from the BIDI® Stick Classic relative to the JUUL ENDS comparator product.

12.    I also note that an evaluation of the data and approach used to compare relative health risks of different ENDS products requires an understanding of toxicology. FDA however, failed to complete its toxicology review, and thus the appropriateness of the submitted data was not fully assessed. A0211.

A0407

13.    With respect to  several other ENDS products that Bidi chose for comparison to the BIDI® Stick Classic (e.g., Apollo Classic Tobacco, BLU Classic Tobacco, Ever Smoke Classic Tobacco, and South Beach Smoke Classic Tobacco), Bidi's deficiency response relied on aerosol HPHC data provided in the El-Hellani et al. (2018) study, *Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics*, which was funded by FDA Center for Tobacco Products and the National Institute on Drug Abuse ("NIDA"), and published in the *Nicotine & Tobacco Research* journal.  *See* https://pubmed.ncbi.nlm.nih.gov/27798087/.

14.    In its deficiency response, Bidi explained that "[a]erosol collection in the study by El-Hellani et al. (2018) was conducted using a slightly modified non-intense puffing regimen (1.5 L/min puff velocity, 4s puff duration and 10s duration), and the HPHC yields were measured from a 15-puff session. Since the difference in the puff duration between the study by El-Hellani et al. (2018) (4 second puff) and the standard ISO non-intense puffing (3 second puff) is minimal (1 second), the difference in puffing topography is not likely to have a measurable impact on the aerosol chemistry, and thus does not preclude the use of this study to inform the comparison of HPHC yields measured in the BIDI® Stick Classic relative to the ENDS products in the study by El-Hellani et al. (2018)." A0315.

A0408

15.     But, as explained in my initial declaration, FDA generally claimed in the MDO (and further in the TPL) that the information Bidi relied on from this peer-reviewed and government-funded study was inadequate, and that Bidi should have provided data from studies on comparator products that used similar puffing life cycle, puffing regimens, and puffing machines, with validated methods and accredited laboratories. A0003; A0156-0157.

16.     However, nowhere in the TPL does FDA explain *why* the testing protocols and results for the comparator products cited by Bidi prevented a comparison of aerosol HPHC levels with the BIDI® Stick Classic. In fact, the minor difference in puffing conditions (1 second) for the products tested by El-Hellani et al. (2018) and the BIDI® Stick Classic is immaterial. FDA did not provide a rationale for how this could change Bidi's conclusion that there were no material differences in the HPHC levels between the comparator ENDS products and the BIDI® Stick Classic.

17.     The TPL also does not address Bidi's scientific justification provided in its deficiency response that the HPHC yields for the product aerosols evaluated by El-Hellani et al. (2018) were *underestimated* because they were based on a 15-puff session, whereas the BIDI® Stick Classic data was based on puffing the entire product (over 200 puffs). Thus, like the JUUL ENDS data described above, use of the aerosol chemistry data reported by El-Hellani et al. (2018) provides a

A0409

conservative approach for the comparison of potential health risks from the BIDI®
Stick Classic relative to the ENDS comparator products.

18.    Moreover, FDA itself cited to the study by El-Hellani et al. (2018) in
the TPL, which it referenced to compare the nicotine concentration in the BIDI®
Stick Classic to "ENDS tested in the literature" A0218.

19.    The other ENDS comparator product that Bidi selected was the NJOY
Standard Research Electronic Cigarette ("SREC"), which was developed for
research purposes with funding by NIDA.  FDA criticized the use of this comparator
ENDS product because the HPHC aerosol data published in the government
database did not include, for example, full method validation reports or the
manufacturing date of the tested product. FDA did not provide a rationale for why
data published on a federal government agency (i.e., NIDA) website may not be used
for a comparative analysis without access to the source full method validation
reports.

20.    Also, the TPL does not address the concerns raised in my initial
declaration relating to the fact that full validation reports or product manufacturing
dates, for example, would generally not be made available in published literature or
government databases, thus effectively making it impossible to utilize such studies,
despite FDA's clear guidance indicating that doing so would be appropriate. A0158-
0159.

