Case No.: 24-10263

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Bidi Vapor LLC,

*Petitioner,*

v.

U.S. Food and Drug Administration; Robert M. Califf, M.D., Commissioner;
U.S. Department of Health and Human Services; Xavier Becerra, Secretary,

*Respondents.*

On Review Of FDA Marketing Denial Order (STN PM0003460.PD2)
Issued Under The Federal Tobacco Control Act

**PETITIONER BIDI VAPOR LLC'S
PRINCIPAL BRIEF**

Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

No. 24-10263, *Bidi Vapor LLC v. U.S. Food and Drug Administration, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, Petitioner hereby certifies that the following have an interest in the outcome of this petition for review:

1.  Ballingrud, Samuel (counsel for Respondents)

2.  Becerra, Xavier (Secretary, Department of Health and Human Services)

3.  Bidi Vapor LLC (Petitioner)

4.  Butler, Samuel (counsel for Petitioner)

5.  Chowdhury, Azim (counsel for Petitioner)

6.  Farrelly, Matthew, Ph.D. (Director, Office of Science, Center for Tobacco Control, Food and Drug Administration)

7.  Garland, Merrick B. (Attorney General of the United States)

8.  Gill, Neelam (counsel for Petitioner)

9.  Gotting, Eric (counsel for Petitioner)

10. Harlow, James W. (counsel for Respondents)

11. Keller and Heckman LLP (counsel for Petitioner)

12. Kennedy, Scott (counsel for Respondents)

13. King, Brian (Director, Center for Tobacco Control, Food and Drug Administration)

14. Klein, Alisa B. (counsel for Respondents)

No. 24-10263, *Bidi Vapor LLC v. U.S. Food and Drug Administration, et al.*

15. Mednick, David (counsel for Respondents)

16. Nguyen, Stephanie (counsel for Respondents)

17. Patel, Nirajkumar (member of Petitioner)

18. Powell, Lindsey (counsel for Respondents)

19. Sabnis, Rohit (counsel for Petitioner)

20. United States Attorney's Office, Middle District of Florida

21. United States Department of Health & Human Services (Respondents)

22. United States Department of Justice

23. United States Food & Drug Administration (Respondents)

24. Van-Tull, LieAnn (counsel for Petitioner)

25. Vicente, Wendy (FDA Office of Chief Counsel)

26. Zeimer, Sara (counsel for Petitioner)

FRAP 26.1 Disclosure Statement: No parent corporation or publicly held corporation owns 10% or more of any stock in Bidi Vapor LLC.

11th Cir. R. 26.1-3 Certification: No publicly traded company or corporation has an interest in the outcome of this appeal.

11th Cir. R. 26.1-2 Certification: The undersigned certifies that this CIP is complete at the time of filing.

Dated: April 15, 2024

C-2 of C-3

No. 24-10263, *Bidi Vapor LLC v. U.S. Food and Drug Administration, et al.*

Respectfully submitted,

/s Eric P. Gotting
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Petitioner Bidi Vapor LLC ("Bidi") requests oral argument in this matter. This case involves important legal questions under the Family Smoking Prevention and Tobacco Control Act ("TCA"), and in particular the nature and scope of Respondent U.S. Food and Drug Administration's ("FDA") obligation under the TCA to conduct a complete review of all relevant information in a premarket tobacco product application ("PMTA") under the statute's "appropriate for the protection of the public health" ("APPH") standard. 21 U.S.C. §387j. This matter also involves portions of an extensive administrative record containing scientific and technical information submitted to FDA by Bidi in support of its PMTA covering Bidi's tobacco-flavored electronic nicotine delivery systems ("ENDS") product, the BIDI® Stick Classic. Therefore, Bidi believes oral argument will assist the Court in resolving the issues raised in this appeal.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.....................................i

TABLE OF CONTENTS ..................................................................ii

TABLE OF CITATIONS ................................................................ v

STATEMENT OF JURISDICTION.......................................................viii

STATEMENT OF THE ISSUES ..................................................... 1

STATEMENT OF THE CASE ......................................................... 2

    I.    Nature of the Case ...................................................... 2

    II.    The Tobacco Control Act And FDA's Deeming Rule.................. 4

    III.    The TCA's "Appropriate For The Protection Of The Public Health" ("APPH") Standard Requires A Holistic, Multi-Factor, Multi-Disciplinary Weighing Or Balancing Analysis........5

        A.    Statutory Language ............................................. 5

        B.    FDA Regulations, Guidance, And Public Statements ........... 6

        C.    Toxicology Assessments Are A Key Component Of APPH Review ............................................................... 9

    IV.    Bidi Vapor LLC...................................................... 11

    V.    Bidi's PMTAs, Amendments, And Deficiency Letter Response .............................................................. 12

    VI.    FDA's Marketing Denial Order ("MDO").............................. 14

STANDARD OF REVIEW ........................................................... 15

SUMMARY OF ARGUMENT ...................................................... 17

ARGUMENT ........................................................................ 20

    I.    An MDO Must Be Vacated And Remanded Where It Is Not Based On A Holistic Review Of The PMTA, Failed To

Consider All Relevant Data And Information In The PMTA, Or Enforced A Tobacco Product Standard That Was Not Adopted Through Notice and Comment Rulemaking ................................................................... 20

II.   FDA Concedes It Did Not Conduct A "Cycle 2" Toxicological Review And For That Reason Alone The MDO Must Be Set Aside ........................................................ 27

III.  Deficiency One ....................................................................... 34

    A.   FDA Did Not Explain How Deficiency One Outweighs Demonstrated Benefits Of The BIDI® Stick Classic ............ 36

    B.   FDA Effectively Imposed A Tobacco Product Standard Governing Product Testing Without Notice And Comment Rulemaking ...................................................................... 37

    C.   Deficiency One Is Arbitrary and Capricious ....................... 39

IV.   Deficiency Two ...................................................................... 47

    A.   FDA Failed To Explain How Deficiency Two Outweighs Proven Benefits Of The BIDI® Stick Classic ...................... 47

    B.   FDA Essentially Adopted A Tobacco Product Standard For Leachability Studies Without Notice And Comment Rulemaking ...................................................................... 49

    C.   Deficiency Two Is Arbitrary And Capricious ..................... 49

V.    Deficiency Three ................................................................... 51

    A.   FDA Entirely Reversed Its Prior Policy As Applied To Other Manufacturers And Products, Without Explanation, Regarding The Need For A Comparable Level Of Abuse Liability In ENDS And Combustible Cigarettes ................. 52

    B.   FDA Did Not Explain How Deficiency Three Outweighs The BIDI® Stick Classic's Benefits As A Lower Risk Alternative ........................................................................ 55

iii

C.   The MDO Contradicted Multiple TPL Statements, Including Evidence Submitted By Bidi And Credited By FDA, That Nonusers And Youth Are Unlikely To Use The BIDI® Stick Classic ................................................................. 56

D.   FDA Failed To Weigh Evidence On Switching In The Context Of Other Benefits To Smokers And A Low Risk To Nonusers And Youth ........................................................ 59

E.   FDA Imposed Tobacco Product Standards For Nicotine Content And Abuse Liability Without Notice And Comment Rulemaking ..................................................................... 60

CONCLUSION ........................................................................... 61

CERTIFICATE OF COMPLIANCE ........................................... 62

CERTIFICATE OF SERVICE ................................................... 63

ADDENDUM

iv

# TABLE OF CITATIONS

Page(s)

## Cases

*Bidi Vapor LLC v. FDA*,
   47 F.4th 1191 (11th Cir. 2022) ..................................................4, 6, 18, 28, 34

*Burlington Northern and Santa Fe Railway Co. v. Surface Trans. Bd.*,
   403 F.3d 771 (D.C. Cir. 2005) ...................................................................... 16

*City of Arlington, Tex. v. FCC*,
   569 U.S. 290 (2013) ....................................................................................... 21

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
   140 S.Ct. 1891 (2020) .................................................................................... 55

*Fontem US, LLC v. FDA*,
   82 F.4th 1207 (D.C. Cir. 2023)....... 21-27, 29, 34, 36, 37-38, 45, 48-49, 56, 61

*Genuine Parts Co. v. EPA*,
   890 F.3d 304 (D.C. Cir. 2018).................................................................... 16

*Michigan v. EPA*,
   576 U.S. 743 (2015)....................................................................................... 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983)......................................................................................... 16

*Physicians for Social Responsibility v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020)...................................................................... 17

## Statutes

5 U.S.C. §706(2)(A) ..............................................................................15, 21

5 U.S.C. §706(2)(C)-(E)........................................................................16, 21

21 U.S.C. §387.............................................................................................4

21 U.S.C. §387a(a).......................................................................................4

21 U.S.C. §387g(a)(4)............................................................... 23, 38, 60

21 U.S.C. §387g(a)(4)(B)(ii)-(iii)............................................39, 49

21 U.S.C. §387g ......................................................................... 26

21 U.S.C. §387j ........................................................................... 4

21 U.S.C. §387j(b) ..................................................................... 10

21 U.S.C. §387j(b)(1) ................................................................... 5

21 U.S.C. §387j(b)(1)(A)-(B) ....................................................... 9

21 U.S.C. §387j(c)(1)(B) .............................................................. 5

21 U.S.C. §387j(c)(2)(A) .......................................................14, 23

21 U.S.C. §387j(c)(2)(B) ............................................................ 26

21 U.S.C. §387j(c)(2)(D) ............................................................ 23

21 U.S.C. §387j(c)(4) ................................................................... 5

21 U.S.C. §387j(d)...................................................................... 58

21 U.S.C. §387*l*(b) .................................................................... 15

## Regulations

21 C.F.R. §1114.7 ........................................................................ 8

21 C.F.R. §1114.7(k)(i)(A)-(B) .................................................. 10

21 C.F.R. §1114.9 ...................................................................... 13

21 C.F.R. §1114.25 .................................................................... 13

21 C.F.R. §1114.27 ...................................................................... 6

21 C.F.R. §1114.33 .................................................................... 14

21 C.F.R. §1114.41 .................................................................... 58

81 Fed. Reg. 28974 (May 10, 2016).............................................. 4

86 Fed. Reg. 55335 (Oct. 5, 2021) .......................................................... 6, 7

**Other Authorities**

Department of Health and Human Services, Office of Inspector General, *The Food and Drug Administration Needs To Improve The Premarket Tobacco Application Review Process For Electronic Nicotine Delivery Systems To Protect Public Health* (Nov. 8, 2023) ............................................................................. 27

FDA, *Guidance for Industry: Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems* (June 2019) ........................................... 7

FDA, *Guidance for Industry: Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems* (March 2023) ......................................... 7

FDA, Dr. Brian King, Director, FDA Center for Tobacco Products, *FDA's Comprehensive Approach To Tobacco Product Regulation: An Update From FDA's Center for Tobacco Products* (Jan. 29, 2024) ..................................... 8

FDA, Deemed Tobacco Product Applications: A Public Meeting (Oct. 28, 2019) ................................................................................................. 7

FDA, Tobacco Product Application Review Public Meeting (Oct. 22, 2018) ................................................................................. 7

## STATEMENT OF JURISDICTION

This Court has jurisdiction under Section 912 of the Family Smoking Prevention and Tobacco Control Act ("TCA"), 21 U.S.C. §387*l*(a), to review the Respondent U.S. Food and Drug Administration's ("FDA") marketing denial order ("MDO") issued to Petitioner Bidi Vapor LLC ("Bidi") on January 22, 2024. The MDO denied marketing authorization sought by Bidi in a premarket tobacco product application ("PMTA") filed under Section 910 of the TCA, 21 U.S.C. §387j, for Bidi's tobacco-flavored electronic nicotine delivery systems ("ENDS") product, BIDI® Stick Classic. The MDO fully and finally decided Bidi's PMTAs at the administrative level. *See* 21 U.S.C. §§387j, 387*l*. Bidi filed a timely Petition for Review with this Court on January 26, 2024 pursuant to the 30-day deadline set forth in 21 U.S.C. §387*l*(a). Venue is proper in this circuit under 21 U.S.C. §387*l*(a) as Bidi is headquartered in Grant-Valkaria, Florida.

## STATEMENT OF THE ISSUES

Petitioner Bidi Vapor LLC ("Bidi") filed an extensive premarket tobacco product application ("PMTA") with Respondent U.S. Food and Drug Administration ("FDA") under the Family Smoking Prevention and Tobacco Control Act ("TCA") which sought FDA's authorization to market and sell the BIDI® Stick Classic, a tobacco-flavored electronic nicotine delivery systems ("ENDS") product (i.e., e-cigarette). FDA denied the PMTA based on three alleged deficiencies, concluding it did not have sufficient information to determine whether the product met the TCA's "appropriate for the protection of the public health" ("APPH") standard. This case raises the following issues:

1.    Did FDA act unlawfully when it admittedly failed to conduct a full toxicological assessment of the BIDI® Stick Classic, including a "cycle 2" toxicological review, and as a result never considered extensive toxicological evidence submitted by Bidi demonstrating the BIDI® Stick Classic presents far less health risk than combustible cigarettes and is otherwise APPH?

