# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### BIDI VAPOR LLC,

Petitioner,

v.

### U.S. FOOD AND DRUG ADMINISTRATION; ROBERT M. CALIFF, M.D., in his official capacity as Commissioner of Food and Drugs; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and XAVIER BECERRA, SECRETARY,

Respondents.

---

On Petition for Review of a Final Marketing Denial Order
by the U.S. Food and Drug Administration

---

## BRIEF FOR RESPONDENTS

---

*Of Counsel:*
SAMUEL BAGENSTOS
*General Counsel*
*Department of Health and Human*
*Services*

MARK RAZA
*Chief Counsel*
*Food and Drug Administration*

WENDY S. VICENTE
*Deputy Chief Counsel for Lit.*
*Food and Drug Administration*

STEPHANIE NGUYEN
*Associate Chief Counsel*
*Office of the Chief Counsel*
*Food and Drug Administration*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*
*Civil Division*
ARUN G. RAO
*Deputy Assistant Attorney General*
AMANDA LISKAMM
*Director*
LISA K. HSIAO
*Senior Deputy Director*
HILARY K. PERKINS
*Assistant Director*
SCOTT P. KENNEDY
SAMUEL BALLINGRUD
*Trial Attorneys*
*Consumer Protection Branch*
*U.S. Department of Justice*
*450 5th Street, NW*
*Washington, DC 20001*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rule 26.1-1, the undersigned counsel certifies

that, in addition to those listed on petitioner's Certificate of Interested

Persons and Corporate Disclosure Statements, to the best of our

knowledge, the following persons and entities may have an interest in the

outcome of this case:

Kennedy, Scott P., counsel for Respondents

Ballingrud, Samuel, counsel for Respondents

Nguyen, Stephanie, counsel for Respondents

Perkins, Hilary K., counsel for Respondents

Powell, Lindsey E., counsel for Respondents


Respectfully submitted,

*/s/ Scott P. Kennedy*
Scott P. Kennedy

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioner challenges an order of the U.S. Food and Drug Administration denying, for three independent reasons, petitioner's application for authorization to market an e-cigarette product. Given the importance of the issues presented, the government believes that oral argument is warranted.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ....................................................3

STATEMENT OF THE ISSUE...........................................................4

STATEMENT OF THE CASE ............................................................4

    I.     Statutory Background .......................................................4

    II.    Regulatory Background ....................................................6

    III.   FDA's Denial Of Petitioner's Application To
           Market A Tobacco-Flavored E-Cigarette ....................10

SUMMARY OF ARGUMENT ..........................................................14

STANDARD OF REVIEW ...............................................................18

ARGUMENT ....................................................................................19

    I.     FDA Reasonably Determined That The Evidence
           Precluded A Finding That The Product Is Appropriate
           For The Protection Of The Public Health ....................19

           A.     Petitioner's evidence demonstrated a comparatively
                   high risk that its product would increase the
                   likelihood and severity of addiction, including
                   among youth ........................................................19

           B.     Petitioner's application also omitted key evidence
                   about the product's potential health hazards, which
                   precluded the agency from assessing certain risks ..........26

C.    Each of the three deficiencies independently
supports the denial of petitioner's application ...............37

II.    FDA Appropriately Applied The Statutory Standard
And Considered The Risks And Benefits To The
Population As A Whole.................................................39

A.    FDA explained the deficiencies in petitioner's
evidence as part of a holistic review of the
product's risks and benefits.................................39

B.    FDA appropriately considered petitioner's
toxicology evidence in evaluating the product's
benefits ..............................................................44

C.    FDA applied the TCA's adjudicative framework
and did not impliedly adopt a tobacco product
standard .............................................................48

CONCLUSION.................................................................50

CERTIFICATE OF COMPLIANCE WITH FEDERAL
RULE OF APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**  Page(s)

*Alabama Hosp. Ass'n v. Beasley*,
702 F.2d 955 (11th Cir. 1983) .......................................... 38

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ............................................. 23, 30, 44

*Bidi Vapor LLC v. FDA*,
47 F.4th 1191 (11th Cir. 2022) ................................. 10, 47

*Casino Airlines, Inc. v. National Transp. Safety Bd.*,
439 F.3d 715 (D.C. Cir. 2006) ........................................ 38

*Fontem US, LLC v. FDA*,
82 F.4th 1207 (D.C. Cir. 2023) ................... 18, 42, 43, 49

*Gripum, LLC v. FDA*,
47 F.4th 553 (7th Cir. 2022) ................................... 35, 44

*Johnson v. Copyright Royalty Bd.*,
969 F.3d 363 (D.C. Cir. 2020) ....................................... 23

*Magellan Tech., Inc. v. FDA*,
70 F.4th 622 (2d Cir. 2023) .......................................... 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................ 19

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) ........................................ 6

*P.I.A. Michigan City Inc. v. Thompson*,
292 F.3d 820 (D.C. Cir. 2002) ...................................... 24

*Prohibition Juice Co. v. FDA*,
45 F.4th 8 (D.C. Cir. 2022) .......................................... 26

*Logic Tech. Dev. LLC v. FDA*,
84 F.4th 537 (3d Cir. 2023) ............................... 43, 43-44

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) ................................................................. 33, 35

*Romano-Murphy v. Commissioner*,
   816 F.3d 707 (11th Cir. 2016) ............................................................... 38

*Shinseki v. Sanders*,
   556 U.S. 396 (2009) ............................................................... 37, 38

**Statutes:**

Administrative Procedure Act (APA):
   5 U.S.C. § 706 ............................................................... 37
   5 U.S.C. § 706(2)(A) ............................................................... 19

Consolidated Appropriations Act, 2022,
   Pub. L. No. 117-103, div. P, tit. I, subtitle B, 136 Stat. 49, 789-92 ...............5

Family Smoking Prevention and Tobacco Control Act,
   Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009) ...........................................4
      21 U.S.C. § 387a ............................................................... 4
      21 U.S.C. § 387g ............................................................... 48
      21 U.S.C. § 387j(a)(1) ............................................................... 5
      21 U.S.C. § 387j(a)(1)-(2) ............................................................... 5
      21 U.S.C. § 387j(b)(1)(A) ........................................... 13, 28, 30, 32, 39, 48
      21 U.S.C. § 387j(b)(1)(G) ............................................................... 48
      21 U.S.C. § 387j(c) ............................................................... 3
      21 U.S.C. § 387j(c)(2) ........................................... 1, 5, 28, 48
      21 U.S.C. § 387j(c)(4) ........................................... 1, 5, 13, 19, 39
      21 U.S.C. § 387j(c)(5)(A)-(B) ............................................................... 48
      21 U.S.C. § 387*l*(a)(1)(B) ............................................................... 3
      21 U.S.C. § 387*l*(b) ............................................................... 19, 37

21 U.S.C. § 321(rr)(1) ............................................................... 4

**Other Authorities:**

FDA:
    *Advisory and Enforcement Actions Against Industry for*
        *Unauthorized Tobacco Products*,
        https://perma.cc/S6L9-CCB7 ............................................................26

    *Approaches to the Evaluation of Extractables and Leachables*
        *in Tobacco Product Application Review* (Oct. 1, 2020),
        https://perma.cc/G3HX-6WDK ..................................................... 29-30

    *Enforcement Priorities for Electronic Nicotine Delivery*
        *Systems (ENDS) and Other Deemed Products on the*
        *Market Without Premarket Authorization (Revised):*
        *Guidance for Industry* (Apr. 2020),
        https://perma.cc/DMB6-4DF8 ...............................................................7

    *Premarket Tobacco Product Marketing Granted Orders*
        (Mar. 28, 2024), https://perma.cc/PS8E-SZCM ................................. 7-8

    *Technical Project Lead (TPL) Review [for Applications]*
        *Submitted by R.J. Reynolds Vapor Company*
        (Oct. 12, 2021), https://perma.cc/7Z8E-FW6T .......................................8

81 Fed. Reg. 28,974 (May 10, 2016) ................................................................. 6

## INTRODUCTION

The Family Smoking Prevention and Tobacco Control Act (TCA) makes it unlawful for a manufacturer to market a "new tobacco product"—defined as a tobacco product that was not on the market as of February 15, 2007—without U.S. Food and Drug Administration (FDA) authorization. The TCA requires FDA to deny an application to market a new tobacco product unless FDA finds that marketing the product would be "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2), (4).  Under this standard, an applicant must show a net benefit to public health based upon the product's "risks and benefits to the population as a whole," taking into account its potential to help existing users of tobacco products quit and its potential to encourage nonusers to start.  *Id.* § 387j(c)(4).