A0410

21.    Finally, relevant to the potential health risks of the BIDI® Stick Classic product and evaluation relative to comparator ENDS products, PM0003460.PD2 also provided FDA with a battery of *in vitro* toxicology studies. This included a neutral red uptake assay to evaluate cytotoxicity (cell death), and a battery of *in vitro* genotoxicity studies (i.e., Ames mutagenicity and micronucleus genotoxicity assay) to evaluate endpoints relative to cancer.  The *in vitro* studies conducted with aerosols generated from the BIDI® Stick Classic were not assessed since FDA admittedly failed to conduct its cycle 2 toxicology review (i.e., toxicology review of Bidi deficiency letter response).  A0211.  FDA could not properly compare the health effects of the BIDI® Stick Classic to the comparator ENDS products without completing this toxicological assessment.

## MDO Second Deficiency

22.    The second alleged deficiency relates to FDA's claims that the non-targeted analysis ("NTA") of the BIDI® Stick Classic aerosol using gas chromatography-mass spectrometry ("GC-MS") was insufficient because it would not capture all possible leachable contaminants.

23.    FDA alleges in the TPL that a comprehensive leachable study is necessary because "[e]xposures to any of these contaminants may pose an acute or chronic health risk to individuals using the new product." A0210.   But FDA is ignoring the reality that the BIDI® Stick Classic has been on the U.S. market for

A0411

years, as a result of FDA's long-standing deferred compliance policy for deemed tobacco products, and has been used by thousands of adults. If there were acute (short-term) health impacts from use of the product, FDA would have known about it. However, as stated in the TPL "[no] adverse experiences related to the design of the new product were identified by FDA Safety Reporting Portal or reported by the applicant." A0230. In addition, with respect to short-term health impacts, the TPL also states "the clinical study is adequate to assess the short-term health impact of the new product from this discipline's perspective" (TPL p44).

24. Moreover, the chemicals measured in the aerosol by NTA account for only 0.1% of the total BIDI® Stick Classic aerosol. The large majority of the aerosol mass is made of intact primary ingredients. The FDA does not explain how the compounds in the NTA of the aerosol generated from BIDI® Stick Classic, which comprised less than 0.1% of the aerosol, is likely to pose a significant hazard, especially considering the significant reduction (up to 100%) of aerosol HPHCs compared to combustible cigarette smoke. A0321-0331.

25. FDA did not factor in its evaluation all studies provided by Bidi to capture potential compounds that may leach into e-liquid and transfer to the aerosol in their decision. FDA also did not rely on or balance the BIDI® Stick Classic extractable study that was included in Bidi's deficiency response. (A0332-0340). This study was conducted using harsh solvents to assess the maximum potential for

A0412

chemicals that could be transferred (i.e., leach) into the e-liquid from the container-closure system and components within the aerosol path. This extractables study used all the forms of mass spectrometry suggested by FDA (i.e., GC-MS – Gas Chromatography – Mass Spectrometry; LC-MS – Liquid Chromatography – Mass Spectrometry Electrospray ionization; ICP – Inductively Coupled Plasma [Mass Spectroscopy or Optical Emission Spectroscopy]; HS-GC-MS – Headspace Gas Chromatography – Mass Spectrometry) (A0332-0340). Therefore, the extractables study would have likely identified the remaining potential leachable compounds FDA indicated in the TPL may have been missed in the aerosol study.

26.    The TPL states that "the analytical results from the extractable study are reliable and acceptable from a chemistry perspective." (A0214). This study provides a conservative approach for the health risk evaluation of compounds that could potentially leach into the e-liquid from the container closure system in the BIDI® Stick Classic, because it uses harsh solvents for extraction, rather than just the e-liquid.  FDA, however, does not explain why the extractables study could not be used to assess compounds that might leach into the BIDI® Stick Classic e-liquids.

27.    The TPL also makes clear that FDA did not take a holistic approach in its review of PM0003460.PD2, as the evaluation "does not include a toxicological evaluation of the_new product and does not rely on any toxicological findings."

(A0211). A complete toxicology review (including cycle 2) is critical to the APPH analysis, as noted above.

28.     As a result of FDA not including a toxicological evaluation in its APPH assessment, FDA's conclusion does not rely on, or balance, any of the following:

- **The chemical characterization and health risk evaluation of the BIDI® Stick Classic product aerosol**. These demonstrate overall substantial reductions in the numbers and levels of HPHCs in the BIDI® Stick Classic compared to cigarette smoke, indicating likely reductions in user exposures and associated health risks. A0266-0308.

- **The in vitro toxicology studies conducted to evaluate potential health hazards from the BIDI® Stick Classic aerosol**. These studies show fewer health hazards from the BIDI® Stick Classic aerosol relative to cigarette smoke A0353-0372.