2.    Did FDA act unlawfully when it denied marketing authorization based on each alleged deficiency standing alone instead of balancing each one against information and significant data in the PMTA demonstrating, *inter alia*,

1

the public health benefits of the BIDI® Stick Classic or explaining how each deficiency outweighed such benefits so as to justify a no APPH finding?

3.      Did FDA act unlawfully when it effectively imposed "tobacco product standards" – specific requirements that must be adopted under the TCA through formal notice and comment rulemaking – by requiring Bidi to satisfy certain product testing obligations, as well as meet nicotine level and other related restrictions, under the pretense of the alleged deficiencies?

4.      Did FDA act in an arbitrary and capricious manner when it: (i) ignored evidence and comments submitted by Bidi in the record going directly to an APPH finding; (ii) failed to explain its allegations in other than conclusory terms, including where they were wholly contradicted by FDA's own findings in the record; (iii) reversed prior FDA policy, without acknowledging or explaining the change, regarding the role of nicotine levels and abuse liability (i.e., addiction potential) in ENDS products under the APPH standard; and (iv) treated Bidi differently than other similarly-situated ENDS products in the PMTA review process?

## STATEMENT OF THE CASE

### I.    Nature of the Case

This case challenges Respondent U.S. Food and Drug Administration's ("FDA") denial of marketing authorization for a tobacco-flavored electronic

2

nicotine delivery systems ("ENDS") product, manufactured and sold by Petitioner Bidi Vapor LLC ("Bidi"), as unlawful under the Family Smoking Prevention and Tobacco Control Act ("TCA") and the Administrative Procedure Act ("APA"). As required by the TCA, Bidi submitted to FDA an extensive premarket tobacco product application ("PMTA") containing information and data demonstrating that its tobacco-flavored ENDS product, branded the BIDI® Stick Classic, meets the TCA's "appropriate for the protection of the public health" ("APPH") standard.

On January 22, 2024, FDA issued Bidi a marketing denial order ("MDO") prohibiting the continued marketing and sale of the BIDI® Stick Classic in the United States. FDA-BIDI-000046-56. The MDO was based on a mere three alleged deficiencies in the PMTA, and not on any holistic balancing of the public health effects of the product. In this regard, the MDO was in clear violation of the TCA, its implementing regulations, and FDA guidance. Furthermore, in issuing the MDO, FDA engaged in arbitrary and capricious decision-making under the APA.

This is not the first time this Court has considered FDA's denial of PMTAs submitted by Bidi. On August 23, 2022, this Court vacated and remanded MDOs issued to Bidi for its non-tobacco flavored ENDS products because FDA had violated the TCA and APA, and in particular failed to

consider relevant evidence in the form of marketing and access restrictions implemented by Bidi to address underage use.  *Bidi Vapor LLC v. FDA*, 47 F.4th 1191 (11th Cir. 2022) ("*Bidi I*").

## II.    The Tobacco Control Act And FDA's Deeming Rule

In 2009, Congress enacted the TCA, amending the Food, Drug and Cosmetic Act ("FDCA"), to give FDA regulatory authority over the marketing and sale of "tobacco products." 21 U.S.C. §387, *et seq.*  Six years later, on August 8, 2016, FDA's "Deeming Rule" went into effect, which applied the TCA to ENDS and other tobacco products that had not been initially regulated under the TCA.  21 U.S.C. §387a(a); 81 Fed. Reg. 28974 (May 10, 2016).

Consequently, ENDS were immediately subject to numerous TCA provisions, including a requirement that ENDS manufacturers, including Bidi, obtain premarket authorization from FDA to sell their ENDS products.  21 U.S.C. §387j (attached as Addendum).  A manufacturer must submit a PMTA which, as discussed below, entails a time-consuming and costly process of compiling extensive scientific, technical, and marketing data that FDA must review and weigh before granting market authorization.

4

### III. The TCA's "Appropriate For The Protection Of The Public Health" ("APPH") Standard Requires A Holistic, Multi-Factor, Multi-Disciplinary Weighing Or Balancing Analysis

#### A. Statutory Language

When deciding whether to grant an ENDS product market authorization, the TCA requires FDA to conduct a complex, science-based evaluation based on *all* contents in a PMTA to determine if the product is "appropriate for the protection of the public health" ("APPH"). FDA must make that determination "with respect to the risks and benefits to the population *as a whole*, including users and nonusers of the tobacco product, and taking into account – (A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products." 21 U.S.C. §387j(c)(4) (emphasis added).

Moreover, the statute lists numerous forms of other evidence that must be in any PMTA, including data on health risks, ingredient and additive information, manufacturing practices, product samples, labeling specimens, and any other information required by FDA. 21 U.S.C. §387j(b)(1). The TCA also explicitly envisions that FDA consider the positive impact manufacturer-implemented restrictions on the sale and distribution of a product to minors could have on the APPH determination. 21 U.S.C. §387j(c)(1)(B).

All of this is consistent with Congress's choice of words in adopting the APPH standard. Congress did not employ any words or terms of limitation; rather, it used the word "appropriate"—"the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 752 (2015).[1]

### B.    FDA Regulations, Guidance, And Public Statements

FDA, not surprisingly, has repeatedly described APPH as a multi-factored and multi-disciplinary standard. For instance, FDA noted in October 2021 when promulgating its final PMTA Rule that APPH involves a "complex determination," 86 Fed. Reg. 55300, 55335 (Oct. 5, 2021), that FDA "considers many factors," *id.* at 55314, and that FDA does not make a "determination on one static set of requirements," *id.* at 55385. FDA further declined "to assign weight to different types of evidence," *id.* at 55335, emphasizing APPH "requires a balancing" of risks and benefits. *Id.* at 55384. FDA also refused "to create a series of criteria" that all products must meet for APPH, stated that an APPH "determination would involve consideration of many factors," and noted it "will be made with respect to…the population as a

---

[1] Prior to scientific review, FDA conducts several screening reviews of the PMTA called an "acceptance review" and "filing review." 21 C.F.R. §1114.27. Bidi successfully completed both reviews. FDA-BIDI-000001-10.

6

whole, rather than whether a product meets each item in a series of specific criteria." *Id.* at 55386. FDA committed to determining APPH on an "individualized" basis, the "risks and benefits of a specific tobacco product" and "based on *all* of the contents of the application." *Id.* at 55320, 55390 (emphasis added).

In June 2019, FDA also issued final *Guidance for Industry: Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems* ("PMTA Guidance") (which was updated in March 2023) that was "intended to assist persons submitting" PMTAs. FDA-BIDI-003323, 003325. Specifically, FDA said it "weighs all of the potential benefits and risks from information contained in the PMTA" to make an APPH determination. FDA-BIDI-003324; *see also* FDA-BIDI-003332 (updated version). During an October 2018 public meeting, FDA similarly described a PMTA review as a "multi-disciplinary approach,"[2] and likewise during an October 2019 public meeting FDA reiterated the "multi-disciplinary" characterization and then described APPH by citing to numerous factors that must be considered (*e.g.*, health risks, marketing plans). FDA-BIDI-003326-27; 003329-30, 003331.

---

[2] FDA, Tobacco Product Application Review Public Meeting, at 119 (Oct. 22, 2018), https://tinyurl.com/w6k59jka.

The PMTA Guidance, which runs over 50 pages, also identifies numerous types of information and data that are considered by FDA as being supportive of an APPH finding. These include, *inter alia*, sales restrictions guarding against underage use, label warnings, health risk studies, toxicological and pharmacological testing, public literature reviews, pharmacokinetic evaluations, and consumer perception and intention studies. FDA-BIDI-003332-40. *See* 21 C.F.R. §1114.7 (listing extensive information and data required for PMTAs); FDA-BIDI-003341-49 (updated version). The following FDA-created diagram depicts the many APPH factors and related disciplines it must consider:[3]

---

[3] Dr. Brian King, Director, FDA Center for Tobacco Products, *FDA's Comprehensive Approach To Tobacco Product Regulation: An Update From FDA's Center for Tobacco Products* (Jan. 29, 2024), https://tinyurl.com/ydm4vje9.



**C.    Toxicology Assessments Are A Key Component Of APPH Review**

The TCA, as well as FDA's rules and guidance, confirm that toxicological information and FDA's evaluation of such data are, in particular, fundamental to any APPH determination.  The TCA itself requires a PMTA to include all information regarding the "health risks" of the ENDS product and "whether such tobacco product presents less risk than other tobacco products" (e.g., combustible cigarettes), including "ingredients [and] additives."  21 U.S.C. §387j(b)(1)(A)-(B).  The final PMTA Rule, in turn, requires information regarding the "health effects" and "toxicological profile" (e.g., genotoxicity, reproductive toxicity, immunotoxicity, and acute and chronic toxicity) of the product, including the "toxicity of the ingredients, additives, and HPHCs"

9

(i.e., harmful and potentially harmful constituents). 21 C.F.R.

§1114.7(k)(1)(i)(A)-(B).

The PMTA Guidance also highlights the significance of a complete

toxicological review. In assessing APPH, FDA states:

> [K]nowing the *full* assessment of the toxicological effects of your
> ENDS (e.g., ingredients, components, use of product) is important
> to assess the health effects on users and nonusers under [Section
> 387j(b)]. As such, FDA assesses the toxicology of the product to
> determine whether product use would have a detrimental effect on
> users' and nonusers' health.

FDA-BIDI-003341 (updated version) (emphasis added). *See also* FDA-BIDI-

003342-43 (recommending a summary in the PMTA of "toxicological testing

outcomes"); 003350 (FDA interpreting Section 387j(b) as requiring

information on "toxicology"); 003351-52 (FDA stating that "[t]o help

understand the health risks of a tobacco product, FDA recommends providing

a full assessment of the toxicological…profile associated with the [ENDS]

including, if available:…Analysis of constituents, including HPHCs and other

toxicants…In vitro toxicology studies (e.g., genotoxicity studies, cytotoxicity

studies); Computational modeling of the toxicants in the product (to estimate

the toxicity of the product); and In vivo toxicology studies.").

Indeed, "TOXICOLOGY" is identified by its own icon in the above

FDA diagram depicting its multi-disciplinary PMTA review process.

10

## IV.    Bidi Vapor LLC

Bidi Vapor was founded by Niraj Patel, a former smoker who quit combustible cigarettes using disposable ENDS.[4]  Having witnessed first-hand the deleterious impact of traditional cigarettes, Mr. Patel left his family's tobacco business in India to start his own venture developing tobacco product alternatives for adult smokers.  *Id.* at ¶¶4-9.  Using his degrees in chemistry and pharmacology, he developed various ENDS technologies culminating in the BIDI® Stick – a high-quality, tamper-resistant, UL-certified disposable ENDS that contains pre-filled e-liquid and uses an innovative sensitivity control system to ensure consistent nicotine delivery.  *Id.* at  ¶¶20-26.  Like all ENDS, the BIDI® Stick Classic does not contain any tobacco leaf material and does not involve the heating or combustion of tobacco.

The BIDI® Stick comes in eleven (11) flavor varieties, with the tobacco-flavored product – the BIDI® Stick Classic – at issue in this case.  As discussed below, there is no indication that minors under 21 years-old are using the BIDI® Stick Classic and FDA has not presented any evidence to the contrary.  That said, from its inception, Bidi recognized the legitimate public health

---

[4] Bidi Stay Mot. (Feb. 2, 2024), Patel Decl. at ¶¶7-8.

concerns over underage ENDS use, and made youth-access prevention, adult-focused marketing, and regulatory compliance its top priorities. *Id.* at ¶¶20-43.