Petitioner filed an application to market a disposable e-cigarette that comes prefilled with tobacco-flavored e-liquid.  After considering the available evidence and giving petitioner an opportunity to provide additional information, FDA concluded that, for three independent reasons, petitioner failed to satisfy its statutory burden of demonstrating that its product is appropriate for the protection of the public health.  First,

petitioner's own evidence showed that its product exposes users to a particularly high level of nicotine, which increases the likelihood and severity of nicotine dependence, including among youth.  FDA thus concluded that the product presents an especially high risk that current tobacco users who try petitioner's product would maintain or augment their addiction, and that nonusers (including youth) who try it would likely develop nicotine dependence and addiction.  Also finding a lack of evidence showing that the product would benefit current smokers of combustible cigarettes by helping them switch or quit, the agency reasonably concluded that the product presented a comparatively high risk of promoting addiction without offering offsetting benefits.

FDA also identified two other reasons why petitioner failed to carry its statutory burden.  Despite the agency's request for additional information, petitioner did not adequately test its product for hazardous compounds that can leach into the e-liquid that is aerosolized and inhaled by users.  Petitioner also failed to provide information needed to assess the product's output of harmful aerosol compounds relative to the output of other, similar products.  FDA reasonably concluded that, because leachable and aerosol compounds can pose serious health risks to users, those

omissions left material questions about the product's risks unanswered and prevented the agency from finding that petitioner had carried its burden of establishing a net benefit to public health.

In considering these issues, FDA also assessed the product's potential benefits. FDA acknowledged that many e-cigarettes deliver significantly lower levels of harmful compounds than combustible cigarettes. But it also explained that petitioner failed to show that its product was likely to lead users of combustible cigarettes to quit or switch so as to realize that potential benefit. Thus, there is no merit to petitioner's assertion that FDA's decision rested solely on "discrete technical deficienc[ies]" and lacked a holistic analysis. Br. 39. Applying the standard established by Congress, FDA reasonably determined that petitioner failed to carry its burden of showing that marketing the product would be appropriate for the protection of the public health. 21 U.S.C. § 387j(c).

## STATEMENT OF JURISDICTION

On January 22, 2024, FDA issued an order denying petitioner's application to market a new tobacco product. Petitioner timely filed a petition for review of that denial on January 26, 2024. This Court has jurisdiction under 21 U.S.C. § 387*l*(a)(1)(B).

## STATEMENT OF THE ISSUE

Whether FDA reasonably denied petitioner's application to market an e-cigarette product where petitioner's evidence showed that the product presents a comparatively high risk of promoting addiction with no reliable evidence of a countervailing benefit, and where petitioner also omitted two key categories of information about the product's potential health risks, thus precluding the agency from determining that marketing the product would be appropriate for the protection of the public health.

## STATEMENT OF THE CASE

### I.     Statutory Background

The TCA established a comprehensive scheme for the regulation of tobacco products.  Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009).  It was predicated on Congress's finding that use of tobacco products by youth "is a pediatric disease of considerable proportions."  123 Stat. at 1777.  The Act applies to products such as cigarettes and smokeless tobacco, as well as to other products made or derived from tobacco that FDA by regulation deems to be subject to the Act.  21 U.S.C. § 387a; *see also id.* § 321(rr)(1).[1]

---

[1] In 2022, Congress amended the TCA to extend FDA's jurisdiction to products "containing nicotine from any source," not just nicotine derived

*Continued on next page.*

The TCA makes it unlawful for a manufacturer to introduce in interstate commerce any "new tobacco product" unless the manufacturer obtains premarket authorization from FDA.  21 U.S.C. § 387j(a)(1)-(2).  A "new tobacco product" is one that was not commercially marketed in the United States as of February 15, 2007, or that was modified after that date. *Id.* § 387j(a)(1).  The TCA provides that FDA "shall deny" a manufacturer's application to market a new tobacco product "if, upon the basis of the information submitted to [FDA] as part of the application and any other information before [FDA] with respect to such tobacco product," the agency "finds that[] . . . there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health."  *Id.* § 387j(c)(2).  The TCA specifies that, in making that determination, FDA must evaluate "the risks and benefits to the population as a whole, including users and nonusers of the tobacco product," taking into account both the "likelihood that existing users of tobacco products will stop using such products" and the "likelihood that those who do not use tobacco products will start."  *Id.* § 387j(c)(4).  In order to obtain

---

from tobacco.  *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. P, tit. I, subtitle B, 136 Stat. 49, 789-92 (2022).

marketing authorization, an applicant must therefore demonstrate a net benefit to public health taking such risks and benefits into account.

## II.    Regulatory Background

**1.**  E-cigarettes deliver nicotine, which is "among the most addictive substances used by humans," "by vaporizing a liquid that includes other chemicals and flavorings."  *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 270 (D.C. Cir. 2019).  "The device heats the liquid until it generates an aerosol— or 'vapor'—that can be inhaled."  *Id.*

In 2016, FDA exercised its statutory authority to deem e-cigarettes and other products meeting the definition of tobacco product under section 201(rr) of the Federal Food, Drug, and Cosmetic Act to be subject to the TCA's requirements.  81 Fed. Reg. 28,974 (May 10, 2016).  Most e-cigarettes were not on the market as of February 15, 2007, and thus meet the TCA's definition of a "new tobacco product," making it unlawful to market them without FDA authorization after the rule's August 8, 2016, effective date. As a policy matter, however, FDA decided against immediate enforcement of that statutory prohibition for products already on the market as of the rule's August 8, 2016 effective date.  *Id.* at 28,977-78; *see also id.* at 29,011 n.13.

Through enforcement policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes may pose and their potential benefit in helping adults quit or significantly reduce smoking combustible cigarettes. For example, FDA has "repeatedly emphasized that the availability of non-combustible options should not come at the expense of addicting a generation of children to nicotine through these same delivery vehicles." FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization (Revised): Guidance for Industry* 38 (Apr. 2020).[2] Moreover, FDA has "consistently informed industry that its compliance policies will be responsive to changed circumstances," *id.* at 35, and that "manufacturers cannot have settled expectations to market unlawful products, especially in the face of evolving public health concerns," *id.* at 36.