- **The evaluations conducted on the BIDI® Stick Classic product to assess health risks from potential inhalation exposures to ingredients, potential thermal degradation products, as well as metal and non-metal leachables**. The evaluation shows overall low toxicological concern from these constituents at the levels in the BIDI® Stick Classic. A0341-0352.

12 of 20

29.     FDA itself agreed that "in the absence of a cycle 2 toxicology review, this TPL review cannot draw final conclusions with respect to the toxicant exposure posed by the new product." A0228.  Taken together, FDA's inability to fully weigh the risks and benefits of the BIDI® Stick Classic to the population as a whole was not due to lack of data from Bidi, but rather due to FDA's own failure to complete the toxicology review of the data submitted by Bidi in the PMTA and the deficiency response.

**MDO Third Deficiency**

30.     The third deficiency in the MDO relates to the allegedly higher abuse liability of the BIDI® Stick Classic. As described in my initial declaration, FDA's argument that the "totality of the evidence" demonstrates that the abuse liability of the new product is similar or higher than a typical combustible cigarette based on nicotine exposures measured in the BIDI® Stick Classic, is contrary to existing evidence and FDA's long-standing approach to abuse liability. A0162.

31.     The TPL makes clear that FDA did not take a holistic approach and did not properly consider all of the BIDI® Stick Classic specific information provided in the PMTA and deficiency response when concluding that marketing of the new product could result in a hypothetical future scenario where tobacco non-users (including youth) who initiate use of the BIDI® Stick Classic will continue to use it.

A0415

32.     First, with respect to experienced adult ENDS users, FDA says throughout the TPL that "[a]dults who have ENDS experience are likely to achieve higher nicotine exposure from the new product than adults with no ENDS experience because they take longer and larger puffs and obtain more nicotine from the same ENDS (Farsalinos et al., 2015; Hiler et al., 2017; Ramoa et al., 2016; Spindle et al., 2017; Yan et al., 2015). Thus, in experienced users of ENDS, the [FDA Behavioral and Clinical Pharmacology (BCP) discipline] expects that the abuse liability will be higher than CC." A0221.

33.     However, the TPL does not address the evidence to the contrary presented in the PM0003460.PD2 indicating that experienced adult ENDS users "self-titrate" and adjust how they vape based on their nicotine intake. Specifically, the updated Cardno ChemRisk comprehensive literature review provided in the PMTA Fourth Amendment (A0250-0251) states that, "In terms of use behaviors and topography measures, all studies published since the Cardno ChemRisk SOS (2020) demonstrated self-titration behaviors. Specifically, all studies demonstrated that as nicotine concentration and/or device power increased, puff duration or volume decreased (Cox et al., 2021; Ebajemito et al., 2020; Eversole et al., 2020; Hiler et al., 2020; Phillips-Waller et al., 2021)." A0264. In other words, experienced ENDS users are able to adjust how they vape (e.g., puff duration and volume) based on

A0416

nicotine levels and may not, as FDA concludes in the TPL, experience higher nicotine exposure from using the BIDI® Stick Classic.

34. With respect to tobacco non-users and youth, the TPL makes clear that FDA did not take a holistic approach in its review, and failed to adequately balance any of the BIDI® Stick Classic-specific studies I described in my first declaration, including the Population Prevalence Study, Perceptions and Behavioral Intentions ("PBI") Study, Likelihood of Use ("LOU") Study, Patterns of Use ("POU") Study, Survey on BIDI® Stick Usage and Potential Impact. A0165-A0168.

35. FDA did this despite <u>agreeing</u> throughout the TPL that the BIDI® Stick Classic data provided was sufficient to demonstrate that both tobacco non-users and youth do not use the BIDI® Stick Classic, are not interested in doing so and, even if they did try the product, are not likely to initiate or progress to regular use of the BIDI® Stick Classic. Specifically, the TPL states:

- "Evidence submitted by [Bidi Vapor] suggests that initiation and current use of the new product is low, and no respondent in the Population Prevalence Study reported current use of the new product. The Behavioral Survey similarly suggests that the use of the new product is low." A0220.

- "Applicant-submitted data and published literature have shown that youth and adult tobacco non-users are not likely to use the new product given that

it is a tobacco flavor and its overall low appeal, use pattern, and actual use" (TPL 40)

- "Because youth are unlikely to use the new product, the data on youth new product use is sufficient from the epidemiology perspective." A0222.

- Based on the PBI Study, a small proportion (0.9%) of never smokers are likely to try the new product. Former smokers were generally more likely to try than never smokers (1.3%)." A0222.