By way of example, Bidi (i) does not market its products to young people (e.g., Bidi does not use social media, hire models or influencers, or advertise on television or radio, or at sporting or entertainment events); (ii) uses only non-descriptive brand names (e.g. Dawn, Gold) to identify products so they do not resemble kid-friendly foods or drinks, or mimic cartoon characters or fruity images; (iii) employs an advanced anti-counterfeiting technology and authentication system; (iv) does not sell BIDI® Sticks directly to consumers via the internet (instead, Bidi relies on a third party vendor who delivers products from local brick-and-mortar stores and employs strict age-gating processes and Prevent All Cigarette Trafficking Act ("PACT Act") compliance measures); and (v) uses packaging containing warnings, instructions, and informational text, including FDA required nicotine addiction warnings. *Id.*

## V.    Bidi's PMTAs, Amendments, And Deficiency Letter Response

Bidi submitted comprehensive PMTAs for its eleven BIDI® Sticks, including the BIDI® Stick Classic, on September 8, 2020. These applications included *in vitro* toxicity testing, e-liquid and aerosol analysis of harmful and potentially harmful chemicals ("HPHCs"), comprehensive scientific literature reviews, comparisons to other tobacco products, hardware safety and battery

12

certification information, manufacturing and quality control details, independent and validated consumer insight surveys, environmental assessments and stability data, as well as details about Bidi's stringent youth-access prevention measures, adult-focused marketing practices, and post-market surveillance strategies.  The submitted PMTAs, including the underlying data, spanned over 285,000 pages combined.  *Id.* at ¶50.

As completing a PMTA is a complex and time-consuming endeavor, FDA's regulations allow manufacturers to submit amendments to a PMTA before FDA makes a final decision on the application.  21 C.F.R. §1114.9. Prior to FDA issuing the MDO in January 2024, Bidi submitted twenty (20) PMTA amendments.  *Id.* at ¶55; FDA-BIDI-00053-56.  These included a consumer insight survey, product pattern of use and likelihood of use studies, updated scientific literature reviews, abuse liability assessments, product stability studies, a consumer perception and behavioral intentions study, aerosol testing results, a toxicological assessment, a nicotine pharmacokinetics and effects study, and, most recently, an update on an ongoing adult smoker switching study.  *Supra* note 4 at ¶55.

On March 20, 2023, FDA sent Bidi a deficiency letter, which identified thirty-two items for the company to address in the PMTA regarding the BIDI® Stick Classic.  FDA-BIDI-000015-41.  21 C.F.R. §1114.25 (allowing deficiency

13

letters).  Bidi filed a comprehensive response on June 18, 2023.  *See infra*.[5]  The

response included extensive additional information and data (i.e., aerosol

testing, *in vitro* studies, an "extractables" study, and a risk assessment)

regarding the benefits of the BIDI® Stick Classic to adult, addicted smokers,

and particularly regarding the product's substantially lower health risks

compared to combustible cigarettes.  *See infra*.

In total, Bidi has spent over $8.2 million compiling the PMTA and

amendments, with $1.6 million of that amount spent on responding to the

deficiency letter.  *Id.* at ¶62.

## VI.    FDA's Marketing Denial Order ("MDO")

On January 22, 2024, FDA issued a marketing denial order ("MDO")

for the BIDI® Stick Classic, FDA-BIDI-000046-56, concluding the product is

not APPH.  21 U.S.C. §387j(c)(2)(A); 21 C.F.R. §1114.33.  The MDO,

however, was based on only three discrete grounds (or alleged deficiencies):

- Bidi relied on test data reported in published literature for aerosol levels
  of harmful and potentially harmful constituents ("HPHCs") in similar
  tobacco-flavored ENDS products that were allegedly insufficient or
  inappropriate for a comparison against HPHC aerosol levels detected in
  the BIDI® Stick Classic.  FDA-BIDI-000047-48 ("Deficiency One")

---

[5] FDA did not include Bidi's response in the administrative record, but counsel
for FDA has confirmed that it falls under footnote 1 of the certified
administrative record index as part of Bidi's PMTA submission.

- Bidi tested for substances (e.g., metals) that might have leached from the BIDI® Stick Classic device and its hardware components into the enclosed, pre-filled e-liquid by testing the product's aerosol using a gas chromatography mass spectrometry ("GC-MS") technique rather than conducting a leachability test using detection methods in addition to GC-MS.  FDA-BIDI-000049 ("Deficiency Two")

- The BIDI® Stick Classic's nicotine levels may lead to continued abuse liability (*i.e.*, risk of addiction) in adult tobacco product users (e.g., smokers) and pose an addiction risk in nonusers (e.g., youth).  FDA-BIDI-000049-50 ("Deficiency Three").

FDA also included in the administrative record an internal staff memo called a Technical Project Lead ("TPL") Review – a document that was not cited in the MDO for support – which purportedly sets forth FDA's rationale underlying the MDO and APPH finding.  FDA-BIDI-000788-855.  FDA argues in the TPL that each deficiency was "independently sufficient" to support the MDO.  FDA-BIDI-000793.

## STANDARD OF REVIEW

When an ENDS manufacturer challenges an MDO, the TCA requires this Court's review be conducted pursuant to the APA, 21 U.S.C. §387*l*(b) (citing 5 U.S.C. §706(2)(A)).  Specifically, the Court must evaluate whether the MDO was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §706(2)(A).  Because Bidi also challenges the lawfulness of the MDO under the TCA itself, the Court must also determine whether the MDO is: (i) in excess of statutory jurisdiction,

15

authority, or limitations, or short of statutory right; (ii) without observance of procedure required by law; or (iii) unsupported by substantial evidence. 5 U.S.C. §706(2)(C)-(E).

Agency action is arbitrary and capricious where it failed to rely on factors Congress intended to be evaluated or consider an important aspect of the problem. *Bidi Vapor*, 47 F.4th at 1202 (citation omitted). An "agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018).

Agency action must also be "reasonable and reasonably explained." *Bidi Vapor*, 47 F.4th at 1202; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must examine relevant evidence and articulate a satisfactory explanation). An agency acts in an arbitrary and capricious manner if it has "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

Moreover, it is arbitrary and capricious for an agency to apply different standards to similarly situated entities without a reasoned explanation. *Burlington Northern and Santa Fe Railway Co. v. Surface Trans. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) (citation omitted). Finally, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must

offer a reason to distinguish them or explain its apparent rejection of their approach." *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (internal quotations marks and citation omitted).

## SUMMARY OF ARGUMENT

1.      This appeal challenges as unlawful Respondent U.S. Food and Drug Administration's ("FDA") marketing denial order ("MDO") issued to Petitioner Bidi Vapor LLC ("Bidi") which prohibits Bidi from selling its tobacco-flavored electronic nicotine device systems ("ENDS") (i.e., electronic cigarette) – branded the BIDI® Stick Classic – in the United States.  Under the Family Smoking Prevention and Tobacco Control Act ("TCA"), ENDS manufacturers must submit detailed premarket tobacco product applications ("PMTA") to FDA and secure market approval before entering or continuing to operate in the marketplace.

2.      Pursuant to the TCA, an ENDS manufacturer must demonstrate its product is "appropriate for the protection of the public health" or "APPH." In making an APPH determination, FDA must engage in a holistic, multi-disciplinary, balancing exercise in which it must weigh all information submitted by the manufacturer.  As set forth in the TCA, as well as FDA's accompanying regulations and guidance, this includes toxicological data

regarding the relative health risks of the ENDS product, and particularly in comparison to risks associated with traditional combustible cigarettes.

3.    The MDO is based on only three purported deficiencies in the PMTA regarding: (i) testing done on the BIDI® Stick Classic's aerosol for harmful and potentially harmful constituents ("HPHCs"); (ii) testing conducted on the product for compounds that could potentially leach from the device into the aerosol; and (iii) nicotine exposure levels.  According to FDA, each discrete deficiency constituted an independent basis for the MDO.

4.    This is the second time Bidi has been forced to seek judicial relief in this Court to ensure FDA fully complies with its obligations under the TCA and the Administrative Procedure Act ("APA").  In the prior case, this Court vacated MDOs issued for Bidi's non-tobacco flavored products because FDA refused to consider all relevant information submitted by Bidi, particularly the aggressive marketing and access restrictions it had implemented to guard against underage use. *Bidi I*, 47 F.4th 1191 (11th Cir. 2022).

5.    Now FDA is at it again.  To begin, FDA concedes it did not conduct a "cycle 2" toxicological review of extensive information and data submitted by Bidi demonstrating that its product is much less risky than combustible cigarettes and is otherwise APPH.  These submissions included: (i) test results comparing the HPHC levels detected in the BIDI® Stick Classic

versus combustible cigarettes and other tobacco products; (ii) *in vitro* studies indicating low overall health risks, including cancer endpoints, of the BIDI® Stick Classic; (iii) an "extractables" study identifying compounds that might leach from the device into the product's e-liquid or aerosol; and (iv) a risk assessment demonstrating the reduced health risks of the BIDI® Stick Classic. FDA did not review or weigh this information; that fact standing alone is sufficient to vacate and remand the MDO.

6.     And it does not get any better.  FDA simply relied on each deficiency to issue the MDO without ever balancing each one against all of the other information in the PMTA relevant to, *inter alia*, the health benefits of the BIDI® Stick Classic – including the toxicological data that should have been considered in the cycle 2 analysis – or showing how each deficiency outweighed such benefits so as to justify issuing an MDO.  That much is clearly required by the TCA, but FDA admitted it did not do so.

7.     And FDA did not stop there.  With regard to the deficiencies themselves, FDA ignored comments and evidence submitted by Bidi addressing the alleged shortcomings or otherwise dismissed them in conclusory fashion, and wholly contradicted its own findings.  In one instance, FDA abandoned its prior policy, which had been applied to other manufacturers when granting marketing approval for tobacco-flavored products, that

permitted nicotine exposures on par with combustible cigarettes to promote switching by smokers to less dangerous ENDS.  Now, any abuse liability means that FDA will issue an MDO, an absurd result under a statute that aims to move addicted adult smokers to less risky tobacco products.  FDA never even acknowledged, let alone justified, such a drastic shift in policy.

8.    Finally, in an effort to avoid the TCA's notice and comment rulemaking requirements, FDA relied on the deficiencies to effectively impose "tobacco product standards" on Bidi regarding testing protocols and nicotine yields.  Such standards may only be established by following rigorous notice and other procedures put in place to protect stakeholders, including the regulated community.  FDA cannot circumvent these provisions under the pretext of an APPH review.

9.    Based on the foregoing, FDA violated the TCA and APA, and otherwise proceeded in an arbitrary, capricious, and unlawful manner.

## ARGUMENT

### I.    An MDO Must Be Vacated And Remanded Where It Is Not Based On A Holistic Review Of The PMTA, Failed To Consider All Relevant Data And Information In The PMTA, Or Enforced A Tobacco Product Standard That Was Not Adopted Through Notice and Comment Rulemaking

FDA based the MDO on three discrete deficiencies without ever engaging in a multi-factored and multi-disciplinary analysis that weighed and

balanced, particularly in the context of those deficiencies, the potential benefits of the BIDI® Stick Classic when making its APPH determination.  To make matters worse, FDA outright ignored significant information and data submitted by Bidi, including responses to FDA's deficiency letter, that were directly relevant to the alleged deficiencies and APPH finding, or otherwise failed to explain FDA's consideration of such material.  And FDA cut corners in violation of the TCA's plain language when it effectively imposed "tobacco product standards" on Bidi, such as product testing standards and nicotine restrictions, without going through statutorily required notice and comment rulemaking.  Each of these shortcomings, standing alone or together, are grounds for vacating and remanding the MDO.  5 U.S.C. §§706(2)(A), 2(C)-(E); *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013) (when agency exceeds power delegated by Congress it acts *ultra vires*).

Indeed, the D.C. Circuit recently held as much when vacating an MDO issued against another tobacco-flavored ENDS product.  In *Fontem US, LLC v. FDA*, 82 F.4th 1207 (D.C. Cir. 2023), the Court considered an MDO that, like the one issued to Bidi, relied on discrete deficiencies to find that Fontem's tobacco-flavored ENDS product was not APPH.  *Id.* at 1213.  Significantly, in describing FDA's burden under the TCA, the D.C. Circuit held FDA must: (i) "engage in [a] holistic public health analysis"; (ii) "account [for] the potential

21

benefits of unflavored [*i.e.*, tobacco-flavored] products or weigh those benefits against risks to the public health"; (iii) "make a single predictive judgment whether a given tobacco product, on balance, will benefit the public as a whole"; (iv) "consider *both* the 'risks and benefits' of the product" and the "overall effect of a product for the 'population as a whole'" (emphasis in original); (v) "engage in a high-level balancing test as to the overall public health consequences"; and (vi) "make an all-things-considered judgment" as to whether a produce is APPH. *Id.* at 1211, 1215, 1218.

Moreover, the D.C. Circuit held that FDA "should generally be concerned with the most epidemiologically significant factors associated with approving the marketing of a new product." *Id.* at 1215. Specifically, FDA must pay careful attention to "balance[ing] the benefits of transitioning existing smokers to the product against the costs of inducing non-smokers to take up smoking." This is so as "[w]eighing the relative risks of new tobacco products will often be central to the public health analysis given the reality that there are both many smokers who wish to stop smoking and many individuals who do not presently consume tobacco products at all." *Id.* In other words, FDA cannot ignore evidence relevant to one side of the equation: the benefits to addicted adult smokers. FDA "must analyze the tradeoffs necessary to make a public health finding…[and] explain how the specific deficiencies relate to its

22

overall conclusion that [the applicant] failed to demonstrate its unflavored [i.e., tobacco-flavored] products were" APPH. *Id.* at 1217.