**2.** FDA has received, and acted on, many applications to market e-cigarette products, and it has granted multiple applications to market tobacco-flavored e-cigarette products. *See* FDA, *Premarket Tobacco Product*

_____

[2] https://perma.cc/DMB6-4DF8

*Marketing Granted Orders* (Mar. 28, 2024).[3]  In authorizing the marketing of those products, FDA acknowledged that many e-cigarettes are less hazardous to users' health than combustible cigarettes, and that the risk of youth using tobacco-flavored e-cigarette products is currently low.  FDA, *Technical Project Lead (TPL) Review [for Applications] Submitted by R.J. Reynolds Vapor Company* 4 (Oct. 12, 2021).[4]  FDA has therefore authorized tobacco-flavored e-cigarettes where a comprehensive scientific review showed, among other things, the absence of any comparatively high or unusual product-specific risks and also confirmed that combustible cigarette smokers would likely use the product to completely switch from, or significantly reduce their use of, combustible cigarettes.  *See generally id.*[5]

The TCA directs FDA to review applications to market new tobacco products on a case-by-case basis, taking into account the product's risks and benefits.  Before FDA can grant a marketing application, it conducts a comprehensive scientific review that considers an array of issues including

_____

[3] https://perma.cc/PS8E-SZCM
[4] https://perma.cc/7Z8E-FW6T
[5] In contrast to tobacco-flavored e-cigarettes, FDA has explained that e-cigarettes in other flavors, such as fruit or dessert, present a greater risk to youth, and therefore require a greater showing of benefit.  FDA-BIDI-000792.

whether the applicant provided sufficient information regarding the product's chemistry, stability, toxicology, abuse liability, and other factors that can impact the product's risks and benefits to users and nonusers. FDA-BIDI-000793. If the agency's review reveals deficiencies within a scientific discipline, the agency may inform the applicant via letter and then perform an additional cycle of review to assess the applicant's efforts to cure those deficiencies. *See, e.g.,* FDA-BIDI-000643 (FDA's cycle 2 chemistry review of petitioner's amendments). While FDA will complete its review within each discipline before authorizing the marketing of a new product, it may be unnecessary for a scientific discipline to perform a further cycle of review where other scientific disciplines have revealed that the central statutory showing (i.e., "appropriate for the protection of the public health") cannot be met. The agency may therefore decline to proceed with an additional cycle of review in a given discipline if that review cannot cure the dispositive shortcomings already identified. *See, e.g.,* FDA-BIDI-000795 (declining to perform a cycle 2 toxicology review due to "non-toxicological" concerns that required denial).

### III.  FDA's Denial Of Petitioner's Application To Market A Tobacco-Flavored E-Cigarette

Petitioner has submitted applications to market one tobacco-flavored e-cigarette product and ten non-tobacco-flavored products.  *Bidi Vapor LLC v. FDA (Bidi I)*, 47 F.4th 1191, 1200 (11th Cir. 2022).  FDA denied petitioner's applications for its non-tobacco-flavored products in September 2021, and these denials were the subject of a petition for review by this Court in 2022. *Id.* at 1206 (granting the petition for review on narrow grounds that do not apply here).  Those products are not at issue here.  This petition concerns petitioner's application to market its tobacco-flavored product, Bidi Stick - Classic (Bidi Classic), which was submitted to FDA on September 8, 2020. FDA-BIDI-000795.

After reviewing petitioner's application, FDA sent petitioner a deficiency letter on March 20, 2023.  FDA-BIDI-000015.  Among other things, the letter explained that, according to petitioner's studies, Bidi Classic exposes users to more nicotine than a typical combustible cigarette. FDA-BIDI-000032.  FDA therefore requested evidence that Bidi Classic's "higher nicotine exposure . . . does not cause higher abuse liability"—*i.e.*, a greater tendency to promote addiction and dependance—than a typical

combustible cigarette. *Id.* The letter also requested that petitioner employ appropriate study techniques to "identify *all* possible chemical compounds that may leach out of [Bidi Classic's] components" into the liquid that is vaporized and inhaled by users, as FDA needs that information "to fully evaluate the health risk of the new product." FDA-BIDI-000025. FDA similarly described additional information that it needed to evaluate Bidi Classic's emission of "harmful and potentially harmful constituents" (HPHC) in the aerosol emissions inhaled by users. FDA-BIDI-000027-29. On June 18, 2023, petitioner amended its application in response to the deficiency letter. FDA-BIDI-000795.

FDA reviewed all of petitioner's evidence, including the evidence submitted in response to the deficiency letter, and conducted analyses in every scientific discipline. *See* FDA-BIDI-000796. The agency ultimately concluded that petitioner failed to meet its statutory burden for three independent reasons relating to Bidi Classic's high abuse liability and the lack of adequate evidence concerning the product's other serious potential health risks. FDA-BIDI-000838-39.

In analyzing Bidi Classic's abuse liability, FDA began with petitioner's own clinical study, which revealed that users' "total nicotine

exposure" from Bidi Classic was significantly higher than their exposure from a typical combustible cigarette. FDA-BIDI-000812. In fact, FDA estimated that Bidi Classic exposes users to 96% more nicotine than a typical combustible cigarette. FDA-BIDI-000559. FDA also observed that Bidi Classic's nicotine concentration is among the highest of e-cigarettes tested in the published literature. FDA-BIDI-000813. Moreover, the presence of "nicotine salts" in Bidi Classic "reduces the harshness of [its] high nicotine concentration," thereby "making it more palatable" to users. FDA-BIDI-000813-14. The "combination" of these findings led FDA to conclude that Bidi Classic would cause existing tobacco users to "maintain or augment [their] nicotine dependence" rather than quit and that nonusers (including youth) who try the product would likely "develop nicotine dependence and addiction." FDA-BIDI-000814-15. FDA also found no evidence of a benefit sufficient to counterbalance these risks because petitioner "did not provide adequate data . . . to demonstrate that" combustible cigarette smokers would quit or reduce combustible cigarette use by "switch[ing] to" Bidi Classic. FDA-BIDI-000827. Thus, petitioner failed to establish that marketing Bidi Classic would be appropriate for the

protection of the public health.  FDA-BIDI-000837 (identifying this issue as Deficiency 3).

FDA additionally determined that petitioner failed to provide key pieces of evidence that were needed to assess Bidi Classic's other potential "risks and benefits to the population as a whole," 21 U.S.C. § 387j(c)(4), including whether the product "presents less risk than other tobacco products," *id.* § 387j(b)(1)(A).  *See* FDA-BIDI-000836-37 (applying these considerations to petitioner's omissions).  Specifically, despite the agency's request, *see* FDA-BIDI-000025, petitioner "did not provide a comprehensive study that would allow for a complete evaluation of [all] possible leachable[]" compounds that could have migrated from Bidi Classic's components to the e-liquid ultimately inhaled by users.  FDA-BIDI-000837 (identifying this issue as Deficiency 2).  Instead, petitioner provided a study that was incapable of detecting certain compounds that "can pose health risks to [Bidi Classic's] users."  *Id.*  This evidentiary deficiency precluded the agency from ascertaining the extent of the product's risks which, in turn, precluded a finding that marketing petitioner's product would be appropriate for the protection of the public health.  *Id.*

Petitioner likewise failed to provide data that would allow FDA to meaningfully assess the amount of HPHCs that users inhale from Bidi Classic compared to similar products, FDA-BIDI-000836 (identifying this issue as Deficiency 1), notwithstanding the agency's request for such data, *see* FDA-BIDI-000027-29. While petitioner provided HPHC data from other e-cigarette products, it failed to establish that this data was "measured and collected in a manner" that would enable a meaningful comparison to petitioner's measurements of Bidi Classic's HPHC output. FDA-BIDI-000836. This independently prevented FDA from fully evaluating the "relative health risks" the population would face in using petitioner's product, and therefore precluded a finding that Bidi Classic would yield a net benefit to public health. FDA-BIDI-000836-37. FDA accordingly denied petitioner's application. *Id*.

Petitioner filed its petition for review of that denial on January 26, 2024. It then moved to stay the effect of FDA's decision on February 2, 2024, and this Court denied that motion on February 16, 2024.

## SUMMARY OF ARGUMENT

**I.** FDA identified three separate ways in which petitioner failed to establish that marketing its product would be appropriate for the

protection of the public health.  First, petitioner's own clinical study revealed that users' "nicotine exposure" from Bidi Classic is significantly higher than their exposure from a typical combustible cigarette.  FDA-BIDI-000812.  Indeed, FDA found that petitioner's product would expose users to nearly twice as much nicotine as a typical combustible cigarette.  FDA-BIDI-000559.  Moreover, the product's nicotine concentration is among the highest of all documented e-cigarettes, and the presence of "nicotine salts" makes that high nicotine concentration more palatable to users and encourages them to use more than they otherwise would.  FDA-BIDI-000813-14.  Based on that evidence, FDA reasonably concluded that Bidi Classic would likely cause existing tobacco users to "maintain or augment [their] nicotine dependence" and likely cause nonusers (including youth) who try the product to "develop nicotine dependence and addiction," thus presenting a significant risk to public health.  FDA-BIDI-000814-15.  The agency's analysis in this respect was wholly consistent with prior statements regarding the significance of abuse liability.