- "The applicant provided the Population Prevalence Study which collected data on current users of the new product stratified by self-reported cigarette use history. The data from this study suggests that few youth will initiate with the new product (e.g., zero youth aged 13 to 17 who were never smokers reported ever using the new product). A0222.

- "Overall, while the perception and intention study (PBI Study) showed low to moderate interest in trying and progressing to regular use, the prevalence of use studies (Population Prevalence Study and Behavioral Survey) showed that initiation and likelihood of use of the new product were low (not likely)". A0225.

- "Overall, as TPL, I agree with the social science and epidemiology reviews that given the tobacco flavor of the new product, it is expected that youth

A0418

are unlikely to use the new product and the appeal for the new product would also be limited." A0227.

36.    But still, despite agreeing that non-users and youth are currently not using the BIDI® Stick Classic and are unlikely to do so, FDA cites to non-BIDI® Stick specific studies in the general literature regarding nicotine salts to conclude, "However, use of the new product by adult tobacco non-users, including youth, may shift depending on the availability of other tobacco products on the market." A0226. This is pure speculation and ignores the fact that FDA requires robust post-marketing surveillance for any product granted marketing authorization. *See* 21 C.F.R. Part 1114 Subpart D – Postmarket Requirements. Indeed, Bidi provided a comprehensive marketing and post-market surveillance plan in its PMTA that FDA again failed to adequately consider. *Id*.; A0223-0224; A0232-0233.

37.    With respect to cigarette smokers switching to the BIDI® Stick Classic, FDA asserts in the TPL that although combustible cigarette use may cause greater "toxicant exposure and adverse health outcomes" than Bidi's product, the evidence was "inconclusive" as to whether combustible cigarette users "would likely use [Bidi's product] to partially or completely switch" from that more harmful product. A0226.

38.    But there is language in the TPL contradicting this exact point. Specifically, the TPL states:

A0419

- Based on the "applicant's data in the PBI Study, among current adult smokers, some (20.2%) are likely to try the new product, and some (20%) are likely to progress to regular use," and that "current smokers (17.8%) were likely to use the new product to completely switch from combusted cigarettes". A0221.

- "Evidence from the published literature on switching behavior suggests that complete switching from CC to ENDS does occur among a small proportion of users (less than 10%)—typically through a period of dual use (Abi Nehme et al., 2022; Piper et al., 2020; Stanton et al., 2020)," showing that more smokers (17.8%) are likely to completely switch to the Bidi Classic product as compared to other ENDS products. A0220-0221.

39.    FDA also failed to consider that an independent smoker switching study was being conducted using the BIDI® Stick, the results of which Bidi informed FDA would be provided to the agency in short order. A0254-0263.  That study is registered with clinicaltrials.gov and is expected to be completed by March 30, 2024.  *See Exploratory Study of Switching From Combustible Cigarettes to the BIDI E-cigarette* (NCT05855343), available at https://clinicaltrials.gov/study/NCT05855343?term=Bidi&rank=2.

A0420

40.     FDA also claims in the TPL that Bidi's own clinical study determined that "[t]otal nicotine exposure" to the BIDI® Stick Classic was "statistically significantly higher" than: exposure to other e-cigarette products and combustible cigarettes in real-world conditions involving actual use. A0217-0218.

41.     This finding, however, is based on a statistical memorandum dated September 13, 2022, that was apparently finalized prior to the March 20, 2023 deficiency letter – yet was not identified as a deficiency. Moreover, the statistical memorandum that this finding is apparently based on has not yet been provided by FDA, despite requests from Bidi for all internal review memoranda. Had FDA indicated in the deficiency letter that it believed the total nicotine content was statistically significantly higher in the BIDI® Stick Classic compared to other products, we would have addressed that issue directly.

42.     Finally, nothing in the TPL addresses the fact I raised in my initial declaration that FDA is now creating a new standard for ENDS products, essentially requiring "less nicotine exposure than a cigarette" to get authorization. A0164. Unlike in the past when we saw authorizations for NJOY's tobacco-flavored ENDS and the IQOS, both of which also deliver nicotine levels comparable to a cigarette, FDA now appears to have changed its policy without any notice, and will not grant authorization if it believes that tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product. FDA ignores that

A0421

ENDS products are not intended to be therapeutic smoking cessation products, like FDA-approved nicotine replacement therapies, which are regulated as drugs.

I certify under penalty of perjury that the foregoing is true and correct.

Executed February 15, 2024.

Dr. Willie J. McKinney