Finally, the *Fontem* court made clear that FDA cannot, under the guise of an APPH review, do an end-run on the TCA's provisions governing the promulgation of tobacco product standards. Specifically, FDA may promulgate standards through notice and comment rulemaking which set uniform rules that govern, *inter alia*, the composition of tobacco products, including nicotine yields and reductions in product constituents or ingredients, as well as provisions for the testing and measurement of the tobacco product. 21 U.S.C. §387g(a)(4). FDA may also, separate and apart from a finding that a product is not APPH (*see* 21 U.S.C. §387j(c)(2)(A)), issue an MDO if a product or manufacturer violates a tobacco product standard. 21 U.S.C. §387j(c)(2)(D); *Fontem*, 82 F.4th at 1218-19 ("The failure to conform to such a standard is another independent ground for denying an application.").

But what FDA cannot do is effectively impose a tobacco product standard that was never adopted through notice and comment rulemaking unless it "explain[s] how the deficiencies relate to the overall public health consequences" of the tobacco-flavored product, including the "potential benefits of [the product] for the public at large…[and] the possibility that existing users of combustible tobacco products such as cigarettes would reap

health benefits by transitioning to…vaping products." *Fontem*, 82 F.4th at 1219 ("FDA cannot impose regulatory requirements through its authority to make public health findings."). In other words, an MDO cannot simply rest on "highly technical deficiencies" without demonstrating that they tip the scales in an APPH analysis. *Id.*[6]

Taking these statutory factors into account, the D.C. Circuit vacated the MDO as to Fontem's tobacco-flavored ENDS product because FDA, while it identified several deficiencies going to the "physical properties" of the products, failed to consider them in the overall context of an APPH finding. *Id.* at 1217, 1219. For example, one purported deficiency included a failure to provide sufficient information regarding the safety of the product, particularly the need for aerosol testing. *Id.* at 1213. FDA demanded information regarding "quantities of certain compounds" that could result in the "emission of harmful chemicals." *Id.* at 1219-20. Although Fontem had produced evidence showing its aerosol concentrations were much lower than

---

[6] When establishing a tobacco product standard, FDA must also comply with additional requirements, such as considering the "technical achievability of compliance," accounting for any comments submitted by the Tobacco Products Scientific Advisory Committee ("TPSAC"), weighing any adverse impacts that could result for adult tobacco users, and providing sufficient time for manufacturers to comply. 21 U.S.C. §§387g(b)(1)-(2), (d)(1)-(2); *Fontem*, 82 F.4th 1219-20. These provisions were put in place to provide "notice and predictability for manufacturers." *Fontem*, 82 F.4th at 1219.

combustible cigarettes, FDA wanted more aerosol data. *Id.* at 1213, 1220. But FDA "did not explain why this deficiency was sufficiently serious to outweigh any benefits associated with Fontem's products across the population as a whole." *Id.* at 1220. Nor did it "acknowledge, must less analyze, these benefits…[or] suggest how the harms…were so risky as to outweigh these benefits." *Id.*

Similarly, another deficiency criticized the lack of information regarding "puffing regimens" and "toxicant yields" whereby "higher puff counts could increase the heater coil temperature, thus resulting in higher toxicant" levels. *Id.* (internal quotations omitted). Although Fontem had provided evidence of the conservative approach it had taken when measuring aerosol concentrations (i.e., its puffing regimens), FDA was worried users could still operate the device in ways that increased exposures to harmful constituents. *Id.* at 1213, 1220. But FDA failed to explain how "negative consequences associated with toxicant yields or aerosol temperature were so serious as to outweigh the asserted benefits of Fontem's products." *Id.* at 1220.

Instead, as to those two deficiencies, what FDA had done was impose tobacco product standards that had not gone through required notice and comment proceedings. If FDA "wishes to prescribe uniform rules requiring "aerosol constituent testing" or "require the testing of tobacco products," it

25

must promulgate regulations.  *Id.* (internal quotations omitted) ("The failure to meet such a standard would be a ground for denying the application, and no public health balancing would be necessary.").  However, "because the FDA has not promulgated such regulations and instead has chosen to evaluate Fontem's application on public health grounds, it must consider *all* the relevant public health considerations, including the benefits of the product."  *Id.* (emphasis in original).

Finally, in yet another deficiency, FDA complained that Fontem had not provided "sufficient information…[regarding] the names, accreditation, and specifications of certain laboratories used by Fontem" for its quality control testing.  *Id.*  As the Court put it, these "may or may not be legitimate concerns, but they do not reflect the required statutory balancing for denying an application on public health grounds.  The agency did not balance its concerns against the potential benefits of Fontem's products.  Nor did [FDA] explain why these deficiencies were so serious as to justify a finding that Fontem had not shown its products would be" APPH.  *Id.* at 1220-21.[7]

---

[7] The *Fontem* court also noted that FDA, if it wanted to issue an MDO based solely on the lack of laboratory and testing information, and without any further public health balancing, was required to adopt a "good manufacturing standard" through notice and comment rulemaking.  82 F.4th at 1220; 21 U.S.C. §387j(c)(2)(B); 21 U.S.C. §387g (good manufacturing standards).

As discussed below, FDA failed, as it did in *Fontem*, to explain how the discrete deficiencies identified in the MDO outweighed the substantial benefits of the BIDI® Stick Classic to addicted adult cigarette smokers and otherwise ignored relevant information and data in Bidi's PMTAs. Instead, FDA relied on the three purported discrepancies to simply bypass the TCA's provisions governing tobacco product standards.

## II. FDA Concedes It Did Not Conduct A "Cycle 2" Toxicological Review And For That Reason Alone The MDO Must Be Set Aside

FDA admits in the TPL that it did not complete a "cycle 2" toxicological review. FDA-BIDI-000795-96, -000829. A cycle 2 review is conducted after a manufacturer responds to an FDA deficiency letter and, in particular, evaluates any additional information submitted by the applicant in response to the alleged deficiencies.[8] FDA further concedes in the TPL that the "TPL review…does not include a toxicological evaluation of the new product and does not rely on *any* toxicological findings." FDA-BIDI-000795 (emphasis added); *see* FDA-BIDI-000829 ("in the absence of a cycle 2 toxicology review, this TPL review cannot draw final conclusions with respect to the toxicant posed by the new product."). The TPL does not even identify a cycle 2

---

[8] Department of Health and Human Services, Office of Inspector General, *The Food and Drug Administration Needs To Improve The Premarket Tobacco Application Review Process For Electronic Nicotine Delivery Systems To Protect Public Health* (Nov. 8, 2023), at 6, 10. *See* https://tinyurl.com/jy5fny3b.

reviewing toxicologist.  FDA-BIDI-000796.  Under this Court's precedent, the absence of such a cycle 2 analysis is fatal to the MDO.

Specifically, when previously vacating MDOs issued by FDA for Bidi's non-tobacco flavored ENDS products, this Court held that "agency action is lawful only if it rests on a consideration of relevant factors" and that "[n]ormally an agency rule would be arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem."  *Bidi I*, 47 F.4th at 1202 (citations and internal quotations omitted).  To determine what relevant factors an agency must consider, this Court looks to the underlying statute, associated regulations, and agency guidance.  *Id.* at 1202-03.

This Court noted in *Bidi I* that the TCA, the final PMTA Rule, and various guidance stressed the importance of marketing and access restrictions implemented by a manufacturer to the question of whether a particular ENDS product posed a risk to underage consumers.  *Id.*  However, FDA admitted in the MDOs and TPLs that it did not consider the extensive focus on youth marketing and access prevention.  47 F.4th at 1203; *supra* at 12.  This Court therefore concluded that because "the marketing and sales-access-restriction plans were relevant factors and addressed an important aspect of the problem…it was arbitrary and capricious for [FDA] not to consider them."  *Bidi I*, 47 F.4th at 1203 (citation and internal quotations omitted).

28

The same holds true here.  Under the TCA, the final PMTA Rule, and PMTA Guidance, FDA must conduct a toxicology review when making an APPH determination.  This includes an assessment of the BIDI® Stick Classic's aerosol for HPHCs and other constituents that might pose a risk, as well as other data that inform the product's toxicological profile, such as *in vitro* studies.  Importantly, this must also involve a comparison of the toxicological risks of combustible cigarettes versus the risks of partially or fully switching to an ENDS product.  *Supra* at 21-23; *Fontem*, 82 F.4th at 1215 (requiring consideration of the benefits to adult smokers who switch).

In response to FDA's deficiency letter, Bidi submitted additional data and information demonstrating the substantially lower health risks of the BIDI® Stick Classic when compared to combustible cigarettes.  *First*, Bidi conducted aerosol testing under non-intense and intense puffing conditions over the lifespan of a BIDI® Stick Classic for all HPHCs identified in FDA's deficiency letter for evaluation, as well as three additional tobacco specific nitrosamines.  FDA-BIDI-003359.  Specifically, Bidi tested for exposures to base e-liquid ingredients, potential heat degradation byproducts, contaminants or impurities, and potential leachable compounds from the device's coil components, and then measured them against levels typically found in cigarettes.  FDA-BIDI-003365-76.

29

As reported by Bidi, "overall decreases in the number and levels of HPHCs measured in the BIDI® Stick Classic aerosols compared to cigarette smoke indicate that switching to the BIDI® Stick Classic is likely to result in lower toxicant exposures and associated health risks compared to smoking cigarettes." FDA-BIDI-003359-60. In particular, the aerosol testing demonstrated substantial reductions in the majority of constituents found in the BIDI® Stick Classic when compared to combustible cigarette smoke, with most reduction percentages reaching close to 100% for both cancer and non-cancer (respiratory, cardiovascular, reproductive, and developmental) hazards. FDA-BIDI-003367-83.

And the overall number of HPHCs detected in the BIDI® Stick Classic's aerosol was far lower than those which would typically be found in cigarette smoke given that ENDS devices do not burn or combust tobacco leaf or other materials (e.g., paper, filler) that result in hazardous constituents, like polycyclic aromatic hydrocarbons ("PAHs"). FDA-BIDI-003376-77. For that additional reason, "switching from combusted cigarettes to the BIDI® Stick Classic is likely to also result in substantial reductions in PAH exposures and associated health risks compared to continued smoking." FDA-BIDI-003377.

*Second*, Bidi conducted non-clinical *in vitro* studies for cytotoxicity (i.e., cell death) and a battery of *in vitro* genotoxicity (i.e., cancer endpoint) studies

using aerosols generated from the BIDI® Stick Classic under non-intense and intense puffing conditions, and measured against toxicological endpoints in combustible cigarettes and comparable ENDS products.  FDA-BIDI-003396-003416.  The data showed that the BIDI® Stick Classic: (i) was "substantially less cytotoxic" compared to cigarette smoke and similar to aerosols from other ENDS products (FDA-BIDI-003396-97; (ii) was "negative" at all doses tested for mutagenicity (i.e., cancer endpoint) in one assay, while the comparator cigarette product was "positive" (FDA-BIDI-003399-003400; and (iii) was "equivocal" for genotoxicity under non-intense puffing conditions in another assay (which was similar to ENDS comparators), whereas the comparable combustible cigarette was "positive."  FDA-BIDI-003401.  Although another assay revealed a "positive" result for genotoxicity under intense puffing, that also held true for combustible cigarette and ENDS comparators.  FDA-BIDI-003403.  Therefore, the *in vitro* studies demonstrated that, even if there is information or data missing regarding specific HPHCs or other constituents (as is alleged by FDA in the MDO), the BIDI® Stick Classic presents an overall lower risk profile than combustible cigarettes and is no less risky than comparable ENDS.