FDA also found petitioner's evidence lacking in two significant respects even after sending a deficiency letter and giving petitioner an opportunity to respond.  As FDA explained, petitioner failed to conduct a

study capable of identifying all leachable compounds that could migrate into Bidi Classic's e-liquid.  FDA-BIDI-000837.  Because such compounds can lead to serious acute and chronic health conditions when they are vaporized and inhaled, FDA reasonably determined that this omission precluded a full evaluation of the product's risks and benefits as needed to support the statutorily required public health finding.  *Id.*  Contrary to petitioner's contention (Br. 49-50), FDA separately considered petitioner's "extractable[] study" and reasonably concluded that it did not provide the necessary identification and assessment of all potential leachable compounds.  FDA-BIDI-000811.

FDA also found insufficient information to assess the amount of HPHCs that users inhale from Bidi Classic compared to similar products. FDA-BIDI-000836.  The agency explained that, while petitioner provided comparison data concerning other products' HPHC output, petitioner failed to establish that such data was "measured and collected in a manner that is sufficient or appropriate" to enable a meaningful comparison to petitioner's product.  *Id.*  Thus, similar to the missing information regarding leachable compounds, the missing information regarding HPHCs precluded FDA from fully evaluating the product's comparative

risks as needed to make the statutorily required assessment.  FDA-BIDI-000836-37.

FDA found that each of these three grounds independently precluded a finding that petitioner had carried its burden of showing that marketing its product is appropriate for the protection of the public health.  FDA-BIDI-000793-94.  Because the agency would have reached the same result based on any one of these grounds, petitioner can succeed only by prevailing as to all three issues, yet petitioner has failed to demonstrate error even as to one.

**II.**  Contrary to petitioner's contention, FDA expressly considered these deficiencies as part of a holistic analysis that accounted for petitioner's evidence of the product's purported benefits.  The agency noted that petitioner "provided minimal evidence to address the likelihood that current [combustible cigarette] users" would use Bidi Classic to switch, and FDA reasonably explained why the limited evidence that petitioner provided failed to demonstrate that "current tobacco users (including [combustible cigarette] users) would likely use [Bidi Classic] to partially or completely switch" from combustible cigarettes.  FDA-BIDI-000826-27.  FDA also considered petitioner's evidence that many e-

cigarettes provide lower toxicant exposure than combustible cigarettes. But because the benefit of lower exposure depends on users making a complete switch or significantly reducing their combustible cigarette use, the absence of evidence that users would actually make that switch prevented FDA from concluding that Bidi Classic would reduce "adverse health outcomes" from combustible cigarette smoking. FDA-BIDI-000827.

As the foregoing shows, FDA appropriately applied the adjudicative framework established by Congress to the particulars of petitioner's application. And it amply "explain[ed] how the deficiencies [in petitioner's application] relate to the overall public health consequences of" petitioner's product. *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1219 (D.C. Cir. 2023). The TCA provides no support for petitioner's suggestion that FDA was additionally required to promulgate a tobacco product standard before undertaking this analysis.

## STANDARD OF REVIEW

FDA's denial of an application to market a new tobacco product is reviewed under the familiar, deferential standards established by the Administrative Procedure Act (APA) and may be held unlawful and set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(A); *see* 21 U.S.C. § 387*l*(b)

(incorporating this standard). Review under that standard "is narrow and

a court is not to substitute its judgment for that of the agency." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

FDA denied petitioner's application to market the tobacco-flavored

Bidi Classic because, for each of three independent reasons, petitioner's

evidence failed to show that the product's benefits outweigh its risks so as

to make it appropriate for the protection of the public health. Petitioner's

challenges to that determination are meritless.

## I. FDA Reasonably Determined That The Evidence Precluded A Finding That The Product Is Appropriate For The Protection Of The Public Health

### A. Petitioner's evidence demonstrated a comparatively high risk that its product would increase the likelihood and severity of addiction, including among youth

**1.** The TCA requires FDA to consider a new tobacco product's risks

and benefits to the population as a whole, taking into account both the

"likelihood that existing users of tobacco products will stop using such

products" and the "likelihood that those who do not use tobacco products

will start." 21 U.S.C. § 387j(c)(4). Because some e-cigarettes pose reduced

health risks relative to combustible cigarettes, FDA has explained that

e-cigarettes can potentially benefit the public health if they encourage

combustible cigarette smokers to switch or quit. FDA-BIDI-000829.

Whether a product will promote switching or quitting is informed in part

by its abuse liability, which bears on the likelihood that a product will

maintain or increase levels of nicotine dependence or addiction. *See* FDA-

BIDI-000812-28.

For these reasons, in reviewing petitioner's application, FDA

addressed a key tradeoff. If a product's abuse liability is too low, smokers

trying to switch may find it to be an "inadequate substitute" for

combustible cigarettes. FDA-BIDI-000812. "On the other hand," FDA

observed, a product with higher abuse liability is more likely to addict new

users or augment existing users' addictions. *Id.*

After considering the evidence, FDA concluded that petitioner's

product failed to strike an appropriate balance between these competing

concerns because its abuse liability is too high. Petitioner submitted a

clinical study showing that, where the subjects were free to use Bidi Classic

as they wished (referred to as "ad libitum use"), their "total nicotine

exposure" from the product was higher than their exposure from a

combustible cigarette.  FDA-BIDI-000812.  Indeed, based on the study's findings, FDA estimated users' exposure to be "96% higher" than what a typical combustible cigarette would yield.  FDA-BIDI-000559.

In addition, FDA noted that Bidi Classic's nicotine concentration, at 60 milligrams per milliliter, is among the highest reported for e-cigarettes in the published literature, which range from 3 to 60 milligrams per milliliter.  FDA-BIDI-000813. Moreover, the presence of "nicotine salts" in Bidi Classic "reduces the harshness of [its] high nicotine concentration," thereby "making it more palatable" to users and encouraging them to use more than they otherwise would.  FDA-BIDI-000813-14.

Based on the "totality of evidence," FDA concluded that Bidi Classic's abuse liability is "similar to or higher than that of" combustible cigarettes among inexperienced e-cigarette users, and "higher than" combustible cigarettes among experienced e-cigarette users, who tend to take "longer and larger puffs."  FDA-BIDI-000814, 818.  Because Bidi Classic has such "high abuse liability," existing tobacco users are especially "likely to maintain or augment" their addiction by using it, and nonusers (including youth) are more likely to "develop nicotine addiction and dependence" if they try it.  FDA-BIDI-000841.  Based on this significant risk

to both users and nonusers of tobacco products and the lack of evidence (discussed below) of a countervailing benefit, FDA found that petitioner failed to establish that marketing Bidi Classic would be appropriate for the protection of the public health.  FDA-BIDI-000837.

**2.**  FDA's analysis of Bidi Classic's abuse liability was wholly consistent with the agency's prior statements.  Petitioner argues that, in denying its application, FDA contradicted its past assertion that a product with low abuse liability can be less effective in helping smokers switch or quit.  Br. 52-53.  But FDA acknowledged in this analysis, as it has elsewhere, the possibility that smokers may find products with especially low abuse liability to be "inadequate substitute[s]" for combustible cigarettes, which limits switching.  FDA-BIDI-000812.  That observation is in no way at odds with the agency's finding here that an especially "high abuse liability will increase the likelihood and severity of nicotine dependence, including in youth."  FDA-BIDI-000815.