*Third*, Bidi conducted an "extractables" study.  Specifically, Bidi used various solvents (e.g,. Isopropanol) to assess the potential for constituents to

leach from device parts coming into contact with the e-liquid and aerosol, as well as artificial saliva to detect leachables from the device's mouthpiece that may result from exposure to a user's mouth or saliva.  FDA-BIDI-003417-25. These tests employed multiple analysis methods, including Gas Chromatography-Mass Spectrometry ("GC-MS"), Liquid Chromatography-Mass Spectrometry ("LC-MS"), Inductive Coupled Plasma Mass Spectrometry ("ICP-MS"), and Headspace Gas Chromatography-Mass Spectrometry ("HS-GC-MS").  FDA-BIDI-003422-23.  Bidi evaluated for volatile ("VOC") and semi-volatile ("SVOC") compounds, non-volatile compounds (NVOCs), metals, and residual solvents.  FDA-BIDI-003424.  The solvent-based tests on device parts represented an aggressive approach to maximize potential compound extraction, and thus may have revealed a broader range of leachables than would be seen under real-world conditions.  The artificial saliva was designed to simulate more realistic exposures when a user comes into contact with the mouthpiece.  FDA-BIDI-003424-25.  As to the latter, the testing results suggested "that the risk of significant leachables reaching the user during real-world usage is low."  *Id.*

*Fourth*, in response to the deficiency letter, Bidi conducted a comprehensive risk assessment that evaluated multiple lines of evidence, including the HPHC aerosol and *in vitro* testing summarized above, as well as

32

an e-liquid ingredient assessment and an analysis of potential thermal

degradation products and leachables in the BIDI® Stick Classic aerosol.  FDA-

BIDI-003426-37.  This risk assessment concluded:

> This evaluation demonstrated that ingredients and leachables
> present a lower toxicological concern than combustible cigarettes.
> The potential hazards identified for compounds in the non-targted
> analysis of the aerosol generated from BIDI® Stick Classic, which
> comprises less than 0.1% of the aerosol are balanced by the
> significant reduction (up to 100%) of the targeted HPHCs
> comparted to combustible cigarette smoke.  Furthermore, thermal
> degradant HPHCs that are released in the aerosol do not present a
> significant toxicological concern under typical use or heavy use
> scenarios.  Lastly, aerosol hazard identification comparisons for
> the BIDI® Stick Classic (i.e., product as a whole) was also
> evaluated *in vitro* studies of aerosols generated from BIDI® Stick
> Classic, which demonstrate fewer comparative identified hazards
> relative to cigarette smoke.

FDA-BIDI-003435.

In the final analysis, Bidi's assessment of the "potential toxicological

concern of ingredients and leachables in the aerosol of BIDI® Stick Classic

provide[] sufficient evidence" to conclude that the product is APPH.  *Id.*

Yet, astonishingly, FDA never considered the full import of this

additional information as, by FDA's own admission, it did not conduct a cycle

2 toxicology review.  In doing so, FDA violated the TCA, as well as its own

PMTA regulations and guidance, by failing to consider *all* evidence contained

in a PMTA and amendments through a multi-disciplinary, balancing approach

when making its APPH determination.  *Supra* at 4-10.  FDA further ran afoul

of the APA and this Court's decision in *Bidi I* when it did not assess toxicological testing results and a risk assessment, all demonstrating the BIDI® Stick Classic is far less risky than combustible cigarettes (and no more risky than comparable ENDS products). And FDA, as discussed below, overlooked the teachings of *Fontem*, never weighing each alleged deficiency against these reported benefits to addicted smokers. *Supra* at 21-27.

FDA admits in the TPL that, without a cycle 2 toxicological review, it could not form any conclusions regarding the toxicant exposure to BIDI® Stick Classic users and that it did not, in fact, base its APPH finding on *any* toxicological findings. But then FDA blindly moved ahead and issued the MDO. This constitutes a wholesale failure on FDA's part to consider patently relevant evidence. Accordingly, the MDO is arbitrary and capricious, as well as unlawful, and must be vacated on this fact alone.

## III.   Deficiency One

FDA requested data showing whether HPHC levels in the BIDI® Stick Classic's pose greater or lower risk than comparable ENDS products. FDA-BIDI-000047-48. Bidi selected comparator tobacco-flavored ENDS products that were either the subject of peer-reviewed and published studies, or part of government-funded studies, which all reported HPHC levels for those

products.[9]  This also included HPHC levels for a standardized research electronic cigarette ("SREC") product that was developed by NJOY, Inc., an ENDS manufacturer, and the National Institute on Drug Abuse ("NIDA"), a federal scientific research body that comprises, in part, the National Institutes of Health, and is a component of the U.S. Department of Health and Human Services ("HHS") (as is FDA).  FDA-BIDI-000047; FDA-BIDI-003440.

In the MDO, FDA argued the published HPHC aerosol data lacked certain information (such as puffing regimens) or used different aerosol testing parameters than those used by Bidi for testing its own product, and thus could not be used to compare against HPHC levels for the BIDI® Stick Classic. FDA-BIDI-000047-48.  As a result, FDA argued that Bidi could have instead conducted its own aerosol testing on comparable ENDS products.  FDA-BIDI-000048.  FDA maintained that without such comparator HPHC data it could not determine whether the BIDI® Stick Classic is APPH, thus warranting an MDO.  FDA-BIDI-000046.  FDA is wrong on all counts.

---

[9] It is important to note that FDA provides no criteria or guidance for how many comparator products an applicant can select to include in its PMTA. That decision is within the discretion of the applicant.

### A.    FDA Did Not Explain How Deficiency One Outweighs Demonstrated Benefits Of The BIDI® Stick Classic

FDA failed to demonstrate how the deficiencies regarding the HPHC comparisons outweigh the benefits of the BIDI® Stick Classic or otherwise tip the scales in favor of an MDO.  As held in *Fontem*, it is not sufficient for FDA to simply rely on technical deficiencies in a PMTA, particularly those that do not even go to the key issue of whether the subject product presents less risk than combustible cigarettes.  *Supra* at 22-27.

In the *Fontem* matter, FDA claimed it lacked information regarding HPHCs in the company's products, and therefore required additional aerosol testing before it would grant marketing approval, and argued it also needed more information on "puffing regimens" that could impact HPHC levels. *Fontem*, 82 F.4th at 1219-20.  Likewise, FDA argues in Bidi's case that it did not have enough HPHC data to compare the BIDI® Stick Classic to other ENDS or information on testing protocols (including puffing regimens) and, if such information was not available in the public literature, it could not make an APPH determination unless Bidi tested the comparators themselves using the same protocols it used when testing the BIDI® Stick Classic.  FDA-BIDI-000047-48. In fact, FDA then imposed even more specific requirements on

Bidi by listing numerous types of product information that must be provided (e.g., storage conditions prior to testing).  FDA-BIDI-000048.

However, the *Fontem* court found that this type of deficiency, without more, cannot independently justify an MDO.  Fontem had provided evidence that HPHC levels in its products were substantially lower than combustible cigarettes.  But FDA "did not acknowledge, must less analyze, these benefits, nor did it suggest how the harms [of higher HPHC levels] were so risky as to outweigh these benefits."  82 F.4th at 1220.  Similarly, FDA never conducted a cycle 2 toxicology review of Bidi's PMTA, nor did it consider extensive evidence submitted by Bidi that HPHC levels in the BIDI® Stick Classic are far lower than those found in combustible cigarettes or that, overall, Bidi's product presents far less health risks than smoking cigarettes (and no more than comparable ENDS).  *Supra* at 29-34.  FDA was obligated under the TCA to balance all of this information, much of it new, and explain why the deficiency "was so serious to outweigh any benefits associated with [Bidi's] products across the population as a whole."  *Id.*  Yet FDA did not do so.

**B.    FDA Effectively Imposed A Tobacco Product Standard Governing Product Testing Without Notice And Comment Rulemaking**

If FDA wishes to require "aerosol constituent testing," the "testing of tobacco products," or "specific tests to determine puff counts," it "may do so

by promulgating a tobacco product standard." *Fontem*, 82 F.4th at 1220 (internal quotations omitted) (citing 21 U.S.C. §387g(a)(4)). Indeed, the TCA permits FDA to establish "provisions for the testing…of the tobacco product" and "provisions for the measurement of the tobacco product characteristics of the tobacco product." 21 U.S.C. §387g(a)(4)(B)(ii)-(iii).

In *Fontem*, FDA cited a lack of aerosol data and required the company to conduct additional aerosol testing before granting marketing approval. 82 F.4th at 1219-20. FDA further argued that Fontem had failed to provide sufficient information about the "puffing regimens used to determine toxicant yields" under certain operating conditions. *Id.* at 1220 (internal quotations omitted). But because FDA had not established tobacco product standards governing such testing requirements through notice and comment proceedings, it could not impose them on Fontem through an MDO without first balancing the purported deficiencies against the product's benefits. *Id.*

The same analysis applies here. In Deficiency One, FDA argued Bidi had to produce additional HPHC aerosol testing results for comparable ENDS and that it was likely Bidi would have to conduct its own testing because HPHC results in published literature were purportedly unreliable. FDA also complained Bidi did not provide certain information regarding the HPHC testing done on the ENDS comparators (e.g., puffing regimens), and that those

products were tested using different puffing protocols and techniques.  FDA then listed numerous items that Bidi would be required to report for any additional comparator testing Bidi did itself.  FDA-BIDI-000047-48.

But that is simply imposing tobacco product standards on Bidi without meeting notice and procedural requirements of the TCA.  Indeed, as shown above, FDA never explained how these alleged deficiencies outweigh all of the benefits associated with using the BIDI® Stick Classic, including those to addicted adult smokers.  And this stems in part from FDA's failure to conduct a "cycle 2" toxicology review of Bidi's HPHC aerosol testing on the BIDI® Stick Classic, *in vitro* studies, and risk assessment.  Accordingly, the MDO is unlawful as it merely rests on a discrete technical deficiency.

### C.    Deficiency One Is Arbitrary and Capricious

Bidi concluded in its response to FDA's deficiency letter that "[o]verall, the comparisons of HPHCs from the BIDI® Stick Classic and other ENDS products indicate the levels of measured constituents in aerosols of the BIDI® Stick Classic (Table 2) are within those reported for the ENDS product category (tobacco-flavored e-liquids)."  FDA-BID-003442.  Again, FDA argued that aerosol data for comparator products that were taken from published literature lacked certain evidence or used different aerosol testing

parameters and thus could not be used to compare against HPHC levels in the BIDI® Stick Classic.  FDA-BIDI-000047-48.  The record indicates otherwise.

*First*, FDA claimed in the MDO that data for comparator JUUL tobacco-flavored products used a different aerosol collection protocol than was used for the BIDI® Stick Classic.  Specifically, aerosol for the JUUL products was limited to 50 machine puffs while laboratory testing on the BIDI® Stick Classic consumed at least 90 percent of the product – i.e., more than 50 puffs.  According to FDA, the limited puff regime for the JUUL products resulted in certain HPHCs not being found above the detection limit – i.e., raising the question in FDA's mind whether those HPHCs would have been detected in some amount if the JUUL products had been tested at a higher puff count.  FDA-BIDI-000047.

FDA never explained, however, how the difference in puff regimes could change Bidi's conclusion that there were no material differences in the HPHC levels between the comparator ENDS products and the BIDI® Stick Classic.  Specifically, FDA never addressed Bidi's common sense observation in its response to the deficiency letter that the JUUL data based on a limited 50 puff regime could only "underestimate" the HPHC yields, and thus by using such data Bidi took a conservative approach.  FDA-BIDI-003441.  If the JUUL devices had been subjected to a testing protocol that consumed all of the

40

device's e-liquid via a higher puff count, HPHCs not detected at the 50 puff count may have been detected and thus the comparator product could conceivably present additional risk. But this would only further support Bidi's conclusion that the BIDI® Stick Classic is no more risky than the JUUL products (i.e., it would only further demonstrate that the BIDI® Stick Classic presents relatively less risk). Bidi therefore took a conservative approach, but FDA completely ignored this point.

*Second*, FDA in conclusory fashion complained that the study reporting aerosol testing results for the JUUL products "lacked method description or protocols." FDA-BIDI-000047. Not true. FDA never acknowledged in the MDO or TPL the detailed method description and information related to method validation provided in the cited publication – *Targeted Characterization of the Chemical Composition of JUUL Systems Aerosol and Comparison with 3R4F Reference Cigarettes and IQOS Heat Sticks* (Chen et al. 2021) – in both the methods section and supplemental tables. FDA-BIDI-01722-1738.

For example, Chen et al. states that, "Both Labstat International ULC and Enthalpy Analytical were International Organization for Standardization (ISO) 17025 accredited at the time of this study. All analytical methods were validated for the analysis of ENDS aerosol according to ICH guidance Q2 (R1) with the exception of gold and carbon monoxide [39]. Method validations

41

included an assessment of accuracy, precision, repeatability, intermediate precision, specificity, detection limit, quantitation limit, linearity, and recovery from the trapping systems.  All method validations were reviewed by an independent accreditation body as part of the ISO 17025 accreditation process."  FDA-BIDI-001724.  Further, Chen et al., in its Supplementary Methods Tables available online, provide information on "Method of Capture", "Analysis Method", "Instrument", "Method Reference Code", and "ISO17025 Status", the "Method level of detection (LOD), and level of quantitation (LOQ)."[10]  But FDA never explained, or even mentioned, in the MDO or TPL how this information was insufficient.