Far from suggesting that "any abuse liability" in a new tobacco product requires denial, Br. 20, FDA determined, based on multiple scientific and evidentiary considerations, that Bidi Classic tipped the balance between having too little abuse liability and too much, thus

creating a significant risk of addiction among both new and current users of tobacco products, FDA-BIDI-000814-15.  This "type of line-drawing and reasoned weighing of the evidence falls squarely within [FDA's] wheelhouse as an expert administrative agency," *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 386 (D.C. Cir. 2020), and it is therefore due deference, *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("a reviewing court must generally be at its most deferential" when an agency has made a "scientific determination" that is "within its area of special expertise").  Because FDA did not "reverse" its prior statement that some degree of abuse liability can help smokers switch or quit, there is no basis for petitioner's argument that the decision marks a departure from prior policy that the agency was required to "acknowledge" or "explain."  Br. 55; *see also Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 630 (2d Cir. 2023) (recognizing that, because FDA did not depart from a prior policy concerning e-cigarettes, it "did not need to provide notice or consider . . . reliance interests").

The record also refutes petitioner's argument (Br. 53-54) that FDA's rationale for the denial order here is irreconcilable with its grant of marketing authorization for a particular NJOY product.  Contrary to

petitioner's suggestion (Br. 53), both decisions "explicitly recognized" that some amount of abuse liability is necessary to help smokers switch to a less harmful alternative, *see* FDA-BIDI-000812. And nothing in FDA's NJOY decision contradicts FDA's finding, in reviewing petitioner's application, that heightened abuse liability implicates an increased risk of addiction. Indeed, far from establishing "sufficient . . . similarities" between NJOY's and petitioner's applications so as to require "similar treatment" by the agency, *P.I.A. Michigan City Inc. v. Thompson*, 292 F.3d 820, 826 (D.C. Cir. 2002), petitioner's own assertions reveal that FDA had *at least* one reason to treat NJOY's application differently: its product's abuse liability was "approaching that of combust[ible] cigarettes" and "no higher than" that of other tobacco products. Br. 54 (quoting FDA-BIDI-003448). By contrast, Bidi Classic has a "*higher* abuse liability compared to [combustible cigarettes]," FDA-BIDI-000815 (emphasis added), in part because it exposes users to 96% more nicotine than a typical combustible cigarette, FDA-BIDI-000559. Petitioner's application is further distinguishable because it failed to make a similar showing of benefits as that established by NJOY's application. *See infra* pp. 39-42 (discussing FDA's conclusion that petitioner failed to establish a sufficient benefit for Bidi Classic).

Petitioner is on no firmer ground in urging that FDA's analysis of Bidi Classic was inconsistent with the agency's prior statements about youth use of tobacco-flavored products. *See* Br. 56-58. In denying petitioner's application, FDA acknowledged that authorization of a tobacco-flavored product generally requires a "lesser showing of benefit" than authorization of products with other flavors, like fruit and candy, which are more appealing to youth. FDA-BIDI-000792. But despite the reduced youth appeal of tobacco-flavored products in general, FDA explained that the risk presented by Bidi Classic is heightened by the product's greater abuse liability. FDA-BIDI-000827. Thus, "[a]lthough published literature and [petitioner's] . . . observational studies showed low likelihood" that youth would use Bidi Classic, FDA explained that some youth do use such products,[6] and those youth and other tobacco nonusers that use Bidi Classic will be at a comparatively high risk of developing nicotine dependence or addiction. FDA-BIDI-000827. The agency also noted the possibility that youth preference for tobacco-flavored products could

------

[6] While youth use of tobacco-flavored e-cigarettes is relatively low, it is not zero. *See, e.g.*, FDA-BIDI-000914 (2023 survey data in which 6.4% of youth e-cigarette users reported using tobacco-flavored e-cigarettes).

increase, *id.,* because youth e-cigarette preferences are "fluid" and "readily shift," as when "the removal of one flavored product option prompt[s] youth to migrate to another," *Prohibition Juice Co. v. FDA*, 45 F.4th 8, 26 (D.C. Cir. 2022) (quotation marks omitted).[7]

## B. Petitioner's application also omitted key evidence about the product's potential health hazards, which precluded the agency from assessing certain risks

FDA identified two other bases for concluding that petitioner failed to demonstrate that marketing the product would be appropriate for the protection of the public health.

**1.** FDA reasonably determined that petitioner failed to provide evidence adequately evaluating its product for harmful compounds that could leach into the liquid that is aerosolized and inhaled by users. FDA-BIDI-000837. In its deficiency letter, FDA asked petitioner to provide a "chemical analysis to identify *all* possible chemical compounds that may leach out of [Bidi Classic's] components during normal product use." FDA-BIDI-000025. But petitioner analyzed its product using only "gas

_____

[7] To date, tobacco-flavored e-cigarettes are the only ones that have been authorized for marketing. FDA, *Advisory and Enforcement Actions Against Industry for Unauthorized Tobacco Products*, https://perma.cc/S6L9-CCB7.

chromatography mass spectrometry," which FDA explained is less capable of detecting some leachable compounds and wholly incapable of detecting others. FDA-BIDI-000026; *see also* FDA-BIDI-000840 (explaining how petitioner's study "is limited to [detecting only] chemical compounds that have high vapor pressure"). Petitioner could also have used "other mass spectrometry . . . techniques," such as "liquid chromatography," in order to detect all leachable compounds—including those potentially missed by gas chromatography alone. FDA-BIDI-000837. But petitioner failed to provide such a study. *Id.*

FDA explained why this omission required denial of petitioner's application under the statutory public health standard. The compounds potentially left "[u]ndetected" by petitioner's study included "volatile organic compounds," "semi-volatile organic compounds," "non-volatile organic compounds" and "thermally labile compounds." FDA-BIDI-000837. And "[e]xposures to any of these contaminants" could "pose an acute or chronic health risk" to Bidi Classic's users. *Id.* Because FDA could not "account[] for" or evaluate the extent of those possible health risks based on the evidence in petitioner's application, the application did not contain the information necessary for FDA to conduct a full "assessment of

risks and benefits" to the population as a whole.  *Id.*; *see also* 21 U.S.C. § 387j(b)(1)(A).  FDA therefore concluded that, "[w]ithout a comprehensive leachable study" to establish the extent of these risks, FDA-BIDI-000837, petitioner had failed to carry its burden of "showing that permitting [Bidi Classic] to be marketed would be appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2).

Rather than rebut FDA's assessment of the limitations of its leachable study, petitioner argues that FDA failed to evaluate a separate study—its "extractable[] study"—that it contends likely "would have identified any remaining potential leachable compounds."  Br. 50.[8]  But the record shows that FDA did review petitioner's extractable study, and petitioner acknowledges as much in noting that the agency found the study to be "acceptable from a chemistry perspective."  *Id.* (quoting FDA-BIDI-000805); *see also* FDA-BIDI-000678-79 (conducting a detailed "cycle 2" review of petitioner's final extractable study).

---

[8] According to petitioner, its extractable study "used various solvents . . . to assess the potential for constituents to leach from device parts" of Bidi Classic. Br. 31-32.

FDA reasonably explained that "comprehensive extractable and leachable studies" were *both* needed to complete its analysis of Bidi Classic's risks. FDA-BIDI-000811. While petitioner's extractable study "used various solvents . . . to assess the potential for [harmful] constituents to leach from *device parts*" of Bidi Classic, Br. 31-32 (emphasis added), the agency explained that "[p]ossible sources of leachables" also include "manufacturing equipment" and "packaging," which are not device parts and may provide independent sources of harmful compounds, FDA-BIDI-000811. Thus, unlike petitioner's extractable study, a comprehensive leachable study would have identified harmful compounds in the e-liquid regardless of their source. Moreover, the agency has explained that "while there may be significant overlap between" the compounds identified by a leachable study and those identified by an extractable study, the two will not necessarily yield the same results, so applicants must "look[] for additional [toxic or harmful] compounds that may not have been detected during [an] extractable" study like petitioner's. FDA, *Approaches to the Evaluation of Extractables and Leachables in Tobacco Product Application Review*

4 (Oct. 1, 2020).[9]  Petitioner's vague, unsupported assertions that its extractable study "*may* have revealed a broader range of leachables than would be seen under real-world conditions" and "*likely* . . . would have identified any remaining potential leachable compounds," Br. 32, 50 (emphases added), fail to demonstrate any error in the agency's scientific judgment that the study was not sufficient to evaluate the full range of risk and that an adequate leachable study was also needed.  *See Baltimore Gas & Elec.*, 462 U.S. at 103 (emphasizing the deference due to an agency's evaluation of evidence within its scientific expertise).