*Third*, as to other comparable ENDS products (i.e., Apollo Classic Tobacco, BLU Classic Tobacco, Ever Smoke Classic Tobacco, and South Beach Smoke Classic Tobacco), FDA generally claimed the "aerosol constituents were collected using different puffing regimens, puffing life cycle, and puffing machine than the [BIDI® Stick Classic] aerosol study, and thus cannot be reliably and consistently compared to the aerosol yield data for the [BIDI® Stick Classic]."  FDA-BIDI-000047.  FDA also stated that Bidi should

---

[10] These tables can be found at https://www.mdpi.com/article/10.3390/separations8100168/s1.

have provided data from published literature using similar puffing life cycle, puffing regimens, and puffing machines.  FDA-BIDI-000048.

Again, FDA disregarded relevant information and comments in Bidi's response to FDA's deficiency letter.  For these products, Bidi relied on aerosol HPHC data provided in the El-Hellani et al. (2018) study, *Nicotine and Carbonyl Emissions From Popular Electronic Cigarette Products: Correlation to Liquid Composition and Design Characteristics*, which was funded by FDA's Center for Tobacco Products ("CTP") and HHS's NIDA.  FDA-BIDI-001820-1828.  In its deficiency response, Bidi explained that "[a]erosol collection in…El-Hellani et al. (2018) was conducted using a slightly modified non-intense puffing regimen (1.5 L/min puff velocity, 4s puff duration and 10s duration), and the HPHC yields were measured from a 15-puff session.  Since the difference in the puff duration between the study by El-Hellani et al. (4 second puff) and the standard ISO non-intense puffing (3 second puff) is minimal (1 second) [used to collect BIDI® Stick Classic data], the difference in puffing topography is not likely to have a measurable impact on the aerosol chemistry, and thus does not preclude the use of this study to inform the comparison of HPHC yields measured in the BIDI® Stick Classic relative to the ENDS products in the study by El-Hellani et al. (2018)."  FDA-BIDI-003441.

43

However, nowhere in the MDO or TPL did FDA explain *why* the testing protocols and results for the comparator products cited by Bidi prevented a comparison of aerosol HPHC levels with the BIDI® Stick Classic. In fact, the minor difference in puffing conditions (1 second) for the products tested by El-Hellani et al. (2018) and the BIDI® Stick Classic is immaterial. FDA did not provide a rationale for how this could change Bidi's conclusion that there were no material differences in the HPHC levels between the comparator ENDS products and the BIDI® Stick Classic.

Also worrisome is the fact that the MDO and TPL never addressed Bidi's scientific justification provided in its deficiency letter response that the HPHC yields for the product aerosols evaluated by El-Hellani et al. were *underestimated* because they were based on a 15-puff session, whereas the BIDI® Stick Classic data were based on puffing the entire product (over 200 puffs).  FDA-BIDI-003441.  Thus, like the JUUL ENDS data described above, use of the aerosol chemistry data reported by El-Hellani et al., a study funded by FDA's own CTP and HHS's NIDA no less, provided a conservative approach for comparing potential health risks from the BIDI® Stick Classic relative to ENDS comparator products, a point FDA completely overlooked.

*Fourth*, the MDO complained as to the SREC ENDS product that Bidi did not furnish certain information about the HPHC testing results, such as

44

analytical method protocols, the name of the testing laboratory and accreditation, or puffing regimens or counts.  FDA-BIDI-000047; *see Fontem*, 82 F.4th at 1220-21 (rejecting such grounds, including allegedly missing laboratory information, as justifying an MDO).  As pointed out by Bidi in its deficiency letter response, the SREC product was developed by the federal government, with NIDA (an arm of HHS) actually publishing the aerosol chemistry data.  FDA-BIDI-003440.  Moreover, the HPHC data on the SREC were collected using the same standardized, non-intense puffing conditions used for the BIDI® Stick Classic, a point never addressed by FDA.  *Id.*  Thus, it was entirely reasonable for Bidi to conclude that the SREC data were reliable and appropriate for purposes of comparison.  *Id.*  It strains all credulity for FDA to now claim it cannot "determine that the test data are accurate and reliable as comparative data," FDA-BIDI-000047-48, data which were generated and published by a sister HHS health agency.

*Fifth*, the MDO argued that "[f]or all comparison ENDS data, [Bidi] did not provide analytical method validation information."  FDA-BIDI-000048.  As Bidi observed in its deficiency response, however, full validation reports are not included in published literature or government databases.  FDA-BIDI-003438.  Indeed, full validation reports for analytical methods are in fact a laboratory's proprietary information that would not be publicly reported.  The

45

deficiency letter also demanded additional information regarding comparables that would not be available to third parties, such as the "length of time between date(s) of manufacture and date(s) of testing." *Id.*  Thus, by demanding such information, FDA "has forclosed [Bidi's] opportunity from choosing to use scientific literature in lieu of conducting additional and costly studies" to provide comparable ENDS data. *Id.*  This, despite the fact the PMTA Guidance encourages applicants to rely on "data from the published literature or government-sponsored databases."  FDA-BIDI-003443.  Yet, despite Bidi's comments, FDA never addressed these issues.

*Lastly*, FDA treated Bidi differently than other manufacturers.  For instance, FDA allowed NJOY to use published literature as a source of aerosol data for ENDS comparator products when granting marketing authorization for NJOY's tobacco-flavored ENDS product.  FDA-BIDI-003344.  But FDA never explained why it is now effectively foreclosing the use of published literature when such an approach was previously accepted as to NJOY.

In short, FDA repeatedly ignored evidence and comments submitted by Bidi in the record, and otherwise treated Bidi differently than other similarly situated manufactures.  The MDO must be vacated as to Deficiency One.

## IV.   Deficiency Two

FDA requested that Bidi conduct tests for potentially hazardous substances (e.g., metals) that may leach from the device and its hardware components into the enclosed, pre-filled e-liquid.  FDA-BIDI- 000049.  Bidi instead analyzed aerosol from the BIDI® Stick Classic, not the e-liquid itself, for leachable substances and explained in its deficiency response that this approach would better assess risks to consumers – i.e., it is the aerosol that users are ultimately exposed to during product use, not the enclosed e-liquid. If compounds that leach into the e-liquid do not transfer to aerosol, there is no risk to the user.  FDA-BIDI-003445.  FDA did not dispute this approach.

In the MDO, however, FDA argued that Bidi used a detection method (i.e., GC-MS) that only captures VOCs and some SVOCs, but would not identify additional SVOCs, NVOCs, and thermally labile compounds in the aerosol.  FDA stated that Bidi, to fully characterize all potential leachables, should have used additional MS-based techniques and, in the deficiency letter, required the following:  HS-GC-MS, ICP-MS, and LC-MS.  FDA-BIDI-003419.  FDA's rationale once again falls short.

### A.   FDA Failed To Explain How Deficiency Two Outweighs Proven Benefits Of The BIDI® Stick Classic

Nowhere in the MDO or TPL did FDA justify how this technical deficiency somehow outweighs evidence of the BIDI® Stick Classic's

47

significant benefits as presented in Bidi's deficiency response.  In *Fontem*, FDA faulted the company for not providing information regarding the safety of the product, and in particular data on levels of harmful chemicals or toxicants produced under certain operating conditions.  82 F.4th at 1220.  But FDA did not consider the reduced risk profile that Fontem's product offered over combustible cigarettes or explain how the harms presented by any additional substances were serious enough to outweigh those benefits.  *Id.*

So too as to Bidi.  FDA could not have balanced the additional aerosol and *in vitro* data, or the overall risk assessment, submitted in Bidi's deficiency letter response against the technical shortcomings alleged in the MDO because it never did a cycle 2 toxicology review.  Indeed, there is no indication in the MDO or TPL that the favorable risk profile of the BIDI® Stick Classic was considered in the context of purportedly missing leachable data.  And as discussed below, this also holds true as to the extractables study conducted by Bidi which employed all of the additional MS-based methods requested by FDA and was designed to detect leachables from the device as well as components coming into contact with the user.  *Supra* at 31-32.  Under the TCA, FDA was obligated to do more.

**B.    FDA Essentially Adopted A Tobacco Product Standard For Leachability Studies Without Notice And Comment Rulemaking**

In the deficiency letter, FDA ordered Bidi (i.e., "provide the following…") to assess potential leachables using MS-based detection methods in addition to GC-MS, including HS-GC-MS, ICP-MS, and LC-MS.  FDA-BIDI-003419.  But this is nothing more than a tobacco product standard as it establishes "provisions for the testing…of the tobacco product" and "provisions for the measurement of the tobacco product characteristics of the tobacco product."  21 U.S.C. §387g(a)(4)(B)(ii)-(iii).  As FDA did not adopt these requirements through notice and comment rulemaking or otherwise consider allegedly missing leachables data as part of a public health balancing, this deficiency was unlawful.  *See Fontem*, 82 F.4th at 1220.

**C.    Deficiency Two Is Arbitrary And Capricious**

As noted, FDA criticized Bidi for conducting a leachability study on the BIDI® Stick Classic's aerosol using the GC-MS method, which would only detect VOCs and some SVOCs.  FDA argued that Bidi should have also used other MS-based techniques to identify additional leachables.  FDA-BIDI-00049.  However, FDA did not factor in its evaluation all studies provided by Bidi to capture compounds that may leach into e-liquid and transfer to the aerosol.  Specifically, FDA did not conduct a cycle 2 toxicological analysis of

49

the extractables study.  This was carried-out using harsh solvents to assess the maximum number of chemicals that could leach into the e-liquid and aerosol, thus constituting a conservative, worst-case approach.  Bidi then employed additional MS-based methods requested by FDA, including LC-MS, ICP-MS, and HS-GC-MS, to detect those compounds.  FDA-BIDI-003419.

But FDA never evaluated the study results to determine whether any additional leachable compounds had been detected and were of toxicological concern.  And this raises serious questions as FDA's chemists concluded the "analytical results from the extractable study are reliable and acceptable from a chemistry perspective" – i.e., it is likely that the extractables study would have identified any remaining potential leachable compounds.  FDA-BIDI-000805.  In fact, FDA's chemists recommended that FDA's toxicologists evaluate the extractables data, but that was never done. *Id.*  Therefore, FDA's claims of missing information regarding leachables rings completely hollow.  Nor did FDA discuss Bidi's conclusion that testing using artificial saliva showed the risk of leachables from the device's mouthpiece under real-world conditions is low.  FDA-BIDI-003425.

Further, even on the off-chance that Bidi's aerosol leachability and extractable studies, when taken together, somehow missed a number of potential leachable compounds, FDA never explained how that could ever

50

independently justify issuing an MDO. Indeed, as discussed above, all lines of evidence gathered by Bidi in response to the deficiency letter point overwhelmingly to the conclusion that the BIDI® Stick Classic presents an overall low risk profile. And this includes the *in vitro* studies which demonstrates that even in the absence of a complete characterization of substances found in the BIDI® Stick Classic's aerosol, the product presents much less risk than combustible cigarettes. If any discrete toxicological data points might have been missing, that must be evaluated in the context of the critical mass of favorable toxicological data provided by Bidi in response to the deficiency letter – which FDA concedes it did not do.

## V.    Deficiency Three

FDA concluded in the MDO that "[d]ue to the high abuse liability of the new product, tobacco users are likely to maintain or augment their nicotine dependence and addiction with use of the new product; and tobacco nonusers (including youth) who initiate use of the new product are likely to continue using it and develop nicotine addiction and dependence." FDA-BIDI-000050. FDA claimed "the totality of the evidence demonstrates that the abuse liability of the new product is *similar* or higher than" a typical combustible cigarette based on nicotine exposures measured in the BIDI® Stick Classic. FDA-BIDI-

51

000049-50 (emphasis added).  Deficiency Three is arbitrary and capricious,

and otherwise fails on multiple grounds.

> **A.**  **FDA Entirely Reversed Its Prior Policy As Applied To Other Manufacturers And Products, Without Explanation, Regarding The Need For A Comparable Level Of Abuse Liability In ENDS And Combustible Cigarettes**

FDA has long recognized that an ENDS product must have an abuse

liability (i.e., potential for addiction) comparable to combustible cigarettes for

smokers to partially or completely switch to less risky tobacco products.  *See*,

*e.g.*, FDA 2020 Enforcement Guidance ("for many individual addicted

cigarette smokers, the potential for ENDS to act as a substitute for cigarettes,

thereby encouraging smokers to seek to switch completely away from

combustible cigarettes, may be dependent, in part, upon the product having

acceptability and abuse liability more comparable to a cigarette.").  FDA-

BIDI-001858.  As Bidi's deficiency response noted in the context of tobacco

harm reduction ("THR"):

> THR relies on the fundamental principle that the harms associated
> with cigarette smoking, at both the individual and population
> levels, can be reduced by providing adult smokers with alternatives
> to cigarettes which deliver a satisfying nicotine level but with
> lower levels of harmful chemicals found in cigarette smoke.
> Acceptability of novel tobacco and nicotine products to adult
> smokers is an important driver of the likelihood that a given
> product will support smokers in transitioning away from cigarette
> smoking…[I]t is generally considered that more cigarette-like
> nicotine delivery is important to the uptake of novel tobacco
> products such as ENDS, their continued use, and prevention of

> relapse back to cigarette smoking…Therefore, the comparable
> dependence of cigarettes and the BIDI® Stick Classic supports the
> notion that this product can assist smokers' switching and
> contribute to reductions in the individual- and population-level
> harms associated with cigarette smoking.