**2.**  FDA also reasonably determined that petitioner's application lacked information needed to permit a meaningful assessment of the product's relative output of HPHCs.  FDA-BIDI-000837-38.  The TCA requires an applicant to provide evidence showing whether its product "presents less risk than other tobacco products."  21 U.S.C. § 387j(b)(1)(A).  Although petitioner's original application compared Bidi Classic's HPHC output to certain other products, FDA's deficiency letter explained that it omitted key data about how those other products' HPHC outputs were

---

[9] https://perma.cc/G3HX-6WDK

measured.  FDA-BIDI-000022-23.  In its response, petitioner "did not address" these concerns but "[i]nstead" submitted existing literature regarding other products' HPHC output that likewise failed to include adequate information to support the necessary comparison.  FDA-BIDI-000810.

FDA explained that the additional data petitioner provided were still "not measured and collected in a manner that is sufficient or appropriate" to enable a meaningful comparison to HPHC data petitioner provided for Bidi Classic.  FDA-BIDI-000836.  FDA elaborated that each of petitioner's comparison data sets suffered from *at least* one of the following issues: some "lacked information" concerning "testing method validations" and "protocols"; some were collected using either an incompatible or unknown "puffing life cycle" or "puffing regimens" (*i.e.*, the "frequency, volume, [and] duration" of puffs); and for some data, "the smoking machine used to collect the HPHC" was not identified.  *Id.*  Because different testing methodologies can significantly "influence the overall HPHC yields of an [e-cigarette]" — thus providing a very different sense of a product's risk — and because FDA also needed each comparison data set's "test methods" to determine their "reliab[ility]," FDA-BIDI-000808, the agency concluded

that each of these issues precluded a valid, like-for-like comparison to the test results for Bidi Classic, FDA-BIDI-000836. This analysis refutes petitioner's insistence that FDA failed to "explain *why*" the shortcomings in petitioner's application "prevented a comparison of aerosol HPHC levels." Br. 44.

FDA also explained why these omissions required denial of petitioner's application under the statutory standard. The agency needed "[a]ppropriate [e-cigarette] comparison . . . data" in order to adequately "assess the relative health risks" of HPHC exposure from Bidi Classic. FDA-BIDI-000836. Petitioner's failure to provide such data therefore precluded the agency from determining whether Bidi Classic "presents less risk than other tobacco products" in a scientifically valid manner, 21 U.S.C. § 387j(b)(1)(A), and from completing "the assessment of risks and benefits" called for by the statute, FDA-BIDI-000837. The agency accordingly concluded that petitioner failed to carry its burden of establishing that marketing Bidi Classic would be appropriate for the protection of the public health. *Id*.

Petitioner's arguments that its data were sufficient all fall short. In discussing data it obtained from a 2018 study by El-Hellani et al., petitioner

argues that, because a "4 second puff" was used for the El-Hellani data whereas petitioner used a "3 second puff," the "difference in puffing conditions" was "immaterial."  Br. 43-44.  But FDA cited multiple issues with petitioner's reliance on the El-Hellani data: specifically, that it "lack[ed] method validation information"; its HPHC yields were collected using a different "puffing machine" than petitioner used; and those yields were derived using a different "puffing life cycle" *and* "different puffing regimens" (which includes puff "frequency," "volume," and "duration"). FDA-BIDI-000809.  By focusing solely on puff duration, petitioner sidesteps most of FDA's rationale for why the El-Hellani data could not be reliably compared to petitioner's.  And petitioner in any event offers no sound reason why its opinion about the "material[ity]" of a "1 second" difference in puff duration—a difference of 33% in this context—should displace the agency's scientific judgment.  *See Rempfer v. Sharfstein*, 583 F.3d 860, 867 (D.C. Cir. 2009) (FDA's "scientific judgment" within "its area of expertise" is given "a high level of deference" (quotation marks omitted)).

Petitioner further argues that FDA acted unreasonably in rejecting some of its HPHC comparison data because the testing that generated the comparison data used less of the subject product's total volume than

petitioner's testing did.  Br. 40 (applying this argument to comparator

JUUL data), Br. 44 (applying a similar argument to the El-Hellani data).

Petitioner asserts that any such discrepancy was harmless because the

puffing regimen used to gather the comparison data could only have

"underestimate[d]" the comparator products' HPHC output, thus making

Bidi Classic look less favorable by comparison.  Br. 40.  But FDA's

reasoning encompassed a broader array of issues than petitioner suggests.

As to the El-Hellani comparison data, as discussed above, FDA cited

myriad issues that precluded a scientifically valid comparison, including a

lack of method validation information along with differences in the puffing

machine, life cycle, volume, and duration used.  FDA-BIDI-000809.  FDA

explained that some of these issues created a "potential for *overestimation*"

of the comparator products' HPHC output in addition to a potential for

underestimation.  FDA-BIDI-000836. (emphasis added).  Similarly, FDA

identified multiple issues with the JUUL data, including "limited analytical

method information" and "no method description or validation

information."  FDA-BIDI-000809.  Thus, by focusing exclusively on the

percentage of the product used to generate data, petitioner again elides

much of FDA's basis for concluding that the information in petitioner's application did not permit a meaningful comparison.

There is likewise no merit to petitioner's argument that FDA overlooked the method description and validation information provided for the 2021 data by Chen et al. Br. 41-42. FDA directly addressed that study in its analysis, explaining that the "Chen et al. paper contains *very limited* analytical method information (e.g., method name, name of testing lab) and no method description or validation information." FDA-BIDI-000809 (emphasis added). Petitioner fails to suggest why FDA was obligated to find that information sufficient as a scientific matter. *Cf. Rempfer*, 583 F.3d at 867.

Petitioner also argues that, because one of its comparison data sets was published by a different part of the federal government, petitioner should not be required to provide adequate information about that data. Br. 45. But this argument inverts the statutory burden. "The [TCA] requires the denial of an application unless *the manufacturer can affirmatively demonstrate* that it meets the appropriateness standard through the section 387j(c) comparative assessment." *Gripum, LLC v. FDA*, 47 F.4th 553, 560 (7th Cir. 2022) (emphasis added). Nothing in the TCA requires FDA to go

fishing for information that may be available to other federal agencies to justify petitioner's selection of comparator data.[10]

Petitioner also fails to substantiate its argument that, by requiring "analytical method validation information" for its comparison data, FDA "foreclosed [petitioner's] opportunity . . . to use [published] literature in lieu of conducting . . . costly studies." Br. 45-46 (quotation marks omitted). In any event, neither the TCA nor agency guidance provides that an applicant will necessarily be able to use published literature, rather than performing new studies, to carry its burden. While FDA has stated that applicants may sometimes rely on "data from the published literature" (Br. 46 (quoting FDA-BIDI-003443)) to support some aspects of their application, applicants must still establish the cited literature's scientific sufficiency to establish the point(s) for which it is offered, and the published literature must "be adequately bridged to [the applicant's] product." FDA-BIDI-003443. In many cases, it will not "be possible to support a marketing order for an ENDS product without conducting new nonclinical or clinical studies." *Id.* Here, FDA reasonably determined that

---

[10] As petitioner also notes, the selection of appropriate comparison products is within the discretion of the applicant. Br. 35 n.9.