FDA-BIDI-003446.  The TPL itself acknowledged that "if a new product has a

low abuse liability, individuals who are currently dependent on nicotine may

find it to be an inadequate substitute for the product they are currently using."

FDA-BIDI-000812; *see* FDA, Memorandum, *Normalization of HPHC yields

between new and comparison products in ENDS PMTAs* (Sept. 9, 2020) ("tobacco

product users tend to have an optimal level of nicotine that provides sufficient

user satisfaction and avoids symptoms of withdrawal.").  FDA-BIDI-003309.

Indeed, as Bidi observed in its deficiency response letter, FDA explicitly

recognized this principle when recently granting marketing approval for a

tobacco-flavored tobacco product manufactured by NJOY and a heat-not-burn

tobacco-flavored product called IQOS.  FDA noted both have similar abuse

liability to combustible cigarettes which would facilitate switching.  The

products were approved even though FDA found that they would nevertheless

continue to sustain addiction in smokers and non-users alike.  FDA-BIDI-

003447-48 ("This is potentially beneficial for smokers trying to switch to IQOS

as they are more likely to have satisfactory results and not resume…smoking.

The nicotine levels do pose an addiction risk for non-tobacco users who initiate

use of these products; however, the risk is no higher than for other, currently available, tobacco products and initiation is expected to be low generally.") (As NJOY testing "shows an abuse liability approaching that of combusted cigarettes, there is support for a potential benefit of smokers trying to switch to the new products…[T]he inherent risk of addiction of the new products appear to be no higher than other currently available tobacco products…[T]he abuse liability of the new products is likely sufficient to sustain dependence in already nicotine-dependent populations.").

But in Bidi's MDO, FDA asserted that an ENDS product can no longer result in continued abuse liability and still be granted marketing approval. FDA will likely respond that, unlike the NJOY and IQOS products, the BIDI® Stick Classic has a higher abuse liability, at least in certain circumstances, than combustible cigarettes and is thus not APPH.  FDA-BIDI-000049-50.[11]  But that is irrelevant to the MDO's conclusion.  Rather, the mere fact that smokers will "*maintain* or augment their nicotine dependance and addiction" is now determinative.  *Id.* (emphasis added).  In FDA's mind, the relative abuse liability is irrelevant; it matters not whether an ENDS product

---

[11] FDA conceded in the MDO that Bidi's evidence demonstrated a similar abuse liability to combustible cigarettes under controlled testing conditions. FDA-BIDI-000049.

has a similar or higher abuse liability; any level of continued abuse liability will result in a no APPH finding.  Indeed, the MDO concludes "the totality of evidence demonstrates that the abuse liability of the new product is *similar to* or higher than" a combustible cigarette.  FDA-BIDI-000049 (emphasis added).

If FDA intends to reverse its policy, it must explicitly acknowledge the change and explain its decision.  *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1912 (2020).  Yet nowhere in the MDO or TPL did FDA explicitly recognize its about-face or justify its position that ENDS products cannot lead to continued abuse liability.  Moreover, this is particularly concerning as FDA treated Bidi in an entirely different fashion than it did the NJOY and IQOS tobacco-flavored products.  Indeed, it is difficult to overstate the sea change under Deficiency Three to FDA's prior approach.  Now, as FDA claims that Deficiency Three is an independent ground for issuing an MDO, it appears FDA, going forward, will not grant marketing authorization to any tobacco-flavored ENDS if it has any continuing addictive potential, even if that means smokers will not move away to a less dangerous product.

**B.    FDA Did Not Explain How Deficiency Three Outweighs The BIDI® Stick Classic's Benefits As A Lower Risk Alternative**

Even if the BIDI® Stick Classic is associated with a higher risk of abuse liability, FDA must evaluate that in the context of any evidence demonstrating that continued use of the ENDS product will result in reduced harm relative to

combustible cigarettes. *Fontem*, 82 F.4th at 1219-20. However, as with the other two deficiencies, FDA never conducted a cycle 2 analysis and therefore never weighed the substantial information submitted by Bidi in response to FDA's deficiency letter (e.g., HPHC testing, *in vitro* studies, the "extractables" study, and risk assessment) showing the BIDI® Stick Classic has a much more favorable risk profile than traditional cigarettes and is APPH. Indeed, as Bidi pointed out in its response, FDA-BIDI-003446, one of the driving imperatives under tobacco harm reduction is to encourage smokers to continue satisfying their need for nicotine by using less risky products. Yet FDA never weighed *all* of the relevant evidence or Bidi's comments.

### C. The MDO Contradicted Multiple TPL Statements, Including Evidence Submitted By Bidi And Credited By FDA, That Nonusers And Youth Are Unlikely To Use The BIDI® Stick Classic

The MDO concluded that the BIDI® Stick Classic's alleged high abuse liability will mean that any non-user of tobacco products (e.g., non-smokers) and youth who try the product will likely continue using it. FDA-BIDI-000050. But what the MDO did not say is that non-users and youth will actually use the BIDI® Stick Classic. And it could not. FDA stated throughout the TPL that evidence submitted by Bidi, as well as the public scientific literature review in the PMTA, demonstrated that both non-users and youth are unlikely to initiate use of the BIDI® Stick Classic.

Significantly, FDA stated in the TPL that manufacturers have a lower burden in showing benefits to smokers for tobacco-flavored (as opposed to non-tobacco flavored products) because, in part, youth do not like tobacco-flavored products. FDA-BIDI-000791-92 ("As the known risks of the product increase or decrease, the burden of demonstrating a substantial enough benefit [to adult smokers] likewise increases or decreases."); ("For tobacco-flavored ENDS the risk to youth is lower compared to flavored ENDS; accordingly, a lessor showing of benefit may suffice."); ("In contrast to flavored ENDS, the risk of youth initiation and use with tobacco-flavored ENDS is lower."); *see* 2020 FDA Enforcement Guidance ("Data shows that tobacco- and menthol-flavored ENDS products are not as appealing to minors as other flavored ENDS products."). FDA-BIDI-001877.

Moreover, as to both nonusers and youth, the TPL concluded that those population groups will not likely use the BIDI® Stick Classic. *See*, *e.g.*, FDA-BIDI-000828 ("Overall, as TPL, I agree with the social science and epidemiology reviews that given the tobacco flavor of the new product, it is expected that youth are unlikely to use the new product and the appeal for the new product would be limited.") ("[P]ublished data generally suggests that tobacco-flavored ENDS have limited appeal for youth.") (Bidi's "Population Prevalence study showed that prevalence of use [among youth] was low

57

overall."); (citing Bidi's Population Prevalence study, Perceptions and Behavioral Intentions ("PBI") study, and BIDI® Stick Likelihood of Use ("LOU") study when concluding, "Considering the overall low appeal and use pattern per the applicant-submitted data and low rate of ENDS use among adult tobacco non-users per published literature review..., as TPL, I agree with the social science and epidemiology reviews, that it is expected that adult tobacco nonusers are unlikely to use the new product.").

Yet, despite FDA's own conclusions, the TPL goes on to state, without *any* support, that use of the new product by nonusers and youth "may shift depending on the availability of other products on the market." FDA-BIDI-000828. This is pure speculation on FDA's part and is wholly contradicted by extensive evidence, submitted by Bidi and in the public scientific literature, as well as credited by FDA in the TPL, that these population groups do not like tobacco-flavored products and will not initiate use. Accordingly, on this point, the MDO is not supported by substantial evidence; in fact, it is the very definition of arbitrary and capricious decision-making.[12]

---

[12] There is also no indication that FDA considered the fact that it requires robust post-marketing surveillance for any product granted marketing authorization so that FDA may determine whether it should temporarily suspend or withdraw the approval because the product is no longer APPH. *See* 21 C.F.R. §1114.41; 21 U.S.C. §387j(d). FDA failed to consider this option instead of speculating about future use by nonusers or youth.

D.    **FDA Failed To Weigh Evidence On Switching In The Context Of Other Benefits To Smokers And A Low Risk To Nonusers And Youth**

In the TPL, but not the MDO, FDA claimed that studies submitted by Bidi were "inconclusive" as to whether the BIDI® Stick Classic would help smokers switch.  FDA-BIDI-000827.  At the same time, however, FDA conceded the product's abuse liability "may increase the likelihood of this already addicted population switching from [combustible cigarettes) to the new product and reducing or eliminating their [combustible cigarette] use."  FDA-BIDI-000815; *see* FDA-BIDI-000814 (TPL concluding the "subjective effects results demonstrated that the new product was liked by adults who use [combustible cigarettes]"); FDA-BIDI-000817 (FDA's epidemiologists stating, "The data submitted by the applicant provide limited evidence that adult tobacco products users will switch to the new product.").

In any event, as discussed above, FDA admitted that Bidi has a lower burden here to show benefits to smokers because the BIDI® Stick Classic is tobacco-flavored and does not present the same risks to youth as non-tobacco flavored products.  Indeed, when granting marketing authorization for the IQOS, FDA noted that "initiation [of product use] is expected to be low generally," thus clearly indicating that Bidi's purportedly "inconclusive" data on switching has limited relevance.  FDA-BIDI-003447.  More importantly, in

the context of this reduced burden, FDA was required to weigh its

observations regarding evidence of switching against both the substantially

reduced health risks presented by the BIDI® Stick Classic and the fact that

nonusers and youth are unlikely to begin using the product. But FDA,

particularly in the absence of a cycle 2 review, failed to meet this obligation.

This is not balancing evidence on both sides of the ledger; rather, it is placing a

thumb on one side of the scale to the detriment of addicted adult smokers.

### E.    FDA Imposed Tobacco Product Standards For Nicotine Content And Abuse Liability Without Notice And Comment Rulemaking

Under the TCA, FDA may establish a tobacco product standard

governing: (i) limits on "nicotine yields"; (ii) requirements for the

"reduction…of other constituents, including smoke constituents, or harmful

components of the product"; or (iii) "provisions respecting the…ingredients,

additives, constituents, including smoke constituents, and properties of the

tobacco product." 21 U.S.C. §387g(a)(4). As discussed above, however, FDA

is now requiring that ENDS products have less nicotine than combustible

cigarettes to be granted marketing authorization – i.e., FDA is directly

regulating through the MDO the maximum levels of nicotine in ENDS

products. Moreover, FDA has established a requirement that an ENDS

product cannot promote continued addiction. As FDA did not adopt these

limitations through notice and comment rulemaking, or any of the additional

requirements necessary to promulgate a standard, Deficiency Three is

unlawful. *See Fontem*, 82 F.4th at 1218-19 (noting limits on "nicotine yield"

are covered by the provision governing tobacco product standards).

## <u>CONCLUSION</u>

This Court should grant Bidi's Petition for Review, and vacate and

remand the MDO for further agency proceedings.


Dated: April 15, 2024

<u>/s Eric P. Gotting</u>
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioner*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify the foregoing complies with the length limitations of Federal Rule of Appellate Procedure ("Rule") 27(d)(2)(A) because it is 12,715 words, excluding the parts that are exempted under Rule 32(f) and 11th Cir. R. 32-4. It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Calisto MT font.

/s Eric P. Gotting
Eric P. Gotting

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

/s Eric P. Gotting
Eric P. Gotting

# ADDENDUM



establish and maintain such records, make such reports, and provide such information, as the Secretary may by regulation reasonably require to assure that such tobacco product is not adulterated or misbranded and to otherwise protect public health. Regulations prescribed under the preceding sentence—

(1) may require a tobacco product manufacturer or importer to report to the Secretary whenever the manufacturer or importer receives or otherwise becomes aware of information that reasonably suggests that one of its marketed tobacco products may have caused or contributed to a serious unexpected adverse experience associated with the use of the product or any significant increase in the frequency of a serious, expected adverse product experience;

(2) shall require reporting of other significant adverse tobacco product experiences as determined by the Secretary to be necessary to be reported;

(3) shall not impose requirements unduly burdensome to a tobacco product manufacturer or importer, taking into account the cost of complying with such requirements and the need for the protection of the public health and the implementation of this subchapter;

(4) when prescribing the procedure for making requests for reports or information, shall require that each request made under such regulations for submission of a report or information to the Secretary state the reason or purpose for such request and identify to the fullest extent practicable such report or information;

(5) when requiring submission of a report or information to the Secretary, shall state the reason or purpose for the submission of such report or information and identify to the fullest extent practicable such report or information; and

(6) may not require that the identity of any patient or user be disclosed in records, reports, or information required under this subsection unless required for the medical welfare of an individual, to determine risks to public health of a tobacco product, or to verify a record, report, or information submitted under this subchapter.