the published literature petitioner cited did not support the necessary comparison due to pervasive methodological differences between that literature and petitioner's studies of its own products.  FDA-BIDI-000793.[11]

### C.    Each of the three deficiencies independently supports the denial of petitioner's application

Even if there were merit to petitioner's challenge to any one of FDA's three grounds for denying the application, such error would be harmless. The TCA makes marketing orders subject to review "in accordance with chapter 7 of title 5," 21 U.S.C. § 387*l*(b), thus incorporating the APA's rule of harmless error in 5 U.S.C. § 706 (instructing that "due account shall be taken of the rule of prejudicial error" in conducting arbitrary-and-capricious review).  In applying the harmless error rule, courts must refrain from applying "mandatory presumptions and rigid rules," and instead must make a "case-specific application of judgment, based upon examination of the record."  *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). The Eleventh Circuit, in evaluating an agency's compliance with procedural rules, has stated that such errors "are deemed harmless unless

---

[11] Contrary to petitioner's suggestion (Br. 46), that NJOY successfully relied on published literature to make certain showings reflects differences in the data used and does not show that petitioner was treated differently.

the court has a 'substantial doubt' that the agency would not have reached the result it did."  *Alabama Hosp. Ass'n v. Beasley*, 702 F.2d 955, 958 n.8 (11th Cir. 1983); *see also Romano-Murphy v. Commissioner*, 816 F.3d 707, 720 (11th Cir. 2016) (same).  And "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki*, 556 U.S. at 409-10 (collecting authority).

Here, FDA found that each of the three grounds it identified, standing alone, prevented the agency from finding that petitioner satisfied the statutory standard.  FDA-BIDI-000793-94.  Any discrete error in one ground would therefore be harmless, because the agency would have reached the same result on either of the remaining grounds.  *See, e.g., Casino Airlines, Inc. v. National Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006) ("[W]hen an agency relies on multiple grounds for its decision," courts will "sustain the decision as long as one is valid and the agency would clearly have acted on that ground even if the other[s] were unavailable." (quotation marks omitted)).  For example, even if this Court were to find that FDA overlooked or misconstrued the relevant evidence in determining that petitioner failed to provide adequate data to assess Bidi Classic's relative HPHC output, *see* Br. 40-46, this would not undermine FDA's

separate conclusions concerning the product's high abuse liability or petitioner's failure to adequately assess the product for leachable compounds. Therefore, petitioner's challenge can succeed only if it shows that FDA's analysis as to all three grounds for denial was arbitrary and capricious or otherwise unlawful. And for the reasons discussed above, petitioner has not made that showing as to even one of the cited deficiencies.

## II. FDA Appropriately Applied The Statutory Standard And Considered The Risks And Benefits To The Population As A Whole

### A. FDA explained the deficiencies in petitioner's evidence as part of a holistic review of the product's risks and benefits

Contrary to petitioner's contention, FDA weighed all of petitioner's evidence concerning Bidi Classic's "risks and benefits to the population as a whole," and it took into account the "likelihood that existing users of tobacco products will stop," the "likelihood that those who do not use tobacco products will start," 21 U.S.C. § 387j(c)(4), and information concerning whether Bidi Classic "presents less risk than other tobacco products," *id.* § 387j(b)(1)(A). This review included consideration of the evidence petitioner offered to support its claim that Bidi Classic would

benefit public health by helping smokers of combustible cigarettes switch away from such products, which the agency reasonably found to be inadequate.

FDA explained that petitioner "provided minimal evidence to address the likelihood that current [combustible cigarette] users will use the new product (or Bidi Stick, in general) to switch." FDA-BIDI-000826. And the agency further explained that the limited evidence petitioner provided was "inconclusive" and failed to demonstrate the claimed benefit. FDA-BIDI-000827. For example, FDA explained that petitioner's cross-sectional survey data purporting to show that a small percentage of Bidi Classic users had stopped smoking captured only one point in time and therefore could not even establish "whether [the survey] respondents used [Bidi Classic] before or after switching," much less whether those respondents actually "used the new product to switch or reduce their consumption" of combustible cigarettes. *Id*. The agency also addressed the shortcomings of petitioner's perceptions-and-intentions study showing that current tobacco users had a "low to moderate interest in trying" Bidi Classic. FDA-BIDI-000826. FDA explained that such studies establish only "precursors" to "future use" and do not demonstrate how much people

will "actual[ly] use" a product. *Id.* By contrast, petitioner's study of *actual* "prevalence of use" showed that current tobacco users were "not likely" to try or regularly use Bidi Classic. *Id.*

As FDA also explained, petitioner's failure to establish that smokers will actually use Bidi Classic to switch or quit entirely undermines the product's claimed benefits. While the agency acknowledged that e-cigarettes like Bidi Classic generally expose users to fewer toxicants than combustible cigarettes, FDA-BIDI-000829, that reduced risk does not result in reduced "toxicant exposure" and "adverse health outcomes" so as to benefit the public health unless smokers actually use the product to "reduce [combustible cigarette] use" — which petitioner failed to show. FDA-BIDI-000827. Contrary to petitioner's suggestion (Br. 59), in undertaking this review FDA acknowledged that tobacco-flavored e-cigarettes present less risk of youth use than other flavored e-cigarettes and that applicants accordingly need to make a "lesser showing of benefit" to demonstrate that the marketing of a tobacco-flavored product is appropriate for the protection of the public health. FDA-BIDI-000792. The agency applied that standard here and concluded that petitioner failed to make even that lesser showing: as part of its analysis, FDA contrasted the

lack of evidence of the product's benefits with evidence showing that it "has a high nicotine concentration and is associated with high abuse liability," which leads to "increased likelihood of addiction and nicotine dependence." FDA-BIDI-000827.

The foregoing belies petitioner's insistence (Br. 36, 47, 55) that FDA failed to consider the product's potential benefits or weigh them against its risks. While petitioner touts its product's "demonstrated" benefits, Br. 36, it identifies none beyond those that FDA considered and reasonably rejected. *Compare* Br. 36-37, 47-48, 55-56 (arguing that Bidi Classic exposes users to fewer toxicants than combustible cigarettes and helps smokers quit), *with* FDA-BIDI-000826-27 (explaining why petitioner failed to establish that these benefits would accrue).

These considerations also render petitioner's reliance on *Fontem US, LLC v. FDA*, 82 F.4th 1207 (D.C. Cir. 2023), unavailing. This "is not a situation" where FDA even arguably "failed to address the potential benefits [or risks] of the applicant's products for the public at large or to consider the possibility that existing users of combustible tobacco products such as cigarettes would reap health benefits by transitioning to [petitioner's] products.'" *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 555 (3d

Cir. 2023) (quotation marks omitted) (quoting and distinguishing *Fontem*).

Nor did FDA fail to "explain[] how the deficiencies [in petitioner's

application] relate to the overall public health consequences of" petitioner's

product. *Fontem*, 82 F.4th at 1219. The agency determined that Bidi

Classic's abuse liability poses a comparatively high risk that the product

will promote addiction rather than help users quit, FDA-BIDI-000827, and

it found that gaps in petitioner's evidence failed to rule out serious "acute

or chronic" health risks to users, FDA-BIDI-000836-37. The agency also

"address[ed] the potential benefits of [petitioner's] product[] for the public

at large" and expressly "consider[ed] the possibility that existing users of

combustible tobacco products such as cigarettes would reap health benefits

by transitioning to [petitioner's] vaping products." *Fontem*, 82 F.4th at

1219. As explained, FDA reasonably found the evidence insufficient to

support a finding that Bidi Classic would provide the benefits that

petitioner claims. Petitioner's quarrel with these determinations ultimately

distills to "a scientific debate" about the relative addictiveness of

petitioner's product, the reliability of its evidence on the product's

potential hazards, and the implications for public health. *Logic Tech.*, 84

F.4th at 555. Such debates are generally unsuitable for judicial review, *id.*,

because an agency's scientific judgment on such issues is entitled to

deference, *Baltimore Gas & Elec.*, 462 U.S. at 103.