In prescribing regulations under this subsection, the Secretary shall have due regard for the professional ethics of the medical profession and the interests of patients. The prohibitions of paragraph (6) continue to apply to records, reports, and information concerning any individual who has been a patient, irrespective of whether or when he ceases to be a patient.

**(b) Reports of removals and corrections**

**(1) In general**

Except as provided in paragraph (2), the Secretary shall by regulation require a tobacco product manufacturer or importer of a tobacco product to report promptly to the Secretary any corrective action taken or removal from the market of a tobacco product undertaken by such manufacturer or importer if the removal or correction was undertaken—

(A) to reduce a risk to health posed by the tobacco product; or

(B) to remedy a violation of this subchapter caused by the tobacco product which may present a risk to health.

A tobacco product manufacturer or importer of a tobacco product who undertakes a corrective action or removal from the market of a tobacco product which is not required to be reported under this subsection shall keep a record of such correction or removal.

**(2) Exception**

No report of the corrective action or removal of a tobacco product may be required under paragraph (1) if a report of the corrective action or removal is required and has been submitted under subsection (a).

(June 25, 1938, ch. 675, §909, as added Pub. L. 111–31, div. A, title I, §101(b)(3), June 22, 2009, 123 Stat. 1805.)

### Editorial Notes

#### Prior Provisions

A prior section 909 of act June 25, 1938, was renumbered section 1009 and is classified to section 399 of this title.

## § 387j. Application for review of certain tobacco products

**(a) In general**

**(1) New tobacco product defined**

For purposes of this section the term ''new tobacco product'' means—

(A) any tobacco product (including those products in test markets) that was not commercially marketed in the United States as of February 15, 2007; or

(B) any modification (including a change in design, any component, any part, or any constituent, including a smoke constituent, or in the content, delivery or form of nicotine, or any other additive or ingredient) of a tobacco product where the modified product was commercially marketed in the United States after February 15, 2007.

**(2) Premarket review required**

**(A) New products**

An order under subsection (c)(1)(A)(i) for a new tobacco product is required unless—

(i) the manufacturer has submitted a report under section 387e(j) of this title; and the Secretary has issued an order that the tobacco product—

(I) is substantially equivalent to a tobacco product commercially marketed (other than for test marketing) in the United States as of February 15, 2007; and

(II) is in compliance with the requirements of this chapter; or

(ii) the tobacco product is exempt from the requirements of section 387e(j) of this title pursuant to a regulation issued under section 387e(j)(3) of this title.

**(B) Application to certain post-February 15, 2007, products**

Subparagraph (A) shall not apply to a tobacco product—

(i) that was first introduced or delivered for introduction into interstate commerce for commercial distribution in the United States after February 15, 2007, and prior to the date that is 21 months after June 22, 2009; and

(ii) for which a report was submitted under section 387e(j) of this title within such 21-month period,

except that subparagraph (A) shall apply to the tobacco product if the Secretary issues an order that the tobacco product is not substantially equivalent.

**(3) Substantially equivalent defined**

**(A) In general**

In this section and section 387e(j) of this title, the term "substantially equivalent" or "substantial equivalence" means, with respect to the tobacco product being compared to the predicate tobacco product, that the Secretary by order has found that the tobacco product—

(i) has the same characteristics as the predicate tobacco product; or

(ii) has different characteristics and the information submitted contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that it is not appropriate to regulate the product under this section because the product does not raise different questions of public health.

**(B) Characteristics**

In subparagraph (A), the term "characteristics" means the materials, ingredients, design, composition, heating source, or other features of a tobacco product.

**(C) Limitation**

A tobacco product may not be found to be substantially equivalent to a predicate tobacco product that has been removed from the market at the initiative of the Secretary or that has been determined by a judicial order to be misbranded or adulterated.

**(4) Health information**

**(A) Summary**

As part of a submission under section 387e(j) of this title respecting a tobacco product, the person required to file a premarket notification under such section shall provide an adequate summary of any health information related to the tobacco product or state that such information will be made available upon request by any person.

**(B) Required information**

Any summary under subparagraph (A) respecting a tobacco product shall contain detailed information regarding data concerning adverse health effects and shall be made available to the public by the Secretary within 30 days of the issuance of a determination that such tobacco product is substantially equivalent to another tobacco product.

**(b) Application**

**(1) Contents**

An application under this section shall contain—

(A) full reports of all information, published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products;

(B) a full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation, of such tobacco product;

(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such tobacco product;

(D) an identifying reference to any tobacco product standard under section 387g of this title which would be applicable to any aspect of such tobacco product, and either adequate information to show that such aspect of such tobacco product fully meets such tobacco product standard or adequate information to justify any deviation from such standard;

(E) such samples of such tobacco product and of components thereof as the Secretary may reasonably require;

(F) specimens of the labeling proposed to be used for such tobacco product; and

(G) such other information relevant to the subject matter of the application as the Secretary may require.

**(2) Referral to Tobacco Products Scientific Advisory Committee**

Upon receipt of an application meeting the requirements set forth in paragraph (1), the Secretary—

(A) may, on the Secretary's own initiative; or

(B) may, upon the request of an applicant,

refer such application to the Tobacco Products Scientific Advisory Committee for reference and for submission (within such period as the Secretary may establish) of a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation.

**(c) Action on application**

**(1) Deadline**

**(A) In general**

As promptly as possible, but in no event later than 180 days after the receipt of an application under subsection (b), the Secretary, after considering the report and recommendation submitted under subsection (b)(2), shall—

(i) issue an order that the new product may be introduced or delivered for introduction into interstate commerce if the Secretary finds that none of the grounds specified in paragraph (2) of this subsection applies; or

(ii) issue an order that the new product may not be introduced or delivered for introduction into interstate commerce if the Secretary finds (and sets forth the basis for such finding as part of or accompanying such denial) that 1 or more

grounds for denial specified in paragraph (2) of this subsection apply.

**(B) Restrictions on sale and distribution**

An order under subparagraph (A)(i) may require that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title.

**(2) Denial of application**

The Secretary shall deny an application submitted under subsection (b) if, upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product, the Secretary finds that—

(A) there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health;

(B) the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of section 387f(e) of this title;

(C) based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or

(D) such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under section 387g of this title, and there is a lack of adequate information to justify the deviation from such standard.

**(3) Denial information**

Any denial of an application shall, insofar as the Secretary determines to be practicable, be accompanied by a statement informing the applicant of the measures required to remove such application from deniable form (which measures may include further research by the applicant in accordance with 1 or more protocols prescribed by the Secretary).

**(4) Basis for finding**

For purposes of this section, the finding as to whether the marketing of a tobacco product for which an application has been submitted is appropriate for the protection of the public health shall be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account—

(A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

(B) the increased or decreased likelihood that those who do not use tobacco products will start using such products.

**(5) Basis for action**

**(A) Investigations**

For purposes of paragraph (2)(A), whether permitting a tobacco product to be marketed would be appropriate for the protection of the public health shall, when appropriate, be determined on the basis of well-controlled investigations, which may in-

clude 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product.

**(B) Other evidence**

If the Secretary determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate the tobacco product, the Secretary may authorize that the determination for purposes of paragraph (2)(A) be made on the basis of such evidence.

**(d) Withdrawal and temporary suspension**

**(1) In general**

The Secretary shall, upon obtaining, where appropriate, advice on scientific matters from the Tobacco Products Scientific Advisory Committee, and after due notice and opportunity for informal hearing for a tobacco product for which an order was issued under subsection (c)(1)(A)(i), issue an order withdrawing the order if the Secretary finds—

(A) that the continued marketing of such tobacco product no longer is appropriate for the protection of the public health;

(B) that the application contained or was accompanied by an untrue statement of a material fact;

(C) that the applicant—

(i) has failed to establish a system for maintaining records, or has repeatedly or deliberately failed to maintain records or to make reports, required by an applicable regulation under section 387i of this title;

(ii) has refused to permit access to, or copying or verification of, such records as required by section 374 of this title; or

(iii) has not complied with the requirements of section 387e of this title;

(D) on the basis of new information before the Secretary with respect to such tobacco product, evaluated together with the evidence before the Secretary when the application was reviewed, that the methods used in, or the facilities and controls used for, the manufacture, processing, packing, or installation of such tobacco product do not conform with the requirements of section 387f(e) of this title and were not brought into conformity with such requirements within a reasonable time after receipt of written notice from the Secretary of nonconformity;

(E) on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when the application was reviewed, that the labeling of such tobacco product, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary of such fact; or

(F) on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when such order was issued, that such tobacco product is not shown to conform in all respects to a tobacco product standard which is in effect under section 387g of this title, compliance

with which was a condition to the issuance of an order relating to the application, and that there is a lack of adequate information to justify the deviation from such standard.

**(2) Appeal**

The holder of an application subject to an order issued under paragraph (1) withdrawing an order issued pursuant to subsection (c)(1)(A)(i) may, by petition filed on or before the 30th day after the date upon which such holder receives notice of such withdrawal, obtain review thereof in accordance with section 387*l* of this title.

**(3) Temporary suspension**

If, after providing an opportunity for an informal hearing, the Secretary determines there is reasonable probability that the continuation of distribution of a tobacco product under an order would cause serious, adverse health consequences or death, that is greater than ordinarily caused by tobacco products on the market, the Secretary shall by order temporarily suspend the authority of the manufacturer to market the product. If the Secretary issues such an order, the Secretary shall proceed expeditiously under paragraph (1) to withdraw such application.

**(e) Service of order**

An order issued by the Secretary under this section shall be served—

(1) in person by any officer or employee of the department designated by the Secretary; or

(2) by mailing the order by registered mail or certified mail addressed to the applicant at the applicant's last known address in the records of the Secretary.

**(f) Records**

**(1) Additional information**

In the case of any tobacco product for which an order issued pursuant to subsection (c)(1)(A)(i) for an application filed under subsection (b) is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, as the Secretary may by regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination of, whether there is or may be grounds for withdrawing or temporarily suspending such order.

**(2) Access to records**

Each person required under this section to maintain records, and each person in charge of custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

**(g) Investigational tobacco product exemption for investigational use**

The Secretary may exempt tobacco products intended for investigational use from the provisions of this subchapter under such conditions as the Secretary may by regulation prescribe.

(June 25, 1938, ch. 675, § 910, as added Pub. L. 111–31, div. A, title I, § 101(b)(3), June 22, 2009, 123 Stat. 1807.)

### Editorial Notes

PRIOR PROVISIONS

A prior section 910 of act June 25, 1938, was renumbered section 1010 and is classified to section 399a of this title.

## § 387k. Modified risk tobacco products

**(a) In general**

No person may introduce or deliver for introduction into interstate commerce any modified risk tobacco product unless an order issued pursuant to subsection (g) is effective with respect to such product.

**(b) Definitions**

In this section:

**(1) Modified risk tobacco product**

The term "modified risk tobacco product" means any tobacco product that is sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products.

**(2) Sold or distributed**

**(A) In general**

With respect to a tobacco product, the term "sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products" means a tobacco product—

(i) the label, labeling, or advertising of which represents explicitly or implicitly that—

(I) the tobacco product presents a lower risk of tobacco-related disease or is less harmful than one or more other commercially marketed tobacco products;

(II) the tobacco product or its smoke contains a reduced level of a substance or presents a reduced exposure to a substance; or

(III) the tobacco product or its smoke does not contain or is free of a substance;

(ii) the label, labeling, or advertising of which uses the descriptors "light", "mild", or "low" or similar descriptors; or

(iii) the tobacco product manufacturer of which has taken any action directed to consumers through the media or otherwise, other than by means of the tobacco product's label, labeling, or advertising, after June 22, 2009, respecting the product that would be reasonably expected to result in consumers believing that the tobacco product or its smoke may present a lower risk of disease or is less harmful than one or more commercially marketed tobacco products, or presents a reduced exposure to, or does not contain or is free of, a substance or substances.

**(B) Limitation**

No tobacco product shall be considered to be "sold or distributed for use to reduce