**B.    FDA appropriately considered petitioner's toxicology evidence in evaluating the product's benefits**

FDA's review of petitioner's application included scientific analyses

spanning a dozen disciplines, including toxicology.  FDA-BIDI-000796; *see*

*also* FDA-BIDI-000539-67 (cycle 1 toxicology review).  There is no merit to

petitioner's contention that FDA acted unreasonably in declining to

conduct a second-round toxicology review after having already performed

a first-round toxicology review and having determined that independent

findings made in other parts of its analysis precluded the agency from

concluding that the product's marketing would be appropriate for the

protection of the public health.  The TCA directs that FDA shall deny a

marketing application where an applicant has failed to make that showing,

*Gripum,* 47 F.4th at 560, and FDA reasonably applied that standard.

As discussed, *supra* p. 9, FDA conducted a second (cycle 2) analysis

with respect to some disciplines in order to address petitioner's response to

the deficiency letter.  For the reasons already explained, FDA found

petitioner's response insufficient to address three of these deficiencies, each

of which provides an independent basis for concluding that the statutory standard was not met. FDA-BIDI-000795. FDA explained that a second toxicology review was not warranted in these circumstances because the agency had already identified three independent and dispositive reasons why petitioner failed to satisfy the statutory standard: the evidence of Bidi Classic's high abuse liability, the failure to conduct a study capable of identifying all leachable compounds that could migrate into Bidi Classic's e-liquid, and the lack of sufficient evidence to assess the amount of HPHCs that users inhale from Bidi Classic compared to similar products. *See id.* FDA explained that each of these issues was "non-toxicological" in nature and that further toxicological analysis therefore would not alter the agency's determination in these respects. *Id.*[12]

Petitioner asserts that in not performing a cycle 2 toxicology review, FDA overlooked evidence "demonstrating the substantially lower health

---

[12] Moreover, if the agency had proceeded with a cycle 2 toxicology review, it could only have added additional grounds for denying petitioner's application. FDA noted that its cycle 1 toxicology review had "identified four [toxicological] deficiencies" in petitioner's application *in addition* to the three "non-toxicological" ones discussed above. FDA-BIDI-000795. But because the agency did not complete a cycle 2 toxicology review, its denial of petitioner's application did "not rely on" those four toxicological deficiencies. *Id.*

risks of [Bidi Classic] when compared to combustible cigarettes." Br. 29. But FDA acknowledged that combustible cigarette smokers who switch to e-cigarettes will generally be exposed to "fewer and lower concentrations of" HPHCs, FDA-BIDI-000792, and that "complete switching [from combustible cigarettes to e-cigarettes] may reduce exposure to some carcinogens and other toxicants," FDA-BIDI-000829. FDA also explained that an attendant reduction in "toxicant exposure" and "adverse health outcomes" will result only if combustible cigarette smokers actually "partially or completely switch" to the lower-risk e-cigarette product. FDA-BIDI-000827. Because petitioner failed to demonstrate that combustible cigarette smokers were likely to "partially or completely switch" to Bidi Classic, *id.*, the product's lower concentrations of HPHCs does not affect the analysis. Petitioner also fails to explain how data comparing Bidi Classic's health risks to combustible cigarettes could address the product's high abuse liability or the evidentiary deficiencies that prevented the agency from assessing specific risks so as to affect FDA's determination. For all of these reasons, the agency reasonably concluded —and petitioner offers no reason to doubt —that further review of the

toxicants associated with Bidi Classic could not have altered this analysis. FDA-BIDI-000795.

Contrary to petitioner's contention, FDA reviewed all of the evidence that petitioner cites in this discussion, including the information that petitioner identifies as having been submitted "[i]n response to FDA's deficiency letter." Br. 29. For example, while petitioner suggests that, due to the absence of a cycle 2 toxicology review, it received no credit for its extractable study, Br. 31-32, FDA analyzed that study and concluded that it had "adequately addressed" the corresponding deficiency, FDA-BIDI-000678-79. Because FDA sufficiently addressed the evidence that petitioner submitted, this case is unlike *Bidi I*. Moreover, *Bidi I* held that FDA erred by not considering information that the Court found to be relevant to the agency's basis for denying petitioner's applications. 47 F.4th 1191, 1203 (11th Cir. 2022). By contrast, the toxicological information that petitioner asserts should have been more thoroughly considered in this case has no bearing on the multiple independent grounds for denial identified by the agency.

## C. FDA applied the TCA's adjudicative framework and did not impliedly adopt a tobacco product standard

There is likewise no merit to petitioner's suggestion (Br. 37, 49, 60) that FDA implicitly adopted a tobacco product standard in denying its application. While Congress gave FDA broad authority to promulgate new standards through rulemaking, 21 U.S.C. § 387g, it also expressly directed FDA to adjudicate applications for marketing authorization under § 387j and to deny any application that fails to meet the standards set forth in that section, *id*. § 387j(c)(2). Congress further specified that a marketing application must include a panoply of information about product safety, including "full reports of all information[] . . . concerning investigations which have been made to show the health risks of [the new] tobacco product," *id*. § 387j(b)(1)(A), and "such other information relevant to the subject matter of the application as [FDA] may require," *id*. § 387j(b)(1)(G). Consistent with that directive, an applicant must provide "well-controlled investigations" or other "valid scientific evidence" to support its claims about a product's risks and benefits. *Id*. § 387j(c)(5)(A)-(B).

The authority to adjudicate marketing applications and the authority to promulgate new tobacco product standards through rulemaking are

thus distinct from one another. And the provisions governing marketing applications expressly put the onus on manufacturers, not FDA, to establish the appropriateness of new products before marketing—a burden that petitioner elides by invoking inapposite provisions. FDA explained why the product's high abuse liability and the absence of key evidence bearing on the product's risks, along with a lack of reliable evidence showing that the product will provide a benefit by helping combustible cigarette smokers switch or quit, precluded a finding that marketing the product would be appropriate for the protection of the public health. FDA-BIDI-000836-37. The agency thus appropriately applied the adjudicative standards established by Congress. Contrary to petitioner's suggestion, Br. 37-39, nothing in the TCA required FDA to promulgate any tobacco product standards in determining that, for the reasons discussed above, petitioner failed to satisfy the statutory standard. *See Fontem*, 82 F.4th at 1219.

**CONCLUSION**

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
  *Civil Division*

*Of Counsel:*
SAMUEL BAGENSTOS
*General Counsel*
*Department of Health and Human*
 *Services*

ARUN G. RAO
  *Deputy Assistant Attorney General*
AMANDA LISKAMM
  *Director*
LISA K. HSIAO
 *Senior Deputy Director*
HILARY K. PERKINS
  *Assistant Director*

MARK RAZA
  *Chief Counsel*
  *Food and Drug Administration*

WENDY S. VICENTE
  *Deputy Chief Counsel for Lit.*
  *Food and Drug Administration*

STEPHANIE NGUYEN
  *Associate Chief Counsel*
  *Office of the Chief Counsel*
    *Food and Drug Administration*

*/s/ Scott P. Kennedy*
SAMUEL BALLINGRUD
SCOTT P. KENNEDY
  *Trial Attorneys*
  *Consumer Protection Branch*
  *U.S. Department of Justice*
  *450 5th Street, NW*
  *Washington, DC 20001*

June 7, 2024

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Book Antiqua, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 9,231 words, excluding the parts of the brief exempted under Rule 32(f), according to the count of Microsoft Word.

/s/ *Scott P. Kennedy*
Scott P. Kennedy

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2024, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

Participants in the case are registered CM/ECF users, and service will be

accomplished by the appellate CM/ECF system.

_/s/ Scott P. Kennedy_
Scott P. Kennedy